FORMAN HOLT ELIADES & YOUNGMAN LLC
80 Route 4 East, Suite 290
Paramus, New Jersey 07652
(201) 845-1000
(Daniel M. Eliades - N.J.D.C. #DME-6203)

Attorneys for Plaintiff, Coldwell Banker Real Estate LLC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COLDWELL BANKER REAL ESTATE LLC, )<br><br>Plaintiff, )<br><br>vs. )<br><br>THE BELLMARC GROUP LLC; AC )<br>LAWRENCE REAL ESTATE LLC; )<br>BELLMARC BROKERAGE MIDTOWN INC.; )<br>BELLMARC DOWNTOWN LLC; )<br>BELLMARC EAST LLC; BELLMARC WEST )<br>LLC; BELLMARC SIMONE SONG INC.; )<br>BELLMARC GRAMERCY/CHELSEA INC.; )<br>NEIL BINDER, AN INDIVIDUAL; )<br>NICE IDEA LLC; AND ALL ENTERPRISES, )<br>LLC, )<br><br>Defendants. ) | Civil Action No. 2:14-cv-07926-FSH-MAH<br><br>**CERTIFICATION OF**<br>**BUDGE HUSKEY** |

Budge Huskey, of full age, hereby certifies pursuant to Title 28 of the United States Code, Section 1746:

    1.    I am the President and Chief Executive Officer for Coldwell Banker Real Estate LLC ("Coldwell Banker").

    2.    I make this certification based on my personal knowledge, a review of the records of Coldwell Banker, and information available through employees and representatives of Coldwell Banker. I am authorized to submit this certification in support of Coldwell Banker's Order to Show Cause to compel the defendant franchisees to cease and desist their unlawful use of Coldwell

Banker's trademarks and to comply with non-monetary post termination obligations imposed under the parties' franchise agreements and at law.

  3.  Coldwell Banker terminated franchise agreements with the defendant franchisees due to their failure to pay Coldwell Banker per the parties' agreements. The defendant franchisees owe Coldwell Banker more than $2.1 million under the terms of the franchise agreements and the borrower defendants owe Coldwell Banker an additional sum of more than $1.4 million on account of loans extended by Coldwell Banker to the borrowers. Following the termination of the subject franchise agreements, Coldwell Banker demanded that the defendant franchisees cease and desist use of the trade names, trademarks and service marks of Coldwell Banker and refrain from participating in the Coldwell Banker franchise system. Coldwell Banker also demanded that the franchisees satisfy their post termination non-monetary obligations under the franchise agreements and pursuant to applicable law. The defendant franchisees have ignored Coldwell Banker's demands, as well as their legal obligations, and they continue to utilize the Coldwell Banker trademarks, trade names and service marks unlawfully to mislead the public into believing that the franchisees are affiliated with the Coldwell Banker® brand. By this Order to Show Cause, Coldwell Banker seeks to compel the applicable defendants to end their unlawful infringement and satisfy their post termination non-monetary obligations by, among other things, de-identifying their real estate brokerage businesses from their appearance as approved Coldwell Banker affiliated establishments.

**A.**  <u>**The Coldwell Banker Marks and System.**</u>

  4.  Coldwell Banker has the exclusive right to use and sublicense certain trade names, trademarks and service marks, including the name "Coldwell Banker"®, which have been registered on the Principal Register of the United States Patent and Trademark Office, with other

appropriate state agencies in the United States, and with governmental agencies of foreign countries (which marks, together with certain other trademarks and service marks which are not registered or which are pending registration, are hereinafter collectively referred to as the "Coldwell Banker Marks"). Registration information as to certain of the Coldwell Banker Marks is attached at **Exhibit "1"** hereto.

5.     Coldwell Banker has developed a franchise system for the promotion and assistance of independently owned and/or operated real estate brokerage offices, which includes policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate market (which system is hereinafter referred to as the "Coldwell Banker System"). The Coldwell Banker System includes, but is not limited to, common use and promotion of certain Coldwell Banker Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs.

6.     Coldwell Banker or its predecessors have continuously used each of the Coldwell Banker Marks since the date of their registration and those service marks are in full force and effect pursuant to 15 U.S.C. § 1065. Coldwell Banker has given notice to the public of the registration of the Coldwell Banker Marks as provided in 15 U.S.C. § 1111, and Coldwell Banker uses or has used the Coldwell Banker Marks as abbreviations of its brand name. The Coldwell Banker Marks are incontestable pursuant to 15 U.S.C. §1065.

7.     Coldwell Banker is one of the largest real estate brokerage franchise systems in the world. Through its franchise system, Coldwell Banker markets, promotes and provides services to its real estate broker franchisees throughout the United States. To identify the origin of their real estate broker services, Coldwell Banker allows it franchisees to utilize the Coldwell Banker Marks and to otherwise associate their brokerage services with the Coldwell Banker® brand.

3

8.     Coldwell Banker has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in the Coldwell Banker Marks as distinctly designating the high quality real estate brokerage services provided by Coldwell Banker franchisees.  The Coldwell Banker Marks are famous throughout the United States and elsewhere.

**B.     The Franchise Agreements.**

9.     Coldwell Banker and The Bellmarc Group LLC; AC Lawrence Real Estate LLC; Bellmarc Brokerage Midtown Inc.; Bellmarc Downtown LLC; Bellmarc East LLC; Bellmarc West LLC; Bellmarc Simone Song Inc.; and Bellmarc Gramercy/Chelsea Inc. (collectively, the "Franchisees")  are parties to that certain Real Estate Franchise Agreement dated March 27, 2013, as amended by those amendments/addendums dated March 27, 2013, May 13, 2013, May 22, 2013, October 24, 2013, November 8, 2013 and December 10, 2013 (collectively, the "Franchise Agreements").   Copies of the Franchise Agreements are attached at **Exhibits "2"** through **"8"** hereto[1].

10.     Pursuant to an Amendment to Franchise Agreement dated May 13, 2013, AC Lawrence, Bellmarc Midtown, Bellmarc Downtown, Bellmarc East and Bellmarc West became additional franchisees under the Real Estate Franchise Agreement.   See Exhibit 4. By signing the Amendment to Franchise Agreement dated May 13, 2013, AC Lawrence, Bellmarc Midtown, Bellmarc Downtown, Bellmarc East, Bellmarc West and Bellmarc Group each specifically agreed to be directly liable for all obligations under the Franchise Agreements.  Id.

11.     Pursuant to a First Addendum to Amendment to Franchise Agreement dated October

---

[1] Portions of the Franchise Agreements attached at Exhibits 3, 6 and 8 have been redacted to exclude confidential commercial information.  Coldwell Banker intends to file a motion to submit unredacted versions of these agreements under seal.

4

24, 2013, Bellmarc Simone Song and Bellmarc Gramercy/Chelsea were also added as franchisees under the Real Estate Franchise Agreement. See Exhibit 6. In the First Addendum to Amendment to Franchise Agreement dated October 24, 2013, Bellmarc Simone Song and Bellmarc Gramercy/Chelsea each agreed to be directly liable for all obligations under the Franchise Agreements.

12.     Pursuant to the Franchise Agreements, Franchisees obtained the non-exclusive right to utilize the Coldwell Banker System and Coldwell Banker Marks in the operation of approved real estate brokerage offices. These locations are collectively referred to herein as the "Offices".

13.     The Real Estate Franchise Agreement dated March 27, 2013 had a term of ten years from the "Opening Date" of May 15, 2013. Exhibit 2 at §§1.5 and 1.7. The Third Addendum to Amendment to Franchise Agreement dated December 10, 2013 extended the term of the Franchise Agreements to June 12, 2033. Exhibit 8 at §1.

14.     The Franchise Agreements require the "Owners" to actively manage and supervise the business operations of the Franchisees. Exhibit 2 at §10.1. See also Exhibits "3" through "8". The "Owners" are those individuals or entities which own the Franchisees, either directly or indirectly. See Exhibit 2 at §1.3 and p. 29.

15.     The Owners of the Franchisees include: (a) Nice Idea, which owns a sixty-five percent (65%) interest in the Franchisees, and (b) All Enterprises, which owns a thirty-five percent (35%) interest in the Franchisees. Id.

16.     Neil Binder is the sole member/owner of Nice Idea. Id.

17.     Until recently, Anthony DeGrotta (30%), Larry Friedman (30%), Lenny Flausso (25%) and Frank Sanchez (5%) (collectively, the "All Enterprises Members") were the

members/owners of All Enterprises. Id. Any remaining members/owners of All Enterprises were not disclosed in the Franchise Agreements. See id.

18. Nice Idea, All Enterprises, Neil Binder, Anthony DeGrotta, Larry Friedman, Lenny Flausso and Frank Sanchez are all "Owners" of the Franchisees as defined in the Franchise Agreements.

19. The license granted by Coldwell Banker is personal to the Franchisees and, with limited exceptions, the Franchise Agreements are non-assignable to third parties absent Coldwell Banker's consent:

> You acknowledge that your rights and obligations under this Agreement are personal to you, and that we have granted this franchise in reliance upon many factors, including your (your Owners') character, skill, knowledge, business and financial capacity. According, you may not assign your rights or delegate your duties under this Agreement including the terms of any Addendum to this Agreement, except as permitted by the Agreement or as required by law.

Exhibit 2 at §15.2.

20. Any "Transfer of the Franchise" (as defined in the Franchise Agreements), without the prior written approval of Coldwell Banker, constitutes a material breach of the Franchise Agreements. Id. at §15.5. A "Transfer of the Franchise" occurs when, among other things, the "Owners" no longer control or manage the business of the franchisee. Id. at §§ 15.1 and 15.4.

21 Failure to obtain written approval of Coldwell Banker for a "Transfer of the Franchise" within 180 days after the event is an event of default under the Franchise Agreements. Id. at §16.2.3.3.

22. The Franchise Agreements obligate Franchisees to pay to Coldwell Banker a "Royalty Fee" and other amounts as and when set forth in Section 7 of the Franchise Agreements. See Exhibits 2-8. Nonpayment of the "Royalty Fee" and/or other amounts set forth

in Section 7 is an event of default by Franchisees under the Franchise Agreements. Id. at §§16.2.3.1 and 16.2.3.2.

23.    The Franchise Agreements also require the Franchisees to report transactions to Coldwell Banker. Id. at §7. Failure by Franchisees to report transactions as required is an event of default under the Franchise Agreements. Id. at §16.2.3.1.

24.    In addition to the Royalty Fee, the Franchise Agreements obligate the Franchisees to pay to Coldwell Banker a "Brand Marketing Fund" contribution. See Exhibits 2-8 at §8 and elsewhere. Nonpayment of the Brand Marketing Fund contribution is an event of default under the Franchise Agreements. Exhibit 2 at §§16.2.3.1 and 16.2.3.2.

25.    The Franchise Agreements obligate Franchisees to pay Coldwell Banker interest and other amounts as and when set forth in Section 11 of the Franchise Agreements. See Exhibits 2-8.

26.    Pursuant to Section 13 of the Franchise Agreements the Franchisees were required to maintain records and accurate financial statements as to the Franchisees and provide same periodically to Coldwell Banker. In addition, Section 13 of the Franchise Agreements contains agreement by the Franchisees to allow Coldwell Banker to review and audit the operations, financial records and other documents pertaining to the Franchisees.

**C.    The Guaranty.**

27.    Nice Idea, All Enterprises, and Neil Binder, individually, (each a "Guarantor" and collectively, the "Guarantors") each executed and conveyed to Coldwell Banker a Guaranty of Payment and Performance (the "Guaranty") of the obligations of Bellmarc Group under the Franchise Agreements. Exhibit 2 at p. 31-32.

**D.    The Loans From Coldwell Banker.**

28.    Coldwell Banker is the holder of a Conversion Promissory Note dated May 15, 2013

7

in the original principal amount of $1,250,000 from Bellmarc Group, Nice Idea, All Enterprises and Neil Binder, individually. A copy of the Conversion Promissory Note dated May 15, 2013 is attached at **Exhibit "9"** hereto.[2]

29.    Bellmarc Group, Nice Idea, All Enterprises and Neil Binder, individually, also executed and conveyed to Coldwell Banker a Conversion Promissory Note dated December 13, 2013 in the original principal amount of $187,500. A copy of the Conversion Promissory Note dated December 13, 2013 is attached at **Exhibit "10"** hereto.

30.    Bellmarc Group, Nice Idea, All Enterprises, and Neil Binder, individually, are collectively referred to herein as the "Borrowers". The Conversion Promissory Note dated May 15, 2013 and the Conversion Promissory Note dated December 13, 2013 are collectively referred to herein as the "Promissory Notes".

31.    The obligations of the Borrowers under the Promissory Notes are joint and several.

32.    The Promissory Notes reflect the repayment obligations of the Borrowers to Coldwell Banker and provide that in the event the Borrowers fail to make any payment to Coldwell Banker when due, including any payment upon acceleration of the Promissory Notes, then the entire principal balance due thereunder shall bear simple interest at a rate equal to the lesser of 18% percent per annum or the highest rate allowed by law from its due date until paid in full. Among other things, the Promissory Notes provide that the Borrowers are default and Coldwell Banker may accelerate the unpaid principal and all interest accrued thereon shall become immediately due and payable upon Franchisees' default under the Franchise Agreements or upon termination of the Franchise Agreements.

33.    In the Promissory Notes, the Borrowers agreed to pay all expenditures made by

---

[2] Due to clerical error, the Conversion Promissory Note reflects ERA Franchise Systems LLC as the holder of the note. The Conversion Promissory Note has since been assigned by ERA Franchise Systems LLC to Coldwell Banker and Coldwell Banker is the holder of the note.

Coldwell Banker in any attempt to collect amounts due under the Promissory Notes, including reasonable attorneys' fees and costs.

**E.    The Security Agreements.**

34.    The obligations due Coldwell Banker pursuant to the Promissory Notes and the Franchise Agreements are secured by the property set forth in the Security Agreements dated May 15, 2013 conveyed to Coldwell Banker by Bellmarc Group and All Enterprises.  Copies of these Security Agreements are attached at **Exhibits "11"** and **"12"** hereto.

35.    In addition, the obligations due Coldwell Banker pursuant to the Franchise Agreements (and any other agreements between these parties and Coldwell Banker) are further secured by the property set forth in the Security Agreements dated May 15, 2013 which were conveyed to Coldwell Banker by: (i) Bellmarc Downtown; (ii) Bellmarc Gramercy/Chelsea; (iii) Bellmarc Midtown.; (iv) Bellmarc East; (v) Bellmarc West; (vi) AC Lawrence; and (vii) Nice Idea Publishing, Inc.[3]  Copies of these Security Agreements are attached at **Exhibits "13"** through **"19"** hereto.

36.    The aforementioned Security Agreements attached at Exhibits "11" through "19" hereto are collectively referred to herein as the "Security Agreements".  In addition, the debtor parties which conveyed the Security Agreements to Coldwell Banker are individually referred to herein as a "Debtor" and are collectively referred to herein as the "Debtors".

37.    The security interests granted to Coldwell Banker via the Security Agreements were perfected by, among other things, UCC-1 Financing Statements filed with the office of the Secretary of State for the State of New York.

---

[3] Nice Idea Publishing, Inc. has not been named as a Defendant in this Complaint as, upon information and belief, Nice Idea Publishing, Inc. is either defunct or was never a validly created entity.  Coldwell Banker reserves the right to seek to amend the Complaint to add Nice Idea Publishing, Inc. as a party or to file a separate action against Nice Idea Publishing, Inc.

38.     Pursuant to the Security Agreements, Coldwell Banker possesses a duly perfected

and validity existing lien and security interest in the following property owned by the Debtors:

> all accounts; accounts receivables; contract rights; leases; furniture; furnishings;
> equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for
> sale or being processed for sale in Debtor's business, including all supplies, finished
> goods and all other items customarily classified as inventory; building improvement
> and construction materials; chattel paper; instruments; documents; letters of credit; all
> funds on deposit with any financial institution; commissions; real estate listings and
> listing Agreement and related rights which are located at or related to the residential
> real estate brokerage business conducted by Debtor and including the proceeds and
> products therefrom and any and all substitutions, replacements, additions and
> accessories thereto and any rebate/aware program (or similar incentive programs) to
> which Debtor may be entitled pursuant to any franchise Agreement entered into with
> a Secured Party, together with all such rights and property hereafter acquired by
> Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts,
> replacements, substitutions, profits, products and cash and non-cash proceeds of the
> foregoing collateral…

See Exhibits 11 through 19.  The aforementioned property is collectively referred to herein as the

"Collateral".

**F.     Coldwell Banker's Termination Rights.**

39.     Pursuant to the terms of the Franchise Agreements, Coldwell Banker is entitled to

terminate the Franchise Agreements upon the event of a non-curable default by Franchisees and/or

for the Franchisees' failure to cure other defaults within the time period provided under the

Franchise Agreements.  See Exhibit 2 at §16.

40.     Upon termination of the Franchise Agreements, the Franchisees no longer have any

right to use or display the Coldwell Banker Marks and are obligated to immediately "de-identify"

the Offices from their appearance to the general public as a Coldwell Banker® affiliated

establishments.  Upon early termination of the Franchise Agreements, the Franchisees are further

required to, among other things, immediately cease and desist use of the Coldwell Banker Marks

and Coldwell Banker System.

41.     The Franchisees' post termination non-monetary obligations under the Franchise

Agreements include:

**16.4    *Effect of Expiration or Termination.*** On expiration or termination, you must immediately, at your expense, return to us all of our property, including originals and copies of the P&P Manual, all copies of our technology products (including copies that your sales associates hold or control), and all films, cassettes and instruction manuals, which are part of our programs. You must also immediately discontinue all use of signs displaying our unique style, logo, colors, color patterns and designs and/or Marks. If you desire to use the signs after expiration or termination, you must immediately change the colors and color patterns by completely repainting the signs, and you must permanently remove or cover any Marks on the signs and provide us with color photographs of such changed signs and signposts. Effective on the date of termination or expiration, you must refrain from any representation that you are our franchisee or are or have been affiliated with us, and take any affirmative action necessary to remove any use of the Marks in connection with your business. You must de-identify your business from the System in a manner that does not confuse the public about the fact that you are no longer part of the System. You must (i) immediately advise all of your then-current clients that you are no longer associated with us; and (ii) immediately cause the local phone company (white pages) and any business phone publisher (the <u>Yellow Pages</u>) to remove you from their listings as our franchisee in their next edition of any directory or listings, including any Internet directories. You must immediately cause any Web masters or websites to remove our Marks from their Web pages, including social media websites, and you must remove the Marks from the social media sites and accounts that you control and your website(s), including from any source code or other mechanism that directs a consumer searching for our Marks to your website. If your URL contains our Marks, you must either cancel such URL registrations for the Business or, at our option, assign your URL(s) to us. You must also cause all agents to cancel all URLs containing our Marks.

42.    **Pursuant to Section 16 of the Franchise Agreements, the Franchisees acknowledge, among other things, that Coldwell Banker has no adequate remedy in the event that the Franchisees engaged in unauthorized post termination use of the Coldwell Banker Marks and expressly agree that Coldwell Banker may obtain an injunction and/or temporary restraining order to terminate such use. <u>See</u> Exhibit 2 at §16.6.**

43.    Upon termination of the Franchise Agreements, Franchisees remain liable to Coldwell Banker for payment of all outstanding financial obligations imposed under the Franchise Agreements. <u>See</u> Exhibit 2 at §16.7.

44.    In addition, pursuant to Section 16.7 of the Franchise Agreements, Franchisees agreed that in the event of an early termination of the Franchise Agreements, Franchisees would pay liquidated damages to Coldwell Banker pursuant to a formula specified in the Franchise Agreements.

11

45.     Pursuant to Section 22.11 of the Franchise Agreements, Franchisees agreed that in addition to any award of damages or injunctive relief, Coldwell Banker would be entitled to collect its costs incurred in enforcing its rights under the Franchise Agreements, including reasonable attorneys' fees, court costs, expert fees, costs of investigation and other litigation expenses. Coldwell Banker's right to collect reasonable attorneys' fees and costs survives termination of Franchise Agreement.  See Exhibit 2 at §16.8.

46.     Upon the event of an uncured default or termination of the Franchise Agreements, Coldwell Banker may accelerate the unpaid principal, interest and other fees due under the Promissory Notes which shall then be immediately due and payable by Borrowers to Coldwell Banker.  See Exhibits 9 and 10 hereto.

47.     Breach of the Franchise Agreements by Franchisees and/or failure of the Borrowers to pay any amounts due under the Promissory Notes are events of default under the Security Agreements.  See Exhibits 11-19 hereto at §2.  In the event of such default under the Security Agreements, Coldwell Banker would be entitled to, among other things: (i) require the Debtors to assemble the Collateral and make it available to Coldwell Banker; (ii) enter any of the Offices and take possession of the Collateral; and/or (iii) enforce its security interests provided under applicable laws.  Id. at §3.

**G.     Defaults of the Franchise Agreements by Franchisees.**

48.     By letter dated July 29, 2014 (the "Notice of Non-Compliance"), Coldwell Banker notified Franchisees of their monetary and non-monetary defaults under the Franchise Agreements and demanded that Franchisees pay all past due fees and comply with certain non-monetary obligations under the Franchise Agreements by August 28, 2014.  A copy of this notice is attached at **Exhibit "20"** hereto.

49.     The Notice of Non-Compliance demanded payment of $241,880.90 then due under the Franchise Agreements as of July 29, 2014, copies of effective certificates of insurance for each of the Offices and trade name compliance on a certain website. See, id. The amounts due and demanded in the Notice of Non Compliance do not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

50.     Franchisees failed to cure any of the defaults detailed in the Notice of Non-Compliance by on or before August 28, 2014.

51.     By letter of August 29, 2014 (the "Notice of Continuing Default"), Coldwell Banker noticed Bellmarc Group that Franchisees has failed to cure any of their defaults detailed in the Notice of Non-Compliance and that the past due fees owed Coldwell Banker under the Franchise Agreements had increased to $276,545 as of August 26, 2014. A copy of this notice is attached at **Exhibit "21"** hereto. The amounts due and demanded in the Notice of Continuing Default do not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys' fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

52.     Without waiving its right to issue a notice of termination of the Franchise Agreements (and proceeding with its enforcement and collection rights), Coldwell Banker scheduled a meeting with representatives of the Franchisees to discuss potential cure of the Franchisees' outstanding uncured defaults under the Franchise Agreements. See id.

53.     A meeting between business and legal representatives of Coldwell Banker, the Franchisees and the Guarantors took place on September 4, 2014. I attended that meeting. The September 4, 2014 meeting did not result in any agreement or in the cure of the then existing defaults of Franchisees under the Franchise Agreements other than compliance with the trade name obligations on the website described in the Notice of Non-Compliance.

**H.      The New York State Supreme Court Litigation.**

54.     On August 25, 2014, Anthony DeGrotta and Laurence Friedman, both individually and purportedly on behalf of all of the Franchisees and All Enterprises, filed a complaint against Neil Binder, individually, and d/b/a "Nice Idea LLC" and "A Nice Idea Publishing LLC", Danuta Brodzinska, Steven Beispel, and Nice Idea Publishing Inc. in the New York Supreme Court, Civil Division (Index No. 652633/2014) (the "Supreme Court Litigation").

55.     In the Supreme Court Action, plaintiffs alleged that the defendants engaged in illicit and wrongful acts in violation of the Franchisees' operating agreements and to the legal and financial detriment of the plaintiffs. Plaintiffs alleged that such misconduct: (i) included obstructing payments to creditors of the Franchisees, including Coldwell Banker; (ii) exposed Franchisees to legal claims and liability; and (iii) threatened the Franchisees with the loss of the Coldwell Banker® license and termination of the Franchise Agreements.

56.     Among other things, the plaintiffs in the Supreme Court Action sought the appointment of a receiver for the Franchisees. Coldwell Banker moved to intervene in the Supreme Court Action only with respect to the request for the appointment of a receiver for the Franchisees.

57.     A stipulated order was entered in the Supreme Court Action by Judge Friedman on September 8, 2014 which provides that: *"For the period from September 8, 2014 through the*

entry of further order, The Bellmarc Group LLC; AC Lawrence Real Estate LLC; Bellmarc Brokerage Midtown Inc.; Bellmarc Downtown LLC; Bellmarc East LLC; Bellmarc West LLC; Bellmarc Simone Song Inc.; and Bellmarc Gramercy/Chelsea Inc. (collectively, "Franchisees") shall report all transactions and pay all fees to Coldwell Banker Real Estate LLC ("Franchisor") pursuant to the terms of the Franchise Agreement dated March 27, 2013, as amended." A copy of the stipulated order of September 8, 2014 is attached at **Exhibit "22"** hereto.

58. On September 11, 2014, Judge Scarpulla again ordered that the Franchisees to report and pay transactions to Coldwell Banker pursuant to the Franchise Agreements subsequent to September 8, 2014. A copy of the transcript of the hearing in the Supreme Court Action of September 11, 2014 is attached at **Exhibit "23"** hereto.

**I.    The Franchisees' Continued Defaults and Notice of Termination of the Franchise Agreements.**

59. By letter dated September 22, 2014 (the "Default/Termination Notice"), Coldwell Banker notified the Franchisees of their monetary defaults under the Franchise Agreements and demanded the Franchisees pay all of the then amounts due under the Franchise Agreements on or before October 23, 2014 (the "Cure Date"). A copy of the Default/Termination Notice is attached at **Exhibit "24"** hereto.

60. The Default/Termination Notice demanded payment of $372,807.10, which was due under the Franchise Agreements as of September 18, 2014, by no later than the Cure Date. The amounts due and demanded in the Default/Termination Notice do not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

15

61.     The Default/Termination Notice provided that if the Franchisees failed to pay the $372,807.10 due as of September 18, 2014 by on or before the Cure Date, same would result in the immediate termination of the Franchise Agreements effective October 24, 2014 (the "Prospective Termination Date") without the requirement of any additional notice from Coldwell Banker.

62.     Franchisees failed to cure the monetary default noticed in the Default/Termination Notice by on or before the Cure Date or as such date was extended by Coldwell Banker.

63.     By separate correspondence dated September 22, 2014 (the "Demands to Assemble and Preserve Collateral"), Coldwell Banker noticed each of the Debtors of their default under the respective Security Agreements.  Copies of the Demands to Assemble and Preserve Collateral sent to each Debtor are attached at **Exhibits "25-34"** hereto.

64.     Among other things, in the Demands to Assemble and Preserve Collateral, Coldwell Banker demanded that each of the Debtors assemble and make available the Collateral for Coldwell Banker's inspection and, upon further notice and at the election of Coldwell Banker, for possession by Coldwell Banker. The Demands to Assemble and Preserve Collateral further advised that Coldwell Banker objected to any further use of its Collateral, or the proceeds of its Collateral, other than for payment to Coldwell Banker for amounts due under the Franchise Agreements and/or Promissory Notes.

65.     The Debtors did not comply with any of the demands of Coldwell Banker set forth in the Demands to Assemble and Preserve Collateral.  The Franchisees also breached their obligation to properly maintain and care for the Collateral as required by the Security Agreement.

66.     By letter dated October 1, 2014 (the "Notice of Note Default"), Coldwell Banker notified Borrowers that they were in default under the Promissory Notes due to, among other things, the default of Bellmarc Group under the Franchise Agreements. Id. A copy of the Notice of Note Default is attached at **Exhibit "34"** hereto. The Notice of Note Default also advised that the Borrowers were not eligible for the principal forgiveness pursuant to the terms of the Promissory Notes, and that the Franchisees remained ineligible for the "Additional Funding", "Allocation", and other benefits pursuant to the terms of the Franchise Agreements.

67.     By letter dated October 10, 2014 (the "Notice of Court Order Default"), Coldwell Banker notified counsel for the Franchisees and Guarantors in the Supreme Court Action that the Franchisees were in default of the orders of September 8, 2014 and September 11, 2014 in that the Franchisees had not reported any transactions or made any payments to Coldwell Banker since September 29, 2014. A copy of the Notice of Court Order Default is attached at **Exhibit "35"** hereto.

68.     In the Notice of Court Order Default, Coldwell Banker demanded that the Franchisees immediately cure their default of the Court Orders of September 8 and September 11, 2014 by immediately reporting and paying Coldwell Banker on account of those transactions which occurred since September 29, 2014. Id.

69.     The Franchisees failed to cure the defaults noticed in the Notice of Court Order Default.

70.     On October 25, 2014, Coldwell Banker, the Franchisees and Guarantors entered into an extension/forbearance agreement (the "Forbearance Agreement") which, among other things, provided for terms of cure by the Franchisees of their default of Judge Friedman's order of September 8, 2014 and the order of Judge Scarpulla of September 11, 2014.

71.     In the Forbearance Agreement, the Franchisees agreed to pay Coldwell Banker $47,263.74 on account of amounts due by the Franchisees under the Franchise Agreements from September 8, 2014 to October 14, 2014.

72.     In the Forbearance Agreement, Coldwell Banker also agreed to extend the Cure Date and Prospective Termination Date, as set forth in the Default/Termination Notice, to October 31, 2014.

73.     The Franchisees defaulted under the Forbearance Agreement by failing to make the payments to Coldwell Banker as agreed upon under the Forbearance Agreement.

74.     By letter of October 31, 2014 (the "<u>Forbearance Agreement Default Letter</u>"), Coldwell Banker noticed the Franchisees of their default under the Forbearance Agreement and demanded payment of the outstanding amounts due under the Forbearance Agreement.  A copy of the Forbearance Agreement Default Letter, which contains a copy of the Forbearance Agreement, is attached at **Exhibit "36"** hereto.

75.     In the Forbearance Agreement Default Letter, Coldwell Banker also agreed to extend the Cure Date and Prospective Termination Date, as set forth in the Default/Termination Notice, to November 10, 2014.  <u>Id</u>.

76.     The Franchisees failed to cure the defaults noticed in the Forbearance Agreement Default Letter by paying the amounts due Coldwell Banker as noticed therein.

**J.      Resolution of Supreme Court Action.**

77.     On or around December 2, 2014, the Supreme Court Action was resolved by a settlement among the plaintiffs and defendants in that action.  Coldwell Banker was (and is) not a party to the settlement of the Supreme Court Action.

78.     As a result of the settlement, the Supreme Court Action was discontinued effective December 15, 2014.  At the time of discontinuance of the Supreme Court Action, Coldwell Banker's motion to intervene in that action to join in the plaintiffs' request to appoint a receiver for the Franchisees had not been heard by the court.

**K.     The All Enterprises Membership Transfer.**

79.     According to a media report, the settlement of the Supreme Court Action involved the transfer of the membership interests in All Enterprises by the All Enterprises Members to "a third party" (the "All Enterprises Membership Transfer").  See The Real Deal Blog of December 1, 2014 attached at **Exhibit "37"** hereto.  The All Enterprises Membership Transfer is a "Transfer of the Franchise" as defined in the Franchise Agreements.  Coldwell Banker has not been asked to approve the All Enterprises Membership Transfer and Coldwell Banker has not approved the All Enterprises Membership Transfer.

**L.     Termination of Franchise Agreements.**

80.     Franchisees failed to cure the monetary default under the Franchise Agreements noticed in the Default/Termination Notice by on or before the extended Cure Date of November 10, 2014.

81.     Franchisees also failed to cure the monetary default under the Franchise Agreements, Judge Friedman's order of September 8, 2014, Judge Scarpulla's order of September 11, 2014 and the Forbearance Agreement as noticed in the Forbearance Agreement Default Letter.

82.     By letter dated December 18, 2014 (the "Termination Notice"), Coldwell Banker notified the Franchisees of termination of the Franchise Agreements effective December 18, 2014 (the "Termination Date") due to the Franchisees' failure to cure the defaults noticed in the

Default/Termination Notice of September 22, 2014. A copy of the Termination Notice is attached at **Exhibit "38"** hereto.

83. **In the Termination Notice, Coldwell Banker notified Franchisees that, as of the Termination Date, the Franchisees are no longer authorized to use the Coldwell Banker Marks or participate in the Coldwell Banker System and Coldwell Banker demanded that the Franchisees immediately cease and desist use of the Coldwell Banker Marks and Coldwell Banker System. Coldwell Banker also demanded that the Franchisees satisfy all of their post termination obligations provided for in the Franchise Agreements and pursuant to applicable law, including those set forth in Section 16.4 of the Franchise Agreements.**

84. In the Termination Notice, Coldwell Banker demanded that Franchisees and Guarantors immediately pay Coldwell Banker $2,146,001.67 known to be due under the Franchise Agreements, comprised of:

(i) $422,151.39 for "Royalty Fees", "Brand Marketing Fund" fees and other fees and charges due under the Franchise Agreements as of December 15, 2014;

(ii) $1,640,769.33 in liquidated damages as set forth in Section 16.7.2 of the Franchise Agreements; and

(iii) $83,080.95 in attorneys' fees, costs of investigation, court costs and/or other litigation expenses incurred by Coldwell Banker as of November 30, 2014, as set forth in Section 16.8 of the Franchise Agreements.

85. In the Termination Notice, Coldwell Banker also accelerated the unpaid principal and all interest accrued under each of the Promissory Notes and demanded immediate payment thereof. As of December 15, 2014, the outstanding principal amount due under the Conversion

Promissory Note dated May 15, 2013 is $1,250,000 and the outstanding amount due under the Conversion Promissory Note dated December 13, 2013 is $187,500.

86.     In the Termination Notice, Coldwell Banker again made demand upon the Debtors to assemble the Collateral and make it available for Coldwell Banker's inspection and, upon further notice and at the election of Coldwell Banker, for possession by Coldwell Banker.

87.     Coldwell Banker also notified the Debtors of Coldwell Banker's objection to further use of its Collateral, or any proceeds of the Collateral, by the Debtors other than for payment to Coldwell Banker of amounts due under the Franchise Agreements and/or Promissory Notes and directed the Debtors to refrain from such use, disposition, conveyance or transfer of its Collateral or the proceeds of its Collateral.

88.     The Defendants have failed to pay Coldwell Banker the amounts due under the Franchise Agreements or Promissory Notes. The Debtors have failed to comply with Coldwell Banker's demands with respect to Coldwell Banker's Collateral and rights under the Security Agreements. The Franchisees have failed to satisfy their post termination non-monetary obligations under the Franchise Agreements and applicable law.

**M.     The Franchisees' Post-Termination Use of the Coldwell Banker Marks.**

89.     Since the termination of the Franchise Agreements, the Franchisees have continued to use the Coldwell Banker Marks to induce the public to buy, sell and/or lease real property under the misimpression that Franchisees are approved Coldwell Banker franchisees despite the knowledge by the Franchisees of their lack of any authority or right to do so.

90.     Coldwell Banker has repeatedly demanded that Franchisees cease using the Coldwell Banker Marks, and to discontinue identifying the Offices and their business to the public as "Coldwell Banker"® affiliated establishments. In addition to the Termination Notice, via e-mail

of December 29, 2014, Coldwell Banker advised counsel for the Franchisees and Mr. Binder that: "The franchise agreements were terminated effective on December 18, 2014. As of the termination date, the franchisees are no longer authorized to use the Coldwell Banker trademarks or franchise system or to hold themselves out to the public as authorized franchisees of Coldwell Banker. Coldwell Banker again demands that the franchisees immediately cease and desist use of the "Marks" and "System" and satisfy all of their post termination obligations provided for in the franchise agreements and pursuant to applicable law. Post termination non-monetary obligations of the franchisees include, but are not limited to, those set forth in Section 16.4 of the Franchise Agreements. See **Exhibit "39"** hereto.

91. On December 29, 2014, Coldwell Banker again demanded that the Franchisees cease and desist their unlawful use of intellectual property of Coldwell Banker; that the Franchisees immediately cease identifying themselves as "Coldwell Banker"® franchisees; and that the Franchisees satisfy their required post termination obligations under the Franchise Agreements and applicable law. See correspondence dated December 29, 2014 attached at **Exhibit "40"** hereto.

92. Since termination of the Franchise Agreements, the Franchisees have failed to satisfy their post termination non-monetary obligations imposed under the Franchise Agreements or under applicable law.

93. After termination of the Franchise Agreements, Coldwell Banker obtained post termination inspection reports as to certain of the Offices. Copies of the post termination inspection reports are attached at **Exhibit "41"** hereto. The post termination inspection reports reflect that the Franchisees continue to use the Coldwell Banker Marks at many of the Offices as well as via their telephone service and internet – including the website of the Franchisees. See id.

22

**N.**   **The Harm to Coldwell Banker Caused by the Franchisees' Continued Infringement.**

94.   The Coldwell Banker brand is the oldest and most established residential real estate franchise system in North America. In fact, in many ways it was the original real estate "start up." Founded by young entrepreneurs Colbert Coldwell in 1906 and later Benjamin Banker, Coldwell Banker changed the way people bought and sold homes across America, ultimately becoming one of the most trusted real estate brands in the world. More than 100 years later, the Coldwell Banker network exists across 3,000 offices in 49 countries and territories.

95.   The network and real estate system created by Coldwell Banker have been emulated by other real estate companies over time.   The monetary value of the good will associated with the Coldwell Banker names and marks is impossible to quantify, but the value is surely significant.

96.   By breaching their Franchise Agreements with Coldwell Banker, but then nonetheless by continuing to use the Coldwell Banker name and marks in New York City, the Franchisees are violating Coldwell Banker's right to control its name and marks in one of the most valuable and unique real estate markets in the world.

97.   More particularly, the defendants' continued use of the Coldwell Banker name and marks, despite the termination of the Franchise Agreement, results in the untenable and undeniably damaging circumstance that the only use of the Coldwell Banker Marks in New York City is an unauthorized use.

98.   Coldwell Banker respectfully submits that the use of its name and trade marks in the whole of New York City by an unauthorized user is, by itself, concrete and conclusive proof of genuine injury to its name and reputation, goodwill, and control of its marks that can never be adequately addressed by money damages.

23

99.  In my judgment, this is not a case of mere presumption or speculation. The defendants' usurpation of the Coldwell Banker name and trade marks in the extraordinarily unique and valuable New York City real estate marketplace is materially more injurious than other cases in which a former franchisee refuses to cease the use of the franchisor's marks.

100.  The location of the defendants' unauthorized use of the Coldwell Banker Marks, as well as the circumstances that they are the only user of the marks in that unique, large, and valuable market, result in fact-specific reasons why the irreparable injury to Coldwell Banker is no mere presumption in this case. But the irreparable injury results not only from the defendants' unauthorized use of the marks in New York City. Through their unauthorized use of the Coldwell Banker name and marks, the defendants are acting to practically exclude Coldwell Banker from competing in the New York marketplace. Given present circumstances, Coldwell Banker is significantly hampered in its efforts to license the authorized use of its name and marks in New York City. So long as the defendants are unlawfully using the Coldwell Banker name, other real estate brokerage firms will be disinclined to associate with Coldwell Banker in that market.

101.  Even if Coldwell Banker could find a New York City firm interested in joining the Coldwell Banker System under the existing circumstances of the defendants infringement, that firm is likely to resist Coldwell Banker's usual and ordinary commercial terms. The opportunity for an authorized user of the Coldwell Banker name and marks to compete against an unauthorized user in the New York City markets is a damaged commercial opportunity.

102.  In a very real sense, it is simply not possible for Coldwell Banker to reap the full commercial value of its name and marks in New York City so long as it must compete against an unauthorized user of its name and marks. While that damage is no doubt impossible to quantify,

that injury is palpable.

103.    Moreover, the circumstances related to the reasons why the defendants defaulted on their obligations under the Franchise Agreements threaten irreparable injury to Coldwell Banker. The precipitating events concern a lawsuit among the members of the Bellmarc Group involving allegations of fraud by the principal member of the firm, which was widely reported in the New York City industry press and blogs. Coldwell Banker's unfortunate association in industry trade papers and blogs, created by both headlines and reports, with fraud and duplicity is damaging to the reputation of the brand.

104.    This is not a case in which the unauthorized user is flying under the public radar. The defendants are not "neutral" users of the Coldwell Banker names and marks. The allegations involving the defendants have been well publicized and the New York Supreme Court Action has resulted in unfavorable publicity and controversy surrounding the defendants. The defendants, through their continued use of the Coldwell Banker Marks, are damaging the reputation of the marks.

I hereby certify that the foregoing statements made by me are true and this Certification is executed under penalty of perjury.  I am aware that if any of the foregoing statements made by me are false, that I am subject to punishment.

By: _____

Budge Huskey
President and Chief Executive Officer
Coldwell Banker Real Estate LLC

Dated: January 5, 2015

**EXHIBIT "1"**

# REGISTERED COLDWELL BANKER
# TRADEMARKS
# (IN THE UNITED STATES)

**Registrations:**

| Trademark | Application No. | Application Date | Registration No. | Registration Date |
|---|---|---|---|---|
| CB & Design | 73210971 | 10-Apr-1979 | 1153366 | 05-May-1981 |
| CB COLDWELL BANKER COMMERCIAL & Design | 78655402 | 21-Jun-2005 | 3179803 | 05-Dec-2006 |
| CBC | 78235734 | 09-Apr-2003 | 3030080 | 13-Dec-2005 |
| COLDWELL BANKER | 73211116 | 09-Apr-1979 | 1154155 | 12-May-1981 |
| COLDWELL BANKER | 75152362 | 19-Aug-1996 | 2057608 | 29-Apr-1997 |
| COLDWELL BANKER | 78008563 | 17-May-2000 | 2453334 | 22-May-2001 |
| COLDWELL BANKER | 78655395 | 21-Jun-2005 | 3100659 | 06-Jun-2006 |
| COLDWELL BANKER CB & Design | 73346790 | 22-Jan-1982 | 1215241 | 02-Nov-1982 |
| COLDWELL BANKER CB & Design | 75152363 | 19-Aug-1996 | 2059501 | 06-May-1997 |
| COLDWELL BANKER CB & Design | 78655400 | 21-Jun-2005 | 3179802 | 05-Dec-2006 |
| COLDWELL BANKER CB & Design HOME LOANS | 77870433 | 11-Nov-2009 | 3810666 | 29-Jun-2010 |
| COLDWELL BANKER CB & Design in 3D in color | 85528560 | 30-Jan-2012 | 4175758 | 17-Jul-2012 |
| COLDWELL BANKER CB & Design in 3D in color | 85528627 | 30-Jan-2012 | 4175759 | 17-Jul-2012 |
| COLDWELL BANKER CB & Design in 3D in color | 85529273 | 31-Jan-2012 | 4400923 | 10-Sep-2013 |
| COLDWELL BANKER CB & Design MORTGAGE | 77870426 | 11-Nov-2009 | 3810664 | 29-Jun-2010 |
| COLDWELL BANKER COMMERCIAL | 73787763 | 20-Mar-1989 | 1598908 | 29-May-1990 |
| COLDWELL BANKER COMMERCIAL | 75120713 | 18-Jun-1996 | 2059364 | 06-May-1997 |
| COLDWELL BANKER COMMERCIAL | 78655398 | 21-Jun-2005 | 3254878 | 26-Jun-2007 |
| COLDWELL BANKER COMMERCIAL CB & Design | 78080719 | 23-Aug-2001 | 2745034 | 29-Jul-2003 |
| COLDWELL BANKER COMMERCIAL CB & Design in 3D in color | 85529640 | 31-Jan-2012 | 4175765 | 17-Jul-2012 |
| COLDWELL BANKER COMMERCIAL CB & Design in 3D in color | 85529643 | 31-Jan-2012 | 4175766 | 17-Jul-2012 |
| COLDWELL BANKER COMMERCIAL CB & Design in 3D in color | 85530549 | 01-Feb-2012 | 4530043 | 13-May-2014 |
| COLDWELL BANKER CONCIERGE | 75588856 | 16-Nov-1998 | 2472004 | 24-Jul-2001 |
| COLDWELL BANKER CONCIERGE | 75630167 | 29-Jan-1999 | 2576448 | 04-Jun-2002 |
| COLDWELL BANKER ON LOCATION | 77721965 | 24-Apr-2009 | 3786028 | 04-May-2010 |
| COLDWELL BANKER PREVIEWS INTERNATIONAL | 78032990 | 30-Oct-2000 | 2529955 | 15-Jan-2002 |
| COLDWELL BANKER PREVIEWS INTERNATIONAL | 78655389 | 21-Jun-2005 | 3093311 | 16-May-2006 |

| Trademark | Application No. | Application Date | Registration No. | Registration Date |
|---|---|---|---|---|
| COLDWELL BANKER PREVIEWS INTERNATIONAL & Sunburst Design in 3D | 85719820 | 04-Sep-2012 | 4327893 | 30-Apr-2013 |
| COLDWELL BANKER PREVIEWS INTERNATIONAL & Sunburst Design in 3D | 85719826 | 04-Sep-2012 | 4313113 | 02-Apr-2013 |
| COLDWELL BANKER PREVIEWS INTERNATIONAL & Sunburst Design in color | 78638810 | 27-May-2005 | 3170029 | 07-Nov-2006 |
| COLDWELL BANKER UNIVERSITY | 74425646 | 05-Aug-1993 | 1842126 | 28-Jun-1994 |
| COLDWELL BANKER UNIVERSITY & Cap in Circle Design | 85179678 | 18-Nov-2010 | 4005411 | 02-Aug-2011 |
| COMMERCIALUNIVERSITY & Design | 85304756 | 26-Apr-2011 | 4063162 | 29-Nov-2011 |

249972

**EXHIBIT "2"**



**COLDWELL BANKER REAL ESTATE LLC**
**REAL ESTATE FRANCHISE AGREEMENT**



## REAL ESTATE FRANCHISE AGREEMENT
## TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| 1. | PARTIES AND TERM | 1 |
| 2. | FRANCHISEE INFORMATION | 2 |
| 3. | INTERPRETATION | 3 |
| 4. | GRANT OF LICENSE | 3 |
| 5. | OFFICE LOCATIONS | 6 |
| 6. | SERVICES AND OBLIGATIONS TO FRANCHISEE | 7 |
| 7. | FRANCHISE ROYALTIES | 8 |
| 8. | BRAND MARKETING FUND | 10 |
| 9. | TECHNOLOGY | 11 |
| 10. | MANAGEMENT AND GOODWILL | 12 |
| 11. | OTHER COSTS AND OBLIGATIONS OF FRANCHISEE | 13 |
| 12. | FEE INCREASES | 14 |
| 13. | RECORDKEEPING; AUDIT | 14 |
| 14. | MODIFICATION OF THE SYSTEM; IMPROVEMENTS | 16 |
| 15. | OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE | 16 |
| 16. | EXPIRATION AND TERMINATION | 18 |
| 17. | INDEMNIFICATION AND INSURANCE | 22 |
| 18. | AMENDMENT | 23 |
| 19. | WAIVER | 23 |
| 20. | NON-COMPETITION COVENANTS | 23 |
| 21. | INDEPENDENT CONTRACTOR | 24 |
| 22. | MISCELLANEOUS | 24 |
| 23. | ADDITIONAL REPRESENTATIONS | 27 |
| 24. | STATE LAW ADDENDA | 28 |
| EXHIBIT A. | OWNERSHIP INTERESTS | 29 |
| EXHIBIT B. | GUARANTY OF PAYMENT AND PERFORMANCE | 31 |
| EXHIBIT C. | GLOSSARY OF TERMS | 33 |
| EXHIBIT D. | LIST OF AUTHORIZED OFFICES | 36 |
| EXHIBIT E. | PERFORMANCE PREMIUM AWARD TABLE FOR 2012 | 37 |
| EXHIBIT F. | STATE LAW ADDENDA | 38 |



Office I.D. No. 500447

## COLDWELL BANKER REAL ESTATE LLC
## REAL ESTATE FRANCHISE AGREEMENT

**1.0    PARTIES AND TERM:**

**1.1    Franchisor.** The words "Franchisor," "we," or "us" mean:

Coldwell Banker Real Estate LLC, a California limited liability company, its successors and assigns.

By: _____    Date: _____ MAR. 27 , 20 13
Name:                                    (the "Effective Date")
Title: A Deborah Iuliano
          VP, Contract Administration

**1.2    Franchisee.** The words "Franchisee," or "you" mean:

**The Bellmarc Group LLC**

(State of Organization: New York)

By: _____    Date: March 26, 2013
Print Name: _____
Print Title: Authorized

**EACH PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS THAT HE OR SHE IS AUTHORIZED TO BIND THE RESPECTIVE PARTY TO THIS AGREEMENT. THIS AGREEMENT IS NOT BINDING OR ENFORCEABLE UNTIL WE SIGN IT.**

**1.3    Owners.** The word "Owner(s)" means a sole proprietor or each Person who has a direct or indirect equity ownership interest in Franchisee (if Franchisee is an entity).

**1.3.1** You represent and warrant that Exhibit A accurately reflects all ownership interests in Franchisee, including all Owners and their ownership shares.

**1.3.2** If any Owner is an entity, information about the Persons owning the entity and their ownership interests appears in Exhibit A.

**1.4    Guaranty.** You will cause the Owners (and if applicable, their members, shareholders and partners) to sign the Guaranty of Payment and Performance of your obligations attached as Exhibit B.

**1.5    Term of Agreement.** The "Term" starts on the Opening Date and expires 10 years after the Opening Date (the "Expiration Date"). For additional approved offices opened after the Effective Date, you must sign a Branch Office Location Addendum that will extend the Term for 10 years from the Branch Office's Opening Date, and this Agreement will govern the operation of the Branch Office(s).



**1.6    Initial Franchise Fee:**

**1.6.1**   The initial franchise fee for the first COLDWELL BANKER office you open is $25,000.

**1.6.2**   For additional Offices, you will pay to us an initial franchise fee of $10,000 for your second office and $7,500 for each additional office. We may increase this fee for any offices you open after the Effective Date consistent with the fee charged for branch offices in our then-current Disclosure Document.

**1.6.3**   YOU WILL PAY THE INITIAL FRANCHISE FEE WHEN YOU SIGN THIS AGREEMENT OR A BRANCH OFFICE LOCATION ADDENDUM FOR A FUTURE BRANCH OFFICE, AS APPLICABLE. THE INITIAL FRANCHISE FEE IS NOT REFUNDABLE; IT IS FULLY EARNED ON THE DATE WE SIGN THIS AGREEMENT OR A BRANCH OFFICE LOCATION ADDENDUM, AS APPLICABLE.

**1.7    Opening Date.** You will begin operating the Business at the Office using the System on May 15, 2013 (the "Opening Date"). You will pay all fees due under this Agreement for all closings that occur on and after the Opening Date. Failure to begin operation using the Marks and System on the Opening Date is a material breach of this Agreement. If you operate the Office using the Marks before the Opening Date without our written consent, in addition to our other remedies, you must pay all fees under this Agreement from the date you begin operating the Office using the Marks.

**2.0    FRANCHISEE INFORMATION:**

**2.1    Business Name.** You must operate solely under the trade name "COLDWELL BANKER Bellmarc " ("Trade Name") and must use no other name in connection with any advertising or operation of the Business. We have the right to review and require changes to any display of your Trade Name or our Marks.

**2.1.1**   You must file and maintain in the county and/or state where your Office is located and/or any other place legally required, a "Fictitious Name Certificate," or comparable filing. Before opening an Office, you must supply evidence that you comply with laws regarding the use of fictitious or assumed names. You may not change your legal entity or Trade Name without our written consent.

**2.1.2**   You must use your Trade Name and the Marks exclusively for the purpose of promoting and operating the Business, and for such other lawful business activities as we may authorize in writing, but we are not required to authorize any additional business activities.

**2.1.3**   None of your advertising will be intentionally misleading, and it will be presented in a professional and dignified manner.

**2.2    Legal Entity.** If you are an entity, you represent and warrant that you were duly formed and are in good standing under applicable laws. You will not include "Coldwell Banker" as part of your legal name.

**2.3    Responsible Broker.** You will not operate without a Responsible Broker, who must have a license in good standing within the state(s) where you operate. You must provide written notice to us upon any change in your Responsible Broker.

**2.4    Notice Address.** All notices required under this Agreement must be in writing addressed to the respective parties at the addresses designated below and will be deemed given: (i) if personally delivered to



the respective party, on the date delivered, (ii) if sent in the United States mail, by certified mail, postage prepaid, 3 business days after it is sent (iii) if delivered by courier or express delivery service, on the date 2 days after it is sent, or (iv) if sent electronically, on the date delivered, to the authorized e-mail address of the receiving party. You may change your notice address by giving written notice as provided in this Section.

2.4.1   All notices sent to you will be sent to the Main Office address and/or to your primary e-mail address listed in our electronic reporting system (currently CREST). Electronic notices under subsection 2.4(iv) will not include notices sent under Section 16 of this Agreement, unless you request this method of delivery in writing.

2.4.2   Unless otherwise provided in the P&P Manual, notices to Franchisor will be sent to:

> Coldwell Banker Real Estate LLC
> Attention: Vice President, Franchise Operations
> 1 Campus Drive
> Parsippany, NJ 07054
> cblegalnotice@coldwellbanker.com

2.5     We may communicate with you, either by telephone or electronic means, about various matters including communications that might otherwise be prohibited by "do not call," "do not fax" or similar legislation. You consent to these communications without the need for any additional consent.

3.0     INTERPRETATION:

Definitions. Certain capitalized terms used in this Agreement are defined in Exhibit C, the Glossary of Terms (which is incorporated into this Agreement by reference), or otherwise in the Agreement.

4.0     GRANT OF LICENSE:

4.1     License. As of the Opening Date, we grant you a nonexclusive license to use the Marks and the System for the Business. In accepting the nonexclusive license, you agree to comply with this Agreement and the P&P Manual.

4.2     Excluded Businesses.

4.2.1   If we consent in writing to your operation of an Excluded Business, you will be permitted to operate the Excluded Business, and no fees will be payable with respect to the gross revenue generated by the Excluded Business, <u>if you satisfy the following conditions</u>:

(i) You may not use or mention, directly or indirectly, of our name, Marks or System in connection with the Excluded Business;

(ii) You must take all actions to ensure that the Excluded Business operations are conducted independently of your Business and our System and will not be conducted in any way that could reasonably cause confusion among the public as to whether the Excluded Business is operated under our name, Marks or System. You must use a completely different business name for the Excluded Business; you may not use the Trade Name or any other business name similar to the Trade Name (or that may reasonably be deemed to cause confusion among consumers as to the relationship between the Excluded Business and the Business or as to the source of the goods or services provided) for the Excluded Business. You must operate the Excluded Business using



separate signage, telephone and facsimile numbers and website URL addresses, and different stationery, business cards, and related documents for the Excluded Business.

(iii) You must maintain separate books and records for the Excluded Business.

(iv) You may operate the Excluded Business from the Business's location if you take all steps necessary to conduct the Excluded Business in a way that avoids confusion among the public as to whether such Excluded Business is operated under the Marks (to be determined in our sole discretion), which steps include the segregation of personnel and workspaces and installation of separate interior and exterior signage for the Excluded Business, and may include the creation of separate entrances at the location. On your Business website, you will not promote or mention any Excluded Business (except through a hyperlink to a separate URL that does not identify the Excluded Business's trade name). Similarly, on the Excluded Business website, you (or your Related Parties) will not promote the Business (other than through a hyperlink to a separate URL). We may impose other reasonable requirements on you to advise consumers that the operations and websites of the Business and Excluded Business are independent of one another.

(v) You may not create or publish any cooperative advertising for the Excluded Business and your Office(s). You may not mention our name, Marks, System or your Office and/or any relationship between the Excluded Business and your Office in any advertising or promotional material.

(vi) Other than the Excluded Business, you will not engage in any aspect of the real estate brokerage business or any other related business, or in any way compete with your Office.

4.2.2 We have the unilateral right to audit or review the Excluded Business's financial records if we have reasonable grounds to believe that you are diverting revenues that would qualify as Gross Revenue to the Excluded Business or there is some other violation of this Agreement. Notwithstanding the terms of this Section, all revenues, commissions, referral fees and/or other payments of any kind paid or transferred to you from the Excluded Business will be Gross Revenue subject to fees under this Agreement.

4.2.3 If any Excluded Business is conducted using the Marks or System in any way or does not meet any conditions we impose, in addition to our other rights and remedies, any revenue from such products or services will be considered Gross Revenue subject to fees under this Agreement.

4.2.4 The System does not include the offering or performing of any commercial or industrial real estate business of any kind. You agree that you will not use any of the Marks in connection with the words "commercial division," "industrial division" or any other words or phrases suggesting that you are authorized to conduct a commercial or industrial real estate business under this Agreement.

4.3 Program Expansion and Modification. We may modify existing programs and introduce new programs. We reserve the right to offer, add to, qualify, or eliminate programs as we deem in the best interests of the System.

4.4 Participation in Programs. We may condition participation in our programs on compliance with this Agreement and certain other requirements, which will be further described in the P&P Manual.

4.5 Identification and Use of Marks.



**4.5.1**    The Marks, System and other products and items we deliver to you under this Agreement (collectively, the "System Components") are our exclusive property, and your right to use them is contingent on your full and timely performance under this Agreement. You will be responsible for, and supervise your Related Parties (and sales agents and employees) to ensure, the proper use of the System Components. You acquire no rights in the System Components, except for your right to use them under this Agreement. You will not contest our sole and exclusive rights in the System Components. You will not claim any interest in the System Components that is contrary to this Section or at any time dispute, disparage or impugn the validity of the Marks and/or the System. During or after the Term, you will not adopt, use, or seek to register any names, marks, insignias, colors, trade dress, or symbols that are confusingly similar to the Marks or that do not comply with this Agreement and the P&P Manual. You will cooperate with and assist us in any legal action brought by or against us regarding the System Components; you will not be required to incur any unreasonable costs in connection with your cooperation in such legal action.

**4.5.2**    We reserve the right to approve all of your public use of the Marks, except for your use of any advertising templates that we may approve and update on a periodic basis. We may determine if you are meeting our standards for the Marks' usage. You will promptly correct any deficiencies we find. All use of the Marks and the System inures to our benefit. At our sole option, we or our Related Party will obtain and maintain the Marks' registrations and exercise rights against unauthorized use of the Marks. You will use the Marks only in connection with the Business. You must supervise all persons working in the Business to ensure compliance with this Agreement.

**4.6    Office Appearance.**    We may require you to make reasonable changes or upgrades to the office space where the Business is operated. You must maintain all Office facilities, equipment, office sign(s), yard signs and all other items in first-class condition and in compliance with the P&P Manual.

**4.7    Office Sign.**    You will install one or more internally lighted exterior signs displaying your Trade Name. Your sign(s) must conform to the P&P Manual and MUST BE APPROVED BY US IN WRITING IN ADVANCE AS TO ARTWORK, LETTERING, COLOR SCHEME, SIZE, AND OVERALL APPEARANCE. You must obtain our written approval for any exception to Office sign requirements because of local ordinances or other reasons.

**4.8    Yard Signs.**    You will purchase or lease from our designated Approved Supplier an adequate quantity of yard signs displaying your Trade Name and any other information required by law and complying with the standards and specifications in the P&P Manual and Identity Standards Manual. Within 60 days of the Effective Date, you will provide either color photographs of the signs or a copy of the order for the signs.

**4.9    Business Hours and Operation.**    You will continuously conduct the Business at the Office, which must be open during regular business hours at least 6 days per week.

**4.10    Disclaimer.**    You will place a conspicuous notice on or near the front entrance of the Office that clearly states: "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" or any modification of this statement as we may require in the P&P Manual (the "Disclaimer"). You must include the Disclaimer on all signage, business cards, stationery, promotional and advertising materials, website and internet communications, real estate documents, and all other materials you use.

**4.11    Confidentiality.**    You will not disclose and will treat as confidential all of the Confidential Information you have now or in the future regarding the System. You will not, directly or indirectly, engage or aid in the misappropriation, disclosure, divulgence or distribution of any such Confidential Information. You will use System Components solely in connection with the operation of the Business and will not direct



or permit their reproduction without our prior written consent. You will require all management personnel for the Business and your licensed sales associates to treat Confidential Information as confidential.

**4.12    Internet and Domain Name.** You may use the Internet to market your Business subject to this Agreement and the P&P Manual. You will not use, license or register any domain name or URL (or other means of identifying you or your Business on the Internet) that uses a mark, image or words confusingly similar to a Mark or any abbreviation, acronym, or phonetic or visual variation of a Mark without our prior written consent. Your employees, sales associates and representatives are not licensed to (and are not permitted to, under any circumstances) register any domain name or URL (or other means of identifying their personal business on the Internet) that uses a Mark or any mark, image or words confusingly similar to a Mark or any abbreviation, acronym, phonetic or visual variation of a Mark. At our request, you will promptly assign or redirect (or cause to be assigned or redirected) any domain name, URL, or other identification that violates this Agreement or the P&P Manual at your expense and without compensation from us. The process for review and approval of your website is described in the P&P Manual. The content you submit to us or use for any Internet marketing must be true, correct and accurate. At our request, you will promptly modify any of your Internet marketing material containing the Marks to conform to this Agreement and the P&P Manual.

**5.0    OFFICE LOCATIONS:**

**5.1    Office.** You will operate the Business only from the Office(s), and you will not operate any other business or engage in any other activity at or from the Office, except in compliance with this Agreement. The Office(s) are listed in Exhibit D, as may be amended from time to time. .

**5.2    Relocation of Office.** You cannot relocate an Office (or announce the relocation of an Office) without our prior written consent. You must request our consent for any proposed relocation through the procedures described in the P&P Manual.

**5.3    No Exclusivity.** The COLDWELL BANKER franchise granted by this Agreement is non-exclusive, covers only the Office(s) described in Exhibit D, and does not grant you any area, market, territorial rights, or protected area. This Agreement does not grant you any right to purchase additional franchises, or grant any right or priority for the location of additional franchises. If we grant you an additional franchise, the franchise will be granted under this Agreement, as well as any additional requirements as we then establish. We and our Related Parties retain <u>all</u> rights and discretion with respect to the Marks, the System and other real estate offices, including the rights to:

**5.3.1**    Operate and grant others the right to operate COLDWELL BANKER offices at locations within or outside the area in which you operate, and on such terms as we deem appropriate;

**5.3.2**    Sell any products or services under the Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution; and

**5.3.3**    Operate and grant others the right to operate real estate offices identified by trademarks, service marks or trade dress other than the Marks, at locations within or outside the area in which you operate, and on such terms and conditions as we or any of our Related Parties deems appropriate.

**5.4    Future Branch Offices.** If you seek to operate the Business from an additional office ("Future Branch Office" after the Effective Date, we must approve the Future Branch Office and we and you must execute a Branch Office Location Addendum. To be eligible to open a Future Branch Office, you must be in compliance with this Agreement and any agreements with us or our Related Parties. Also, as described in Section 8.2, each Future Branch Office will be subject to the then-current minimum and maximum Brand



Marketing Fund contribution amounts published in our then-current Disclosure Document. We have the right to accept or reject your application for Future Branch Office.

**5.5 Special Offices.** We may establish and modify from time to time special categories of office locations (e.g., locations open on a seasonal basis or authorized to offer limited services). Conditions and restrictions for the opening, operation and closing of such special locations, including signage, permitted services, and fees, will be described in the P&P Manual or in separate agreements. We will require you to sign an addendum to this Agreement for the operation of any special offices.

**6.0 SERVICES AND OBLIGATIONS TO FRANCHISEE:**

**6.1 Our Obligations.** After the Opening Date, we will provide the following services:

**6.1.1 Orientation Training.** The "Orientation" is our training program to introduce the System to the Responsible Broker and other staff. The Orientation will consist of our then-current training program and will be held at times and locations designated by us. Except as set forth in Section 6.1.1.2, you will be responsible for all travel costs and living expenses incurred in connection with the attendance of your representative(s) at the Orientation.

6.1.1.1 If you are signing this Agreement to acquire a new franchise directly from us, then you must register your Responsible Broker or other agreed upon individual ("Designee") for the next available Orientation held after the Opening Date of this Agreement.

6.1.1.2 If the Office is in an A Market,[1] we will pay for certain reasonable coach class travel and lodging expenses (enrollment package) incurred in connection with your Responsible Broker or Designee's attendance at the Orientation, so long as arrangements are made through our approved travel agent. If you fail to have your Responsible Broker or Designee attend Orientation within 12 months of the Opening Date, we will not pay for your enrollment package and we may charge you the enrollment package fee as a delinquency fee.

6.1.1.3 If the Office is in a B Market[2], we will not pay for your enrollment package.

6.1.1.4 You must pay all costs incurred by the Responsible Broker or Designee in attending Orientation if you acquired the Office through a transfer.

6.1.1.5 Any new Responsible Broker must attend the first available Orientation after he or she has been approved by us. You must pay all costs incurred by the new Responsible Broker in attending the Orientation.

6.1.1.6 You acknowledge that the failure of your representative(s) to attend the Orientation required by this section is a material breach of this Agreement.

**6.2 Continuing Obligations.**

---

[1] "A Market" means any market area that is not a "B Market".
[2] "B Market" means a market which meets the following criteria: (i) the market is located out of a "Standard Metropolitan Statistical Area" or is located in a county with a population of less than 15,000; and (ii) the combined gross sales of single family residences in that market during the preceding calendar year was less than $30 million based on local or regional multiple service listing data; and (iii) the Office in question had production in the prior year of less than $10 million.



6.2.1 **Optional Training Courses.** We may make available to you optional training courses, seminars or conferences at such times and places and for such fees as we designate. You must pay all course fees, travel and living expenses incurred as a result of attending additional training courses.

6.2.2 **Continuing Assistance.** We will provide you with guidance on compliance with the System in the P&P Manual, bulletins and other written materials, consultations by telephone or in person at our facilities or the Office, or by other means of communication. We may, at our request, provide special assistance for which you will be required to pay such fees and expenses as we then charge.

6.2.3 **Optional Programs.** We have the right to develop, implement, modify and/or discontinue optional programs to enhance the Business.

6.3 **No Implied Duties.** This Section 6 describes our express obligations to you. We assume no implied duties to you under this Agreement. This Section 6.3 does not disclaim the representations of the Disclosure Document.

7.0 **FRANCHISE ROYALTIES:**

7.1 **Royalty Fee.**

7.1.1 You will pay us a continuing fee equal to ⅚ % of your Gross Revenue during the Term (the "Royalty Fee"). For each real estate transaction that occurs on or after the Opening Date, including all transactions pending before the Opening Date, you must report the transaction and pay a Royalty Fee by ePay (or other method we may designate) on the date of settlement (closing). Royalty Fees are also due for all transactions and sales contracts entered into before the Expiration Date or the date this Agreement is terminated.

7.1.2 Gross Revenue from Property Management Services will be subject to a ( ) % "Royalty Fee" provided that it is reported and paid to us separately from other Royalty Fees owed by you. You will not commingle Property Management Services files, Royalty Fees, records, or bookkeeping. Royalty Fees on Property Management Services are due and payable when accrued to the benefit of Franchisee. *For the avoidance of doubt, revenue from leasing and rental activities having a nonrenewable term of 90 days or more shall be subject to the Royalty Fee rate applicable to the Business (as set forth herein) unless you provide any Property Management Services to the owner of the leased property (other than collecting rents or other amounts due the property owner).*

7.1.3 Royalty Fees are due and payable in U.S. currency. In addition to Royalty Fees due on all third-party transactions, you will pay a Royalty Fee on personal real estate transactions involving you, your Owners and your Related Parties (whether or not a commission was paid on the transaction) ("Personal Transactions"), except that we will waive Royalty Fees on 3 Personal Transactions per calendar year if you (a) did not collect a commission or fee on the Personal Transaction, and (b) submit documentation that we may require to confirm eligibility for the waiver. We will impute your regularly charged brokerage commission or fee for any transactions on which you do not charge a commission, including transactions involving your sales associates or employees, and you will pay a Royalty Fee based on the imputed commission or fee.

7.2 **Performance Premium Award.** "Performance Premium Award" or "PPA" means a cash award given by us to you based on your achievement of certain levels of Gross Revenue and compliance with



the operational criteria identified below. Each calendar year or part of a calendar year in which you are engaged in the Business under the terms of this Agreement is referred to as a "Calculation Year."

7.2.1   We may establish reasonable conditions to our obligation to pay a PPA, including the following conditions, without limitation:

7.2.1.1   You, your Owners and Related Parties must be current with respect to all financial obligations owed to us and must be in full compliance with this Agreement, the P&P Manual, and all other agreements with us and our Related Parties;

7.2.1.2   You must achieve minimum levels of participation and performance in our various sponsored programs during the applicable calendar year; and

7.2.1.3   You must have at least 15 months left prior to the expiration of this Agreement.

7.2.2   The "Award Date" is April 15th of the calendar year immediately following the Calculation Year. If, as of April 15th of the calendar year immediately following the Calculation Year you have met the conditions described above, we will pay to you, on or before the Award Date, a PPA determined for the Calculation Year in accordance with the table in Exhibit E of this Agreement (subject to the variations described in 7.2.3 and 7.2.4 that may impact your PPA Awards).

7.2.3   All of the other conditions to our obligation to pay the PPA and all adjustments to the PPA will be provided in the P&P manual. We annually may increase or decrease the percentage and/or dollar amounts contained in Exhibit E, provided that such adjustments may not exceed 20% of the percentages and/or dollar amounts then in effect.

7.2.4   We have the right to pay in advance of the Award Date any or all of the PPA for any Calculation Year. You must pay any unearned portion of the advanced PPA to us immediately upon your request. We will have the right to off-set, without prior notice, any PPA earned by you against any and all payments, obligations and amounts, whether or not liquidated, that you or any of your Owners or Related Parties may owe to us or any of our Related Parties.

7.2.5   We will exclude any Gross Revenue for PPA Award purposes from any calendar quarter that you receive a notice of default under Section 16 or have not cured a previously noticed default. The entire calendar quarter of Gross Revenue will be excluded regardless of when the default is cured.

7.2.6   We will exclude any Gross Revenue for PPA Award that was derived from Property Management Services and on which a 1.5% Royalty Fee was paid.

7.2.7   For purposes of this Section, Gross Revenue will include Gross Revenues for all offices operating under any franchise agreement with us in the same metropolitan area with identical ultimate equity ownership; provided that only one PPA will be payable to all offices.

7.3   **Continuing Obligation.** You will pay us the full amount of Royalty Fees when due regardless of our obligations or payment of the PPA Award.

7.4   **Right of Offset.** We have the right to offset any PPA you earn against any payments, obligations, amounts, whether or not liquidated, that you, your Owners or Related Parties may owe to us or our Related Parties.



## 8.0    BRAND MARKETING FUND:

8.1    **Brand Marketing Fund Contribution.**  You will pay us each month during the Term a Brand Marketing Fund ("BMF") contribution equal to a percentage of the Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
|---|---|
| | |
| | |

To be eligible for the reduced BMF contribution rates above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue.  All Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual shall be subject to a      BMF contribution. On January 1st of each year, your Gross Revenue, for purposes of this Section, will be reset and on an annualized basis, you will pay a BMF contribution of(       of Gross Revenue on all Gross Revenue up to(       ) (the "BMF Threshold") and          on all Gross Revenue over          (except as otherwise stated in this Section).   During the first calendar year of the Term, the BMF Threshold will be pro-rated based on the number of calendar days remaining in that calendar year (in the Opening Date).  For example, if the Opening Date is July 1, then the BMF Threshold in the first calendar year of the term will be        (or        ).  We reserve the right to increase the BMF Threshold each year by an amount not to exceed        of the BMF Threshold, as adjusted.

8.2    **Payment.**  You must pay the BMF contribution for each month by the 10th day of the following month.

8.2.1    We have the right to impose additional assessments on you for special advertising, public relations and/or promotional activities we design for an area if 80% of the franchisees located in the area agree. You must pay any additional assessments in a timely manner.

8.3    **Use and Management of BMF.**

8.3.1    The BMF is not held in trust and we do not manage it in a fiduciary capacity.  The BMF is a contractually generated fund.  We may deposit BMF contributions with our other monies, but will separately and distinctly identify and account for BMF contributions on our books and records.  We use the BMF for the development, implementation, production, placement, payment and costs of national and regional (as defined by us) advertising, marketing, promotions, public relations and/or other programs, including direct mail (and email), market research, customer surveys and test marketing to promote and further the recognition of the Marks, the System and franchisees generally. The BMF may also be used for other purposes such as website development and maintenance for the brand consumer website and the System intranet site, training, customer service support, real estate listing enhancement costs and subsidies, listing distribution arrangements, regional and national COLDWELL BANKER® system events and related activities, social media development and training, awards, LeadRouter (or any similar or successor) leads management system development, maintenance and updates, customer loyalty programs, agent or broker productivity tools, system communications, identity standards and website compliance, brand extension development and marketing, agent recruiting initiatives, tools and marketing, software development and distribution and other related activities in support of the COLDWELL BANKER® and the COLDWELL BANKER® system.  The BMF compensates us or our affiliates for out-of-pocket costs on behalf of the BMF, for marketing staff compensation and a portion of our senior management



compensation, and for reasonable expenses incurred for rent, overhead, accounting, collection, reporting, legal, human resources, finance, operations, management and other services (collectively "Corporate Services"), which we or our affiliates provide to, or which relate to the services provided to, the BMF to support marketing activities. We and our affiliates may provide certain products and/or services to the BMF, including the Corporate Services outlined above, which would otherwise be provided by unaffiliated third parties. Any products and/or services provided by us or our affiliates will be provided at a cost comparable to those costs that the BMF would otherwise incur if the products or services were obtained from unaffiliated third parties.

8.3.2  We are not required to use or allocate BMF contributions on a proportional basis with the contributions collected from any geographic area or to benefit any particular franchisee or group of franchisees. We are not obligated to use BMF contributions in the year we receive them. If we spend less of the BMF in any calendar year than we collect, the excess contributions will be used in future years. The BMF may borrow from us or other lenders to cover its deficits or invest any of its surplus for future use. In the event that BMF contributions made by any of our Related Parties in any calendar year exceed the total amount required to be contributed during such calendar year, such Related Parties will have the right to be reimbursed to the extent of such excess contributions from any amounts subsequently contributed to the BMF or to use such excess as a credit against future contributions that may become due.

8.3.3  On your written request, we will provide you a financial report of the BMF showing the total BMF contributions collected and disbursed for the previous year, certified to be true and correct by one of our authorized officers or by an independent certified public accountant. We are not required to cause the BMF to be audited or reviewed by an independent certified public accounting firm. The report is typically available after April 1 of the following year.

8.3.4  Except as provided in this Section, we assume no direct or indirect liability or obligation to you with respect to the BMF's maintenance, direction or administration.

8.3.5  We will not be liable for any act or omission with respect to the BMF that is consistent with this Agreement or done in good faith.

## 9.0  TECHNOLOGY:

9.1  **Internet Reporting System.** You must use our Internet based reporting system to promptly report all listings and pendings and closed transactions for which a Royalty Fee is, or may be, payable. The system consists of our proprietary software and non-proprietary operating programs, that enables you to transmit required listing information, transaction information and other data. We will provide the software to you without charge. You must obtain appropriate connectivity and browser software for this application as well as any platform upgrades that may be necessary. You are responsible for purchasing compatible hardware from a vendor you select. The technology systems are not available for Apple®, Power PCs® or MacIntosh® hardware and are not compatible with OS2®, Unix®, or Linux operating systems.

9.2  **Required Computer Equipment.** The current minimum standards are listed in the P&P Manual. You must also maintain high-speed access for this computer equipment. You must upgrade, replace or add equipment at your cost as changes in technology require. We may require you to use an Approved Supplier of computer equipment to meet our specifications and standards. We do not currently have an Approved Supplier of computer equipment.



**9.3    Additional Technology Products.** We may charge a fee for additional technology products that we offer and that you may subscribe to and use at your discretion. Any fee will be consistent with the fee imposed on other franchisees for similar services.

**9.4    Systems Support.** Applications we develop are licensed and distributed on an "as is" basis. We will use our best efforts to provide support, limited solely to our issued applications. We reserve the right to change the level and type of support provided at any time without notice.

**9.5    Lead Management Application.** You will purchase, lease or enter into a license agreement with us, our Related Parties or an Approved Supplier for a lead management program that we designate to be used by your Office to manage leads obtained through our website or otherwise. If we modify the lead management program or require our franchisees to use a new program, you will be required to comply with any changes. You will use your best efforts to properly manage and service any leads provided to you through the lead management program and to train all personnel on the management of leads through the program.

**9.6    IDX Technology.** If permitted under law and/or the rules of the applicable Multiple Listing Services, you will provide us access to the Multiple Listing Services in which you are a member. You will cooperate with us and sign any documents required to provide us access to the listings in the Multiple Listing Service to display information as a direct electronic feed on our consumer website.

**9.7    Your Responsibilities.** You are responsible for the selection, purchase, installation, maintenance and support of all hardware and systems software required to run our technology products.

**9.8    Additional Programs.** You agree to purchase or participate in any additional programs that may require special licensing, software or other technology acquisitions or upgrades to improve the services, efficiency, and operation of your Business as we deem necessary.

**10.0    MANAGEMENT AND GOODWILL:**

**10.1    Management.** You and your Owners will actively manage and supervise the Business's Operation.

**10.2    P&P Manual.** You must comply with the P&P Manual and supervise your sales associates, employees, and Related Parties to ensure their compliance. We reserve the right to make reasonable changes in the P&P Manual that we determine are appropriate in our Reasonable Business Judgment for the continued success and development of the System and its franchisees. We may also modify the P&P Manual at any time to reflect changes in the System. At your own expense, you must adopt on a timely basis (but no later than 90 days after notice) any such modifications. We will notify you by email or regular mail as to changes in the P&P Manual or other changes related to the Franchise. If there is any conflict, discrepancy or ambiguity between the terms of this Agreement and the P&P Manual, the terms of this Agreement will control. If a dispute arises over the P&P Manual contents, the master copy that we maintain at our principal office, or the most current edition maintained on our Intranet site, will control.

**10.3    Ethical Conduct, Consumer Relations and Protection of Goodwill.** You must give prompt, courteous and efficient service to the public and operate the Business in compliance with the P&P Manual and professional standards to preserve and enhance the value and goodwill of the Marks and the System. You will uphold, and take reasonable steps to ensure that your sales associates and employees uphold, high standards of honesty, integrity, fair dealing and ethical conduct in dealing with the general public, customers of the Business, other franchisees and us. All persons engaged in the Business must comply with the National Association of REALTORS® Code of Ethics. You hereby authorize any federal, local or state body regulating or supervising real estate practices to release to us information about complaints and disciplinary actions related to your (or your Related Parties') practices. You must maintain all required permits,



certificates and licenses in good standing and in compliance with applicable laws and regulations. You must operate the Business in compliance with all municipal, county, state and federal laws, including all laws and regulations of the real estate commission or other licensing authority governing your operation. We and you recognize that disputes may arise between you, or your Related Parties or agents, and a client or other Person involved in a real estate transaction, and that it is in the best interest of all parties, when possible, to quickly resolve disputes. You must promptly respond to all complaints received from your clients or other individuals in an attempt to resolve the dispute in a reasonable business manner. If we: (i) are contacted by a complaining party or become aware of a complaint against you; (ii) make a reasonable finding that you, your Related Parties or agents acted in a materially improper fashion; and (iii) determine that the complaint was not resolved with the complaining party to our satisfaction within 30 days from our finding, we may terminate this Agreement on 10 days' written notice to you. You will not make or publish any statement or advertisement which would reasonably be expected to demean the image, value, identity, reputation or goodwill associated with our name or trademarks or the Marks described in this Agreement. This covenant is independent of and will survive any termination, expiration or Transfer of the Franchise.

**11.0 OTHER COSTS AND OBLIGATIONS OF FRANCHISEE:**

**11.1 Marketing Materials.** We will make materials available for purchase to promote your Business and our products, services, and programs. You will pay for such purchases by cash, check, or credit cards.

**11.2 Payments and Interest.** You must promptly pay us all fees and contributions, as well as any additional charges for products, supplies, or services that we furnish at your request. We will apply your payments (and any amounts we (or our Related Parties) owe you or your Related Parties) to any of your past due indebtedness for Royalty Fees, BMF contributions, purchases from us or our Related Parties, interest or other indebtedness as we may determine in our Reasonable Business Judgment. No restriction on any check or in any communications accompanying payment will bind us or our Related Parties. Our acceptance of any payment will not constitute an accord or satisfaction and will not be construed as a waiver of any breach of this Agreement. Any payments more than 10 days past due will bear interest at the lesser of the highest rate allowed by law or 18% per annum (1.5% per month). You may not withhold payment of any Royalty Fee, BMF contribution or any amount due based on alleged non-performance or breach of any of our or our Related Parties' obligations under this Agreement or any related agreement, including for the sale of products or services by us or our Related Parties to you.

**11.3 Payment Procedure.** You must pay amounts due to us using CREST ePay, a Web-based, self-service application for electronic payments. We may revise the required form of payment from time to time in the P&P Manual and you must comply with any changes.

**11.4 Offsets.** We may offset any amounts we owe you in full or partial satisfaction of any amounts you owe under this Agreement or other agreements between you and us or our Related Parties, whenever your payments are more than 30 days past due.

**11.5 Returned Checks.** You must pay a returned check charge on any checks returned unpaid for any reason. You must replace any such check with a certified or cashier's check, money order or electronic transfer of funds within 3 days of notification. We may charge the highest commercial rate allowed by law.

**11.6 Net Worth.** You acknowledge that a material consideration for us in granting this Franchise is your representation that you and your Owner(s) are financially responsible and have both (A) a Net Worth in tangible assets in excess of $150,000, not including (i) the value of any interest in this Agreement (or notes provided to you from us or our Related Parties in conjunction with this agreement) or (ii) any of your working capital (defined as total current assets less total current liabilities, all prepared in accordance with generally accepted accounting principles); and (B) liquid assets (cash or securities that can be easily

CB EXHC1 03/12                    13



converted into cash) of at least $75,000. You agree and warrant that you and your Owners will maintain the minimum net worth requirement throughout the Term. You further agree that maintaining these requirements and remaining in financial good standing with us and your third party creditors is critical to the protection of our goodwill and the Marks. If the net worth requirement is not maintained at any time, you must procure a guarantor acceptable to us to the extent of the deficiency, which guarantor will guarantee your performance under this Agreement.

**11.7    Listing and Pending Listing Inventory.** You will provide, within 15 days of the Effective Date, and thereafter maintain with us, a complete and current inventory of all listings, pending or otherwise, of your Business, in our required format. You consent to our use of your listing and transaction information. For any pictures or other media you supply to us (including those used in listings on our website), if you own the copyright of any such picture or other media, you grant us a fully paid up and royalty free license and right to use and sublicense such pictures and other media for any purpose, and if you do not own the copyright in such pictures or other media, you agree to indemnify and hold us harmless against any third party claims that our use infringes such third party's rights.

**11.8    International Business Conference.** Your Responsible Broker or an Owner or other designated Person will attend, and you will encourage your sales associates and employees to attend, our international business conference (if held) or at least one national or regional event that we designate in the P&P Manual each calendar year. You must pay at least 1 registration fee for the event each calendar year, whether or not a representative attends. We have the right to bill you for 1 full-price registration fee, if we have not received a registration from you at the time of billing.

## 12.0    FEE INCREASES:

**12.1    Annual Increases.** On January 1st each year, we have the right to increase the BMF Threshold in Section 8 by an amount not to exceed 5% per year. The amount of the increase in the BMF Threshold shall be cumulative. Therefore, if for any reason we do not increase the BMF Threshold by the maximum amount permitted in any given year, we may add the amount not increased in any given year to the BMF Threshold in subsequent years. We may round to the nearest dollar the amount of any increase.

**12.2    Other Fee Increases.** We have the right to impose, eliminate or modify training fees, fees to participate in voluntary programs, or administrative fees, including, but not limited to, referral fees, late charges, returned check charges, cancelled audit and access fees, which revisions are not subject to the limitations of Section 12.1.For the avoidance of doubt, we agree that we may not unilaterally modify the Royalty Fees or BMF contributions other than as described in Sections 7, 8 and 12.1.

## 13.0    RECORDKEEPING; AUDIT:

**13.1    Recordkeeping, Financial Statements and Audit.** During the Term and for 3 years after the expiration or termination of the Term, you must maintain accurate records in the form we require. You will provide us with a detailed profit and loss statement within 60 days after each calendar quarter (or as often as we designate in the P&P Manual). You will submit any additional information we require in the P&P Manual. You will also supply a complete financial statement, on an annual basis within 90 days of your fiscal year-end and a copy of your federal tax return. You, your authorized officer (if you are a corporation or a limited liability company), a general partner (if you are a partnership) or your independent accountant will sign the financial statement certifying its truth and accuracy. Financial statements must be prepared in accordance with generally accepted accounting principles. You must transmit information to us in the manner and format we require and allow us or our designee(s) to audit your operations, including your financial record retention systems, or to obtain information from other sources, including the local Multiple Listing Service, to verify Royalty Fees, BMF contributions and other fees due to us. You must immediately



pay us any fees that the audit reveals were due during the audit period but not paid. If the audit exposes a deficiency of 5% or more in amounts due for any 3-month period, you must also pay all of our audit costs and the deficiency will constitute a material breach of this Agreement. You must dispute any audit findings in writing and identify the basis for any dispute. Procedures and timing for disputing audit findings will be described in the P&P Manual and in Section 13.7 below. We may also impose audit costs on you if you fail to cooperate with an audit. We may charge you an administrative fee, up to $500 currently, if you cancel or reschedule an audit.

**13.2** **Access to Records.** We, or our designee, have the right during the Term and for 3 years following termination of the Agreement, to visit your Office or administrative office location (or such other place where your records are located) during normal business hours and without hindrance or delay, proceed:

**13.2.1** to inspect, audit, check and make copies of your books, records (including state and federal tax returns), journals, orders, receipts, any correspondence and other data relating to your Business or to any transactions, including the books and records of any Related Party if we have reason to believe that (i) its funds were commingled with the Business; (ii) it was operated in violation of Section 4.2; or (iii) the Marks were used in connection with the Related Party's business;

**13.2.2** to verify any portion of your records or your Business or any Excluded Business as we may deem reasonable under the circumstances, including prompt response to any post-audit request for additional information; and

**13.2.3** to discuss your records and the Business or any Excluded Business with any officers, directors and employees responsible for maintaining the records, or with your Responsible Broker, or with your sales associates.

**13.3** **Condition of Transfer of the Franchise.** We may require an audit of your operations at any time, including as a condition of our approval of any Transfer of the Franchise.

**13.4** **Sales Associate Information.** You will provide us information about your sales associates and assist us in any survey of your sales associates. Sales associate information will be updated promptly; all sales associate information will be current as of the end of each calendar quarter.

**13.5** **Other Matters relating to Information.** We expressly agree to keep confidential any financial statements you submit under the Agreement, provided that our confidentiality obligations do not extend to information that (a) is or becomes generally available to the public; (b) was in our possession before it was furnished; or (c) is or becomes available to us from a source that is not prohibited from disclosing such information by any confidentiality obligation. This restriction shall not apply if we (or any of our Related Parties) are required under a court or government agency order or applicable law to disclose any non-public information we received. Other than financial statements, no information supplied to us will be considered confidential. We have the right to use any information you supply for our own business purposes, to disclose information as may be required by law and governmental authority, and to aggregate your information with other franchisee information and disclose aggregated information as we deem appropriate. You will provide us and/or cooperate with us in collecting other information as we may reasonably request, including information for research and development of services, products and programs, identification of demographic information, industry reports and preparation of our Disclosure Document.

**13.6** **Cooperation.** You must cooperate in scheduling any audit and providing access to records, which must be maintained and presented in reasonable order to allow the audit to be conducted in a reasonable time.



**13.7 Waiver.** Your failure, refusal or neglect to dispute any fees or contributions that an audit reveals you owe, including any fees, costs and penalties assessed in connection with an audit, constitutes a waiver of any right to challenge such fees, unless you provide us written notice of your dispute, along with an explanation of the basis for your dispute, within 90 days of the date we deliver the audit results to you in writing.

## 14.0 MODIFICATION OF THE SYSTEM; IMPROVEMENTS:

**14.1 Agreement to Accept Modifications.** We have the right to change, augment or modify the Marks or the System, including the adoption of new or modified trade names, trademarks, trade dress, service marks, copyrighted materials, new products or services, new equipment, new business methods or new techniques from time to time, without your consent. We also reserve the right to modify, suspend or eliminate any new or existing portion of the System or the Marks. Any changes related to the Marks or System will be communicated to you and reflected in the P&P Manual. You will accept, use and display any changes in the System and will make such expenditures as may be required to implement the changes.

**14.2 Improvements by You.** If you conceive or develop any improvements or additions to the System, new trade names, trademarks, service marks or other commercial symbols related to the Business or any advertising or promotion ideas related to the Business ("Improvements"), you will fully disclose the Improvements to us without disclosing the Improvements to others. You must obtain our written approval before using any of the Improvements. Any Improvements we approve will be deemed licensed to us on a royalty-free, paid-up, perpetual worldwide license, and may be used by us and our franchisees without paying you royalties or similar fees. We also have the right to make application for and own copyrights, trade names, trademarks and service marks relating to any Improvements. We may also consider the Improvements as our property and trade secret. We will authorize you to utilize any Improvements authorized generally for use by other franchisees.

## 15.0 OWNERSHIP CHANGES AND TRANSFERS OF THE FRANCHISE:

**15.1 Ownership Changes.** We must first approve in writing any proposed ownership change to transfer 5% or more of the Franchisee ownership rights. If you propose to transfer less than 5% of Franchisee ownership rights, you must report the transfer to us at least 20 days in advance, and it will not be subject to our approval if all prior transactions under this Section combined do not result in the transfer of at least 5% of the ownership rights in Franchisee. If you are a partnership, a corporation, or a limited liability company, which is owned in whole or part by another entity, this Section will apply to the Owner entities as well.

**15.2 No Assignment.** You acknowledge that your rights and obligations under this Agreement are personal to you and that we have granted this franchise in reliance on many factors, including your (and your Owners') character, skill, knowledge, business and financial capacity. Accordingly, you may not assign your rights or delegate your duties under this Agreement, including the terms of any Addendum to this Agreement, except as permitted by this Agreement or as required by law.

**15.3 Limited Assignment Right for Sole Proprietorships or Partnerships.** If you are a sole proprietorship or partnership, we expressly consent to the assignment of this Agreement, without payment of a fee, to an entity owned and controlled by the same Owners, provided that the Owners execute an assignment agreement and guaranty of the assignee's obligations to us. You must notify us in writing of any proposed assignment under this Section and must provide and/or sign all documents we request including, but not limited to, assignment documents, Articles of Incorporation or Organization and Bylaws.

CB EXHC1 03/12                                    16



**15.4    Transfer of the Franchise – Definition.** The phrases "Transfer of the Franchise" and "Transfer the Franchise" mean:  (i) any transaction or series of transactions that results in the sale or transfer of substantially all of the Business's assets, (ii) any transaction or series of transactions that results in (x) the Owner(s) before the transaction(s) holding less than 51% equity interest in you or the Business's assets after the transaction, or (y) another entity becoming the Franchisee after the transaction(s), or (z) the Owner(s) no longer controlling or managing the Business.  The Transfer of the Franchise may include transfers resulting from a divorce, death, insolvency, entity dissolution, declaration of or transfer in trust, or a foreclosure on the Business assets.  If any Owners are entities, a Transfer of the Franchise will be deemed to occur if such Owner entity experiences any of these events or transactions.

**15.5    Prohibited Assignments or Transfers of the Franchise.** You may not Transfer the Franchise without our prior written approval, which will be subject to our Reasonable Business Judgment; failure to obtain our approval will be a material breach of this Agreement.  Any attempted Transfer of the Franchise not expressly permitted by this Agreement or required by law will be null and void, and you will remain liable for all obligations under this Agreement.  After a Transfer of the Franchise, you will be liable for events that occurred before the Transfer of the Franchise and for all obligations that survive termination of this Agreement, including your indemnification obligations for any claims arising before the Transfer of the Franchise.  If you Transfer the Franchise in violation of this Section, you agree that our continued performance of our obligations, and the acceptance of any amounts due under this Agreement, does not waive our rights.  If an undisclosed Transfer of the Franchise occurs, we have the right to require any New Franchisee (as defined below) to comply with this Agreement, but regardless of our actions, in consideration of our performance under the Agreement (A) you and each of the Owners releases us and our Related Parties from and forever waives all claims,  damages, and causes of action of every nature, known and unknown, which you have or may have against us and/or our Related Parties arising out of the Agreement and our relationship up from the Opening Date through the date the Transfer of the Franchise is properly executed, and (B) the New Franchisee and any new Owners (as conditional assignees of the Agreement) agree to indemnify and hold harmless us and our Related Parties from all expenses, claims, losses, damages, liabilities or actions of any kind (including costs and attorneys' fees) arising out of the operation of the Business under this Agreement from the Opening Date through the date the Transfer of the Franchise is properly executed.

**15.6    Approval of Transfer of the Franchise; Prerequisites.** You must provide us 30 business days' advance written notice of any proposed Transfer of the Franchise to a new franchisee ("New Franchisee").  The New Franchisee must submit any documents we reasonably require to approve the Transfer of the Franchise.  Our approval will be based on various factors that include:  (i) our review of a New Franchisee's franchise application (and other documents), (ii) any New Franchisee's or prospective owner's business experience, character, reputation and financial condition (including our review of credit checks and financial statements), (iii) our review of the proposed transfer documents and/or any new entity organizational documents, (iv) unless prohibited by law or we otherwise elect, the New Franchisee's execution of the then-current form of franchise agreement and new owners' execution of the then-current form of guaranty, (v) payment and/or assumption of any outstanding indebtedness you owe us, (vi) payment of a $5,000 transfer fee, (vii) execution by you and any departing Owners of a release of all claims against us and our Related Parties, (viii) an audit of your operations, and (ix) your purchase of tail coverage on errors and omissions and general liability insurance policies naming us as an additional insured.  In connection with any proposed Transfer of the Franchise, we may also consider the financial impact that a Transfer of the Franchise to an existing franchisee may have on us, including a potential increase in a PPA award or decrease in the net effective Royalty Fee rate paid to us.  We may require adjustments to the Agreement to account for or eliminate any financial impact to us as a condition of our approval.



**15.7** **Right of First Refusal.** If you and/or any of your Owners intend to Transfer the Franchise for valuable consideration, you and/or such Owner must obtain a bona fide, signed, written offer from the potential purchaser and must deliver immediately to us a complete and accurate copy of the offer. If the offeror proposes to buy any other tangible or intangible assets that do not relate to or are not used by or in the Business, the proposal for such assets or rights must be described in a separate offer that is disclosed to us, but to which this right of first refusal is not applicable. If the interest which is subject to the offer involves less than all of your ownership interest, our right of first refusal will apply to all the equity in Franchisee and the consideration of the offer will be divided by the percentage interest subject to the offer and the resulting quotient will be the price to be paid for the entire ownership interest. The purchase price and terms for the Transfer of the Franchise will reflect the bona fide offered price and not reflect any value for any other assets.

**15.7.1** Within 30 days after you deliver a complete and accurate copy of the offer to us, we or our designee will have the option exercisable by written notice to you, to purchase the interest that is the subject of the offer, for the price and on the terms and conditions contained in the offer; provided, however, that we may substitute cash for any form of in-kind payment proposed in the offer, our credit will be deemed equal to the proposed purchaser's credit, and we will have not more than 120 days from the option exercise date to consummate the transaction. During that time, you will promptly respond to all of our reasonable due diligence requests. Terms and conditions for the purchase will be as similar as practicable to the offer's terms and conditions, subject to the exceptions above.

**15.7.2** Unless expressly limited in the third-party offer, we have the right to purchase the interest subject to all customary representations and warranties, closing documents, releases and indemnities as we reasonably may require, including representations and warranties as to the ownership and condition of, and title to, shares of ownership and/or assets, the validity and status of contracts and leases and the extent of any liabilities, contingent or otherwise. We also will have the option to acquire from you, for nominal consideration, an assignment of your leasehold rights for the Office premises.

**15.7.3** If we do not exercise our purchase option, you or your Owners may complete the sale to the offeror on the offer's exact terms, subject to our approval of the Transfer of the Franchise; provided that if there is a material change in the offer's terms, we will have an additional option to purchase during the 30-day period after your notice to us of a material change in the offer's terms.

**15.7.4** If the proposed Transfer of the Franchise is not supported by valuable consideration (e.g. gift, testamentary transfer or reorganization of your entity without any change in the Owners), we have no right of first refusal.

**15.8** **Orientation Training for New Franchisee.** The New Franchisee must attend the Orientation Training seminar for new franchisees required under Section 6.

**15.9** **Assignment by us.** We may assign, transfer, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third-party beneficiary of any of our contracts with third parties, including vendors or other franchisees. We will have no obligations to you after you are notified that a transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**16.0** **EXPIRATION AND TERMINATION:**

**16.1** **Non-Renewability of Agreement.** NEITHER PARTY HAS RENEWAL RIGHTS. The tender or acceptance of your payments after expiration or termination of this Agreement does not prejudice our rights to enforce the expiration or termination or your obligations on expiration or termination, nor create any additional rights in your favor under this Agreement.



**16.2 Termination.** This Agreement may be terminated only under the following terms and conditions:

**16.2.1 Mutual Consent.** By mutual consent of the parties;

**16.2.2 Termination by us for Good Cause.** By us for good cause which means your material breach of any obligations under this Agreement as we may determine in our Reasonable Business Judgment or as stated in this Agreement. Good cause includes both curable and non-curable defaults and the failure to meet our system standards.

**16.2.3 Curable Defaults; Notice.** After giving you written notice of termination and 30 days to cure identified defaults (except for other cure periods established elsewhere in this Agreement or longer notice periods required by the state's law where the Office is located), we may terminate this Agreement for the following uncured defaults:

**16.2.3.1** Your failure to timely and consistently report transactions or to pay when due any financial obligation to us or to the BMF;

**16.2.3.2** Your underreporting and/or underpayment of at least 5% of Royalty Fees and/or BMF contributions within any 3-month period, or your refusal to permit us to audit your operations and records, or your failure to reasonably cooperate with an audit;

**16.2.3.3** On the death, judicial determination of incompetence, or the appointment of a conservator or guardian over you or an Owner, the failure to seek our written approval for a Transfer of the Franchise within 180 days after such event;

**16.2.3.4** Your attempt to subfranchise, license or grant to any other person or entity the right to use the Marks or the System licensed to you under this Agreement;

**16.2.3.5** Your failure to comply in all material respects with applicable municipal, county, state or federal laws;

**16.2.3.6** The operation of any other business within the franchise location using our Marks;

**16.2.3.7** Your failure to properly display and use our Marks as described in the P&P Manual;

**16.2.3.8** The creation of a security interest in this Agreement or the assets of the Business without our prior written consent; or

**16.2.3.9** Any other material breach of this Agreement not listed above or those listed below as a noncurable default.

**16.2.4 Noncurable Defaults; No Notice Required.** We may terminate this Agreement immediately without prior notice or an opportunity to cure, if any of the following defaults occurs:

**16.2.4.1** Suspension or revocation of your Responsible Broker's license; unless you timely appoint a substitute Responsible Broker as permitted under applicable law and such suspension or revocation does not otherwise breach this Agreement;

**16.2.4.2** Any conduct by you that impairs the image, identity, value or goodwill associated with the Marks or the System;



16.2.4.3 The filing or imposition of any bankruptcy, receivership, composition, assignment, marshaling, insolvency or similar proceeding for the benefit of creditors related to you or your assets, provided that termination on bankruptcy may not be enforceable under the Bankruptcy Code;

16.2.4.4 Abandonment of your Office(s), demonstrated by (i) the failure to commence operation as required under Section 1.7, (ii) removal of the Marks, or (iii) failure to operate the Business for five consecutive business days or any shorter period when, under the facts and circumstances, it would be reasonable for us to conclude that you do not intend to continue to operate the Business, unless the cause is a force majeure, e.g., flood, earthquake or similar acts of God;

16.2.4.5 Any default for which we have issued you a notice of default during the last 12 months advising you of our intent to terminate for the same cause, even if the default(s) were cured;

16.2.4.6 Any material misrepresentation or omission by you to us in the franchise application or otherwise with respect to acquiring the Franchise; or

16.2.4.7 The operation of a competing residential brokerage business in violation of the in-term non-competition covenant.

16.2.5   **Failure to Meet Minimum Office Design and Appearance Standards.** You acknowledge and recognize that all Offices must meet certain minimum standards of professionalism for size, interior design and decor, exterior attractiveness, general appearance and cleanliness. These standards are contained in the P&P Manual. If your Office fails to meet these Standards, we will notify you in writing and describe the deficiencies, and you will be given 90 days to correct them. If such deficiencies are not corrected to our satisfaction within 90 days, we have the right to terminate this Agreement.

16.3   **Our Pre-Termination Options.** Before termination, if you fail to pay any amount owed under this Agreement, or fail to comply with any term of this Agreement (subject to applicable notice and opportunity to cure), then in addition to any right we may have to terminate this Agreement or to bring a claim for damages, we will also have the following options:

16.3.1   To suspend all services provided to you under this Agreement or otherwise, including training, marketing assistance, PPA and other award(s) eligibility for you and your agents, and the sale of products and supplies;

16.3.2   To suspend taking or placing referrals, leads, or relocation requests, HPP and/or SSP applications, for or from you and to direct any inquiries regarding these or other programs or services to other franchisees; and/or

16.3.3   To eliminate listing you in any advertising, marketing or promotional materials, including any directory listings, approved or published by us.

We may continue taking these actions until you comply with our requirements and we acknowledge your compliance in writing. The options in this Section will have no effect on, and will not release you from, any obligation you owe to us, our Related Parties, or to the BMF. Your right to cure does not restrict our right to file any legal action before, during or after the cure period.

16.4   **Effect of Expiration or Termination.** On expiration or termination, you must immediately, at your expense, return to us all of our property, including originals and copies of the P&P Manual, all copies of our



technology products (including copies that your sales associates hold or control), and all films, cassettes and instruction manuals, which are part of our programs. You must also immediately discontinue all use of the Marks in all of your materials. You must immediately discontinue all use of signs displaying our unique style, logo, colors, color patterns and designs and/or Marks. If you desire to use the signs after expiration or termination, you must immediately change the colors and color patterns by completely repainting the signs, and you must permanently remove or cover any Marks on the signs and provide us with color photographs of such changed signs and signposts. Effective on the date of termination or expiration, you must refrain from any representation that you are our franchisee or are or have been affiliated with us, and take any affirmative action necessary to remove any use of the Marks in connection with your business. You must de-identify your business from the System in a manner that does not confuse the public about the fact that you are no longer part of the System. You must (i) immediately advise all of your then-current clients that you are no longer associated with us; and (ii) immediately cause the local phone company (white pages) and any business phone publisher (the Yellow Pages) to remove you from their listings as our franchisee in their next edition of any directory or listings, including any Internet directories. You must immediately cause any Web masters or websites to remove our Marks from their Web pages, including social media websites, and you must remove the Marks from the social media sites and accounts that you control and your website(s), including from any source code or other mechanism that directs a consumer searching for our Marks to your website. If your URL contains our Marks, you must either cancel such URL registrations for the Business or, at our option, assign your URL(s) to us. You must also cause all agents to cancel all URLs containing our Marks.

**16.5    Effect of Continued Use of the Marks.** On expiration or termination, any continued use of the Marks by you, the Business or any of your sales associates: (i) will constitute willful and knowing infringement, dilution of our trademark rights and unfair competition; and (ii) may constitute trafficking in a counterfeit mark for which both civil remedies and criminal penalties may be imposed.

**16.6    Infringement Damages.** If we bring an action against you or anyone associated with you before or after expiration or termination, seeking to halt infringement of the Marks, you acknowledge that any court of competent jurisdiction may enter temporary restraining orders or preliminary and permanent injunctions (under applicable law) without posting a bond or other security and may order the immediate seizure and destruction of any infringing materials. If any court requires a bond, you stipulate that a $1,000 bond is sufficient. You must also pay Royalty Fees and BMF contributions on all Gross Revenues during the period of any infringement, our attorneys' fees, costs and disbursements incurred in enforcing our trademark and contract rights. You acknowledge that if you breach this Agreement and/or continue to utilize the System or Marks after termination or expiration, we will have no adequate remedy at law. Therefore, you expressly consent and agree that we may, in addition to any other available remedies, obtain an injunction and/or temporary restraining order to terminate or prevent the continuation of any existing default or violation, and to prevent the occurrence of any threatened default or violation, by you of this Agreement.

**16.7    Surviving Obligations.**

**16.7.1**    Except as otherwise provided in this Agreement, on expiration or termination of the Agreement, you will have no further interest or rights in this Agreement. All financial obligations, incurred before termination or expiration, will not be affected by such termination or expiration and must be satisfied. In addition, you remain obligated to pay Royalty Fees, BMF contributions, and referral fees, on transactions pending at the time of expiration, termination or Transfer of the Franchise. The provisions of this Section survive termination or expiration of this Agreement.

**16.7.2**    If an "early termination" of this Agreement occurs (which will mean any termination of the Agreement before the Expiration Date, other than a mutual termination under Section 16.2.1), you will immediately pay us "liquidated damages." The parties acknowledge and agree that it would be



impracticable or extremely difficult to calculate the actual amount you would have been obligated to pay as Royalty Fees, BMF Contributions and any other fees due under this Agreement through the Expiration Date and that the following method of calculation represents a fair and reasonable estimate of our damages: Liquidated damages will be equal to the combined monthly average of Royalty Fees, BMF contributions, and any other fees under this Agreement (without regard to any fee waivers, PPA or other reductions) payable from the Opening Date through the date of early termination, multiplied by the lesser of (i) 36 or (ii) the number of full months remaining in the Term. The present value of the total calculated at a discount rate of 8%, assuming payment is made at the end of each month, will constitute our liquidated damages.

16.7.3 You acknowledge that at all times, we have the right to access and use (i) all information you provide to us as required by the P&P Manual, including, without limitation, any reporting items or categories that may later be adopted in the P&P Manual; (ii) all information you provide to us contained in your sales and transaction reports, and in such other operational reports that we request from you; and (iii) all information you provide to us regarding your customers' enrollment in any client contact program we may adopt. The information in (i), (ii) and (iii) above is referred to collectively as "the Client Information." We may use the Client Information for business purposes that may include, without limitation, public relations, advertising, statistical compilations, investigations and resolutions of client complaints, and quality surveys. In addition, we have the right, on termination, to continue to use the Client Information and to make the Client Information available to other franchisees for such purposes as we deem appropriate. On termination, you will be deemed to have assigned your client contact program enrollments to us to deal with the enrollments as we deem appropriate. On termination, your name and your sales associates' names will be removed from client contact program mailings.

16.8 **Other Damages.** Our right to collect reasonable attorneys' fees, costs of investigation, court costs and other litigation expenses incurred in enforcing our rights under this Agreement will survive termination.

17.0 **INDEMNIFICATION AND INSURANCE:**

17.1 **Your Indemnification.** You will indemnify and hold harmless us, our Related Parties, and all other franchisees from all expenses, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or related to your operations. If we are made a party to a lawsuit or other legal action or we otherwise have a claim asserted against us in connection with your (or your Related Parties') activities, regardless of whether you or your franchise was named or served in the subject lawsuit, we may (i) tender the defense and/or prosecution of the case to you and you will be responsible for diligently pursuing the case at your expense; or (ii) hire counsel directly to protect our interests and bill you for all costs and attorneys' fees incurred, which you must promptly pay. This indemnity will apply to claims that we were negligent or failed to train, supervise or discipline you, and to claims that you or your agents are our agent or part of a common enterprise with us. The obligations under this Section survive the expiration or termination of this Agreement.

17.2 **Insurance.**

17.2.1 **Required Policies and Coverage.** You will obtain and maintain for the Term the following types of insurance: (1) automobile liability coverage, included hired and non owned auto's, with limits of at least $1,000,000 per occurrence; (2) general liability with limits of at least $1,000,000 per occurrence; (3) professional liability (real estate errors and omissions) coverage with limits of at least $1,000,000 per occurrence coverage; and (4) any additional types of policies and coverage as may be required by law, including, without limitation, workers compensation coverage. You must furnish us with certificates of insurance before the Opening Date. We reserve the right to require you to obtain additional types of



insurance, to increase limits during the Term or to reduce minimum coverage requirements, but you may carry reduced coverage only if you first receive our written approval to do so. Approval to do so may be revoked at any time. If you fail to maintain any required insurance, we may, but are not obligated to, obtain any and all required insurance on your behalf and to charge you for the cost. You will promptly reimburse us for all our costs upon demand.

**17.2.2 Carriers.** All policies must be in form and content satisfactory to us and must be issued by an insurer(s) rated A- or better in Class X by Alfred M. Best and Company Inc., or comparably rated by Moody's and/or Standard and Poor's or similarly reliable rating services acceptable to us. We reserve the right to change the minimum acceptable rating requirement.

**17.2.3 Additional Insureds.** We and Realogy, their subsidiaries, successors and assigns must be named as additional insureds on all of the insurance policies listed and maintained by you.

**17.2.4 Notice of Policy Changes or Cancellation.** All policies must provide that they may not be canceled except upon 30 days' advance written notice to us.

**17.2.5 Annual Certificates.** You must furnish us certificates of coverage and endorsements annually on or before the anniversary of the Opening Date.

**18.0 AMENDMENT:**

**18.1 Written and Signed.** Any modification of this Agreement must be in writing and signed by the authorized representatives of both parties.

**18.2 Authority to Amend.** NO FIELD REPRESENTATIVE, INCLUDING ANY DIVISIONAL OR REGIONAL PRESIDENT, VICE PRESIDENT OR BUSINESS MANAGER OF OURS, HAS THE RIGHT OR AUTHORITY TO MAKE ORAL OR WRITTEN MODIFICATIONS TO THIS AGREEMENT. NO UNAUTHORIZED MODIFICATION WILL BE BINDING ON EITHER PARTY.

**19.0 WAIVER:**

**19.1 Waiver; Severability.** If any provision(s) of this Agreement is or becomes in violation of any local, state or federal law, such provision(s) will be considered immediately amended to conform to that law. If the violative provision cannot be amended to conform to law, each party expressly releases the other from any liability under the violative provision of this Agreement. To the extent any provision of this Agreement is deemed to be invalid or unenforceable for any reason, the remainder of this Agreement will not be adversely affected, but rather will be enforced to the greatest extent permitted by law. No waiver of any breach of any term or condition contained in this Agreement will constitute a waiver of any subsequent breach of the same term or condition.

**19.2 Disputes with Others.** Each party waives the right to assert that principles of collateral estoppel or issue preclusion prevent raising any claim or defense because either party lost a similar claim or defense in another action. Any ruling by a third-party factfinder or court in any prior proceeding in which either party was involved as a litigant (or its equivalent) (such party referred to as a "Litigant") with a third party will not prevent the Litigant from asserting similar arguments or positions in any action between the parties.

**20.0 NON-COMPETITION COVENANTS:**

**20.1 In Term.** During the Term, you, your Owners, officers, guarantors, and Responsible Broker (for so long as each are engaged or employed by you) will not, directly or indirectly, through ownership or



otherwise, engage in any real estate brokerage business or related business, other than the Business authorized under this Agreement. Moreover, immediate family members of the restricted parties will not engage in any residential real estate brokerage business in the market you serve.

**20.2    On Transfer of the Franchise.** Any New Franchisee must be protected against the potential for unfair competition by your use of our training, assistance and trade secrets in direct competition after a Transfer of the Franchise. Therefore, for 24 months following a Transfer of the Franchise (or the remaining Term, whichever is less), you, your Owners, officers, guarantors, and the spouses of such Persons, will not, directly or indirectly, operate, own, license, franchise, be employed by or consult with any residential real estate brokerage within a two-mile radius of any Office.

**20.3    Competing Services or Products.** During the Term, you, your Owners, officers, employees, sales associates and agents will not manage, operate, hold any ownership interest in or receive compensation from any Person, that provides or seeks to provide equipment, supplies, services or other operating materials to our other franchisees, without our advance written consent.

**20.4    Post Term Restriction on Start-Ups.** If on the Effective Date you were a Start-Up Company, you agree that you, your Owners, officers and guarantors, as well as any of the immediate family members of these Persons (collectively, the "Restricted Parties") will not, directly or indirectly, through ownership or otherwise, engage in any real estate brokerage business from any Office for a period of 1 year following termination or expiration of the Agreement. A Start-Up Company is a real estate brokerage that operated a stand-alone licensed real estate business for less than 12 months before the Effective Date.

**21.0    INDEPENDENT CONTRACTOR:**

**21.1    At all times,** you will hold yourself and the Business out to be independently owned and operated.

**21.2    You must conspicuously disclose** in the Office, in your real estate sale documents, listing agreements and on all business cards, stationery, and in all advertisements and in all other printed or recorded material you and your sales associates and employees use, that you are independently owned and operated and are not our agent or owned by us. You expressly understand that you will be an independent contractor and must hold yourself out to the general public as such. This Agreement does not make you our agent, legal representative, joint venture, partner, employee or servant for any purpose. You are not authorized to make or promise any contract, agreement, warranty or representation on our (or our Related Parties') behalf, except as expressly provided in this Agreement, or to create any obligation, express or implied, on our behalf. You are not authorized to accept service of process or legal notices directed to us. You acknowledge that this Agreement does not constitute or create a fiduciary relationship, and the relationship between the parties is not, and is not intended to be a fiduciary relationship.

**21.3    Responsibility for Operations.** We have no obligation to pay your commissions, taxes, wages or other expenses, and have no right to regulate or participate in the recruitment, engagement, retention, discipline or termination of sales associates or employees, or to determine or limit the parties from whom you accept listings or to or for whom you may sell property, the commission rates you charge, your commission splits with sales associates, your working conditions, the manner or details of work performed by you or your sales associates or employees, except as may be necessary to protect the Marks and goodwill. You agree that you are solely responsible for the Business operated under this Agreement according to your own judgment, and in accordance with the provisions of this Agreement and the P&P Manual.

**22.0    MISCELLANEOUS:**



**22.1    Credit Report.** You authorize us to investigate your credit and will supply us with references and signed consent forms for this purpose. You consent to exchange of information about you, the Business and your business and credit history on a privileged basis between us and your references or persons named in your credit report.

**22.2    Taxes.** You will pay promptly when due all taxes, accounts, liabilities and indebtedness of any kind incurred by you in the conduct of the Business. If any fees (including, without limitation, Royalty Fees and the initial franchise fee) payable by you to us are subject to Value Added Taxes, Gross Receipts Taxes, or similar taxes imposed by taxing authorities within the jurisdiction where you operate, you shall, in addition to the fees due us, pay us an additional sum equal to the amount of such tax imposed on fees due us.

**22.3    Successors and Assigns.** Subject to Section 15, this Agreement will be binding on and inure to the benefit of the parties and their respective legal representatives, successors and assigns.

**22.4    Headings.** The headings in this Agreement are for convenience only, do not constitute a part of this Agreement, and will not be deemed to limit or affect any of the provisions of this Agreement.

**22.5    Time of the Essence.** Time is of the essence for all of this Agreement's provisions that specify a time for performance.

**22.6    Applicable Law.** Subject to our rights under federal trademark laws, the parties' rights under this Agreement, and the relationship between the parties is governed by, and will be interpreted in accordance with New Jersey laws (statutory and otherwise), except that the New Jersey Franchise Practices Act will not apply to agreements for Offices located outside New Jersey. You waive, to the fullest extent permitted by law, the rights and protections that might be provided through the laws of any state relating to franchises or business opportunities, other than those of the state in which the Office is located.

**22.7    Venue and Jurisdiction.** You submit to the non-exclusive personal jurisdiction in New Jersey state and federal courts for any litigation arising out of or related to this Agreement or to any aspect of the business relationship between the parties. Such litigation will have venue in state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

**22.8    Waiver of Class Action.** You agree that any judicial proceeding will be considered as to its facts and may not be brought as a class action. You and your Owners waive any right to proceed against us by way of class action.

**22.9    WAIVER OF JURY TRIAL.** The parties waive the right to a jury trial in any action arising out of or related to this Agreement or any aspect of the relationship between you, us, any guarantor and their respective successors and assigns.[3]

**22.10    Waiver of Punitive Damages.** We and you (and your Owners and guarantors) fully waive any right to or claim for any punitive or exemplary damages against each other. If any dispute arises between you and us, you and we will each be limited to recovery of actual damages which, in our case, includes liquidated damages in Section 16 or damages provided in the Lanham Act or its state counterpart.

**22.11    Attorney Fees.** We will be entitled to collect, in addition to any award of damages or injunctive relief, our costs in enforcing our rights under this Agreement against you, including reasonable attorneys'

---

[3] Section 41 of the Illinois Franchise Disclosure Act ("Act") provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Act or any other law of the State of Illinois is void.



fees, court costs, expert fees, costs of investigation, and other litigation expenses. We will also be entitled to collect our attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses in the event we are the prevailing party with respect to any claim or counterclaim or other legal proceeding brought by you against us in connection with this Agreement or our relationship.

**22.12    USA PATRIOT Act and Foreign Assets Control Regulations Compliance.** You will, at all times, operate in compliance with any applicable laws, rules and regulations, including the USA PATRIOT Act (Public Law 107-56) and Foreign Assets Control Regulations (31 CFR Parts 500; 501). You represent and warrant that you, your Owners, directors, and employees:  (i) are not included on any U.S. government list (including the Office of Foreign Assets Control ("OFAC")) of Persons with whom financial or similar transactions are prohibited;  and (ii)  are not subject to embargo or sanctions under OFAC regulations or similar U.S. government laws, regulations, or Executive Orders.  Further, you will promptly notify us if any of the covenants and representations in this Section are inaccurate, and you will cooperate with us in any resulting audits or investigations.

**22.13    Variations Among Agreements.** We have the right to vary standards for any other franchisee based on a particular area, circumstance, business practice or other condition that we deem important to the other franchisee's successful operation. You have no rights based on our variation from standard practices and will not be entitled to require us to grant you a similar variation under this Agreement.

**22.14    Opportunity to Investigate.** You acknowledge that you have had full opportunity to investigate independently our operations and be thoroughly advised of the terms and conditions of this Agreement by counsel of your choice. Unless expressly provided otherwise, this Agreement is exclusively for our and your benefit and may not give rise to liability to any third party unless specifically stated.  Our exercise of any right or discretion granted to us under this Agreement will not constitute a lack of good faith.

**22.15    Integration.**   You acknowledge that we have fully explained our operations to you; that you understand their uses, benefits and limitations; and that we made no representations to you as to the financial benefit to be gained under this Agreement.  You have not relied on any written or oral representations except those specifically made a part of this Agreement in writing.  This Agreement, any Exhibits, and any Addendum signed by our authorized officer and you represents the entire integrated agreement between us and you and supersedes all prior negotiations or agreements, either written or oral, between the parties. This clause does not disclaim the representations of the Disclosure Document.   DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE DISCLOSURE DOCUMENT.

**22.16    Consent.**  In those instances where our prior consent is required without identifying the method or timing for consent, you will request consent in writing, and we will notify you of our decision within 30 days after receiving your written request and all supporting documents.  Whenever our consent or approval is required under this Agreement, it must be in writing.  If we do not respond within 30 days, the request is deemed denied.  Our consent or approval will be effective only to the extent specifically stated and we will not be deemed to waive our right to consent to or approve any later request.  Except where this Agreement expressly obligates us to reasonably approve or consent to (or not to unreasonably withhold our approval of or consent to) any action or request by you, we have the right to withhold our approval of or consent to any action requested by you.

**22.17    Our Rights.**  Whenever this Agreement provides that we have a certain right, that right is absolute and the parties intend that our exercise of that right will not be subject to any limitation or review.  We have the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement.



**22.18    Our Reasonable Business Judgment.**  Whenever we reserve discretion, or are deemed to have reserved discretion, in a particular area or we agree or are deemed to be required to exercise our rights reasonably or in good faith, we will satisfy our obligations by exercising Reasonable Business Judgment in making our decision or exercising our rights.  Neither you nor any third party (including, without limitation, a trier of fact) shall substitute its judgment for our reasonable business judgment.

**22.19    Counterparts/Facsimiles.**  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which will constitute one and the same agreement.  Facsimile copies of this Agreement have the same force and effect as the original and will be fully binding on all parties.

**22.20    Further Assurances.**  The parties will execute any documents necessary to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

**23.0    ADDITIONAL REPRESENTATIONS:** You make the following additional warranties and representations that are an inducement on which we are relying to enter into this Agreement:

**23.1**    The information in the franchise application is accurate and complete.  Any consents or authorizations in the franchise application are incorporated into this Agreement and are effective for the Term.

**23.2**    You are not obtaining this Franchise for speculative purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchise in whole or in part.

**23.3**    You acknowledge the importance of the high and uniform standards of quality, appearance and service imposed by us in order to maintain the value of our name and the necessity of operating the Office in compliance with our standards.  You represent that you have the ability and intention to meet those standards.

**23.4**    You have procured such certificates, licenses and permits, in addition to appropriate real estate licenses, necessary for you to carry on the Business contemplated by this Agreement.

**23.5**    Your signing of this Agreement does not violate or breach any other agreement or commitment to which you are bound.

**23.6**    Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you.  You acknowledge that the success of the Franchise is dependent on your and your Owners' efforts.  Your non-exclusive right to use the System and its programs does not imply or guarantee you any level of business, any specific advertising programs, any number of recruits, or the receipt of referrals from our other franchisees or our Related Parties' franchisees.  You and the Owners represent that you each intend to engage in the management or supervision of the Franchise.  You agree to conduct the Business strictly in accordance with this Agreement and to exercise your continuous best efforts to maintain and develop the Business to its greatest potential.  You will exert your best efforts to promote Such Excluded Business offered by such companies as we from time to time designate, including without limitation, our and/or any of our Related Parties, provided that such Excluded Business is available in your market area and can be offered and sold in a commercially practicable manner.  We and/or any of our Related Parties have the right to modify or discontinue any and all such Excluded Business.

**23.7**    You and each Owner has read fully this Agreement, the P&P Manual table of contents and the Disclosure Document, and understand their terms, and represent that each is able to and will comply with the



franchise requirements described in the Agreement and the P&P Manual. You acknowledge that you have had not less than 14 calendar days to review our Disclosure Document before signing this Agreement.

23.8   As of the Opening Date, the Owners will be and, during the entire Term will remain, in full compliance with all applicable U.S. laws and regulations that prohibit unfair, fraudulent or corrupt business practices in the performance of your obligations under this Agreement and related activities.

24.0   STATE LAW ADDENDA.   The state law addenda included in Exhibit F are an integral part of this Agreement.   If you are a resident of California, Georgia, Hawaii, Illinois, Maryland, Minnesota, North Dakota, Rhode Island, South Dakota, Virginia, Washington or Wisconsin, the respective state law addendum included in Exhibit F applies to you upon your execution of this Agreement.

(Balance of Page Intentionally Left Blank.)



### EXHIBIT A
### REAL ESTATE FRANCHISE AGREEMENT

---

Franchisee's Legal Name: <u>The Bellmare Group LLC</u>
Business Name: COLDWELL BANKER Bellmarc

This Exhibit is an integral part of the Real Estate Franchise Agreement ("Agreement") between Coldwell Banker Real Estate LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.

### OWNERSHIP INTERESTS

**I.** **Franchisee Ownership.** You represent and warrant that the following Persons own ownership interests in Franchisee as stated below:

Name:                                    Interest:

| Nice Idea, LLC | 65% |
|---|---|
| ALL Enterprises, LLC | 35% |

**II.** **Underlying Ownership.** The words "Owner" and "Owners" in the Agreement include each "Person" who has a direct ownership interest in Franchisee. If any Owner listed above is a corporation, partnership or other legal entity, you represent and warrant that the ownership interests stated below for the Owners are accurate and complete:

Name of Legal Entity: <u>Nice Idea, LLC</u>

| Name: | Ownership Interest: |
|---|---|
| Neil Binder | 100% |

Name of Legal Entity: <u>ALL Enterprises LLC</u>

| Name: | Ownership Interest: |
|---|---|
| Anthony DeGrotta | 30% |
| Larry Friedman | 30% |
| Lenny Flausso | 25% |
| Frank Sanchez | 5% |

Name of Legal Entity: _____

| Name: | Ownership Interest: |
|---|---|
|  |  |
|  |  |
|  |  |

**COLDWELL BANKER**

Name of Legal Entity: _____

| Name: | Ownership Interest: |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Name of Legal Entity: _____

| Name: | Ownership Interest: |
|---|---|
|  |  |
|  |  |
|  |  |

If additional legal entities are Owners of Franchisee or if additional Persons have ownership interests in the legal entity listed above, such information is included on additional pages attached to, and made a part of, this Exhibit A.



## EXHIBIT B
## REAL ESTATE FRANCHISE AGREEMENT

---

### GUARANTY OF PAYMENT AND PERFORMANCE

This Guaranty of Payment and Performance is given by the undersigned, <u>Nice Idea, LLC, ALL Enterprises LLC, Neil Binder,</u> (individually a "Guarantor" and collectively "Guarantors"), effective as of the Effective Date of the Franchise Agreement to Coldwell Banker Real Estate LLC ("Franchisor"), in order to induce Franchisor to accept <u>The Bellmarc Group LLC</u> ("Franchisee") as a franchisee of Franchisor.

Each Guarantor, independently of Franchisee's obligations, jointly and severally, guarantees to Franchisor the prompt payment and performance, when due of all of Franchisee's obligations under the Franchise Agreement(s) between Franchisor and Franchisee, including any renewal, replacement or modification of the agreement (the "Agreement"), and other agreements or instruments of indebtedness now existing or hereafter entered into by Franchisee and Franchisor. This Guaranty applies to all obligations in the Agreement, including payment of the initial franchise fee, all Royalty Fees, advertising fund contributions, charges for manuals, supplies, materials, services and products furnished by Franchisor, audit fees, assignment fees, attorneys fees, referral fees, obligations to indemnify and other such charges, fees and assessments under the Agreement. This Guaranty incorporates by reference, as if contained fully in this Guaranty, Sections 22.9 (Waiver of Jury Trial) and 22.10 (Waiver of Punitive Damages) of the Agreement, and the Guarantors knowingly and voluntarily waive their right to a jury trial and to seek punitive damages. Guarantors also agree that Section 22.8 (Waiver of Class Action) of the Agreement is incorporated in this Guaranty, as if contained fully in this Guaranty, and Guarantors waive any right to proceed against Franchisor by way of a class action.

This Guaranty will be deemed continuing in nature and will apply to Franchisee's obligations for the Office(s) (as defined in the Agreement) and all Future Branch Office(s) (as defined in the Agreement). This Guaranty will not be discharged by any compromise of any debt and/or the extension of payment deadlines. Guarantors waive defenses based on presentment, demand, protest, notice of protest and dishonor, and diligence in collecting any obligation under the Agreement. Franchisor will not be required to pursue any remedy against Franchisee as a condition of the Guarantors' obligation under this Guaranty.

It will not be a condition to the enforcement of this Guaranty that Guarantors will be given any notice.

The obligation of each Guarantor is an absolute and unconditional obligation and constitutes a guaranty of payment and performance. Separate action(s) may be brought and prosecuted against Guarantors whether action is brought against Franchisee or Franchisee is joined in any such action(s). Guarantors waive to the fullest extent permitted by law, the benefit of any statute of limitations affecting their liability under this agreement or the enforcement of this Guaranty. Any Guarantor who is a married person agrees that recourse may be had against his or her separate property for his or her obligations under the Agreement. Without the prior written consent of Franchisor, Guarantors will not transfer any assets described in the Personal Financial Statement (or such other similar document) submitted to Franchisor for review and acceptance of Franchisee to an individual, trust or other legal entity for the purpose of protecting or shielding such assets from the claims or rights that Franchisor may have under this Guaranty.



Each Guarantor expressly waives notice of the acceptance of this Guaranty and agrees that Franchisor's actions or failure to act will not in any way limit or discharge Guarantor's liability under this Guaranty.

This Guaranty and the Guarantors' liabilities and obligations under this Guaranty are binding on Guarantors and their respective heirs, executors, successors and assigns (and if applicable, successor trusts and trustees), and inure to the benefit of and are enforceable by Franchisor and its successors, transferees, and assigns.

This Guaranty will be governed by the laws of the State of New Jersey in all respects, including matters of construction, validity, and performance, and its terms and provisions may not be waived, altered, modified, or amended except in writing duly signed by an authorized officer of Franchisor and by Guarantors.

Each Guarantor submits to the non-exclusive personal jurisdiction of the state and federal courts of New Jersey with respect to any claims arising out of the Agreement, this Guaranty or the business relationship between Franchisor and Franchisee. Such litigation will have venue in the state courts in Morris County, New Jersey, or in the United States District Court for the District of New Jersey.

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty will be construed as if it did not contain that provision, and the rights and liabilities of the parties will be construed and enforced accordingly.

This Guaranty may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Guaranty. Facsimile copies of this Guaranty will be deemed to have the same force and effect as the original and will be fully binding on all Guarantors.

**THE GUARANTORS SIGNING THIS GUARANTY REPRESENT AND WARRANT THAT THE PERSON SIGNING THE AGREEMENT IS AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THE AGREEMENT AND ANY FUTURE AGREEMENTS UNLESS THEY PROVIDE NOTICE OTHERWISE TO FRANCHISOR. THE GUARANTORS ACKNOWLEDGE THAT FRANCHISOR IS EXPRESSLY RELYING ON THIS REPRESENTATION IN ENTERING INTO THE AGREEMENT.**

Nice Idea, LLC

By:

ALL Enterprises LLC

By:

Neil Binder, Individually and Personally



## EXHIBIT C
## REAL ESTATE FRANCHISE AGREEMENT

### GLOSSARY OF TERMS

For your reference, the capitalized terms used in the Agreement will have the meaning set forth below.

**"Branch Office"** is any approved COLDWELL BANKER Office you operate, other than the Main Office.

**"Broker Price Opinions"** means standard, non-substantive residential value estimates issued to financial institutions or others for a nominal fee and do not include appraisals or other substantive estimates or opinions of value.

**"Business"** means the operation of a real estate brokerage under the terms of this Agreement.

**"BMF Threshold"** is defined in Section 8.2

**"Client Information"** is defined in Section 16.7.3.

**"Confidential Information"** means information owned or licensed by us and involving the operation of the Business, including without limitation, the P&P Manual, procedures related to our proprietary communications and referral systems, and other methods and information. Confidential Information does not include information that (a) is or becomes generally available to the public; or (b) is or becomes available to the recipient from a source that is not, to its knowledge, prohibited from disclosing such information to it by a legal, contractual, or fiduciary obligation of confidentiality.

**"Disclaimer"** is defined in Section 4.9.

**"Disclosure Document"** means our Franchise Disclosure Document used in the offer and sale of franchises in your state in effect at the time you sign the Agreement.

**"Effective Date"** is defined in Section 1.1.

**"Excluded Business"** means any business you operate other than the Business, as defined in Section 2.

**"Expiration Date"** is defined in Section 1.5.

**"Franchisee"** is defined in Section 1.2.

**"Franchisor"** is defined in Section 1.1.

**"Future Branch Office"** is defined in Section 5.4

**"Gross Revenue"** means all money or things of value, calculated at their fair market value in United States currency, received or receivable (earned but not yet received), by you (including, without limitation, all revenues and commissions whether or not other individuals or entities are entitled to retain such revenues or commissions), directly or indirectly, in connection with the Business (earned in compliance with all laws) including transactions and services that require a real estate or auctioneer's license and/or in which you use the Marks or the System in any manner. "Gross Revenue" will include all such revenue before the deduction of any fees, costs or expenses you incur, except for referral fees you pay to: (i) other licensed brokers operating under a Realogy brand franchise agreement; (ii) any referral networks owned or operated by Realogy or its Related Parties; or (iii) brokers or referral networks not related to Realogy, unless you pay more than 5% of your annual Gross Revenue to non-Realogy brokers or referral networks, in which case all such referral fees you pay that exceed the 5% cap will be considered Gross Revenue. Moreover, any amounts deposited in the Business's bank accounts will be deemed



Gross Revenue earned in compliance with all laws unless proven otherwise.

"**Improvements**" is defined in Section 14.2.

"**Main Office**" is the first COLDWELL BANKER Office you operate (or such other substitute Office that has been designated as your Main Office).

"**Marks**" means the trademarks, service marks and trade dress that we authorize you to use in the P&P Manual, including all additional or substitute trademarks, service marks and trade dress that we may authorize you to use.

"**New Franchisee**" is defined in Section 15.6.

"**Office**" means any Office covered by this Agreement as of the Effective Date.

"**Opening Date**" is defined in Section 1.7.

"**Owner**" is defined in Section 1.3.

"**Performance Premium Award**" is defined in Section 7.2.

"**Person**" means an individual, a partnership, a trust, a corporation, a limited liability company, an association and any other incorporated or unincorporated organization or entity.

"**Personal Transaction**" is defined in Section 7.1.2.

"**P&P Manual**" means our Policy and Procedures Manual.

"**PPA**" is defined in Section 7.2.

"**PPA Table**" is defined in Section 7.2.

"**Property Management Services**" means acting as agent for an owner of real property (including projects governed by Homeowners' Associations, apartment complexes, and resort properties), performing all services required in connection with the day-to-day management and operation of the property, including, but not limited to: (i) collecting rents or other amounts due the property owner; (ii) enforcing tenants' lease obligations; (iii) receiving service of process for litigation or condemnation proceedings; (iv) securing permits and licenses for the property's management and operation; (v) contracting for or overseeing utility repairs, maintenance, alterations, and/or purchasing and maintaining equipment, personal property, supplies or materials; (vi) performing property maintenance services; (vii) performing construction services on the property; and/or (viii) any leasing or rental activity having a nonrenewable term of less than 90 days.

"**Realogy**" means Realogy Corporation, its successors and assigns.

"**Reasonable Business Judgment**" means any decision we make or action we take that promotes or benefits the System generally, even if the decision or action also promotes our financial or other interest, or if other reasonable or arguably preferable alternatives exist and regardless of whether an individual brokerage may be unfavorably affected. This includes, but is not limited to, actions to increase the value of the Marks; increase or enhance the overall franchisee or customer satisfaction; minimize possible brand inconsistencies or customer confusion; enhance or encourage modernization; or improve the competitive position of the System.

"**Related Party**" means, with respect to a particular Person, a Person who, directly or indirectly, owns or controls that Person, is owned or controlled by a Person, or is under common control with that Person. Control, in this context, means the possession of executive power to direct or to cause the direction of the management and policies of a Person, whether through voting power, ownership, by contract or otherwise.

"**Responsible Broker**" means your licensed real estate broker as required under the laws of the state in which the Office is located.



"Restricted Party" is defined in Section 20.4.

"Royalty Fee" has the meaning in Section 7.1.

"Standards" means our mandatory specifications, standards, methods and procedures prescribed by us in the P&P Manual or this Agreement.

"Start-Up Company" is defined in Section 20.4.

"System" means the business format and methods developed or licensed by us for the promotion of independently owned and operated real estate brokerage offices, including policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate sales market. The System includes use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs. The System does not include any real estate or other investment syndication business of any kind.

"System Components" is defined in Section 4.5.1.

"Term" is defined in Section 1.5.

"Trade Name" is defined in Section 2.1.

"Transfer of the Franchise" is defined in Section 15.4.

"URL" means uniform resource locator (also known as a domain name or web site address).



## EXHIBIT D
## REAL ESTATE FRANCHISE AGREEMENT

### AUTHORIZED OFFICES

You are authorized to operate Offices under the terms of this Agreement at the following addresses:

| | |
|---|---|
| 1. | 936 Broadway, New York, NY 10010 |
| 2. | 1178 Lexington Avenue, New York, NY 10028 |
| 3. | 424 Columbus Avenue, New York, NY 10024 |
| 4. | 681 Lexington Avenue, New York, NY 10022 |
| 5. | 16 East 12th Street, New York, NY 10003 |

This Exhibit is an integral part of the Real Estate Franchise Agreement ("Agreement") between Coldwell Banker Real Estate, LLC ("we" or "us") and you ("Franchisee" or "you"). This Exhibit will not be modified except by written agreement signed by both you and us.



## EXHIBIT E
### REAL ESTATE FRANCHISE AGREEMENT

**PERFORMANCE PREMIUM AWARD PROGRAM FOR CALENDAR YEAR 2012[1]**

| Range[2] | Annual Gross Revenue | | Maximum Range Amount | Multiplier Rate | Maximum Award Per Range | Cumulative Award Per Year |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| Range I | $0 | $1,706,516 | $1,706,516 | N/A | $0 | $0 |
| Range II | $1,706,517 | $2,559,773 | $853,256 | N/A | $2,500 | $2,500 |
| Range III | $2,559,774 | $3,412,905 | $853,131 | 1.00% | $8,531 | $11,031 |
| Range IV | $3,412,906 | $5,972,615 | $2,559,709 | 1.25% | $31,996 | $43,028 |
| Range V | $5,972,616 | $8,532,388 | $2,559,772 | 1.50% | $38,397 | $81,424 |
| Range VI | $8,532,389 | $11,091,970 | $2,559,582 | 1.75% | $44,793 | $126,217 |
| Range VII | $11,091,971 | $13,651,808 | $2,559,837 | 2.00% | $51,197 | $177,414 |
| Range VIII | $13,651,809 | $16,211,456 | $2,559,647 | 2.25% | $57,592 | $235,006 |
| Range IX | $16,211,457 | $18,771,038 | $2,559,581 | 2.50% | $63,990 | $298,995 |
| Range X | Over $18,771,038 | | * | 3.00% | * | * |

*No maximum award will be calculated at 3% of gross revenue above $18,771,038

(1) Under certain Franchise Agreements executed prior to April 1, 1997, the franchisee is eligible under certain circumstances to receive a Performance Premium Award with a multiplier rate of 5% in certain ranges. This eligibility will remain in effect if the franchisee renews its Franchise Agreement.

(2) Within each range over $2,559,773, the PPA is calculated by multiplying the "Maximum Range Amount" by the "Multiplier Rate" for that range. The total PPA for any year is equal to the sum of the PPA attributable to all the ranges.



**EXHIBIT F**
**REAL ESTATE FRANCHISE AGREEMENT**

**STATE LAW ADDENDA**

## CALIFORNIA

For a Franchisee who is a resident of California, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.  Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. California Business and Professions Codes Sections 20000 through 20043 provide rights to you concerning termination or non-renewal of the franchise. If this Agreement contains a provision that is inconsistent with the law, the law will control.

    B.  Limitations Period: Section 19.2 of this Agreement is deleted.

## GEORGIA

If you are a resident of Georgia, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.  Section 20.1 of the Agreement is deleted in its entirety and replaced with the following:

    20.1    In Term. During the Term, you, your Owners, officers, guarantors, and any of the immediate family members of the Owners, officers, guarantors, and Responsible Broker will not, directly or indirectly, through ownership or otherwise, engage in any other real estate brokerage business within 15 miles of any Office authorized under this Agreement without our advance written consent.

## HAWAII

If you are a resident of Hawaii, the following provisions will apply and will supersede any provision in this Agreement to the contrary the following provisions will supersede and apply to the Agreement:

    A.  Section 1.6.1 of this Agreement is deleted in its entirety and replaced with the following:

    If on the Effective Date you are not operating any Offices under the System, within five (5) days after the Opening Date, you will pay us an initial franchise fee of $25,000 for the first office, $10,000 for the second office and $7,500 for each additional office.

    B.  Section 1.6.3 is deleted in its entirety and replaced with the following:

## ILLINOIS

If you are a resident of Illinois, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

    A.  Illinois law applies to this transaction and supersedes any conflicting provisions of this Agreement or New Jersey law.



B. Termination and Non-renewal:  Section 16 of this Agreement relates to renewal and termination of the franchise. The conditions under which the franchise can be terminated and your rights on non-renewal may be affected by Illinois law, specifically Illinois Compiled Statutes 1992, Chapter 815, Sections 705/19 and 705/20.

C. Illinois Cause of Action:  Section 22.7 of this Agreement relate to dispute resolution, including judicial proceedings.  Notwithstanding the provisions of Article 16.0, (i) the Act applies to this Agreement and supersedes any conflicting provisions of this Agreement and New Jersey law, and (ii) any provision in this Agreement that designates jurisdiction or venue in a forum outside of Illinois is void provided that this Agreement may provide for arbitration in a forum outside of Illinois.

D. Release or Waiver:  Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act or any other law of the state of Illinois is void; provided, however, that this Section will not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Illinois Franchise Disclosure Act.

E. Section 1.6.1 of this Agreement is deleted in its entirety and replaced with the following:

If on the Effective Date you are not operating any Offices under the System, within five (5) days after the Opening Date and after we have satisfied all of our material pre-opening obligations to you, you will pay us an initial franchise fee of $25,000 for the first office, $10,000 for the second office, and $7,500 for each additional office.

F. Section 1.6.3 is deleted in its entirety and replaced with the following:

THE INITIAL FRANCHISE FEE FOR THE OFFICES COVERED BY THIS AGREEMENT IS FULLY EARNED ON THE DATE PAID (WITHIN FIVE (5) DAYS AFTER THE OPENING DATE AND AFTER WE HAVE SATISFIED ALL OF OUR MATERIAL PRE-OPENING OBLIGATIONS TO YOU) AND IS NOT REFUNDABLE. THE INITIAL FRANCHISE FEE FOR EACH FUTURE BRANCH OFFICE IS FULLY EARNED ON THE DATE YOU BEGIN OPERATING THE BRANCH OFFICE.

<u>MARYLAND</u>

If you are a resident of Maryland or you are a resident of another state and you intend for the franchise to be operational in Maryland, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Franchisee may bring a lawsuit in Maryland against Franchisor for claims arising under the Maryland Franchise Registration and Disclosure Law.

B. The general release required as a condition to renewal, sale and or assignment/transfer will not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

C. Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

CB EXHC1 03/12    39



D. The representations of Franchisee in the Franchise Agreement are not intended, nor will they act, as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

E. Section 1.6.1 of this Agreement is deleted in its entirety and replaced with the following:

If on the Effective Date you are not operating any Offices under the System, within five (5) days after the Opening Date, you will pay us an initial franchise fee of $25,000 for the first office, $10,000 for the second office, and $7,500 for each additional office.

F. Section 1.6.3 is deleted in its entirety and replaced with the following:

THE INITIAL FRANCHISE FEE FOR THE OFFICES COVERED BY THIS AGREEMENT IS FULLY EARNED ON THE DATE PAID (WITHIN FIVE (5) DAYS AFTER THE OPENING DATE) AND IS NOT REFUNDABLE. THE INITIAL FRANCHISE FEE FOR EACH FUTURE BRANCH OFFICE IS FULLY EARNED ON THE DATE YOU BEGIN OPERATING THE BRANCH OFFICE.

Each provision of this Section 24.3 will be effective only to the extent that, with respect to the provision, the jurisdictional requirement of the Maryland Franchise Registration and Disclosure Law are met independently without reference to this Section 24.3.

## MINNESOTA

If you are a resident of Minnesota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. With respect to franchises governed by Minnesota law, Franchisor will comply with Minnesota Statutes, Section 80C.14, Subdivisions 3, 4, and 5, which require, except in certain specified cases, that the Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Agreement.

B. Sections 22.6 through 22.9 of this Agreement relate to judicial proceedings. Judicial proceedings may, take place outside of Minnesota. The provisions of Sections 22.6 through 22.9 will not in any way abrogate or reduce any right of Franchisee, as provided under Minnesota Statutes, Chapter 80C, or Minnesota Rule 2860.4400J, including the right to submit matters to the jurisdiction of Minnesota courts or the right to a jury trial.

C. Franchisee Indemnification: We agree to indemnify and save you harmless from any loss, costs or expenses arising out of or related to any claim, suit or demand against you relating to your use of the Marks in accordance with this Agreement.

D. General Release Not Required: Notwithstanding any terms in this Agreement, you are not required to agree to any general release as a condition for approval of any assignment, transfer or renewal of this Agreement.

E. No Waiver of Bond: Notwithstanding any terms of this Agreement, Franchisee is not required to consent in advance as to any application by Franchisor for injunctive relief or to waive any bond.



F. Section 1.6.1 of this Agreement is deleted in its entirety and replaced with the following:

If on the Effective Date you are not operating any Offices under the System, within five (5) days after the Opening Date, you will pay us an initial franchise fee of $25,000 for the first office, $10,000 for the second office and $7,500 for each additional office.

G. Section 1.6.3 is deleted in its entirety and replaced with the following:

THE INITIAL FRANCHISE FEE FOR THE OFFICES COVERED BY THIS AGREEMENT IS FULLY EARNED ON THE DATE PAID (WITHIN FIVE (5) DAYS AFTER THE OPENING DATE) AND IS NOT REFUNDABLE. THE INITIAL FRANCHISE FEE FOR EACH FUTURE BRANCH OFFICE IS FULLY EARNED ON THE DATE YOU BEGIN OPERATING THE BRANCH OFFICE.

## NORTH DAKOTA

If you are a resident of North Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

Revisions: The North Dakota Securities Commissioner has held the following to be appropriate and required revisions to franchise agreements for Franchisees in North Dakota:

A. Covenants not to compete on termination or expiration of the franchise agreement that conflict with Section 9-08-06 of the North Dakota Century Code are generally unenforceable in the State of North Dakota.

B. North Dakota law provides that any arbitration between franchisor and Franchisee relating to the franchise be held at a location mutually agreeable to both franchisor and Franchisee. North Dakota law prohibits mandatory arbitration at a site remote from the location of the franchise.

C. North Dakota Franchisees are not required to consent to the jurisdiction of courts outside of North Dakota. All franchise agreements for North Dakota franchises will be governed by the laws of the state of North Dakota.

D. Any provision of the franchise agreement requiring the Franchisee to consent to liquidated damages or termination penalties is unfair and inequitable to Franchisees.

E. North Dakota Franchisees are not required to sign a general release on the renewal of the franchise agreement. Consequently, any provision of a franchise agreement as it applies to the requirement that Franchisee's execute a general release on renewal does not apply to North Dakota Franchises.

F. North Dakota Franchisees are not required to consent to a waiver of the right to a class action. Consequently, Section 22.7 of the Agreement as it applies to the waiver of the right to a class action does not apply to North Dakota Franchisees.

G. North Dakota Franchisees are not required to waive their right to a jury trial. Consequently, Section 22.8 does not apply to North Dakota Franchisees.



H. North Dakota Franchisees are not required to consent to a waiver of exemplary and punitive damages. Consequently, Section 22.9 of the Agreement does not apply to North Dakota Franchisees.

I. This Agreement will be governed by the laws of the state of North Dakota.

## RHODE ISLAND

If you are a resident of Rhode Island, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Jurisdiction and Venue: A provision in a franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of another State is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

B. Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that:

"A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

This supersedes Section 22.6 or any other contrary provision of the Agreement.

## SOUTH DAKOTA

If you are a resident of South Dakota, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. South Dakota Law:  Section 22.5 of this Agreement relates to the laws governing this Agreement.  Notwithstanding anything to the contrary in Section 22.5, the law regarding franchise registration, employment, covenants not to compete, and other matters of local concern will be governed by the laws of the State of South Dakota.  However, as to contractual and all other matters, this Agreement and all of its provisions will be and remain subject to the application, construction, enforcement and interpretation under the governing law in Section 22.5.

B. South Dakota Cause of Action:  Section 22.6 of this Agreement relates to, among other things, judicial proceedings between the parties.  Notwithstanding anything to the contrary contained in Section 22.6, under South Dakota law any provision in this Agreement that designates jurisdiction or venue, or that requires Franchisee to agree to jurisdiction or venue, in a judicial forum outside of South Dakota is void with respect to any cause of action which is otherwise enforceable in South Dakota.

C. Termination:  Section 16 of this Agreement pertains to default and termination of the franchise.  Notwithstanding the provisions of Section 16, you will be provided with 30 days' written notice and opportunity to cure any breach of this Agreement, any failure to meet performance and quality standards or any failure to make payments of Royalty Fees required by this Agreement.



D. Disclaimers: Notwithstanding anything to the contrary contained in this Agreement, under South Dakota Codified Laws, Section 37-5A-86, any acknowledgment provision, disclaimer or integration clause, or other provision having a similar effect, in this Agreement will not negate or act to remove from judicial review any statement, misrepresentation or action that would violate this Chapter of the Law or a rule or order under this Chapter.

## WASHINGTON

If you are a resident of Washington, the following provisions will apply and will supersede any provision in this Agreement to the contrary:

A. Transfer Fees: Section 15 of this Agreement relates to franchise ownership and transfer. Section 15.5 requires the transferee of the franchise to pay a transfer fee. Transfer fees are collectable to the extent that they reflect franchisor's reasonable estimated or actual costs in effecting a transfer.

B. Termination and Non-renewal: Section 16 of this Agreement relates to renewal and termination of the franchise. Washington statute, RCW 19.100.180 may supersede the franchise agreement in your relationship with Franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Agreement in your relationship with us, including the areas of termination and renewal of your franchise.

C. Section 22.5 of this Agreement prescribes the laws governing this Agreement. Notwithstanding anything to the contrary contained in Section 22.5, in the event of a conflict of law, the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will take precedence.

D. Inconsistent Provisions: If any of the provisions in our disclosure document or this Agreement are inconsistent with the relationship provisions of RCW 19.100.180 or other requirements of the Washington Franchise Investment Protection Act, the provisions of the Act will prevail over the inconsistent provisions of the disclosure document or this Agreement with regard to any franchise sold in Washington.

E. Release or Waiver: Any release or waiver of rights executed by you will not include rights under the Washington Franchise Investment Protection Act except when executed under a negotiated settlement after the Agreement is in effect and where the parties are represented by independent counsel. Provisions like those that unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

## WISCONSIN

If you are a resident of Wisconsin, the following provisions will apply and will supersede any provision in this Agreement to the contrary the following provisions will supersede and apply to the Agreement:

A. Wisconsin Law: The Wisconsin Fair Dealership Law applies to franchising in the State of Wisconsin. This Law prohibits the termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement without good cause.



B. **Inconsistent Provisions:** The Wisconsin Fair Dealership Law supersedes any provisions contained in this Agreement that are inconsistent with the Law. If a conflict under this Agreement arises, the Law will prevail.

C. **Written Notice:** The Wisconsin Fair Dealership Law further provides that 90 days prior written notice of termination, cancellation, non-renewal or substantial change of the competitive circumstances of a franchise agreement must be given to the Franchisee. The Franchisee has 10 days to cure the non-payment of fees to franchisor and 60 days to cure any other deficiency and, if the deficiency is so cured within the applicable cure period, the notice of termination is void.

## VIRGINIA

If you are a resident of Virginia, the following provisions will apply and will supersede any provision in this Agreement to the contrary the following provisions will supersede and apply to the Agreement:

A. The Virginia State Corporation Commission's Division of Securities and Retail Franchising requires us to defer payment of the initial franchise fee and other initial payments owed by franchisees to the franchisor until the franchisor has completed its pre-opening obligations under the franchise agreement.

B. Section 1.6.1 of this Agreement is deleted in its entirety and replaced with the following:

If on the Effective Date you are not operating any Offices under the System, within five (5) days after the Opening Date, you will pay us an initial franchise fee of $25,000 for the first office, $10,000 for the second office and $7,500 for each additional office.

C. Section 1.6.3 is deleted in its entirety and replaced with the following:

THE INITIAL FRANCHISE FEE FOR THE OFFICES COVERED BY THIS AGREEMENT IS FULLY EARNED ON THE DATE PAID (WITHIN FIVE (5) DAYS AFTER THE OPENING DATE) AND IS NOT REFUNDABLE. THE INITIAL FRANCHISE FEE FOR EACH FUTURE BRANCH OFFICE IS FULLY EARNED ON THE DATE YOU BEGIN OPERATING THE BRANCH OFFICE.

**EXHIBIT "3"**

# ADDENDUM TO FRANCHISE AGREEMENT

THIS AMENDMENT TO THE ADDENDUM TO FRANCHISE AGREEMENT by and between **Coldwell Banker Real Estate LLC** ("Franchisor") and **The Bellmarc Group LLC** ("Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

1.    The Franchise Agreement (hereinafter the "Agreement") is amended by adding Section 25 with the following special stipulations that apply to the Agreement and supersede any inconsistent or conflicting provisions therein. These stipulations apply only to Franchisee and are not transferable or assignable, except that the stipulations will survive any transfer of the Agreement from Franchisee to any Owners of Franchisee who are Owners as of the date hereof. The stipulations may also survive the transfer of the Agreement to other third parties, provided   Franchisee obtains the consent of Franchisor, which consent   will not be unreasonably withheld and provided such other third parties otherwise meet the conditions of transferability in accordance with Section 15 of the Agreement.

## 25.1    Marketing of COLDWELL BANKER in Manhattan.

1

**25.2.    Initial Franchise Fee.** Notwithstanding any terms, provisions, and/or conditions of the Agreement to the contrary, the total Initial Franchise Fee of ⸱          ⸱ is reduced to

**25.2.1  Waiver of Initial Franchise Fees on Additional Offices.**    Notwithstanding any terms, conditions and/or provisions of the Agreement to the contrary, if Franchisee opens Future Branch Offices, there shall be no initial franchise fee ("IFF") charged by Franchisor in connection with the first three (3) Future Branch Office(s), **provided** Franchisee opens the Office(s) within calendar year 2013.  The IFF for each Future Branch Office after calendar year 2013 will be $5,000. Any such additional office must be approved and opened in accordance with the terms of the Agreement. Notwithstanding anything herein, the relocation of an Office to a new location under the Franchise Agreement shall not constitute the opening a new office, and there is no IFF for any such relocation, provided Franchisee otherwise complies with the provisions of the Franchise Agreement regarding relocation and obtains Franchisor's prior approval for any such relocation.

**25.3    Royalty Fees.**  The first sentence of Section 7.1.1 of the Agreement is deleted in its entirety and replaced with the following:

2

"You agree to pay us a continuing fee equal to 2.25% of your annual Gross Revenues during the Term (the 'Royalty Fee')."

25.3.1 <u>Default Royalty Fee</u>. If in <u>any</u> calendar year during the Term, the Gross Revenue on which Franchisee has reported and paid Royalty Fees and BMF contributions is not equal to or greater than                         ("Gross Revenue Deficiency"), the above provision will be automatically terminated and the following will replace the first sentence of Section 7.1.1 of the Agreement, effective as of the first day of the calendar year following the occurrence of a Gross Revenue Deficiency, through the end of the Term:

"You agree to pay us a continuing fee equal to 6% of your annual Gross Revenues during the Term (the 'Royalty Fee')."

As it is used in this Addendum, the 6% Royalty Fee will be referred to as the "Default Royalty Fee."

If in any calendar year after the Gross Revenue Deficiency occurs, the Gross Revenue on which you have reported and paid Royalty Fees (and BMF contributions, if applicable) exceeds (the "Gross Revenue Achievement"), you will pay us a continuing fee equal to 2.25% of Gross Revenue for the calendar year following the Gross Revenue Achievement. As a condition precedent to the application of the 2.25% Royalty Fee, you shall advise us in writing by March 31 of each calendar year if your aggregated Gross Revenue meets or exceeds the             threshold (the "Gross Revenue Threshold") to trigger the 2.25% Royalty Fee. Upon receipt of such written notice (directed to the Vice President of Contract Administration), we will confirm your eligibility for the 2.25% Royalty Fee based on information reported in our electronic reporting system (currently CREST), and upon confirmation, we will apply the 2.25% Royalty Fee for the following calendar year, subject to the terms of this Section. If you fail to provide written notice by March 31 of your eligibility to pay the 2.25% Royalty Fee, you will pay us an amount equal to 6.00% of Gross Revenue for that calendar year.

If in any calendar year, there is a decline in sales volume in the Manhattan residential real estate market by over 20% year over year ("Market Decline") as reported by Franchisor's affiliated companies operating in Manhattan or by a system similar to a multiple listing service for the city of Manhattan (it being understood that Franchisee bears the burden of proving and corroborating the same) <u>and</u> Franchisee has previously achieved the Gross Revenue Threshold in the calendar year preceding the Market Decline, Franchisee shall not be required to meet the Gross Revenue Threshold for the calendar year in which the Market Decline occurred. If Franchisee was required to pay the Default Royalty Fee in the calendar year preceding the Market Decline, this paragraph shall not be applicable to any Market Decline.

25.4. <u>Performance Premium Award.</u> In exchange for the reduced Royalty Fee described in Section 25.3 above, Section 7.2 of the Agreement is deleted in its entirety. Franchisee shall not be entitled to earn or receive a Performance Premium Award ("PPA") under the Agreement, <u>except that</u> if a Gross Revenue Deficiency occurs under Section 25.3.1 above and the Default Royalty Fee is effective, the original terms of Section 7.2 shall be reinstated and shall govern the parties' relationship, effective as of the first day of the calendar year following the occurrence of a Gross Revenue Deficiency, through the end of the Term.

25.5. <u>Pending Transactions.</u> Notwithstanding anything to the contrary contained in the Agreement, Royalty Fee and BMF Contributions shall not be due on any transactions pending

3

(transactions that are evidenced by a binding agreement between any third parties and have been submitted to escrow for closing) prior to the Opening Date (the "Pending Transactions") provided that on or before the Opening Date, Franchisee submits to Franchisor a written list of the Pending Transactions. If Franchisee fails to submit the list of Pending Transactions on or before the Opening Date, this provision shall be null and void.

      **25.6.   Expiration Date.** The "Expiration Date" shall be the date twenty (20) years from the Opening Date.

      **25.7.   Area of Protection/Limited And Conditional Exclusivity.**

**25.8    Initial Conversion Funding.** Franchisor agrees to extend to Franchisee funding (the "Funding") in the aggregate amount of **$1,250,000**, subject to the terms and conditions set forth in this Section.  The Funding shall occur 20 business days after the later of (x) the Opening Date, and (y) the date that Franchisee satisfies all of the conditions to funding set forth in this Section.  The payment will be made by direct deposit, subject to the following conditions: (A) Franchisee completes and delivers to Franchisor a signed Direct Deposit Authorization Form (or such other replacement wire transfer documentation requested by Franchisor) and a Form W-9 - Request for Taxpayer Identification Number and Certification, (B) Franchisee opens its real estate brokerage business under the System prior to **July 7, 2013** in accordance with the terms and conditions of the Franchise Agreement (C) Franchisee enters all of its agents into the applicable Franchisor Reporting System (currently "CREST"), (D) any checks delivered by Franchisee for any fees payable under the Agreement (including initial franchise fees) have cleared, (E) Franchisee delivers to Franchisor a properly signed original of the promissory note (the "Note") and security agreement (the "Security Agreement"), in the form attached to the Franchise Disclosure Document, (F) Franchisee is in full compliance with the material terms of the Franchise Agreement (including being current on all reporting and payment obligations) and any other agreement or instruments by and between Franchisor and Franchisee, and (G) Franchisee has not filed a petition for bankruptcy protection under federal or state laws between the Effective Date and the funding date.   If Franchisee's Gross Revenue in any

6

measurement year does not meet or exceed _____ Franchisee may elect, at its option, to pay Franchisor the difference between the Royalty Fees owed on _____ (based on Franchisee's then-current net effective Royalty Fee rate) and the amount of Royalty Fees actually paid by Franchisee in the applicable calendar year, instead of the yearly Principal (defined in the Note). If Franchisee signs and delivers the Note and Security Agreement to Franchisor prior to the date of the funding, Franchisor agrees to hold them in escrow until the commencement of Franchisee's obligations thereunder. The Note will expressly provide for annual ratable forgiveness of the principal amount based upon Franchisee's continued maintenance of _____ in annual Gross Revenues. The Note shall be executed by Franchisee, Nice Idea Publishing, Inc., ALL Enterprises LLC and Neil Binder individually.

### 25.9    Additional Conversion Funding on Reported and Paid Gross Revenue Thresholds.

25.9.1 **Amount of Funding.** Franchisor will make available additional Conversion Funding ("Additional Funding") in four installments as set forth below (minus any taxes or other amounts payable by Franchisor in connection with the Funding) in the event Franchisee timely reports and pays Royalty Fees and BMF Contributions on Gross Revenue over and above certain Gross Revenue Thresholds (defined below) in a twelve-month period between the Opening Date and the end of the Term:

| Amount of Additional Funding | Gross Revenue Threshold |
|---|---|
|  |  |
|  |  |
|  |  |

Additional Funding shall only be available after the first instance that Franchisee achieves the applicable Gross Revenue Threshold. The total aggregate Additional Funding available to Franchisee under Section 25.9 is _____ If Franchisee achieves the Gross Revenue Threshold, Franchisee must notify Franchisor and Franchisor will extend Additional Funding within twenty (20) business days of the date Franchisee gives written notice to Franchisor, provided that Franchisor has confirmed Franchisee's eligibility under this Section based solely on amounts reported in Franchisor's internet reporting system, and on which all fees are paid, which shall be subject to Franchisor's confirmation of the same, and provided Franchisee has satisfied the conditions to funding described in Section 25.9.4 below.

Franchisee agrees that the Gross Revenue Thresholds set forth in the above table shall be increased by the amount of annual Gross Revenue (measured over the twelve-month period preceding the Acquisition of an office as hereinafter described) acquired by Franchisee through (a) the acquisition of any franchisee office operating under a Realogy brand at the time of acquisition; or (b) any acquisition for which Franchisor has provided conversion funding (the "Acquisition"). For example, if Franchisee receives funding on an Acquisition for an office with Confirmed GCI, as defined below, of _____ and Franchisee has not received any funding under this Section, the Gross Revenue Thresholds in the table above shall

automatically be increased to _____ and _____ respectively. For purposes of this Section 25.9.1, "Confirmed GCI" shall mean the trailing twelve months of gross commission income achieved by those sales associates from the Acquisition who (i) have transferred their licenses to Franchisee's company, and (ii) have entered their professional information and listings into Franchisor's reporting system.

**25.9.2 Documentation of Additional Funding.** Any Additional Funding provided under this Section 25.9 will be evidenced by a separate conversion promissory note(s) and other applicable documentation that Franchisor may reasonably require. Each said conversion promissory note(s) shall contain terms and provisions similar to those contained in the conversion promissory note signed pursuant to the terms of Section 25.8, provided that the Note Forgiveness Threshold (as defined in the table set forth below in Section 25.9.3) shall govern as it relates to any Additional Funding. in accordance with Section 25.9.3 below. No funding under this Section will affect the Note Forgiveness Threshold for any promissory note previously signed by Franchisee. Each separate conversion promissory note will be measured for forgiveness separate and apart from the conversion promissory note signed pursuant to the terms of Section 25.8 and each promissory note will have a separate Note Forgiveness Threshold as set forth in Section 25.9.3. However, each separate conversion promissory note shall have a forgiveness period based on the balance of the term of the Agreement.

**25.9.3 Note Forgiveness Thresholds.** For each conversion promissory note extended to Franchisee pursuant to this Section 25.9, Franchisee's annual Note Forgiveness Threshold will be determined in accordance with the table set forth below. Each conversion promissory note will provide that the Note Forgiveness Threshold will be measured each December 31 beginning with the first full calendar that begins after the date of the conversion promissory note. For example, if Franchisee executed a conversion promissory note dated January 10, 2014, Franchisee's first measurement of the Note Forgiveness Threshold will occur effective as of December 31, 2015.

| Amount of Additional Funding | Note Forgiveness Threshold |
|---|---|
|  |  |
|  |  |
|  |  |

**25.9.4 Conditions.** To receive any funding under this Section 25.9, Franchisee must (a) be in compliance with the terms of the Franchise Agreement (including timely reporting and timely payment of all fees due under the Agreement); (b) submit documentation required by Franchisor as a condition of such funding; and (c) have satisfied conditions (D), (E), (F) and (G) of Section 25.8 for each Additional Funding.

**25.10 Excluded Business(es).** Franchisor hereby consents to the operation of **A.C. Lawrence, a commercial real estate brokerage business and Kwartier, a property management company.** Such business(es) shall be considered "Excluded Business(es)" and operated by Franchisee as such in accordance with the terms of Section 4.2 of the Franchise Agreement.

**25.11 Limited Renewability of Franchise.**

8

25.12 <u>Improvements</u>. Section 14.2 of the Agreement is modified to provide that "Improvements" are limited to improvements and enhancements made by Franchisee to Franchisor's tools, technology, System, Marks and related materials. Tools, programs and marketing concepts that Franchisee has developed prior to its affiliation with the Coldwell Banker Real Estate System are listed on Schedule 25.12 to this Agreement and are exempt from the restrictions of Section 14.2. Schedule 25.12 may be amended by the parties from time to time to add any tools or programs that Franchisee develops that are separate and apart from the Coldwell Banker Real Estate System, tools, technology, Marks and related programs.

9

**25.13 Ethical Conduct, Consumer Relations and Protection of Goodwill.** Nothing in this Agreement will require Franchisee or its agents to join or hold memberships with the National Association of REALTORS®.

**25.14 Notices.** It is understood and agreed that wherever notice is required to be provided to Franchisor under this Section 25, Franchisee's failure to give the notice required herein shall not constitute an event of default under this Agreement.

25.15 **Attorney's Fees.** Section 22.11 of the Agreement is deleted in its entirety.

2.    Except as expressly stated in this Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Addendum.

3.    The terms of the special stipulations contained in this Addendum are expressly confidential between the parties. Franchisee agrees to use commercially reasonable efforts to ensure that the terms of this Addendum are kept strictly confidential. If Franchisee's Owners intentionally or negligently disclose the terms of this Addendum to any third party, with the exception of Franchisee's disclosure to Franchisee's legal counsel, accountant, financial institutions with a need for Franchisee's contracts, or employees with a need to know such information to assist in the operation of the Franchise, such disclosure will be deemed a material breach of this Agreement, subjecting the Agreement to termination or the payment of the liquidated damages as set forth below and may give rise to Franchisor's need for injunctive relief. Specifically, Franchisee's Owners may not disclose the financial terms of this Addendum to any third party in connection with discussions regarding acquisition/merger or otherwise; such disclosure will be deemed a material breach of this Agreement by Franchisee. In the event of Franchisee Owner's disclosure of the terms of this Addendum in violation of the terms of this Agreement, Franchisee will be required to pay Franchisor $10,000 in liquidated damages per Disclosure Event. A "Disclosure Event" shall be defined as any occurrence of a disclosure by Franchisee's Owners. *In addition, in the event that Franchisee is in material default under the Agreement and Franchisee fails to timely cure such default or take reasonable steps to initiate a cure after notice from Franchisor, then any special stipulations made for your benefit shall immediately become null and void, without any further notice from Franchisor, and shall forever cease to exist.*

4.    All capitalized terms not otherwise defined herein shall have the respective meanings given such terms in the Agreement.

5.    Counterparts/Facsimiles. The Parties agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In addition, the Parties further acknowledge and agree that facsimile or electronic copies of this agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS ADDENDUM ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM.**

10

"FRANCHISEE" The Bellmarc Group LLC

Dated: _Marh 26_, 20_13_   By: _____
                           Name: _Neil Binder, presid.t_
                           Authorized Person


"FRANCHISOR"   Coldwell Banker Real Estate LLC

Dated: _Apr. 27_, 20_13_   By: _____
                           **Debbie Iuliano**
                           **Vice President**
                           **Contract Administration**

11

## Schedule 25.12

Custom Programs, Copywrites, Business Methodologies and Writings and Training Programs Unique to the Bellmarc Group and protected from use by the franchisor without the consent of the franchisee.

1. Bellmarc Listing System
2. AC Lawrence Listing System
3. Bellmarc Accounting System
4. Bellmarc Job Order system
5. Bellmarc Advertising System
6. Bellmarc Deal Monitoring system
7. AC Lawrence Deal Tracking System
8. AC Lawrence and Bellmarc internet sites
9. Bellmarc Homepik field listing system
10. Selection Portfolio Business Procedure
11. The content of all Books generated by Neil Binder
12. All Training Program Content and Material generated by Bellmarc and Neil Binder
13. All Training Program Content and Material generated by AC Lawrence.

12



The Borough of Manhattan shall be defined as the geography beginning on the north end at the Harlem River which separates the island of Manhattan from the Bronx (220th Street), extended to the southernmost tip of the island (South Street). This piece of geography shall be separated from New Jersey on the western side by the Hudson River, and extends east to the Harlem River/East River, and shall include Roosevelt Island.

**EXHIBIT "4"**

## AMENDMENT TO FRANCHISE AGREEMENT

THIS AMENDMENT TO FRANCHISE AGREEMENT and THE ADDENDUM TO FRANCHISE AGREEMENT by and between Coldwell Banker Real Estate LLC ("Franchisor") and The Bellmarc Group LLC ("Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

### RECITALS

Whereas, Franchisor and Franchisee entered into a certain Franchise Agreement, as amended by a certain Addendum to Franchise Agreement ("the Addendum") effective as of March 27, 2013 (the Franchise Agreement and Addendum are sometimes collectively referred to as the "Agreement");

Whereas, Franchisee has informed Franchisor that each of the Offices governed by the Franchise Agreement are operated by certain Bellmarc Companies, including limited liability companies affiliated with Franchisee which are under common ownership and control as Franchisee (the "Bellmarc Affiliate Companies") as more particularly described in Schedule A attached hereto; and

Whereas, Franchisee and Franchisor desire to amend the terms of the Agreement to add and join as parties each of the respective Bellmarc Affiliate Companies to the Agreement to be bound by the terms, conditions and provisions of the Agreement as if they had been named originally as Franchisee, as set forth and as specifically provided herein.

Now Therefore, for good and valuable consideration, the receipt of which is acknowledged by the parties Franchisor and Franchisee agree as follows:

### AMENDMENT

1.     **Joinder of Parties as Franchisee.** Each of the Bellmarc Affiliate Companies identified and set forth in Schedule A attached hereto are hereby added as parties to the Agreement and shall be jointly, severally and collectively referred to as "Franchisee" as if originally named therein and shall be bound to all of the terms and conditions of the Agreement, except as specifically provided otherwise in the terms of this Amendment. Each of the Bellmarc Affiliate Companies shall execute this Amendment by its duly authorized representatives to effect the joinder and shall be considered as the Franchisee hereunder as to each particular Office operated by said company as set forth in Schedule A. By signing this Amendment, Franchisee shall be directly liable for all obligations under the Agreement as to each such Office as set forth in Schedule A.

2.     **Representations and Covenants.**     Franchisee hereby represents, covenants and warrants to Franchisor that each of the Bellmarc Affiliate Companies are commonly owned and controlled by the same owners of The Bellmarc Group LLC ("Bellmarc Group") in the same ownership percentage structure as Bellmarc Group as set forth herein. Nice Idea Publishing, Inc. owns 65% of each of the Bellmarc Affiliate Companies and ALL Enterprises, Inc. owns 35% of each of the Bellmarc Affiliate Companies.

1

3. **Initial Conversion Funding.** Franchisor and Franchisee agree that the Initial Conversion Funding (the "Funding") set forth in Section 25.8 of the Addendum to the Agreement dated March 27, 2013 ("Addendum") shall be paid directly to Bellmarc Group in accordance with the terms and conditions of said Addendum. It is understood and agreed to by Franchisee that Franchisor shall have no obligation to pay the Funding or any portion thereof to any of the other Bellmarc Affiliate Companies. Each of the Bellmarc Affiliate Companies hereby waives any right to receive any portion of the Funding. Franchisor has agreed to fund a portion of the Initial Conversion Funding in the amount of $250,000 (the "Funding Advance") within 20 days following the execution of this Amendment by the parties. The Funding Advance is being made by Franchisor on the express condition that Franchisee impacts and opens the Offices under the Agreement no later than June 13, 2013. In the event Franchisee fails to impact and open the Offices on or before June 13, 2013, the Funding Advance will be immediately due and payable under the Conversion Promissory Note dated May 15, 2013. Franchisee acknowledges that, if it fails to either (i) open the Offices as stated herein or (ii) immediately repay the Funding Advance, Franchisee shall be considered in default of the Agreement and Franchisor shall be entitled to exercise any rights or remedies available at law or in equity. Following the payment of the Funding Advance, the remaining Funding available under Section 25.8 of the Addendum will be reduced to 1,000,000.00.

4. **Additional Conversion Funding on Reported and Paid Gross Revenue Thresholds.** Franchisor and Franchisee agree that the Additional Conversion Funding provided for in Section 25.9.1 of the Addendum will be made available directly to Bellmarc Group in accordance with the terms and conditions of the Addendum. It is understood and agreed to by Franchisee that Franchisor shall have no obligation to pay the Additional Conversion Funding or any portion thereof to any of the other Bellmarc Affiliate Companies. Each of the Bellmarc Affliate Companies hereby waives any right to receive any portion of the Additional Conversion Funding.

5. **Fees.** Franchisor and Franchisee agree that all Fees, including Royalty Fees and Brand Marketing Fund Contributions, due and payable under the Agreement shall be paid directly by Bellmarc Group for and on behalf of all of the Bellmarc Affiliate Companies to achieve administrative convenience. Notwithstanding anything herein to the contrary, each of the Bellmarc Affiliate Companies understand and agree that they are bound to use all of the Coldwell Banker trademarks, service marks and logos in accordance with the Agreement, and shall remain liable for the payment of all Fees for the respective Offices.

6. **Business Name.** Franchisor and Franchisee acknowledge and agree that office numbers 0001 and 0006 located at 936 Broadway, New York, NY and 729 Seventh Avenue, New York, NY, respectively will operate under the trade name  Coldwell Banker AC Lawrence Real Estate for their residential only business and shall be subject to the terms of the Agreement.

7. **Excluded Business(es).** Section 25.10  of the Addendum is amended to state that Franchisor hereby consents  to the operation of **A.C. Lawrence, a commercial real estate brokerage business subject to the following requirements.** Franchisee agrees that it will maintain  the A.C. Lawrence commercial real estate office physically separate and distinct from the residential offices described in Paragraph 6 above, and shall not conduct any commercial activities from or at either of the aforementioned offices in Paragraph 6 above.  Franchisee further agrees that it will create a separate web site for it's A.C .Lawrence commercial business, which shall be separate and distinct from its Coldwell Banker AC Lawrence Real Estate web site and which shall clearly identify that A.C. Lawrence commercial is not affiliated with Coldwell Banker in any manner.

2

8.  **Incorporation.** Except as expressly stated in this Amendment, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Amendment.

9.  **Confidentiality.** The terms of the special stipulations contained in this Amendment are expressly confidential between the parties. Franchisee agrees to use commercially reasonable efforts to ensure that the terms of this Amendment are kept strictly confidential. If Franchisee's Owners intentionally or negligently disclose the terms of this Amendment to any third party, with the exception of Franchisee's disclosure to Franchisee's legal counsel, accountant, financial institutions with a need for Franchisee's contracts, or employees with a need to know such information to assist in the operation of the Franchise, such disclosure will be deemed a material breach of this Agreement, subjecting the Agreement to termination or the payment of the liquidated damages as set forth below and may give rise to Franchisor's need for injunctive relief. Specifically, Franchisee's Owners may not disclose the financial terms of this Amendment to any third party in connection with discussions regarding acquisition/merger or otherwise; such disclosure will be deemed a material breach of this Agreement by Franchisee. In the event of Franchisee Owner's disclosure of the terms of this Amendment in violation of the terms of this Agreement, Franchisee will be required to pay Franchisor $10,000 in liquidated damages per Disclosure Event. A "Disclosure Event" shall be defined as any occurrence of a disclosure by Franchisee's Owners. *In addition, in the event that Franchisee is in material default under the Agreement and Franchisee fails to timely cure such default or take reasonable steps to initiate a cure after notice from Franchisor, then any special stipulations made for your benefit shall immediately become null and void, without any further notice from Franchisor, and shall forever cease to exist.*

10.  **Defined Terms.** All capitalized terms not otherwise defined herein shall have the respective meanings given such terms in the Agreement.

11.  **Counterparts/Facsimiles.** The Parties agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In addition, the Parties further acknowledge and agree that facsimile or electronic copies of this agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

THE PERSON SIGNING THIS AMENDMENT ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM.

"FRANCHISEE"

The Bellmarc Group LLC

Dated: _May 13_____, 20_13_   By: _____
                                  Name: _Neil Binder_
                                  **Authorized Person**

3

AC Lawrence Real Estate, LLC

Dated: May 13 , 20 13   By: _____
                         Name: Neil Binder
                         **Authorized Person**

Bellmarc Brokerage Midtown, Inc.

Dated: May 13 , 20 13   By: _____
                         Name: Neil Binder
                         **Authorized Person**

Bellmarc Downtown L.L.C.

Dated: Mon 13 , 20 13   By: _____
                         Name: Neil Binder
                         **Authorized Person**

Bellmarc East L.L.C.

Dated: May 13 , 20 13   By: _____
                         Name: Neil Binder
                         **Authorized Person**

Bellmarc Gramercy/Chelsea Inc.

Dated: May 13 , 20 13   By: _____
                         Name: Neil Binder
                         **Authorized Person**

Bellmarc West L.L.C.

4

Dated: May 13 , 20 13    By: _____

Name: _____

Authorized Person

"FRANCHISOR"    Coldwell Banker Real Estate LLC

Dated: _____ May 13 , 20 13    By: _____

Debbie Iuliano
Vice President
Contract Administration

5

## SCHEDULE A

### Bellmarc Affiliated Companies/Office Locations

| Legal Entity | Office Location |
|---|---|
| AC Lawrence Real Estate LLC | 936 Broadway, New York, NY |
| Bellmarc Brokerage Midtown Inc. | 681 Lexington Avenue, New York, NY |
| Bellmarc Downtown, L.L.C. | 16 East 12th Street, New York, NY |
| Bellmarc East, L.L.C. | 1178 Lexington Avenue, New York, NY |
| Bellmarc West, L.L.C. | 424 Columbus Avenue, New York, NY |

6

**EXHIBIT "5"**

# ADDENDUM TO FRANCHISE AGREEMENT

THIS AMENDMENT TO THE ADDENDUM TO FRANCHISE AGREEMENT by and between **Coldwell Banker Real Estate LLC** ("Franchisor") and **The Bellmarc Group LLC** ("Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

     1.     The Franchise Agreement (hereinafter the "Agreement') is amended by adding Section 25 with the following special stipulations that apply to the Agreement and supersede any inconsistent or conflicting provisions therein. These stipulations apply only to Franchisee and are not transferable or assignable, except that the stipulations will survive any transfer of the Agreement from Franchisee to any Owners of Franchisee who are Owners as of the date hereof. The stipulations may also survive the transfer of the Agreement to other third parties, provided Franchisee obtains the consent of Franchisor, which consent will not be unreasonably withheld and provided such other third parties otherwise meet the conditions of transferability in accordance with Section 15 of the Agreement

     **25.16  New Franchise Number.**  Franchisor and Franchisee acknowledge that an additional COLDWELL BANKER office number of **500469** is hereby established for the operation of Franchisee's offices specifically operated by A.C. Lawrence Real Estate LLC, which two offices are 936 Broadway, New York, NY 10010 and 16 East 12th Street, New York, NY 10003 In the event that A.C. Lawrence Real Estate LLC establishes any additional offices, said offices shall operate under the preceding office number. The New Office Number will be effective as of the date of execution by Franchisor. All of the other offices now or hereafter operated by Franchisee or one of the Bellmarc affiliated limited liability companies as set forth in the Amendment dated May 13, 2013, shall continue to be operated under #500447. It is understood by the parties that a separate company number is necessary to accommodate certain back-room system functions. Notwithstanding anything herein to the contrary, the creation of the second office number shall in no event alter or modify the terms of the Franchise Agreement, Addendum or Amendment to Franchise Agreement, except as provided in Section 25.17 and 25.18 herein.

     **25.17  Brand Marketing Fund – Two Tier.**  **(The Bellmarc Group, LLC)** Franchisee's obligation to pay Brand Marketing Fund (formerly referred to as the National Advertising Fund or NAF) contributions for all Offices operated under Franchise #500447:

     You will pay us each month during the Term a Brand Marketing Fund contribution equal to a percentage of the Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
|---|---|
| Up to $1,300,000 | 2.50% |
| More than $1,300,000 | 0.5% |

To be eligible for the reduced BMF contribution rates above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue. Notwithstanding the schedule above and your total annual Gross Revenue, all Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual will be subject to a 2.5% BMF contribution. On January 1 of each year, your Gross Revenue, for purposes of this Section, will be reset and on an annualized basis, you will pay a BMF

contribution of 2.5% of Gross Revenue on all Gross Revenue up to $1,300,000 (the "BMF Threshold") and 0.5% on all Gross Revenue over $1,300,000 (except as otherwise stated in this Section). We reserve the right to increase the BMF Threshold each year by an amount not to exceed 5% of the BMF/NAF Threshold, as adjusted. Franchisee acknowledges that Franchisor will use the BMF/NAF for the purposes described in Item 11 of the Franchise Disclosure Document. Notwithstanding anything to the contrary in the Agreement, there are no percentage limitations on the categories of expenses relating to the Brand Marketing Fund.

**25.18  Brand Marketing Fund – Two Tier.  (A.C. Lawrence Real Estate, LLC)** Franchisee's obligation to pay Brand Marketing Fund (formerly referred to as the National Advertising Fund or NAF) contributions for all Offices operated under Franchise #500469:

You will pay us each month during the Term a Brand Marketing Fund contribution equal to a percentage of the Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
| --- | --- |
| Up to $700,000 | 2.50% |
| More than $700,000 | 0.5% |

To be eligible for the reduced BMF contribution rates above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue. Notwithstanding the schedule above and your total annual Gross Revenue, all Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual will be subject to a 2.5% BMF contribution. On January 1 of each year, your Gross Revenue, for purposes of this Section, will be reset and on an annualized basis, you will pay a BMF contribution of 2.5% of Gross Revenue on all Gross Revenue up to $700,000 (the "BMF Threshold") and 0.5% on all Gross Revenue over $700,000 (except as otherwise stated in this Section). We reserve the right to increase the BMF Threshold each year by an amount not to exceed 5% of the BMF/NAF Threshold, as adjusted. Franchisee acknowledges that Franchisor will use the BMF/NAF for the purposes described in Item 11 of the Franchise Disclosure Document. Notwithstanding anything to the contrary in the Agreement, there are no percentage limitations on the categories of expenses relating to the Brand Marketing Fund.

2.      Except as expressly stated in this Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Addendum.

3.      The terms of the special stipulations contained in this Addendum are expressly confidential between the parties. Franchisee agrees to use commercially reasonable efforts to ensure that the terms of this Addendum are kept strictly confidential. If Franchisee's Owners intentionally or negligently disclose the terms of this Addendum to any third party, with the exception of Franchisee's disclosure to Franchisee's legal counsel, accountant, financial institutions with a need for Franchisee's contracts, or employees with a need to know such information to assist in the operation of the Franchise, such disclosure will be deemed a material breach of this Agreement, subjecting the Agreement to termination or the payment of the liquidated damages as set forth below and may give rise to Franchisor's need for injunctive relief. Specifically, Franchisee's Owners may not disclose the financial terms of this Addendum to any third party in connection with discussions regarding acquisition/merger or otherwise; such disclosure will be deemed a material breach of this Agreement

2

by Franchisee. In the event of Franchisee Owner's disclosure of the terms of this Addendum in violation of the terms of this Agreement, Franchisee will be required to pay Franchisor $10,000 in liquidated damages per Disclosure Event. A "Disclosure Event" shall be defined as any occurrence of a disclosure by Franchisee's Owners. *In addition, in the event that Franchisee is in material default under the Agreement and Franchisee fails to timely cure such default or take reasonable steps to initiate a cure after notice from Franchisor, then any special stipulations made for your benefit shall immediately become null and void, without any further notice from Franchisor, and shall forever cease to exist.*

4. All capitalized terms not otherwise defined herein shall have the respective meanings given such terms in the Agreement.

5. Counterparts/Facsimiles. The Parties agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In addition, the Parties further acknowledge and agree that facsimile or electronic copies of this agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

THE PERSON SIGNING THIS ADDENDUM ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM.

"FRANCHISEE"     The Bellmarc Group LLC

Dated: May 19 , 20 13     By: _____
                          Name: Neil Binder
                          Authorized Person

"FRANCHISOR"     Coldwell Banker Real Estate LLC

Dated: May 22 , 20 13     By: _____
                          Debbie Iuliano
                          Vice President
                          Contract Administration

3

Case 2:14-cv-07926-MCA-MAH Document 4-6 Filed 01/06/15 Page 1 of 7 PageID: 164

# EXHIBIT "6"

# FIRST ADDENDUM TO AMENDMENT TO FRANCHISE AGREEMENT

**THIS FIRST ADDENDUM TO AMENDMENT TO FRANCHISE AGREEMENT** and **THE ADDENDUM TO FRANCHISE AGREEMENT** by and between Coldwell Banker Real Estate LLC ("Franchisor") The Bellmarc Group LLC and the Bellmarc Affiliate Companies as hereinafter defined (collectively "Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

## RECITALS

**Whereas,** Franchisor and Franchisee entered into a certain Franchise Agreement, as amended by a certain Addendum to Franchise Agreement ("the Addendum") effective as of March 27, 2013, including a Location Addendum for Bellmarc Gramercy-Chelsea, Inc. dated May 13, 2013, and an Amendment to Franchise Agreement dated May 13, 2013 (the Franchise Agreement, Addendum, Location Addendum and Amendment are sometimes collectively referred to as the "Agreement").;

**Whereas,** Franchisee desires to add a new branch location to be operated by Bellmarc Simone Song, Inc., which company is under common ownership and control as Franchisee in addition to the Offices operated by said Bellmarc Affiliate Companies (the "Bellmarc Affiliate Companies"), which are more particularly described in Schedule A of the aforesaid Amendment; and

**Whereas,** Franchisee and Franchisor desire to amend the terms of the Agreement to add and join as parties Bellmarc Simone Song, Inc. and Bellmarc Gramercy-Chelsea Inc. to the Agreement to be bound by the terms, conditions and provisions of the Agreement as if it had been named originally as Franchisee, as set forth and as specifically provided herein.

**Now Therefore,** for good and valuable consideration, the receipt of which is acknowledged by the parties Franchisor and Franchisee agree as follows:

## AMENDMENT

1.   **Joinder of Parties as Franchisee. Bellmarc Simone Song, Inc. and Bellmarc Gramercy Chelsea, Inc. are hereby** identified and set forth in Schedule A-1 attached hereto and are added as parties to the Agreement, together with the Bellmarc Affiliate Companies previously set forth in Schedule A to the Amendment, and shall be jointly, severally and collectively referred to as "Franchisee" as if originally named therein and shall be bound to all of the terms and conditions of the Agreement, except as specifically provided otherwise in the terms of this First Addendum to Amendment. Each of the Bellmarc Affiliate Companies shall execute this First Addendum to Amendment by its duly authorized representatives to effect their consent to the joinder and shall be considered as the Franchisee hereunder as to each particular Offices operated by said company as set forth in Schedule A and Schedule A-1 hereto. By signing this Amendment, Bellmarc Simone Song, Inc. and Bellmarc Gramercy Chelsea Inc. shall be directly liable for all obligations under the Agreement as to each such Office operated as set forth in Schedule A-1. It is understood that Bellmarc Simone Song, Inc. shall operate the new branch office ("New Office") located at 241 Cabrini Boulevard, New York, NY.

1

2.   **Representations and Covenants.**   Franchisee hereby represents, covenants and warrants to Franchisor that each of the Bellmarc Affiliate Companies are commonly owned and controlled by the same owners of The Bellmarc Group LLC ("Bellmarc Group") in the same ownership percentage structure as Bellmarc Group as set forth herein. Nice Idea Publishing, Inc. owns 65% of each of the Bellmarc Affiliate Companies and ALL Enterprises, Inc. own 35% of each of the Bellmarc Affiliate Companies.

3.   **Initial Franchise Fee.**

4.   **Fees.**  Franchisor and Franchisee agree that all Fees, including Royalty Fees and Brand Marketing Fund Contributions, due and payable under the Agreement shall be paid directly by Bellmarc Group for and on behalf of all of the Bellmarc Affiliate Companies to achieve administrative convenience. Notwithstanding anything herein to the contrary, each of the Bellmarc Affiliate Companies understand and agree that they are bound to use all of the Coldwell Banker trademarks, service marks and logos in accordance with the Agreement, and shall remain liable for the payment of all Fees for the respective Offices.

5.   **Pendings.**  Notwithstanding anything to the contrary contained in the Agreement, Royalty Fee and advertising / marketing contributions shall not be due on any transactions pending (transactions that are evidenced by a binding agreement between the parties <u>and have been submitted to escrow for closing) prior to December 31, 2013, provided that on or before the Opening Date, Franchisee submits a written list of said transactions.</u> If Franchisee fails to submit the list on or before the Opening Date, this provision shall be null and void.

6.   **Incorporation.**  Except as expressly stated in this Amendment, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Amendment.

7.   **Confidentiality.**  The terms of the special stipulations contained in this Amendment are expressly confidential between the parties. Franchisee agrees to use commercially reasonable efforts to ensure that the terms of this Amendment are kept strictly confidential. If Franchisee's Owners intentionally or negligently disclose the terms of this Amendment to any third party, with the exception of Franchisee's disclosure to Franchisee's legal counsel, accountant, financial institutions with a need for Franchisee's contracts, or employees with a need to know such information to assist in the operation of the Franchise, such disclosure will be deemed a material breach of this Agreement, subjecting the Agreement to termination or the payment of the liquidated damages as set forth below and may give rise to Franchisor's need for injunctive relief. Specifically, Franchisee's Owners may not disclose the financial terms of this Amendment to any third party in connection with discussions regarding acquisition/merger or otherwise; such disclosure will be deemed a material breach of this Agreement by Franchisee. In the event of Franchisee Owner's disclosure of the terms of this Amendment in violation of the terms of this Agreement, Franchisee will be required to pay Franchisor $10,000 in liquidated damages per Disclosure Event. A "Disclosure Event" shall be defined as any occurrence of a disclosure by Franchisee's Owners. *In addition, in the event that Franchisee is in material default under the Agreement and Franchisee fails to timely cure such default or take reasonable steps to initiate a cure after notice from Franchisor, then any special stipulations made for your benefit shall immediately become null and void, without any further notice from Franchisor, and shall forever cease to exist.*

2

8. **Defined Terms.** All capitalized terms not otherwise defined herein shall have the respective meanings given such terms in the Agreement.

9. **Counterparts/Facsimiles.** The Parties agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In addition, the Parties further acknowledge and agree that facsimile or electronic copies of this agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AMENDMENT ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM**

"FRANCHISEE"

The Bellmarc Group LLC

Dated: 10 . 11 . 2013 , 20____     By: _____
                                   Name: _____
                                         Authorized Person

AC Lawrence Real Estate, LLC

Dated: October 11 , 20 13     By: _____
                              Name: _____
                                    Authorized Person

Bellmarc Brokerage Midtown, Inc.

Dated: October 11 , 20 13     By: _____
                              Name: _____
                                    Authorized Person

3

**Bellmarc Downtown L.L.C.**

Dated: _October 11_ , 20 _13_    By: _____
Name: _Neil Binder_
Authorized Person

**Bellmarc East L.L.C.**

Dated: _October 11_ , 20 _13_    By: _____
Name: _Neil Binder_
Authorized Person

**Bellmarc Gramercy-Chelsea Inc.**

Dated: _October 11_ , 20 _13_    By: _____
Name: _Neil Binder_
Authorized Person

**Bellmarc West L.L.C.**

Dated: _October 11_ , 20 _13_    By: _____
Name: _Neil Binder_
Authorized Person

**Bellmarc Simone Song, Inc.**

Dated: _October 11_ , 20 _13_    By: _____
Name: _Neil Binder_
Authorized Person

4

"FRANCHISOR"

Coldwell Banker Real Estate LLC

Dated: _____ Oct. 24, 2013 ___ By: _____

Debbie Iuliano
Vice President
Contract Administration

5

## SCHEDULE A-1

### Bellmarc Affiliated Companies/New Additional Office Locations

**Legal Entity**

Bellmarc Gramercy-Chelsea, Inc.

Bellmarc Simone Song, Inc.

**Office Location**

48 West 22nd Street, New York, NY

241 Cabrini Boulevard, New York, NY

6

Case 2:14-cv-07926-MCA-MAH   Document 100-2   Filed 09/22/17   Page 108 of 265 PageID:
2355
Case 2:14-cv-07926-MCA-MAH   Document 40-9   Filed 01/06/15   Page 1 of 5 PageID: 971

# EXHIBIT "7"

## MASTER BRAND MARKETING FUND ADDENDUM TO FRANCHISE AGREEMENT

THIS MASTER BRAND MARKETING FUND ADDENDUM TO FRANCHISE AGREEMENT by and between Coldwell Banker Real Estate LLC ("Franchisor") The Bellmarc Group LLC and the Bellmarc Affiliate Companies as hereinafter defined (collectively "Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

### RECITALS

Whereas, Franchisor and Franchisee entered into a certain Franchise Agreement, as amended by a certain Addendum to Franchise Agreement ("the Addendum") effective as of March 27, 2013, including a Location Addendum for Bellmarc Gramercy-Chelsea, Inc. dated May 13, 2013, an Addendum to the Franchise Agreement dated May 22, 2013 and an Amendment to Franchise Agreement dated May 13, 2013 (the Franchise Agreement, Addendum, Location Addendum and Amendment are sometimes collectively referred to as the "Agreement").

In accordance with the terms of the Addendum to Franchise Agreement dated May 22, 2013, all Offices now or hereinafter opened under The Bellmarc Group, LLC or AC Lawrence Real Estate, LLC will have the following applicable Brand Marketing Fee structures:

1. **Brand Marketing Fund – Two Tier.** (The Bellmarc Group, LLC) Franchisee's obligation to pay Brand Marketing Fund (formerly referred to as the National Advertising Fund or NAF) contributions for all Offices operated under Franchise #500447:

You will pay us each month during the Term a Brand Marketing Fund contribution equal to a percentage of the Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
|---|---|
| Up to $1,300,000 | 2.50% |
| More than $1,300,000 | 0.5% |

To be eligible for the reduced BMF contribution rates above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue. Notwithstanding the schedule above and your total annual Gross Revenue, all Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual will be subject to a 2.5% BMF contribution. On January 1 of each year, your Gross Revenue, for purposes of this Section, will be reset and on an annualized basis, you will pay a BMF contribution of 2.5% of Gross Revenue on all Gross Revenue up to $1,300,000 (the "BMF Threshold") and 0.5% on all Gross Revenue over $1,300,000 (except as otherwise stated in this Section). We reserve the right to increase the BMF Threshold each year by an amount not to exceed 5% of the BMF/NAF Threshold, as adjusted. Franchisee acknowledges that Franchisor will use the BMF/NAF for the purposes described in Item 11 of the Franchise Disclosure Document. Notwithstanding anything to the contrary in the Agreement, there are no percentage limitations on the categories of expenses relating to the Brand Marketing Fund.

1

**2.** **Brand Marketing Fund – Two Tier.** (A.C. Lawrence Real Estate, LLC) Franchisee's obligation to pay Brand Marketing Fund (formerly referred to as the National Advertising Fund or NAF) contributions for all Offices operated under Franchise #500469:

You will pay us each month during the Term a Brand Marketing Fund contribution equal to a percentage of the Gross Revenue according to the following schedule:

| Gross Revenue (reported and paid on a calendar year basis) | Percentage Payable as a BMF Contribution |
|---|---|
| Up to $700,000 | 2.50% |
| More than $700,000 | 0.5% |

To be eligible for the reduced BMF contribution rates above, you must have reported and paid Royalty Fees and BMF contributions on all Gross Revenue. Notwithstanding the schedule above and your total annual Gross Revenue, all Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual will be subject to a 2.5% BMF contribution. On January 1 of each year, your Gross Revenue, for purposes of this Section, will be reset and on an annualized basis, you will pay a BMF contribution of 2.5% of Gross Revenue on all Gross Revenue up to $700,000 (the "BMF Threshold") and 0.5% on all Gross Revenue over $700,000 (except as otherwise stated in this Section). We reserve the right to increase the BMF Threshold each year by an amount not to exceed 5% of the BMF/NAF Threshold, as adjusted. Franchisee acknowledges that Franchisor will use the BMF/NAF for the purposes described in Item 11 of the Franchise Disclosure Document. Notwithstanding anything to the contrary in the Agreement, there are no percentage limitations on the categories of expenses relating to the Brand Marketing Fund.

**9.** **Counterparts/Facsimiles.** The Parties agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same agreement. In addition, the Parties further acknowledge and agree that facsimile or electronic copies of this agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AMENDMENT ON BEHALF OF THE FRANCHISEE REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS ADDENDUM**

"FRANCHISEE"

The Bellmarc Group LLC, for and on behalf of all of the Bellmarc Affiliated Companies

Dated: OCTOBER 31, 2013   By: _____

Name: _____

Authorized Person

2

AC Lawrence Real Estate, LLC

Dated: _OCTOBER 31, 2013_     By: _____

Name: _Neil Binker_

Authorized Person

"FRANCHISOR"

Coldwell Banker Real Estate LLC

Dated: _Nov. 8, 2013_     By: _____

Debbie Iuliano
Vice President
Contract Administration

3

## SCHEDULE A-1

### Bellmarc Affiliated Companies/New Additional Office Locations

**Legal Entity**

**Office Location**

Bellmarc Gramercy-Chelsea, Inc.

48 West 22nd Street, New York, NY

Bellmarc Simone Song, Inc.

241 Cabrini Boulevard, New York, NY

Case 2:14-cv-07926-MCA-MAH   Document 41-3   Filed 01/06/15   Page 1 of 51 PageID: 476

**EXHIBIT "8"**

Case 2:14-cv-07926-MCA-MAH Document 100-3 Filed 09/28/17 Page 114 of 265 PageID:
Case 2:14-cv-07926-MCA-MAH Document 100-3 Filed 09/28/17 Page 2 of 51 PageID:
2361

## THIRD ADDENDUM TO AMENDMENT TO FRANCHISE AGREEMENT

THIS THIRD ADDENDUM TO AMENDMENT TO FRANCHISE AGREEMENT and THE ADDENDUM TO FRANCHISE AGREEMENT by and between Coldwell Banker Real Estate LLC ("Franchisor") The Bellmarc Group LLC and the Bellmarc Affiliate Companies (collectively "Franchisee") shall be effective as of the date of execution by Franchisor. Franchise #500447.

## RECITALS

Whereas, Franchisor and Franchisee entered into a certain Franchise Agreement, as amended by a certain Addendum to Franchise Agreement ("the Addendum") effective as of March 27, 2013, including a Location Addendum for Bellmarc Gramercy-Chelsea, Inc. dated May 13, 2013, an Amendment to Franchise Agreement dated May 13, 2013, and a First Addendum to Franchise Agreement dated October 24, 2013 (the Franchise Agreement, Addendum, Location Addendum and Amendment are sometimes collectively referred to as the "Agreement");

Now Therefore, for good and valuable consideration, the receipt of which is acknowledged by the parties Franchisor and Franchisee agree as follows:

## AMENDMENT

25.9    Additional Conversion Funding on Reported and Paid Gross Revenue Thresholds.

25.9.1 Per the Addendum to Franchise Agreement dated March 27, 2013, Section 25.9.1 is hereby deleted in its entirety and replaced with the following:

Amount of Funding. Franchisor will make available additional Conversion Funding ("Additional Funding") in six installments as set forth below (minus any taxes or other amounts payable by Franchisor in connection with the Funding) in the event Franchisee timely reports and pays Royalty Fees and BMF Contributions on Gross Revenue over and above certain Gross Revenue Thresholds (defined below) in a twelve-month period between the Opening Date and the end of the Term:

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Additional Funding shall only be available after the first instance that Franchisee achieves the applicable Gross Revenue Threshold. The total aggregate Additional Funding available to Franchisee under this Section shall not exceed          If Franchisee achieves the Gross Revenue Threshold, Franchisee must notify Franchisor

1

and Franchisor will extend Additional Funding within twenty (20) business days of the date Franchisee gives written notice to Franchisor, provided that Franchisor has confirmed Franchisee's eligibility under this Section based solely on amounts reported in Franchisor's internet reporting system, and on which all fees are paid, which shall be subject to Franchisor's confirmation of the same, and provided Franchisee has satisfied the conditions to funding described in Section 25.9.4.

<u>Increased Thresholds</u>

<u>Franchisee agrees that the Gross Revenue Thresholds set forth in the above table shall be increased by the amount of annual Gross Revenue (measured over the twelve-month period preceding the Acquisition of an office as hereinafter described) acquired by Franchisee through (a) the acquisition of any franchisee office operating under a Realogy brand at the time of acquisition; or (b) any acquisition for which Franchisor has provided conversion funding (the "Acquisition").</u> For example, if Franchisee receives funding on an Acquisition for an office with Confirmed GCI, as defined below, of ____ and Franchisee has not received any funding under this Section, the Gross Revenue Thresholds in the table above shall automatically be increased to ____ (____, ____), respectively.

For purposes of this Section 25.9.1, "Confirmed GCI" shall mean the trailing twelve months of gross commission income achieved by those sales associates from the Acquisition who (i) have transferred their licenses to Franchisee's company, and (ii) have entered their professional information and listings into Franchisor's reporting system.

    25.9.3    The table inserted at Section 25.9.3 ("Note Forgiveness Thresholds") is hereby deleted and replaced as follows:

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

    1.    <u>Term of Franchise Agreements.</u>    Notwithstanding any terms, conditions and/or provisions of the Agreement (or any other franchise agreements by and between the parties) to the contrary, Franchisor and Franchisee hereby agree that any and all franchise agreements shall run co-terminus with this Agreement <u>and shall all expire on June 12, 2033.</u> Franchisee hereby agrees to execute any and all documents deemed necessary by Franchisor to effectuate the terms of this Section.

    2.    <u>Incorporation.</u>    Except as expressly stated in this Amendment, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Amendment.

2

The Bellmarc Affiliate Companies

AC Lawrence Real Estate, LLC

Dated: _____, 20 __    By: _____
                                  Name: _____
                                  Authorized Person

Bellmarc Brokerage Midtown, Inc.

Dated: _____, 20 __    By: _____
                                  Name: _____
                                  Authorized Person

Bellmarc Downtown L.L.C.

Dated: _____, 20 __    By: _____
                                  Name: _____
                                  Authorized Person

Bellmarc East L.L.C.

Dated: _____, 20 __    By: _____
                                  Name: _____
                                  Authorized Person

Bellmarc Gramercy-Chelsea Inc.

Dated: _____, 20 __    By: _____
                                  Name: _____
                                  Authorized Person

Bellmarc West L.L.C.

4

Dated: December 10, 2013    By: _____

Name: Neil Binder

**Authorized Person**

Bellmarc Simone Song, Inc.

Dated: December 10, 2013    By: _____

Name: Neil Binder

**Authorized Person**

"FRANCHISOR"

Coldwell Banker Real Estate LLC

Dated: December 10, 2013    By: _____

**Debbie Iuliano**
**Vice President**
**Contract Administration**

5

Case 2:14-cv-07326-MCA-MAH   Document 4-11   Filed 01/06/15   Page 1 of 91 PageID: 481

**EXHIBIT "9"**

Company No. 500447

## CONVERSION PROMISSORY NOTE

**$1,250,000**                                       Parsippany, New Jersey
                                                    Dated: **May 15, 2013**

     FOR GOOD AND VALUABLE CONSIDERATION, the undersigned **The Bellmare Group LLC, a New York limited liability company** ("Maker") and **Nice Idea, LLC, ALL Enterprises LLC, and Neil Binder individually** ("Co-Maker(s)") promise to pay to ERA FRANCHISE SYSTEMS LLC or its successors or assigns ("Holder"), on the date eighteen years from the first Determination Date (as defined below), at 1 Campus Drive, Parsippany, New Jersey, or at such other place as Holder may from time to time designate, in writing, the principal sum of **One Million Two Hundred Fifty Thousand Dollars ($1,250,000)** (the "Principal"), which amount shall, except as set forth below, bear no interest.

     If (a) Maker is not in default with respect to its obligations under any membership or franchise agreements with Holder, as each may be amended (the "Franchise Agreements") (including payment of royalty fees and advertising/marketing fund contributions thereunder) and (b) the real estate brokerage offices operated by Maker have aggregate Gross Revenues (as such term is defined in the Franchise Agreement governing each such office) on which royalties are payable under each such Franchise Agreement, over the first full calendar year beginning on or after the date of this Note (as set forth above), and over each full calendar year thereafter (each such calendar year ending on a "Determination Date") of at least **$17,000,000**, then on each such Determination Date, one-nineteenth of the Principal (the "Yearly Principal") shall be forgiven. On each such Determination Date, to the extent no Principal has been forgiven on such date, an amount of Principal equal to the Yearly Principal shall become due and payable. The last Determination Date shall be the date eighteen years from the first Determination Date. In the event Maker or Co-Maker(s) fail to make any payment when due, including any payment due upon acceleration of this Note, the entire outstanding Principal shall thereafter bear simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by law from its due date until paid in full.

     Notwithstanding the foregoing installment payments, Maker acknowledges and agrees that Holder, at its sole option and discretion, without notice, may apply to the outstanding due and payable Principal and accrued and unpaid interest amount evidenced by this Note any and all payments due to Maker from Holder under the Volume Incentive Plan Award set forth in any Franchise Agreement, if or when any such Volume Incentive Plan Award becomes due or payable to Maker. If and to the extent necessary, Maker hereby assigns, transfers and conveys to Holder all of Maker's rights, title and interest in and to the Volume Incentive Plan Award. Amounts of Volume Incentive Plan Awards applied against the Principal shall correspondingly reduce amounts owed by Maker hereunder.

     All payments shall be made in lawful money of the United States of America without set-off, offset, recoupment, deduction or counterclaim of any kind whatsoever. Payments, when made, shall first be applied to accrued and unpaid interest, if any, and then to Principal.

     Maker and Co-Maker(s) may prepay this Note in whole or in part on any date without premium or penalty. No partial prepayment shall extend or postpone the due date of any subsequent installment payment or change the amount of the installment payment. Prepayments will be applied without notation on this Note.

1

Holder of this Note may determine that Maker and Co-Maker(s) are in default and may accelerate the unpaid Principal and all interest accrued thereon to become immediately due and payable, without presentment for payment or any notice or demand, (A) if Maker, Co-Maker(s), endorser, surety or guarantor of this Note (i) suspends business; (ii) becomes insolvent or offers settlement to any creditors; (iii) files a petition in bankruptcy, either voluntary or involuntary; (iv) institutes any proceeding under any bankruptcy or insolvency laws relating to the relief of debtors; (v) makes an assignment for the benefit of creditors; or (vi) makes any false statement or representation orally or in writing, fails to furnish information, or fails to permit inspection of any books or records on demand of Holder, (B) upon default in payment of any Principal payment due hereunder, (C) upon default, in Holder's sole opinion, of any other agreement or note between Maker and Holder or any of Holder's related companies, including, but not limited to, any of the Franchise Agreements, or (D) upon termination or expiration of any agreement between Maker and Holder or any of Holder's related companies, including, but not limited to, any of the Franchise Agreements. For the purposes of this Note, a party shall be in default of an agreement if such party shall have been given notice of such default in accordance with the terms of any such agreement, and, as to those defaults for which such party is afforded an opportunity to cure pursuant to such agreement, such party shall have failed to make such cure within the applicable period provided. Maker's and Co-Maker(s)'s obligation to pay the Principal and interest thereon, if accelerated, shall be absolute and unconditional, and shall not be subject to any rights of set-off, offset or recoupment.

Maker and Co-Maker(s) agree that any attorney-at-law may appear in any court of record situated in any County where the Maker and/or Co-Maker(s) then reside or in the County where Maker and/or Co-Maker signed this Note and being in the United States at any time after the debt evidenced shall become due, either at its stated maturity or by declaration, and waive the issuing and service of process and confess judgment against the Maker and Co-Maker(s), jointly and severally, in favor of the Holder, for the amount then owing hereon, together with the costs of suit and thereupon release all errors and waive all right of appeal.

Maker and Co-Maker(s) agree to pay all expenditures made in any attempt to collect any amounts due pursuant to this Note. If Holder takes legal action to enforce or collect this Note, Holder shall be entitled to reasonable attorney's fees (including in-house attorneys) and court costs and all costs of collection in addition to any other relief to which it may be entitled.

Maker, Co-Maker(s) and all endorsers or guarantors of this Note, and each of them, hereby waive, to the fullest extent permitted by law, diligence, demand, notice of demand, presentment for payment, notice of non-payment, notice of dishonor, protest and notice of protest and specifically consent to and waive notice of any renewals, extensions, amendments or modifications of this Note, whether made to or in favor of Maker or any other person or persons. Holder reserves the right to modify the terms of this Note, grant extensions, notations, renewals, releases, discharges, compositions and compromises with any party liable under this Note, with or without any notice to or the consent of, and without discharging or affecting the obligations of, any other party liable under this Note. The claiming of any statute of limitations as a defense to any demand against Maker, Co-Maker(s) or any endorser or guarantor is expressly waived by each and all of said parties.

If this Note is being executed in connection with the acquisition or consolidation (by merger, acquisition or otherwise) of a real estate brokerage business from another person or entity, each of the Maker and Co-Makers acknowledges and agrees that while Holder and its representatives may have participated in the negotiation of the terms and conditions of, or in other aspects of, such acquisition and assisted with the preparation of documents (legal or otherwise) which memorialize the terms and conditions of such acquisition, Holder and its representatives were acting solely in the capacity of

2

franchisor of its franchise system and were not retained by Maker or any Co-Maker in the capacity of agent, consultant or advisor. Maker and each Co-Maker acknowledges and agrees that it and they have not and will not rely upon any financial advisory services, investment banking services, or any legal or accounting advice relating to the acquisition that have been provided by Holder or any of its employees, representatives, or affiliates and that neither Holder nor any of its affiliates has shall have any liability in connection therewith. Maker acknowledges and agrees that it has completed any due diligence and other investigations of the acquired office as Maker deemed appropriate. Additionally, Maker acknowledges and agrees that it has not relied on any representations made by Holder or any of its affiliates and its representatives in deciding to complete the acquisition and related transactions. Maker waives any and all claims against Holder and its officers, directors, shareholders, affiliates, employees and agents arising out of the acquisition or consolidation. In addition, each of Maker and Co-Makers acknowledges and agrees that neither Holder nor any of its affiliates has made any representations or warranties, nor furnished any information to them concerning any aspect of the Franchise Agreements or Maker's business.

This Note shall be construed and enforced in accordance with the laws of the State of New Jersey. The terms of this Note are confidential and will not be disclosed to any third party by Maker without the prior written consent of Holder, unless otherwise required by law. This Note may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Note.

This Note shall be the joint and several obligation of Maker, Co-Maker(s), all guarantors and endorsers, if any, and shall be binding upon them and their heirs, executors, personal representatives, successors and assigns and shall inure to the benefit of Holder and its successors and assigns. This Note shall not be assignable by Maker or any Co-Maker without the prior written consent of Holder.

[Remainder of page left blank; Signature page follows]

3

**THIS PROMISSORY NOTE MAY NOT BE ACCEPTED BY HOLDER WITHOUT ALL MAKER AND CO-MAKER SIGNATURES AND ALL WITNESS SIGNATURES AND ADDRESSES**

IN WITNESS WHEREOF, the undersigned Maker and Co-Maker(s) have executed this Note as of the date first set forth above.

WITNESS:

_Witness Signature_

Frank Sanchez

225 Stanley Ave #309

Mamoroneck NY 10543
_Print Witness Name and Home Address_

MAKER: The Bellmarc Group LLC

By: _____
Name: NEIL BINDER
Title: **Authorized Person**

WITNESS:

_Witness Signature_

Frank Sanchez

225 Stanley Ave #309

Mamoroneck NY 10543
_Print Witness Name and Home Address_

CO-MAKER(S): Nice Idea, LLC

NEIL BINDER **Trustee**

WITNESS:

_Witness Signature_

Frank Sanchez

225 Stanley Ave #309

Mamoroneck NY 10543
_Print Witness Name and Home Address_

CO-MAKER(S): ALL Enterprises LLC

LARRY FRIEDMAN **Authorized Person**

WITNESS:

CO-MAKER(S): **Neil Binder**

4

_Witness Signature_

Frank Sanchez

225 stanley Ave #309

Mamaroneck NY 10543

_Print Witness Name and Home Address_

NZIG BINDER

**Individually**

5

Case 2:14-cv-07326-MCA-MAH   Document 4-12   Filed 01/06/15   Page 1 of 71 PageID: 487

# EXHIBIT "10"

Office No. **500447**

## CONVERSION PROMISSORY NOTE
### (New Franchisee)

**December 13, 2013** (the "Note Date")

| MAKER: | The Bellmarc Group, LLC |
|---|---|
| CO-MAKER(S): | Nice Idea, LLC |
| | ALL Enterprises, LLC |
| | Neil Binder |
| | |
| HOLDER: | COLDWELL BANKER REAL ESTATE LLC |
| PLACE FOR PAYMENT: | 175 PARK AVENUE, MADISON, NJ |
| | |
| PRINCIPAL: | $187,500 |
| ANNUAL INTEREST RATE: | 0%, EXCEPT AS DESCRIBED BELOW |
| MATURITY DATE: | December 31, 2032 |

     **1.  TERMS OF PAYMENT.**  FOR GOOD AND VALUABLE CONSIDERATION, the undersigned Maker and Co-Maker(s) promise(s) to pay Holder (or its successors or assigns) the Principal set forth above on the Maturity Date. Payments are payable to Holder at 175 Park Avenue, Madison, New Jersey, or at such other place as Holder may designate in writing.

     **2.  FORGIVENESS.**  If on December 31 of each full calendar year ("Measurement Date") after the Note Date, Maker and Co-Maker(s) satisfy the conditions in this Note, an amount equal to the Principal divided by **nineteen** (the "Yearly Principal") will be forgiven by Holder.  To qualify for forgiveness of the Principal, Maker and Co-Maker(s) must establish that, as of the Measurement Date and for the calendar year concluding on the Measurement Date:

        A.  Maker is not in default of its obligations under any franchise agreement(s) with Holder (the "Franchise Agreement"), including payment of royalty fees and marketing fund contributions; **and**

        B.  Maker(s) has timely paid Holder all royalty fees and marketing contributions owed under the Franchise Agreement on aggregate Gross Revenues (as defined in the Franchise Agreement) of at least $17,000,000 ("Forgiveness Threshold").

     **3.  YEARLY PRINCIPAL DUE ON FAILURE TO SATISFY CONDITIONS.** If Maker does not satisfy the above conditions as of any Measurement Date, the Yearly Principal shall become due and payable to Holder within 30 days after the Measurement Date.  If Maker or Co-Maker(s) fails to make any payment when due, including any payment due on acceleration of this Note, the entire outstanding Principal shall bear simple interest at a rate equal to the lesser of

eighteen percent (18%) per year or the highest rate allowed by law, from its due date until paid in full.

**4.  APPLICATIONS OF FUNDS DUE MAKER.**  Maker agrees that Holder, at its sole option, without notice, may apply to the outstanding due and payable Principal (and accrued and unpaid interest amount) payments due to Maker(s) from Holder under the Performance Premium Award program described in the Franchise Agreement, if any Performance Premium Award becomes due or payable to Maker. To the extent necessary, Maker(s) hereby assigns, transfers and/or conveys to Holder all of Maker's rights, title and interest in and to the Performance Premium Award. Any and all amounts of the Performance Premium Award applied against the Principal shall correspondingly reduce amounts owed by Maker(s) hereunder.

**5.  DEFAULT – ACCELERATION OF PRINCIPAL.**  Holder may determine that Maker and Co-Maker(s) are in default and may accelerate the unpaid Principal and all accrued interest to become immediately due and payable, without presentment for payment or any notice or demand, upon the occurrence of any of the following:

A.  Maker or Co-Maker(s) (i) suspends business; (ii) becomes insolvent or offers settlement to any creditors; (iii) files a petition in bankruptcy, either voluntary or involuntary; (iv) institutes any proceeding under any bankruptcy or insolvency laws relating to the relief of debtors; (v) makes an assignment for the benefit of creditors; or (vi) makes any false statement or representation orally or in writing, fails to furnish information, or fails to permit inspection of any books or records on demand of Holder;

B.  Upon default in payment of any Principal payment due under this Note;

C.  Upon default, in Holder's sole opinion, of any other agreement or note between Maker and Holder or any of Holder's related companies, including, but not limited to, the Franchise Agreement; or

D.  Upon termination or expiration of the Franchise Agreement.

For the purposes of this Note, a party will be in default of an agreement if the party has been given notice of default under the agreement, and, for defaults for which the party is afforded an opportunity to cure under the applicable agreement, the party failed to cure within the period provided. Maker's and Co-Maker(s)'s obligation to pay the Principal and interest, if accelerated, will be absolute and unconditional, and will not be subject to any rights of offset or recoupment.

**6.  ASSIGNMENT.** This Note is not assignable by Maker or any Co-Maker without the prior written consent of Holder.

**7.  NO PRE-PAYMENT PENALTY.** Maker and Co-Maker(s) may prepay this Note in whole or in part on any date without premium or penalty. No partial prepayment shall extend

or postpone the due date of any subsequent installment payment or change the amount of the installment payment. Prepayments will be applied without notation on this Note.

8. **ATTORNEYS' FEES.** Maker and Co-Maker(s) agree to pay all expenditures made in any attempt to collect any amounts due pursuant to this Note. If Holder takes legal action to enforce or collect this Note, Holder shall be entitled to reasonable attorney's fees (including in-house attorneys) and court costs and all costs of collection in addition to any other relief to which it may be entitled.

9. **WAIVER OF PRESENTMENT.** Maker and Co-Maker(s) and each of them, waive, to the fullest extent permitted by law, diligence, demand, notice of demand, presentment for payment, notice of non-payment, notice of dishonor, protest and notice of protest and specifically consent to and waive notice of any renewals, extensions, amendments or modifications of this Note, whether made to or in favor of Maker or any other person or persons. Holder reserves the right to modify the terms of this Note, grant extensions, notations, renewals, releases, discharges, compositions and compromises with any party liable under this Note, with or without any notice to or the consent of, and without discharging or affecting the obligations of, any other party liable under this Note. The claiming of any statute of limitations as a defense to any demand against Maker, Co-Maker(s) or any endorser or guarantor is expressly waived by each and all of said parties.

10. **ACQUISITION-RELATED REPRESENTATIONS.** If this Note is being executed in connection with the acquisition or consolidation (by merger, acquisition or otherwise) of a real estate brokerage business from another person or entity, Maker and Co-Makers agree that while Holder and its representatives may have participated in the negotiation of such acquisition and assisted with the preparation of documents (legal or otherwise), Holder and its representatives were acting solely in the capacity of franchisor and were not retained by Maker or any Co-Maker in the capacity of agent, consultant or advisor. Maker and each Co-Maker agree that they have not and will not rely on any financial, legal or accounting advice about the acquisition that may have been provided by Holder or any of its employees, representatives, or affiliates. Maker represents and warrants that it has completed any due diligence and other investigations of the acquired office as Maker deemed appropriate. Additionally, Maker agrees that it has not relied on any representations made by Holder or any of its representatives or affiliates in deciding to complete the acquisition and related transactions. Maker waives any and all claims against Holder and its officers, directors, shareholders, affiliates, employees and agents arising out of the acquisition or consolidation.

11. **GOVERNING LAW/CONFIDENTIALITY/COUNTERPARTS.** This Note will be construed and enforced in accordance with the laws of the State of New Jersey. The terms of this Note are confidential and will not be disclosed to any third party by Maker without the prior written consent of Holder, unless otherwise required by law. This Note may be executed in counterparts, each of which will be deemed an original, and all of which, when taken together, will constitute one Note.

12. **JOINT AND SEVERAL LIABILITY.** This Note will be the joint and several obligation of Maker, Co-Maker(s), all guarantors and endorsers, if any, and will be binding upon them and their heirs, executors, personal representatives, successors and assigns and will inure to the benefit of Holder and its successors and assigns.

13. **CONFESSION OF JUDGMENT.** Maker and Co-Maker(s) agree that any attorney-at-law may appear in any court of record situated in any County where the Maker and/or Co-Maker(s) then reside or in the County where Maker and/or Co-Maker signed this Note and being in the United States at any time after the debt evidenced will become due, either at its stated maturity or by declaration and will waive the issuing and service of process and confess judgment against the Maker and Co-Maker(s), jointly and severally, in favor of the Holder, for the amount then owing on this Note, together with the costs of suit and thereupon release all errors and waive all right of appeal.

14. **HEADINGS.** The headings in this Note are for convenience only, do not constitute a part of this Note, and will not be deemed to have any legal effect.

[Remainder of page left blank; Signature page follows]

THIS PROMISSORY NOTE MAY NOT BE ACCEPTED BY HOLDER WITHOUT ALL
MAKER AND CO-MAKER SIGNATURES AND ALL WITNESS SIGNATURES AND
ADDRESSES

    IN WITNESS WHEREOF, the undersigned Maker and Co-Maker(s) have executed this
Note as of the date first set forth above.

WITNESS:

_____
*Witness Signature*

NINA SCERBO

240 E 47ᵗʰ ST

N/ N/ 10017
*Print Witness Name and Home Address*


MAKER: **The Bellmarc Group LLC**

By: _____
Name: Neil Bhar
Title: **Authorized Person**


WITNESS:

_____
*Witness Signature*

NINA SCERBO

240 E 47ᵗʰ ST

N/ N/ 10017
*Print Witness Name and Home Address*


CO-MAKER(S): **Nice Idea, LLC**

_____

____, **Individually**


WITNESS:

_____
*Witness Signature*

DANUTA BRODZINSKA

110 North 8ᵗʰ Street

Brooklyn NY 11249
*Print Witness Name and Home Address*


CO-MAKER(S): **ALL Enterprises LLC**

_____

____, **Individually**


CB EXHD2 03/13                  5

WITNESS:

_____
*Witness Signature*

NINA SCERBO

240 E 47TH ST

NY NY 10017
_____
*Print Witness Name and Home Address*

CO-MAKER(S): Neil Binder

_____

_____, **Individually**

Case 2:14-cv-07926-MCA-MAH   Document 4-3   Filed 01/06/15   Page 1 of 51 PageID: 194

# EXHIBIT "11"

## SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of **May 15, 2013**, between **The Bellmarc Group LLC, a New York limited liability company** ("Debtor"), Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

SECTION 1 – DEBTOR'S OBLIGATIONS. Debtor agrees to the following:

(a)      Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)      Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)      Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)      Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)      Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

1.

<u>SECTION 2 – DEFAULTS.</u>  Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)      The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)      Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)      The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)      The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)      Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

<u>SECTION 3 – REMEDIES AFTER DEFAULT.</u>

(a)      In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)      Declare all obligations secured hereby immediately due and payable;

2)      Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)      Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)      Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)      Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses.  Debtor shall remain liable for any deficiency.

<u>SECTION 4 – INSURANCE PROCEEDS.</u>  So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

2

**SECTION 5 -- DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 -- MISCELLANEOUS.**

(a)     <u>Debtor's Obligations Under Note.</u>  Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)     <u>Waiver.</u>  Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)     <u>Governing Law.</u>  This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)     <u>Remedies.</u>  All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)     <u>Financing Statement.</u>  Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)     <u>Notices.</u>  In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail.  Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent.  Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)     <u>Attorney's Fees.</u>  In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)     <u>Successors in Interest.</u>  This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i)     <u>Amendments.</u>  This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)     <u>Entire Agreement.</u>  The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)      Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

The Bellmarc Group LLC

By:
Name:
Title:

**COLDWELL BANKER REAL ESTATE LLC**

By:

Debbie Iuliano
Vice President
Contract Administration

4

Case 2:14-cv-07926-MCA-MAH   Document 4-14   Filed 01/06/15   Page 1 of 51 PageID: 195

# EXHIBIT "12"

## SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of **May 15, 2013**, between **ALL Enterprises LLC, a New York limited liability company** ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

<u>SECTION 1 – DEBTOR'S OBLIGATIONS.</u>  Debtor agrees to the following:

(a)    Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)    Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)    Except for a certain financing statement dated May 25, 2012 given by Debtor in favor of Franzblau, Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)    Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)    Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

1

SECTION 2 -- DEFAULTS. Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)     The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)     Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)     The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)     The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)     Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

SECTION 3 -- REMEDIES AFTER DEFAULT.

(a)     In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)     Declare all obligations secured hereby immediately due and payable;

2)     Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)     Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)     Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)     Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

SECTION 4 -- INSURANCE PROCEEDS. So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and

2

restoration.

**SECTION 5 -- DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 -- MISCELLANEOUS.**

(a) <u>Debtor's Obligations Under Note.</u> Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b) <u>Waiver.</u> Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c) <u>Governing Law.</u> This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d) <u>Remedies.</u> All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e) <u>Financing Statement.</u> Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f) <u>Notices.</u> In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g) <u>Attorney's Fees.</u> In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h) <u>Successors in Interest.</u> This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i) <u>Amendments.</u> This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j) <u>Entire Agreement.</u> The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)     Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

ALL Enterprises, LLC

By: _____
Name:
Title:

Coldwell Banker Real Estate LLC

By: _____
    Debbie Iuliano
    Vice President
    Contract Administration

4

Case 2:14-cv-07926-MCA-MAH   Document 4-13   Filed 01/06/15   Page 1 of 51 PageID: 204

**EXHIBIT "13"**

# SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of <u>May 15, 2013</u>, between <u>Bellmarc Downtown, LLC a New York limited liability company</u> ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

<u>SECTION 1 – DEBTOR'S OBLIGATIONS.</u>  Debtor agrees to the following:

(a)      Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)      Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)      Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)      Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)      Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 – DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a) The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b) Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c) The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d) The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e) Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

(a) In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

    1) Declare all obligations secured hereby immediately due and payable;

    2) Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

    3) Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

    4) Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b) Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 -- DUTIES OF SECURED PARTY.**  Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein.  Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 -- MISCELLANEOUS.**

(a)  <u>Debtor's Obligations Under Note.</u>  Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)  <u>Waiver.</u>  Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)  <u>Governing Law.</u>  This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)  <u>Remedies.</u>  All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)  <u>Financing Statement.</u>  Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)  <u>Notices.</u>  In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail.  Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent.  Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)  <u>Attorney's Fees.</u>  In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)  <u>Successors in Interest.</u>  This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i)  <u>Amendments.</u>  This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)  <u>Entire Agreement.</u>  The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)    <u>Facsimiles</u>. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

    IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

Bellmarc Downtown, LLC

By: _____

Name: Neil Benkle

Title: President

Coldwell Banker Real Estate LLC

By: _____

Andrew Napurano
CAO and CFO
Realogy Franchise Group

Case 2:14-cv-07326-MCA-MAH   Document 41-6   Filed 01/08/15   Page 1 of 51 PageID: 205

# EXHIBIT "14"

# SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of **May 15, 2013**, between **Bellmarc Gramercy/Chelsea, Inc. a New York incorporation** ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (I) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

## SECTION 1 – DEBTOR'S OBLIGATIONS. Debtor agrees to the following:

(a)     Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)     Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)     Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)     Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 – DEFAULTS.**  Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

   (a)      The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

   (b)      Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

   (c)      The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

   (d)      The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

   (e)      Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

   (a)      In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

      1)      Declare all obligations secured hereby immediately due and payable;

      2)      Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

      3)      Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

      4)      Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

   (b)      Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses.  Debtor shall remain liable for any deficiency.

**SECTION 4 – INSURANCE PROCEEDS.**  So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 -- DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 -- MISCELLANEOUS.**

(a)    <u>Debtor's Obligations Under Note.</u> Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)    <u>Waiver.</u> Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)    <u>Governing Law.</u> This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)    <u>Remedies.</u> All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)    <u>Financing Statement.</u> Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)    <u>Notices.</u> In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)    <u>Attorney's Fees.</u> In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)    <u>Successors in Interest.</u> This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i)    <u>Amendments.</u> This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)    <u>Entire Agreement.</u> The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

ERA EXHG 10/12                                3

Case 2:14-cv-07926-MCA-MAH  Document 100-2  Filed 09/22/17  Page 150 of 265 PageID
Case 2:14-cv-07926-MCA-MAH  Document 41-3  Filed 02/26/15  Page 5 of 51 PageID:
2397

(j)  Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

Bellmarc Gramercy/Chelsea, Inc.

By:
Name:
Title:

Coldwell Banker Real Estate LLC

By:

Andrew Napurano
CAO and CFO
Realogy Franchise Group

Case 2:14-cv-07326-MCA-MAH Document 41-2 Filed 01/08/15 Page 1 of 51 PageID: 214

# EXHIBIT "15"

# SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of May 15, 2013, between Bellmarc Brokerage Midtown, Inc., a New York corporation ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (I) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

## SECTION 1 – DEBTOR'S OBLIGATIONS. Debtor agrees to the following:

(a) Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b) Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c) Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d) Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e) Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 -- DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

    (a)    The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

    (b)    Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

    (c)    The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

    (d)    The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

    (e)    Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 -- REMEDIES AFTER DEFAULT.**

    (a)    In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

    1)    Declare all obligations secured hereby immediately due and payable;

    2)    Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

    3)    Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

    4)    Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

    (b)    Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

**SECTION 4 -- INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a)     Debtor's Obligations Under Note. Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)     Waiver. Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)     Governing Law. This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)     Remedies. All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)     Financing Statement. Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)     Notices. In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)     Attorney's Fees. In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)     Successors in Interest. This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i)     Amendments. This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)     Entire Agreement. The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

ERA EXHG 10/12                                    3

(j)    <u>Facsimiles</u>. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

Bellmarc Brokerage Midtown, Inc.

By: _____

Name: Nil Bordon

Title: President

Coldwell Banker Real Estate LLC

By: _____

Andrew Napurano

CAO and CFO

Realogy Franchise Group

ERA EXHG 10/12                              4

Case 2:14-cv-07326-MCA-MAH   Document 4-18   Filed 01/06/15   Page 1 of 51 PageID: 9215

# EXHIBIT "16"

# SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of May 15, 2013, between Bellmarc East, LLC a New York limited liability company ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

SECTION 1 – DEBTOR'S OBLIGATIONS.  Debtor agrees to the following:

(a)      Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)      Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)      Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)      Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)      Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 – DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

    (a)    The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

    (b)    Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

    (c)    The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

    (d)    The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

    (e)    Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

    (a)    In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

        1)    Declare all obligations secured hereby immediately due and payable;

        2)    Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

        3)    Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

        4)    Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

    (b)    Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a)    **Debtor's Obligations Under Note.** Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b)    **Waiver.** Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c)    **Governing Law.** This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d)    **Remedies.** All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)    **Financing Statement.** Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f)    **Notices.** In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g)    **Attorney's Fees.** In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h)    .  **Successors in Interest.** This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i)    **Amendments.** This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j)    **Entire Agreement.** The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)      <u>Facsimiles</u>. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.


**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.


Bellmarc East, LLC

By: _____
Name: Neil Binder
Title: President


**Coldwell Banker Real Estate LLC**

By: _____
Debbie Iuliano
Vice President
Contract Administration

Case 2:14-cv-07326-MCA-MAH   Document 41-3   Filed 01/06/15   Page 1 of 51 PageID: 924

**EXHIBIT "17"**

## SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of May 15, 2013, between Bellmarc West, LLC a New York limited liability company ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

SECTION 1 – DEBTOR'S OBLIGATIONS. Debtor agrees to the following:

(a)     Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)     Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)     Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)     Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

SECTION 2 -- DEFAULTS. Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)     The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)     Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)     The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)     The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)     Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

SECTION 3 -- REMEDIES AFTER DEFAULT.

(a)     In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)     Declare all obligations secured hereby immediately due and payable;

2)     Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)     Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)     Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)     Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

SECTION 4 -- INSURANCE PROCEEDS. So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a) <u>Debtor's Obligations Under Note.</u> Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b) <u>Waiver.</u> Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c) <u>Governing Law.</u> This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d) <u>Remedies.</u> All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e) <u>Financing Statement.</u> Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f) <u>Notices.</u> In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g) <u>Attorney's Fees.</u> In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h) <u>Successors in Interest.</u> This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i) <u>Amendments.</u> This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j) <u>Entire Agreement.</u> The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)    Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

Bellmarc West, LLC

By:

Name: Neil Binder

Title: President

Coldwell Banker Real Estate LLC

By:

Andrew Napurano
CAO and CFO
Realogy Franchise Group

EXHIBIT "18"

## SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of May 15, 2013, between AC Lawrence, LLC a New York limited liability company ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

SECTION 1 – DEBTOR'S OBLIGATIONS.  Debtor agrees to the following:

(a)     Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)     Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)     Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)     Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 – DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

(a)     The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

(b)     Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

(c)     The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

(d)     The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

(e)     Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

(a)     In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

1)     Declare all obligations secured hereby immediately due and payable;

2)     Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

3)     Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

4)     Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

(b)     Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

Case 2:14-cv-07936-MCA-MAH  Document 142-3  Filed 09/08/17  Page 4 of 51  PageID: 9232

**SECTION 5 -- DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

    (a)    <u>Debtor's Obligations Under Note.</u> Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

    (b)    <u>Waiver.</u> Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

    (c)    <u>Governing Law.</u> This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

    (d)    <u>Remedies.</u> All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

    (e)    <u>Financing Statement.</u> Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

    (f)    <u>Notices.</u> In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

    (g)    <u>Attorney's Fees.</u> In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

    (h)    <u>Successors in Interest.</u> This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

    (i)    <u>Amendments.</u> This Security Agreement may only be amended by a writing executed by both of the parties hereto.

    (j)    <u>Entire Agreement.</u> The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)    Facsimiles. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

AC Lawrence, LLC

By:
Name: Neil Binar
Title: President

Coldwell Banker Real Estate LLC

By:

Andrew Napurano
CAO and CFO
Realogy Franchise Group

EXHIBIT "19"

## SECURITY AGREEMENT

This Security Agreement (this "Security Agreement") is made as of **May 15, 2013**, between **Nice Idea Publishing, Inc., a New York corporation** ("Debtor"), and Coldwell Banker Real Estate LLC ("Secured Party").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a security interest in all accounts; accounts receivable; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and any rebate/award program (or similar incentive programs) to which Debtor may be entitled pursuant to any franchise Agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing Collateral (including insurance and condemnation proceeds payable by reason of condemnation of or loss or damage thereto) as security for (i) the prompt payment of any promissory notes executed by Debtor in favor of Secured Party, and any renewals, compromises, extensions, modifications, accelerations or other changes in the time for performance or other terms thereof (the "Notes"), and (ii) performance under any franchise agreements between Debtor and Secured Party, as the same may be amended (the "Franchise Agreements"), and (iii) all other agreements between Debtor and Secured Party.

## SECTION 1 -- DEBTOR'S OBLIGATIONS. Debtor agrees to the following:

(a)     Debtor will properly maintain and care for the Collateral and will not remove the Collateral from the Office (as defined in the Franchise Agreement).

(b)     Debtor will notify Secured Party in writing prior to any change in Debtor's place of business;

(c)     Debtor has not executed and will not execute as debtor thereunder any security agreement or financing statement covering any of the Collateral except with Secured Party, nor will Debtor pledge or encumber the Collateral, or allow any lien to be placed against the Collateral, whether voluntary or involuntary;

(d)     Debtor represents and warrants to Secured Party that the Collateral shall not become collateral for any other obligations previously incurred, nor collateral under any other security agreement(s) previously executed by Debtor; and

(e)     Debtor will not sell, contract for sale or otherwise dispose of any of the Collateral except in the ordinary course of business.

**SECTION 2 – DEFAULTS.** Debtor shall be in default under this Security Agreement upon the occurrence of any of the following events or conditions (an "Event of Default"):

    (a)    The failure by Debtor to pay any amount when due under the terms and provisions of the Note (after applicable grace periods, if any); or

    (b)    Debtor's breach of any term, provision, warranty or representation set forth herein or in the Franchise Agreements, or in any other agreement between Debtor and Secured Party; or

    (c)    The making of any levy on, or seizure or attachment of, any of the Collateral, if such levy, seizure or attachment is not set aside within fifteen (15) days thereafter; or

    (d)    The dissolution, termination of existence or insolvency of Debtor; the appointment of a receiver of all or any part of the property of Debtor; an assignment for the benefit of creditors by Debtor; the calling of a meeting of creditors of Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Debtor or any guarantor, surety or endorser for Debtor; or

    (e)    Any guarantor, surety or endorser for Debtor defaulting in any obligation or material liability to Secured Party, if such default is not cured within five (5) days thereafter.

**SECTION 3 – REMEDIES AFTER DEFAULT.**

    (a)    In the event of the occurrence of an Event of Default, Secured Party, in addition to all other rights and remedies given Secured Party under any and all agreements by and among Secured Party, Debtor and/or Debtor's guarantors, or otherwise by law, may do one or more of the following, without notice to or demand upon Debtor:

        1)    Declare all obligations secured hereby immediately due and payable;

        2)    Enforce the security interest given hereunder and otherwise exercise the rights of a secured creditor provided under the laws of the state in which the Office is located

        3)    Require Debtor to assemble the Collateral and make it available to Secured Party; and/or

        4)    Enter any office or offices of Debtor and take possession of the Collateral and of the records pertaining to the Collateral.

    (b)    Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness, which shall include the reasonable expenses of such sale, in any order of preference which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

**SECTION 4 – INSURANCE PROCEEDS.** So long as no default exists hereunder, the proceeds of fire and casualty insurance covering the Collateral may be utilized by Debtor for the repair and restoration of Debtor's facilities, subject to such procedures as Secured Party may reasonably require to assure the application of any such insurance proceeds for such purpose and completion of such repair and restoration.

**SECTION 5 – DUTIES OF SECURED PARTY.** Secured Party's duties or responsibilities with reference to the Collateral shall be limited solely to the duties and responsibilities set forth in this Security Agreement and Secured Party shall not be responsible in any way for the condition, depreciation or maintenance of the Collateral other than as set forth herein. Debtor shall pay when due all taxes, charges, liens and assessments against the Collateral.

**SECTION 6 – MISCELLANEOUS.**

(a) **Debtor's Obligations Under Note.** Simultaneously with the payment in full of all of Debtor's obligations under the Notes, all liens, encumbrances and security interests created by this Security Agreement shall be null and void.

(b) **Waiver.** Any waiver, express or implied, of any provision of this Security Agreement and any delay or failure by Secured Party to enforce any provision of this Security Agreement shall not preclude Secured Party from enforcing any such provision thereafter.

(c) **Governing Law.** This Security Agreement shall be governed by and construed according to the laws of the State of New Jersey.

(d) **Remedies.** All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e) **Financing Statement.** Concurrently herewith, Secured Party shall file a UCC-1 Financing Statement with the Secretary of State in the state of formation (or residence if sole proprietor) of the Debtor or other appropriate governmental authority to perfect the security interest created hereby. Debtor will execute such other documents as Secured Party may reasonably require to perfect its security interest in the Collateral.

(f) **Notices.** In the event either party desires to give notice to the other with regards to this Security Agreement, such notice shall be in writing and may be hand delivered, express mailed, or sent by certified or registered mail. Notices mailed as provided herein shall be deemed to be given two (2) days after they are sent. Such notices shall be sent to the address provided for such party in the Franchise Agreement, unless a party gives notice of a change of its respective address.

(g) **Attorney's Fees.** In the event either party commences litigation against the other with respect to this Security Agreement, or its interpretation or enforcement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

(h) **Successors in Interest.** This Security Agreement shall inure to the benefit of, and be binding upon, the successors in interest of the parties hereto.

(i) **Amendments.** This Security Agreement may only be amended by a writing executed by both of the parties hereto.

(j) **Entire Agreement.** The foregoing constitutes the entire agreement between the parties, all representations or understandings, whether oral or written, having been incorporated herein or otherwise superseded hereby.

(j)    <u>Facsimiles</u>. Facsimile or electronic copies of this Security Agreement shall be deemed to have the same force and effect as the original and, as such, shall be fully binding on all parties.

**THE PERSON SIGNING THIS AGREEMENT ON BEHALF OF THE DEBTOR REPRESENTS AND WARRANTS THAT HE OR SHE IS A DULY APPOINTED OFFICER OR OTHERWISE HAS BEEN AUTHORIZED TO BIND THE FRANCHISEE TO THE TERMS OF THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first written above.

Nice Idea Publishing, Inc.

By:
Name:
Title:

**Coldwell Banker Real Estate LLC**

By:
Debbie Iuliano
Vice President
Contract Administration

4

Case 2:14-cv-07926-MCA-MAH   Document 4-22   Filed 01/08/15   Page 1 of 91 PageID: 935

EXHIBIT "20"



COLDWELL BANKER REAL ESTATE, LLC
CORPORATE HEADQUARTERS
175 PARK AVENUE
MADISON, NJ 07940

July 29, 2014

**VIA SECOND DAY COURIER AND FIRST CLASS MAIL**

**PERSONAL & CONFIDENTIAL**

Neil Binder
Anthony DeGroita
Larry Friedman
Lenny Flauso
Frank Sanchez
The Bellmarc Group LLC and the Bellmarc Affiliate Companies d/b/a
        Coldwell Banker Bellmarc (Franchise No. 500447) and
        Coldwell Banker A.C. Lawrence (Franchise No. 500469)

1178 Lexington Ave.               936 Broadway
New York, NY 10028                New York, NY 10010

Re: **Notice of Non-Compliance:** *Franchise Agreement (the "Agreement") by and between COLDWELL BANKER REAL ESTATE LLC F/K/A COLDWELL BANKER REAL ESTATE CORPORATION ("We" or "Us") and The Bellmarc Group LLC d/b/a COLDWELL BANKER Bellmarc and COLDWELL BANKER A.C. Lawrence (with the Bellmarc Affiliate Companies, collectively referred to as "You" or "Franchisee")*

Dear Sirs:

At Coldwell Banker Real Estate LLC, we work to ensure that we provide our franchisees with tools and services offered under our franchise agreements and the benefit of the trusted and respected Coldwell Banker® name. In return, we expect our Brokers to comply with their franchise agreement (the "Agreement") obligations for our benefit and the benefit of the entire Coldwell Banker System.

It has come to our attention that you are not in compliance with your Agreement, for the reasons stated herein, as related to your continued failure to pay fees which are due and payable, the operation of your websites, and your failure to maintain and provide certificates of insurance, all of which are required under the Agreement. Specifically:

## A. Past Due Fees.

We have advised you on numerous occasions that you are delinquent in the payment of your account. As of July 29, 2014, you continue to have an unpaid billed balance of $241,880.90. The balances per office, as of this date, are as follows:

    i.    Office # 500447-0002 has unpaid billed balance of $159,464.67.

    ii.    Office # 500447-0003 has unpaid billed balance of $23,283.10.

    iii.    Office # 500447-0004 has unpaid billed balance of $37,077.65.

    iv.    Office # 500447-0005 has unpaid billed balance of $5,055.93.

    v.    Office # 500447-0007 has unpaid billed balance of $15,475.33.

    vi.    Office # 500447-0008 has unpaid billed balance of $533.25.

    vii.    Office # 500469-0001 has unpaid billed balance of $990.97.

    viii.    Office # 500469-0002 has unpaid billed balance of $0.00.

    ix.    Office # 500469-0003 has unpaid billed balance of $0.00.

Please note that the above balances do not include the unbilled principal related to any promissory notes (including conversion promissory notes), which will be accelerated and payable in the event of termination.

## B. Website and Insurance Non-Compliance.

    i.    The Coldwell Banker AC Lawrence website, www.aclawrence.com, includes use of the company trade name without the Marks. (See attached, Exhibit A); and

    ii.    We have not received updated Certificates of Insurance for all offices.

For your reference, please see the following selected excerpts from the Policy and Procedures and Identity Standards Manuals:

    (1.)    "Your approved trade name must always begin with the words 'Coldwell Banker'." (Identity Standards Manual, page 36).

    (2.)    "Insurance Requirements. You are required to obtain and keep in full force and effect all insurance necessary to cover your business operations and to comply with local law...all policies of insurance should contain a separate endorsement naming Coldwell Banker Real Estate LLC, Realogy Holdings Corp. and their subsidiaries, successors and assigns as additional insureds... You are also required to cause certificates showing such insurance to be

delivered to us. See your Franchise Agreement....." *(Policy and Procedures Manual, page 27).*

This Notice is to advise you that <u>within 30 days:</u>

1. You must pay the past due balance noted above in full. Please make all payments via e-Pay as soon as possible. If you have any questions specific to the payment of your account, please contact Danielle Ferrazzano, Account Manager, Real Estate Financial Services, at 973-407-7790 to discuss and arrange payment.

2. You must correct your website to include "Coldwell Banker" in all instances where your approved trade name is used.

   <u>and</u>

3. You must supply current Certificates of Insurance for General Liability and Errors and Omissions for all offices.

Kindly advise us in writing once you have corrected each of the issues identified in this letter so that we may avoid escalation of this matter to our Legal Department. We look forward to hearing from you and appreciate your anticipated cooperation.

Nothing contained herein is a waiver of our rights under the Franchise Agreement, all of which rights are expressly reserved.

Sincerely,

Nancy Danesecs
Franchise Compliance Specialist

cc: Budge Huskey
    Michael Fischer
    Valerie Workman
    Jeanette Halldas
    Joanne DeNicola
    Debbie Iuliano
    Adele Vespa
    Nelson Bennett

About A.C. Lawrence - Manhattan Apartments, Condos & Commercial Real Estate          Page 1 of 1



Enter Web ID or Agent Name

For immediate assistance call 212.989.0880

Rentals   Sales & Rentals   Commercial Properties   Rental Permits   Careers   Blog   Company Resources   Contact Us

## OUR COMPANY

About Us    Our Agents    Management & Staff    Media & Press Releases

It started out tiny: AC Lawrence was founded in 2005 by Anthony DeGrotte and Larry Friedman, who identified there was a void in customer service and professionalism in residential real estate, so built a company to answer that need.

From an initial handful of agents in a Chelsea loft space, AC Lawrence then doubled in team size and doubled again, before moving into the larger office of a now-defunct brokerage, giving the company even more space to grow and the ability to add a commercial component.

While growing itself from five agents in 2005 to 165 in 2012, the brokerage also emphasized developing client-focused, technologically-advanced websites, intricate branding and marketing programs to reach a multiplying client base, and intensely-focused training programs for new and tenured agents.

In 2012, AC Lawrence was acquired by holding company The Bellmarc Group, becoming AC Lawrence Real Estate, a member company - alongside Bellmarc Realty - of The Bellmarc Group, now one of the largest real estate companies in NYC, with a combined count of more than 500 agents between its residential sales and rental and commercial teams.

The spring of 2013 registered bigger growth and the addition of an international brand. AC Lawrence knew to best serve its escalating national and international clientele, it would need the reach and name recognition of a real estate entity known worldwide: The Bellmarc Group became the sole Manhattan franchise of Coldwell Banker, and AC Lawrence was rebranded as Coldwell Banker AC Lawrence.

Coldwell Banker AC Lawrence ... Fueling the next generation in NYC Real Estate

### Resources

Buyer's Guide
Renter's Guide
Seller's Guide
Neighborhoods
Sitemap
AGENT LOGIN

### Stay Connected

Facebook          Twitter
Google+           Pinterest
YouTube           LinkedIn
SocialProfiles    RSS Updates
Newsletter

### Contact Us

Coldwell Banker AC Lawrence Real Estate
P: 212 - 989 - 0880
E: info@cbaclawrence.com
Contact us

Let us help you find
the right home loan



Bank of America

© 2014 Coldwell Banker Real Estate LLC. A Realogy Company. All Rights Reserved. Coldwell Banker Real Estate LLC fully supports the principles of the Fair Housing Act and the Equal Opportunity Act. Each Office is Independently Owned and Operated. Coldwell Banker® and the Coldwell Banker Logo are registered service marks owned by Coldwell Banker Real Estate LLC.

REBNY

All information furnished regarding property for sale, rental or financing is from sources deemed reliable, but no warranty or representation is made as to the accuracy thereof and same is submitted subject to errors, omissions, change of price, rental or other conditions, prior sale, lease or financing or withdrawal without notice. All dimensions, photographs and square footage are approximate unless otherwise indicated and should be confirmed by customers own architect or photographer. Coldwell Banker AC Lawrence represents the seller/owner on Coldwell Banker AC Lawrence own exclusives, except if another agent of Coldwell Banker AC Lawrence represents the buyer/tenant, in which case Coldwell Banker AC Lawrence will be a dual agent with designated agents representing seller/owner and buyer/tenant. Coldwell Banker AC Lawrence represents the buyer/tenant when showing the exclusives of other real estate firms. We provide sales listings from other companies thru our VOW and these listings are provided as a convenience, but are not reviewed or confirmed by us.

Case 2:14-cv-07926-MCA-MAH Document 4-23 Filed 01/06/15 Page 1 of 91 PageID: 244

EXHIBIT "21"



**FORMAN HOLT ELIADES & YOUNGMAN** LLC

ATTORNEYS AT LAW

Daniel M. Eliades
Member
deliades@formanlaw.com

www.formanlaw.com
REPLY TO PARAMUS

August 29, 2014

TO ALL PARTIES ON ATTACHED SERVICE LIST

> Re:  *Notice of Continuing Default Under the Franchise Agreement by and between COLDWELL BANKER REAL ESTATE LLC F/K/A COLDWELL BANKER REAL ESTATE CORPORATION (herein referred to as "We" or "Us") and THE BELLMARC GROUP LLC, doing business as Coldwell Banker® Bellmarc and Coldwell Banker® A.C. Lawrence Real Estate (with the Bellmarc Affiliate Companies, collectively referred to as "Bellmarc" or "Franchisee").*

Dear Sirs:

We represent Coldwell Banker Real Estate LLC ("Coldwell Banker"). Enclosed is another copy of a Notice of Non-Compliance issued by Coldwell Banker on July 29, 2014. The Notice of Non-Compliance demand that Bellmarc pay past due fees and comply with certain non-monetary obligations under the Franchise Agreement by August 28, 2014. Bellmarc has failed to cure any of these defaults detailed in the Notice of Non-Compliance. In fact, the past due fees owed by Bellmarc under the Franchise Agreement have increased such that the total outstanding balance for all offices as of August 26, 2014 was **$276,545.00**.

The balances per office as of August 26, 2014 were as follows:

    i.      The balance for Office # 500447-0002 was $185,205.95;
    ii.     The balance for Office # 500447-0003 was $26,690.69;
    iii.    The balance for Office # 500447-0004 was $40,740.66;
    iv.    The balance for Office # 500447-0005 was $5,215.91;
    v.     The balance for Office # 500447-0007 was $18,305.32;
    vi.    The balance for Office # 500447-0008 was $0.00;
    vii.   The balance for Office # 500469-0001 was $180.23;
    viii.  The balance for Office # 500469-0002 was $206.24; and
    ix.   The balance for Office # 500469-0003 was $0.00.

The outstanding monetary and non-monetary defaults by Bellmarc noticed in the Notice of Non-Compliance and this Notice of Continuing Default constitute material breaches of the Franchise Agreement which entitle Coldwell Banker to notice termination of the Franchise Agreement.

---

80 Route 4 East, Suite 290
Paramus, NJ 07652
T 201.845.1000
F 201.845.9112

1700 Broadway, 41st Floor
New York, NY 10019
T 212.707.8500
F 212.707.8511

1615 Jackson Street
Philadelphia, PA 19145
T 215.925.7191
F 215.925.7192

00388425 - 2

The Bellmarc Group LLC
August 29, 2014
Page 2

Prior to issuing a notice of termination of the Franchise Agreement, with a full reservation of all rights and remedies, Coldwell suggests a meeting next week between Coldwell Banker, all of the members of The Bellmarc Group LLC and the guarantor of the Franchise Agreement to discuss potential cure of the outstanding defaults of Bellmarc under the Franchise Agreement. Counsel for the Franchisee, its members and guarantor are invited to attend the meeting, which would take place at the offices of Realogy Corporation, 175 Park Avenue, Madison, New Jersey 07940.

Coldwell Banker is aware of pending litigation involving members of The Bellmarc Group LLC. In light of this dispute, Coldwell Banker will accommodate members of the Franchisee and their counsel in separate conference rooms if that is requested. However, in order to have a productive meeting, Coldwell Banker requires attendance at a meeting by all of the members of The Bellmarc Group LLC and the guarantor under the Franchise Agreement (as well as any counsel for such parties).

Coldwell Banker requests a meeting on **September 4, 2014** beginning at 10:00 a.m. Please let me know if you can attend the meeting by 5:00 p.m. on **September 2, 2014** (so that we can thereafter communicate to all parties whether or not the meeting will occur based upon the level of positive responses received).

Please be advised that nothing contained in this letter shall be construed as an admission or a waiver of any right(s) or claim(s) that Coldwell Banker may possess including, but not limited to, the right to issue a notice of termination of the Franchise Agreement. This letter does not constitute an offer of Coldwell Banker to forbear from exercising any of its rights or remedies. This Notice of Continuing Default does not modify, replace or affect any current or future default or termination notices, if any, from Coldwell Banker. Moreover, this letter is forwarded without prejudice to or waiver of any of Coldwell Banker's rights and without constituting an admission that there are no other obligations due and owing from to Coldwell Banker. Coldwell Banker hereby reserves all additional rights and remedies under the Franchise Agreement, at law or equity.

Very truly yours,

Daniel M. Eliades
DME/dmz

The Bellmarc Group LLC
August 29, 2014
Page 3

## SERVICE LIST

The Bellmarc Group LLC
936 Broadway
New York, New York 10010
(By Federal Express & First Class Mail)

The Bellmarc Group LLC
1178 Lexington Ave.
New York, New York 10028
(By Federal Express & First Class Mail)

Nice Idea, LLC
c/o Neil Binder
(Via E-Mail at nbinder@cbbellmarc.com)

Mr. Neil Binder
(Via E-Mail at nbinder@cbbellmarc.com)

All Enterprises, LLC
c/o Larry Friedman
(Via E-Mail at LFriedman@aclawrence.com)

c/o Anthony Degrotta
(Via E-Mail at adegrotta@cbbellmarcgroup.com)

c/o William Hummell, Esq.
Kucker & Bruh, LLP
747 Third Avenue, 12th Floor
New York, New York 10017
(By Federal Express & E-mail at whummell@kbllp.com)



COLDWELL BANKER REAL ESTATE, LLC
CORPORATE HEADQUARTERS
175 PARK AVENUE
MADISON, NJ 07940

July 29, 2014

**VIA SECOND DAY COURIER AND FIRST CLASS MAIL**

**PERSONAL & CONFIDENTIAL**

Neil Binder
Anthony DeGroita
Larry Friedman
Lenny Flauso
Frank Sanchez
The Bellmarc Group LLC and the Bellmarc Affiliate Companies d/b/a
    Coldwell Banker Bellmarc (Franchise No. 500447) and
    Coldwell Banker A.C. Lawrence (Franchise No. 500469)

1178 Lexington Ave.            936 Broadway
New York, NY 10028            New York, NY 10010

Re: **Notice of Non-Compliance:** *Franchise Agreement (the "Agreement") by and between COLDWELL BANKER REAL ESTATE LLC F/K/A COLDWELL BANKER REAL ESTATE CORPORATION ("We" or "Us") and The Bellmarc Group LLC d/b/a COLDWELL BANKER Bellmarc and COLDWELL BANKER A.C. Lawrence (with the Bellmarc Affiliate Companies, collectively referred to as "You" or "Franchisee")*

Dear Sirs:

At Coldwell Banker Real Estate LLC, we work to ensure that we provide our franchisees with tools and services offered under our franchise agreements and the benefit of the trusted and respected Coldwell Banker® name. In return, we expect our Brokers to comply with their franchise agreement (the "Agreement") obligations for our benefit and the benefit of the entire Coldwell Banker System.

It has come to our attention that you are not in compliance with your Agreement, for the reasons stated herein, as related to your continued failure to pay fees which are due and payable, the operation of your websites, and your failure to maintain and provide certificates of insurance, all of which are required under the Agreement. Specifically:

## A. Past Due Fees.

We have advised you on numerous occasions that you are delinquent in the payment of your account. As of July 29, 2014, you continue to have an unpaid billed balance of $241,880.90. The balances per office, as of this date, are as follows:

   i.    Office # 500447-0002 has unpaid billed balance of $159,464.67.

   ii.   Office # 500447-0003 has unpaid billed balance of $23,283.10.

   iii.  Office # 500447-0004 has unpaid billed balance of $37,077.65.

   iv.   Office # 500447-0005 has unpaid billed balance of $5,055.93.

   v.    Office # 500447-0007 has unpaid billed balance of $15,475.33.

   vi.   Office # 500447-0008 has unpaid billed balance of $533.25.

   vii.  Office # 500469-0001 has unpaid billed balance of $990.97.

   viii. Office # 500469-0002 has unpaid billed balance of $0.00.

   ix.   Office # 500469-0003 has unpaid billed balance of $0.00.

Please note that the above balances do not include the unbilled principal related to any promissory notes (including conversion promissory notes), which will be accelerated and payable in the event of termination.

## B. Website and Insurance Non-Compliance.

   i.    The Coldwell Banker AC Lawrence website, www.aclawrence.com, includes use of the company trade name without the Marks. (See attached, Exhibit A); and

   ii.   We have not received updated Certificates of Insurance for all offices.

For your reference, please see the following selected excerpts from the Policy and Procedures and Identity Standards Manuals:

   (1.)  "Your approved trade name must always begin with the words 'Coldwell Banker'." (Identity Standards Manual, page 36).

   (2.)  "Insurance Requirements. You are required to obtain and keep in full force and effect all insurance necessary to cover your business operations and to comply with local law...all policies of insurance should contain a separate endorsement naming Coldwell Banker Real Estate LLC, Realogy Holdings Corp. and their subsidiaries, successors and assigns as additional insureds... You are also required to cause certificates showing such insurance to be

*delivered to us. See your Franchise Agreement... ." (Policy and Procedures Manual, page 27).*

This Notice is to advise you that <u>within 30 days</u>:

1. You must pay the past due balance noted above in full. Please make all payments via e-Pay as soon as possible. If you have any questions specific to the payment of your account, please contact Danielle Ferrazzano, Account Manager, Real Estate Financial Services, at 973-407-7790 to discuss and arrange payment.

2. You must correct your website to include "Coldwell Banker" in all instances where your approved trade name is used.

   <u>and</u>

3. You must supply current Certificates of Insurance for General Liability and Errors and Omissions for all offices.

Kindly advise us in writing once you have corrected each of the issues identified in this letter so that we may avoid escalation of this matter to our Legal Department. We look forward to hearing from you and appreciate your anticipated cooperation.

Nothing contained herein is a waiver of our rights under the Franchise Agreement, all of which rights are expressly reserved.

Sincerely,

Nancy Danesecs
Franchise Compliance Specialist

cc: Budge Huskey
    Michael Fischer
    Valerie Workman
    Jeanette Halkias
    Joanne DeNicola
    Debbie Iuliano
    Adele Vespa
    Nelson Bennett



**OUR COMPANY**    About Us    Our Agents    Management & Staff    Media & Press Releases

It started out tiny: AC Lawrence was founded in 2005 by Anthony DeGrotta and Larry Friedman, who identified there was a void in customer service and professionalism in residential real estate, so built a company to answer that need.

From an initial handful of agents in a Chelsea loft space, AC Lawrence then doubled in team size and doubled again, before moving into the larger office of a now-defunct brokerage, giving the company even more space to grow and the ability to add a commercial component.

While growing itself from five agents in 2006 to 165 in 2012, the brokerage also emphasized developing client-focused, technologically-advanced websites, intricate branding and marketing programs to reach a multiplying client base, and intensely-focused training programs for new and tenured agents.

In 2012, AC Lawrence was acquired by holding company The Bellmarc Group, becoming AC Lawrence Real Estate, a member company - alongside Bellmarc Realty - of The Bellmarc Group, now one of the largest real estate companies in NYC, with a combined count of more than 500 agents between its residential sales and rental and commercial teams.

The spring of 2013 registered bigger growth and the addition of an international brand. AC Lawrence knew to best serve its escalating national and international clientele, it would need the reach and name recognition of a real estate entity known worldwide: The Bellmarc Group became the sole Manhattan franchise of Coldwell Banker, and AC Lawrence was rebranded as Coldwell Banker AC Lawrence.

Coldwell Banker AC Lawrence ... Fueling the next generation in NYC Real Estate

**Resources**
Buyer's Guide
Renter's Guide
Seller's Guide
Neighborhoods
Sitemap
AGENT LOGIN

**Stay Connected**
Facebook    Twitter
Google+    Pinterest
YouTube    LinkedIn
SocialProfiles    RSS Updates
Newsletter

**Contact Us**
Coldwell Banker AC Lawrence Real Estate
P: 212 - 989 - 0880
E: info@cbaclawrence.com
Contact us

© 2014 Coldwell Banker Real Estate LLC. A Realogy Company. All Rights Reserved. Coldwell Banker Real Estate LLC fully supports the principles of the Fair Housing Act and the Equal Opportunity Act. Each Office is Independently Owned and Operated. Coldwell Banker© and the Coldwell Banker Logo are registered service marks owned by Coldwell Banker Real Estate LLC.

All information furnished regarding property for sale, rental or financing is from sources deemed reliable, but no warranty or representation is made as to the accuracy thereof and same is submitted subject to errors, omissions, change of price, rental or other conditions, prior sale, lease or financing or withdrawal without notice. All dimensions, photographs and square footage are approximate unless otherwise indicated and should be confirmed by customers own architect or photographer. Coldwell Banker AC Lawrence represents the seller/owner on Coldwell Banker AC Lawrence own exclusives, except if another agent of Coldwell Banker AC Lawrence represents the buyer/tenant, in which case Coldwell Banker AC Lawrence will be a dual agent with designated agents representing seller/owner and buyer/tenant. Coldwell Banker AC Lawrence represents the buyer/tenant when showing the exclusives of other real estate firms. We provide sales listings from other companies thru our VOW and these listings are provided as a convenience, but are not reviewed or confirmed by us.

Case 2:14-cv-07926-MCA-MAH   Document 100-2   Filed 09/22/17   Page 189 of 265 PageID:
2436
Case 2:14-cv-07326-MCA-MAH   Document 4-24   Filed 01/06/15   Page 1 of 21 PageID: 932

# EXHIBIT "22"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

_Anthony De Oratta et al_
_Plaintiffs_

_- against -_

_Neil Binder et al_
_Defendants_

INDIVIDUAL ASSIGNMENT PART 60

STIPULATION - INTERIM

INDEX NO. 652633/2014

MOTION CALENDAR NO.

DATE 9/8/14

IT IS HEREBY STIPULATED AND AGREED by and between the below-named attorney(s) as follows:

_For the period_

From September 8, 2014 Through the entry of Further order, The Bellmore Group LLC; AC Lawrence Real Estate LLC; Bellmore Brokerage Midtown ~~the~~ Inc.; Bellmore Downtown LLC; Bellmore East LLC; Bellmore West LLC; Bellmore Simone Song Inc.; and Bellmore Greene Chelsea, Inc. ( collectively, "Franchisees") Shall report all Transactions and pay all fees to Coldwell Banker Real Estate LLC ("Franchisor") pursuant to the terms of the Franchise Agreement dated March 27, 2013, as amended. Franchisees shall also report all Transactions occurring prior to September 8, 2014 by noon on September 16, 2014.

Date: 9/8/14

Attorney for Plaintiff
William D. Hummel

Attorney for Defendant
and Nice Idea Publishing INC
& Neil Binder

Attorney for Defendant

So Ordered. 9-8-14

ENTER:
**MARCY S. FRIEDMAN, J.S.C.**

SC-8G (rev 2/86)

Case 2:14-cv-07926-MCA-MAH   Document 109-2   Filed 09/22/17   Page 191 of 265 PageID:
2438
Case 2:14-cv-07926-MCA-MAH   Document 105-2   Filed 01/06/15   Page 1 of 79 PageID: 254

**EXHIBIT "23"**

FILED: NEW YORK COUNTY CLERK 09/30/2014 04:36 PM

NYSCEF DOC. NO. 119

INDEX NO. 652633/2014

RECEIVED NYSCEF: 09/30/2014

1

```
 1

 2    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK: TRIAL TERM PART 39
 3    - - - - - - - - - - - - - - - - - - - -X

 4    ANTHONY DeGROTTA and LARREY FRIEDMAN,
      individually, and on behalf of THE BELLMARC
 5    GROUP LLC, and on behalf of AC LAWRENCE
      REAL ESTATE LLC, and on behalf of BAL
 6    ADMINISTRATION INC., and on behalf of
      BELLMARC BROKERAGE MIDTOWN INC., and on
 7    behalf of BELLMARC GRAMERCY/CHELSEA, INC.,
      and on behalf of AC LAWRENCE OPERATIONS INC.,
 8    and on behalf of BELLMARC EAST LLC, and on
      behalf of BELLMARC WEST LLC, and on
 9    behalf of BELLMARC DOWNTOWN LLC, and
      ALL ENTERPRISES LLC,
10
                                   Plaintiffs,
11                                                  INDEX NO.
             - against -                            652633/14
12
      NEIL  BINDER, individually, and doing
13    business as "Nice Idea LLC", and doing
      business as "A Nice Idea Publishing LLC,"
14    DANUTA BRODZINSKA, STEVEN BEISPEL and
      NICE IDEAA PUBLISHING INC.,
15
                                   Defendants.
16    - - - - - - - - - - - - - - - - - - - -X

17                     60 Centre Street
                       New York, New York
18                     September 11, 2014
                       PROCEEDINGS
19

20    BEFORE:
                 HONORABLE SALIANN SCARPULLA,
21                                        Justice

22
      APPEARANCES:
23
             KUCKER & BRUH, LLP
24           Attorneys for the Plaintiffs
             747 Third Avenue
25           New York, New York  10017
             BY:   SAUL D. BRUH, ESQ.
26                 WILLIAM D. HUMMELL, ESQ.
```

Bonnie Piccirillo - Official Court Reporter

2

1

2  ROSENBERG & PITTINSKY, LLP
    Attorneys for Defendants Neil Binder and
3  Nice Idea Publishing, Inc.
    232 Madison Avenue, Suite 906
4  New York, New York   10016
    BY:   LAURENCE D. PITTINSKY, ESQ.

5

6  LAW OFFICES OF STEVEN BEISPEL
    Defendant -  Appearing Pro Se
7  12 East 46th Street, Suite 6E
    New York, New York · 10017
8  BY:  STEVEN BEISPEL, ESQ.

9

10 DANUTA BRODZINSKA
    Defendant - Appearing Pro Se
11 936 Broadway
    New York, New York   10010

12

13 FORMAN HOLT ELIADES & YOUNGMAN LLC
    Attorneys for Coldwell Banker Real Estate LLC
14 Proposed Intervenor
    80 Route 4 East, Suite 290
15 Paramus, New Jersey   07652
    BY:  ANDREW J. KARAS, ESQ.
16       DANIEL M. ELIADES, ESQ.

17 JAMES MATTHEWS, ESQ.
    Executive Leggal Counsel Coldwell Banker Real Estate
18 Corporate Headquarters
    175 Park Avenue
19 Madison, New Jersey   07940

20

21

22

23

24                    Bonnie Piccirillo
25                Official Court Reporter

26

1          Proceedings

2                THE COURT:  So, I see that Justice Friedman issued

3     a TRO, correct?

4                MR. HUMMELL:  Yes, your Honor.

5                MR. PITTINSKY:  Correct.

6                THE COURT:  And I just got handed some papers that

7     were supposedly filed last night.

8                MR. PITTINSKY:  By defendant, Neil Binder, and

9     defendant, Nice Idea, yes, Judge.  Judge Friedman basically

10    wanted to know from plaintiffs if there was anything that

11    needed to be done between Monday and when you returned

12    today.

13               So although she made the order to show cause

14    returnable today, the TRO argument that they presented

15    Monday is really now being brought for the first time

16    before you other than that limited relief that she granted

17    on Monday.  So it's not that we're here arguing the

18    preliminary injunction as though it's the return date of

19    the order to show cause, and I believe counsel has the

20    transcript from Monday.

21               We're actually here for them to present the TRO.

22    We filed last night a -- just an affidavit for your Honor

23    on the TRO aspect to give our side of the story.  I have a

24    hard copy of that, because I didn't think your Honor would

25    have had printed it obviously in time.

26               THE COURT:  I didn't even know that it had been

                  Bonnie Piccirillo - Official Court Reporter

4

1                     Proceedings

2 filed until five minutes ago.

3         MR. PITTINSKY:  So, if I could hand that up.  That

4 is our quick response just to the TRO.

10:22:16   5         Additionally we had filed an order to show cause

6 for our own TRO, which is in the file.

7         THE COURT:  All right, please be seated.  Let's

8 start from the beginning.  It's a business.  There are two

9 halves of the business are having a disagreement, correct?

10:22:31  10         MR. HUMMELL:  Your Honor, William Hummell, for

11 plaintiffs.

12         THE COURT:  Yes.

13         MR. HUMMELL:  I brought something which may be

14 helpful.

10:22:39  15         THE COURT:  I'm not reading in front of you,

16 twelve lawyers.  So, I mean, I'll take whatever you want to

17 hand me, but it's all online.  I will read it.  I want to

18 just get to the -- cut to the chase.

19         MR. HUMMELL:  This is just the clean TRO before

10:22:53  20 Justice Friedman marked it up.  I thought you might liked

21 to have it as not marked.

22         THE COURT:  I don't need it.  It's e-filed,

23 correct?

24         MR. HUMMELL:  Essentially, though, your Honor,

10:23:02  25 it's more than just the dispute because our clients who are

26 Mr. DeGrotta and Mr. Friedman on behalf of the Plaintiff

5

|    |    |
|----|----|
| 1 | Proceedings |
| 2 | entities, who are two of the three members of the Board of |
| 3 | Directors with majority decision power have found that |
| 4 | there's actually substantial funds in excess of a million |
| 10:23:19  5 | dollars which had been diverted out of the company and paid |
| 6 | for the personal obligations of the other member of the |
| 7 | Board of Directors, Mr. Binder.  And so they brought a |
| 8 | request for injunctive relief in connection with the |
| 9 | Summons and Complaint they filed asking the Court, please, |
| 10:23:35  10 | have it stopped so the business can try to continue without |
| 11 | these diversions and without the things that are going to |
| 12 | destroy the business if it continues. |
| 13 | THE COURT:  Who writes the checks to pay the rent |
| 14 | and -- |
| 10:23:46  15 | MR. HUMMELL:  It's a little complicated because |
| 16 | there's two operational groups.  The Bellmarc operational |
| 17 | group for which Mr. Binder has the primary operational |
| 18 | role, and the AC Lawrence Real Estate LLC operational group |
| 19 | for which our clients, Mr. DeGrotta and Mr. Friedman have |
| 10:24:03  20 | operational control. |
| 21 | In each of them -- |
| 22 | THE COURT:  Operational control meaning that each |
| 23 | -- so for one group, the defendant writes out the checks -- |
| 24 | MR. HUMMELL:  Well, there's actually -- |
| 10:24:13  25 | THE COURT:  If you interrupt me, I'm not even |
| 26 | going to be able to get my question out, okay? |

Bonnie Piccirillo - Official Court Reporter

1              Proceedings

2         So operational, you mean that one group, one

3 defendant runs the operations in terms of pays the

4 employees, pays the rent, pays for the coffee, for the

10:24:29 5 coffee maker; and the two do the same thing for the other

6 corporation?

7         MR. HUMMELL:  Yes.

8         THE COURT:  Although, they do both use BAL

9 Administration, Inc., which is a -- under shared services

10:24:43 10 agreement the vehicle by which things happen and there's a

11 controller for each operational group at BAL.

12         THE COURT:  BAL is a nonaffiliated sort of like

13 administrator?

14         MR. PITTINSKY:  No --

10:24:58 15         MR. HUMMELL:  It has certain administrative

16 functions.  It is one of the named plaintiffs.

17         THE COURT:  It is a plaintiff?

18         MR. HUMMELL:  Yes.

19         THE COURT:  So who -- is that the management group

10:25:07 20 BAL that --

21         MR. HUMMELL:  No, it's just a vehicle.

22         THE COURT:  A vehicle for what?

23         MR. HUMMELL:  For doing the banking, payments.

24         THE COURT:  And it is one of the plaintiffs?

10:25:18 25         MR. HUMMELL:  Yes.

26         THE COURT:  Okay.

7

1

2    Who runs BAL?  Who is on staff at BAL?

3         MR. HUMMELL:  Well, it has the same three Board of

4    Directors Members, and there's a controller --

10:25:29    5         THE COURT:  I just want to know who physically

6    writes the check?

7         MR. HUMMELL:  Ms. Brodzinska writes the checks as

8    the controller for the Bellmarc operation group and Tashina

9    Mehta -- I think that's her last name -- writes the checks

10:25:43  10    for AC Lawrence Real Estate operation group.

11         THE COURT:  Are either of them in the courtroom

12    today?

13         MR. HUMMELL:  Ms. Brodzinska is a defendant.

14         THE COURT:  You are a defendant.  Yes, please be

10:25:53  15    seated.

16         All right, I'm sure you're not happy to be a

17    defendant, but it is what it is.

18         And the allegations here is that the plaintiffs --

19    the defendant has diverted funds from the group to his own

10:26:07  20    personal benefit?

21         MR. HUMMELL:  Enormous funds, including mortgage,

22    rent --

23         THE COURT:  And what are you seeking in the TRO?

24         MR. HUMMELL:  Well, in the TRO, essentially, we're

10:26:17  25    asking that rather than him be able to have checks written

26    to himself, including the million dollars which has already

Bonnie Piccirillo - Official Court Reporter

| | | |
|---|---|---|
| | 1 | Proceedings |
| | 2 | left the group through BAL -- |
| | 3 | THE COURT:  Are you saying there's a check to him |
| | 4 | personally for a million dollars? |
| 10:26:31 | 5 | MR. HUMMELL:  Well, we have seven or eight |
| | 6 | categories, including checks to him personally. |
| | 7 | THE COURT:  To him personally. |
| | 8 | MR. HUMMELL:  Yes, I think there's 45 of those. |
| | 9 | THE COURT:  Does he work for the company? |
| 10:26:41 | 10 | MR. HUMMELL:  Yes. |
| | 11 | THE COURT:  Does he draw a salary? |
| | 12 | MR. HUMMELL:  Yes. |
| | 13 | THE COURT:  Does he draw commissions? |
| | 14 | MR. HUMMELL:  No. |
| 10:26:45 | 15 | MR. PITTINSKY:  Distributions. |
| | 16 | THE COURT:  All right, distributions. |
| | 17 | All right, some of those checks could be his |
| | 18 | salary and distributions, correct? |
| | 19 | MR. HUMMELL:  Well, there's $300,000 for labor and |
| 10:26:57 | 20 | cash.  That's one category. |
| | 21 | THE COURT:  Okay, so there are other checks made |
| | 22 | out to him personally? |
| | 23 | MR. HUMMELL:  Well, there's -- |
| | 24 | THE COURT:  It's a yes or no.  Other than checks |
| 10:27:08 | 25 | that are made out to him that say salary and distributions, |
| | 26 | are there other checks made out to him personally?  Yes or |

Bonnie Piccirillo - Official Court Reporter

Proceedings

1
2   no?

3          MR. HUMMELL:  No.  Indirectly, but not directly.

4          THE COURT:  No, let's go again.  I'm just going to

10:27:25  5   cross-examine you until you answer my question.  It's

6   entirely up to you.  I need to know -- I don't want your

7   extra stuff.  I'm asking you questions because I need to

8   know what I need to know.

9          Now, the controller here -- is the other

10:27:42  10  controller here for the other corporation?  Are you

11  alleging that both corporations are paying him money or

12  only one?

13         MR. HUMMELL:  Until recently, it was just the one.

14         THE COURT:  So, this is the controller for that

10:27:52  15  corporation; correct?

16         MR. HUMMELL:  Yes.

17         THE COURT:  Okay, so is there any dispute other

18  than on any of the flows going out of the business other

19  than the checks that are going to him and his entities or

10:28:06  20  whatever else you think indirectly to him?

21         MR. HUMMELL:  And for his mortgage and his rent,

22  into the company that he solely owns.

23         THE COURT:  Okay, anything else but that?  Any

24  other dispute about the funds going out of this company?

10:28:21  25         MR. HUMMELL:  Yeah, he actually raided an account

26  and set aside for health insurance premiums for employees.

Bonnie Piccirillo - Official Court Reporter

Proceedings

1

2    He took, unilaterally, what he described as short term

3    loans for those accounts which created -- I mean, he's not

4    allowed to do that.  It's a sake /KREUP sank escrow account

5    for the benefit of employees, and we introduced in evidence

6    that he's done that on repeated occasions.

7              THE COURT:  All right, so you want to prevent him

8    from doing all of that?

9              MR. HUMMELL:  Yes, your Honor.

10             THE COURT:  Okay, just for the one corporation;

11   correct?

12             MR. HUMMELL:  Well, there are five entities in

13   that operation group.  There's only one in our operation

14   group.

15             THE COURT:  All right, thanks.

16             Counsel.

17             MR. PITTINSKY:  I think your Honor needs a little

18   -- might I describe better for your Honor how this works,

19   because there's a little confusion.

20             There's not two separate operations.  There's not

21   two separate entities, not two separate businesses.

22   There's one business.

23             THE COURT:  Is Mr. Binder here?  Has he taken

24   loans, short-term loans from pension funds?

25             MR. PITTINSKY:  No.

26             THE COURT:  No?

Bonnie Piccirillo - Official Court Reporter

11

                                    Proceedings

 1

 2              MR. PITTINSKY:  No, he has not taken any

 3      short-term loans from pension funds.  It was a health

 4      insurance account, special account.

10:29:32   5              THE COURT:  Has he taken funds out of that?

 6              MR. PITTINSKY:  I would have to --

 7              THE COURT:  No?  There's no checks to him from the

 8      health insurance?  This is easy to figure out.

 9              MR. PITTINSKY:  We won't do it.

10:29:43  10              THE COURT:  Show me what you're talking about,

11      counsel, because I just heard an allegation.  I'd like to

12      know what you base it on.

13              I have the documents.  Show me.

14              MR. HUMMELL:  One of the documents is Exhibit 2,

10:29:55  15      to the ones with side tabs.

16              THE COURT:  This is going to be straightforward.

17      Either it is or it isn't.

18              MR. HUMMELL:  It's the one attached to the order

19      to show cause.

10:30:24  20              MR. HUMMELL:  Actually, your Honor, that one has

21      most of the money that he diverted, but the one that

22      answered your question is tab one.

23              THE COURT:  Tab one.

24              MR. HUMMELL:  And we took the liberty of

10:30:37  25      highlighting some of the entries, and I should note this is

26      only excerpts from this general ledger.  There are many

                    Bonnie Piccirillo - Official Court Reporter

12

1                    Proceedings

2    more pages.

3              THE COURT:  Show me which --

4              MR. HUMMELL:  The first page.

10:30:48  5              THE COURT:  The first page, which check are you

6    alleging?

7              MR. HUMMELL:  Check 23393, which is on

8    February 24, 2014, three from the bottom.

9              THE COURT:  Short-term loan, $32,000 from -- this

10:31:06  10   is from the healthcare account?

11             MR. HUMMELL:  Yes.

12             THE COURT:  All right, let me ask the controller.

13             Is that correct?

14             MS. BRODZINSKA:  We transfer money, $32,000 from

10:31:15  15   the --

16             THE COURT:  Is it from the health care account?

17             MS. BRODZINSKA:  It's a special account where we

18   keep the money to pay the healthcare insurance.

19             THE COURT:  And he took a loan from that?

10:31:26  20             MS. BRODZINSKA:  That loan wasn't for him --

21             THE COURT:  Listen to me.  Answer the question.

22             MS. BRODZINSKA:  The money was transferred --

23             THE COURT:  It was transferred to him personally?

24             MS. BRODZINSKA:  No.

10:31:35  25             THE COURT:  To whom?

26             MS. BRODZINSKA:  To the operating account of the

Bonnie Piccirillo - Official Court Reporter

13

|  | |
|---|---|
| 1 | Proceedings |
| 2 | business to pay the bills. |
| 3 | THE COURT:  To pay bills? |
| 4 | MS. BRODZINSKA:  Yes. |
| 10:31:41  5 | THE COURT:  For the company? |
| 6 | MS. BRODZINSKA:  Yes. |
| 7 | THE COURT: . Transferred from the health care |
| 8 | account to pay other bills? |
| 9 | MS. BRODZINSKA:  Correct. |
| 10:31:47  10 | THE COURT:  And none of it went to him personally? |
| 11 | MS. BRODZINSKA:  No. |
| 12 | THE COURT:  Okay. |
| 13 | MR. PITTINSKY:  So the answer is yes, none of them |
| 14 | went to him personally. |
| 10:31:55  15 | MS. BRODZINSKA:  Oh, yeah. |
| 16 | THE COURT:  Okay. |
| 17 | MR. PITTINSKY:  So if I could finish, Judge.  Real |
| 18 | short. |
| 19 | So these are not two separate operations, not two |
| 10:32:04  20 | separate businesses.  It's a brokerage sales; it's a |
| 21 | brokerage rental.  AC Lawrence Real Estate is one of the |
| 22 | entities that controls mostly the rentals.  The Bellmarc |
| 23 | entities control and do mostly the rental business. |
| 24 | However, it is 65 percent owned by my client |
| 10:32:22  25 | through his company and 35 percent owned by the two |
| 26 | gentlemen that are the plaintiffs here.  What they did is |

Bonnie Piccirillo - Official Court Reporter

14

Proceedings

1

2  they created the BAL Administration which is an

3  administration company in order to consolidate all of the

4  operations.

5  It's not two controllers.  It's one company with
10:32:36

6  two people that handle the work, at least.

7  They formed another company called the Bellmarc

8  Group LLC, another umbrella company in a sense that holds

9  the Coldwell Banker licensing over which Mr. Binder is the

10  signatory.
10:32:51

11  All the other entities are assigned their offices.

12  So AC Lawrence is -- has two offices.  Bellmarc West has

13  one.  Bellmarc East, et cetera, et cetera.  All of these

14  corporations have the same corporate structure.

15  Sixty-five percent owned by Mr. Binder's entity;
10:33:08

16  thirty-five percent owned by them.  It's one large

17  business.

18  In connection with that, Mr. Binder had authority

19  as President of the company.  He ran the company.  He

20  operated overall.  He communicated with them in all
10:33:20

21  transactions.  Everything was approved, meetings,

22  everything else.

23  What's going on today is they would like their

24  company back.  What do I mean by that?

25  They have orchestrated this for over two months.
10:33:32

26  They've taken computers.  They have taken staff.  We have

Bonnie Piccirillo - Official Court Reporter

15

                            Proceedings

 1      brokers and sales people leaving now because of this

 2      lawsuit.

 3              When I say "leaving", the entire organization.  We

 4      have a situation where their company was worth two to three

 5      million when they first joined with Mr. Binder.  We were

 6      worth more, and the idea was to build a big sales and

 7      rental business.

 8              So it's not like, all of a sudden, you start

 9      taking the pieces.  Without both of them working together,

10      you don't have an operation anymore.  Mr. Binder was in

11      charge of that operation.  So, hopefully, that gives you

12      the structure.

13              We have not -- there's allegations left and right.

14      We have phantom employees; absolutely false.  The people

15      that they cite, Mr. Binder's wife, we have hundreds of

16      e-mails that show that on a daily basis she was doing work

17      with the plaintiff, Mr. DeGrotta, on web design and

18      literature.

19              The other person, Mr. Binder's sister, comes to

20      work everyday as an administrative assistant.  She even

21      worked for his prior companies.  They put together a

22      picture, your Honor, that looks like Mr. Binder is a bad

23      guy.  They put out in the press, a very negative article

24      calling him a pill-popper embezzler.  He is not taking

25      monies.  He's taking his distributions.  He's taking his

             Bonnie Piccirillo - Official Court Reporter

16

Proceedings

salary.  He gets paid to his company he had and from that
company, from that company he's paid his bills.

If they are worried about money coming out of the
health insurance, we won't.  We didn't.  We will not.

Mr. Binder is a straight-shooter.  He's got a
reputation of 30-plus years in this business.  They are
trying to create a situation where they take control of AC
Lawrence in two locations, but we deny all of their
allegations factually.

MR. HUMMELL:  Your Honor, he went actually into
more substance rather than to answer your questions.

I would urge you, if you're willing to do so and I
hope you're willing to do so.  In Mr. Friedman's affidavit
which is attached to this, which is I think is the third
thing in the order to show cause, and then my affirmation
which identifies the eight different components in the
order-to-show-cause papers and is followed by
Mr. Friedman's 29-page affidavit.

And in Paragraphs 13 to 20, there is a list of
categories of money that had been pilfered from the
company, which is more than a million dollars, including
money to pay a personal debt to a former partner of his,
$81,690.

THE COURT:  Well, I don't know that that's not his
salary and his distributions.  I have no idea whether that

Bonnie Piccirillo - Official Court Reporter

1                    Proceedings

2    is or isn't.

3                    The fact that you say it is or isn't, you just

4    told me that he took money from the health insurance fund

10:36:21    5    to line his pocket, and I find out from the person who

6    actually did it, that they just took the money from one

7    account and put it into another to pay bills.

8                    So, yes, I hear your allegations, but I'm not

9    accepting them as true.

10:36:34    10                    Now, sit down please for a moment.

11                    Look, let me ask you all this.  Where do you see

12    this ending?  Is this, Let's dissolve this?  Is that the

13    goal of this?  Because, obviously, when you come in and you

14    make these accusations, it does not appear to me that

10:36:51    15    anyone wants to keep this operation going.

16                    I have a majority partner and a minority partner.

17    What do the minority partners want to do?  Do they want

18    out?  Let's figure out where we want to end this up,

19    because I don't want you to spend $2 million getting

10:37:07    20    somewhere in 8 to 10, 12 months where I can get in a month.

21                    So, what's the end game?  Do you want to dissolve

22    the corporate structure, separate out, have an accounting

23    and take your monies and go your own separate ways?

24                    MR. HUMMELL:  That's not what we asked for.  If I

10:37:24    25    can point out with regard to Ms. Brodzinski --

26                    THE COURT:  I moved on.  Can you focus on what I

Bonnie Piccirillo - Official Court Reporter

18

1
2       want to focus on, please, because that really is the only
3       thing that helps me out.
4                       So the question is what is your ultimate --
10:37:35  5            MR. HUMMELL:  We just want him to stop taking
6       money out of the account.
7                       THE COURT:  And you think -- do you think after
8       making those kind of allegations that you're going to be
9       able to run a corporation with a majority shareholder
10:37:47 10      together?  You think that that's a viable plan?
11                      MR. HUMMELL:  We knew we had no choice, but over a
12      million dollars disappears --
13                      THE COURT:  I'm asking you do you think that's a
14      viable plan that now that you've made these kind of
10:37:59 15      allegations against the majority shareholder, that you're
16      going to be able to successfully run this business
17      together?
18                      MR. HUMMELL:  I don't know, your Honor.
19                      THE COURT:  Oh, come on.  If you don't know, then
10:38:11 20      you're not the lawyer I think you are and I think you're a
21      very good lawyer, so you know the answer.  There's no way
22      that this is going to go that way.  No way.
23                      HUMMELL:  It cannot possibly continue the way it
24      is.
10:38:20 25                      THE COURT:  Right, so what my suggestion to you is
26      this and I take it back to you to take to your clients.

                    Bonnie Piccirillo - Official Court Reporter

Proceedings

Have an accountant come in, split the costs, do an
accounting, end the business. He goes his way; you go your
way. That's the only way this is going to resolve in a,
least expensive plan that works for everybody.

MR. KARAS: Your Honor, if I may?

THE COURT: Are you an attorney, sir?

MR. KARAS: Yes.

THE COURT: And you represent?

MR. KARAS: Coldwell Banker --

THE COURT: Are you one of plaintiffs?

MR. KARAS: No, Judge, we filed an application --
if I may, Andrew Karas for the firm Forman Holt Eliades &
Youngman for Coldwell Banker.

THE COURT: Coldwell Banker is a plaintiff?

MR. KARAS: They're the franchiser. We filed an
order to show cause yesterday to move for a receiver in
this matter.

THE COURT: Oh, I didn't get that. Is that
another one?

MR. KARAS: It was filed last night, judge. A
hard copy is coming this morning. What I wanted to ask of
the Court is, Judge, we have proposed to the parties that
mediation take place in this case. We would host it to try
to get to resolution of the case. We're looking for a
receiver. We're not taking sides as far as the

Bonnie Piccirillo - Official Court Reporter

20

1

2    allegations; but we are concerned enough that if a receiver

3    came in this way we know nothing is taking place, I would

4    agree an accounting in terms of what happened to all of the

10:39:39   5    monies would not only be appropriate, but would help

6    towards mediating this matter.

7              We're willing to host mediation.  We think it

8    would help resolve the issues and get to a place where both

9    entities can continue on with their business without

10:39:53   10   clogging the Court and try to get an ultimate resolution of

11   the case.

12             THE COURT:  It seems to me that's the only way to

13   go, that's the only way to go.  But, I mean, you can spend

14   2 or 3 million dollars litigating this.  I have no problem

10:40:07   15   with that.  I have no problem with it, but I hear your

16   allegations.  I hear them, a minority shareholder, saying

17   we're getting ripped off.  I hear the majority shareholder

18   saying, That's not happening.  I can explain every single

19   one of these expenses.  I have my controller here, who will

10:40:28   20   back me up.

21             I don't know what's going on.

22             The only thing that I can recommend to you is the

23   following:  That I will insure that no extraordinary

24   expenses are paid while you have an accountant come in.

10:40:42   25   Extraordinary meaning nothing but straight salary and

26   regular bills get paid by the controller.  That's it.  No

Bonnie Piccirillo - Official Court Reporter

1          Proceedings

2    transfers of money from anywhere else.

3          If there is an issue, if you're short on

4    something, then you can come back to court.

10:40:56   5          But you get an accountant, do an accounting and

6    you move forward from there.

7          MR. KARAS:  Your Honor, part of the issues that we

8    have is that under the Franchise Agreement, there's

9    approximately $331,000 outstanding.  They're in default

10:41:14   10   with regard to its franchise fees, which is under the

11   Franchise Agreement.  Obviously, the default calls for

12   termination.

13         Judge, we're trying to get this thing resolved so

14   I think in light of the fact that there's a default,

10:41:26   15   subject to termination, I think it's beneficial for all

16   parties to sit down with us, mediate and try to get this

17   thing resolved sooner rather than later.

18         THE COURT:  Are you saying you're owed $300,000 in

19   franchise fees?

10:41:37   20         MR. KARAS:  We are.

21         Does anyone dispute that?

22         MR. PITTINSKY:  We just got papers today, Judge.

23   It's not by us or them.  It's total global monies overall.

24   What we spoke about on Monday was they needed us to enter

10:41:49   25   all the transactions, both sides.  All done and ahead of

26   schedule.  All done.

Bonnie Piccirillo - Official Court Reporter

22

1
2         They present us with a reconciliation today.  I
3    gave it to my client.  We're going to work on it.  I
4    already had discussions with them regarding some monies
10:42:02  5    that are owed by Coldwell Banker, about a hundred
6    eighty-seven five to us.
7         THE COURT:  "Us" meaning both?
8         MR. PITTINSKY:  Meaning the group.  When I say
9    us --
10:42:11  10        THE COURT:  You think there's charge backs?
11        MR. PITTINSKY:  Well, it's -- what is it a note?
12        MR. KARAS:  It's not a charge.  Judge, there's a
13   note that's due of one point I believe four million dollars
14   that once the default under the franchise fees that becomes
10:42:27  15   payable.  That 187,000, if certain events happen, then they
16   are entitled to a certain 187.  Once you have a default,
17   you're not entitled to those monies.  So while they can
18   argue that --
19        THE COURT:  Well, you think they're not entitled
10:42:43  20   and they do.  Again, I don't know who is entitled or not.
21        MR. KARAS:  But either way, everybody
22   acknowledges in terms of franchise fees, there is a
23   default.
24        MR. HUMMELL:  Your Honor --
25        THE COURT:  That is, that is two separate issues.
10:42:53  26   Yes?

Bonnie Piccirillo - Official Court Reporter

23

Proceedings

1  
2      HUMMELL:  Please, there are franchise fees fees  
3  due to the operations of each group.  Our clients made  
4  certain all of them were paid.  Mr. Binder instead of  
10:43:06    5  paying the 281,000 that his group paid for his Westhampton  
6  luxury residence, for his 12,000-a-month apartment, for  
7  other monies that he diverted to pay debts.  He's got a  
8  $2 million judgment he's using the funds to pay for.  He's  
9  got an IRS tax lien.  He's got obligations he owes to banks  
10:43:28   10  that has to do with pre-existing things.  
11      That's where his money has gone.  That issue  
12  actually crystallizes the issue here about the problem here  
13  about the money disappearing to pay his obligations.  
14      With regard to going forward, if we had an  
10:43:42   15  evidentiary hearing and that's your Honor's discretion and  
16  we spent the time, this gets back to your point do we  
17  really want to spend all the legal fees; we would prove  
18  everyone of these.  We already introduced proof of all of  
19  them --  
10:43:55   20      THE COURT:  No, but I found at least the first one  
21  you showed me that I'm not convinced that you're correct --  
22      MR. HUMMELL:  Your Honor --  
23      THE COURT:  -- so having said that -- please, gee,  
24  honestly.  I just let you speak for fifteen minutes  
10:44:09   25  straight.  I listened, both my ears.  I spoke for three  
26  seconds and again you're starting to speak over me and your  

Bonnie Piccirillo - Official Court Reporter

24

1          Proceedings

2     co-counsel has jumped up and adversaries jumped up.

3              Everyone -- sit down, please.

4              At least show me the respect that you intend for

10:44:26  5    me to hear what you have to say and you are hearing what I

6     have to say.

7              When you walk out of this courtroom you can say

8     whatever you want, but at least let's have a real dialogue

9     where you're listening to me as I am trying to listen to

10:44:40  10   you.

11             My point is this:  I am -- I hear that you are

12    saying to me that you don't want anymore money to

13    disappear.  I hear that.  I am not convinced that any money

14    has disappeared yet.

10:45:02  15            But I am -- I take seriously your allegation that

16    it has.  What I am trying to avoid is spending a whole host

17    of time on a hearing that's just going to get you where

18    I'll get you to today.

19             I am not unwilling to issue a TRO to make sure

10:45:25  20   that only ordinary course of business debts are paid.  That

21    there are no extraordinary expenses being paid.  That any

22    payments outside ordinary expenses are to be held off until

23    our next hearing.

24             That, with this debt to Coldwell Banker, which is

10:45:52  25   I guess one of the big ones and has to be dealt with right

26    away.  Counsel says he got the papers, the reconciliation

Bonnie Piccirillo - Official Court Reporter

1                 Proceedings

2    today. He will go back and speak to his client; and if

3    that cannot be resolved and paid in the next couple of

4    days, then we will certainly be back here.

10:46:10   5        Other than that, my suggestion to you is get an

6    accountant because if you want to have a hearing, I'm going

7    to have an accountant. I'm -- I'm not going to have your

8    two guys telling me something is paid is not going to sway

9    the debt.

10:46:29  10        So, in the end, if you want to have a hearing, we

11    will; but in the meantime, get an accountant in to do a

12    reconciliation.

13        Do you have an accountant, an outside accountant

14    who is not your clients', who have done a reconciliation,

10:46:43  15  counsel?

16        MR. HUMMELL:  There's an accountant who we

17    considered making a defendant. We do not want to use him.

18        THE COURT:  Okay. I'm asking you, do you have an

19    outside accountant reconciliation that you could put up on

10:46:55  20  a hearing today?

21        HUMMELL:  No. We only --

22        THE COURT:  Exactly. That's my point. My point

23    is this. Let's get our house in order.

24        HUMMELL:  Having to do with the answer Ms.

10:47:11  25  Brodzinski gave, it's directly related to another issue

26    which is he has not caused all the money to be paid him

26

1

2 directly.  He's utilized shell companies he solely

3 controls, including notably Bellmarc Insurance Agency, Inc.

4 which only he owns and a lot of money --

10:47:31  5           THE COURT:  Okay, that's another one of your

6 allegations that he denies.

7           MR. HUMMELL:  But I --

8           THE COURT:  So again what I'd like to do -- the

9 fact that you keep saying it doesn't make it true.  Number

10:47:41  10 one, you don't even have any personal knowledge.  You're

11 not his -- that's first.

12           So the fact that you keep saying it to me, doesn't

13 make it true.

14           And, secondly, I'm not disputing that it may be

10:47:53  15 true, but I'm not taking your word for it is my point.  And

16 the only word I would take for it is an accountant's word

17 who did a reconciliation.

18           So we're back at the same point.

19           MR. HUMMELL:  Actually, I was done because the

10:48:08  20 whole point I was trying to make actually was with regard

21 to a standstill not to take money, I just wanted your Honor

22 to be aware it's not just money to him; he has entities

23 that need to be blocked as well.

24           THE COURT:  I understand that.  I was not -- I

10:48:25  25 suppose I meant the royal we as opposed to him

26 individually.

Bonnie Piccirillo - Official Court Reporter

Proceedings

I am only saying that there are ordinary course of business, including the salary to his sister if she comes in and works. The fact that he hires his sister, good for him. If she works, she deserves to get paid. If she doesn't work, that's a different thing; but if she's coming in and working everyday, she gets a salary like everybody else.

This is not -- I assume there's no anti-nepotism plan; and if he owns a business and he want's to employ every single person in his family, so long as they're working, there's no issue with them.

So I agree with you that when you're talking about the not divert to him, that we should not divert to any of his corporations, any extraordinary expenses; but, for example, if one of his corporations cleans the building, that corporation has to get paid. It's an ordinary expense. There's nothing weird or extraordinary about that.

MR. HUMMELL: We agree.

MR. PITTINSKY: Judge, can I speak for one moment?

THE COURT: Yes.

MR. PITTINSKY: I'm asking the Court what's good for the goose is good for the gander. AC Lawrence --and that's in our order to show cause which is before you to sign -- we've outlined a whole list of things that they

Bonnie Piccirillo - Official Court Reporter

28

Proceedings

1   have done ans to use the generic phrase is not Kosher.

2          If you're going to do any sort of TRO, we would

3   ask the TRO be equal, meaning they can't take extraordinary

4   expenses because they --

10:49:50   5          THE COURT: Yes, yes.  You don't have to go any

6   further.  No one, look --

7          MR. PITTINSKY:  What about salaries that all three

8   of them are entitled to under the --

9          THE COURT:  No one's salary is going to be put

10:50:02  10   off.  Everyone is going to take their salary.  Let me ask

11   you this.  Aside from salary, do they get other

12   distributions?

13          MR. PITTINSKY:  Yes.

14          THE COURT:  How often?

10:50:13  15          MR. PITTINSKY:  They get distributions of a

16   percentage of their share ownership.

17          Think we have to speak about that maybe, your

18   Honor, and get on the same page.

19          Yes, There's a $5,000 --

10:50:30  20          THE COURT:  All Right, So They Get a Distribution,

21   But They're Not Getting One Until October.  They get it

22   once a month.

23          MR. BRUH:  My clients have not received theirs.

24          THE COURT:  Has your client received his September

10:50:48  25   distribution?

26

Bonnie Piccirillo - Official Court Reporter

Proceedings

1

2      MR. PITTINSKY:  No.

3      THE COURT:  So, with respect to the September

4  distribution, what I'd like the attorneys to do is get

10:51:01   5  together and propose amounts for each of them; and if you

6  can agree, you can do the September distribution.  If you

7  can't agree, then there's no September distribution.

8      MR. PITTINSKY:  Understood.

9      THE COURT:  Or you can show it to me and I'll make

10:51:15  10  a decision on the September distribution, which I really

11  would like not to the do that.

12      MR. HUMMELL:  There's additional --

13      MR. PITTINSKY:  I was in the middle of speaking,

14  please.

10:51:22  15      THE COURT:  I thought you were done.

16      MR. PITTINSKY:  I apologize.  The transfer of

17  monies in your Honor's order, we ask you be careful because

18  there is transfers within the plaintiff entities that in

19  the ordinary course is used to pay bills.

10:51:35  20      So, for example, the location may transfer monies

21  up into the administration company.  We have to be able to

22  do those internal transfers, including the plaintiffs, in

23  order to pay the bills.

24      THE COURT:  I think everyone knows what an

10:51:46  25  ordinary course -- I mean, if you don't --

26      MR. PITTINSKY:  I do.

Bonnie Piccirillo - Official Court Reporter

1      Proceedings

2          THE COURT: -- then we'll come back.  I don't

3  think anyone is disputing what an ordinary course of

4  business payment is.

5          MR. PITTINSKY: Excuse me.  One last point, your

6  Honor, which is they have -- "they" meaning Mr. DeGrotta

7  and Mr. Friedman have taken control over computers and

8  staff and the location.  We're going to need access.

9          THE COURT:  What do you mean by that?

10          MR. PITTINSKY:  What they did is that they moved

11  the financial computers that ran the AC Lawrence rental

12  aspects, they moved it to another office and we don't have

13  access, monies.  AC Lawrence, monies coming into the entity

14  AC Lawrence real estate over which my clients entity owns

15  65 percent, they have basically hijacked it and all the

16  money is in that, all the business operations, all of the

17  financial records.

18          THE COURT:  Just the computers.

19          MR. PITTINSKY:  All the financial records, even

20  physically moved the controller out of our office.  They

21  changed the lock to 936 Broadway; and when I asked counsel

22  for a key, he attached conditions to get a key to our own

23  main office.

24          MR. BRUH:  No spoliation, that was the --

25          MR. PITTINSKY:  I said fine, as long as

26  reciprocal --

          Bonnie Piccirillo - Official Court Reporter

1        Proceedings

2            THE COURT:  Wait a second.  Did you say you can

3    spoliate, but --

4            MR. BRUH:  Absolutely not.  Absolutely not.

10:53:09    5            THE COURT:  Stop.  I want to know why you moved a

6    single computer?

7            MR. BRUH:  Okay, the reason the computers were

8    moved, number one, it followed us being cut off from the

9    financial records of the other five companies.  That's

10:53:24   10    number one.

11            THE COURT:  So we retaliated.  That's the way you

12    go, you move forward.

13            MR. BRUH:  Number two.  Well, if you can't get

14    access to five of your own companies, then you certainly

10:53:36   15    don't have the ability to monitor where the monies are

16    going as the other person in the company has stolen over a

17    million dollars.

18            THE COURT:  Stop.  Let me just stop you for one

19    second.

10:53:49   20        My point precisely that this company is not going

21    to go forward with everybody together.  This is irreparably

22    finished.  So you've got to acknowledge it today, and the

23    point is no more, no more anybody spending any money.  Get

24    an accountant in.  Split it up fast before more accusations

10:54:11   25    take place, on both sides.

26            MR. BRUH:  And I understand where you're going

Bonnie Piccirillo - Official Court Reporter

32

| | |
|---|---|
| | 1 |

<pre>
1                         Proceedings
2   with this; but in the interim, nobody, including Coldwell
3   Banker wants this business to stop; because if the business
4   stops, then the money will stop, the income will stop.
10:54:29  5   There will be nothing left to fight over and Coldwell
6   Banker will never get their franchise fees.  So what we
7   want to be able to do is continue doing business.  One of
8   the things that is in this order to show cause is to be
9   allowed access.
10:54:43  10             Mr. Pittinsky says Mr. Binder doesn't have a key.
11  The premises are opened from eight o'clock till
12  nine o'clock at night.
13             The only reason that the lock was changed was
14  because Mr. Binder -- we at that point had a security guard
10:55:01  15  in there, because Mr. Binder was going in at various times
16  and placing at risk our financial records --
17             THE COURT:  Wait a second, he's a 65 percent owner
18  of that business, correct?
19             MR. BRUH:  Let me make a correction.  There are
10:55:18  20  three board members.  There are three managing members.
21  Each one of them has an equal vote.  So the fact that he
22  has --
23             THE COURT:  I'm talking about who owns the shares.
24             MR. BRUH:  He has 65 percent shares.  That doesn't
10:55:31  25  mean he could do whatever he wants.
26             THE COURT:  I could not agree more.

          Bonnie Piccirillo - Official Court Reporter
</pre>

33

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. BRUH:  Let me just make a single correction of |
| 3 | a misunderstanding you may have. |
| 4 | You're not allowed to take money from a health |
| 10:55:43  5 | insurance escrow account, transfer it to BAL Administrative |
| 6 | for whatever purposes.  That money is sacrosanct.  It's |
| 7 | ERISA protected.  It's a crime.  You're not allowed to do |
| 8 | that.  It didn't happen once.  It happened multiple times. |
| 9 | THE COURT:  Stop right there.  Number one, that |
| 10:56:03  10 | wasn't the accusation.  The accusation was he took the |
| 11 | money and put it in his pocket. |
| 12 | MR. BRUH:  No, that wasn't. |
| 13 | THE COURT:  That was the accusation -- |
| 14 | MR. BRUT:  That's -- |
| 10:56:10  15 | THE COURT:  -- that I heard today. |
| 16 | Let me make it clear.  I'm the only one getting |
| 17 | taken down here.  You want a record for yourself, you don't |
| 18 | even want to be respectful to me, no problem.  But, you're |
| 19 | not getting taken down, not a word of what you say.  Do you |
| 10:56:24  20 | understand me? |
| 21 | MR. BRUH:  I understand. |
| 22 | THE COURT:  Thank you. |
| 23 | The accusation that was made to me at the |
| 24 | beginning of this hearing was that he took that money and |
| 10:56:33  25 | he took it for himself.  I understand perfectly well what |
| 26 | you are saying about not using the ERISA money for other |

1       Proceedings

2   purposes; but my point was and is that there is not --

3   still, the accusation that he took the healthcare money and

4   put it in his own pocket, that's a different accusation.

5           Now, what -- what is the bottom line of what you

6   are telling me right now?

7           MR. BRUH:  What I'd like to correct, your Honor,

8   is that was a confusion.  That was not the allegation.  The

9   allegations are very clearly written in our papers.

10          The allegation about the short-term loans to BAL

11  Administrative was exactly as I said.  It wasn't a lining

12  of Mr. Binder's personal pocket; but indirectly if you're

13  taking money from the general health escrow account and

14  putting it into BAL Administrative, then you're using it

15  for improper purposes whether or not the money goes from

16  there to this fake insurance agency company that does no

17  work for the brokerage, or you pay your bills.  Either way,

18  it's not allowed.

19          MR. PITTINSKY:  We're --

20          MR. BRUH:  Excuse me.  With respect to the point

21  that I'm trying to make is that Mr. Binder has access to

22  936 Broadway.  He'll continue to have access.  We will give

23  him a key so that he can access the place after hours like

24  he did at midnight on a Saturday night.  And then instead

25  of doing what he had to do, he spent the next hour and a

26  half throwing out the security guard so that there wouldn't

Bonnie Piccirillo - Official Court Reporter

35

Proceedings

1     be anybody to see what he's doing.

2          That's --

3          MR. PITTINSKY:  I to object --

10:58:21  5     MR. BRUH:  That's the type of thing that we've

6     been contending with.

7          THE COURT:  You've been alleging, you've been

8     alleging.

9          MR. BRUH:  Of course.  So what I'm asking for is

10:58:30  10    that the order to show cause says that my clients be

11    allowed to have free access to their offices, which is 936

12    Broadway, 729 7th Avenue where their agents are doing their

13    business, which is funded the income for the business,

14    which is funded the income that pays Coldwell Banker

10:58:51  15    franchise fees while the other franchise fees are not paid.

16         So, all that we're asking for is reasonable

17    things.  Free access.

18         With regard to the financial records of 729, we'll

19    put them on line again.  The reason why they were taken

10:59:11  20    away is because Mr. Binder one day wrote a $130,000 worth

21    of checks, which was over and above which we had in the

22    account.

23         The reason why the controller was moved from 936

24    Broadway is because she was being intimidated.  I'm not

10:59:30  25    saying anything that's not in the papers.  This is all in

26    the papers, and I understand this is overwhelming for

Bonnie Piccirillo - Official Court Reporter

1          Proceedings

2    anyone to try to catch up with all this.

3          THE COURT:  It's not overwhelming.  I hear this

4    stuff all the time.  There six sides to every story.  So

5    for every accusation you've made, he made one back.

6          So my point is rather than get involved in all of

7    this, accusation, accusation, accusation, accusation; I'm

8    going to stop it right now.  I'm going to issue a TRO

9    today.

10          I want you to get an accountant.  I'm going to

11   order that an accountant come in.  I'm going to have the

12   accountant do a reconciliation, and then I want you to talk

13   to -- I guess just the defendants.  The plaintiffs are

14   telling me they have paid their portion of the Coldwell

15   Banker fees.  The plaintiff will talk to Coldwell Banker,

16   get the Coldwell Banker fees paid and come back towards the

17   view of how are we going to straighten out this best and

18   finish it so that nobody loses any money.

19          MR. PITTINSKY:  Judge, they have to restore what

20   they have taken, and it also includes they went to

21   Citibank, they signed documents, represented Mr.

22   Binder Didn't have certain authority and they removed him

23   off the account.

24          When counsel says they only want what's reasonable

25   in their papers, they are asking check writing authority

26   which is now what Citibank is, one of the accounts used, is

Bonnie Piccirillo - Official Court Reporter

37

Proceedings

1
2    to be two out of three.  Well, that's coincidental, they
3    got the two.  Meanwhile, my client can't write it.  It's
4    right in their papers.
5            So if your Honor is going -- we just ask what's
6    good for the goose is good for the gander.  Restore us to
7    Citibank.  Give us our key, give us our online access
8    again.  Bring up our e-mail, let it run again.  Let us have
9    access to all of the information we're supposed to have and
10   what not.
11           We'll pay ordinary costs, but there needs to be --
12   to use a word synergy where the business gets operating the
13   way it was in order to have the funds to pay Coldwell.  You
14   can't just take monies from two of the entities to pay
15   Coldwell.  The AC Lawrence funds are integral to the
16   operation.
17           THE COURT:  Sit down for a movement.  Let me talk
18   to the controller.
19           When you pay the bills, do you and another person
20   pay the bills for all the entities?
21           MS. BRODZINSKA:  I basically pay majority of all
22   bills for Bellmarc, and Tashina pays bills for AC Lawrence.
23   But, there are some bills that I was paying for AC Lawrence
24   also, and there were situations that Tashina had to pay
25   bills for Bellmarc.
26           THE COURT:  So it's mixed.

                Bonnie Piccirillo - Official Court Reporter

11:01:09  5
11:01:25  10
11:01:39  15
11:01:49  20
11:02:11  25

1                          Proceedings

2          MS. BRODZINSKA:  It's mixed.

3          THE COURT:  How does a bill come to your attention

4  to be paid?

11:02:21  5          MS. BRODZINSKA:  I usually get a bill in the mail.

6  Sometimes I'm getting a bill through the e-mail, and

7  sometimes in the few times I got the bill just handed to me

8  by Mr. DeGrotta.

9          THE COURT:  Does anyone -- I guess what I'm trying

11:02:47  10  to figure out is how is it that someone can write a check

11  to themselves?  Does anyone come in and take your checkbook

12  and write a check?

13          THE WITNESS:  Nobody writes the check to

14  themselves.

11:02:57  15          THE COURT:  You're the only one?

16          THE WITNESS:  I write the checks and, obviously,

17  the person who works with me, if I'm not there, she writes

18  the checks.

19          THE COURT:  And do you ever have requests from the

11:03:06  20  three of these individuals to write checks to them?

21          THE WITNESS:  Yes -- not individual.

22          THE COURT:  That makes it very easy.  That makes

23  it very easy for me.  It doesn't matter who's the signatory

24  on the accounts.

11:03:18  25         The only person who is writing checks is the

26  controller.  None of the three are to direct her to write

Proceedings

1
2  checks to them for themselves or any of their entities.

3          MR. PITTINSKY:  The other controller as well?

4          THE COURT:  And the other controller, both

5  controllers.  That makes it very easy.

6          MS. BRODZINSKA:  There are four people that write

7  the checks.  The person that works with me, Tashina, the

8  controller for AC Lawrence and Patricia who works with her.

9          THE COURT:  So only those four will write checks.

10  None of the three owners of the corporations will direct

11  that any funds be paid to them or any of their corporations

12  except if you get a bill for services rendered.

13          MR. PITTINSKY:  And salary.

14          THE COURT:  And their salaries, right.

15          MR. KARAS:  Judge, if I may --

16          MR. HUMMELL:  The reason why -- Ms. Brodzinski

17  seems like a very nice person; but the reason why we made

18  her a defendant is because she's letting Mr. Binder --

19  she's taking instructions from him and paying all these

20  things.

21          So having her do it, I believe her if she's

22  admonished to only pay limited expenses, she won't actually

23  anymore write a check to pay the mortgage for the Hamptons

24  house or for the rent.  So if she's actually admonished,

25  she won't do that.  And we regretted that we had to make

26  her a defendant; but the reality is, that she's taking

Bonnie Piccirillo - Official Court Reporter

40

Proceedings

1
2  instructions from Mr. Binder, done what he tells her to do
3  even if it's not appropriate so there needs to be control
4  for that.
5          THE COURT:  Yes, right.
6          MR. PITTINSKY:  But the AC Lawrence controller has
7  done the same thing for DeGrotta and Friedman.
8          THE COURT:  Yes, I get it.  I understand both
9  sides way that their people are paying -- you know, this is
10  a small corporation.  It's not the first time I've seen a
11  small corporation in terms of ownership interest being run
12  not -- people tend to think when you have three owners of a
13  corporation, that a third of the money is mine, a third or
14  two, whatever.  This is not the first time I've seen this.
15  Not even this month.  So --
16          MR. KARAS:  Judge, can I add something, two
17  things?
18          THE COURT:  Yes.
19          MR. KARAS:  Number one, in terms of the
20  distributions that you mentioned before, Judge, that is
21  Coldwell Banker's Collateral.  Before Any of Those
22  Distributions are to be paid, we have to be brought
23  current, which that is the money that is secured by us.
24  That's number one.
25          Number two, Judge, as I indicated before, I think
26  this case warrants mediation; and if you could add within

11:04:43   5
11:04:54  10
11:05:12  15
11:05:18  20
11:05:37  25

Bonnie Piccirillo - Official Court Reporter

41

Proceedings

in that order mediation as I indicated, we will host it, do
it through JAMS or any other entity the parties agree to;
but I think that will help facilitate resolution.

THE COURT:  Does anyone have anything else they
want to say right now?

MR. PITTINSKY:  I just have a procedural.  Before
you is an order to show cause that we've presented, which I
would say, your Honor, given the discussion today, we have
a certain TRO which I think is going to be overall subsumed
where we asked for both sides to kind of do what they are
supposed to.

There's termination notices that we issued as
managers of these individuals.  I would ask that just
procedurally, even if the TRO is not granted, your Honor at
least make the order to show cause returnable at the next
court date on the relief we're requesting.

THE COURT:  And, yes?

MR. HUMMELL:  Just to clarify something, I just
wanted to point out since there's been discussions 65
percent/35 percent.

The memorandum of understanding which is in
Exhibit B to Mr. Friedman's Affidavit, which has all the
stuff on the bottom tab which has the corporate governance
things specifically says that:  Each manager shall --
that's on page six -- shall also act as a director and

Bonnie Piccirillo - Official Court Reporter

42

1       Proceedings

2    shall be entitled to one vote irrespective of their

3    ownership interest.

4              THE COURT:  I understand what you said before, but

5    it's a 65 percent majority owner and minority owners.  So

6    each of your two defendants have 17 and a quarter percent,

7    correct?

8              MR. PITTINSKY:  Through an entity.

9              THE COURT:  Of ownership through an entity.

10             MR. HUMMELL:  We're not trying to take the

11   company.

12             THE COURT:  I'm asking you a question.  If you

13   don't want to answer it --

14             MR. BRUH:  All enterprises own 35 percent.

15             THE COURT:  So that corporation is a minority

16   owner of the business, correct?

17             MR. BRUH:  In that sense, absolutely.

18             THE COURT:  That's the only sense that there is.

19             All right, I'm not talking about management.  I'm

20   not talking about board of directors.  I'm talking about

21   who owns the shares of the corporation.

22             MR. BRUH:  That's the way the shares hold.

23             THE COURT:  All right.

24             Now I have before me -- I'm going to issue a TRO.

25   I have before me an order to show cause brought by the

26   plaintiffs in this action who are together through a

Bonnie Piccirillo - Official Court Reporter

43

Proceedings

1

2  corporate entity the minority shareholders of the plaintiff

3  corporations.

4      MR. PITTINSKY:  Certain corporations, Judge, that

5  are plaintiffs that are not part of this operation group

6  that are owned individually.

7      THE COURT:  I'm issuing an order.  Now I have to

8  start again.  Really, honestly.

9      MR. PITTINSKY:  I apologize.

10     THE COURT:  This is not a free for all.

11     MR. PITTINSKY:  I apologize.  I stepped back to

12  speak to my client.  I apologize.

13     THE COURT:  Let me start again.

14     I have before me an order to show cause by the

15  plaintiffs seeking to prevent the defendant and defendant

16  corporations from taking certain actions with respect to a

17  group of corporations that the parties have an interest in.

18     Having heard oral argument this morning, I'm going

19  to grant a TRO as follows:

20     I am going to direct that only ordinary course of

21  business expenses be paid for any of the corporations that

22  are controlled by the parties.

23     What I mean by ordinary course of business

24  expenses, includes salaries for all employees, day-to-day

25  operating expenses -- and I have before me here the

26  controller, the person who actually writes out the checks

Bonnie Piccirillo - Official Court Reporter

11:08:26  (line 5)
11:08:36  (line 10)
11:08:57  (line 15)
11:09:29  (line 20)
11:10:09  (line 25)

44

Proceedings

for one of the group of entities, and I direct her to
express -- I think I've been very clear about what should
and shouldn't be paid, but in case there is any doubt an
expense should not be paid prior to the parties return to
court. So what I mean by ordinary course of business
expenses is salaries, rent, electricity, the coffee people,
the ordinary bills to run the business.

If there is a doubt as to whether or not an
expense is an ordinary course of business expense, I'm
going to direct the controllers not to pay it, hold it to
the side and I will -- the lawyers will come in with an
emergency application and we can go forward from there.

I direct the three owners of all of these
corporations not to make expenses -- okay, they're LLCs.
So where I said corporation, I change it to LLCs.

MR. PITTINSKY: They're both.

MR. HUMMELL: Five LLCs.

THE COURT: So when I use the word "corporation",
I am using it to mean both LLCs and corporations. I'm
directing the three owners, Mr. DeGrotta, Mr. Friedman, Mr.
Binder not to submit any requests for payment to any of the
controllers unless it is an ordinary course of the business
expense. That means, no outside expenses.

Now, having said that, it is fine for salary to be
paid to a corporate entity as opposed to an individual.

Bonnie Piccirillo - Official Court Reporter

Proceedings

I'm not saying the check has to be written out personally

to a person, but I am saying that none of the three owners

is to make a request outside of the ordinary course of

business expense request; because I don't know the full

extent of all of the operations of the businesses. It may

be that one owner has another business that is providing a

service to the group of entities, that as long as it's in

the ordinary course. And, again, the controllers are

directed that if there is any question whatsoever, the

expense is not to be paid, to be put aside, to be brought

to the attorneys' attentions and they will come in and we

will discuss that.

Next. With respect to the September distribution,

the parties are to get together to exchange with each other

what they believe their September distribution payment

should be with whatever backup they have for that.

If the parties can agree that those distributions

can be made, then the controllers are authorized to make

the September distributions to the parties.

If they cannot agree, the September distributions

are not to be made until we return to court.

All three owners are to have access to all

accounts. I am directing the defendants to put Mr. Binder

back -- plaintiffs to put Mr. Binder back on the Citibank

account. I am directing Mr. Binder or any of the

Bonnie Piccirillo - Official Court Reporter

46

Proceedings

defendants who have taken the plaintiffs off or excluded

them from any information of all the corporations, to

restore 100 percent access, 100 percent access to all

information for all the three parties.

I am directing all three of the parties and anyone

under their control to maintain every single business

record, and I am directing controllers not to destroy a

single record from this point forward and not to permit any

party to come in, to erase anything, including e-mails.

Everything is to be maintained straight from now forward

and back until whatever you have.  Do not destroy a single

document.

Anyone who violates this will be subject to

contempt of court.

Hold on just a second.  Let's go off the record.

(Whereupon, a discussion was then held off the

record.)

THE COURT:  Let's go back on the record.

With respect to Coldwell Banker, counsel, do you

agree that part of those fees have been paid?

MR. KARAS:  No, Judge.  There's $325,000 that

remains outstanding.

THE COURT:  From all of the entities?

MR. KARAS:  Judge, we don't differentiate between

the entities.  It's as a group, the money is owed under the

Bonnie Piccirillo - Official Court Reporter

47

Proceedings

terms of the franchise.

MR. ELIADES:  Your Honor, the AC Lawrence side of the business is relatively current.  I think they owe $2,500.  The Bellmarc side of the business owes approximately $331,000.  There was a default letter issued on July 29th of the Franchise Agreement.  The amount in that default letter was $241,000.

That default was not cured within the time provided in the Franchise Agreement.  The default letter, when we were here on Monday, your Honor, there was a stipulation entered which directed the franchisees to report all outstanding transactions, which had not been reported since July.  That was done.

THE COURT:  That was the document that was handed to counsel today, both counsel?

MR. ELIADES:  How it works, Judge, is the franchises report and we provide them with a statement reflecting what that report means in terms of how much money is owed Coldwell Banker.  They're reported by yesterday.  We provided them with the reconciliation today. That reconciliation shows that the outstanding amounts due on the Bellmarc side went from 241 on July 29th up to 331 today.

The stipulation which was entered on Monday provides that from Monday going forward, all of the

Bonnie Piccirillo - Official Court Reporter

48

franchisees will report and pay their obligations to Coldwell Banker in the ordinary course pursuant to the terms of the Franchise Agreement. That does not cure the existing default which is now 300 some-odd thousand dollars.

THE COURT: Well, it's not. It's $241,000. You don't get to default something that you haven't declared on, correct?

MR. ELIADES: Your Honor, what happened is the default was a nonmonetary and a monetary. They didn't report from back in July. So a lot of the 341 is not dealing with amount's that came due in the last week or so. Came due in July.

THE COURT: If you don't tell them that they owe that money, how could they be in default?

MR. ELIADES: The default, your Honor, is a nonmonetary and monetary. It says you're in default because you know you owe us 241, and because you default and you know you owe us more.

THE COURT: So, having said all that, the parties are to meet and confer with their attorneys between now and next Wednesday with respect to the outstanding Coldwell Banker bill.

If the parties agree, that bill will be considered an ordinary course of business bill and should be paid by

Proceedings

next Wednesday.

That is the deadline for the reconciliation also with respect to the September payout of the distribution to the three owners.  That either a reconciliation will be made by or before next Wednesday.

MR. BRUH:  Your Honor, with respect to paying the Coldwell Banker, as Mr. Eliades said with regard to Coldwell Banker, AC Lawrence has paid its obligations.

What I'm concerned about is that as before, Mr. Binder's side, the Bellmarc side, is going to just say, Fine, now that I have access to all this great AC Lawrence money, I'm going to take that money and just pay the Coldwell Banker fees.

THE COURT:  Let me stop you a second.  Doesn't he own 65 percent of AC Lawrence?  Does he?

MR. BRUH:  Again, he does --

THE COURT:  Okay, please sit down.

So, again, it's going to be an ordinary course of business payments.  No more, no less.

Now, between now and next Wednesday, I would like the parties to meet and confer and see if they could agree on an outside accountant.  Do you know what I mean by an outside accountant?  One that has no connection to either side.  I have a list, a fiduciary list that I can go to myself; but I prefer and I think it's better for the

Bonnie Piccirillo - Official Court Reporter

Proceedings

parties to come up with someone that they agree on because then I find that access and everything else is more forthcoming.

And let me assure you that while I suggest that everyone has access to all the records and all the businesses and all the computers and all the offices, I have directed that no one destroy a document or make a check request.

So I'm perfectly comfortable with the business running. These three individuals are not going to wreck the business in the next seven days, hopefully not. If they do, their attorneys will be back here and we will be holding people in contempt.

So, next?

MR. BRUH: What is the return date?

THE COURT: We are going to come back next Wednesday. The problem is, we're getting closer and closer to holidays.

So, next Wednesday is the 17th.

MR. PITTINSKY: Yes.

THE COURT: At 2:15.

MR. PITTINSKY: We are not required -- is my order to show cause -- do I need to put the preliminary injunction opposition or is that held in abeyance until we meet? Because a week, I'd like --

Bonnie Piccirillo - Official Court Reporter

51

Proceedings

THE COURT: I'd like to get over the hump.

MR. PITTINSKY: Very well.

THE COURT: Let's do that first.

MR. PITTINSKY: That's what I hoped you were saying.

THE COURT: Let's get the bills paid. Let's get the distributions made. Let's get Coldwell Banker paid in a way that is acceptable to everyone, and then let's start with seeing if we can pick an accountant.

Next Wednesday at this time, we will either -- everyone will go back to their corners, think about really where they want this case to end. And I'm thinking a week of no crisis, but negotiation between the two sides will crystallize in everyone's mind where they want this case to end and how they think is most effective and efficient way to get there.

I can tell you now that my view -- look, it's not my company. But, my view is that this company is probably not going to go forward as a growing business.

So the thought is to separate it out and to make that happen.

MR. PITTINSKY: There's a transaction in the hopper that I want to while we're here, I might as well ask. The midtown Bellmarc sales office was closed due to eviction. The landlord evicted them. AC Lawrence's person

Bonnie Piccirillo - Official Court Reporter

52

Proceedings

1    had the same landlord for one of their locations, that rent

2    got paid.  Bellmarc's did not.

3        Mr. Binder is in the process now of securing a new

4    location, a replacement location and a lease negotiation is

5    in place.

6        Would your Honor consider like a security deposit,

7    first month's rent payment and lease signing in the

8    ordinary course of business?

9        THE COURT:  No.  That's not going to happen.  If

10   it's going to happen between now and next Wednesday, then

11   we'll have a phone conference about it.

12       MR. PITTINSKY:  We'll deal with it Wednesday.

13       MR. BRUH:  I have one question with regard to your

14   order.  I tried to write it down as quickly as possible.

15   With regard to your order, you had said to Ms. Brodzinski

16   that if in fact there's any question, she's not to write

17   it.

18       So, as the businesses have three managing members,

19   as the businesses need to be able to agree on things; if

20   they don't agree on a payment, I'm assuming that would be a

21   question that would cause --

22       THE COURT:  Let's see what happens -- what I'm

23   saying is come back next Wednesday.  Let's see really what

24   this is about.  If it's about what's happened over a

25   million dollars or this and that and we can reconcile that

Bonnie Piccirillo - Official Court Reporter

53

Proceedings

and split the businesses up; but everyone basically agrees
the other payments should have been, ought to have been and
were supposed to have been paid, then it's not so big.

I think it's reached its critical mass at this
moment and my goal is to dial it down, get the business
back to its regular course and then when everybody has a
chance, feels confident that no looting on either side is
taking place, no funny business, anything like that,
they're confident that's not happening; they'll take a
fresh look at what's going on and what's the best way to
proceed.  That's my goal.

MR. BRUH:  Okay so, if in fact --

MR. PITTINSKY:  Can I just make a suggestion?

THE COURT:  No, no, I have one person -- counsel
is going to make -- finish your statement and then, yes.

MR. BRUH:  It's a question.  If in fact either
side objects to a payment being made, then it will not be
made because --

THE COURT:  No, if either side objects to a
payment being made on the basis that it's not an ordinary
course of business payment, nobody is going to be able to
mess this business up by not paying the coffee vendor or
not paying the rent or not paying anything that's in
ordinary course.  It has to be something that's out of the
ordinary.

Bonnie Piccirillo - Official Court Reporter

1                       Proceedings

2          MR. BRUH:  I'm just more concerned that monies are

3  going to be taken just from one side, just dragged out from

4  that one side --

11:25:56  5          THE COURT:  There is no one side.  Everything is

6  owned 65/35.

7          MR. BRUH:  But everything -- well, what we didn't

8  get to, your Honor, because it's just such a big story is

9  that for the past year at least, everything has been

11:26:10  10  handled as two side.

11          MR. PITTINSKY:  No --

12          MR. BRUH:  In fact, Ms. Brodzinska said that with

13  regard to the Bellmarc fees, she writes the checks.  With

14  regard to AC Lawrence, Tashina writes the checks.  And the

11:26:25  15  reason for that is that's the way the --

16          THE COURT:  Okay, okay, so let me just finish.  I

17  haven't even finished my order.  This isn't going to be the

18  most clear order and it certainly will not have been my

19  fault.

11:26:37  20          Counsel, go ahead.

21          MR. HUMMELL:  I think I'm required, my duty to add

22  something which is with regard to the Coldwell franchise

23  fees, there was a conversation on Monday in the presence of

24  the gentleman there from Coldwell Banker in which Mr.

11:26:54  25  Binder recognized that the amount that wasn't paid

26  attributable to the transactions that were performed by the

55

Proceedings

1

2  Bellmarc operational group were the responsibility of that

3  group; not the responsibility of the AC Lawrence.  They

4  admitted that in front of Coldwell Banker.

11:27:11  5          THE COURT:  I don't understand that because it's

6  all together.

7          MR. HUMMELL:  It's not.

8          THE COURT:  So, I mean, he owns 65 percent and

9  they own 35 percent of both groups.  But in any event, it

11:27:21  10  doesn't even matter.  Please sit down.  Let me finish this

11  order.

12          If the end of it you want to split it out and you

13  want your company and you want to give him his, that is

14  what -- all I hear is that is where this is going.  And if

11:27:35  15  that's what you want and that's where you want to end up,

16  okay.  Then let's get that done.

17          But, at this point, Mr. Binder owns 65 percent of

18  that company.  He owns it.  He's a 65 percent shareholder.

19  He may have one of three votes, but in the end he's a

11:27:56  20  65 percent shareholder of that company, too.

21          So, let me finish this.

22          Now, with respect to going forward, I would like

23  the parties to meet and confer and decide whether or not

24  they want to take up Coldwell Banker's offer of mediation

11:28:14  25  because it seems to me that this is probably the best way,

26  the most effective way to resolve these issues in terms of

Bonnie Piccirillo - Official Court Reporter

56

                          Proceedings

the overall lawsuit.

          When you come back next week between now and next
week, I will ask you also to put in -- I'm not going to
request any reply papers.  If anyone has made an order to
show cause and the other side has not put in answering
papers, answering papers must be submitted to me by next
Wednesday.

          If it seems that this is not a workable solution,
the one that I have ordered today in this TRO between now
and next Wednesday, then I will -- then we will either have
a hearing on both orders to show causes or I think I'll
have to set it down for a hearing on both orders to show
causes.

          But, I am really hoping because having a hearing
on these two orders to show cause is going to be the most
ineffective and most expensive way to go forward; and I
hope all your clients understand that.  In the end they may
choose to spend tons of money and that's their prerogative.
Good for us, we live in the United States of America; but
what I think would be the most efficient and the least
expensive way to go forward is to let the businesses run,
to stop further cross accusations of looting, to decide how
we want to -- what the end game is and to start working
towards getting there.

          MR. PITTINSKY:  On the papers, Judge, if I can ask

                Bonnie Piccirillo - Official Court Reporter

Proceedings

1
2  the Court, to make a different suggestion.  Instead of
3  myself and my adversaries spending a week preparing
4  opposition papers to the preliminary injunction aspect and
5  having those papers ready for you next Wednesday, can we
6  instead use the week to comply with your order and not come
7  in?
8          Because, I've got my papers, they've got theirs.
9  THE order to show cause, can we hold opposition to the
10  injunction in a week and set a schedule Wednesday?
11  Otherwise, I'm a small firm.  I'm going to be concentrating
12  more on meeting your deadline on opposition than I am on
13  what you look at more of let's talk and see where we're
14  going approach.
15          THE COURT:  Okay, I heard it.  Let me hear what
16  you have to say.
17          MR. HUMMELL:  Your Honor, it's under your local
18  rules.  I think I have three procedural requirements we
19  have to deal with before we stop.
20          THE COURT:  Okay, so I have no problem.  I can't
21  have a preliminary injunction hearing next Wednesday in any
22  event; but if you need more time, I don't have any problem
23  with giving you more time to put in papers.  Next Wednesday
24  I'll set a date for answering papers.
25          MR. PITTINSKY:  Thank you.
26          MR. BRUH:  I just want to make it clear the

Bonnie Piccirillo - Official Court Reporter

1       Proceedings

2   $331,000 debt is not an ordinary course of business right

3   now.

4           Ordinary course of business is paying your

5   transactions and your franchise fees as they come up.  That

6   debt which was built up by all Bellmarc transactions and

7   should have been paid at the time and should have been

8   reported at the time while AC Lawrence did exactly that,

9   it's not --

10          THE COURT:  Stop.  Stop this.

11          MR. BRUH:  I just don't --

12          THE COURT:  It is not an ordinary course of

13  business debt, yes.  If you cannot resolve it next

14  Wednesday -- I don't know why you continue to insist on

15  making accusations.  All that does is dial it up, and all

16  I'm trying to do is dial it down and make it efficient and

17  effective and cost effective.

18          MR. BRUH:  I just wanted to clarify.

19          THE COURT:  There's no clarification needed.

20          All right, if you cannot resolve that issue on

21  next Wednesday, you've got a default and Coldwell

22  Banker -- both businesses are going to crash and burn.  So

23  I think no one wants that.

24          MR. KARAS:  Judge, if I can make a suggestion?  We

25  filed an order to show cause that --

26          THE COURT:  I don't have yours.

Bonnie Piccirillo - Official Court Reporter

59

1                          Proceedings

2              MR. KARAS:  Which I understand.  I was going to

3       suggest --

4              THE COURT:  I'll put it on for next Wednesday.  So

5       your order to show cause, so I will have both orders to

6       show cause and the Coldwell Banker one, which has not come

7       up yet.  So there are three orders to show cause which are

8       all on for next Wednesday at 2:15.

9              Is everyone clear?  Is there any further not clear

10      about the TRO, about what can and cannot be paid?  Let me

11      say this to you.  With respect to what we're talking about,

12      the Coldwell Banker fee, I agree it is not ordinary course

13      of business.  It cannot be paid without -- unless the

14      parties agree.  If the parties agree, you can go ahead and

15      pay it.  If they can't agree, I will take a look at it

16      myself next Wednesday and decide whether or not it's backed

17      up and it should be paid.

18             MR. PITTINSKY:  My client wanted to clarify when

19      you say access to everything, they're turning back on the

20      e-mails, they're turning back on the electronic access for

21      the brokers and the sales people.  I know Mr. Bruh said on

22      the record he's going to give us a key so I trust his

23      representation is good enough; but the informations -- the

24      seasoned part of the information is going to be flowing

25      back to Bellmarc and, likewise, if there was anything to

26      AC, that's going to be done as well?

                  Bonnie Piccirillo - Official Court Reporter

60

THE COURT:  Yes, with the proviso that not a
single document is to be altered or deleted.  If any -- if
the tech person comes in and tells me a lunch e-mail was
deleted next week, whoever deleted that e-mail will be in
contempt of court and will be fined and the next time will
be further sanctioned.

So, I mean, the fact that you can go in and look
at something is all everybody gets.  Nothing is to be
touched.

MR. PITTINSKY:  Mr. Binder was just concerned that
the agencies can get access to the listings and add
listings --

THE COURT:  Everyone can get access to the
listings.  No one can delete any documents.

MR. PITTINSKY:  There's a freeze?

THE COURT:  No one can alter any documents.
There's a litigation freeze as of this he moment on the
entirety of all the corporate records.

MR. PITTINSKY:  Understood.

THE COURT:  And anything going back that is still
in the system, nothing is to be deleted.

MR. PITTINSKY:  Thank you, Judge.

THE COURT:  Anything else?

MR. HUMMELL:  Under your local rules, I think I
need to hand three or at least find out.  We electronically

61

| | |
|---|---|
| 1 | Proceedings |
| 2 | filed the proof of service for the order to show cause.  I |
| 3 | have hard copies. |
| 4 | THE COURT:  That's okay I don't need that. |
| 11:34:58  5 | So long as you electronically filed. |
| 6 | MR. HUMMELL:  We did. |
| 7 | THE COURT:  Judge Friedman, that's the oral |
| 8 | argument from Judge Friedman? |
| 9 | MR. PITTINSKY:  I think that should be handed it. |
| 11:35:07  10 | THE COURT:  No, just put it online. |
| 11 | MR. HUMMELL:  It's online. |
| 12 | THE COURT:  I don't need paper. |
| 13 | MR. HUMMELL:  A hard copy of the transcript. |
| 14 | THE COURT:  I don't need it.  Did you put it |
| 11:35:17  15 | online? |
| 16 | HUMMELL:  I didn't know if the court reporter may |
| 17 | do that. |
| 18 | THE COURT:  No. |
| 19 | HUMMELL:  As soon as we get back. |
| 11:35:25  20 | Third, is I know that you're spearheading the |
| 21 | concept of having -- well, in fact I was going on to |
| 22 | something.  You'd like to have cases that you cite put, |
| 23 | made available. |
| 24 | THE COURT:  Links. |
| 11:35:38  25 | MR. HUMMELL:  We didn't know this was going to be |
| 26 | assigned to you.  We didn't cite that many cases, but I |

62

| | Proceedings |
|---|---|
| 1 | |
| 2 | also have which we filed online a table of contents and |
| 3 | table of authorities. |
| 4 | THE COURT:  It's now hyper-linked? |
| 5 | MR. HUMMELL:  I'll do that.  I didn't do that. |
| 6 | THE COURT:  Yeah, if you would, that would be |
| 7 | good. |
| 8 | MR. HUMMELL:  I was just referring to the |
| 9 | memorandum of law that we filed before we knew it was going |
| 10 | to be assigned to you, we didn't have the table of |
| 11 | contents.  We filed them as an exhibit to the memo.  We |
| 12 | will hyperlink the cases. |
| 13 | THE COURT:  You don't have to do it between now -- |
| 14 | if we go forward on the papers, then I would like you to |
| 15 | hyperlink; but don't spend the money now. |
| 16 | MR. BRUH:  Just a technical question, since you |
| 17 | have to ECF only PDF, nobody in my office could figure out |
| 18 | how to hyperlink PDF material. |
| 19 | MR. PITTINSKY:  There is a way. |
| 20 | THE COURT:  Do you use Adobe or can you do it on |
| 21 | Foxit? |
| 22 | MR. BRUH:  We use Adobe. |
| 23 | THE COURT:  Can you do me a favor, call Jeff |
| 24 | Carucci or call the ECF filing office and they will walk |
| 25 | you through it.  We have Foxit here, and that's how we do |
| 26 | it.  Anyone in the office can tell you.  Anyone in the ECF |

Timestamps in left margin:
11:35:50 (line 5)
11:35:58 (line 10)
11:36:14 (line 15)
11:36:30 (line 20)
11:36:45 (line 25)

Bonnie Piccirillo - Official Court Reporter

63

1    Proceedings

2    office, electronic filing office can tell you.

3         MR. KARAS:  Your Honor, I just want a

4    clarification on one point.  In terms of the franchise

11:37:07  5    fees, I understand what you said about the past-due amount

6    as in terms of ordinary course.  There's a stipulation that

7    was entered the other day where current amounts and

8    reporting requirements are to continue.

9         THE COURT:  Yes.

11:37:19  10         MR. KARAS:   I just want to confirm those amounts

11    are ordinary costs?

12         THE COURT:  Yes, current amounts that are given to

13    you to pay franchise fees are to be paid in the ordinary

14    costs.  It's just this $300,000 back fee that we have to

11:37:36  15    take a look at.

16         Okay, I will see you all next Wednesday and 2:15

17    when that order to show cause comes up.  I'll add it in.

18

19

---

20

21    CERTIFIED TO BE A TRUE
      AND CORRECT TRANSCRIPT

22

23

24    _____
      BONNIE PICCIRILLO
      OFFICIAL COURT REPORTER

25

26

Bonnie Piccirillo - Official Court Reporter

64

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Proceedings

1

## $

$130,000 [1] - 35:20
$2,500 [1] - 47:5
$241,000 [2] - 47:8, 48:7
$300,000 [3] - 8:19, 21:18, 63:14
$32,000 [2] - 12:9, 12:14
$325,000 [1] - 46:22
$331,000 [3] - 21:9, 47:6, 58:2
$5,000 [1] - 28:20
$81,690 [1] - 16:24

## /

/KREUP [1] - 10:4

## 0

07652 [1] - 2:14
07940 [1] - 2:19

## 1

10 [1] - 17:20
100 [2] - 46:4
10010 [1] - 2:11
10016 [1] - 2:4
10017 [2] - 1:25, 2:7
11 [1] - 1:18
12 [2] - 2:7, 17:20
12,000-a-month - 23:6
13 [1] - 16:20
17 [1] - 42:6
175 [1] - 2:18
17th [1] - 50:20
187 [1] - 22:16
187,000 [1] - 22:15

## 2

2 [4] - 11:14, 17:19, 20:14, 23:6
20 [1] - 16:20
2014 [2] - 1:18, 12:8
232 [1] - 2:3
23393 [1] - 12:7
24 [1] - 12:8
241 [2] - 47:23, 48:19
281,000 [1] - 23:5
29-page [1] - 16:19
290 [1] - 2:14
29th [2] - 47:7, 47:23
2:15 [3] - 50:22, 59:8, 63:16

## 3

3 [1] - 20:14
30-plus [1] - 16:7
300 [1] - 48:5
331 [1] - 47:23
341 [1] - 48:12
35 [3] - 13:25, 42:14, 55:9
39 [1] - 1:2

## 4

4 [1] - 2:14
45 [1] - 8:8
48th [1] - 2:7

## 6

60 [1] - 1:17
65 [11] - 13:24, 30:15, 32:17, 32:24, 41:20, 42:6, 49:16, 55:8, 55:17, 55:18, 55:20
65/35 [1] - 54:6
652633/14 [1] - 1:11
6E [1] - 2:7

## 7

729 [2] - 35:12, 35:18
747 [1] - 1:24
7th [1] - 35:12

## 8

8 [1] - 17:20
80 [1] - 2:14

## 9

906 [1] - 2:3
936 [5] - 2:10, 30:21, 34:22, 35:11, 35:23

## A

abeyance [1] - 50:25
ability [1] - 31:15
able [6] - 5:26, 7:25, 18:9, 18:16, 29:21, 32:7, 52:20, 53:22
absolutely [4] - 15:15, 31:4, 42:17
aC [1] - 13:21
AC [24] - 1:5, 1:7, 5:18, 7:10, 14:12, 16:8, 27:24, 30:11, 30:13, 30:14, 37:15, 37:22, 37:23, 39:8,

40:6, 47:3, 49:9, 49:12, 49:16, 51:26, 54:14, 55:3, 58:8, 58:26
acceptable [1] - 51:9
accepting [1] - 17:9
access [21] - 30:8, 30:13, 31:14, 32:9, 34:21, 34:22, 34:23, 35:11, 35:17, 37:7, 37:9, 45:23, 46:4, 49:12, 50:3, 50:6, 59:19, 59:20, 60:12, 60:14
account [16] - 9:25, 10:4, 11:4, 12:10, 12:16, 12:17, 12:26, 13:8, 17:7, 18:6, 33:5, 34:13, 35:22, 36:23, 45:26
accountant [17] - 19:2, 20:24, 21:5, 25:6, 25:7, 25:11, 25:13, 25:16, 25:19, 31:24, 36:10, 36:11, 36:12, 49:23, 49:24, 51:10
accountant's [1] - 26:16
accounting [4] - 17:22, 19:3, 20:4, 21:5
accounts [4] - 10:3, 36:26, 38:24, 45:24
accusation [11] - 33:10, 33:13, 33:23, 34:3, 34:4, 36:5, 36:7
accusations [4] - 17:14, 31:24, 56:23, 58:15
acknowledge [1] - 31:22
acknowledges [1] - 22:22
act [1] - 41:26
action [1] - 42:26
actions [1] - 43:16
add [5] - 40:16, 40:26, 54:21, 60:12, 63:17
additional [1] - 29:12
additionally [1] - 4:5
ADMINISTRATION [1] - 1:6
Administration [2] - 6:9, 14:2
administration [2] - 14:3, 29:21
Administrative [2] - 33:5, 34:11, 34:14

administrative [2] - 6:15, 15:21
administrator [1] - 6:13
admitted [1] - 55:4
admonished [2] - 39:22, 39:24
Adobe [2] - 62:20, 62:22
adversaries [2] - 24:2, 57:3
Affidavit [1] - 41:23
affidavit [3] - 3:22, 16:14, 16:19
affirmation [1] - 16:16
agencies [1] - 60:12
agency [1] - 34:16
Agency [1] - 26:3
agents [1] - 35:12
ago [1] - 4:2
agree [19] - 20:4, 27:13, 27:20, 29:6, 29:7, 32:26, 41:3, 45:18, 45:21, 46:21, 48:25, 49:22, 50:2, 52:20, 52:21, 59:12, 59:14, 59:15
agreement [1] - 6:10
Agreement [5] - 21:8, 21:11, 47:7, 47:10, 48:4
agrees [1] - 53:2
ahead [3] - 21:25, 54:20, 59:14
ALL [1] - 1:9
allegation [4] - 11:11, 24:15, 34:8, 34:10
allegations [10] - 7:18, 15:14, 16:10, 17:8, 18:8, 18:15, 20:2, 20:16, 26:6, 34:9
alleging [4] - 9:11, 12:6, 35:7, 35:8
allowed [6] - 10:4, 32:9, 33:4, 33:7, 34:18, 35:11
alter [1] - 60:17
altered [1] - 60:3
America [1] - 56:20
amount [5] - 47:7, 54:25, 63:5
amount's [1] - 48:13
amounts [6] - 29:5, 47:22, 63:7, 63:10, 63:12
AND [1] - 63:21
Andrew [1] - 19:13
ANDREW [1] - 2:15
ans [1] - 28:2
answer [7] - 9:5,

12:21, 13:13, 16:12, 18:21, 25:24, 42:13
answered [1] - 11:22
answering [3] - 56:6, 56:7, 57:24
ANTHONY [1] - 1:4
anti [1] - 27:9
anti-nepotism [1] - 27:9
apartment [1] - 23:6
apologize [3] - 29:16, 43:9, 43:11, 43:12
appear [1] - 17:14
APPEARANCES [1] - 1:22
Appearing [2] - 2:6, 2:10
application [2] - 19:12, 44:13
approach [1] - 57:14
appropriate [2] - 20:5, 40:3
approved [1] - 14:21
argue [1] - 22:18
arguing [1] - 3:17
argument [3] - 3:14, 43:18, 61:8
article [1] - 15:24
aside [3] - 9:26, 28:12, 45:11
aspect [2] - 3:23, 57:4
aspects [1] - 30:12
assigned [3] - 14:11, 61:26, 62:10
assistant [1] - 15:21
assume [1] - 27:9
assuming [1] - 52:21
assure [1] - 50:5
attached [3] - 11:18, 16:15, 30:22
attention [1] - 38:3
attentions [1] - 45:12
attorney [1] - 19:7
attorneys [3] - 29:4, 48:22, 50:13
Attorneys [3] - 1:24, 2:2, 2:13
attorneys' [1] - 45:12
attributable [1] - 54:26
authorities [1] - 62:3
authority [3] - 14:18, 38:22, 38:25
authorized [1] - 45:19
available [1] - 61:23
Avenue [4] - 1:24, 2:3, 2:18, 35:12
avoid [1] - 24:16
aware [1] - 26:22

2

**B**

backed [1] - 59:16
backs [1] - 22:10
backup [1] - 45:17
bed [1] - 15:23
BAL [2] - 1:5, 6:8,
6:11, 6:12, 6:20, 7:2,
8:2, 14:2, 33:5,
34:10, 34:14
Banker [27] - 2:13,
2:17, 14:9, 19:10,
19:14, 19:15, 22:5,
24:24, 32:3, 32:6,
35:14, 36:15, 36:16,
46:20, 47:20, 48:3,
48:24, 49:8, 49:9,
49:14, 51:8, 54:24,
55:4, 58:22, 59:6,
59:12
Banker's [2] - 40:21,
55:24
banking [1] - 6:23
banks [1] - 23:9
base [1] - 11:12
basis [2] - 15:17,
53:21
BE [1] - 63:21
becomes [1] - 22:14
BEFORE [1] - 1:20
beginning [2] - 4:8,
33:24
behalf [10] - 1:4, 1:5,
1:5, 1:6, 1:7, 1:7,
1:8, 1:8, 1:9, 4:26
BEISPEL [1] - 1:14,
2:6, 2:8
Bellmarc [17] - 5:16,
7:8, 13:22, 14:7,
14:12, 14:13, 26:3,
37:22, 37:25, 47:5,
47:23, 49:11, 51:25,
54:13, 55:2, 58:6,
59:25
BELLMARC [6] - 1:4,
1:6, 1:7, 1:8, 1:8, 1:9
bellmarc's [1] - 52:3
beneficial [1] - 21:15
benefit [2] - 7:20, 10:5
best [2] - 36:17, 53:11,
55:25
better [2] - 10:18,
49:26
between [9] - 3:11,
46:25, 48:22, 49:21,
51:14, 52:11, 56:3,
58:10, 62:13
big [4] - 15:7, 24:25,
53:4, 54:8
bill [6] - 38:3, 38:5,

38:6, 38:7, 39:12,
48:24, 48:25, 48:26
bills [17] - 13:2, 13:3,
13:8, 16:3, 17:7,
20:26, 29:19, 29:23,
34:17, 37:19, 37:20,
37:22, 37:23, 37:25,
44:8, 51:7
BINDER [1] - 1:12
Binder [28] - 2:2, 3:8,
5:7, 5:17, 10:23,
14:9, 14:18, 15:6,
15:11, 15:23, 16:6,
23:4, 32:10, 32:14,
32:15, 34:21, 35:20,
35:22, 39:18, 40:2,
44:22, 45:24, 45:25,
45:26, 52:4, 54:25,
56:17, 60:11
Binder's [2] - 14:15,
49:11
binder's [3] - 15:16,
15:20, 34:12
blocked [1] - 26:23
Board [3] - 5:2, 5:7,
7:3
board [2] - 32:20,
42:20
Bonnie [1] - 2:24
BONNIE [1] - 63:24
bottom [3] - 12:8,
34:5, 41:24
bring [1] - 37:8
Broadway [6] - 2:10,
30:21, 34:22, 35:12,
35:24
Brodzinska [3] - 7:7,
7:13, 54:12
BRODZINSKA [17] -
1:14, 2:9, 12:14,
12:17, 12:20, 12:22,
12:24, 12:26, 13:4,
13:6, 13:9, 13:11,
13:15, 37:21, 38:2,
38:5, 39:6
Brodzinski [4] - 17:25,
25:25, 39:16, 52:16
brokerage [3] - 13:20,
13:21, 34:17
BROKERAGE [1] - 1:6
brokers [2] - 15:2,
59:21
brought [6] - 3:16,
4:13, 5:7, 40:22,
42:25, 45:11
Bruh [1] - 59:21
BRUH [24] - 1:23,
1:25, 28:24, 30:24,
31:4, 31:7, 31:13,
31:26, 32:19, 32:24,

33:2, 33:12, 33:21,
34:7, 34:20, 35:5,
35:9, 42:14, 42:17,
42:22, 49:7, 49:17,
50:16, 52:14, 53:13,
53:17, 54:2, 54:7,
54:12, 57:26, 58:11,
58:16, 62:16, 62:22
BRUT [1] - 33:14
build [1] - 15:7
building [1] - 27:16
built [1] - 58:5
burn [1] - 58:22
business [54] - 1:13,
1:13, 4:8, 4:9, 5:10,
5:12, 9:18, 10:22,
13:2, 13:23, 14:17,
15:8, 16:7, 18:16,
19:3, 20:9, 24:20,
27:3, 27:10, 30:4,
30:16, 32:3, 32:7,
32:18, 35:13, 37:12,
42:16, 43:21, 43:23,
44:6, 44:8, 44:10,
44:23, 45:5, 45:7,
46:7, 47:4, 47:5,
48:26, 49:20, 50:10,
50:12, 51:20, 52:9,
53:6, 53:9, 53:22,
53:23, 58:2, 58:4,
58:13, 59:13
businesses [9] -
10:21, 13:20, 45:6,
50:7, 52:19, 52:20,
53:2, 56:22, 58:22
BY [4] - 1:25, 2:4, 2:8,
2:15

**C**

cannot [7] - 18:23,
25:3, 45:21, 58:13,
58:20, 59:10, 59:13
care [2] - 12:16, 13:7
careful [1] - 29:17
Carucci [1] - 62:24
case [7] - 19:24,
19:25, 20:11, 40:26,
44:4, 51:13, 51:15
cases [3] - 61:22,
61:26, 62:12
cash [1] - 8:20
catch [1] - 36:2
categories [2] - 8:6,
16:21
category [1] - 8:20
caused [1] - 25:26
causes [2] - 56:12,
56:14
Centre [1] - 1:17

certain [8] - 6:15,
22:15, 22:16, 23:4,
36:22, 41:10, 43:4,
43:16
certainly [3] - 25:4,
31:14, 54:18
CERTIFIED [1] - 63:21
cetera [2] - 14:13
chance [1] - 53:8
change [1] - 44:16
changed [2] - 30:21,
32:13
charge [3] - 15:12,
22:10, 22:12
chase [1] - 4:18
check [11] - 7:6, 8:3,
12:5, 12:7, 36:25,
38:10, 38:12, 38:13,
39:23, 45:2, 50:9
checkbook [1] - 38:11
checks [23] - 5:13,
5:23, 7:7, 7:9, 7:25,
8:6, 8:17, 8:21, 8:24,
8:26, 9:19, 11:7,
35:21, 38:16, 38:18,
38:20, 38:25, 39:2,
39:7, 39:9, 43:26,
54:13, 54:14
choice [1] - 18:11
choose [1] - 58:19
cite [3] - 15:16, 61:22,
61:26
Citibank [3] - 36:21,
36:26, 37:7, 46:25
clarification [2] -
58:19, 63:4
clarify [3] - 41:19,
58:18, 59:18
clean [1] - 4:19
cleans [1] - 27:16
clear [5] - 33:16, 44:3,
54:18, 57:26, 59:9
clearly [1] - 34:9
client [7] - 13:24, 22:3,
25:2, 28:25, 37:3,
43:12, 59:18
clients [4] - 4:26, 5:19,
18:26, 23:3, 28:24,
44:4, 35:10, 56:18
clients' [1] - 25:14
clogging [1] - 20:10
closed [1] - 51:25
closer [2] - 50:18
co [1] - 24:2
co-counsel [1] - 24:2
coffee [4] - 6:4, 6:5,
44:7, 53:25
coincidental [1] - 37:2
Coldwell [31] - 2:13,
2:17, 14:9, 14:9, 19:14,

19:15, 22:5, 24:24,
32:2, 32:5, 35:14,
36:14, 36:15, 36:16,
37:13, 37:15, 40:21,
46:20, 47:20, 48:3,
48:23, 49:8, 49:9,
49:14, 51:8, 54:22,
54:24, 55:4, 55:24,
58:21, 59:6, 59:12
coldwell [1] - 19:10
Collateral [1] - 40:21
comfortable [1] -
50:10
coming [4] - 16:4,
19:22, 27:6, 30:13
commissions [1] -
8:13
communicated [1] -
14:20
companies [4] -
15:22, 26:2, 31:9,
31:14
company [28] - 5:5,
8:9, 9:22, 9:24, 13:5,
13:25, 14:3, 14:5,
14:7, 14:8, 14:19,
14:24, 15:5, 16:2,
16:3, 16:22, 29:21,
31:16, 31:20, 34:16,
42:11, 51:19, 55:13,
55:18, 55:20
Complaint [1] - 5:9
complicated [1] - 5:15
comply [1] - 57:6
components [1] -
16:17
computer [1] - 31:6
computers [8] - 14:26,
30:7, 30:11, 30:18,
31:7, 50:7
concentrating [1] -
57:11
concept [1] - 61:21
concerned [4] - 20:2,
49:10, 54:2, 60:11
conditions [1] - 30:22
confer [2] - 48:22,
49:22, 55:23
conference [1] - 52:12
confident [2] - 53:8,
53:10
confirm [1] - 63:10
confusion [2] - 10:19,
34:8
connection [3] - 5:8,
14:18, 49:24
consider [1] - 52:7
considered [2] -
25:17, 48:25
consolidate [1] - 14:3

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

3

contempt [3] - 46:15, 50:14, 60:6
contending [1] - 35:6
contents [2] - 62:2, 62:11
continue [7] - 5:10, 18:23, 20:9, 32:7, 34:22, 58:14, 63:8
continues [1] - 5:12
control [7] - 5:20, 5:22, 13:23, 16:8, 30:7, 40:3, 46:7
controlled [1] - 43:22
controller [16] - 6:11, 7:4, 7:8, 9:9, 9:10, 9:14, 12:12, 20:19, 20:26, 30:20, 35:23, 37:18, 38:26, 39:3, 39:4, 39:8, 40:6, 43:26
controllers [1] - 14:5, 39:5, 44:11, 44:23, 45:9, 45:19, 46:8
controls [2] - 13:22, 26:3
conversation [1] - 54:23
convinced [2] - 23:21, 24:13
copies [1] - 61:3
copy [3] - 3:24, 19:22, 61:13
corners [1] - 51:12
corporate [5] - 14:14, 17:22, 41:24, 43:2, 44:26, 60:19
Corporate [1] - 2:18
corporation [13] - 6:8, 9:10, 9:15, 10:10, 18:9, 27:17, 40:10, 40:11, 40:13, 42:15, 42:21, 44:15, 44:19
corporations [14] - 9:11, 14:14, 27:15, 27:16, 39:10, 39:11, 43:3, 43:4, 43:16, 43:17, 43:21, 44:15, 44:20, 48:3
CORRECT [1] - 63:21
correct [16] - 3:3, 3:5, 4:9, 4:23, 8:16, 9:15, 10:11, 12:13, 13:9, 23:21, 32:18, 34:7, 42:7, 42:16, 48:9
correction [2] - 32:19, 33:2
cost [1] - 58:17
costs [4] - 19:2, 37:11, 53:11, 63:14
Counsel [1] - 2:17

counsel [13] - 3:19, 10:16, 11:11, 24:2, 24:26, 25:15, 30:21, 36:24, 46:20, 47:16, 53:15, 54:20
COUNTY [1] - 1:2
couple [1] - 25:3
course [25] - 24:20, 27:2, 29:19, 29:25, 30:3, 35:9, 43:20, 43:23, 44:6, 44:10, 44:23, 45:4, 45:9, 48:3, 48:26, 49:19, 52:9, 53:7, 53:22, 53:25, 58:2, 58:4, 58:12, 59:12, 63:6
court [7] - 21:4, 41:17, 44:6, 45:22, 46:15, 60:6, 61:16
Court [5] - 2:25, 5:9, 19:23, 20:10, 27:23, 57:2
COURT [182] - 1:2, 3:2, 3:6, 3:26, 4:7, 4:12, 4:15, 4:22, 5:13, 5:22, 5:25, 6:8, 6:12, 6:17, 6:19, 6:22, 6:24, 6:26, 7:5, 7:11, 7:14, 7:23, 8:3, 8:7, 8:9, 8:11, 8:13, 8:16, 8:21, 8:24, 9:4, 9:14, 9:17, 9:23, 10:7, 10:10, 10:15, 10:23, 10:26, 11:5, 11:7, 11:10, 11:15, 11:23, 12:3, 12:5, 12:9, 12:12, 12:16, 12:19, 12:21, 12:23, 12:25, 13:3, 13:5, 13:7, 13:10, 13:12, 13:16, 16:25, 17:26, 18:7, 18:13, 18:19, 18:25, 19:7, 19:9, 19:11, 19:15, 19:19, 20:12, 21:18, 22:7, 22:10, 22:19, 22:25, 23:20, 23:23, 25:18, 25:22, 26:5, 26:8, 26:24, 27:22, 28:6, 28:10, 28:15, 28:21, 28:25, 29:3, 29:9, 29:15, 29:24, 30:2, 30:9, 30:18, 31:2, 31:5, 31:11, 31:18, 32:17, 32:23, 32:26, 33:9, 33:13, 33:15, 33:22, 35:7, 36:3, 37:17, 37:26, 38:3, 38:9, 38:15, 38:19, 38:22, 39:4, 39:9,

39:14, 40:5, 40:8, 40:18, 41:5, 41:18, 42:4, 42:9, 42:12, 42:15, 42:18, 42:23, 43:7, 43:10, 43:13, 44:19, 46:19, 46:24, 47:15, 48:7, 48:15, 48:21, 49:15, 49:18, 50:17, 50:22, 51:2, 51:4, 51:7, 52:10, 52:23, 53:15, 53:20, 54:5, 54:16, 55:5, 55:8, 57:15, 57:20, 58:10, 58:12, 58:19, 58:26, 59:4, 60:2, 60:14, 60:17, 60:21, 60:24, 61:4, 61:7, 61:10, 61:12, 61:14, 61:18, 61:24, 62:4, 62:6, 62:13, 62:20, 62:23, 63:9, 63:12, 63:24
courtroom [2] - 7:11, 24:7
crash [1] - 58:22
create [1] - 16:8
created [1] - 10:3, 14:2
crime [1] - 33:7
crisis [1] - 51:14
critical [1] - 53:5
cross [2] - 9:5, 56:23
cross-examine [1] - 9:5
crystallize [1] - 51:15
crystallizes [1] - 23:12
cure [1] - 48:4
cured [1] - 47:9
current [4] - 40:23, 47:4, 63:7, 63:12
cut [2] - 4:18, 31:8

## D

daily [1] - 15:17
DANIEL [1] - 2:15
DANUTA [2] - 1:14, 2:9
date [4] - 3:18, 41:17, 50:16, 57:24
day-to-day [1] - 43:24
days [2] - 25:4, 50:12
deadline [2] - 49:3, 57:12
deal [2] - 52:13, 57:19
dealing [1] - 48:13
dealt [1] - 24:25
debt [6] - 16:23, 24:24, 25:9, 58:2, 58:9, 58:13

debts [2] - 23:7, 24:20
decide [3] - 55:23, 56:23, 59:16
decision [2] - 5:3, 29:10
declared [1] - 48:8
default [18] - 21:9, 21:11, 21:14, 22:14, 22:16, 22:23, 47:6, 47:8, 47:9, 47:10, 48:5, 48:8, 48:11, 48:16, 48:17, 48:18, 48:19, 58:21
Defendant [2] - 2:6, 2:10
defendant [13] - 3:8, 3:9, 5:23, 6:3, 7:13, 7:14, 7:17, 7:19, 25:17, 39:18, 39:26, 43:15
defendants [4] - 38:13, 42:5, 45:24, 46:2
Defendants [2] - 1:15, 2:2
DeGrotta [5] - 1:4, 4:26, 5:19, 15:18, 30:6, 38:8, 40:7, 44:21
delete [1] - 60:15
deleted [4] - 60:3, 60:5, 60:22
denies [1] - 26:6
deny [1] - 16:9
deposit [1] - 52:7
describe [1] - 10:18
described [1] - 10:2
deserves [1] - 27:5
design [1] - 15:18
destroy [5] - 5:12, 46:8, 46:12, 50:8
dial [5] - 53:6, 58:15, 58:16
dialogue [1] - 24:8
different [4] - 16:17, 27:6, 34:4, 57:2
differentiate [1] - 46:25
direct [5] - 38:26, 39:10, 43:20, 44:2, 44:11, 44:14
directed [3] - 45:10, 47:12, 50:6
directing [5] - 44:21, 45:24, 45:26, 46:6, 46:8
directly [4] - 9:3, 25:25, 26:2
director [1] - 41:26
Directors [3] - 5:3,

5:7, 7:4
directors [1] - 42:20
disagreement [1] - 4:9
disappear [1] - 24:13
disappeared [1] - 24:14
disappearing [1] - 23:13
disappears [1] - 18:12
discretion [1] - 23:15
discuss [1] - 45:13
discussion [2] - 41:9, 46:17
discussions [2] - 22:4, 41:20
dispute [4] - 4:25, 9:17, 9:24, 21:21
disputing [2] - 26:14, 30:3
dissolve [2] - 17:12, 17:21
Distribution [1] - 28:21
distribution [5] - 28:26, 29:4, 29:6, 29:7, 29:10, 45:14, 45:16, 49:4
Distributions [1] - 40:22
distributions [13] - 8:15, 8:16, 8:18, 8:25, 15:26, 16:26, 28:13, 28:16, 40:20, 45:18, 45:20, 45:21, 51:8
diversions [1] - 5:11
divert [2] - 27:14
diverted [4] - 5:5, 7:19, 11:21, 23:7
document [4] - 46:13, 47:15, 50:8, 60:3
documents [5] - 11:13, 11:14, 36:21, 60:15, 60:17
dollars [10] - 5:5, 7:26, 8:4, 16:22, 18:12, 20:14, 22:13, 31:17, 48:6, 52:26
done [13] - 3:11, 10:6, 21:25, 21:26, 25:14, 26:19, 28:2, 29:15, 40:2, 40:7, 47:14, 55:16, 59:26
doubt [2] - 44:4, 44:9
down [12] - 17:10, 21:16, 24:3, 33:17, 33:19, 37:17, 49:18, 52:15, 53:6, 55:10, 56:13, 58:16
DOWNTOWN [1] - 1:9

dragged [1] - 54:3
draw [2] - 8:11, 8:13
due [7] - 22:13, 23:3,
47:22, 48:13, 48:14,
51:25, 63:5
duty [1] - 54:21

**E**

e-filed [1] - 4:22
e-mail [4] - 37:8, 38:6,
60:4, 60:5
e-mails [3] - 15:17,
46:10, 59:20
ears [1] - 23:25
EAST [1] - 1:8
East [3] - 2:7, 2:14,
14:13
easy [4] - 11:8, 38:22,
38:23, 39:5
ECF [3] - 62:17, 62:24,
62:26
effective [4] - 51:16,
55:26, 58:17
efficient [3] - 51:16,
56:21, 58:16
eight [3] - 8:5, 16:17,
32:11
eighty [1] - 22:6
eighty-seven [1] -
22:6
either [11] - 7:11,
11:17, 22:21, 34:17,
49:5, 49:24, 51:11,
53:8, 53:17, 53:20,
56:11
electricity [1] - 44:7
electronic [2] - 59:20,
63:2
electronically [2] -
60:26, 61:5
ELIADES [5] - 2:12,
2:15, 47:3, 47:17,
48:10, 48:17
Eliades [2] - 19:13,
49:8
embezzler [1] - 15:25
emergency [1] - 44:13
employ [1] - 27:10
employees [5] - 6:4,
9:26, 10:5, 15:15,
43:24
end [11] - 17:18,
17:21, 19:3, 25:10,
51:13, 51:16, 55:12,
55:15, 55:19, 56:18,
56:24
ending [1] - 17:12
enormous [1] - 7:21
enter [1] - 21:24

entered [3] - 47:12,
47:25, 63:7
ENTERPRISES [1] -
1:9
enterprises [1] - 42:14
entire [1] - 15:4
entirely [1] - 9:6
entirety [1] - 80:19
entities [17] - 5:2,
9:19, 10:12, 10:21,
13:22, 13:23, 14:11,
20:9, 26:22, 29:18,
37:14, 37:20, 39:2,
44:2, 45:8, 46:24,
46:26
entitled [6] - 22:16,
22:17, 22:19, 22:20,
28:9, 42:2
entity [6] - 14:15,
30:13, 30:14, 41:3,
42:8, 42:9, 43:2,
44:26
entries [1] - 11:25
equal [2] - 28:4, 32:21
erase [1] - 46:10
ERISA [2] - 33:7,
33:26
escrow [1] - 10:4,
33:5, 34:13
ESQ [7] - 1:25, 1:26,
2:4, 2:8, 2:15, 2:15,
2:17
essentially [2] - 4:24,
7:24
estate [1] - 30:14
Estate [6] - 2:13, 2:17,
5:18, 7:10, 13:21
ESTATE [1] - 1:5
et [2] - 14:13
event [2] - 55:9, 57:22
events [1] - 22:15
everyday [2] - 15:21,
27:7
evicted [1] - 51:26
eviction [1] - 51:26
evidence [1] - 10:5
evidentiary [1] - 23:15
exactly [3] - 25:22,
34:11, 58:8
examine [1] - 9:5
example [2] - 27:16,
29:20
except [1] - 39:12
excerpts [1] - 11:26
excess [1] - 5:4
exchange [1] - 45:15
excluded [1] - 46:2
excuse [2] - 30:5,
34:20
Executive [1] - 2:17

Exhibit [2] - 11:14,
41:23
exhibit [1] - 62:11
existing [2] - 23:10,
48:5
expense [7] - 27:18,
44:5, 44:10, 44:24,
45:5, 45:11
expenses [13] - 20:19,
20:24, 24:21, 24:22,
27:15, 28:5, 39:22,
43:21, 43:24, 43:25,
44:7, 44:15, 44:24
expensive [2] - 19:5,
56:17, 56:22
explain [1] - 20:18
express [1] - 44:3
extent [1] - 45:6
extra [1] - 9:7
extraordinary [6] -
20:23, 20:25, 24:21,
27:15, 27:18, 28:4

**F**

facilitate [1] - 41:4
fact [12] - 17:3, 21:14,
26:9, 26:12, 27:4,
32:21, 52:17, 53:13,
53:17, 54:12, 60:8,
61:21
factually [1] - 16:10
fake [1] - 34:16
false [1] - 15:15
family [1] - 27:11
far [1] - 19:26
fast [1] - 31:24
fault [1] - 54:19
favor [1] - 62:23
Foxit [2] - 62:21,
62:25
Franchise [5] - 21:8,
21:11, 47:7, 47:10,
48:4
franchise [13] - 21:10,
21:19, 22:14, 22:22,
23:2, 32:6, 35:15,
47:2, 54:22, 58:5,
63:4, 63:13
franchisees [2] -
47:12, 48:2
franchiser [1] - 19:16
franchises [1] - 47:18
free [3] - 35:11, 35:17,
43:10
freeze [2] - 60:16,
60:18
fresh [1] - 53:11
FRIEDMAN [1] - 3:2,
Friedman [1] - 3:2,

filing [2] - 62:24, 63:2
financial [6] - 30:11,
30:17, 30:19, 31:9,
32:16, 35:18
Fine [1] - 49:12
fine [2] - 30:25, 44:25
fined [1] - 60:6
finish [6] - 13:17,
36:18, 53:16, 54:16,
55:10, 55:21
finished [2] - 31:22,
54:17
firm [2] - 19:13, 57:11
first [10] - 3:15, 12:4,
12:5, 15:6, 23:20,
26:11, 40:10, 40:14,
51:4, 52:8
five [8] - 4:2, 10:12,
14:15, 14:16, 22:6,
31:9, 31:14, 44:18
flowing [1] - 59:24
flows [1] - 9:18
focus [2] - 17:26, 18:2
followed [2] - 16:18,
31:8
following [1] - 20:23
follows [1] - 43:19
Forman [1] - 19:13
FORMAN [1] - 2:12
formed [1] - 14:7
former [1] - 18:23
forthcoming [1] - 50:4
forward [13] - 21:5,
23:14, 31:12, 31:21,
44:13, 46:9, 46:11,
47:26, 51:20, 55:22,
56:17, 56:22, 62:14
four [2] - 22:13, 39:6,
39:9

**G**

game [2] - 17:21,
56:24
gander [2] - 27:24,
37:6
gee [1] - 23:23
general [2] - 11:26,
34:13
generic [1] - 28:2
gentlemen [1] - 54:24
gentlemen [1] - 13:26
given [2] - 41:9, 63:12
global [1] - 21:23
goal [3] - 17:13, 53:6,
53:12
goose [2] - 27:24,
37:6
governance [1] -
41:24
GRAMERCY/
CHELSEA [1] - 1:7
grant [1] - 43:19
granted [2] - 3:16,
41:15
great [1] - 49:12
Group [1] - 14:8
group [22] - 5:17,
5:18, 5:23, 6:2, 6:11,
6:19, 7:8, 7:10, 7:19,
8:2, 10:13, 10:14,
22:8, 23:3, 23:5,
43:5, 43:17, 44:2,
45:8, 46:26, 55:2,
55:3
GROUP [1] - 1:5
groups [2] - 6:16, 55:9
growing [1] - 51:20
guard [2] - 32:14,
34:26
guess [4] - 24:25,
36:13, 38:9
guy [1] - 15:24

3:9, 4:20, 4:26, 5:19,
30:7, 40:7, 44:21,
61:7, 61:8
Friedman's [2] -
16:14, 16:19, 41:23
front [2] - 4:15, 55:4
full [1] - 45:5
functions [1] - 8:16
fund [1] - 17:4
funded [2] - 35:13,
35:14
funds [11] - 5:4, 7:19,
7:21, 9:24, 10:24,
11:3, 11:5, 23:8,
37:13, 37:15, 39:11
funny [1] - 53:9

5

guys [1] - 25:8

**H**

half [1] - 34:26
halves [1] - 4:9
Hamptons [1] - 39:23
hand [2] - 4:3, 4:17, 60:26
handed [4] - 3:6, 38:7, 47:15, 61:9
handle [1] - 14:6
handled [1] - 54:10
happy [1] - 7:16
hard [4] - 3:24, 19:22, 61:3, 61:13
Headquarters [1] - 2:18
health [5] - 9:26, 11:3, 11:8, 12:16, 13:7, 16:5, 17:4, 33:4, 34:13
healthcare [3] - 12:10, 12:16, 34:3
hear [10] - 17:8, 20:15, 20:16, 20:17, 24:5, 24:11, 24:13, 36:3, 55:14, 57:15
heard [4] - 11:11, 33:15, 43:18, 57:15
hearing [12] - 23:15, 24:5, 24:17, 24:23, 25:6, 25:10, 25:20, 33:24, 56:12, 58:13, 56:15, 57:21
held [3] - 24:22, 46:17, 50:25
help [3] - 20:5, 20:8, 41:4
helpful [1] - 4:14
helps [1] - 18:3
highlighting [1] - 11:25
hijacked [1] - 30:15
himself [2] - 7:26, 33:25
hires [1] - 27:4
hold [4] - 42:22, 44:11, 46:16, 57:9
holding [1] - 50:14
holds [1] - 14:8
holidays [1] - 50:19
HOLT [1] - 2:12
Holt [1] - 19:13
honestly [2] - 23:24, 43:8
Honor [32] - 3:4, 3:22, 3:24, 4:10, 4:24, 10:9, 10:17, 10:18, 11:20, 15:23, 16:11,

18:18, 19:6, 21:7, 22:24, 23:22, 26:21, 28:19, 30:6, 34:7, 37:5, 41:9, 41:15, 47:3, 47:11, 48:10, 48:17, 49:7, 52:7, 54:8, 57:17, 63:3
Honor's [2] - 23:15, 29:17
HONORABLE [1] - 1:20
hope [1] - 16:14, 56:18
hoped [1] - 51:5
hopefully [2] - 15:12, 50:12
hoping [1] - 56:15
hopper [1] - 51:24
host [4] - 19:24, 20:7, 24:16, 41:2
hour [1] - 34:25
hours [1] - 34:23
house [2] - 25:23, 39:24
HUMMELL [72] - 1:26, 3:4, 4:10, 4:13, 4:19, 4:24, 5:15, 5:24, 6:7, 6:15, 6:18, 6:21, 6:23, 6:25, 7:3, 7:7, 7:13, 7:21, 7:24, 8:5, 8:8, 8:10, 8:12, 8:14, 8:19, 8:23, 9:3, 9:13, 9:16, 9:21, 9:25, 10:9, 10:12, 11:14, 11:16, 11:20, 11:24, 12:4, 12:7, 12:11, 16:11, 17:24, 18:5, 18:11, 18:18, 18:23, 22:24, 23:2, 23:22, 25:16, 25:21, 25:24, 26:7, 26:19, 27:20, 29:12, 39:16, 41:19, 42:10, 44:18, 54:21, 55:7, 57:17, 60:25, 61:8, 61:11, 61:13, 61:16, 61:19, 61:25, 62:5, 62:8
Hummell [1] - 4:10
hump [1] - 51:2
hundred [1] - 22:5
hundreds [1] - 15:16
hyper [1] - 62:4
hyper-linked [1] - 62:4
hyperlink [2] - 62:12, 62:15, 62:16

**I**

idea [1] - 15:7, 16:26
idea [4] - 1:13, 1:13,

2:3, 3:9
IDEAA [1] - 1:14
identifies [1] - 16:17
improper [1] - 34:15
Inc [5] - 2:3, 6:9, 26:3
INC [6] - 1:6, 1:6, 1:7, 1:7, 1:14
includes [2] - 36:20, 43:24
including [8] - 7:21, 7:26, 8:6, 16:22, 26:3, 27:3, 29:22, 32:2, 46:10
income [2] - 32:4, 35:13, 35:14
INDEX [1] - 1:11
indicated [2] - 40:25, 41:2
indirectly [3] - 9:3, 9:20, 34:12
individual [2] - 38:21, 44:26
individually [4] - 1:4, 1:12, 26:26, 43:6
individuals [2] - 38:20, 41:14, 50:11
ineffective [1] - 56:17
Information [4] - 37:9, 46:3, 46:5, 59:24
Informations [1] - 59:23
injunction [5] - 3:18, 50:25, 57:4, 57:10, 57:21
injunctive [1] - 5:8
insist [1] - 58:14
instead [4] - 23:4, 34:24, 57:2, 57:8
instructions [2] - 39:19, 40:2
insurance [1] - 26:3
insurance [6] - 9:26, 11:4, 11:8, 12:18, 16:5, 17:4, 33:5, 34:16
insure [1] - 20:23
integral [1] - 37:15
intend [1] - 24:4
interest [6] - 40:11, 42:3, 43:17
interim [1] - 32:2
internal [1] - 29:22
interrupt [1] - 5:25
intervenor [1] - 2:13
intimidated [1] - 35:24
introduced [2] - 10:5, 23:18
involved [1] - 36:6
irreparably [1] - 31:21
irrespective [1] - 42:2

IRS [1] - 23:9
issue [5] - 21:3, 23:11, 23:12, 24:19, 25:25, 27:12, 36:8, 42:24, 58:20
issued [3] - 3:2, 41:13, 47:6
issues [4] - 20:8, 21:7, 22:25, 55:26
issuing [1] - 43:7

**J**

JAMES [1] - 2:17
JAMS [1] - 41:3
Jeff [1] - 62:23
Jersey [2] - 2:14, 2:19
joined [1] - 15:6
judge [7] - 19:21, 21:13, 35:19, 39:15, 40:16, 46:25, 58:24
Judge [17] - 3:9, 13:17, 19:12, 19:23, 21:22, 22:12, 27:21, 40:20, 40:25, 43:4, 46:22, 47:17, 56:26, 60:23, 61:7, 61:8
judgment [1] - 23:8
July [5] - 47:7, 47:14, 47:23, 48:12, 48:14
jumped [1] - 24:2
Justice [3] - 1:21, 3:2, 4:20

**K**

Karas [1] - 19:13
KARAS [20] - 2:15, 19:6, 19:8, 19:10, 19:12, 19:16, 19:21, 21:7, 21:20, 22:12, 22:21, 39:15, 40:16, 40:19, 46:22, 46:25, 58:24, 59:2, 63:3, 63:10
keep [4] - 12:18, 17:15, 26:9, 26:12
key [6] - 30:22, 32:10, 34:23, 37:7, 59:22
kind [5] - 16:8, 18:14, 41:11
knowledge [1] - 26:10
knows [1] - 29:24
Kosher [1] - 28:2
KUCKER [1] - 1:23

**L**

labor [1] - 6:19
landlord [2] - 51:26,

52:2
large [1] - 14:16
LARREY [1] - 1:4
last [6] - 3:7, 3:22, 7:9, 19:21, 30:5, 48:13
LAURENCE [1] - 2:4
law [1] - 62:9
LAW [1] - 2:6
LAWRENCE [2] - 1:5, 1:7
Lawrence [21] - 5:18, 7:10, 13:21, 14:12, 16:9, 27:24, 30:11, 30:13, 30:14, 37:15, 37:22, 37:23, 39:8, 40:6, 47:3, 49:9, 49:12, 49:16, 54:14, 55:3, 58:8
Lawrence's [1] - 51:26
lawsuit [2] - 15:3, 55:2
lawyer [2] - 18:20, 18:21
lawyers [2] - 4:16, 44:12
lease [2] - 52:5, 52:8
least [6] - 14:6, 19:5, 23:20, 24:4, 24:8, 41:16, 54:9, 56:21, 60:26
leaving [2] - 15:2, 15:4
ledger [1] - 11:26
left [3] - 8:2, 15:14, 32:5
legal [1] - 23:17
Leggal [1] - 2:17
less [1] - 49:20
letter [3] - 47:6, 47:8, 47:10
letting [1] - 39:18
liberty [1] - 11:24
licensing [1] - 14:9
lien [1] - 23:9
light [1] - 21:14
likewise [1] - 59:25
limited [2] - 3:16, 39:22
line [3] - 17:5, 34:5, 35:19
lining [1] - 34:11
linked [1] - 62:4
links [1] - 61:24
list [6] - 16:20, 27:26, 49:25
listen [2] - 12:21, 24:9
listened [1] - 23:25
listening [1] - 24:9
listings [3] - 60:12, 60:13, 60:15
literature [1] - 15:19
litigating [1] - 20:14

6

litigation [1] - 60:18
live [1] - 56:20
LLC [12] - 1:5, 1:5,
1:8, 1:8, 1:9, 1:9,
1:13, 1:13, 2:12,
2:13, 5:18, 14:8
LLCs [4] - 44:15,
44:16, 44:18, 44:20
LLP [2] - 1:23, 2:2
loan [3] - 12:9, 12:19,
12:20
loans [5] - 10:3, 10:24,
11:3, 34:10
local [2] - 57:17, 60:25
location [4] - 29:20,
30:8, 52:5
locations [2] - 16:9,
52:2
lock [2] - 30:21, 32:13
look [8] - 17:11, 28:7,
51:18, 53:11, 57:13,
59:15, 60:8, 63:15
looking [1] - 19:25
looks [1] - 15:23
looting [2] - 53:6,
56:23
loses [1] - 36:18
lunch [1] - 60:4
luxury [1] - 23:6

## M

Madison [2] - 2:3,
2:19
mail [5] - 37:8, 38:5,
38:6, 60:4, 60:5
malls [3] - 15:17,
46:10, 59:20
main [1] - 30:23
maintain [1] - 46:7
maintained [1] - 46:11
majority [7] - 5:3,
17:16, 18:9, 18:15,
20:17, 37:21, 42:5
maker [1] - 6:5
management [2] -
5:19, 42:19
manager [1] - 41:25
managers [1] - 41:14
managing [2] - 32:20,
52:19
marked [2] - 4:20,
4:21
mass [1] - 53:5
material [1] - 62:18
matter [4] - 19:18,
20:6, 38:23, 55:10
MATTHEWS [1] - 2:17
mean [14] - 4:16, 6:2,
10:3, 14:24, 20:13,

29:25, 30:9, 32:25,
43:23, 44:6, 44:20,
49:23, 55:8, 60:8
meaning [6] - 5:22,
20:25, 22:7, 22:8,
28:4, 30:6
means [2] - 44:24,
47:19
meant [1] - 26:25
meantime [1] - 25:11
meanwhile [1] - 37:3
mediate [1] - 21:16
mediating [1] - 20:6
mediation [5] - 19:24,
20:7, 40:26, 41:2,
55:24
meet [4] - 48:22,
49:22, 50:26, 55:23
meeting [1] - 57:12
meetings [1] - 14:21
Mehta [1] - 7:9
member [1] - 5:6
Members [1] - 7:4
members [4] - 5:2,
32:20, 52:19
memo [1] - 62:11
memorandum [2] -
41:22, 62:9
mentioned [1] - 40:20
mess [1] - 53:23
middle [1] - 29:13
midnight [1] - 34:24
MIDTOWN [1] - 1:6
midtown [1] - 51:25
might [3] - 4:20,
10:18, 51:24
million [12] - 5:4, 7:26,
8:4, 15:6, 16:22,
17:19, 18:12, 20:14,
22:13, 23:8, 31:17,
52:26
mind [1] - 51:15
mine [1] - 40:13
minority [6] - 17:16,
17:17, 20:16, 42:5,
42:15, 43:2
minutes [2] - 4:2,
23:24
misunderstanding [1]
- 33:3
mixed [3] - 37:26, 38:2
moment [4] - 17:10,
27:21, 53:6, 60:18
Monday [3] - 3:11,
3:15, 3:17, 3:20,
21:24, 47:11, 47:25,
47:26, 54:23
monetary [2] - 48:11,
48:18
money [41] - 9:11,

11:21, 12:14, 12:18,
12:22, 16:4, 18:21,
16:23, 17:4, 17:6,
18:6, 21:2, 23:11,
23:13, 24:12, 24:13,
25:26, 26:4, 26:21,
26:22, 30:16, 31:23,
32:4, 33:4, 33:6,
33:11, 33:24, 33:26,
34:3, 34:13, 34:15,
36:18, 40:13, 40:23,
46:26, 47:20, 48:16,
49:13, 56:19, 62:15
monies [14] - 15:26,
17:23, 20:5, 21:23,
22:4, 22:17, 23:7,
29:17, 29:20, 30:13,
31:15, 37:14, 54:2
monitor [1] - 31:15
month [3] - 17:20,
28:23, 40:15
month's [1] - 52:8
months [2] - 14:25,
17:20
morning [2] - 19:22,
43:18
mortgage [5] - 7:21,
9:21, 39:23
most [7] - 11:21,
51:16, 54:18, 55:26,
56:16, 56:17, 56:21
mostly [2] - 13:22,
13:23
move [3] - 19:17, 21:6,
31:12
moved [17] - 17:26,
30:10, 30:12, 30:20,
31:5, 31:8, 35:23
movement [1] - 37:17
MR [179] - 3:4, 3:5,
3:8, 4:3, 4:10, 4:13,
4:19, 4:24, 6:15,
5:24, 6:7, 6:14, 6:15,
6:18, 6:21, 6:23,
6:25, 7:3, 7:7, 7:13,
7:21, 7:24, 8:5, 8:8,
8:10, 8:12, 8:14,
8:15, 8:19, 8:23, 9:3,
9:13, 9:16, 9:21,
9:25, 10:9, 10:12,
10:17, 10:25, 11:2,
11:6, 11:9, 11:14,
11:18, 11:20, 11:24,
12:4, 12:7, 12:11,
13:13, 13:17, 18:11,
17:24, 18:5, 18:11,
18:18, 19:6, 19:8,
19:10, 19:12, 19:16,
19:21, 21:7, 21:20,
21:22, 22:8, 22:11,

22:12, 22:21, 22:24,
23:22, 25:16, 26:7,
26:19, 27:20, 27:21,
27:23, 28:8, 28:14,
28:16, 28:24, 29:2,
29:8, 29:12, 29:13,
29:16, 29:26, 30:5,
30:10, 30:19, 30:24,
30:25, 31:4, 31:7,
31:13, 31:26, 32:19,
32:24, 33:2, 33:12,
33:14, 33:21, 34:7,
34:19, 34:20, 35:4,
35:5, 35:9, 36:19,
39:3, 39:13, 39:15,
39:16, 40:6, 40:16,
40:19, 41:7, 41:19,
42:8, 42:10, 42:14,
42:17, 42:22, 43:4,
43:9, 43:11, 44:17,
44:18, 46:22, 46:25,
47:3, 47:17, 48:10,
48:17, 49:7, 49:17,
50:16, 50:21, 50:23,
51:3, 51:5, 51:23,
52:13, 52:14, 53:13,
53:14, 53:17, 54:2,
54:7, 54:11, 54:12,
54:21, 55:7, 56:26,
57:17, 57:25, 57:26,
58:11, 58:18, 58:24,
59:2, 59:16, 60:11,
60:16, 60:20, 60:23,
60:25, 61:6, 61:9,
61:11, 61:13, 61:25,
62:5, 62:8, 62:16,
62:19, 62:22, 63:3,
63:10
MS [15] - 12:14, 12:17,
12:20, 12:22, 12:24,
12:26, 13:4, 13:6,
13:9, 13:11, 13:15,
37:21, 38:2, 38:5,
39:5
multiple [2] - 33:8
must [1] - 56:7

## N

name [1] - 7:9
named [1] - 6:16
need [13] - 4:22, 9:6,
9:7, 9:6, 26:23, 30:8,
50:24, 52:20, 57:22,
60:26, 61:4, 61:12,
61:14
needed [3] - 3:11,
21:24, 58:19
needs [3] - 10:17,
37:11, 40:3

negative [1] - 15:24
negotiation [2] -
51:14, 52:5
NEIL [1] - 1:12
Neil [2] - 2:2, 3:8
nepotism [1] - 27:9
never [1] - 32:6
NEW [2] - 1:2, 1:2
new [1] - 52:4
New [12] - 1:17, 1:25,
2:4, 2:7, 2:11, 2:14,
2:19
next [31] - 24:23, 25:3,
34:25, 41:16, 45:14,
48:23, 49:2, 49:6,
49:21, 50:12, 50:15,
50:17, 50:20, 51:11,
52:11, 52:24, 56:3,
56:7, 58:11, 57:5,
57:21, 57:23, 58:13,
58:21, 59:4, 59:8,
59:16, 60:5, 60:6,
63:16
nice [1] - 39:17
Nice [4] - 1:13, 1:13,
2:3, 3:9
NICE [1] - 1:14
night [5] - 3:7, 3:22,
19:21, 32:12, 34:24
nine [1] - 32:12
NO [1] - 1:11
nobody [5] - 32:2,
36:18, 38:13, 53:22,
62:17
nonaffiliated [1] - 6:12
none [3] - 13:10,
13:13, 38:26, 39:10,
45:3
nonmonetary [2] -
48:11, 48:16
notably [1] - 26:3
note [3] - 11:25,
22:11, 22:13
nothing [5] - 20:3,
20:25, 27:18, 32:5,
60:9, 60:22
notices [1] - 41:13
number [6] - 26:9,
31:8, 31:10, 31:13,
33:9, 40:19, 40:24,
40:25

## O

o'clock [2] - 32:11,
32:12
object [1] - 35:4
objects [2] - 53:18,
53:20
obligations [6] - 5:6,

7

23:9, 23:13, 48:2, 49:9

**obviously** [4] - 3:25, 17:13, 21:11, 38:16

**occasions** [1] - 10:6

**October** [1] - 28:22

**odd** [1] - 48:5

**OF** [4] - 1:2, 1:2, 2:6

**offer** [1] - 55:24

**office** [9] - 30:12, 30:20, 30:23, 51:25, 62:17, 62:24, 62:26, 63:2

**offices** [4] - 14:11, 14:12, 35:11, 50:7

**OFFICES** [1] - 2:6

**Official** [1] - 2:25

**OFFICIAL** [1] - 63:24

**often** [1] - 28:15

**once** [4] - 22:14, 22:16, 28:23, 33:8

**one** [65] - 5:23, 6:2, 6:16, 6:24, 8:20, 9:12, 9:13, 10:10, 10:13, 10:22, 11:14, 11:16, 11:20, 11:21, 11:22, 11:23, 13:21, 14:5, 14:13, 14:16, 17:6, 19:11, 19:20, 20:19, 22:13, 23:20, 24:25, 26:5, 26:10, 27:16, 27:21, 28:7, 30:5, 31:8, 31:10, 31:18, 32:7, 32:21, 33:9, 33:16, 35:20, 36:5, 36:26, 38:15, 40:19, 40:24, 42:2, 44:2, 45:7, 49:24, 50:8, 52:2, 52:14, 53:15, 54:3, 54:4, 54:5, 55:19, 56:10, 58:23, 59:6, 60:15, 60:17, 63:4

**One** [1] - 28:22

**one's** [1] - 28:10

**ones** [2] - 11:15, 24:25

**online** [6] - 4:17, 37:7, 61:10, 61:11, 61:15, 62:2

**opened** [1] - 32:11

**operated** [1] - 14:20

**operating** [3] - 12:26, 37:12, 43:25

**operation** [9] - 7:8, 7:10, 10:13, 15:11, 15:12, 17:15, 37:16, 43:5

**operational** [6] - 6:16, 5:17, 5:18, 5:20, 5:22, 6:2, 6:11, 55:2

**OPERATIONS** [1] - 1:7

**operations** [7] - 6:3, 10:20, 13:19, 14:4, 23:3, 30:16, 45:6

**opposed** [2] - 26:25, 44:26

**opposition** [4] - 50:25, 57:4, 57:9, 57:12

**oral** [2] - 43:18, 61:7

**orchestrated** [1] - 14:25

**order** [35] - 3:13, 3:19, 4:5, 11:18, 14:3, 16:16, 16:18, 19:17, 26:23, 27:25, 29:17, 29:23, 32:8, 35:10, 38:11, 37:13, 41:2, 41:8, 41:16, 42:25, 43:7, 43:14, 50:23, 52:15, 52:16, 54:17, 54:18, 55:11, 56:5, 57:6, 57:9, 58:25, 59:5, 61:2, 63:17

**order-to-show-cause** [1] - 16:18

**ordered** [1] - 56:10

**orders** [5] - 56:12, 56:13, 56:16, 59:5, 59:7

**ordinary** [30] - 24:20, 24:22, 27:2, 27:17, 29:19, 29:25, 30:3, 37:11, 43:20, 43:23, 44:6, 44:8, 44:10, 44:23, 45:4, 45:9, 48:3, 48:26, 49:19, 52:9, 53:21, 53:25, 53:26, 58:2, 58:4, 58:12, 59:12, 63:6, 63:11, 63:13

**organization** [1] - 15:4

**otherwise** [1] - 57:11

**ought** [1] - 53:3

**outlined** [1] - 27:26

**outside** [7] - 24:22, 25:13, 25:19, 44:24, 45:4, 49:23, 49:24

**outstanding** [5] - 21:9, 46:23, 47:13, 47:22, 48:23

**overall** [4] - 14:20, 21:23, 41:10, 56:2

**overwhelming** [2] - 35:26, 36:3

**owe** [4] - 47:4, 48:15, 48:19, 48:20

**owed** [4] - 21:18, 22:5, 46:26, 47:20

**owes** [2] - 23:9, 47:5

**own** [5] - 4:6, 7:19, 17:23, 30:22, 31:14, 34:4, 42:14, 49:16, 55:9

**owned** [5] - 13:24, 13:25, 14:15, 14:16, 43:6, 54:6

**owner** [4] - 32:17, 42:5, 42:16, 45:7

**owners** [5] - 39:10, 40:12, 42:5, 44:14, 44:21, 45:3, 45:23, 49:5

**ownership** [4] - 28:17, 40:11, 42:3, 42:9

**owns** [6] - 9:22, 26:4, 27:10, 30:14, 32:23, 42:21, 55:8, 55:17, 55:18

---

## P

**page** [4] - 12:4, 12:5, 28:19, 41:26

**pages** [1] - 12:2

**paid** [38] - 5:5, 16:2, 16:3, 20:24, 20:26, 23:4, 23:5, 24:20, 24:21, 25:3, 25:8, 25:26, 27:5, 27:17, 35:15, 36:14, 36:16, 36:4, 39:11, 40:22, 43:21, 44:4, 44:5, 44:26, 45:11, 48:21, 48:26, 49:9, 51:7, 51:8, 52:3, 53:4, 54:25, 56:7, 59:10, 59:13, 59:17, 63:13

**paper** [1] - 61:12

**papers** [19] - 3:6, 16:18, 21:22, 24:26, 34:9, 35:25, 35:26, 36:25, 37:4, 56:5, 56:7, 56:26, 57:4, 57:5, 57:9, 57:23, 57:24, 62:14

**Paragraphs** [1] - 16:20

**Paramus** [1] - 2:14

**Park** [1] - 2:18

**PART** [1] - 1:2

**part** [6] - 21:7, 43:5, 46:21, 59:24

**parties** [16] - 19:23, 21:16, 41:3, 43:17, 43:22, 44:5, 45:15, 45:18, 45:20, 46:5, 46:6, 48:21, 48:25, 49:22, 50:2, 55:23, 59:14

**personal** [5] - 5:9, 7:20, 16:23, 26:10, 34:12

**partner** [3] - 16:23, 17:16

**partners** [1] - 17:17

**party** [1] - 46:10

**past** [2] - 54:9, 63:5

**past-due** [1] - 63:5

**Patricia** [1] - 39:8

**pay** [27] - 5:13, 12:18, 13:2, 13:3, 13:8, 16:23, 17:7, 23:7, 23:8, 23:13, 29:19, 29:23, 34:17, 37:11, 37:13, 37:14, 37:19, 37:20, 37:21, 37:24, 39:22, 39:23, 44:11, 48:2, 49:13, 59:15, 63:13

**payable** [1] - 22:15

**paying** [10] - 9:11, 23:5, 37:23, 39:19, 40:9, 49:7, 53:23, 53:24, 58:4

**payment** [8] - 30:4, 44:22, 45:16, 52:8, 52:21, 53:18, 53:21, 53:22

**payments** [4] - 6:23, 24:22, 49:20, 53:3

**payout** [1] - 49:4

**pays** [5] - 6:3, 6:4, 35:14, 37:22

**PDF** [2] - 62:17, 62:18

**pension** [2] - 10:24, 11:3

**people** [9] - 14:6, 15:2, 15:15, 39:6, 40:9, 40:12, 44:7, 50:14, 59:21

**percent** [19] - 13:24, 13:25, 14:15, 14:16, 30:15, 32:17, 32:24, 41:21, 42:5, 42:6, 42:14, 46:4, 49:16, 55:8, 55:9, 55:17, 55:18, 55:20

**percent/35** [1] - 41:21

**percentage** [1] - 28:17

**perfectly** [2] - 33:25, 50:10

**performed** [1] - 54:26

**permit** [1] - 46:9

**person** [14] - 15:20, 17:5, 27:11, 31:16, 37:19, 38:17, 38:25, 39:7, 39:17, 43:26, 45:3, 51:26, 59:15, 60:4

**personally** [9] - 8:4, 8:6, 8:7, 8:22, 8:26, 12:23, 13:10, 13:14, 45:2

**phantom** [1] - 15:15

**phone** [1] - 52:12

**phrase** [1] - 28:2

**physically** [2] - 7:5, 30:20

**Piccirillo** [1] - 2:24

**PICCIRILLO** [1] - 63:24

**pick** [1] - 51:10

**picture** [1] - 15:23

**pieces** [1] - 15:10

**pilfered** [1] - 16:21

**pill** [1] - 15:25

**pill-popper** [1] - 15:25

**PITTINSKY** [60] - 2:2, 2:4, 3:5, 3:8, 4:3, 6:14, 8:15, 10:17, 10:25, 11:2, 11:6, 11:9, 13:13, 13:17, 21:22, 22:8, 22:11, 27:21, 27:23, 28:8, 28:14, 28:16, 29:2, 29:8, 29:13, 29:16, 29:26, 30:5, 30:10, 30:19, 30:25, 34:19, 35:4, 36:19, 39:3, 39:13, 40:6, 41:7, 42:8, 43:4, 43:9, 43:11, 44:17, 50:21, 50:23, 51:3, 51:5, 51:23, 52:13, 53:14, 54:11, 56:26, 57:25, 59:18, 60:11, 60:16, 60:20, 60:23, 61:9, 62:19

**Pittinsky** [1] - 32:10

**place** [7] - 19:24, 20:3, 20:8, 31:25, 34:23, 52:6, 53:9

**placing** [1] - 32:16

**plaintiff's** [6] - 6:17, 15:18, 19:15, 29:18, 36:15, 43:2

**Plaintiff** [1] - 4:26

**Plaintiffs** [2] - 1:10, 1:24

**plaintiffs** [14] - 3:10, 4:11, 6:16, 6:24, 7:18, 13:26, 19:11, 29:22, 36:13, 42:26, 43:5, 43:15, 45:25, 46:2

**plan** [4] - 18:10, 18:14, 19:5, 27:10

**pocket** [4] - 17:5, 33:11, 34:4, 34:12

8

point [20] - 17:25, 22:13, 23:16, 24:11, 25:22, 26:15, 26:18, 28:20, 30:5, 31:20, 31:23, 32:14, 34:2, 34:20, 36:6, 41:20, 46:9, 55:17, 63:4
popper [1] - 15:25
portion [1] - 36:14
possible [1] - 52:15
possibly [1] - 18:23
power [1] - 5:3
pre [1] - 23:10
pre-existing [1] - 23:10
precisely [1] - 31:20
prefer [1] - 49:26
preliminary [3] - 3:18, 50:24, 57:4, 57:21
premises [1] - 32:11
premiums [1] - 9:26
preparing [1] - 57:3
prerogative [1] - 56:19
presence [1] - 54:23
present [2] - 3:21, 22:2
presented [2] - 3:14, 41:8
President [1] - 14:19
press [1] - 15:24
prevent [2] - 10:7, 43:15
primary [1] - 5:17
printed [1] - 3:25
Pro [2] - 2:6, 2:10
problem [7] - 20:14, 20:15, 23:12, 33:18, 50:18, 57:20, 57:22
procedural [2] - 41:7, 57:18
procedurally [1] - 41:15
proceed [1] - 53:12
PROCEEDINGS [1] - 1:18
process [1] - 52:4
proof [2] - 23:18, 61:2
propose [1] - 29:5
proposed [1] - 19:23
Proposed [1] - 2:13
protected [1] - 33:7
prove [1] - 23:17
provide [1] - 47:18
provided [2] - 47:10, 47:21
provides [1] - 47:26
providing [1] - 45:7
proviso [1] - 50:2
Publishing [2] - 1:13,

2:3
PUBLISHING [1] - 1:14
purposes [3] - 33:6, 34:2, 34:15
pursuant [1] - 48:3
put [10] - 15:22, 15:24, 17:7, 25:19, 28:10, 33:11, 34:4, 35:19, 45:11, 45:24, 45:25, 50:24, 56:4, 56:6, 57:23, 59:4, 61:10, 61:14, 61:22
putting [1] - 34:14

Q

quarter [1] - 42:6
questions [2] - 9:7, 16:12
quick [1] - 4:4
quickly [1] - 52:15

R

raided [1] - 9:25
ran [2] - 14:19, 30:11
rather [4] - 7:25, 16:12, 21:17, 36:6
reached [1] - 53:5
read [1] - 4:17
reading - 4:15
ready [1] - 57:5
Real [8] - 2:13, 2:17, 5:18, 7:10, 13:21
real [3] - 13:17, 24:8, 30:14
REAL [1] - 1:5
reality [1] - 39:26
really [6] - 3:15, 18:2, 23:17, 29:10, 43:8, 51:12, 52:24, 56:15
reason [7] - 31:7, 32:13, 35:19, 35:23, 39:18, 39:17, 54:15
reasonable [2] - 35:16, 36:24
received [2] - 28:24, 28:25
receiver [3] - 19:17, 19:26, 20:2
recently [1] - 9:13
reciprocal [1] - 30:26
recognized [1] - 54:25
recommend [1] - 20:22
reconcile [1] - 52:26
reconciliation [11] - 22:2, 24:26, 25:12, 25:14, 25:19, 26:17,

36:12, 47:21, 47:22, 49:3, 49:5
record [7] - 33:17, 46:8, 46:9, 46:16, 46:18, 46:19, 59:22
records [7] - 30:17, 30:19, 31:9, 32:16, 35:18, 50:6, 60:19
refering [1] - 62:8
reflecting [1] - 47:19
regard [11] - 17:25, 21:10, 23:14, 26:20, 35:18, 49:8, 52:14, 52:16, 54:13, 54:14, 54:22
regarding [1] - 22:4
regretted [1] - 39:25
regular [2] - 20:26, 53:7
related [1] - 25:25
relatively [1] - 47:4
relief [3] - 15:6, 5:8, 41:17
remains [1] - 46:23
removed [1] - 36:22
rendered [1] - 39:12
rent [9] - 5:13, 6:4, 7:22, 9:21, 39:24, 44:7, 52:2, 52:6, 53:24
rental [4] - 13:21, 13:23, 15:8, 30:11
rentals [1] - 13:22
repeated [1] - 10:6
replacement [1] - 52:5
reply [1] - 66:5
report [5] - 47:13, 47:18, 47:19, 48:2, 48:12
reported [3] - 47:14, 47:20, 58:6
reporter [1] - 61:16
Reporter [1] - 2:25
REPORTER [1] - 63:24
reporting [1] - 63:8
represent [1] - 18:9
representation [1] - 59:23
represented [1] - 36:21
reputation [1] - 16:7
request [5] - 6:8, 45:4, 45:5, 50:9, 56:5
requesting [1] - 41:17
requests [2] - 38:19, 44:22
required [2] - 50:23, 54:21
requirements [2] -

57:18, 63:8
residence [1] - 23:6
resolution [3] - 19:25, 20:10, 41:4
resolve [5] - 19:4, 20:8, 55:26, 58:13, 58:20
resolved [3] - 21:13, 21:17, 25:3
respect [11] - 24:4, 29:3, 34:20, 43:16, 45:14, 46:20, 48:23, 49:4, 49:7, 55:22, 59:11
respectful [1] - 33:18
response [1] - 4:4
responsibility [2] - 55:2, 55:3
restore [3] - 36:19, 37:6, 46:4
retaliated [1] - 31:11
return [4] - 3:18, 44:5, 45:22, 50:16
returnable [3] - 3:14, 41:16
returned [1] - 3:11
ripped [1] - 20:17
risk [1] - 32:16
role [1] - 5:18
ROSENBERG [1] - 2:2
Route [1] - 2:14
royal [1] - 26:25
rules [2] - 57:18, 60:25
run [6] - 18:9, 18:16, 37:8, 40:11, 44:6, 56:22
running [1] - 50:11
runs [2] - 6:3, 7:2

S

sacrosanct [1] - 33:6
sake [1] - 10:4
salaries [4] - 26:8, 39:14, 43:24, 44:7
salary [13] - 6:11, 8:18, 8:25, 16:2, 16:26, 20:25, 27:3, 27:7, 28:10, 28:11, 28:12, 39:13, 44:25
sales [6] - 13:20, 15:2, 15:7, 51:25, 59:21
SALIANN [1] - 1:20
sanctioned [1] - 60:7
sank [1] - 10:4
Saturday [1] - 34:24
SAUL [1] - 1:25
SCARPULLA [1] - 1:20

schedule [2] - 21:26, 57:10
Se [2] - 2:6, 2:10
seasoned [1] - 59:24
seated [2] - 4:7, 7:15
second [8] - 31:2, 31:19, 32:17, 46:16, 49:15
secondly [1] - 26:14
seconds [1] - 23:26
secured [1] - 40:23
securing [1] - 52:4
security [2] - 32:14, 34:26, 52:7
see [6] - 3:2, 17:11, 35:2, 49:22, 52:23, 52:24, 57:13, 63:16
seeing [1] - 51:10
seeking [2] - 7:23, 43:15
sense [5] - 14:8, 42:17, 42:18
separate [9] - 10:20, 10:21, 13:19, 13:20, 17:22, 17:23, 22:25, 51:21
September [11] - 1:18, 28:25, 29:3, 28:6, 29:7, 29:10, 45:14, 45:16, 45:20, 45:21, 49:4
seriously [1] - 24:15
service [2] - 45:8, 61:2
services [2] - 6:9, 39:12
set [4] - 9:26, 56:13, 57:10, 57:24
seven [3] - 8:5, 22:6, 50:12
shall [3] - 41:25, 41:26, 42:2
share [1] - 28:17
shared [1] - 6:9
shareholder [6] - 18:9, 18:15, 20:16, 20:17, 55:18, 55:20
shareholders [1] - 43:2
shares [4] - 32:23, 32:24, 42:21, 42:22
shell [1] - 26:2
shooter [1] - 16:6
short [7] - 10:2, 10:24, 11:3, 12:9, 13:18, 21:3, 34:10
short-term [4] - 10:24, 11:3, 12:9, 34:10
show [32] - 3:13, 3:19, 4:5, 11:10, 11:13, 11:19, 12:3, 16:17,

9

16:16, 16:18, 19:17,
24:4, 27:25, 29:9,
32:8, 35:10, 41:8,
41:16, 42:25, 43:14,
50:24, 56:6, 56:12,
56:13, 56:16, 57:9,
58:25, 59:5, 59:6,
59:7, 61:2, 63:17
showed [1] - 23:21
shows [1] - 47:22
side [17] - 3:23, 11:15,
44:12, 47:3, 47:5,
47:23, 49:11, 49:25,
53:8, 53:18, 53:20,
54:3, 54:4, 54:5,
54:10, 56:6
sides [7] - 19:26,
21:25, 31:25, 36:4,
40:9, 41:11, 51:14
sign [1] - 27:26
signatory [2] - 14:10,
38:23
signed [1] - 36:21
signing [1] - 52:8
single [8] - 20:18,
27:11, 31:6, 33:2,
46:7, 46:9, 46:12,
60:3
sister [3] - 15:20,
27:3, 27:4
sit [8] - 17:10, 21:16,
24:3, 37:17, 49:18,
56:10
situation [2] - 15:5,
16:8
situations [1] - 37:24
six [2] - 36:4, 41:26
sixty [1] - 14:15
sixty-five [1] - 14:15
small [3] - 40:10,
40:11, 57:11
solely [2] - 9:22, 26:2
solution [1] - 56:9
some-odd [1] - 48:5
someone [2] - 38:10,
50:2
sometimes [2] - 38:6,
38:7
somewhere [1] -
17:20
soon [1] - 61:19
sooner [1] - 21:17
sort [2] - 6:12, 28:3
speaking [1] - 29:13
spearheading [1] -
61:20
special [2] - 11:4,
12:17
specifically [1] - 41:25
spend [5] - 17:19,

20:13, 23:17, 56:19,
62:15
spending [3] - 24:16,
31:23, 57:3
spent [2] - 23:16,
34:25
split [4] - 19:2, 31:24,
53:2, 55:12
spoilate [1] - 31:3
spoliation [1] - 30:24
staff [3] - 7:2, 14:26,
30:8
standstill [1] - 26:21
start [5] - 4:8, 15:8,
43:8, 43:13, 51:9,
56:24
starting [1] - 23:26
STATE [1] - 1:2
statement [2] - 47:18,
53:16
States [1] - 56:20
stepped [1] - 43:11
STEVEN [3] - 1:14,
2:6, 2:8
still [2] - 34:3, 60:21
stipulation [3] - 47:12,
47:25, 63:6
stolen [1] - 31:16
stop [14] - 18:5, 31:5,
31:18, 32:3, 32:4,
33:9, 36:8, 49:15,
56:23, 57:19, 58:10
stopped [1] - 5:10
stops [1] - 32:4
story [3] - 3:23, 36:4,
54:8
straight [4] - 16:6,
20:25, 23:25, 46:11
straight-shooter [1] -
16:6
straighten [1] - 36:17
straightforward [1] -
11:16
Street [2] - 1:17, 2:7
structure [3] - 14:14,
16:13, 17:22
stuff [3] - 9:7, 36:4,
41:24
subject [2] - 21:15,
46:14
submit [1] - 44:22
submitted [1] - 56:7
substance [1] - 16:12
substantial [1] - 5:4
subsumed [1] - 41:10
successfully [1] -
18:16
sudden [1] - 15:9
suggest [2] - 50:5,
59:3

suggestion [6] -
18:25, 25:5, 53:14,
57:2, 58:24
Suke [3] - 2:3, 2:7,
2:14
Summons [1] - 5:9
suppose [1] - 26:25
supposed [2] - 37:9,
41:12, 53:4
supposedly [1] - 3:7
SUPREME [1] - 1:2
sway [1] - 25:8
synergy [1] - 37:12
system [1] - 60:22

**T**

tab [1] - 11:22, 11:23,
41:24
table [3] - 62:2, 62:3,
62:10
tabs [1] - 11:15
Tashina [5] - 7:8,
37:22, 37:24, 39:7,
54:14
tax [1] - 23:9
tech [1] - 60:4
technical [1] - 62:16
tend [1] - 40:12
TERM [1] - 1:2
term [5] - 10:2, 10:24,
11:3, 12:9, 34:10
termination [3] -
21:12, 21:15, 41:13
terms [11] - 6:3, 20:4,
22:22, 40:11, 40:19,
47:2, 47:19, 48:4,
55:26, 63:4, 63:6
THE [180] - 1:2, 1:4,
3:2, 3:6, 3:26, 4:7,
4:12, 4:15, 4:22,
5:13, 5:22, 5:25, 6:8,
6:12, 6:17, 6:19,
6:22, 6:24, 6:26, 7:5,
7:11, 7:14, 7:23, 8:3,
8:7, 6:9, 8:11, 8:13,
8:16, 8:21, 8:24, 9:4,
9:14, 9:17, 9:23,
10:7, 10:10, 10:15,
10:23, 10:26, 11:5,
11:7, 11:10, 11:16,
11:23, 12:3, 12:5,
12:9, 12:12, 12:16,
12:19, 12:21, 12:23,
12:25, 13:3, 13:5,
13:7, 13:10, 13:12,
13:16, 16:25, 17:26,
18:7, 18:13, 18:18,
18:25, 19:7, 19:8,
19:11, 19:15, 19:18,

20:12, 21:18, 22:7,
22:10, 22:19, 22:25,
23:20, 23:23, 25:18,
25:22, 26:5, 26:8,
26:24, 27:22, 28:6,
28:10, 28:15, 28:21,
28:25, 29:3, 29:9,
29:15, 29:24, 30:2,
30:9, 30:18, 31:2,
31:5, 31:11, 31:18,
32:17, 32:23, 32:26,
33:9, 33:13, 33:15,
33:22, 35:7, 36:3,
37:17, 37:26, 38:3,
38:9, 38:13, 38:15,
38:16, 38:19, 38:21,
38:22, 39:4, 39:9,
39:14, 40:5, 40:8,
40:18, 41:5, 41:18,
42:4, 42:9, 42:12,
42:15, 42:18, 42:23,
43:7, 43:10, 43:13,
44:19, 45:19, 46:24,
47:15, 48:7, 48:15,
48:21, 49:15, 49:18,
50:17, 50:22, 51:2,
51:4, 51:7, 52:10,
52:23, 53:15, 53:20,
54:5, 54:16, 55:5,
55:8, 57:9, 57:15,
57:20, 58:10, 58:12,
58:19, 58:26, 59:4,
60:2, 60:14, 60:17,
60:21, 60:24, 61:4,
61:7, 61:10, 61:12,
61:14, 61:18, 61:24,
62:4, 62:6, 62:13,
62:20, 62:23, 63:9,
63:12
theirs [2] - 28:24, 57:8
themselves [3] -
38:11, 38:14, 39:2
they've [2] - 14:26,
57:8
thinking [1] - 51:13
third [4] - 16:15,
40:13, 61:20
Third [1] - 1:24
thirty [1] - 14:16
thirty-five [1] - 14:16
thousand [1] - 48:5
three [26] - 5:2, 7:3,
12:8, 15:5, 23:26,
28:8, 32:20, 37:2,
38:20, 38:26, 39:10,
40:12, 44:14, 44:21,
45:3, 45:23, 46:5,
46:6, 49:5, 50:11,
52:19, 55:19, 57:18,
59:7, 60:26

throwing [1] - 34:26
TO [1] - 63:21
today [17] - 3:12, 3:14,
7:12, 14:23, 21:22,
22:2, 24:18, 25:2,
25:20, 31:22, 33:15,
36:9, 41:9, 47:16,
47:21, 47:24, 56:10
together [9] - 15:10,
15:22, 18:10, 18:17,
29:5, 31:21, 42:26,
45:15, 55:6
tons [1] - 58:19
took [9] - 10:2, 11:24,
12:19, 17:4, 17:6,
33:10, 33:24, 33:25,
34:3
total [1] - 21:23
touched [1] - 60:10
towards [2] - 20:6,
36:16, 58:25
transaction [1] - 51:23
transactions [6] -
14:21, 21:25, 47:13,
54:26, 58:5, 58:6
TRANSCRIPT [1] -
63:21
transcript [2] - 3:20,
61:13
transfer [4] - 12:14,
29:16, 29:20, 33:5
transferred [3] -
12:22, 12:23, 13:7
transfers [3] - 21:2,
29:18, 29:22
TRIAL [1] - 1:2
tried [1] - 52:15
TRO [16] - 3:3, 3:14,
3:21, 3:23, 4:4, 4:6,
4:19, 7:23, 7:24,
24:19, 28:3, 28:4,
36:8, 41:10, 41:15,
42:24, 43:19, 56:10,
59:10
TRUE [1] - 63:21
true [4] - 17:9, 26:9,
26:13, 26:15
trust [1] - 59:22
try [5] - 5:10, 19:24,
20:10, 21:16, 36:2
trying [8] - 16:8,
21:13, 24:9, 24:16,
26:20, 34:21, 38:9,
42:10, 58:16
turning [2] - 59:19,
59:20
twelve [1] - 4:16
two [29] - 4:8, 5:2,
5:16, 6:5, 10:20,
10:21, 13:19, 13:25,

14:5, 14:6, 14:12,
14:25, 15:5, 16:9,
22:25, 25:8, 31:13,
37:2, 37:3, 37:14,
40:14, 40:16, 40:25,
42:6, 51:14, 54:10,
58:16
**type** [1] - 35:5

## U

**ultimate** [2] - 18:4,
20:10
**umbrella** [1] - 14:8
**under** [8] - 6:9, 21:8,
21:10, 22:14, 28:9,
46:7, 46:26, 57:17,
60:25
**understood** [2] - 29:8,
60:20
**unilaterally** [1] - 10:2
**United** [1] - 56:20
**unless** [2] - 44:23,
59:13
**unwilling** [1] - 24:19
**up** [24] - 4:3, 4:20, 9:6,
17:18, 20:20, 24:2,
25:19, 29:21, 31:24,
36:2, 37:8, 47:23,
50:2, 53:2, 53:23,
55:15, 56:24, 56:5,
58:6, 58:16, 59:7,
59:17, 63:17
**urge** [1] - 16:13
**utilized** [1] - 26:2

## V

**various** [1] - 32:15
**vehicle** [3] - 6:10,
6:21, 6:22
**vendor** [1] - 53:23
**viable** [2] - 18:10,
18:14
**view** [3] - 36:17,
51:18, 51:19
**violates** [1] - 46:14
**vote** [2] - 32:21, 42:2
**votes** [1] - 55:19

## W

**wait** [2] - 31:2, 32:17
**walk** [2] - 24:7, 62:24
**want's** [1] - 27:10
**wants** [4] - 17:15,
32:3, 32:25, 58:23
**warrants** [1] - 40:26
**ways** [1] - 17:23
**web** [1] - 15:18

**Wednesday** [22] -
48:23, 49:2, 49:6,
49:21, 50:18, 50:20,
51:11, 52:11, 52:13,
52:24, 56:8, 56:11,
57:5, 57:10, 57:21,
57:23, 58:14, 58:21,
59:4, 59:8, 59:16,
63:16
**week** [9] - 48:13,
50:26, 51:13, 56:3,
56:4, 57:3, 57:6,
57:10, 60:5
**weird** [1] - 27:18
**WEST** [1] - 1:8
**West** [1] - 14:12
**Westhampton** [1] -
23:5
**whatsoever** [1] -
45:10
**whole** [3] - 24:16,
26:20, 27:26
**wife** [1] - 15:16
**William** [1] - 4:10
**WILLIAM** [1] - 1:26
**willing** [3] - 16:13,
16:14, 20:7
**WITNESS** [3] - 38:13,
38:16, 38:21
**word** [6] - 26:15,
26:16, 33:19, 37:12,
44:19
**workable** [1] - 56:9
**works** [8] - 10:18,
19:5, 27:4, 27:5,
38:17, 39:7, 39:8,
47:17
**worried** [1] - 16:4
**worth** [3] - 15:5, 15:7,
35:20
**wreck** [1] - 50:11
**write** [11] - 37:3,
38:10, 38:12, 38:16,
38:20, 38:26, 39:6,
39:9, 39:23, 52:15,
52:17
**writes** [10] - 5:13,
5:23, 7:6, 7:7, 7:9,
38:13, 38:17, 43:26,
54:13, 54:14
**writing** [2] - 36:25,
38:25
**written** [3] - 7:25,
34:9, 45:2
**wrote** [1] - 35:20

## Y

**year** [1] - 54:9
**years** [1] - 16:7

**yesterday** [2] - 19:17,
47:21
**YORK** [2] - 1:2, 1:2
**York** [10] - 1:17, 1:25,
2:4, 2:7, 2:11
**YOUNGMAN** [1] - 2:12
**Youngman** [1] - 19:14
**yourself** [1] - 33:17