THIS FORM IS TO BE <u>RETYPED</u> IN FULL (INCLUDING ALL INSTRUCTIONS) AND ALL MATERIAL INSERTED IN PROPER SEQUENCE AND <u>NOT BY MEANS OF ATTACHED RIDERS EXCEPT AS PROVIDED BELOW.</u>

(PLEASE NUMBER ALL PAGES)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COLDWELL BANKER REAL ESTATE LLC,<br><br>       Plaintiff,<br><br>v.<br><br>THE BELLMARC GROUP LLC; AC LAWRENCE REAL ESTATE LLC; BELLMARC BROKERAGE MIDTOWN, INC.; BELLMARC DOWNTOWN LLC.; BELLMARC EAST LLC; BELLMARC WEST LLC; BELLMARC SIMONE SONG INC.; BELLMARC GRAMERCY/CHELSEA INC.; NEIL BINDER, AN INDIVIDUAL; NICE IDEA LLC; AND ALL ENTERPRISES, LLC,<br><br>       Defendants. | Civil Action No. 14-cv-07926 MCA-MAH |

<u>**JOINT FINAL PRETRIAL ORDER**</u>

      This matter having come before the Court for a pretrial conference pursuant to <u>Fed. R. Civ. P. 16</u>; David W. Phillips, Esq. and Daniel M. Eliades, Esq., having appeared for plaintiff(s) and Laurence R. Pittinsky, Esq., having appeared for defendant(s) (excluding defendant All Enterprises, LLC); and counsel all having been notified that:

      (1) a bench trial in this matter has been scheduled before the Hon. Madeline Cox Arleo, U.S.D.J., on November 29, 2018;

      (2) the pretrial submissions detailed in ¶2, 18 and 19 below are to be submitted no later than **forty-five (45) days prior to trial** (or as otherwise ordered by the Court) or they will be deemed waived; and

      (3) a pretrial housekeeping conference is scheduled before Hon. Madeline Cox Arleo, U.S.D.J., on _____, 2018;

the following Final Pretrial Order is hereby entered:

    1.  JURISDICTION—[The parties shall identify the basis for the Court's jurisdiction.]

Jurisdiction for the claims in the Complaint is premised on:

1. Certain of the claims asserted in this Complaint arise under the Lanham Act 15, U.S.C. §1501 et seq., which is an act of Congress relating to trademarks. Thus, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1338, 15 U.S.C. § 1121, and, with respect to certain claims, 28 U.S.C. § 1367.

2. This Court also has subject matter jurisdiction over this action because complete diversity exists between the parties under 28 U.S.C. § 1332(a) and the amount in controversy exceeds $75,000. The residence, principal place of business or incorporation of each party is:

   a. Plaintiff, Coldwell Banker Real Estate LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 175 Park Avenue, Madison, New Jersey. Coldwell Banker's sole member is a corporation organized under the laws of the State of Delaware with a principal place of business in New Jersey.

   b. Defendant, The Bellmarc Group LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 936 Broadway, New York, New York. All members of the Bellmarc Group are residents of the State of New York.

   c. Defendant, AC Lawrence Real Estate LLC is a is a limited liability company organized and existing under the laws of the State of New York with a principal place of business located at 936 Broadway, New York, New York. All members of the AC Lawrence are residents of the State of New York.

   d. Defendant, Bellmarc Brokerage Midtown Inc. is a corporation organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to New York Department of State ("DOS") records.

   e. Defendant, Bellmarc Downtown LLC is a limited liability company organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records. All members of Bellmarc Downtown are residents of the State of New York.

   f. Defendant, Bellmarc East LLC is a limited liability company organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records. All members of Bellmarc East are residents of the State of New York.

   g. Defendant, Bellmarc West LLC is a limited liability company organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records. All members of Bellmarc West are residents of the State of New York.

h. Defendant, Bellmarc Simone Song Inc. is a corporation organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records.

i. Defendant, Bellmarc Gramercy/Chelsea Inc. is a corporation organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records.

j. Defendant, ALL Enterprises, LLC is a limited liability company a corporation organized and existing under the laws of the State of New York with a designated address of 225 E. 45th Street, New York, New York according to DOS records. Upon information and belief, all members of All Enterprises are residents of the State of New York.

k. Defendant, Nice Idea, LLC is, upon information and belief, a limited liability company organized under the laws of the State of New York with a principal place of business c/o Neil Binder at 240 East 47th Street, Unit #2CD, New York, New York. All members of Nice Idea are residents of the State of New York.

l. Defendant, Neil Binder, is an individual and, upon information and belief, a citizen of the State of New York, residing at 240 East 47th Street, Unit #2CD, New York, New York.

Jurisdiction for the claims in the Counterclaim is premised on: The court has subject matter jurisdiction over this Counterclaims pursuant to 28 U.S.C. 1332, as the parties hold diverse citizenship and the amount in controversy exceeds $75,000.00. This Court has supplemental jurisdiction over the claims in this matter that arise under state statutory and common law of the State of New Jersey pursuant to 28 U.S.C. 1367, as the state law claims herein are joined herein with a substantial and related claim that forms a common nucleus of operative facts. The Franchise Agreement signed by the parties stipulate that New Jersey Law shall apply. Plaintiff is a New Jersey Corporation and Defendants are New York corporations or companies.

2. NATURE OF THE ACTION—[The parties shall provide a brief description of the nature and background of the action.]

Plaintiff's Case in Chief:

Coldwell Banker Real Estate LLC ("Coldwell Banker"), is a real estate brokerage franchise company. On March 27, 2013, it entered into a Franchise Agreement with Defendants for a franchise in the Borough of Manhattan in New York City. Each of the corporate defendants was then or thereafter became a franchisee, and defendant Neil Binder was a principal of each Defendant, and entered a guarantee of the obligations of the Defendants to Coldwell Banker. As of March 2013, Defendants represented themselves as a sizeable existing real estate brokerage business in Manhattan, and very experienced and well known in the market. Pursuant to the Franchise Agreement, the Defendants began operating as a Coldwell Banker franchise on June 13, 2013 (the "Impact Date" or the "Opening Date").

Pursuant to the Franchise Agreement, Defendants paid an initial franchise fee of $25,000 combined for all Defendants. Also pursuant to the Franchise Agreement, Coldwell Banker agreed to make a loan to Defendants in the total amount of $2,650,000.00, subject to certain conditions, of which $1,250,000.00 was advanced shortly after the Impact Date (the "Conversion Loan"). Future advances were to be made when Defendants reached pre-determined levels of gross sales, if Defendants met the conditions, including that Defendants were not in default of the Franchise Agreement. The Conversion Loan had no periodic repayment requirements, and had Defendants remained franchisees in good standing could have been ultimately forgiven. The Conversion Loan, and other franchise obligations, were fully secured through security agreements executed by each of the corporate Defendants.

Coldwell Bank alleges that Defendants became delinquent in their royalty and advertising fee payments within two months of the Impact Date. The delinquencies increased through the Fall of 2013, at which time Defendants asserted they were in bad financial straits. In order to assist Defendants, Coldwell Banker agreed to alter the structure of the advancements under the Conversion Loan to make a portion of the second advance early. Any advance or payment to Defendants under the Franchise Agreement required that Defendants be current in all obligations to Coldwell Banker prior to the advance. Accordingly, Defendants came current prior to the end of December 2013, and the second advance was made in January 2014.

However, after that, Defendants again became delinquent. Defendants began to assert they were due reimbursement from Coldwell Banker for advertising they had purchased. By February 2014, Defendants refused to pay royalty or advertising fees due to Coldwell Banker, seeking a "set off" for the advertising they had purchased. Their claim that they were entitled to reimbursement from Coldwell Banker for advertising has been dismissed by this Court on Summary Judgment. Thus, by February 2014, Defendants were in default under the Franchise Agreement for failure to pay royalties and advertising fees.

Additionally, by December 2013, rifts had developed between Mr. Binder and two of his partners, Anthony DeGrotta and Laurence Friedman. The disagreements grew, and by February 2014, they were all telling Coldwell Banker that they wanted out of the business. Relations apparently worsened further, leading to a lawsuit in August 2014 alleging, among other things, that Mr. Binder has syphoned company funds for his own personal use and that Mr. Binder deceived them regarding making required royalty and advertising payments to Coldwell Banker when Mr. Binder was actually obstructing such payments. During this period, Defendants sank further in arrears, and efforts to sell the business were unfruitful.

The litigation between Mr. Binder and his partners was settled in December 2014, with Messrs. Friedman and DeGrotta leaving the business. Defendants remained in default of the Franchise Agreement, and by letter dated December 18, 2014, Coldwell Banker terminated the Franchise Agreement, and demanded that Defendants deidentify their locations, and assemble and deliver all collateral to Coldwell Banker. Defendants failed to deidentify in a timely manner, forcing Coldwell Banker to seek and obtain an injunction. Defendants abandoned all of the physical collateral in their leaseholds, failing

to assemble and deliver the collateral to Coldwell Banker, and without even informing Coldwell Banker they were intending to abandon the collateral.  Defendants also failed to deliver their cash and receivables to Coldwell Banker (all of which was collateral under the security agreements), instead dissipating it for their own purposes.  They have refused to account for how the cash and receivables was used.

Financial records produced by Defendants in this action show that despite their delinquencies to Coldwell Banker, their revenues and profits increased greatly after the Impact Date, and through at least May 31, 2014, the last information available.

Coldwell Banker seeks sums due under the Franchise Agreement, including royalties, advertising fees and liquidated damages, the return of the Conversion Loan, interest, all pursuant to the terms thereof, and attorneys fees under the Franchise Agreement, in the total amount of $6,401,923.18 as of October 11, 2018 (plus interest and attorney fees continuing to accrue).  Coldwell Banker also seeks statutory damages under 25 U.S.C. § 1117(c) of the Lanham Act, in an amount deemed appropriate by the Court.

Defendants deny Plaintiff's claims in their entirety.

Defendants' Counterclaim:

Defendant was a franchisee for Coldwell Banker in Manhattan, New York City.

Defendant claims that it was fraudulently induced to enter into a Franchise Agreement and that Plaintiff breached the terms of this agreement causing the destruction of Defendant's business.

Several of Defendants' counterclaims were dismissed by this Court on Summary Judgment.  Defendants' remaining counterclaim alleges fraudulent inducement under the New York Franchise Sales Act, and breach of the Franchise Agreement.  They allege that Coldwell Banker orally promised them an additional $1 million to start a luxury real estate brokerage, and failed to deliver on the oral promise.  They further allege that Coldwell Banker failed to provide marketing materials they were due under the Franchise Agreement, and that certain computer systems of Coldwell Banker were not acceptable to Defendants.

Defendants seek as damages the value of the businesses as of May 31, 2014, and the purported future value of Defendants, in the total of $45,215,778.00.

Plaintiff denies any fraudulent inducement, and denies any breach of the Franchise Agreement.

3. *PATENT INFRINGEMENT SUITS ONLY – not applicable*

4. PENDING/CONTEMPLATED MOTIONS/TRIAL BRIEFS—Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position.

NOTE: ALL PRE-TRIAL MOTIONS INCLUDING *DAUBERT* AND *IN LIMINE* MOTIONS SHALL BE FULLY BRIEFED AND FILED **NO LATER THAN FORTY-FIVE (45) DAYS PRIOR TO TRIAL or AS OTHERWISE ORDERED BY THE COURT.** Only those motions listed herein will be entertained prior to trial.

Plaintiff anticipates the following motions *in limine*:

    a.  Motion to strike the expert testimony of Neil Binder;

    b.  Motion to strike the expert testimony of Linda Alexander;

    c.  Motion to strike the expert testimony of Steven Murray;

    d.  Motion for judgment on Lanham Act claims for the limited time period from termination of the Franchise Agreement in December 2014 through the May 2015 Court Order finding Defendants in contempt of the February 2015 injunction requiring Defendants to cease use of Coldwell Banker® trademarks.

    e.  Motion to preclude use of any documents not produced in discovery;

    f.  Motion to preclude the introduction of hearsay statements;

    g.  Motion for sanctions for spoliation of evidence – destruction of marketing materials, computer systems and records from Bellmarc (and/or limit allegations concerning these under Count Three of Counterclaims);

    h.  Motion to bar evidence contradicting terms of Franchise Agreement, under parole evidence rule;

    i.  Motion under New Jersey Statute of Frauds to bar evidence of alleged oral promise to advance $1,000,000.00 to Defendants for Previews business;

    j.  Motion to preclude theories about the secondary public offering of Realogy, as evidenced in Certification of Neil Binder in Opposition to Summary Judgement at ¶¶s 191 to 197;

    k.  Motion to strike demand for punitive damages.

Defendants anticipate the following motions *in limine*:

    a.  Motion for sanctions for spoliation of evidence by Plaintiff – documents relating to referrals into the New York market.

    b.  Motion to preclude use of any documents not produced in discovery.

    c.  Motion to preclude the introduction of hearsay statements.

    d.  Motion to preclude any evidence not disclosed in Plaintiff's Rule 26 Disclosure which was required to be produced.

5. STIPULATION OF FACTS—[Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties.]

1.      Plaintiff, Coldwell Banker Real Estate LLC ("Plaintiff", "Franchisor" or "Coldwell Banker") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 175 Park Avenue, Madison, New Jersey. Coldwell Banker's sole member is a corporation organized under the laws of the State of Delaware with a principal place of business in New Jersey.

2.      Defendant, The Bellmarc Group LLC ("Bellmarc Group") is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 936 Broadway, New York, New York.  All members of the Bellmarc Group are residents of the State of New York.

3.      Defendant, AC Lawrence Real Estate LLC ("AC Lawrence") is a limited liability company organized and existing under the laws of the State of New York with a principal place of business located at 936 Broadway, New York, New York.  All members of the AC Lawrence are residents of the State of New York.

4.      Defendant, Bellmarc Brokerage Midtown Inc. ("Bellmarc Midtown") is a corporation organized and existing under the laws of the State of New York  with a designated address of 936 Broadway, New York, New York according to New York Department of State ("DOS") records.

5.      Defendant, Bellmarc Downtown LLC ("Bellmarc Downtown") is a limited liability company organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records.  All members of Bellmarc Downtown are residents of the State of New York.

6.      Defendant, Bellmarc East LLC ("Bellmarc East") is a limited liability company organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records.  All members of Bellmarc East are residents of the State of New York.

7.      Defendant, Bellmarc West LLC ("Bellmarc West") is a limited liability company organized and existing under the laws of the State of New York  with a designated address of 936 Broadway, New York, New York according to DOS records.  All members of Bellmarc West are residents of the State of New York.  Answer, ¶7.

8.      Defendant, Bellmarc Simone Song Inc. ("Bellmarc Simone") is a corporation organized and existing under the laws of the State of New York  with a designated address of 936 Broadway, New York, New York according to DOS records.

9.      Defendant, Bellmarc Gramercy/Chelsea Inc. ("Bellmarc Gramercy/Chelsea") is a corporation organized and existing under the laws of the State of New York with a designated address of 936 Broadway, New York, New York according to DOS records.

10.     Defendant, ALL Enterprises, LLC ("All Enterprises") is a limited liability company organized and existing under the laws of the State of New York with a designated address of 225 E. 45th Street, New York, New York according to DOS records.   Upon information and belief, all members of All Enterprises are residents of the State of New York.

11.     Defendant, Nice Idea, LLC ("Nice Idea") is, upon information and belief, a limited liability company organized under the laws of the State of New York with a principal place of business in New York State.

12.     Defendant, Neil Binder, is an individual and a citizen of the State of New York.

- 8 -

13. The Bellmarc Group was formed by Neil Binder, Anthony DeGrotta and Larry Friedman in or about October 1, 2012, by the joinder of the then existing Bellmarc Group owned by Mr. Binder, with the then existing A.C. Lawrence Inc., owned by Messrs. DeGrotta and Friedman.  The combined operations, using the name Bellmarc Group, began doing business as of January 1, 2013.

14. Neil Binder has a B.A. from Syracuse University in government and law, and an MBA from New York University in finance, and was licensed as a Certified Public Accountant, but has not been licensed for over 20 years.

15. Mr. Binder obtained a real estate license in 1977, and a real estate broker license in 1979.  He has been employed in real estate in New York City since 1977.

16. Pursuant to: (i) Section 22.7 of the Franchise Agreements (defined below); and/or (ii) the Guaranty (defined below), each of the Defendants consented to the non-exclusive personal jurisdiction of the State and Federal Courts of New Jersey with respect to the claims raised by Plaintiff herein.

17. Venue is proper in this District, among other things, pursuant to Section 22.7 of the Franchise Agreements and the Guaranty, insomuch as those agreements contain an express waiver by all of the Defendants of any objection to venue in this District.

18. Coldwell Banker has the exclusive right to use and sublicense certain trade names, trademarks and service marks, including the name "Coldwell Banker"®, which have been registered on the Principal Register of the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with governmental agencies of foreign countries (which marks, together with certain other trademarks and service marks which are not

registered or which are pending registration, are hereinafter collectively referred to as the "Coldwell Banker Marks").

19.     Coldwell Banker and The Bellmarc Group LLC; AC Lawrence Real Estate LLC; Bellmarc Brokerage Midtown Inc.; Bellmarc Downtown LLC; Bellmarc East LLC; Bellmarc West LLC; Bellmarc Simone Song Inc.; and Bellmarc Gramercy/Chelsea Inc. (collectively, the "Franchisees") are parties to that certain Real Estate Franchise Agreement dated March 27, 2013, as amended by those amendments/addendums consisting of: Addendum to Franchise Agreement dated March 27, 2013, Amendment to Franchise Agreement dated May 13, 2013, Amendment to the Addendum to Franchise Agreement dated May 22, 2013, First Addendum to Amendment to Franchise Agreement dated October 24, 2013, Master Brand Marketing Fund Addendum to Franchise Agreement dated November 8, 2013, and Third Addendum to Amendment to Franchise Agreement dated December 10, 2013.

20.     Mr. Binder read the Franchise Agreement and the Addendum to Franchise Agreement, had the ability to have them reviewed by counsel, and then executed them.

21.     Pursuant to the Amendment to Franchise Agreement dated May 13, 2013, AC Lawrence, Bellmarc Midtown, Bellmarc Downtown, Bellmarc East and Bellmarc West became additional franchisees under the Real Estate Franchise Agreement.  By signing the Amendment to Franchise Agreement dated May 13, 2013, AC Lawrence, Bellmarc Midtown, Bellmarc Downtown, Bellmarc East, Bellmarc West and Bellmarc Group each specifically agreed to be directly liable for all obligations under the Franchise Agreements.

22.     Pursuant to a First Addendum to Amendment to Franchise Agreement dated October 24, 2013, Bellmarc Simone Song and Bellmarc Gramercy/Chelsea were also added as franchisees under the Real Estate Franchise Agreement.  In the First Addendum to Amendment

to Franchise Agreement dated October 24, 2013, Bellmarc Simone Song and Bellmarc Gramercy/Chelsea each agreed to be directly liable for all obligations under the Franchise Agreements.

23.     The Franchise Agreements require the "Owners" to actively manage and supervise the business operations of the Franchisees.   The "Owners" are those individuals or entities which own the Franchisees, either directly or indirectly.

24.     The Owners of the Franchisees include: (a) Nice Idea, which owns a sixty-five percent (65%) interest in the Franchisees, and (b) All Enterprises, which owns a thirty-five percent (35%) interest in the Franchisees.

25.     Neil Binder is the sole member/owner of Nice Idea.

26.     Anthony DeGrotta (30%), Larry Friedman (30%), Lenny Flausso (25%) and Frank Sanchez (5%) (collectively, the "All Enterprises Members") were the members/owners of All Enterprises.

27.     Section 15.2 of the Franchise Agreement states:

**15.2 No Assignment**.  You acknowledge that your rights and obligations under this Agreement are personal to you, and that we have granted this franchise in reliance upon many factors, including your (your Owners') character, skill, knowledge, business and financial capacity.  According, you may not assign your rights or delegate your duties under this Agreement including the terms of any Addendum to this Agreement, except as permitted by the Agreement or as required by law.  (emphasis in original).

28.     Failure to obtain written approval of Coldwell Banker for a "Transfer of the Franchise" within 180 days after the event is an event of default under the Franchise Agreements.

29.     The Franchise Agreements also require the Franchisees to report transactions to Coldwell Banker.  Failure by Franchisees to report transactions as required is an event of default under the Franchise Agreements.

30.     The Franchise Agreements obligate Franchisees to pay Coldwell Banker interest and other amounts as and when set forth in Section 11 of the Franchise Agreements.

31.     Pursuant to Section 13 of the Franchise Agreements the Franchisees were required to maintain records and accurate financial statements as to the Franchisees and provide same periodically to Coldwell Banker.   In addition, Section 13 of the Franchise Agreements contains an agreement by the Franchisees to allow Coldwell Banker to review and audit the operations, financial records and other documents pertaining to the Franchisees.

32.     Section 2.15 of the Franchise Agreement states:

**22.15 Integration.**  You acknowledge that we have fully explained our operations to you; that you understand their uses, benefits and limitations; and that we made no representations to you as to the financial benefit to be gained under this Agreement.  You have not relied on any written or oral representations except those specifically made a part of this Agreement in writing.  This Agreement, any Exhibits, and any Addendum signed by our authorized officer and you represents the entire integrated agreement between us and you and supersedes any prior negotiations or agreements, either written or oral, between the parties.   This clause does not disclaim the representations of the Disclosure Document.   DO NOT SIGN THIS AGREEMENT IF YOU BELIEVE WE OR ANY OF OUR REPRESENTATIVES HAS PROMISED YOU SOMETHING THAT IS NOT PART OF THIS AGREEMENT, ANY ATTACHED ADDENDUM OR THE DISCLOSURE DOCUMENT.  (emphasis in original).

33.     Defendants produced from their files a 131-page Coldwell Banker "Franchise Disclosure Document."   Mr. Binder could not recall seeing the document or reading the documents, but confirmed that some of the information was familiar, and that if it had been provided to him he would have read it.

34.     The Franchise Disclosure Document produced by Defendants did not include all of the original exhibits thereto.   Upon discovering this, Plaintiffs produced the full Franchise Disclosure Document to Defendants.

35.     Nice Idea, All Enterprises, and Neil Binder, individually, (each a "Guarantor" and collectively, the "Guarantors") each executed and conveyed to Coldwell Banker a Guaranty of

Payment and Performance (the "Guaranty") of the obligations of Bellmarc Group under the Franchise Agreements.

36.     Neil Binder, individually and on behalf of Defendants Bellmarc Group, Nice Idea, and All Enterprises (the "Borrowers"), executed and delivered to Coldwell Banker a Conversion Promissory Note dated May 15, 2013, in the original principal amount of $1,250,000.00 ("Note #1").

37.     Due to clerical error, Note #1 reflects ERA Franchise Systems LLC as the holder of the note.  Note #1 has since been assigned by ERA Franchise Systems LLC to Coldwell Banker, and Coldwell Banker is the holder of Note #1.

38.     The entire $1,250,000.00 was funded to Defendants, and used for "business purposes."

39.     Pursuant to the second paragraph of Note #1, Coldwell Banker agreed to forgive one eighteenth of the amount due over the course of 18 years, provided that beginning at the end of the first calendar year after Note 31 was executed (i.e., December 31, 2014), Defendants were not in default of the Franchise Agreement, and had met annual royalty quotas.

40.     Note #1 provides that Coldwell Banker may declare the note in default and accelerate the amounts due if, among other things, any of the Defendants are in default of the Franchise Agreements, and upon termination or expiration of the Franchisee Agreements.

41.     The Franchise Agreements were terminated by Coldwell Banker effective December 18, 2014.

42.     By letter dated December 18, 2014, Coldwell Banker, by its counsel, declared Note #1 in default, accelerated Note #1, and demanded payment of the outstanding principal balance of $1,250,000.00.

43.     No portion of the $1,250,000.00 due under Note #1 has been repaid by Defendants.

44.     Neil Binder, individually and on behalf of other defendant Borrowers, also executed and conveyed to Coldwell Banker a Conversion Promissory Note dated December 13, 2013 in the original principal amount of $187,500 ("Note #2"; and collectively with Note #1, the "Promissory Notes").

45.     The entire $187,500.00 was funded to Defendants.

46.     Pursuant to the second paragraph of Note #2, Coldwell Banker agreed to forgive one eighteenth of the amount due over the course of 19 years, provided that beginning at the end of the first calendar year after Note #2 was executed (i.e., December 31, 2014), Defendants were not in default of the Franchise Agreement, and had met annual royalty quotas.

47.     Note #2 provides that Coldwell Banker may declare the note in default and accelerate the amounts due if, among other things, any of the Defendants are in default of the Franchise Agreements, and upon termination or expiration of the Franchisee Agreements.

48.     The Franchise Agreements were terminated by Coldwell Banker effective December 18, 2014.

49.     By the letter dated December 18, 2014, Coldwell Banker, by its counsel, declared Note #2 in default, accelerated Note #2, and demanded payment of the outstanding principal balance of $187,500.00.

50.     The $187,500.00 has also been not repaid by Defendants.

51.     The obligations of the Borrowers under the Promissory Notes are joint and several.

52.     In the Promissory Notes, the Borrowers agreed to pay all expenditures made by Coldwell Banker in any attempt to collect amounts due under the Promissory Notes, including reasonable attorneys' fees and costs:

> Maker and Co-Maker(s) agree to pay all expenditures made in any attempt to collect any amounts due pursuant to this Note. If Holder takes legal action to enforce or collect this Note, Holder shall be entitled to reasonable attorneys' fees (including in-house attorneys) and court costs and all costs of collection in addition to any other relief to which it may be entitled.

53.     In order to secure the amounts due under the Promissory Notes and the Franchise Agreements, and all other obligations of defendants to Coldwell Banker, each of the then-existing franchisee defendants executed and delivered to Coldwell Banker Security Agreements dated May 15, 2013 (the "Security Agreements"). Bellmarc Simone Song and Bellmarc Gramercy/Chelsea executed and delivered to Coldwell Banker Security Agreements upon being added as franchisees effective October 24, 2013.

54.     The Security Agreements stated that Coldwell Banker was being granted a lien and security interest in the following property owned by the Debtors:

> all accounts; accounts receivables; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessories thereto and any rebate/aware program (or similar incentive programs) to which Debtor may be entitled pursuant to any Franchise Agreement entered into with a Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing collateral…

55.     Upon termination of the Franchise Agreements, the Franchisees no longer have any right to use or display the Coldwell Banker Marks and are obligated to immediately "de-

identify" the Offices from their appearance to the general public as a Coldwell Banker®
affiliated establishments.  Upon early termination of the Franchise Agreements, the Franchisees
are further required to, among other things, immediately cease and desist use of the Coldwell
Banker Marks and Coldwell Banker System.

     56.    The Franchisees' post termination non-monetary obligations under the Franchise
Agreements include:

> **16.4**    ***Effect of Expiration or Termination.***  *On expiration or termination, you must
> immediately, at your expense, return to us all of our property, including originals and
> copies of the P&P Manual, all copies of our technology products (including copies that
> your sales associates hold or control), and all films, cassettes and instruction manuals,
> which are part of our programs.  You must also immediately discontinue all use of signs
> displaying our unique style, logo, colors, color patterns and designs and/or Marks.  If
> you desire to use the signs after expiration or termination, you must immediately change
> the colors and color patterns by completely repainting the signs, and you must
> permanently remove or cover any Marks on the signs and provide us with color
> photographs of such changed signs and signposts.  Effective on the date of termination or
> expiration, you must refrain from any representation that you are our franchisee or are
> or have been affiliated with us, and take any affirmative action necessary to remove any
> use of the Marks in connection with your business.  You must de-identify your business
> from the System in a manner that does not confuse the public about the fact that you are
> no longer part of the System.  You must (i) immediately advise all of your then-current
> clients that you are no longer associated with us; and (ii) immediately cause the local
> phone company (white pages) and any business phone publisher (the Yellow Pages) to
> remove you from their listings as our franchisee in their next edition of any directory or
> listings, including any Internet directories.  You must immediately cause any Web
> masters or websites to remove our Marks from their Web pages, including social media
> websites, and you must remove the Marks from the social media sites and accounts that
> you control and your website(s), including from any source code or other mechanism that
> directs a consumer searching for our Marks to your website.  If your URL contains our
> Marks, you must either cancel such URL registrations for the Business or, at our option,
> assign your URL(s) to us.  You must also cause all agents to cancel all URLs containing
> our Marks.*

     57.    Pursuant to Section 16 of the Franchise Agreements, the Franchisees
acknowledge, among other things, that Coldwell Banker has no adequate remedy in the event
that the Franchisees engaged in unauthorized post termination use of the Coldwell Banker Marks

and expressly agree that Coldwell Banker may obtain an injunction and/or temporary restraining order to terminate such use.

58.     In addition, pursuant to Section 16.7 of the Franchise Agreements, Franchisees agreed that in the event of an early termination of the Franchise Agreements, Franchisees would pay liquidated damages to Coldwell Banker pursuant to a formula specified in the Franchise Agreements.

59.     Pursuant to Section 22.11 of the Franchise Agreements, Franchisees agreed that in addition to any award of damages or injunctive relief, Coldwell Banker would be entitled to collect its costs incurred in enforcing its rights under the Franchise Agreements, including reasonable attorneys' fees, court costs, expert fees, costs of investigation and other litigation expenses.  Coldwell Banker's right to collect reasonable attorneys' fees and costs survives termination of Franchise Agreement.

60.     By letter dated July 29, 2014 (the "Notice of Non-Compliance"), Coldwell Banker asserted Franchisees had committed monetary and non-monetary defaults under the Franchise Agreements, and demanded that Franchisees pay all past due fees and comply with certain non-monetary obligations under the Franchise Agreements by August 28, 2014.

61.     The Bellmarc Group received the Notice of Non-Compliance.

62.     The Notice of Non-Compliance demanded payment of $241,880.90 within 30 days of July 29, 2014.

63.     The Notice of Non-Compliance demanded payment of $241,880.90 Coldwell Banker alleged was due under the Franchise Agreements as of July 29, 2014, as well as copies of effective certificates of insurance for each of the Offices and trade name compliance on a certain website.

64.     Franchisees did not pay Coldwell Banker the $241,880.90, demanded in the Notice of Non-Compliance.

65.     By letter of August 29, 2014 (the "Notice of Continuing Default"), Coldwell Banker asserted to the Bellmarc Group that Franchisees has failed to cure any of their defaults detailed in the Notice of Non-Compliance and that the past due fees owed Coldwell Banker under the Franchise Agreements had increased to $276,545 as of August 26, 2014.

66.     The Bellmarc Group, LLC, Nice Idea, LLC and Neil Binder received the August 29, 2014, Notice of Continuing Default.

67.     Without waiving its right to issue a notice of termination of the Franchise Agreements (and proceeding with its enforcement and collection rights), Coldwell Banker scheduled a meeting with representatives of the Franchisees to discuss potential cure of the Franchisees' outstanding uncured defaults under the Franchise Agreements.

68.     On August 25, 2014, Anthony DeGrotta and Laurence Friedman, both individually and purportedly on behalf of all of the Franchisees and All Enterprises, filed a complaint against Neil Binder, individually, and d/b/a "Nice Idea LLC" and "A Nice Idea Publishing LLC", Danuta Brodzinska, Steven Beispel, and Nice Idea Publishing Inc. in the New York Supreme Court, Civil Division (Index No. 652633/2014) (the "Supreme Court Litigation").

69.     In the Supreme Court Action, plaintiffs alleged that the defendants engaged in illicit and wrongful acts in violation of the Franchisees' operating agreements and to the legal and financial detriment of the plaintiffs.  Plaintiffs alleged that such misconduct: (i) included obstructing payments to creditors of the Franchisees, including Coldwell Banker; (ii) exposed Franchisees to legal claims and liability; and (iii) threatened the Franchisees with the loss of the Coldwell Banker® license and termination of the Franchise Agreements.

70.     Among other things, the plaintiffs in the Supreme Court Action sought the appointment of a receiver for the Franchisees.

71.     Coldwell Banker moved to intervene in the Supreme Court Action only with respect to the request for the appointment of a receiver for the Franchisees.

72.     A stipulated order was entered in the Supreme Court Action by Judge Friedman on September 8, 2014 which provides that: *"For the period from September 8, 2014 through the entry of further order, The Bellmarc Group LLC; AC Lawrence Real Estate LLC; Bellmarc Brokerage Midtown Inc.; Bellmarc Downtown LLC;  Bellmarc East LLC; Bellmarc West LLC; Bellmarc Simone Song Inc.; and Bellmarc Gramercy/Chelsea Inc. (collectively, "Franchisees") shall report all transactions and pay all fees to Coldwell Banker Real Estate LLC ("Franchisor") pursuant to the terms of the Franchise Agreement dated March 27, 2013, as amended."*

73.     On September 11, 2014, Judge Scarpulla again ordered that the Franchisees report and pay transactions to Coldwell Banker pursuant to the Franchise Agreements subsequent to September 8, 2014.

74.     By letter dated September 22, 2014 (the "Default/Termination Notice"), Coldwell Banker alleged that the Franchisees had committed monetary defaults under the Franchise Agreements and demanded the Franchisees pay all of the then amounts due under the Franchise Agreements by on or before October 23, 2014 (the "Cure Date").

75.     Defendants received the letter dated September 22, 2014, Default/Termination Notice.

76.     The Default/Termination Notice demanded payment of $372,807.10, which was due under the Franchise Agreements as of September 18, 2014, by no later than the Cure Date.

- 19 -

77.     The amounts alleged due and demanded in the Default/Termination Notice did not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

78.     The Default/Termination Notice provided that if the Franchisees failed to pay the $372,807.10 due as of September 18, 2014 by on or before the Cure Date, same would result in the immediate termination of the Franchise Agreements effective October 24, 2014 (the "Prospective Termination Date") without the requirement of any additional notice from Coldwell Banker.

79.     Franchisees did not pay Coldwell Banker the $372,807.10 on or before October 23, 2014.

80.     By separate correspondence dated September 22, 2014 (the "Demands to Assemble and Preserve Collateral"), Coldwell Banker alleged that each of the Debtors were in default under the respective Security Agreements.

81.     Defendants received the letter dated September 22, 2014, Demands to Assemble and Preserve Collateral.

82.     Among other things, in the Demands to Assemble and Preserve Collateral, Coldwell Banker demanded that each of the Debtors assemble and make available the Collateral for Coldwell Banker's inspection and, upon further notice and at the election of Coldwell Banker, for possession by Coldwell Banker. The Demands to Assemble and Preserve Collateral further advised that Coldwell Banker objected to any further use of its Collateral, or the proceeds

of its Collateral, other than for payment to Coldwell Banker for amounts due under the Franchise Agreements and/or Promissory Notes.

83.     By letter dated October 1, 2014 (the "Notice of Note Default"), Coldwell Banker notified Borrowers that Coldwell Banker alleged they were in default under the Promissory Notes due to, among other things, the default of Bellmarc Group under the Franchise Agreements.  The Notice of Note Default also advised that the Borrowers were not eligible for the principal forgiveness pursuant to the terms of the Promissory Notes, and that the Franchisees remained ineligible for the "Additional Funding", "Allocation", and other benefits pursuant to the terms of the Franchise Agreements.

84.     By letter dated October 10, 2014 (the "Notice of Court Order Default"), Coldwell Banker notified counsel for the Franchisees and Guarantors in the Supreme Court Action that Coldwell Banker alleged that the Franchisees were in default of the orders of September 8, 2014 and September 11, 2014 in that the Franchisees had not reported any transactions or made any payments to Coldwell Banker since September 29, 2014.

85.     Counsel for Defendants received the letter dated October 10, 2014, Notice of Court Order Default.

86.     In the Notice of Court Order Default, Coldwell Banker demanded that the Franchisees immediately cure their default of the court orders of September 8 and September 11, 2014 by immediately reporting and paying Coldwell Banker on account of those transactions which occurred since September 29, 2014.

87.     By letter of October 31, 2014 (the "Forbearance Agreement Default Letter"), Coldwell Banker noticed the Franchisees that Coldwell Banker alleged they were in default

under the Forbearance Agreement and demanded payment of the outstanding amounts due under the Forbearance Agreement.

88.    In the Forbearance Agreement Default Letter, Coldwell Banker also agreed to extend the Cure Date and Prospective Termination Date, as set forth in the Default/Termination Notice, to November 10, 2014.

89.    On or around December 2, 2014, the Supreme Court Action was resolved by a settlement among the plaintiffs and defendants in that action.

90.    Coldwell Banker was (and is) not a party to the settlement of the Supreme Court Action.

91.    As a result of the settlement, the Supreme Court Action was discontinued effective December 15, 2014.

92.    The settlement of the Supreme Court Action involved the transfer of the membership interests in All Enterprises by the All Enterprises Members to "a third party" (the "All Enterprises Membership Transfer").

93.    By letter dated December 18, 2014 (the "Termination Notice"), Coldwell Banker notified the Franchisees of termination of the Franchise Agreements effective December 18, 2014 (the "Termination Date") due to the Franchisees' alleged failure to cure the defaults noticed in the Default/Termination Notice of September 22, 2014.

94.    Defendants received the December 18, 2014, Termination Notice.

95.    In the Termination Notice, Coldwell Banker notified Franchisees that, as of the Termination Date, the Franchisees are no longer authorized to use the Coldwell Banker Marks or participate in the Coldwell Banker System and Coldwell Banker demanded that the Franchisees immediately cease and desist use of the Coldwell Banker Marks and Coldwell Banker System.

Coldwell Banker also demanded that the Franchisees satisfy all of their post termination obligations provided for in the Franchise Agreements and pursuant to applicable law, including those set forth in Section 16.4 of the Franchise Agreements.

96.     The Franchise Agreements were terminated by Coldwell Banker effective December 18, 2014.

97.     In the Termination Notice, Coldwell Banker demanded that Franchisees and Guarantors immediately pay Coldwell Banker $2,146,001.67 known to be due under the Franchise Agreements, comprised of:

(i)     $422,151.39 for "Royalty Fees", "Brand Marketing Fund" fees and other fees and charges due under the Franchise Agreements as of December 15, 2014;

(ii)    $1,640,769.33 in liquidated damages as set forth in Section 16.7.2 of the Franchise Agreements; and

(iii)   $83,080.95 in attorneys' fees, costs of investigation, court costs and/or other litigation expenses incurred by Coldwell Banker as of November 30, 2014, as set forth in Section 16.8 of the Franchise Agreements.

98.     In the Termination Notice, Coldwell Banker also accelerated the unpaid principal and all interest accrued under each of the Promissory Notes and demanded immediate payment thereof.

99.     In the Termination Notice, Coldwell Banker again made demand upon the Debtors to assemble the Collateral and make it available for Coldwell Banker's inspection and, upon further notice and at the election of Coldwell Banker, for possession by Coldwell Banker.

100.    Coldwell Banker also notified the Debtors of Coldwell Banker's objection to further use of its Collateral, or any proceeds of the Collateral, by the Debtors other than for payment to Coldwell Banker of amounts due under the Franchise Agreements and/or Promissory Notes and directed the Debtors to refrain from such use, disposition, conveyance or transfer of its Collateral or the proceeds of its Collateral.

101.    When they abandoned all of the Collateral in the offices, Defendants did not inform Coldwell Banker they were abandoning all the Collateral.

102.    The abandonment took place after Coldwell Banker terminated the Franchise Agreement, and after several demands to assemble and turn over the Collateral to Coldwell Banker.

103.    Coldwell Banker repeatedly demanded that Franchisees cease using the Coldwell Banker Marks, and to discontinue identifying the Offices to the public as "Coldwell Banker®" affiliated establishments.

104.    In February 2015, Coldwell Banker obtained an injunction requiring Defendants to properly deidentify their real properties and intellectual properties.  The injunction required Defendants to:

> (1) cease any use of Plaintiff's trademarks, trade names, and service marks (collectively, the "Marks") in connection with Defendants' business; (2) de-identify (within 7 days) Defendants' offices from an appearance as Coldwell Banker–affiliated brokerage firms; (3) refrain from any representation to the public that Defendants are franchisees of Coldwell Banker; (4) advise (within 7 days) all of their current clients that Defendants are no longer associated with Coldwell Banker; (5) cause the local phone company and any business phone publisher to remove the Defendants from their listings as a Coldwell Banker franchisee in their next addition of any directory, including any Internet directory; (6) remove (within 7 days) the Marks from websites and webpages, including webpages on social media websites, associated with Defendants' business and from source code or other underlying mechanisms of such websites and webpages; (7) cease use of the Marks in any advertising, printed materials, or electronically distributed material; and (8) satisfy (within 7 days) Defendants' non-monetary, post-termination obligations under Section 16.4 of the parties' Franchise Agreement.

105.    Plaintiffs believed that Defendants did not comply with the injunction, and Plaintiffs moved for contempt.  In order to resolve the contempt motion, Defendants agreed to a

consent order, requiring them to immediately comply with the February 9, 2015 injunction, and
to complete deidentification immediately.

106.    Paragraph 23.6 of the Franchise Agreement states:

Neither we nor any of our employees or representatives made any representations,
promises, guarantees or warranties of any kind to induce you to sign this
Agreement, except as specifically described in the Disclosure Document delivered
to you.  You acknowledge that the success of the Franchise is dependent on your
and your Owners' efforts.  Your non-exclusive right to use the System and its
programs does not imply or guarantee you any level of business, any specific
advertising programs, any number of recruits, or the receipt of referrals from our
other franchisees or our Related Parties' franchisees.  You and the Owners
represent that you each intend to engage in the management or supervision of the
Franchise.  You agree to conduct the Business strictly in accordance with this
Agreement and to exercise your continuous best efforts to maintain and develop
the Business to its greatest potential.  You will exert your beat efforts to promote
Such Excluded Business offered by such companies as we from time to time
designate, including without limitation, our and/or any of our Related Parties,
provided that such Excluded Business is available in your market area and can be
offered and sold in a commercially practicable manner.  We and/or any of our
Related Parties have the right to modify or discontinue any and all such Excluded
Business.

107.    Neil Binder read this paragraph and understood this paragraph prior to entry into
the Franchise Agreement.

108.    Defendants produced to Coldwell Banker in this litigation a copy of the Franchise
Disclosure Document.

109.    The Franchise Disclosure Document specifically states:

Owning a franchise does not guaranty the receipt of referrals from other Coldwell
Banker® offices or those of our Real Estate Affiliates.

110.    Mr. Binder was aware of NRT and Corcoran before entering the Franchise
Agreement.   Within the Franchise Disclosure Document, under the heading "Business
Experience of Real Estate Affiliates," Defendants and Mr. Binder were informed that Sotheby's,
Better Homes and Gardens, ERA Franchise Systems, Century 21 Real Estate were affiliated with

Coldwell Banker.  Phillips Certification, Ex. 6, page 3.  Under the heading "Business Experience of Certain Other Affiliates," the Franchise Disclosure Statement says:

> NRT is a Delaware limited liability company.  It was originally formed as a corporation on August 29, 1997, and converted to a limited liability company on July 2, 2007, in connection with Apollo's acquisition of Realogy.  NRT is also a subsidiary of RSG.  NRT owns and operates real estate brokerage offices.  NRT was originally formed to acquire independent residential real estate brokerage offices and convert them to Coldwell Banker®, CENTURY 21® or ERA® franchised real estate brokerage offices.  As of December 31, 2011, NRT owned and operated 648 Coldwell Banker® residential real estate brokerage offices, 9 Coldwell Banker Commercial real estate brokerage offices, 10 ERA real estate brokerage offices, and 31 *Sotheby's International Realty*® real estate brokerage offices.  NRT also owns and operates real estate brokerage offices doing business as The Corcoran Group, Corcoran Sunshine Marketing Group, and Citihabitats.  As of December 31, 2011, NRT owned and operated a total of 35 real estate brokerage offices doing business as The Corcoran Group, Corcoran Sunshine Marketing Group, or Citihabitats. NRT's principal business address is the same as ours.  NRT operates mainly in metropolitan areas and competes directly with franchisees in the area in which it operates, NRT may compete with you and other franchisees in your market to solicit customers, sales associates, managers, employees, and other business, including relationships with title, mortgage, escrow and relocation services.  There are no restrictions on NRT regarding competition with franchisees.

111.   Further, Defendants and Mr. Binder were informed in the Franchise Disclosure Document that they would be competing with other Coldwell Banker offices, specifically including NRT Coldwell Banker offices:

> **Competition.** The residential real estate brokerage industry is a mature industry. You will be competing with other unaffiliated and chain-affiliated real estate brokerage offices in your market area.  Some of those offices might be other Coldwell Banker offices or franchised offices of the Real Estate Affiliates or offices of our affiliate NRT.  You may face competition for sales associates, customers (buyers and sellers), listings, properly management, and related real estate business in your market area from other Coldwell Banker® and Coldwell Banker Commercial franchisees, franchisees of the Real Estate Affiliates and NRT.   We do not restrict your competition, although we encourage our franchisees to work together to build the Coldwell Banker System and to refrain from soliciting agents and customers from other Coldwell Banker® offices.

112.    Defendants were in severe financial straits by the winter of 2013-2014, just months after they executed the Franchise Agreement, which severe financial straits Mr. Binder described as "a serious negative cash position."

113.    The negative cash flow was so serious that Defendants were not paying rent on time, vendors were not being paid, commissions to agents were drastically delayed, and Defendants were forced to use their reserves to stay afloat.

114.    Mr. Binder also averred that the financial strain was further exacerbated because in the fall of 2013, Mr. Friedman used over $400,000 from Defendants accounts, and it had to be replaced from reserves, including monies from Note #1.

115.    Mr. Binder contemporaneously communicated this situation to Coldwell Banker.

116.    In January of 2014, due to Defendants financial difficulties, Mr. Binder proposed to Nelson Bennett of Coldwell Banker that Defendants also withhold royalty payments, and that Coldwell Banker set off against sums that Mr. Binder felt were due to Defendants.  Mr. Nelson rejected this suggestion, and noted to Mr. Binder that, consistent with the terms of the Promissory Notes, the policy of Coldwell Banker is that funds would be released to Defendants only after they reported and paid all of their obligations to Coldwell Banker, and were otherwise not in default of the Franchise Agreement.

117.    A meeting was held with Defendants in February 2014, and Coldwell Banker again informed Defendants that they had to pay all past due fees prior to any distributions from Coldwell Banker.

118.    In the spring of 2014, Mr. Binder tried to arrange for a loan to bring Defendants' royalty and BMF fees (and other sums due) current, including exploring "hard money" sources and a loan on a property in New Jersey.

- 27 -

119.   A Second Addendum to Amendment to Franchise Agreement was negotiated, but not executed.

120.   Mr. Binder then reviewed the books and records of Defendants, and averred that he discovered that Messrs. Friedman and DeGrotta had used $600,000 of Defendants' funds for personal expenses.

121.   Mr. Binder has stated under oath that his dispute with his partners Messrs. Freidman and DeGrotta led to the destruction of the Bellmarc business: "The dire financial position I find myself in today is not the result of some devious asset protection scheme, but rather the consequence of a bitter and highly publicized battle with former partners that in fact destroyed a successful business that I spent thirty (30) years of my life building."

122.   Messrs. Friedman and DeGrotta were the "point" people for day to day contact with Coldwell Banker.

123.   Coldwell Banker provided considerable "point of sale" documents to Defendants, but – despite the fact that Mr. Binder and Defendants have been embroiled in litigation over the franchise since September 2014 – Defendants cannot locate them anymore.

124.   Mr. Binder felt the Coldwell Banker marketing materials were not sophisticated enough for the New York City market, and Defendants worked with Coldwell Banker to create new marketing materials.  Defendants did not preserve any of the marketing materials.

125.   Mr. Binder and Defendants had counsel with respect to entering into the Franchise Agreements.

126.   Mr. Binder cannot recall discussing ¶ 23.6 of the Franchise Agreement with counsel.

127.   Mr. Binder cannot recall ever informing Coldwell Banker that ¶ 23.6 of the Franchise Agreement was not correct because of the prior representations he alleges.

128.   By August 2013, Defendants began to be late on payment of royalties and advertising fees.

129.   Defendants did not bring their royalties and advertising fees current until late December 2013.

130.   The initial franchise fee for all of the Defendants combined was $25,000.00.

131.   An audit of Defendants' books and records in the fall of 2013 discovered that $11,074.56 in royalties due to Coldwell Banker had not been reported by Defendants.

132.   The "impact date" (or the "Opening Date") is the date the franchise becomes branded as a Coldwell Banker franchise.

133.   The impact date for defendants was June 13, 2013.

134.   In the Franchise Agreement, Coldwell Banker and Defendants agreed to a reduced BMF fee of 0.5% of Defendants' gross sales over $2 million.

135.   On June 13, 2013, a launch party for all Bellmarc agents takes place at a Manhattan restaurant.

136.   In late December 2013, Plaintiff sends an email to Defendant advising that if all amendments are not signed, and if the dispute relating to the audit funds is not paid, Coldwell Banker will not release any future money due to Defendant.

137.   In January 2014, as a result of Defendant's failure to pay franchise fees, Plaintiff declared Defendant delinquent.

138.   On February 27, 2014, Darla Delayne, the Director of Referrals and Relocation for Bellmarc, sent out by email information about the Metropolitan Alliance. This was an

organization formed by Defendant for the purpose of creating a joint advertising and referral program with Coldwell Banker brokers in the metropolitan area. Prior to sending out this information, a memorandum describing Bellmarc's plan for the Metropolitan Alliance and related forms were sent to Coldwell Banker for comment and approval. At the January 18, 2014 advertising meeting, Coldwell Banker executive Nelson Bennett advised Bellmarc that he had no objection to the Alliance but would not permit any funds from the Manhattan Initiative to be used for this purpose.

139.    In August 2014, Defendant was advised by Steve Murray, the valuation consultant that Defendant had retained, of serious interest by the Rand Better Homes and Gardens Brokerage Company to acquire Defendant. The prospective buyer was aware of the valuation performed by RealTrends, Inc., which placed a value of in excess of $22 million on Bellmarc. Serious negotiations were initiated but ceased once DeGrotta and Friedman filed a lawsuit against Binder. Steve Murray acknowledged that the lawsuit was the impediment to proceeding with the deal.

140.    In late August 2014, DeGrotta and Friedman filed a lawsuit against Binder making an array of accusations that included embezzlement, malfeasance, sexual harassment and drug abuse. Binder responded to the court that all the accusations were untrue and sought to have the court confirm his termination of DeGrotta and Friedman for cause.

141.    As a result of the lawsuit filed against him, a battery of articles appeared in the trade and local newspapers claiming that Binder was an "embezzler" and "drug addled." This had a dramatic negative impact on agent morale and sales production.

142.    On October 23, 2014, DeGrotta and Friedman made a settlement with Binder in which they agreed to relinquish their ownership interest, resign from the company and pay $25,000 in damages. Soon after the agreement was signed Binder advised Coldwell Banker of it

143.    In early December 2014, Binder sent an email to Huskey seeking a meeting to resolve their differences. One was set up for December 10, 2014, at which Binder presented his plan for operating Bellmarc in light of its declining condition. Huskey requested a proposal for how Bellmarc would resolve its open balances.

144.    All offices occupied by The Bellmarc Group were under leases with other companies controlled by Binder. Upon insolvency The Bellmarc Group abandoned all these offices. The tenant corporations then licensed these offices to Bellmarc Realty, the operating company that predated the formation of The Bellmarc Group.

6.  STIPULATIONS REGARDING TRIAL PROCEDURES—[The parties shall identify stipulations regarding trial procedures (e.g., exchange of demonstratives, disclosure of deposition designations and objections, etc.)]

      None.

7.  JUDICIAL NOTICE

      a.  Plaintiff requests that the Court take judicial notice of the following facts:

          New York General Obligations Law § 7-103, entitled "*Money deposited or advanced for use or rental of real property*," requires that monies collected as security deposits ". . . shall be held in trust by the person with whom such deposit or advance shall be made and shall not be mingled with the personal moneys or become an asset of the person receiving the same . . ."

      b.  Defendants object to the taking of judicial notice for the following reasons: None.

8.  JUDICIAL NOTICE

      a.  Defendants request that the Court take judicial notice of the following facts:
          N.J.S.A. 25:1-5. Promises or agreement not binding unless in writing; NJ St. Title 12A Commercial Transactions.

      b.  Plaintiff objects to the taking of judicial notice for the following reasons:  None.

9. PLAINTIFF'S CONTESTED FACTS—[Plaintiff must state contested facts separately for each Defendant. Proof shall be limited at trial to the contested facts set forth below. Failure to set forth any contested facts shall be deemed a waiver thereof.]

Defendants' exhibit list was not provided until after 7:30 p.m. on October 10, 2018, the day before the pre-trial order was to be filed.  It contains numerous documents that have not been produced, or are not identified sufficiently for plaintiff to locate them.  Given the time constraints, plaintiff was not able to conduct a through review of the documents that were identified, and could not review at all the documents that were not identified or provided.  As a result, Plaintiff had no time to determine if additional contested facts were necessary to respond to the documents on Defendants' list.  Additionally, at the same time, Defendants provided an additional 22 pages of facts they intend to prove, and Plaintiff had no time to review these contested facts to formulate responses. Accordingly, Plaintiff reserves a right to seek to amend its contested facts to respond to defendants' exhibit list and additional contested facts.

Defendants dispute the assertions of Plaintiff in this paragraph 9, including all allegations as to the production of documents during discovery, through motions or as part of depositions and the timeliness of the disclosure of information and documents for this Pre-Trial Order.  Defendants did not receive a revised draft of the Pre-Trial Order  until October 8, 2018, 10:08 pm.  Defendants reserve the right to amend its contested facts and exhibit list.

   **a. Plaintiff intends to prove the following contested facts with regard to liability on its Complaint:**

1.     Coldwell Banker has developed a franchise system for the promotion and assistance of independently owned and/or operated real estate brokerage offices, which includes policies, procedures and techniques designed to enable such offices to compete more effectively in the real estate market (which system is hereinafter referred to as the "Coldwell Banker System"). The Coldwell Banker System includes, but is not limited to, common use and promotion of certain Coldwell Banker Marks, copyrights, trade secrets, centralized advertising programs, recruiting programs, referral programs and sales and management training programs.

2.     Coldwell Banker or its predecessors have continuously used each of the Coldwell Banker Marks since the date of their registration and those service marks are in full force and effect pursuant to 15 U.S.C. § 1065.  Coldwell Banker has given notice to the public of the

registration of the Coldwell Banker Marks as provided in 15 U.S.C. § 1111, and Coldwell Banker uses or has used the Coldwell Banker Marks as abbreviations of its brand name.

3.      Coldwell Banker is one of the largest real estate brokerage franchise systems in the world.  Through its franchise system, Coldwell Banker markets, promotes and provides services to its real estate broker franchisees throughout the United States.  To identify the origin of their real estate broker services, Coldwell Banker allows it franchisees to utilize the Coldwell Banker Marks and to otherwise associate their brokerage services with the Coldwell Banker® brand.

4.      Coldwell Banker has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in the Coldwell Banker Marks as distinctly designating the high quality real estate brokerage services provided by Coldwell Banker franchisees.  The Coldwell Banker Marks are famous throughout the United States.

5.      Pursuant to the Franchise Agreements, Franchisees obtained the non-exclusive right to utilize the Coldwell Banker System and Coldwell Banker Marks in the operation of approved real estate brokerage offices.  These locations are collectively referred to herein as the "Offices".

6.      The Real Estate Franchise Agreement dated March 27, 2013 had a term of ten years from the "Opening Date" of May 15, 2013.  The Opening Date was amended to June 13, 2013 pursuant to the Addendum executed on or about June 7, 2013.  The Third Addendum to Amendment to Franchise Agreement dated December 10, 2013 extended the term of the Franchise Agreements to June 12, 2033.

7.     Nice Idea, All Enterprises, Neil Binder, Anthony DeGrotta, Larry Friedman, Lenny Flausso and Frank Sanchez are the "Owners" of the Franchisees as defined in the Franchise Agreements.

8.     The Franchise Agreement states that the license granted by Coldwell Banker is personal to the Franchisees and, with limited exceptions, the Franchise Agreements are non-assignable to third parties absent Coldwell Banker's consent:

> You acknowledge that your rights and obligations under this Agreement are personal to you, and that we have granted this franchise in reliance upon many factors, including your (your Owners') character, skill, knowledge, business and financial capacity.  According, you may not assign your rights or delegate your duties under this Agreement including the terms of any Addendum to this Agreement, except as permitted by the Agreement or as required by law.

9.     Any "Transfer of the Franchise" (as defined in the Franchise Agreements), without the prior written approval of Coldwell Banker, constitutes a material breach of the Franchise Agreements.  A "Transfer of the Franchise" occurs when, among other things, the "Owners" no longer control or manage the business of the franchisee.

10.     Coldwell Banker provides the Franchise Disclosure Document to prospective franchisees at or before the first meeting with them, and at least 14 days prior to permitting them to execute a franchise agreement.

11.     The Promissory Notes reflect the repayment obligations of the Borrowers to Coldwell Banker and provide that in the event the Borrowers fail to make any payment to Coldwell Banker when due, including any payment upon acceleration of the Promissory Notes, then the entire principal balance due thereunder shall bear simple interest at a rate equal to the lesser of 18% percent per annum or the highest rate allowed by law from its due date until paid in full.  Among other things, the Promissory Notes provide that the Borrowers are default and Coldwell Banker may accelerate the unpaid principal and all interest accrued thereon shall

become immediately due and payable upon Franchisees' default under the Franchise Agreements or upon termination of the Franchise Agreements.

12.     The security interests granted to Coldwell Banker by the Security Agreements were perfected by, among other things, UCC-1 Financing Statements filed with the office of the Secretary of State for the State of New York.

13.     Pursuant to the Security Agreements, Coldwell Banker possessed a duly perfected and validity existing lien and security interest in the following property owned by the Debtors:

> all accounts; accounts receivables; contract rights; leases; furniture; furnishings; equipment; fixtures; machinery; accessories; movable trade fixtures; goods held for sale or being processed for sale in Debtor's business, including all supplies, finished goods and all other items customarily classified as inventory; building improvement and construction materials; chattel paper; instruments; documents; letters of credit; all funds on deposit with any financial institution; commissions; real estate listings and listing Agreement and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessories thereto and any rebate/aware program (or similar incentive programs) to which Debtor may be entitled pursuant to any Franchise Agreement entered into with a Secured Party, together with all such rights and property hereafter acquired by Debtor; and all general intangibles (collectively, the "Collateral") as well as all parts, replacements, substitutions, profits, products and cash and non-cash proceeds of the foregoing collateral…

14.     Pursuant to the terms of the Franchise Agreements, Coldwell Banker is entitled to terminate the Franchise Agreements upon the event of a non-curable default by Franchisees and/or for the Franchisees' failure to cure other defaults within the time period provided under the Franchise Agreements.

15.     Upon termination of the Franchise Agreements, Franchisees remain liable to Coldwell Banker for payment of all outstanding financial obligations imposed under the Franchise Agreements.

16.     Upon the event of an uncured default or termination of the Franchise Agreements, Coldwell Banker may accelerate the unpaid principal, interest and other fees due under the

Promissory Notes which shall then be immediately due and payable by Borrowers to Coldwell Banker.

17.     Breach of the Franchise Agreements by Franchisees and/or failure of the Borrowers to pay any amounts due under the Promissory Notes are events of default under the Security Agreements.   In the event of such default under the Security Agreements, Coldwell Banker would be entitled to, among other things: (i) require the Debtors to assemble the Collateral and make it available to Coldwell Banker; (ii) enter any of the Offices and take possession of the Collateral; and/or (iii) enforce its security interests provided under applicable laws.

18.     The amounts due and demanded in the Notice of Non-Compliance do not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

19.     Franchisees failed to cure any of the other defaults detailed in the Notice of Non-Compliance by on or before August 28, 2014.

20.     The amounts due and demanded in the Notice of Continuing Default do not include amounts due under the Promissory Notes, amounts due under the Franchise Agreements for unreported transactions, attorneys fees due under the Franchise Agreements, or amounts which would be due under the Franchise Agreements in the event of premature termination of same.

21.     A meeting between business and legal representatives of Coldwell Banker, the Franchisees and the Guarantors took place on September 4, 2014.

22.     Although invited, neither Neil Binder nor his counsel attended the September 4, 2014, meeting.

23.     Messrs. DeGrotta and Friedman did attend the September 4, 2014, meeting.

24.     The September 4, 2014 meeting did not result in any agreement or in the cure of the then existing defaults of Franchisees under the Franchise Agreements other than compliance with the trade name obligations on the website described in the Notice of Non-Compliance.

25.     Franchisees did not pay Coldwell Banker the $372,807.10 on or before October 23, 2014, and therefore failed to cure the monetary default noticed in the Default/Termination Notice by on or before the Cure Date or as such date was extended by Coldwell Banker.

26.     The Debtors did not comply with any of the demands of Coldwell Banker set forth in the Demands to Assemble and Preserve Collateral.  The Franchisees also breached their obligation to properly maintain and care for the Collateral as required by the Security Agreement.

27.     The Franchisees failed to cure the defaults noticed in the Notice of Court Order Default.

28.     On October 25, 2014, Coldwell Banker, the Franchisees and Guarantors entered into an extension/forbearance agreement (the "Forbearance Agreement") which, among other things, provided for terms of cure by the Franchisees of their default of Judge Friedman's order of September 8, 2014 and the order of Judge Scarpulla of September 11, 2014.

29.     In the Forbearance Agreement, the Franchisees agreed to pay Coldwell Banker $47,263.74 on account of amounts due by the Franchisees under the Franchise Agreements from September 8, 2014 to October 14, 2014.

30.     In the Forbearance Agreement, Coldwell Banker also agreed to extend the Cure Date and Prospective Termination Date, as set forth in the Default/Termination Notice, to October 31, 2014.

31.     The Franchisees defaulted under the Forbearance Agreement by failing to make the payments to Coldwell Banker as agreed upon under the Forbearance Agreement.

32.     The Franchisees failed to cure the defaults noticed in the Forbearance Agreement Default Letter by paying the amounts due Coldwell Banker as noticed therein.

33.     At the time of discontinuance of the Supreme Court Action, Coldwell Banker's motion to intervene in that action to join in the plaintiffs' request to appoint a receiver for the Franchisees had not been heard by the court.

34.     Mr. Binder confirmed at his deposition that the ownership of The Bellmarc Group., LLC, had been transferred.

35.     The ownership of the other Defendants was transferred by Mr. Binder by late December 2014, to an entity named Nieveda, Inc., owned by his wife and daughters.

36.     Franchisees failed to cure the monetary default under the Franchise Agreements noticed in the Default/Termination Notice by on or before the extended Cure Date of November 10, 2014.

37.     Franchisees also failed to cure the monetary default under the Franchise Agreements, Judge Friedman's order of September 8, 2014, Judge Scarpulla's order of September 11, 2014 and the Forbearance Agreement as noticed in the Forbearance Agreement Default Letter.

38.     As of December 18, 2014, the outstanding principal amount due under the Conversion Promissory Note dated May 15, 2013 is $1,250,000.  As of December 18, 2014, the

outstanding amount due under the Conversion Promissory Note dated December 13, 2013 is $187,500.

39.     The Defendants have failed to pay Coldwell Banker the amounts due under the Franchise Agreements.

40.     The Defendants have failed to pay Coldwell Banker the amounts due under the Conversion Promissory Notes.

41.     The Defendants have failed to comply with Coldwell Banker's demands with respect to Coldwell Banker's Collateral and rights under the Security Agreements.

42.     The Defendants have failed to satisfy their post termination non-monetary obligations under the Franchise Agreements and applicable law.

43.     When Defendants abandoned their offices in December 2014, and June 2015, all of the Collateral covered by the Security Agreements was left behind in the offices.

44.     However, despite the demand to assemble and turn over the Collateral, Mr. Binder retained and used the cash and accounts receivables of Defendants.

45.     Defendants have never disclosed how the cash and receivables were actually used, simply indicating they spent the money for business expenses.

46.     Despite the termination of the Franchise Agreements, the Franchisees continued to use the Coldwell Banker Marks to induce the public to buy and sell real property under the misimpression that Franchisees were approved Coldwell Banker franchisees despite the knowledge by the Franchisees of their lack of any authority or right to do so.

47.     In addition to other uses of the Coldwell Banker Marks:

      i.      Subsequent to December 18, 2014, Defendants continued to use the Coldwell Banker Marks.

     ii.      Subsequent to December 18, 2014, Defendant continued to identify itself as a "Coldwell Banker"® real estate office.

iii.   Subsequent to December 18, 2014, Defendant continued to utilize the domain name www.cbbellmarcgroup.com.

iv.   Subsequent to December 18, 2014, Defendant continued to hold itself out the public as an authorized franchisee of Coldwell Banker.

v.   Subsequent to December 18, 2014, Defendant generated revenue from its continued use of the Coldwell Banker Marks and/or from holding itself out the public as an authorized franchisee of Coldwell Banker.

48.   Defendants failed to comply with the injunction, and Coldwell Banker was forced to seek to hold them in contempt.

49.   Nevertheless, Defendants failed to comply with the May 19, 2015, Consent Order, and Coldwell Banker had to file yet another motion for contempt on June 25, 2015.  Defendants thereafter substantially complied with the May 19, 2015, Order.

50.   The Coldwell Banker brand is the oldest and most established residential real estate franchise system in North America. In fact, in many ways it was the original real estate "start up." Founded by young entrepreneurs Colbert Coldwell in 1906 and later Benjamin Banker, Coldwell Banker changed the way people bought and sold homes across America, ultimately becoming one of the most trusted real estate brands in the world. More than 100 years later, the Coldwell Banker network exists across 3,000 offices in 49 countries and territories.

51.   The network and real estate system created by Coldwell Banker have been emulated by other real estate companies over time. The monetary value of the good will associated with the Coldwell Banker names and marks is impossible to quantify, but the value is surely significant.

52.   By breaching their Franchise Agreements with Coldwell Banker, but then nonetheless by continuing to use the Coldwell Banker name and marks in New York City, the

Franchisees violated Coldwell Banker's right to control its name and marks in one of the most valuable and unique real estate markets in the world.

53.     More particularly, the defendants' continued use of the Coldwell Banker name and marks, despite the termination of the Franchise Agreement, resulted and could result in the untenable and undeniably damaging circumstance that the only use of the Coldwell Banker Marks in New York City is an unauthorized use.

54.     The defendants' usurpation of the Coldwell Banker name and trade marks in the extraordinarily unique and valuable New York City real estate marketplace is materially more injurious than other cases in which a former franchisee refuses to cease the use of the franchisor's marks.

55.     The location of the defendants' unauthorized use of the Coldwell Banker Marks, as well as the circumstances that they are the only user of the marks in that unique, large, and valuable market, result in fact-specific reasons why the irreparable injury to Coldwell Banker is no mere presumption in this case. But the irreparable injury results not only from the defendants' previously unauthorized use of the marks in New York City.  Through their unauthorized use of the Coldwell Banker name and marks, the defendants are acting to practically exclude Coldwell Banker from competing in the New York marketplace.  Given present circumstances, Coldwell Banker is significantly hampered in its efforts to license the authorized use of its name and marks in New York City.  If the defendants unlawfully use the Coldwell Banker name, other real estate brokerage firms will be disinclined to associate with Coldwell Banker in that market.

56.     Even if Coldwell Banker could find a New York City firm interested in joining the Coldwell Banker System under the existing circumstances of the Defendants' infringement, that firm is likely to resist Coldwell Banker's usual and ordinary commercial terms. The

opportunity for an authorized user of the Coldwell Banker name and marks to compete against an unauthorized user in the New York City markets is a damaged commercial opportunity.

57.     In a very real sense, it is simply not possible for Coldwell Banker to reap the full commercial value of its name and marks in New York City if it must compete against an unauthorized user of its name and marks. While that damage is no doubt impossible to quantify, that injury is palpable.

58.     Moreover, the circumstances related to the reasons why the defendants defaulted on their obligations under the Franchise Agreements threaten irreparable injury to Coldwell Banker.  The precipitating events concern a lawsuit among the members of the Bellmarc Group involving allegations of fraud by the principal member of the firm, which was widely reported in the New York City industry press and blogs.  Coldwell Banker's unfortunate association in industry trade papers and blogs, created by both headlines and reports, with fraud and duplicity is damaging to the reputation of the brand.

59.     This is not a case in which the unauthorized user was or would be flying under the public radar.  The defendants are not "neutral" users of the Coldwell Banker names and marks. The allegations involving the defendants have been well publicized and the New York Supreme Court Action has resulted in unfavorable publicity and controversy surrounding the defendants. The defendants, through their continued use of the Coldwell Banker Marks, damaged the reputation of the marks.

60.     Coldwell Banker did not make any representations to Mr. Binder about referrals as alleged by Binder.

61.     Mr. Binder understood that all brokers competed against one another, including NRT and other Coldwell Banker brokerages.

62.     In this context, Mr. Binder found it unsurprising that NRT brokers were sending their referrals to other NRT brokers, and that brokers.  Further, he acknowledged that brokers tend to maintain long term relationships for referrals, and it is not easy for a new company to break into that relationship.

63.     During the time Defendants were franchisees of Coldwell Banker, any and all referrals from other Coldwell Banker franchises concerning real property in Manhattan were referred to Defendants.

64.     Mr. Binder and Defendants never got their Previews business "off the ground," as, among other things, they never formed a corporation to operate the business.

65.     Mr. Binder testified that the monies allegedly used by Mr. Freidman came from tenant first months rents and security deposits, that were being held in trust prior to be transferred to landlords.

66.     Nevertheless, in January, 2014, Mr. Binder withheld royalty payments due to Coldwell Banker, without any further discussion with Coldwell Banker prior to doing so.

67.     Mr. Binder acknowledges that although he requested Coldwell Banker to offset the royalties and other funds due from Defendants against the funds Defendants felt were due to them from Coldwell Banker, the Franchise Agreement provides that Coldwell Banker does not have an obligation to offset funds due.  Mr. Binder acknowledges that each of his requests for Coldwell Banker to make an exception and offset funds due from Defendants was rejected by Coldwell Banker.

68.     Mr. Binder admitted in the New York Action that the third conversion fund payment in the amount of $187,500 was not yet due as of September 10, 2014, by stating that

"Coldwell Banker is obligated to pay an additional $187,500 after the firm fully pays up its outstanding obligations to Coldwell Banker."

69.    In December 2014, Mr. Binder transferred his shares in Bellmarc LLC to an entity owned by his wife and daughter.  This transfer was found to be fraudulent by Justice Manuel Martinez of the New York County Supreme Court.

70.    Coldwell Banker delivered to Mr. Binder, and Mr. Binder acknowledged receipt of, the Coldwell Banker Franchise Disclosure Document before Mr. Binder executed the Franchise Agreement and any addenda to the Franchise Agreement.

71.    The Franchise Agreements obligate Franchisees to pay to Coldwell Banker a "Royalty Fee" and other amounts as and when set forth in Section 7 of the Franchise Agreements.  Nonpayment of the "Royalty Fee" and/or other amounts set forth in Section 7 is an event of default by Franchisees under the Franchise Agreements.

72.    In addition to the Royalty Fee, the Franchise Agreements obligate the Franchisees to pay to Coldwell Banker a "Brand Marketing Fund" contribution.  Nonpayment of the Brand Marketing Fund contribution is an event of default under the Franchise Agreements.

73.    Defendants ceased doing business and abandoned their office locations in December 2014 through June 2015, and left behind all the physical Collateral, including their furniture, fixtures, computers, computer servers, and other assets.

74.    At the February 2014, meeting with Coldwell Banker, Messrs. Friedman and DeGrotta announced to Coldwell Banker that they were in disagreement with Mr. Binder and not getting along.  In retaliation, Mr. Binder informed everyone at the meeting that he wanted to sell the business.

75.    Mr. Binder felt that the announcements of Messrs. Friedman and DeGrotta at the February 2014 meeting would make Coldwell Banker insecure about the future of Defendants' business operations, and was likely to have a negative impact on Coldwell Banker's outlook on Defendants.

76.    Mr. Binder then reviewed the books and records of Defendants, and averred that he discovered that Messrs. Friedman and DeGrotta had used $600,000 of Defendants' funds for personal expenses.

77.    Mr. Binder closely watched Messrs. DeGrotta and Friedman after January 2014 through August 2014, and in early August he "terminated" his partners, following which they brought the suit against him in New York Supreme Court.

78.    As of September 10, 2014, Mr. Binder averred that Messrs. DeGrotta's and Friedman's actions had "material impair[ed] the ability of each of the companies/corporations and the entire Bellmarc Group Entities' operations and will destroy its reputation."

79.    In his affidavit in the New York Supreme Court action started by Messrs. Friedman and DeGrotta, Mr. Binder details a business falling apart, with multiple, serious issues between the partners, including financial transactions, bank accounts, bounced checks, control over assets, removal of records, and authority over the business and employees.

80.    Mr. Binder has stated under oath that his dispute with his partners Messrs. Freidman and DeGrotta led to the destruction of the Bellmarc business: "The dire financial position I find myself in today is not the result of some devious asset protection scheme, but rather the consequence of a bitter and highly publicized battle with former partners that in fact destroyed a successful business that I spent thirty (30) years of my life building."

81.     In December 2014, Mr. Binder transferred his shares in Bellmarc LLC to an entity owned by his wife and daughter.

82.     The amount of arrears grew during the fall of 2013.

83.     Defendants brought their royalties and advertising fees current in late December 2013 in order to be eligible for release of a second conversion financing.

84.     Shortly after payment of the second conversion financing, Defendants again began to be late in payment of royalties and advertising fees.

85.     Defendants were sent constant reminders of their arrears in payment.

86.     Defendants were never eligible for a third advance of conversion funding as they were not current on their obligations to Coldwell Banker under the Franchise Agreement.

87.     In the spring of 2014, Mr. Binder told Coldwell Banker that he had arranged a loan against real estate he owned in New Jersey, and that the loan would be used to bring royalties and advertising fees current.

88.     The loan was not used to bring royalties and advertising fees current.

89.     Defendants' revenues and profits were higher in 2013 than in 2012.

90.     Defendants' revenues and profits for the twelve months ending May 31, 2014, were higher than for the twelve months ending May 31, 2013.

91.     Defendants' revenues and profits increased as a result of their entry into the Franchise Agreement.

92.     Mr. Binder was negotiating with Dolly Lenz in April 2013, with regard to establishing a Previews section for Defendants.

93.     There is no mention of Previews in the Franchise Agreement.

94.     There was no agreement by Coldwell Banker to fund any amount for Defendants to build a Previews business.

95.     Coldwell Banker assisted Defendants in their efforts to build a Previews Business.

96.     The regular BMF rate that Defendants would owe if they were not eligible for the reduced rate is 2.5%.

97.     The Franchise Agreement provides that the reduced BMF rate is not available to Defendants if they are over 30 days in arrears in paying BMF to Coldwell Banker.

   **b.   Plaintiff intends to prove the following contested facts with regard to damages on the Complaint: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

1.     As a result of Franchisees' breach of the Franchise Agreements, Coldwell Banker has been damaged in the amount of at least $6,401,923.18 known to be due under the Franchise Agreements and Conversion Notes as of October 11, 2018, comprised of:

   a.   $422,151.39 for "Royalty Fees", "Brand Marketing Fund" fees and other fees and charges due under the Franchise Agreements as of December 15, 2014, as set forth in Sections 7, 8 and elsewhere in the Franchise Agreements;

   b.   $1,640,769.33 in liquidated damages as set forth in Section 16.7.2 of the Franchise Agreements;

   c.   $1,437,000.00 in principal is due under the defaulted and accelerated Conversion Notes; and

   d.   $2,516,800.23 in interest on the foregoing through the date of submission of the final pre-trial conference in this matter, October 11, 2018 (interest will continue to accrue at the rate of 18% as set forth in the Franchise Agreement and Conversion Notes until judgment).

2.      Additionally, Coldwell Banker has paid attorneys fees and expenses in the amount of at least $385,202.23 related to Defendants and their defaults under the Franchise Agreements and the Promissory Notes to date hereof.  *See* ¶ 22.11 of Franchise Agreement and page 2 of the Note.  Coldwell Banker will incur additional and fees and expenses through trial, which will be added to the amounts due pursuant to the Franchise Agreement.

3.      Defendants failed to timely and completely deidentify prior to May 19, 2015, such that they continued to use Coldwell Banker's trademarks after termination of the franchise Agreement as of December 18, 2014, and after the Court's February 9, 2015, injunction requiring them to deidentify.

### c.  Plaintiff intends to prove the following contested facts with regard to liability on Defendants' Counterclaim.

1.      The facts set forth as regards the case in chief are relevant to defense of the counterclaim, and Coldwell Banker incorporates them herein as if set forth verbatim.

2.      Coldwell Banker assisted Binder continuously with efforts to get a Previews program off the ground.  However, it never agreed to give Binder $1 million, and when he suggested that in late 2013, when he was already in default of royalty and BMF payments, it was not well received.

3.      Budge Huskey never assured Binder that Coldwell Banker will support Bellmarc's Previews business this with up to $1 million in dedicated funds.

4.      Coldwell Banker agreed to specific financial support to Bellmarc, in the form of the Conversion Loans detailed in the Franchise Agreement.  No other financial support was promised or agreed to by the parties.

5.      Bellmarc always contemplated that its Previews program would be operated in a separate entity, which would become a franchisee like the other Bellmarc entities.

6.      Although Bellmarc had addresses and phone numbers for every Coldwell Banker broker in the United States, it sought email addresses for the brokerages, so it could mass-email all the brokers with solicitations for referrals.  This would be considered spam emails by the brokerages, and was highly discouraged.  Thus, Coldwell Banker had a policy against such mass-emails, and declined to provide the email addresses to Bellmarc.

7.      Royce Pinkwater had been associated with Sotheby's, a real estate brokerage franchisor owned by Realogy, the corporate parent of Coldwell Banker.  Thus, she was known to Coldwell Banker.  Pinkwater left Sotheby's and was looking for a new position, and Coldwell Banker introduced her to Binder for his developing Previews program as a potential business partner.

8.      Coldwell Banker did not discourage Pinkwater from doing business with Bellmarc, and in fact encouraged the potential relationship.

9.      Binder first brought up the idea of Coldwell Banker providing him with money for Previews in October, 2014.  At that time, he was told it was highly unlikely.

10.     Franchise Agreement has full disclosures, and Binder agreed therein that no representations outside the contract had been made to him.

11.     The Franchise Agreement specifically states at ¶ 23.6:

Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you.  You acknowledge that the success of the Franchise is dependent on your and your Owners' efforts.  Your non-exclusive right to use the System and its programs does not imply or guarantee you any level of business, any specific advertising programs, any number of recruits, or the receipt of referrals from our other franchisees or our Related Parties' franchisees.   You and the Owners represent that you each intend to engage in the management or supervision of the Franchise.  You agree to conduct the Business strictly in accordance with this Agreement and to exercise your continuous best efforts to maintain and develop the Business to its greatest potential.  You will exert your beat efforts to promote

- 49 -

Such Excluded Business offered by such companies as we from time to time designate, including without limitation, our and/or any of our Related Parties, provided that such Excluded Business is available in your market area and can be offered and sold in a commercially practicable manner.  We and/or any of our Related Parties have the right to modify or discontinue any and all such Excluded Business.

12.    The names, address and phone numbers of every Coldwell Banker brokerage in the country were disclosed to Binder repeatedly, with each Franchise Disclosure Document.  He executed them after the disclosures.

13.    The Hunt litigation was fully disclosed in the litigation disclosure section of the Franchise Disclosure Document.  Binder submitted a falsified portion of that disclosure in opposition to the motion for summary judgment, trying to convince the court there had been no disclosure.

14.    While Binder was defaulting on his obligations to Coldwell Banker, which totaled about $250,000 by the summer of 2014, he and the other partners were taking $209,000.00 a month out of the business.  Binder paid down his "legacy debt" by over $1.5 million between the Impact Date and the franchise termination on December 18, 2014, but could not pay the fees due to Coldwell Banker.

15.    Coldwell Banker never exerted control over any aspect of defendants' business, except as permitted by and contemplated by the Franchise Agreement.

16.    Referrals come from established relationships between brokers, and Defendants would have had to establish relationships with other brokers over time to get referrals.

17.    Defendants' efforts to develop a referral business from other Coldwell Banker brokers were led by Darla Delayne.  Mr. Binder has described her as highly unsuccessful in this endeavor, to the point where he terminated her by refusing to sign her check due in March 2014.  He testified that she was uncommunicative and hostile, and destroyed all her records when she

was terminated, so he could not continue her efforts.  Of course, with the records destroyed, we cannot know what was accomplished.

18.     Defendants were well aware of NRT offices, both from their substantial time in the industry, from the disclosures in the Franchise Disclosure Document, and from the listing of brokerages in Exhibit G to the Franchise Disclosure Document.  It is also disclosed in Realogy's securities filings.

19.     Defendants understand that referrals are often based on personal relationships.

20.     All referrals into Manhattan went to Bellmarc.

21.     Binder and Defendants never got their Previews business "off the ground," as, among other things, they never formed a corporation to operate the business.

22.     Nothing prevented Bellmarc from selling high end properties.

23.     Discussion of Previews continued throughout 2013, and by 2014 Coldwell Banker was working on setting thresholds for Manhattan.  The threshold is the price level above which a property is considered eligible to be a Previews Property, and featured in advertising and promotional materials.  Because Manhattan real estate prices differ so greatly, a single threshold was not workable.  Instead, Coldwell Banker and Bellmarc were working developing thresholds by zip codes.

24.     Binder abandoned the Previews effort in early 2014 as strife developed between him and his partners.

25.     Plaintiff had no obligation to engage in offsets.

26.     The AC Lawrence computer software for its rental listing was not compatible with the Coldwell Banker systems.  Thus, it hindered the ability of Coldwell Banker to electronically load the AC Lawrence data into the Coldwell Banker website.  While both parties

worked to resolve the issues, AC Lawrence was free to manually load rental listings into the Coldwell Banker website.

27.     Coldwell Banker worked with Bellmarc continuously to help Bellmarc develop marketing and advertising materials.

28.     Mr. Binder sought an agreement with fellow Owners DeGrotta and Friedman that they would withhold the payment of royalties and advertising fees to Coldwell Banker. DeGrotta and Friedman nevertheless paid AC Lawrence fees, but did not pay Bellmarc fees.

   **a.  Plaintiff intends to prove the following contested facts with regard to damages on Defendants' Counterclaim.**

1.     Financial records produced by Defendants in this action show that despite their delinquencies to Coldwell Banker, their revenues and profits increased greatly after the Impact Date, and through at least May 31, 2014, the last information available.

2.     Defendants' revenues and profits were higher in 2013 than in 2012.

3.     Defendants' revenues and profits for the twelve months ending May 31, 2014, were higher than for the twelve months ending May 31, 2013.

4.     Defendants' revenues and profits increased as a result of their entry into the Franchise Agreement.

5.     The total franchise fee paid by all the Bellmarc defendants for becoming franchisees was $25,000.00.

6.     The allegations relating to the rental computer listings caused no damages to Bellmarc

7.     Bellmarc has not shown that any of its listings were not rented as a result of computer issues, and defendants have not come forward with any evidence of damage.

8.     The allegations relating to the failure of advertising materials caused no damages to Bellmarc, as all of its listings were, indeed, rented, and defendants have not come forward with any evidence of damage.

10.   DEFENDANT'S CONTESTED FACTS—[Stated separately for each plaintiff. Proof shall be limited at trial to the contested facts set forth below. Failure to set forth any contested facts shall be deemed a waiver thereof.]

     a.   **Defendants intend to prove the following contested facts with regard to liability on the Complaint and the Counterclaim:**

1.     From May 2012 through August 2012 an agreement to become partners was reached between Bellmarc Realty (which was 100% owned by Neil Binder) and AC Lawrence (which was owned by Anthony DeGrotta and Larry Friedman who each owned 35% of the company and were the operators; Frank Sanchez who was an owner of 5% and the company's rental manager; and Lenny Franzblau, an investor who owned 25%). Bellmarc focused on cooperative and condominium sales and AC Lawrence focused on rentals.

2.     From July through September 2012 Plaintiff initiated discussions with Defendant seeking to persuade the Defendant to become a Coldwell Banker franchise. Binder advised Coldwell Banker of Bellmarc's pending acquisition of AC Lawrence and introduced DeGrotta and Freidman as his potential new partners.

3.     In August 2012 Defendant provided to Plaintiff financial and other information requested by Plaintiff consistent with the requirements of its franchise application.

4.     In August 2012, Defendant advised Plaintiff of Defendant's legacy obligations and presented a schedule which identified the specific obligations and monthly payment amounts.

5.     In August 2012, during a lunch, Plaintiff's President Budge Huskey ("Huskey") and Defendant's President Neil Binder ("Binder") described his idea for setting up a separate

company that would concentrate on high-end sales under the Plaintiff's Previews program. Huskey was enthusiastic and assured Binder that Coldwell Banker will support this with up to $1 million in dedicated funds. Binder was excited about this assurance and Defendant viewed it as an important component in Defendant's decision to become a franchisee.

6.       In September through October 2012 Plaintiff and Defendant were unable to come to an agreement about Defendant becoming a franchisee primarily due to legacy debt issues that remained unresolved.

7.       In October 2012, after a trial period, the parties signed an agreement whereby AC Lawrence was acquired and a new company was formed, The Bellmarc Group, which was 65% owned by Nice Idea Inc., a company fully owned by Neil Binder, and 35% by All Enterprise Inc. which was owned by the same parties that had owned the predecessor rental brokerage company in the same ownership allocations. Each office was separately incorporated as affiliated companies under the branding of The Bellmarc Group. The new brokerage began business on January 1, 2013.

8.       In October 2012, the Apollo Global Advisors ("Apollo"), the owner of Plaintiff's parent company, Realogy, undertook an Initial Public Offering ("IPO") of the shares of Realogy Holding Corp. Approximately 50% of shares were sold at an average price of $27.

9.       In December 2012, Defendant sent projections for its business in 2013 to Plaintiff.

10.      In December 2012, Plaintiff again sent Disclosure Documents to Defendant.

11.      In February 2013, Plaintiff re-initiated negotiations with Defendant and offered more favorable terms which become the basis for an agreement. During these negotiations Defendant again warned Plaintiff of its legacy debt and financial condition, and stated that it was

depending on Coldwell Banker's support for its success and growth. Plaintiff's negotiator Phil Hughes advised "don't worry, you'll do fine."

12. On April 12, 2013, Plaintiff's parent Realogy initiated a secondary offering. The offering is performed in two stages, the first phase on April 12, 2013 and the second phase on July 12 2013. The secondary offering sells at an average price of $44 per share and Realogy Executives receive a bonus of $47 million.

13. On June 13, 2013, Defendant closes on Franchise Agreement and initiated business as a Coldwell Banker affiliated company. Binder is designated the "responsible party" for the franchise.

14. On June 13, 2013 for the launch party, Defendant prepared an announcement brochure that was to be distributed to all Bellmarc agents. The brochure was vetted and approved by Plaintiff prior to its release. The brochure prominently discloses:

      a. the referral opportunities of the Coldwell Banker network consisting of 83,000 agents in 3,100 offices,

      b. the exclusive franchise covering all of Manhattan given to Defendant, and

      c. the nature and advantages of Plaintiff's Previews program intended to exploit high-end sales opportunities.

15. On June 13, 2013, at the launch party Plaintiff's President Budge Huskey distributed a Welcome Letter that described the advantages of becoming a Coldwell Banker franchise, the size of its network and the advantages of the Preview program.

16. On June 13, 2013, Plaintiff expressed excitement about Defendant becoming a franchise and in an email to all corporate employees refers to it as a "Monumental Event."

Plaintiff also takes a full-page ad in The New York Times Business section to make the announcement of the "perfect partnership".

17.     Over three months in April, May and early June 2013, Plaintiff created a media plan. This plan detailed an agenda for June 13, 2013 of TV appearances by Coldwell Banker's president Budge Huskey and Bellmarc's President Neil Binder and interviews with local news reporters. At the last minute, Plaintiff excluded Binder and only Huskey appeared, where he primarily spoke in general terms of the housing market and Realogy, and made only minimal reference to the new Bellmarc franchise.

18.     In June 2013, subsequent to becoming a franchise, Bellmarc requested a contact list of all franchisees from Plaintiff in order to begin a campaign to promote Manhattan properties that Defendant had for sale. This request was denied by Plaintiff, and Plaintiff further advised Defendant that it should not expect a lot of referrals.

19.     In July 2013 Plaintiff was actively involved in assisting Defendant in seeking a satisfactory party to head up the new high-end company, which was tentatively named Premier Properties Inc.

20.     In October 2013 Binder became aware that his new partners had improperly taken substantial funds from the company's special account where tenant/landlord funds were maintained. Binder replenished the account and contacted Coldwell Banker seeking assistance and guidance in his effort to terminate his partners. Coldwell Banker offered no support or assistance.

21.     In October 2013, Coldwell Banker executive Nelson Bennett referred an experienced salesperson, Royce Pinkwater, to Bellmarc to be considered for the position of Sales Manager for the Premier Properties Inc. Binder liked Pinkwater and prepared a proposal for her

to become the Sales Manager. Prior to sending it to Pinkwater, he sent it to Coldwell Banker for comments and approval. Coldwell Banker was not happy about Binder's intention to hire Pinkwater and sought to discourage her from joining the company by suggesting other offices for her to join. It also formulated a plan to disrupt Binder's efforts to engage Pinkwater. Huskey stated in an email "Make sure he doesn't make any commitments for Coldwell Banker."

22.    In October 2013, Defendant contacts Plaintiff to express concern for its declining cash position. Defendant provides a financial report displaying a favorable performance as well as a personal financial statement from Neil Binder who is the sole personal guarantor that displays that he continues to have adequate net worth to meet Plaintiff's requirements.

23.    A meeting is takes place on November 7, 2013 at Plaintiff proposes a change the terms of conversion fund payments which called for the Defendant to meet designated Gross Commission Income threshold levels to qualify for the payment. Under the new terms, the threshold levels and the amount of payment were split in half. This permitted the Defendant to qualify for funds at an earlier date and receive half the original amount—$187,500 rather than $350,000—at each achievement level. Defendant agreed. Under this new arrangement, Defendant achieved the first threshold of $4,250,000 in November 2012 and Plaintiff advised that funds would be disbursed in two weeks, by early December. However, funds are not disbursed until January 7, 2014.

24.    At this meeting Defendant tells Plaintiff that there are substantial arrears in reimbursing Defendant for advertising costs it incurred under the "Manhattan Initiative," and requests that funds that are due from Plaintiff be paid.

25.    At this same meeting, Plaintiff advises Defendant that it will not support Defendant's effort to set up a high-end company. Plaintiff also advises Defendant that it would

not consider an effort to acquire New York Living Solutions, a company with which Defendant was in serious negotiations, and for which a contract had been prepared.

26.     After the November meeting, Defendant sent a memo to Plaintiff in which it describes how it developed a cash flow problem, explaining that it was a function of its growth, transitional costs and a seasonal decline in rental brokerage business.

27.     On November 22, 2013, Defendant received a check from Plaintiff for approximately $34,000 as partial payment for its obligation under the Manhattan Initiative. Plaintiff still owed approximately $33,000 which it did not pay.

28.     Another meeting took place in early November at which Defendant complained to Plaintiff that promises made to accommodate the rental business of Bellmarc (on its website, in its systems and in marketing materials) have not been performed. Included among Defendant's objections is that rental transactions cannot be entered into the Coldwell Banker website. Nothing is ever done to correct these problems.

29.     On November 22, 2013, Defendant receives a second amendment to the Franchise Agreement calling for payments under the Manhattan Initiative to be paid 45 days after submission of invoices and advertising proofs to the Plaintiff. Defendant refuses to sign and asserts that payment was supposed to be made at the time invoices and proofs were submitted, and that failure to make these payments timely impaired Defendant's cash flow position.

30.     In December 2013, Defendant continued to complain both in writing and verbally about Plaintiff's failure to provide funds Defendant was entitled to under the Manhattan Initiative.

31.     In December 2013, Plaintiff sent an auditor to review Defendant's books. Auditor determined that approximately $11,000 in royalties were due to Plaintiff for open transactions

entered into prior to Defendant becoming a franchise, and that subsequently closed. Defendant insisted that a list of these deals was given to Coldwell Banker at the time of closing and that Plaintiff knew that they were "pending deals" excluded from royalties. Plaintiff disagreed and insisted that because there was only an offer and acceptance and not a signed contract, they do not qualify. This became a dispute between the parties.

32.    On January 8, 2014, more than 30 days had passed since written requests for payment were made. Under the terms of the Franchise Agreement, failure of Coldwell Banker to respond to such requests within 30 days should be interpreted as a denial.

33.    On January 8, 2014, Defendant advised Plaintiff that if the funds that are due are not paid, it intended to offset money it was due against money due to Plaintiff as franchise fees.

34.    A meeting was set up in February 2014 to discuss Defendant's delinquency. At this meeting Defendant proposed an offset between funds owed to Bellmarc against franchise funds owed by Defendant. Plaintiff refused offset. Defendant states that it was owed substantially more that it owed to Plaintiff. Huskey acknowledges this but still refused to perform any offsets.

35.    On January 18, 2014 a meeting was set between Defendant and Plaintiff to formulate a new advertising plan for the year as called for in the Franchise Agreement. Defendant provided an array of proposals all of which were either rejected or deferred for further consideration. Plaintiff provided no proposals. Accordingly, Defendant was not authorized to engage in any advertising under the Manhattan Initiative. Defendant wrote a memo describing what took place at this meeting and sent it to all participants and to Huskey. A response was issued by Plaintiff that was vague, but was interpreted by Defendant as permitting New York Times advertising. No other advertising was ever approved. The Franchise Agreement provided

that the Gross Commission Income for 2013 is designated at $15,900,000 which, based on the formula in the Franchise Agreement, computes to approximately $88,000 as the allocation for the Manhattan Initiative in 2014. Due to a contractual obligation with The New York Times, Defendant continues its advertising program, making the substantial payments for each insertion. However, none of the funds that Plaintiff was obligated to pay were ever made to Defendant.

36.    On February 27, 2014, on the same day that emails about the Metropolitan Alliance were sent to various brokers, Bellmarc received a communication from NRT, a wholly owned subsidiary of the parent company Realogy. This email stated that Bellmarc should cease sending any communication regarding the Metropolitan Alliance to any NRT location, that any attempt to engage in referrals must be undertaken with the approval and direction of the regional office of NRT. Communication between NRT to Coldwell Banker displayed Coldwell Banker's displeasure with Bellmarc's actions.

37.    In February 2014, Binder advised Director of Referrals and Relocation Delayne that, due to the failure of the company to generate referral business, the company could no longer support her monthly draw of $8,000. A few days later, Binder was given a letter by Friedman that purportedly detailed complaint from Delayne of sexual harassment by Binder. Delayne had not signed the letter, and Friedman acknowledged he wrote it. Binder provided an extensive response in which he denied all the allegations and insisted that the complaining party had an agenda relating to the loss of her monthly draw payment.

38.    Without ever advising Binder, and prior to the date that Binder even received the letter of complaint from Friedman, Plaintiff's Business Consultant Dawn Covehey, engages in discussions with Friedman and DeGrotta and sent an email advising to get an attorney. She then arranged to go to all the Bellmarc offices and give sexual sensitivity training classes. This was

done subsequent to agents becoming aware of the accusations against Binder, which added credibility to the complaint against him. Binder was never informed about these classes until the day that they were taking place.

39.     On February 20, 2014, given the array of problems that Defendant was having with Plaintiff, Binder sent a memo to Huskey describing his concerns. As a result of this memo, a meeting is set up in March 2013 to go over the items identified.

40.     In February 2014, Defendant achieved the next threshold level of $8,500,000 that called for payment of $187,500. Plaintiff never paid this amount.

41.     This meeting was held on March 25, 2014 for the purpose of discussing the list of issues submitted by Binder to Coldwell Banker. Unbeknownst to Binder, DeGrotta and Friedman had been in secret communication with Coldwell Banker to express their unhappiness with the partnership. They complained that Binder refused to address cash flow problems by cutting expenses. Everyone at the meeting except Binder knew of DeGrotta's and Friedman's intention to voice their complaint, and Binder was caught off guard. Plaintiff strongly backed DeGrotta and Friedman and sought to persuade Binder to close three Bellmarc sales offices.

42.     At this meeting, Binder again requested that offsets be made of payments due against payments owed, which Coldwell Banker again refused.

43.     At this meeting, Binder announced that since the partners were not getting along, he intended to sell Bellmarc. At the urging of Plaintiff, Binder agreed to obtain $200,000 to address any open items and resolve the delinquency condition with Plaintiff.

44.     In April 2014 Plaintiff executive Bennett provided Binder with the names of two valuation experts for the purpose of assessing Bellmarc's value in order to sell it. Binder selected

Steve Murray of RealTrends Inc. whom he knew and whom Bennett states is the most reputable in the business.

45.     In May 2014, Binder assembled an information packet consisting of all the important information about the company, its financial performance and market data. This was given this to Bennett who reviewed the material, requested certain changes be made and then approved transmission of the packet to Steve Murray.

46.     In May 2014, Bellmarc advised Coldwell Banker that it had achieved the next performance threshold level of $12,750,000 and was entitled to another payment of $187,000. Binder sent an email to Plaintiff stating that Coldwell Banker owed Defendant approximately $450,000. Plaintiff paid nothing.

47.     In July 2014, DeGrotta and Friedman depart for St. Thomas compliments of the Plaintiff for the Chairman's Circle event. Even though Coldwell Banker execs were advised by Realogy Executives that Binder should be invited to attend, Coldwell Banker never disclosed any information about the event to Binder and secretly arranged for DeGrotta and Friedman to go without him.

48.     A few weeks after returning from the Chairman's Circle event, DeGrotta and Friedman engaged in actions that were serious violations of the Bellmarc Group Operating agreement. Binder sent each of them termination letters, on August 7 and 8 respectively, and then advised Coldwell Banker of these terminations.

49.     Although Coldwell Banker was aware that Binder had terminated DeGrotta and Friedman it continued to engage in communication with them without ever notifying Binder. During these communications, accusations were made against Binder but Plaintiff never

disclosed this communication to Binder, nor made any effort to verify or discount these statements.

50.     In late August 2014, Binder advised Coldwell Banker that he had obtained the $200,000 he had sought following the meeting on March 25, 2014. A conference call was set up during which Binder asked Huskey "If I give you this money, will you give to Bellmarc the money that it is owed?" Huskey replied, "We'll see." Based on this response, Binder did not give any funds to Plaintiff.

51.     After the meeting, Binder sent to Huskey a statement prepared by the company's independent accountant averring that none of the accusations made by DeGrotta and Friedman about financial irregularities were true. Binder included a schedule of the company account showing that Binder had made substantial contributions to the company as well as payments for the legacy debt.

52.     On December 17, 2014, Binder came to the offices of Plaintiff with a schedule that showed Defendant owed approximately $80,000 to Plaintiff, and proposed making payments of $10,000 per month. This schedule was in fact inaccurate. Binder had deliberately reduced the amount of funds that were due to Bellmarc, fearing that an accurate portrayal would impair his chances of reconciling with Coldwell Banker.

53.     On December 18, 2014, Plaintiff sent a letter of termination to Bellmarc and advised the press that it had "Dumped Bellmarc."

54.     Binder realized that The Bellmarc Group was insolvent and began to wind up the affairs of the company. He posted all deals performed by The Bellmarc Group prior to December 18, 2014 into the Coldwell Banker company accounts. Any deals that closed subsequent to the December 18, 2014 were placed into The Bellmarc Group account from which funds were used

to pay commissions due to agents. The Bellmarc Group filed tax returns that fully recognized all income and expenses through the end of the year. On December 31, 2014, The Bellmarc Group declared itself insolvent and ceased doing business.

55.    Bellmarc Realty attempted to maintain operations but the traumatic effect of the recent events caused many agents to leave and resulted in a substantial decline in revenues that failed to cover continuing operations. Bellmarc Realty ceased operations in May 2016.

56.    From July through September 2012 Plaintiff initiated discussions with Defendant seeking to persuade the Defendant to become a CB franchise. Binder advised COLDWELL BANKER of Bellmarc's pending acquisition of AC Lawrence and introduced DeGrotta and Freidman as his potential new partners.

57.    In August 2012 Defendant provided to Plaintiff financial and other information requested by Plaintiff consistent with the requirements of its franchise application.

58.    In August 2012, Defendant Binder advised Plaintiff that as a result of the departure for medical reasons of Binder's former partner Defendant Binder engaged in workout arrangements with various banks. These "legacy debts" required payments of approximately $74,000 per month and Defendant Binder was taking monthly distributions from Bellmarc to pay off these debts. Binder presented a schedule to Plaintiff which identified the specific obligations and monthly payment amounts. Binder also stated that the income generated from Bellmarc was enough to pay off the monthly legacy debt obligations and take care of his person living expenses but that after these disbursements the company was effectively running at a breakeven level.  Defendant Binder stated that he wouldn't enter into an agreement unless he felt secure that the legacy debt obligations were addressed and the company could receive sufficient support to grow.

59.     In September through October 2012 Plaintiff and Defendant were unable to come to an agreement about Defendant becoming a franchisee primarily due to legacy debt issues that remained unresolved.

60.     In October 2012, after a trial period, the parties signed an agreement whereby AC Lawrence was acquired and a new company was formed, The Bellmarc Group, which was 65% owned by Nice Idea Inc., a company fully owned by Neil Binder, and 35% by All Enterprise Inc. which was owned by the same parties that had owned the predecessor rental brokerage company in the same ownership allocations. Each office was separately incorporated as affiliated companies under the branding of The Bellmarc Group. The new brokerage began business on January 1, 2013.

61.     Defendants executed a Disclosure Document in December 2012 that was issued in March 2012 and no other Disclosure documents were provided prior to signing the franchise agreement on March 27 2013.

62.     In October 2012, the Apollo Global Advisors ("Apollo"), the owner of Plaintiff's parent company, Realogy Holdings Corp ("Realogy"), undertook an Initial Public Offering ("IPO") of the shares of Realogy Holding Corp. Approximately 50% of shares were sold at an average price of $27.

63.     In February 2013, Plaintiff re-initiated negotiations with Defendant and offered more favorable terms which became the basis for an agreement. During these negotiations Defendant again warned Plaintiff of its legacy debt and financial condition, and stated that it was depending on CB's support for its success and growth.

64.     On April 12, 2013, Apollo initiated a secondary offering to sell the remaining shares of Realogy that it owned. The offering was performed in two stages, the first phase on

April 12, 2013 and the second phase on July 12 2013. The secondary offering sold at an average price of $44 per share and Realogy Executives receive a bonus of $47 million. No bonus was offered or received by Realogy executives on the Initial public offering.

65.     On March 27th 2013, Defendant signed Franchise Agreement, which closed on June 13, 2013.

66.     On June 13, 2013, Defendant closed on Franchise Agreement and initiated business as a CB affiliated company. Binder is designated the "responsible party" for the franchise.

67.     On June 13, 2013, a launch party for all Bellmarc agents takes place at a Manhattan restaurant.

68.     On June 13, 2013 for the launch party, Defendant prepared an announcement brochure that was to be distributed to all Bellmarc agents. The brochure was vetted and approved by Plaintiff prior to its release. The brochure prominently discloses:

a.     the referral opportunities of the Coldwell Banker network consisting of 83,000 agents in 3,100 offices,

b.     the exclusive franchise covering all of Manhattan given to Defendant, and

c.     the nature and advantages of Plaintiff's Previews program intended to exploit high-end sales opportunities.

69.     On June 13, 2013, at the launch party Plaintiff's President Budge Huskey distributed a Welcome Letter that described the advantages of becoming a Coldwell Banker franchise, the size of its network and the advantages of the Preview program.

70.     On June 13, 2013, Plaintiff expressed excitement about Defendant becoming a franchise and in an email to all corporate employees and refers to it as a "Monumental Event."

Plaintiff also takes a full-page ad in The New York Times Business section to make the announcement of the "perfect partnership".

71.    Over three months in April, May and early June 2013, Plaintiff created a media plan. This plan detailed an agenda for June 13, 2013 and included TV appearances by CB's president Budge Huskey and Bellmarc's President Neil Binder and interviews with local news reporters. At the last minute, Plaintiff excluded Binder and only Huskey appeared, where he primarily spoke in general terms of the housing market and Realogy, and made only minimal reference to the new Bellmarc franchise.

72.    In June 2013, subsequent to becoming a franchise, Bellmarc requested a contact list of all franchisees from Plaintiff in order to begin a campaign to promote Manhattan properties that Defendant had for sale. Plaintiff refused to provide this information.

73.    In July 2013 Plaintiff was actively involved in assisting Defendant in seeking a satisfactory party to head up the new high-end company, which was tentatively named Premier Properties Inc.

74.    In October 2013 Binder became aware that his new partners had improperly taken substantial funds from the company's special account where tenant/landlord funds were maintained. Binder replenished the account and contacted CB seeking assistance and guidance in his effort to terminate his partners. CB offered no support or assistance.

75.    In section 10.2 the Franchise Agreement states that you and your owners will actively manage and supervise the business operation.

76.    However, no assignment of the franchise ever occurred other than the transfer of ownership of All Enterprise's interest. This is not defined in the Franchise Agreement as an

assignment of the franchise. In any event the franchise was terminated within 180 days from the date ownership of All Enterprise was assigned to the new owner, Nievda Inc.

77.     Nonpayment of the "Royalty Fee" is a curable default under section 16.2.3 of the Franchise Agreement which requires written notice and 30 days to cure..

78.     However, Bellmarc Defendants advised Plaintiff in December 9, 2014 that all transactions had been entered. No notices associated with this curable default relating to the reporting of transactions was ever received by the Bellmarc Defendants. Additionally, Plaintiff had every right to come to the offices of Defendant and review its books and records which it elected not to do.

79.     Plaintiff refused to give funds to the Defendant which the Defendant claimed it was rightfully owed. Funds owed to the Defendant were in the Plaintiff's possession and control which satisfies the substantial compliance obligation of the Defendant.

80.     Such interest charges would only apply if funds were owed to the Plaintiff exceeded 40 days which consists of 30 days as the standard expected payment term based on the Plaintiffs course of conduct and 10 additional days identified in section 11 of the Franchise Agreement.

81.     The Plaintiff engaged in due diligence at the time it reviewed the accounts and records of the Defendant when it became a franchise and identified no issues that were brought to the attention of the Defendant. Plaintiff then performed an audit of the books of the Defendant in December 2013 and identified no issues relating to the accounting and records of the Defendant other than certain transactions which it stated royalty payments were due. Defendant objected stating that these were pending transactions contained on a list of transactions excluded from royalty fees since offers and acceptances were obtained prior to the franchise closing date.

Plaintiff finally accepted Defendants position and agreed to waive franchise fees on these transactions however, such waivers were never properly posted even though they were fully authorized. Plaintiff also received from Defendant on a number of occasions financial statements prepared by an independent accountant which displayed a balance sheet, income statement and related schedules as well as notes thereto. Plaintiff never expressed any reservations that these financial statements were not a complete and accurate presentation of the affairs of the company.

82.    The Disclosure Document provided by plaintiff along with the franchise agreement, and related documents included in the Franchise Agreements (National Association of Realtors Code of Ethics, the Realogy Code of Ethics and the Coldwell Banker Policy and Procedures Manual) constitute the full agreement between the parties.

83.    In addition to Plaintiff violating the terms and conditions of the franchise agreement, Plaintiff also engaged in material deceptions in the disclosure documents provided to the Bellmarc Defendants that violated the FTC Compliance Guidelines. This includes failing to properly reveal any franchise contacts which it was obligated to provide, or in the minimum at least 100 franchise contacts within the Defendant Plaintiffs metropolitan area. Failure to properly reveal facts about referral programs which it buried in the "territories" section of the Disclosure Documents, Failure to properly reveal litigation with the predecessor franchisee by placing it in the middle of "Cases Resolved Against Us" but surrounded it with cases in which the Plaintiff was paid or where the case was dismissed. In addition, Plaintiff omitted material information that the Defendant had no reason to believe would be existing in its decision making. This would include representing in all its advertising and promotional material that all offices were "independently owned and operated" when in truth substantially all offices in the New York City metropolitan area were owned, directed and controlled by a subsidiary of Defendant's parent and

that none of these offices would engage in a referral business with the Defendant even though Plaintiff represented that it was part of a "network."

84.     At the time of the deposition, Plaintiff's counsel presented the Disclosure Document and asked Binder to acknowledge that it was a true and complete copy of the Disclosure Document. Binder was unable to make that statement since he did not recall every provision in the document and did not have his own version of the document in order to determine if they conformed.

85.     Defendant was never advised about documents that were missing from its Franchise Agreements.

86.     Defendant states that it was not in violation of the Franchise Agreements and therefore any declaration of default was improper.

87.     Defendant states that it was not in violation of the franchise agreement and therefore any declaration of default was improper.

88.      In October 2013, Defendant contacted Plaintiff to express concern about its declining cash position. Defendant provided a Nine Month Financial Statement for the period ending September 30. 2013 prepared by an independent accountant that displayed a positive economic performance as well as a personal financial statement for Neil Binder dated September 30, 2013 who was the sole personal guarantor. This personal financial statement displayed that he continued to have adequate net worth to meet Plaintiff's requirements.

89.     A meeting is takes place on November 7, 2013 at Plaintiff proposed a change in the terms for conversion financing by suggesting that the Gross Commission Income threshold levels be split in half and the payment also be split in half.  This permitted the Defendant to qualify for funds at an earlier date and receive half the original amount—$187,500 rather than

$350,000—at each achievement level. Defendant agreed. This new agreement was memorialized in a Third Amendment. Under this new arrangement, Defendant achieved the first threshold of $4,250,000 in November 2012 and funds were disbursed on January 7, 2014. The next threshold was reset to $8,500,000 at which time the Defendant was entitled to $187,500. The next conversion financing threshold was set at  $12,750,000 when Defendant would be entitled to another $187,500. Defendant achieve the third threshold in March 2014 and the fourth threshold in May 2014. Plaintiff refused to make any payments when these thresholds were achieved.

90.     At this November meeting Defendant told Plaintiff that it was in substantial arrears in reimbursing Defendant for advertising costs it incurred under the "Manhattan Initiative," and requests that funds that are due from Plaintiff be paid.

91.     At this same meeting, Plaintiff advises Defendant that it will not support Defendant's effort to set up a high-end company. Plaintiff also advises Defendant that it would not  consider providing funds associated with Defendant intention to acquire a brokerage company, New York Living Solutions, even though this company met the requirements necessary for funding associated with Plaintiff's acquisition funding program and would have provided immediate positive cash flow to the company..

92.     After the November meeting, Defendant sent a memo to Plaintiff in which it described how Defendant developed a cash flow problem, explaining that it was a function of its growth, transitional costs associated with the rental business as well as a seasonal decline in rental brokerage business.  Defendant also included a business strategy for cutting company expenses.

93.     On November 22, 2013, Defendant received a check from Plaintiff for approximately $34,000 as partial payment for its obligation under the Manhattan Initiative. This

payment covered the months of June, July and August. Plaintiff still owed Defendant approximately $33,000 which it never paid.

94.     On November 22, 2013, Defendant receives a second amendment to the Franchise Agreement calling for payments under the Manhattan Initiative to be paid 45 days after submission of invoices and advertising proofs to the Plaintiff. Defendant refuses to sign and asserts that payment was supposed to be made at the time invoices and proofs were submitted, and that failure to make these payments timely impaired Defendant's cash flow position.

95.     In December 2013, Defendant continued to complain both in writing and verbally about Plaintiff's failure to provide funds Defendant was entitled to under the Manhattan Initiative.

96.     In December 2013, Plaintiff sent an auditor to review Defendant's books. Auditor determined that approximately $11,000 in royalties were due to Plaintiff for open transactions entered into prior to Defendant becoming a franchise, and that subsequently closed. Defendant insisted that a list of these deals was given to CB at the time of closing and that Plaintiff knew that they were "pending deals" excluded from royalties. Plaintiff disagreed and insisted that because there was only an offer and acceptance and not a signed contract, they do not qualify. This became a dispute between the parties.

97.     In late December 2013, Plaintiff sends an email to Defendant advising that if all amendments are not signed, and if the dispute relating to the audit funds is not paid, CB will not release any future money due to Defendant.

98.     On January 8, 2014, more than 30 days had passed since written requests for payment were made. Under section 22.16 of the Franchise Agreement, failure of CB to respond to such requests within 30 days should be interpreted as a denial.

99.     On January 8, 2014, Defendant advised Plaintiff that if the funds that are due were not paid, it intended to offset money it was due against money due to Plaintiff as franchise fees.

100.    In January 2014, as a result of Defendant's failure to pay franchise fees, Plaintiff declared Defendant delinquent. However, no notice to cure was ever sent to the Defendant.

101.    A meeting was set up in February 2014 to discuss Defendant's delinquency. At this meeting Defendant proposed an offset between funds owed to the  Defendants against franchise funds owed by Plaintiff.. Plaintiff refused offset. Defendant stated that it was owed substantially more that it owed to Plaintiff. CB's President Huskey acknowledges this but still refused to perform any offsets.  This is in violation of section 11.2 which states:

102.    We will apply your payments or any amounts we (or our Related Parties) owe you or your Related Parties) to any of your past indebtedness for Royalty Fees, BMF contributions, purchases from our Related Parties, interest or other indebtedness as we may determine in our Reasonable Business Judgment.

103.    Reasonable Business Judgment is defined in Exhibit C of the franchise agreement as:

> **Reasonable Business Judgment** means any decision we make or action we take that promotes or benefits the System generally, even if the decision or action also promotes our financial or other interest, or if other reasonable or arguably preferable alternatives exist and regardless of whether an individual brokerage may be unfavorably affected. This includes, but is not limited to, actions to increase the value of the Marks, increase or enhance the overall franchisee or customer satisfaction; minimize possible brand inconsistencies ore customer confusion, enhance or encourage modernization; or improve the competitive position of the System.

There is nothing in this definition that would impair any of the items identified and offsetting of funds, given the importance that Plaintiff purported had for having a franchise in Manhattan as well as the funds that were provided to Defendant's in conversion funds would make offsetting consistent with promoting the "benefits of the System generally."

104.    On February 27, 2014, Darla Delayne, the Director of Referrals and Relocation for Bellmarc, sent out by email information about the Metropolitan Alliance. This was an organization formed by Defendant for the purpose of creating a joint advertising and referral program with CB brokers in the metropolitan area. Prior to sending out this information, a memorandum describing Bellmarc's plan for the Metropolitan Alliance and related forms were sent to CB for comment and approval. At advertising meeting on the January 18, 2014, CB executive Nelson Bennett advised Bellmarc that he had no objection to the Alliance but would not permit any funds from the Manhattan Initiative to be used for this purpose.

105.    On February 27, 2014, on the same day that emails about the Metropolitan Alliance were sent to various brokers, Bellmarc received a communication from NRT, a wholly owned subsidiary of the parent company Realogy. This email stated that The Bellmarc Group should cease sending any communication regarding the Metropolitan Alliance to any NRT location and that any attempt to engage in referrals must be undertaken with the approval and direction of the regional office of NRT. Internal emails between NRT to CB display CB's displeasure with Bellmarc's actions.

106.    Defendant again states that it was not in violation of the franchise agreement and any declaration of default was improper.

107.    Plaintiff and Defendant entered into an agreement to reconcile the dispute concerning branding and use of Coldwell Banker's logo. Any branding or use of the logo that may have occurred subsequent to the date of the agreement was due to uses beyond the control of the Defendant. Furthermore, the Defendant advised Plaintiff that various social media sites that were using Coldwell Banker's logo and branding could only be removed by Coldwell Banker since it was the owner of these marks however, Plaintiff elected not to do so and

continued to blame Defendant even though Plaintiff knew that it and not the Defendant was the only party that could remove these marks.

108.     Defendant states the termination was improper no liquidating damages are due to Plaintiff.

109.     Defendant states it is making similar request for legal and related costs based on the legitimacy of its claim.

110.     Defendant states that it did not commit any defaults of the franchise agreement at the time the Notice of Non-Compliance was delivered.

111.     Defendant states that it did not commit any defaults at the time the Notice of Non Compliance was delivered.

112.     Although CB was aware that Binder had terminated DeGrotta and Friedman it continued to engage in communication with them without ever notifying Binder. During these communications, accusations were made against Binder but Plaintiff never disclosed this to Binder, nor made any effort to verify or discount these statements.

113.     Plaintiffs were aware that the failure to comply with the judge's order was due to the refusal of DeGrotta and Friedman to permit access to the books and records in its possession and that Neil Binder demanded that such records be provided which they initially refused to do.

114.     Defendant states that it did not default under the terms of the franchise agreement.

115.     Defendant repeatedly provided to Plaintiff information about its corporate structure. Plaintiff therefore knew that all offices that were occupied by the Defendants were leased to other parties and that the brokerage companies had no rights to the fixtures and improvements in these offices since Defendants did not own them. The only assets owned by the brokerage offices were commissions receivable with salespeople who were independent

contractors and therefore entitled to receive commission payments. All additional funds received by the company went to pay commission arrears or critical operating expenses such as electric and phone.

116.    Defendant disagrees with the balances that Plaintiff states are owing and by Certification portrayed that at the time Defendant was terminated Plaintiff owed to Defendant $279,220.

117.    Thereafter, The Bellmarc Group abandoned all offices and declared itself insolvent.

118.    Defendant had no assets to assemble other than accounts receivables which were already known to Plaintiff. Plaintiff also knew that these funds were being used to pay commissions that were owed to salespeople.

119.    Defendants had an exclusive "area of protection" that gave it sole and unique rights to be the Coldwell Banker franchisee for the island of Manhattan.

120.    The right to engage in open competition between NRT owned offices and the Defendant does not extend to the right to deceive Defendant into believing that all Coldwell Banker offices would participate in its network. Plaintiff knew that NRT would exclude Defendant from engaging in referral business even though these offices were presented as Coldwell Banker affiliates.

121.    Defendant immediately advised Plaintiff about the removal of these funds and sought its help in terminating DeGrottta and Friedman however Plaintiff was indifferent. Funds were immediately placed into this account and Binder replenished the company reserves with $600,000 in funds he obtained in March 2014.

122.    Defendant was frustrated by the failure of Plaintiff to pay funds it was due from Advertising reimbursement under the agreement it had with Plaintiff. It gave written notice and after thirty days Defendant began withholding franchise fees when it had no recourse because the franchise agreement provided that failure by Plaintiff to respond in a 30 day period should be interpreted as refusal.

123.    At this time, even though Coldwell Banker owed a substantially greater sum to Defendant that it owed to plaintiff, Plaintiff refused to engage in offsets which was a violation of the franchise agreement requiring the franchisor to act with Reasonable Business Judgment.

124.    In March 2014 Binder obtained $600,000 in funds but due to the actions of Coldwell Banker against Bellmarc he refrained from making payments since he believed that Coldwell Banker was seeking to destroy the company and any payment he might make would only reduce his reserves to fight their efforts.

125.    When Binder asked CB's President Husky if by turning over the $200,000 to Plaintiff it would release funds it to the Defendant. Plaintiff was noncommittal. Accordingly, Defendant decided not to give up these funds for fear that Plaintiff would still seek to hurt its business.

126.    A Second Addendum to Amendment to Franchise Agreement was negotiated, but not executed in November 2013 seeking to delay payments under the Manhattan Initiative to 45 days after invoiced were received. Binder objected that this was not the intention of the parties.

127.    Binder was never advised about these discussions and entered into the meeting expecting to discuss a memo he had sent to Plaintiff expressing a number of complaints. When the issue of DeGrotta and Friedman's unhappiness was stated, everyone feigned surprise even though they all knew what was coming except Binder. Given the level of problems the company

was experiencing and the actions being taken by Plaintiff, Binder stated that he felt it would be appropriate to sell Bellmarc

128.    Mr. Binder was anxious about the actions of Plaintiff at the meeting in February when Plaintiff sought to have Defendant close sales offices that were contributing to central overhead while it failed to consider the losses that were being generated from the rental component of the business. It appeared obvious to Binder that Coldwell Banker had an agenda against him and against the business.

129.    Coldwell Banker knew that Binder was making an intensive effort to properly review all the books and accounts for the year end financial statement for the year 2013 due to the fact that he wanted to make sure that his figures would be accurate since he knew that any buyer would carefully review the company's books. In the course of his work he identified approximately $600,000 in disbursements that he was not able to identify. He gave this list to DeGrotta and Friedman along with his work papers in order to have them identify their business purpose.  He did not accuse them of improper payments but only sought to clarify the costs incurred so that it could be properly accounted for.

130.    Mr. Binder became increasingly concerned about the actions of DeGrotta and Friedman in seeking to create de facto separation between the rental component of the business, AC Lawrence and the sales Component, Bellmarc sales. He also became increasingly aware that Coldwell Banker's business consultant was avoiding him and engaging in private discussions that he knew had implications to the overall business. In July DeGrotta and Friedman was invited by the Plaintiff to go to the Chairman's Circle event in St. Thomas. Binder was never advised about this event.   When DeGrotta and Friedman returned, their actions became increasingly

untenable and Binder was forced to terminate both them for violating the company's operating agreement.

131.    Three weeks thereafter, DeGrotta and Friedman filed a lawsuit against Binder accusing him of a number of improprieties.

132.    In his affidavit in the New York Supreme Court action started by Messrs. Friedman and DeGrotta, Mr. Binder describes violations of the Company's operating agreement by DeGrott and Friedman including their efforts to create de facto separation.

133.    Binder's statement at this trial was based on the information he knew at that time. He did not know about the encouragement that Coldwell Banker had given DeGrotta and Friedman to pursue an action to get rid of Binder. He did not know the efforts that Coldwell Banker had pursued to control the company and seek to diminish Binder's authority and legitimacy. However, Binder was well ae that the actions taken by DeGrotta and Friedman were the natural outgrowth of Plaintiff's continual efforts to impair the company's operation by denying it benefits it was entitled to under the franchise agreement, by deceiving it about referrals and refusing to give Bellmarc Defendants the names of other Coldwell Banker franchisees and by seeking to discourage Defendant's efforts to build a referral business. The actions of DeGrotta and Friedman were the natural outgrowth of their frustration and disappointment with Coldwell Banker and their awareness that Binder was responsible for pursuing the franchise.

134.    As part of the settlement agreement with DeGrotta and Friedman, they agreed to relinquish their ownership interest which was transferred to Nievda Inc. which is a company whose stockholders are the wife and daughters of Neil Binder. However, there was no transfer of the franchise from the Bellmarc Group and the transfer did not qualify as a "transfer or

assignment based on the definition of these actions in in section 15.4 of the Franchise Agreement.

135.   While Binder permitted DeGrotta and Friedman to be the point of communication with operating issues and day to day transaction problems, this responsibility was never intended and never expressed as relinquishing Binder's duties as the President of The Bellmarc Group and as the responsible party for the franchise. Plaintiff decided that all corporate decisions should be performed in concert with DeGrotta and Friedman. When Binder made executive decisions from hiring employees or making an executive decision, Plaintiff would often consult with DeGrotta and Friedman to decide what to do. The span of improper actions by the Plaintiff runs from conversations relating to serious business matters without Binder present or even consulted, to accepting accusations made by DeGrotta and Friedman as true when they were not. Plaintiff sought to avoid Binder because it knew that his point of view was often not theirs and he could not be "controlled."

136.   The request for point of sale information was made at a deposition when such information was not readily available. The point of sale information was controlled by Xpressdocs which is a company that was extensively controlled by Plaintiff so that when Defendant's business was terminated its portal in Xpressdocs was closed and unavailable.

137.   There is communication provided by Plaintiff and also held by Nina Scerbo of Nina Scerbo Design, Inc. to affirm the difficulties Bellmarc had in obtaining point of sale material suitable to the Manhattan market.

138.   The discussions that Binder had with his counsel relating to the Franchise Agreement are covered by Attorney Client privilege and any discussions about strategy and their accumulated thoughts are not subject to review by Plaintiff.

139.    Defendant experienced a number of occasions where documents that were purported to be copies of agreements were not exactly conforming to agreements that had been previously drawn . In Section 23.6 of the franchisee agreement. Defendant recognizes that various representations were made to him in the franchise agreement including documents that were identified as part of the franchise agreement including the Coldwell Banker Policy and Procedures Manual, the National Association of Realtors Code of Ethics, the Realogy Code of Ethics and the Disclosure Document Given to him for review prior to signing the franchise agreement. The Plaintiff repeatedly violated multiple provisions of these agreements.

140.    Defendant was not late in making franchise payments and at no time did Franchisor give any notice of a curable default as required under section 16.2.3.1. Furthermore, discussion took place in August with Nelson Bennett the Vice President for the Northeast Region concerning the available timeframe for making payments on transactions. Binder advised Bennett that Bellmarc had a complicated bonus plan system and, as such, careful review needed to be made of all receipts and disbursements associated with a transaction. Bennett told Binder that he could only take a month to make payments and Binder accepted this parameter and altered company procedures. It is also clear from all the schedules and accounting documents used by Coldwell Banker in monitoring a franchisee's performance that it relies on 30 days as a course of conduct for standard terms for payment and the franchise agreement identifies an additional 10 days for the item to first be identified as "late." Thereafter, section 16.2.3 of the Franchise agreement identifies that provides that there must be notice and then an additional 30 days to cure the default.

141.    Contrary to Plaintiff's assertions, there were no arrears associated with Bellmarc's business on an ongoing basis. Accounting documents and correspondence between the

accounting department of Defendant and Plaintiff show that due to the manual system utilized by Plaintiff for inputting transactions that there was a high error rate that occurred both in Defendant's and Plaintiff's accounting departments. Defendant repeatedly requested that Plaintiff set up a daily bulk transfer mechanism or automatic transfer plan but Plaintiff refused. The level of these errors can be clearly identified when in December 23, 2013, Coldwell Banker confirmed that Bellmarc had satisfied all payment requirements only to be told on December 26 that there was still open items. However all of the open items were due to transactions that were mis-posted by Coldwell Banker so in reality Bellmarc was never delinquent.  In late December, a dispute arose with Plaintiff concerning approximately $11,000 of items where Plaintiff asserted that franchise fees should be paid. Defendant disputed this and stated that they were excluded transactions that were pending the time the Defendant became a franchisee. Bennett threatened that a resolution to the audit must be made and all amendments signed (including the second amendment which Binder refused to execute) prior to release of funds.  Binder protested and funds were released on January 7, 2014 when Bennett confirmed that all balances had been paid and had always been paid.

142.    in January 2014 Plaintiff released the second  conversion financing that were due but would not release the advertising funds that were also due.

143.    As a result of Plaintiff's failure to provide advertising funds that were due as well as its refusal to respond to Defendant's pleas, Defendant advised Plaintiff that it intended to engage in an offset of funds due to the Plaintiff against funds due to Defendant.

144.    Based on the fact that the Plaintiff improperly held funds due to the Defendant which would more than satisfied any claim the Plaintiff had, the Defendant was in substantial compliance which was the necessary prerequisite called for under section 25.1. Plaintiff's failure

to provide conversion financing was a violation of the franchise agreement under section 22.18 of the franchise agreement.

145.    This was approximately $9,600 from deals that were pending the time the Defendant completed the franchise agreement with the balance due to off the top expenses where there was an ongoing dispute as to the propriety of these charges as reduction to the proceeds received by the broker. We were earlier assured that these expenses would not be a problem. However, this interpretation changed after the Defendant became a franchisee.

146.    In March 2014, Mr. Binder arranged a loan against real estate he owned in New Jersey. The amount he received was $600,000 which was used to pay open arrears and to maintain proper reserves for the company. None of these funds were given to Coldwell Banker as a result of Defendant's concern that Plaintiff was seeking to control or destroy its business and that by giving funds to Plaintiff it would not resolve open difficulties which had become serious.

147.    Defendants' revenues and profits were higher in 2013 than in 2012 as a result of the acquisition of AC Lawrence. This improvement was due to the favorable response in the marketplace to the combination of the two companies which resulted in a 145% increase in staff as well as a dramatic increase in revenues. After the Bellmarc became a franchise there was no change in the subsequent performance of the company..

148.    For the year ending 2014 Defendant had no change in its performance. The prior year financial statement include approximately $4 million in revenue derived from accounts receivable received by the Bellmarc Group from the predecessor company Bellmarc Realty. Accordingly, when these funds are removed from 2013 the relative performance of  2013 and 2014 was basically flat.

149.     The addition of the franchise made no difference in the revenue in the company except for the additional cost of franchise fees. Binder engaged in discussions with the President of Coldwell Banker Budge Husky in August and September 2012. During these discussions Binder talked about his idea to build a "third leg on the chair" Binder viewed the first leg to be Bellmarc sales where middle market activity would be the focus, the second leg would be rentals and the third leg would focus on exploiting the Plaintiff's Preview program to take advantage of high end sales and rentals. Husky was very excited about the proposal. He affirmed Binder's position that it was a huge opportunity and he said "Coldwell Banker will support you on this. I love the idea." Husky then asked "How much do you think you will need?" Binder responded "as much as a $1 million." Husky responded "That sounds about right." Thereafter they talked about the best means for getting this high end company initiated. Binder wrote a business plan and sent it to Husky. Binder also had conversations about his progress and sent emails to an Employee about prospective brokers who might want to join the new high end company. Binder then approached Dolly Lenz who was one of the highest performing brokers in Manhattan. Dolly Lenz expressed an interest in managing this new high end company. A series of meetings took place in which Budge Husky sought to persuade Dolly Lenz to join the high end company and spoke about the advantages of the Previews program and referrals. An agreement could not be reached however, Husky sought to encouraged an employee of Coldwell Banker to help Bellmarc identify a high end company to acquire and he continued to show an interest in getting the company off the ground. Another candidate, Royce Pinkwater was introduced to Bellmarc by CB and Binder desired to enter into an agreement to have her become the manager of the new high end company, After CB learned of Binder's intentions it reneged on its prior assurances and developed a plan to quash Royce Pinkwater's interest in coming to Bellmarc.

150.    The default rate that Defendant would be charged if it was not in substantial compliance with Section 25.1 was 2.5%.

151.    The Franchise Agreement provides that the reduced BMF rate is applicable as long as the Defendant is in substantial compliance with the terms of section 25.1.

Defendant THE BELLMARC GROUP LLC intends to prove that Plaintiff's claims that the Defendant is in default of the Franchise Agreement, Promissory Notes, Security Agreements and Guarantees is untrue and that Defendant did not breach these agreements at any time. Defendant asserts that Plaintiff engaged in deception, misrepresentation and fraudulent inducement and that Plaintiff violated the terms of the Franchise Agreement resulting in substantial damages to Defendant.

1.    Plaintiff's allegation: Defendant was in default of the Franchise Agreement.

Pursuant to the terms of the Franchise Agreements, Coldwell Banker is entitled to terminate the Franchise Agreements upon the event of a non-curable default by Franchisees and/or for the Franchisees' failure to cure other defaults within the time period provided under the Franchise Agreements.

 *Huskey Certification, ¶39, Exhibit 2 at §16.*

Defendant intends to prove: At no time was the Defendant in violation of the Franchise Agreement and actions taken by the Plaintiff to deny its rights under the Franchise Agreement were an incorrect reading of the Agreement or a flagrant violation of its terms.

2.    Plaintiff's allegation: Defendant had a non-exclusive Franchise Agreement.

Pursuant to the Franchise Agreements, Franchisees obtained the non-exclusive right to utilize the Coldwell Banker System and Coldwell Banker Marks in the operation of approved real estate brokerage offices. These locations are collectively referred to herein as the "Offices".

 *Huskey Certification, ¶12.*

Defendant intends to prove: Plaintiff gave the Defendant an exclusive "Area of Protection" consisting of the entire county of Manhattan, New York City and Defendant was thereby assured that it would be the only Coldwell Franchise in this designated area.

3.    Plaintiff's allegation: The Defendant owed Plaintiff substantial funds due to its failure to make payments required under the Franchise Agreement.

In the Termination Notice, Coldwell Banker demanded that Franchisees and Guarantors immediately pay Coldwell Banker $2,146,001.67 known to be due under the Franchise Agreements, comprised of:

(i) $422,151.39 for "Royalty Fees", "Brand Marketing Fund" fees and other fees and charges due under the Franchise Agreements as of December 15, 2014;

(ii) $1,640,769.33 in liquidated damages as set forth in Section 16.7.2 of the Franchise Agreements; and

(iii) $83,080.95 in attorneys' fees, costs of investigation, court costs and/or other litigation expenses incurred by Coldwell Banker as of November 30, 2014, as set forth in Section 16.8 of the Franchise Agreements.

*Huskey Certification, ¶84.*

Defendant intends to prove: At no time was the Defendant in violation of the Franchise Agreement and all payments were properly made in accordance with the terms of the agreement. Defendant improperly engaged in making false entries, padding charges and improperly demanding additional funds. In reality, Coldwell Banker owed funds to Bellmarc during the entire year 2014 including at the time of termination.

4.   Plaintiff's allegation: Coldwell Banker fully disclosed all material facts to the Defendant and Defendant acknowledged in the Franchise Agreement that it was fully informed.

There is simply no manner in which a rational trier of fact could believe that Mr. Binder reasonably relied on the alleged representations. Even if made, the express statements of the Franchise Agreement and the Franchise Disclosure Document should have put Mr. Binder and his counsel on notice to make some inquiries. Moreover, he was aware that referrals come from established relationships between brokers, and that Defendants would have to establish relationships with other brokers over time to get referrals. SOMF ¶¶s 164-165. Instead, if Mr. Binder is to be believed, he ignored the statements, never asked Coldwell Banker about the discrepancies in an issue he alleges was crucial to his decision to enter the Franchise Agreements, and never applied his personal experience in the industry – but instead blindly believed contrary representations from Coldwell Banker. This is the height of unreasonableness, and is simply not believable.

5   Coldwell Banker, and the individuals who are alleged to have made the representations, deny any such representations.

*Plaintiff's Memorandum of Law page 21*

Defendant intends to prove: Plaintiff failed to provide a disclosure statement that conformed to the requirements of the FTC guidelines and purposely sought to avoid inclusion of material information and to position such information in the disclosure document to foster deception. These omissions and deceptions were material to Defendant's decision to become a Coldwell Banker franchisee. These omissions and deceptions included information about litigation with the predecessor Coldwell Banker franchise serving Manhattan in which the franchisee accused Plaintiff of diverting referrals to an NRT company. Coldwell Banker lost this case and paid damages to the Plaintiff/franchisee.

5.   <u>Plaintiff's allegation:</u> No assurances were made to Bellmarc of any support outside of the terms expressed in the Franchise Agreement.

Paragraph 23.6 of the Franchise Agreement states:

Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you…

*Plaintiff's Statement of Material Facts Page 35 □ 158*

<u>Defendant intends to prove</u>: Various meetings took place with Defendant and Plaintiff to discuss coming to terms on a deal. At one lunch, the President of Coldwell Banker Huskey sat next to Binder who told him of his idea to form another company that would focus on high-end sales using Previews as the main means of exploiting opportunities. Huskey expressed excitement about the possibility and gave assurances to Binder that Coldwell Banker would support this effort with up to $1 million in funds. At the time that Defendant became a franchisee it was clear to everyone that the funds relating to this high-end company were a significant factor in Defendant's decision to enter into an agreement. Subsequent to becoming a franchise substantial effort was made by both Defendant and Plaintiff to find the right sales manager for this position and possibly to acquire a small high-end firm to help kick off the effort. Additionally, Binder wrote memos to Huskey in which he described his ongoing progress and maintained contact with a designated representative of Plaintiff, advising of all the steps being taken towards this goal. Binder finally found a Sales Manager that he wanted to hire for the position and he prepared a proposal to send to this individual. When he contacted Plaintiff for comments and approval, Plaintiff backtracked and sought to obstruct Binder's efforts and ensure that no commitment be made involving Plaintiff. Plaintiff then informed Defendant that it was reneging on its prior assurance of assistance.

6.   <u>Plaintiff's allegation:</u> Plaintiff's financial problems were of its own making and Coldwell Banker was not responsible for any financial problems the Defendant incurred.

Moreover, these allegations fly in the face of the facts, as detailed by Mr. Binder in his deposition and in his own affidavit. Defendants were in severe financial straights by December 2013, in large part due to the alleged usurpation of $400,000 in trust funds by Mr. Binder's partners, Messrs. DeGrotta and Friedman

*Plaintiff's Memorandum of Law page 23*

<u>Defendant Intends to Prove:</u> Negotiations between Plaintiff and Defendant began in August 2012. At that time, Defendant provided to Plaintiff a list of "legacy debts" for which payments were made on a monthly basis. Defendant also advised Plaintiff that these legacy debt payments effectively caused the company to be operating at a break-even level. Defendant refused to engage in any deal that did not address this challenge because the risk was too great. Plaintiff contacted a number of banks seeking a means to resolve this problem but was unable to do so and franchise negotiations ceased. The

legacy debt was the top consideration of the Defendant at the time final negotiations for the Franchise Agreement were occurring. Plaintiff assured Defendant that it had nothing to worry about since it was receiving cash infusions. Additionally, Plaintiff had repeatedly assured Defendant that it would earn enough income through referrals to eliminate any financial problems that Defendant may have. The financial strains that the company experienced were due to required capital expenditures, payment of royalties, the seasonality of the rental brokerage business and growth. This was clearly portrayed to the Plaintiff in November 2013. The fact that Plaintiff knew that Defendant was having financial difficulty became an opportunity for Coldwell Banker to control Defendant and in the event it wasn't successful, to destroy the business. Plaintiff assertion that Defendant was in financial difficulty due to the removal of $400,000 in funds by DeGrotta and Friedman is erroneous since Binder contributed $600,000 to the company in March 2014.

7.   Plaintiff's allegation: No assurances were made to Defendant about referrals.

There is simply no manner in which a rational trier of fact could believe that Mr. Binder reasonably relied on the alleged representations. Even if made, the express statements of the Franchise Agreement and the Franchise Disclosure Document should have put Mr. Binder and his counsel on notice to make some inquiries. Moreover, he was aware that referrals come from established relationships between brokers, and that Defendants would have to establish relationships with other brokers over time to get referrals. SOMF ¶¶s 164-165. Instead, if Mr. Binder is to be believed, he ignored the statements, never asked Coldwell Banker about the discrepancies in an issue he alleges was crucial to his decision to enter the Franchise Agreements, and never applied his personal experience in the industry – but instead blindly believed contrary representations from Coldwell Banker. This is the height of unreasonableness, and is simply not believable.

5 Coldwell Banker, and the individuals who are alleged to have made the representations, deny any such representations.

*Plaintiff's Memorandum of Law, page 21*

Defendant intends to prove: Plaintiff grossly misrepresented to Defendant the referrals available to Defendant. The Plaintiff vetted and approved a brochure for distribution to all of Defendant's agents that highlighted the referral opportunities. Plaintiff was also repeatedly quoted in various news media about the international referral opportunities available to Defendant. The Coldwell Banker Policy and Procedures manual specifies that referrals are a benefit associated with becoming a franchisee. Plaintiff also had a duty under the provisions of the Franchise Agreement to act ethically and not engage in deception, misrepresentation or any other action that did not seek to protect the interest of the Defendant. Rather, Plaintiff did the following:

A.   Failed to advise Defendant of the substantial concentration of offices owned by a subsidiary of Plaintiff's parent, NRT.

B.   Failed to perform consistent with its advertising and representations that all offices were independently owned and operated.

C.  Refused to provide the names of franchisee contacts to the Defendant though this information was required under FTC guidelines.

D.  Deceived Defendant by hiding information about a lawsuit against Coldwell Banker by the predecessor franchise Hunt Kennedy, positioning information in the Disclosure Statement to all but eliminate the likelihood that the Defendant would read it, which was contrary to FTC guidelines. Thereafter, deceiving Bellmarc by claiming that Hunt Kennedy failed through growth and mismanagement.

E.  Failed to inform Defendant that the predecessor broker Hunt Kennedy claimed that Coldwell Banker was diverting buyers to an NRT-owned company, Corcoran, and that the decision of the arbitrator held in favor of Hunt Kennedy and Coldwell Banker was forced to pay damages. Furthermore, Coldwell Banker failed to disclose the amount of the damages it paid, though this was a requirement under FTC guidelines.

F.  Refused to provide the names of all franchisee contacts when this was specifically requested by the Defendant.

G.  Refused to permit Coldwell Banker franchises owned by NRT to engage in building a referral relationship with Defendant's offices.

H.  Engaged in efforts to disrupt Defendant's efforts to build a referral network by preventing Defendant from distributing its book entitled The Ultimate Guide to Buying and Selling Coops and Condos in New York City, at a function held in Manhattan attended by approximately 2,300 agents, even when it was Defendant's intention to give the books away for free.

I.  Failed to advise Defendant that its efforts to build an Alliance with Coldwell Banker agents in the Metropolitan area would not succeed since NRT offices would not participate.

J.  Did not seek to be helpful and supportive of Defendant's efforts to build a referral network.

K.  Acknowledged that referrals were going to Coldwell Banker offices owned by NRT, but insisted that these were merely personal referrals wherein the agent had "relationships," and then used this false contention to deny Defendant the ability to gain referrals through competitive effort and by building its own relationships.

L.  Pursued other actions and made additional misrepresentations which sought to prevent or impair Defendant's ability to engage in a referral business.

8.  <u>Plaintiff's allegation</u>: Plaintiff knew that NRT owned various Coldwell Banker franchises and this information was fully disclosed in the Disclosure Documents.

Mr. Binder was aware of NRT and Corcoran before entering the Franchise Agreement. Binder Dep., 52:24-53:22. Within the Franchise Disclosure Document, under the heading "Business Experience of Real Estate Affiliates," Defendants and Mr. Binder were informed that Sotheby's, Better Homes and Gardens, ERA Franchise Systems, Century 21 Real Estate were affiliated with Coldwell Banker. Phillips Certification, Ex.

6, page 3. Under the heading "Business Experience of Certain Other Affiliates," Defendants and Mr. Binder were informed in detail of the relationship with NRT:

*Plaintiff's Statement of Material Facts Page 35 ¶162*

Defendant intends to prove: Plaintiff failed to advise Defendant that a substantial portion Coldwell Banker office consisting of over 90% of locations in Connecticut and over 80% of locations in New Jersey were owned by NRT, a subsidiary of the Parent Company Realogy and that NRT would not permit building a referral relationship with these offices by the Defendant. No disclosure of offices in the metropolitan area was ever given to Defendant in any disclosure documents and when information about franchise contacts was requested by Defendant, Plaintiff refused to provide it.   In addition, Plaintiff never advise Defendant that the NRT-owned Coldwell Banker offices were centrally directed and controlled thought it had represented to Defendant through its advertising that they were not.

9.   Plaintiff's allegation: Defendant did not participate in the Previews program because it was not prepared to do so, and not because of any actions of the Plaintiff.

Binder and Defendants never got their Previews business "off the ground," as, among other things, they never formed a corporation to operate the business. Binder Dep., 158:8-16.

*Plaintiff's Statement of Material Facts page 37, ¶167*

Defendant intends to prove: Plaintiff told Defendant that as a franchisee it would be able to participate in the company's Previews program which focused on high-end property sales. It was advised that this program was very successful and would give a tremendous advantage to agents in persuading high-end sellers and buyers to work with Defendant. Defendant had no reason to doubt this since Previews was featured in the Coldwell Banker Policy and Procedures Manual (part of the Franchise Agreement) as available to all franchisees. Previews was heavily promoted to Defendant's agents through materials distributed to all agents: an announcement brochure that was vetted and approved by Plaintiff, and a Welcome Letter from Budge Huskey, the President of Coldwell Banker, that highlighted Previews. However, Plaintiff engaged in a plan to prevent Defendant from ever participating in the Previews program by refusing to approve price threshold levels proposed by Defendant and then using this as an excuse to deny participation.

10.   Plaintiff's allegation: Section 25.1 expressly identifies nonpayment of royalties as a as a breach of the Franchise Agreement.

In addition to the Royalty Fee, the Franchise Agreements obligate the Franchisees to pay to Coldwell Banker a "Brand Marketing Fund" contribution. Nonpayment of the Brand Marketing Fund contribution is an event of default under the Franchise Agreements.

*Huskey Certification, ¶24, and Exhibit 2 thereto at §§16.2.3.1 and 16.2.3.2, and Exhibits 2-8 at §8 Plaintiff's Statement of Facts ¶40*

<u>Defendant intends to prove</u>: Consistent with section 25.1 Defendant was in full compliance. Defendant made repeated requests to Plaintiff both orally and in writing that it pay the unpaid portion of its obligation to Bellmarc consisting of funds from the Manhattan Initiative. Plaintiff ignored Defendants all requests. The Franchise Agreement provides that failure to respond within 30 days to any written request constitutes a refusal. Prior to the time the Defendant stopped paying royalties, it notified Plaintiff of its intention to stop paying royalties as a means of offsetting the Coldwell Banker's obligation to Bellmarc against funds due to Coldwell Banker. The actions of Coldwell Banker declaring Bellmarc delinquent and then refusing to engage in offsets failed to conform to Coldwell Banker's obligation under the Franchise Agreement to make decisions using reasonable business judgment.

11. <u>Plaintiff's allegation</u>: Defendant's transfer of ownership was a default under the Franchise Agreement,

Any "Transfer of the Franchise" (as defined in the Franchise Agreements), without the prior written approval of Coldwell Banker, constitutes a material breach of the Franchise Agreements. A "Transfer of the Franchise" occurs when, among other things, the "Owners" no longer control or manage the business of the franchisee. Huskey Certification, ¶ 20, and Exhibit 2 thereto at §15.5.

*Plaintiff's Statement of Facts ¶36*

<u>Defendant intends to prove</u>: The Defendant did not transfer the franchise to another party and at all times the franchise was owned by The Bellmarc Group. In addition, Neil Binder owned 65% of the shares of the franchises and was the responsible broker controlling the brokerage operation at all times. None of the elements defined as a transfer under section 15.4 apply to the actions performed by the Defendant.

12. <u>Plaintiff's allegation</u>:   Plaintiff states that the corporate and personal guarantees signed by the Defendant require payment of the open obligation

Note #1 provides that Coldwell Banker may declare the note in default and accelerate the amounts due if, among other things, any of the Defendants are in default of the Franchise Agreements, and upon termination or expiration of the Franchisee Agreements.

*Exhibit 9 to Huskey Certification*

Note #2 provides that Coldwell Banker may declare the note in default and accelerate the amounts due if, among other things, any of the Defendants are in default of the Franchise Agreements, and upon termination or expiration of the Franchisee Agreements.

*Exhibit 10 to Huskey Certification, at ¶5.*

<u>Defendant intends to prove:</u> There was no default under the Franchise Agreement by Defendant so the right of Plaintiff to make any demands under the guarantees is inappropriate.

13. <u>Plaintiff's allegation:</u> The Defendant's failed to comply with the terms of the security agreements.

Defendant ignored the demand to assemble and turn over the Collateral, and instead abandoned, dissipated and used the Collateral, to the detriment of Coldwell Banker.

*Plaintiff's Memorandum of Law page 10*

<u>Defendant intends to prove:</u> Plaintiff was well aware that the structure of The Bellmarc Group provided for separate corporations that owned the leases to the respective offices. Plaintiff was also aware that all fixed assets were acquired by BAL Administrative Corp, the administrative company formed by the owners to handle the operating affairs of the companies. Accordingly, the only assets owned by the brokerage companies comprising The Bellmarc Group consisted of the accounts receivables of the respective companies. Even though this information was available to Coldwell Banker, at no time did it make any claim on any specific commission receivable, though it was Coldwell Banker's responsibility to do so. Furthermore, all funds collected were distributed to sales agents in satisfaction of commissions payable as defined in the Bellmarc Policy Manual. Since Defendant never violated the Franchise Agreement, Plaintiff had no right to make any claim on Bellmarc's assets.

14. <u>Plaintiff's allegation:</u> Plaintiff had no duty to make payments to the Defendant for advertising under the Manhattan Initiative.

The Franchise Agreements provide that Coldwell Banker will undertake its own advertising in the New York City area to support Defendants. It says nothing about reimbursing Defendants for their advertising.

*Plaintiff's Statement of Facts ¶179.*

<u>Defendant intends to prove</u>: The Franchise Agreement specifically provides for an annual meeting to formulate a new marketing plan to be effectuated yearly including advertising and the related allocation of funds. Coldwell Banker and Bellmarc had resolved in the year 2013 that Bellmarc should place the advertising since it was able to obtain a lower rate than Coldwell Banker. For all advertisements in The New York Times, Coldwell Banker created and transmitted to Bellmarc the top third portion of each ad page, which Bellmarc inserted into the advertisement. Coldwell Banker was then billed for that portion by means of statements including vendor invoices and ad proofs that Bellmarc submitted monthly to Coldwell Banker, identifying on the first page that payment was due upon receipt. Coldwell Banker further acknowledged that it owed funds to Bellmarc by having made a partial payment covering the months of June, July and August. The following are additional pertinent points:

A. Each year a new agreement was made with terms that would be performed within one year. Under the Uniform Commercial Code such an agreement need not be in writing.

B. Defendant is able to present correspondence relating to the advertising arrangement, copies of bills sent to Coldwell Banker and partial payment made by Coldwell Banker to support its contention of the oral arrangement.

C. Coldwell Banker's Director of Operations admitted in an email to President Huskey that he had reneged on the agreement with Bellmarc and that he knew it would result in a cash flow problem for the company,

D. Aside from violating the yearly agreement for the Manhattan Initiative marketing campaign, Plaintiff's actions also breached the Franchise Agreement section 10.3 which sets a high standard of ethical conduct as prescribed by the National Association of Realtors and the Realogy Code of Ethics.

15. <u>Plaintiff's allegation</u>: Plaintiff made no representations to the Defendant other than those in the Disclosure Documents.

Neither we nor any of our employees or representatives made any representations, promises, guarantees or warranties of any kind to induce you to sign this Agreement, except as specifically described in the Disclosure Document delivered to you.

*Huskey Certification Exhibit 2*

<u>Defendant Intends to Prove</u>: Plaintiff sought to fraudulently induce Defendant by making the following representations:

A. Plaintiff gave assurances of support for the formation of a high-end broker company, Premier Properties LLC, including financial support which Plaintiff knew was a substantial component of Defendant's decision to become a franchisee.

B. Plaintiff failed to disclose that almost all the offices in the Metropolitan area that were Coldwell Banker franchises were owned by NRT, a subsidiary of Plaintiff's parent Realogy Holding Corp., as required under FTC Guidelines.

C. Plaintiff failed to provide contact information of other franchises to the Defendant, as required under FTC Guidelines.

D. Plaintiff failed to disclose material litigation with the predecessor franchisee Hunt Kennedy relating to diversion of buyers to Corcoran, a company owned by NRT. Furthermore, it failed to disclose that Coldwell Banker lost and was compelled to make payment,

E. Plaintiff failed to disclose the terms of the final agreement with Hunt Kennedy, which, even though under a nondisclosure agreement, must be revealed according to FTC Guidelines.

F. Plaintiff knowingly sought to deceive Defendant by attempting to hide information about the lawsuit in the Disclosure Documents in such a way that a reasonable person reading the document would never have identified it.

G. All of Plaintiff's advertising contained the statement "all offices independently owned and operated." This is false. Plaintiff's parent Realogy has a wholly owned subsidiary NRT, that owns and centrally controls the affairs of approximately 700 Coldwell Banker offices, including most Coldwell Banker offices in the New York City metropolitan area. None of these offices would engage in building a referral business with the Plaintiff at the direction of NRT.

H. Plaintiff made representations in writing and orally that Bellmarc would be the only franchise operating in Manhattan and as such, would have exclusive access to the Coldwell Banker network as it may relate to any Manhattan business. A franchisee's right to exploit this network is also set forth in the Coldwell Banker Policy and Procedures Manual that is part of the Franchise Agreement. However, Plaintiff did not provide information on franchise contacts and stonewalled all of the Defendant's efforts to build this network of over 3,100 offices worldwide and over 83,000 agents.    Furthermore, without advising Bellmarc, this business was exploited by another firm owned by Realogy, Corcoran.

I. Plaintiff represented that Defendant would be able to participate in its Previews Program which offered a unique means of exploiting the high-end sales business. The right to participate in the program is identified in the Coldwell Banker Policy and Procedures Manual as a benefit to franchisees. However, Plaintiff prevented this participation.

16. <u>Plaintiff's allegation:</u> There was a transfer of the franchise without the consent of Coldwell Banker.

20. Any "Transfer of the Franchise" (as defined in the Franchise Agreements), without the prior written approval of Coldwell Banker, constitutes a material breach of the Franchise Agreements. Id. at §15.5. A "Transfer of the Franchise" occurs when, among other things, the "Owners" no longer control or manage the business of the franchisee. Id. at §§ 15.1 and 15.4.

21. Failure to obtain written approval of Coldwell Banker for a "Transfer of the Franchise" within 180 days after the event is an event of default under the Franchise Agreements. Id. at §16.2.3.3.

*Certification of Budge Huskey page 6 ¶20,21*

<u>Plaintiff intends to prove:</u> There was no transfer of the franchise within the definition of the Franchise Agreement and Bellmarc continued to be the franchisee at all times.

17. <u>Plaintiff's allegation</u>: Plaintiff had no obligation to engage in offsets.

Mr. Binder acknowledges that although he requested Coldwell Banker to offset the royalties and other funds due from Defendants against the funds Defendants felt were due to them from Coldwell Banker, the Franchise Agreement provides that Coldwell Banker does not have an obligation to offset funds due. Huskey Certification, Ex. 1 at ¶¶s 7.3 and 7.4; Binder Dep., 184:1-9.

*Plaintiff's Statement of Material Facts page 38 ¶175*

<u>Defendant Intends to Prove</u>: Plaintiff refused to engage in offsetting funds owed to Defendant against funds owed to Plaintiff for royalties. At all times the amount of funds Plaintiff owed to Defendant was far greater than the funds owed to Plaintiff. The refusal to engage in offsets was a violation of the Franchise Agreement requiring the Plaintiff to use Reasonable Business Judgment in making any business decisions.

18.  Plaintiff's allegation:  The actions of DeGrotta and Friedman against Binder did not involve Coldwell Banker and it cannot be held responsible for the actions of others.

Mr. Binder has stated under oath that his dispute with his partners Messrs. Freidman and DeGrotta led to the destruction of the Bellmarc business: "The dire financial position I find myself in today is not the result of some devious asset protection scheme, but rather the consequence of a bitter and highly publicized battle with former partners that in fact destroyed a successful business that I spent thirty (30) years of my life building."

*Affidavit of Neil Binder in Opposition to Plaintiff's Order to Show Cause for a Appointment of a Receiver, dated October 27, 2016, filed in Capital One, N.A., v. Binder, New York Supreme Court, Suffolk County, Index No. 67110/2014, submitted herewith as Exhibit 10 to Phillips Certification, at ¶11*

Defendant Intends to Prove:  Defendant Neil Binder, who was majority owner, persuaded his junior partners to become a Coldwell Banker franchise based on his belief that the opportunity for referrals would be a significant factor in the future of the business. However, due to Coldwell Banker's actions, deceptions and misrepresentations, no referrals took place and Bellmarc suffered a net negative position since it was compelled to pay franchise fees and was not receiving reimbursement of funds due to the company. In addition, Coldwell Banker was not performing under assurances that it had given the company including the following:

A.  It would upgrade its rental system so that the rental business of Bellmarc could be effectively integrated into the network.

B.  It would fund a new high-end company and provide additional support.

C.  Bellmarc would be able to participate in the Previews program from inception.

DeGrotta and Friedman also knew that Binder's relationship with Coldwell Banker was strained and there were considerable disagreements on a number of additional issues. In turn, covert communication between Coldwell Banker and DeGrotta and Friedman began that fueled their unhappiness. Thus, the actions taken by DeGrotta and Friedman were the natural result of the accumulation of these events, the negative cash position of the company in the winter of 2013 and Coldwell Banker's reticence in providing any goodwill to the company as most vividly expressed by the refusal to pay Bellmarc funds it was due thereby further exacerbating Bellmarc precarious position. Coldwell Banker was responsible for creating this negative environment and for the obvious effect. DeGrotta and Friedman may have fired, but the gun, the bullets and the reason to pull the trigger where all Coldwell Banker's doing.  Coldwell Banker therefore is responsible for the liability associated with the consequences of their actions.

19.  Plaintiff's allegation: There is no correlation between the public offering of Realogy and the agreement with Bellmarc to become a Coldwell Banker franchise.

No documents have been provided to Defendant that reveal Coldwell Banker's hidden agenda. However, documents which might disclose this hidden agenda are believed to

be in the notes and minutes associated with "Project Double-Take," which was the name given by Realogy to the effort to augment the stock price of its secondary offering. Plaintiff has refused to provide these documents claiming attorney/client privilege.

<u>Defendant Intends to Prove:</u> The owner of the parent company Realogy was Apollo Global Management Inc, until 2012. In October 2012, Apollo issued a public offering which sold approximately half the shares of Realogy at an average price of $27 per share. Apollo then undertook a secondary offering in two phases, the first phase in April 2013 and the second phase in July 2013. To encourage Realogy executives to promote the stock, Apollo offered a Phantom Value Plan which provided for substantial bonuses upon the success of the secondary offering. In order to stimulate interest, Coldwell Banker executives offered to Bellmarc unusually favorable terms in the hope that by promoting a franchise in the most active real estate market in the country it could create an enhanced level of interest in the Realogy shares. The signing of the Franchise Agreement and the closing of the Agreement where each scheduled to happen a few weeks before the two offering phases. Coldwell Banker sought to promote the affiliation to business interests rather than real estate companies. The effect of their efforts was a substantial improvement in the share price to $44 per share. The Realogy executives therefore received a bonus under the Phantom Value Plan of $47 million. Coldwell Banker's undertaking to make Bellmarc a franchise was primarily an effort to pump up the stock price of Realogy. Bellmarc was never aware of this agenda.

- Defendant AC LAWRENCE REAL ESTATE LLC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC BROKERAGE MIDTOWN INC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC DOWNTOWN LLC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC EAST LLC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC WEST LLC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC SIMONE SONG INC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant BELLMARC GRAMERCY/CHELSEA INC restates and affirms the actions and violations identified above as also applicable to its case.

- Defendant NEIL BINDER, AN INDIVIDUAL restates and affirms the actions and violations identified above as also applicable to its case. In addition, Defendant BINDER, AN INDIVIDUAL, asserts that any claim made by the Plaintiff relating to a personal guarantee on the obligations of other defendants is improper since the guarantee can only be enforced if there is a violation of the Franchise Agreement by the Defendants and there was none.

- Defendant NICE IDEA LLC restates and affirms the actions and violations identified above as also applicable to its case. In addition, Defendant NICE IDEA LLC asserts that any claim made by the Plaintiff relating to a corporate guarantee on the obligations of other defendants is improper since the guarantee can only be enforced if there is a violation of the Franchise Agreement by the Defendants and there was none.

      b. **Defendant intends to prove the following contested facts with regard to damages on the Complaint and the Counterclaim:**

1.   Loss due to destruction of the company as of the valuation date, May 31, 2013:

The Defendant announced to Coldwell Banker on March 25, 2013 that it intended to sell itself. Defendant took actions consistent with this intent including preparing a sale information packet, engaging valuation expert Steve Murray to determine the value of the business and obtaining consent from Coldwell Banker to send this information packet to him. Murray made his determination using on the actual performance of the company based on a year-end financial statement prepared by an outside accountant, and financial projections that he carefully reviewed. The determination was based on the existing performance of the company without reference to any loss of business during operation or any lost opportunity to the business from future operations. The value of Bellmarc as of May 31, 2013 was determined to be $22,815,016.

2.   The Value of Operating Loss during the term Defendant was a Coldwell Banker franchise:

Neil Binder is an expert in the residential real estate business in Manhattan as well as an expert in valuation. Binder prepared his report for the Loss from Operations and for the Accretive Loss based on growth strategies in Defendant's business plans that would have been effectuated absent the actions of Plaintiff. The following are the facts for creating liability conclusions associated with Loss from Operations:

A.  Plaintiff's parent company Realogy has a wholly owned subsidiary, NRT, that owns real estate brokerage offices around the United States. NRT in turn wholly owns Corcoran, a brokerage company that is a major player in residential brokerage in Manhattan.

B.  Prior to Bellmarc become the exclusive franchise for Coldwell Banker, there was a predecessor franchisee Hunt Kennedy that ceased operations in 2006. Hunt Kennedy sued Plaintiff under an arbitration clause in its Franchise Agreement complaining that Coldwell Banker was diverting referral buyers to Corcoran. The arbitrator found in favor of Hunt Kennedy and Coldwell Banker was required to make payment for damages. Federal District court affirmed the arbitrator's findings. A pattern of business practice was established, revealing the diversion of referral buyers to Corcoran rather than directing them Coldwell Banker's own franchisee.

C.  On Corcoran's website, President Pam Liebman states that 80% of the company's business comes through "personal referrals and the Realogy Mobility Network." No information exists in the Disclosure Documents about the Realogy Mobility Network and there is no such company identified in Realogy's SEC 10K filings.

- 97 -

D. The independent company Referral Exchange performed a survey of 20,000 real estate agents and concluded that 40% of all referrals were agent to agent.

E. On May 1, 2015, The Real Deal magazine reported in an article entitled "Real Deals Don't Lie" that for the 12 months ending March 31, 2015 Corcoran performed 2,270 deals with a total sales value of $4.29 billion. This information was obtained by examining recorded closings for the period.

F. On May 1, 2013, The Real Deal magazine reported in an article entitled "Corcoran brokers sold most Manhattan homes of any firm in 2012" that Corcoran performed 1,178 deals at a sales price over $1 million for a total sales value of $3.1 billion. The article also states that Pam Liebman, President of Corcoran, disputed this and said that Corcoran had performed $3.5 billion in sales value. By comparing the total of all sales as stated in the 2015 Real Deal Article to the total of all sales exceeding $1 million as reported in the 2013 Real Deal article, a conclusion can be drawn that 52% of Corcoran deals were above $1 million and would be equivalent to Previews deals. The remaining 48% of Corcoran deals would be equivalent to non-Previews deals. The same allocation is used for rentals.

G. The Corcoran Report for the 4th quarter of 2013 displayed the median price for a home in Manhattan as $855,000. Rentals equivalent to Previews apartments were $8000 per month and lower priced rentals equivalent to non-Previews were $4,000 per month. The rental values were derived from the Corcoran Rental Report for the 4th quarter of 2015 and from an article in the December 2015 Real Deal magazine entitled "Manhattan's rental elite" that disclosed Corcoran's exclusive listings and the average rent of $8,531. This figure was reduced to $8,000 to reflect a time adjustment from 2015 to 2014.

H. An allocation was made by Neil Binder based on his 35 years of real estate broker experience in Manhattan that 35% of all deals were performed "direct" in which one broker served both the buyer and seller, while 65% of all deals were "co-brokerage" in which the broker received half the commission and served only one party to the transaction. For rental transactions no co-brokerage deals were included due to the nature of that brokerage market.

I. The standard commission earned on a direct transaction according to Bellmarc's Policy Manual is 6%, and the standard commission on a co-brokerage transaction is 3%. However, for high-end deals an assumption is made that the commission will, on average be negotiated down to 5%. This determination was made by Neil Binder given his 35% years of experience. For rentals, the standard commission as noted in the Bellmarc Policy Manual was 15% of a year's rent. For Previews rentals, an assumption was made that on average the commission will be negotiated to 12%.

J. The referral payment to the referring broker is 25%, consistent with the Bellmarc Policy Manual, and is the predominant referral fee reported in the Referral Exchange report.

K. The franchise fee paid to Coldwell Banker by the franchisee is 2.5%, which is the applicable rate in The Bellmarc Group Franchise Agreement.

L. In Realogy's SEC 10K for 2013 Realogy reported that it performed 1,065,339 "sides" of a deal for its independent franchise offices and 308,332 "sides" for its owned offices, totaling 1,373,671. In this same filing Realogy reported that Coldwell Banker did 725,058 "sides," which constitutes 52% of all deals. This same allocation was applied to rentals.

M. Bellmarc was in the process of selling itself, therefore any lost revenue would be reflected in the loss of income, which in turn would reduce the company's value for sale, because the valuation expert relied on Earnings Before Interest, Depreciation, Taxes and Amortization (EBITDA) in his determination. Steve Murray determined that the valuation multiple for Bellmarc was 6x. Therefore, the Lost Value is (1) lost earnings computed by Murray as shown in the company's reported yearly performance; (2) the lost earnings that the company should have received from its operations had Coldwell Banker not taken actions, deceptions and misrepresentation (Loss from Operations); and (3) the reasonable determinable lost earnings in future years (Accretive Loss). The sum of these three elements times the valuation multiple of 6x comprise the Total Loss to Defendant.

Given these facts, a determination was made that the loss value lost Previews transactions was $14,816,155.00; for lost non-Previews transactions was $5,994,788; and for lost rental transactions was $2,387,024.00, for a combined total loss value from operations of $22,730,662.00.

3. Defendant's facts in determining Accretive Loss in Value:

In determining Accretive Loss, a 5-year pro-forma projection was developed and the yearly benefits were discounted to the present value using 8% as the discount rate. The assumptions of growth were formulated by Neil Binder as an expert based on his 35 years of experience. All assumptions and facts applying to the loss from operations were also applied to identifying the Accretive Loss. Defendant submitted to Plaintiff a business plan on July 7, 2013 and a revised business plan in October 2013. Included in each of these business plans was a strategy calling for implementation of the following programs that would generate profits in the future:

A. Developing a High-End Company ("Premier Properties"): Bellmarc was in the process of establishing a high-end company when Coldwell Banker withdrew its previous assurance of support. It is assumed that this support was not removed and that the high-end company began operating in first quarter of 2014. In addition, Bellmarc agents in local offices would have participated in Previews and it is assumed that they did so productively in future years.

B. Expansion of Neighborhood Network: Bellmarc was in final negotiations with a real estate brokerage company New York Living Solutions and a contract had been drawn. Coldwell Banker refused to permit the acquisition, even though it would have added two offices to the network in the underserved downtown market. From inception, these additional offices would have contributed significantly to the brand image as well as to the direct revenue and revenue.

C. <u>Referral and Relocation</u>: Bellmarc formed a Relocation and Referral Department to exploit the opportunities that it believed would be forthcoming. This Department had a full-time manager and multiple attempts were made to build the referral business, all thwarted by Coldwell Banker:

- Coldwell Banker refused to give Bellmarc any franchise contact information;

- Coldwell Banker refused to permit the free distribution of a highly praised book on Buying and Selling Coops and Condos in New York City that had been written by Binder and which Coldwell Banker had sponsored; and

- Coldwell Banker failed to advise Bellmarc that a substantial portion of the Coldwell Banker offices in the New York City Metropolitan area were owned by NRT, a subsidiary of Coldwell Banker's parent company, and that these offices would refuse to engage in referrals with Bellmarc.

The value of lost business during the period Bellmarc was in operation was separately computed as a loss during operations and the computation is based on future revenues the company would also fail to receive. .

Given these facts the present value of the accretive loss is $6,614,808.00.

4.  Loss of Reputation:

Linda Alexander, President of Alexander Marketing and an expert in real estate public relations for Manhattan, made the determination of the cost for remediation of the reputations of Bellmarc and Neil Binder. She utilized:

A.  her continuous knowledge of the company for over 25 years;

B.  the reputations of Bellmarc and Neil Binder prior to the events that destroyed them; and

C.  articles and other public media that had a deleterious effect on the reputations of Bellmarc and Neil Binder

Alexander's valuation for the amount of public relations work necessary to rebuild the reputations of Bellmarc and Binder was $500,000.00.

5.   Defendant's factual basis for each defense against Plaintiff's claims for damages:

Plaintiff claims are derived from accusations that the Defendant breached the Franchise Agreement, the Promissory Notes and Security Agreements signed by the Defendant. Defendant's factual basis for its position is derived from the terms of the Franchise Agreement, Promissory Notes and Security Agreements. Defendant will prove that it never violated the Franchise Agreement and should not have been held in default. The Promissory Notes and Security Agreements were never violated because a breach of these agreements is conditioned on a default under the Franchise Agreement, which did not occur.

11. PLAINTIFF'S WITNESSES—[Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial. Indicate whether the witness is expected to testify live or by deposition.]

    a.   On liability on Plaintiff's affirmative claims, plaintiff intends to call the following witnesses who will testify in accordance with the <u>following summaries</u>:

<u>Jacqueline Bertet</u> (live) – Senior Director for Real Estate Financial Services, Coldwell Banker Real Estate LLC.  Ms. Bertet will testify as to the facts set forth in the Plaintiff's Contested Facts above:

- The Coldwell Banker franchise system and intellectual property rights;

- the provisions of the Franchise Agreement and related documents which are contested by Defendants, including the Security Agreements and the perfection thereof;

- Defendants' breach of the Franchise Agreements by failure to pay royalties in or about January 2014;

- Defendants continuing breach through termination as of December 14, 2014;

- Defendants' other acts of breach of the Franchise agreement and related documents, including non-monetary breaches of failure to provide proper insurance information and intellectual property defaults;

- The various notices of breach in 2014 and Defendants' failure to cure the breaches;

- Defendants failure to pay the sums due after each successive notice of default and demand for cure;

- Debtors failure to maintain, care for, assemble and preserve the Collateral;

- The October 25, 2014, extension/forbearance agreement, and Defendants' failure to comply therewith;

<u>Michael Fischer</u> (live) – Chief Operating Officer, Coldwell Banker Real Estate LLC.  Mr. Fischer may be called to testify as to the following:

- A meeting between business and legal representatives of Coldwell Banker, the Franchisees and the Guarantors that took place on September 4, 2014, in an effort to resolve the defaults under the Franchise Agreement, but which did not result in any agreement or in the cure of the then existing defaults of Franchisees under the Franchise Agreements other than compliance with the

trade name obligations on the website described in the Notice of Non-Compliance;

- ■ Coldwell Banker's irreparable injury due to defendants' unauthorized use of the Coldwell Banker Marks;

<u>Budge Huskey</u> (live) – formerly Chief Executive Officer, Coldwell Banker Real Estate LLC.  Mr. Huskey may be called to testify as to the following:

- ■ A meeting between business and legal representatives of Coldwell Banker, the Franchisees and the Guarantors that took place on September 4, 2014, in an effort to resolve the defaults under the Franchise Agreement, but which did not result in any agreement or in the cure of the then existing defaults of Franchisees under the Franchise Agreements other than compliance with the trade name obligations on the website described in the Notice of Non-Compliance.

Plaintiff reserves the right to decide not to call any of the foregoing.

    b.  On damages on the Complaint, plaintiff intends to call the following witnesses who will testify in accordance with the <u>following summaries</u>:

<u>Jacqueline Bertet</u> (live) – Senior Director for Real Estate Financial Services, Coldwell Banker Real Estate, LLC.  Ms. Bertet will testify as to the amounts due under the Franchise Agreement as set forth above, including the calculation of the Liquidated Damages, and the interest, as well as the amount of attorneys fees actually paid.

<u>Michael Fischer</u> (live) – Chief Operating Officer, Coldwell Banker Real Estate.  Mr. Fischer will testify as to the amounts due under the Lanham Act as set forth above.

Plaintiff reserves the right to decide not to call any of the foregoing.

    c.  On liability in Plaintiff's defense of Defendants affirmative Counterclaims, plaintiff intends to call the following witnesses who will testify in accordance with the <u>following summaries</u>:

<u>Budge Huskey</u> (live) – Mr. Huskey will dispute assertions of Binder on representations made to Binder, and provide general knowledge of relationship to respond to Binder

<u>Marc Seinfeld</u> (live) – Mr. Seinfeld will dispute assertions by Mr. Binder of representations of Coldwell Banker and provide general knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder

Michael Fisher (live) – Mr. Fisher will testify as to efforts by Coldwell Banker to assist Bellmarc with advertising and marketing issues, efforts by Coldwell Banker to bring Previews to Bellmarc, Coldwell Banker's efforts to assist Bellmarc with computer issues, and provide general knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder

Phil Hugh (live) – Mr. Hugh will dispute assertions of Mr. Binder regarding alleged representations by Coldwell Banker, knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder, and testify as to the negotiation and execution of the Franchise Agreement

Rick Gregory (live) – Mr. Gregory will dispute assertions by Mr. Binder of representations of Coldwell Banker, provide general knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder, and testify as to the negotiation and execution of the Franchise Agreement

Rich DeNicola (live) – Mr. DeNicola will dispute assertions by Mr. Binder of representations of Coldwell Banker, provide general knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder, and testify as to the negotiation and execution of the Franchise Agreement

Plaintiff reserves the right to decide not to call any of the foregoing.

    d. On damages in Plaintiff's defense of Defendants' affirmative Counterclaims, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

Michael Fisher (live) – Mr. Fisher will testify as to efforts by Coldwell Banker to assist Bellmarc with advertising and marketing issues, efforts by Coldwell Banker to bring Previews to Bellmarc, Coldwell Banker's efforts to assist Bellmarc with computer issues, and provide general knowledge of the relationship between Coldwell Banker and Mr. Binder to respond to Mr. Binder

    e. Defendant objects to the following witnesses for the reasons stated:  None

12. DEFENDANT'S WITNESSES—[Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial. Indicate whether the witness is expected to testify live or by deposition.]

  A. On liability, defendant intends to call the following witnesses who will testify in accordance with the following summaries:

    6. Neil Binder, Defendant, President of Bellmarc (live)

401 East 34th Street
Apt. # N29C
New York, N.Y. 10016

Will describe all events that took place, portray violations of the Franchise Agreement and misrepresentations, deceptions and related actions by the Plaintiff.

7. Nina Scerbo, Art Director (live)

   401 East 34th Street
   Apt. # N29C
   New York, N.Y. 10016

Will describe procedures for reviewing and submitting ads and promotional materials including the launch brochures by Coldwell Banker. Will describe the Coldwell Banker' participation in creating ads for the Manhattan Initiative that appeared in The New York Times. Will discuss problems with marketing materials

8. Marc Seinfeld, Coldwell Banker Sales Representative (live)

   c/o Coldwell Banker
   175 Park Avenue
   Madison, N.J. 07940

Party who made the preliminary contact with Defendant to become a franchisee. Made representations about referrals and the advantages of becoming an affiliate, which were an integral part of persuading Defendant to become a franchisee.

9. Nelson Bennett, Vice President Northeast Region (live)

   c/o Coldwell Banker
   175 Park Avenue
   Madison, N.J. 07940

Responsible for overseeing Defendant, including ensuring that it conformed to Coldwell Banker policies and procedures.  Made decisions that had significant impact on the operation of the company.

10. Richard Smith, Chairman and CEO, Realogy (live)

   Realogy Holdings Corp
   175 Park Avenue
   Madison, N.J. 07940

Responsible for formulating terms and conditions for the Franchise Agreement with The Bellmarc Group and was the primary party who approved the franchise. Responsible for overseeing Realogy's effort to promote Apollo's secondary offering of Realogy's shares through Project Double Take, including Bellmarc's promotional role in helping to enhance Realogy's stock price.

11. Budge Huskey, President Coldwell Banker (live)

   C/O Coldwell Banker
   175 Park Avenue
   Madison, N.J. 07940

Responsible for overseeing the operation of Coldwell Banker. Made critical decisions that affected the company's operation including a refusal to engage in offsets. Told Binder prior to it entering into a franchise contract that Coldwell Banker would support Bellmarc's effort to create a high-end company with up to $1 million. Responsible for refusing to give Bellmarc franchise contact information. Responsible for pressuring Binder to cut offices from Bellmarc. Handled final negotiations of disputes with Defendant before its termination.

12.    Michael Fischer: Director of Operations (live)

> C/O Coldwell Banker
> 175 Park Avenue
> Madison, N.J. 07940

Responsible for denying Previews to Bellmarc. Responsible for overseeing rental improvements which never occurred. Oversaw advertising for Manhattan Initiatives and was responsible for withholding payment.

13.    Danuta Brodzinska: Bellmarc Controller (live)

> c/o Douglas Elliman
> 575 Madison Avenue
> New York, N.Y. 10022

Responsible for maintaining the books and records of Bellmarc and will attest to the actions taken by Binder relating to non-payment of funds and deal recognition, royalty and BMF payments.

14. E.B. Solomont, Author of Real Deal Articles

> c/o Real Deal Magazine
> 450 West 31st Street
> New York, N.Y. 10001

Will authenticate and testify to Real Deal articles she authored and which are identified in the Bellmarc Defendants' exhibit list.

15. Sandy Sklareski, Former Employee of or Associated with Coldwell Banker
> Address Unknown

Testimony on the topic of promotional material approved by Coldwell Banker for the Bellmarc Defendants' franchise.

16. Karen Burke, Present/Former Senior Director, Broker/Agent Engagement Coldwell Banker
> c/o Coldwell Banker
> 175 Park Avenue
> Madison, N.J.

Testimony on promotional materials and promotional and marketing support of the Bellmarc Defendants by Coldwell Banker.

B.   On damages, defendant intends to call the following witnesses who will testify in accordance with the following summaries:

17.   Steve Murray, President, Real Trends Inc.

7501 Village Square Dr. Suite 200
Castle Rock, CO 80108

Will provide an expert report showing that the value of the business as of May 31, 2014 was $22,185,016.00.

18.   Linda Alexander, Alexander Marketing

1650 Broadway
New York, N.Y. 10019

Will provide a report showing that to remedy the reputation of Binder and Bellmarc will require $500,000.00.

19.   Neil Binder, Expert in Real Estate Finance and Valuation

401 East 34th Street
Apt. N29C
New York, N.Y. 10016

Will give a report showing that there was a loss during the period of operations due the actions of Coldwell Banker of $22,630,662.00. Will also give a report showing that the accretive loss, representing the loss of growth as described in the Bellmarc Business Plan would be $6,614,808.00.

20.  E.B. Solomont, Author of Real Deal Articles

c/o Real Deal Magazine
450 West 31st Street
New York, N.Y. 10001

Will authenticate and testify to Real Deal articles she authored and which are identified in the Bellmarc Defendants' exhibit list.

The Bellmarc Defendants reserve the right not to call any witness set forth in this Pre-Trial Order and reserve the right to call any witnesses designated by Plaintiff.

C.   Plaintiff objects to the following witnesses for the reasons stated:

Nina Scerbo – Ms. Scerbo was not identified as a potential witness in Defendants' Rule 26 disclosures, their answers to interrogatories, or in depositions.  As she is the wife of Defendants Neil Binder, Plaintiff would have taken her deposition.

Accordingly, Plaintiff objects to Ms. Scerbo being identified at this late date, and to her testifying at trial.

Nelson Bennett – the former CEO of Plaintiff.  Mr. Bennett is ill and should not be forced to attend a trial.  His participation is tangential as well.

Richard Smith – completely irrelevant to any issue before this Court, and was never identified in Defendants' discovery responses.  Further, Mr. Smith clearly qualifies as an "apex executive" with no demonstrated personal knowledge relevant to the issues raised by the Counterclaim, and employed by an entity which is not a litigant to this action.

E.B. Solomont – This witness was not identified as a potential witness in Defendants' Rule 26 disclosures, their answers to interrogatories, or in depositions.

Sandy Sklareski – This witness was not identified as a potential witness in Defendants' Rule 26 disclosures, their answers to interrogatories, or in depositions.

Karen Burke, Present/Former Senior Director, Broker/Agent Engagement Coldwell Banker – This witness was not identified as a potential witness in Defendants' Rule 26 disclosures, their answers to interrogatories, or in depositions.  Further, she is believed to be largely irrelevant to the claims.  However, since she was not identified until minutes before the pre-trial order was to be filed, Plaintiff's counsel could not complete any investigation of her relevance to this matter.

13. EXPERT AND SPECIALIZED LAY OPINION WITNESSES—[No expert or specialized lay opinion witness offering scientific, technical, or other specialized knowledge will be permitted to testify at trial unless listed below. A summary of the expert's qualifications and a copy of his/her report must be provided for the Court's review at the pretrial conference. Said summary shall be read into the record at the time he/she takes the stand, and no opposing counsel shall be permitted to question his/her qualifications unless the basis of the objection is set forth herein.]

    a.  Plaintiff's expert and specialized lay opinion witnesses are:

        i.  Complaint, none.

        ii.  Defense of damages on Counterclaims, Susan M. Schnell, MSBA

    b.  Defendant's objections to the qualifications of plaintiff's experts and specialized lay opinion witnesses are:  N/A.

    c.  Defendant's expert and specialized lay opinion witnesses are:

        i.  Defense of Complaint, none.

        ii.  On Affirmative Counterclaims:

1. Steve Murray, RealTrends Inc.

2. Linda Alexander, Alexander Marketing Inc.

3. Neil Binder

d. Plaintiff's objections to the qualifications of defendant's experts and specialized lay opinion witnesses are:

    1. Steve Murray, RealTrends Inc.

    Plaintiff has no objections as to Mr. Murray's qualifications to render a business valuation, but does object to the complete irrelevance of his report (the value of defendants as of May 31, 2014) to damages under the Counterclaim.

    2. Linda Alexander, Alexander Marketing Inc.

    Ms. Alexander has no qualification for quantifying an individual's damages for loss of reputation. Educationally, she has a bachelor's degree in psychology, and no subsequent formal education. Beginning in 1979, she worked in advertising. In or about 1997, she started writing about real estate. In 2000 she started Alexander Marketing Corporation, a public relations firm for the real estate industry. She described PR in real estate as "branding" – letting the public know the names and abilities of the principals of real estate companies. Additionally, she indicates she does "long-term reputation management strategies," – responding to reputational issues for clients. She has no experience in valuation of reputational damages, and has never rendered an expert report

before.  In the end, her calculation of reputational damages was nothing more then what she would charge for a program to attempt to restore Mr. Binder's alleged reputation.

3. Neil Binder

Mr. Binder has fewer qualifications then Ms. Alexander.  He is a defendant in this case, and the owner, directly or indirectly, of each of the other defendants.  Each of them is insolvent and has ceased operations, so he is functionally the only viable defendant.  His claimed expertise to render his opinion is as "an expert in valuation associated with companies relating to operational losses and accreted growth loss, especially as they relate to the affairs of Bellmarc."  Thus, Mr. Binder rendered a report that started with Mr. Murray's valuation of the businesses as of May 31, 2014, and then added additional alleged losses of over $20 million in value of the business, which more than doubled.  Although Mr. Binder has been a real estate broker for 30 years, he has little to no business valuation experience.  What business valuation experience he does have was limited to calculating maintenance fees for coops and cooperative developments, and he hasn't done any of them for over 10 years.  He has no copies of any valuation he previously performed.  His CPA license expired over 20 years ago.  He has no training in business valuation, or an educational background that could assist him (1974 BA in Domestic Government and Law and

a 1976 MBA in Finance).  He testified that he did not rely on any known or recognized methodology, treatises or learned publications, but essentially made it up as he went along.  Between rendering his report on December 7, 2017, and the day he appeared to defend it in depositions, on March 26, 2018, he decided that portions of his methodology were faulty, and delivered an Addendum correcting his methodology at the beginning of his deposition.  At numerous points in his depositions he admitted that facts he relied on were incorrect, or that his interpretation of documents was incorrect, or even that his math was incorrect.  He constantly admitted he had no basis for his methodology other than his own thoughts.  In sum, Mr. Binder was imminently ***un***qualified to render any business valuation opinion, and certainly not on his own business for damages on his counterclaim.

14. PLAINTIFF'S DEPOSITIONS—[List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy among counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.]

   a. On liability on its case in chief, plaintiff intends to read into evidence the following:

   Deposition of Neil Binder October 24, 2016

   10/5-20/17
   15:15-17:18
   62:21-63:15;
   64:20-65:17
   70:20-89:25
   70:20-90:5
   95:1-96:15
   98:20-100:6;
   117:5-20

        119:8-120:18
        209:9-210:11
        Defendants' Responses to Requests for Admission, ¶¶s 5, 9 to 15, 17 to 21, 23 to 25, 26, 27, 28, 88, 89, 90, 91, and 92.

    b.  On damages on its case in chief, plaintiff intends to read into evidence the following:

        <u>Deposition of Neil Binder October 24, 2016</u>

        66:25-69:5
        67:20-69:5
        95:1-96:15

    c.  On defense of liability on Defendants' Counterclaims, plaintiff intends to read into evidence the following:

        <u>Deposition of Neil Binder February 12, 2016</u>

        8:21-25
        27:18-29:7
        30:24-31:25
        35:7-39:15
        46:14-47:11
        96:21-97:4
        185:12-18
        213:2-16
        253:13-254:8
        259:3-260:5
        265:10-268:4
        308:24-310:13
        320:20-324:20
        330:12-334:2
        336:7-338:10
        340:10-25

        <u>Deposition of Neil Binder October 24, 2016</u>

        21:25-30:1
        31:20-36:10
        50:1-19
        51:6-52:20
        52:24-55:3
        55:8-57:6
        61:9-63:18
        64:20-65:17
        66:15-69:5

69:20-81:11
87:13-89:25
90:12-22
95:1-96:15
97:5-7
119:8-120:23
122:8-25
124:15-126:15
133:16-137:15
155:23-159:1
170:25-171:17
173:3-24
174:12-16
178:18-179:13
202:10-203:24
210:14-17

Deposition of Neil Binder March 26, 2018

22:25-23:4
33:7-25
50:12-20
59:8-60:12
63:5-15
99:18-101:16
103:4-105:13
107:8-109:16
119:22-120:5
122:24-124:9
127:4-128:23
152:15-153:4
162:15-163:24
179:19-182:1
190:4-8
197:7-199:5

Deposition of Neil Binder April 3, 2018

217:16-219:19
317:24-326:13
327:22-336:3

    d.  On damages on Defendants' Counterclaims, plaintiff intends to read into evidence the following:

        None.

    e.  Defendant objects to the deposition testimony set forth above for the reasons stated: N/A

15. DEFENDANT'S DEPOSITIONS—[List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy among counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.]

    a.  On liability, defendant intends to read into evidence the following:

        None.

    b.  On damages, defendant intends to read into evidence the following:

        None.

    a.  Plaintiff objects to the deposition testimony set forth above for the reasons stated: N/A

16. PLAINTIFF'S EXHIBITS—[Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.]

    a.  Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit).

        Defendants' exhibit list was not provided until after 7:30 p.m. on October 10, 2018 the day before the pre-trial order was to be filed. It contains numerous documents that have not been produced, or are not identified sufficiently for plaintiff to locate them. Given the time constraints, plaintiff was not able to conduct a through review of the documents that were identified, and could not review at all the documents that were not identified or provided. Accordingly, Plaintiff had no time to determine if additional documents were necessary to respond to the documents on Defendants' list. Accordingly, Plaintiff reserves a right to seek to amend its exhibit list to add documents to respond to defendants' exhibit list.

        Defendants dispute the assertions of Plaintiff in this paragraph a, including all allegations as to the production of documents during discovery, through motions or as part of depositions and the timeliness of the disclosure of information and documents for this Pre-Trial Order. Defendants did not receive a revised draft of the Pre-Trial Order until October 8, 2018, 10:08 pm. Defendants did not receive a revised draft of the Pre-Trial Order until October 8, 2018, 10:08 pm. Defendants reserve the right to amend its contested facts and exhibit list.

b.  Defendant objects to the introduction of plaintiff's exhibits (set forth number of exhibit and grounds for objection):

| Exhibit Reference | | Objection |
|---|---|---|
| (i) | P-7 | Hearsay FRE 802; Authentication FRE 901 |
| (ii) | P-9 | Hearsay FRE 802 |
| (iii) | P-11 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (iv) | P-14 | Hearsay FRE 802; Authentication FRE 901 |
| (v) | P-25 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (vi) | P-26 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (vii) | P-27 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (viii) | P-29 | Relevance FRE 401 & 403 |
| (ix) | P-35 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (x) | P-39 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (xi) | P-42 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (xii) | P-55 | Hearsay FRE 802; Authentication FRE 901; (Completeness of Proposed Exhibit) |
| (xiii) | P-67 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 (Exhibit not completely identified) |
| (xiv) | P-83 | Hearsay FRE 802; Authentication FRE 901 |
| (xv) | P-136 | Hearsay FRE 802; Authentication FRE 901 |
| (xvi) | P-138 | Hearsay FRE 802; Authentication FRE 901 |
| (xvii) | P-146 | Hearsay FRE 802; Authentication FRE 901 (Completeness of Proposed Exhibit) |

| (xviii) | P-178 | Hearsay FRE 802; Authentication FRE 901 |
| (xix) | P-182 | Hearsay FRE 802; Authentication FRE 901 |
| (xx) | P-198 | Hearsay FRE 802; Authentication FRE 901 |
| (xxi) | P-205 | Hearsay FRE 802; Authentication FRE 901 |
| (xxii) | P-215 | Hearsay FRE 802; Authentication FRE 901 (Completeness of Proposed Exhibit) |
| (xxiii) | P-240 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (xxiv) | P-242 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |
| (xxv) | P-247 | Hearsay FRE 802; Authentication FRE 901; Relevance FRE 401 & 403 |

17. DEFENDANT'S EXHIBITS—[Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.]

    a. Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit):

    b. Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

    As an initial matter, Defendants' exhibit list was not provided until after 7:30 p.m. on October 10, 2018 the day before the pre-trial order was to be filed.  It contains numerous documents that have not been produced, or are not identified sufficiently for plaintiff to locate them.  Further, there are many documents that are not relevant, are redundant or which relate to claims of the counterclaim which have been dismissed.  Given the time constraints, plaintiff was not able to conduct a through review of the documents that were identified, and reserves a right to seek to amend its objections.

    Defendants dispute the assertions of Plaintiff in this paragraph a, including all allegations as to the production of documents during discovery, through motions or as part of depositions and the timeliness of the disclosure of information and documents for this Pre-Trial Order.  Defendants did not receive a revised draft of the Pre-Trial Order  until October 8, 2018, 10:08 pm.  Defendants did not receive

a revised draft of the Pre-Trial Order   until October 8, 2018, 10:08 pm. Defendants reserve the right to amend its contested facts and exhibit list.

| Defendants' Exhibit Number | Objection |
| --- | --- |
| 1 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 2 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 3 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 4 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 5 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 6 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 7 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 8 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 9 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 10 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 11 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 12 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 13 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 14 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 15 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 16 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 18 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 19 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 20 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 21 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 22 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 23 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 24a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 24b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 25 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 26a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 26b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 27 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 28 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 29a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 29b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 30 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 31 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 32 | not relevant |
| 33 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 34 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 35 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 37 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 38a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 38b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 39 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 40 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 41 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 42 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 43a | incomplete, full email is CB 3690-3691 |
| 43b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 43c | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 43d | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 44a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 44b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 45 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 46 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 47 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 48 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 49 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 51 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 52 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 53 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 54b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 55 | incomplete document |
| 56b | not relevant, incomplete |

| | |
|---|---|
| 57 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 58 | Not produced in discovery or Rule 26 disclosures, copy not provided by defendants, not relevant |
| 59a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant |
| 59b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant |
| 60 | statement of law, inadmissible |
| 61 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant |
| 62 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant; appears to offer expert opinion; appears to lack foundation; and appears to include hearsay |
| 64 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant; appears to offer expert opinion; appears to lack foundation; and appears to include hearsay |
| 65 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant; appears to offer expert opinion; appears to lack foundation; and appears to include hearsay |
| 66 | incomplete, full email is CB 2558-2561 |
| 67 | not relevant |
| 68 | incomplete, full email is CB 1583-1586 |
| 70 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant; appears to offer expert opinion; appears to lack foundation; and appears to include hearsay |
| 71 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures; not relevant; appears to offer expert opinion; appears to lack foundation; and appears to include hearsay |
| 72 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 73 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 74 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 75 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 76 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 77 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 78 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 79 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 83 | email chain incomplete |
| 84 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 86 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 88 | incomplete.  The email chain is CB 2131 to 2134 |
| 89 | incomplete.  The email chain is CB 2076 to 2081 |
| 90 | incomplete.  The email chain is CB 2076 to 2081 |
| 91 | incomplete.  The email chain is CB 2076 to 2081 |
| 92 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 93 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 94 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| 95 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 96 | not relevant |
| 97 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 98 | incomplete.  The email chain is CB 2371-2372 |
| 100 | incomplete.  The email chain is CB 2371-2372 (see above) |
| 102 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 103 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 104 | ok, if it can be dated.   Also, it goes with BD 364-369 |
| 105 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 106 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 107a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 107b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 107c | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 107d | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 108 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 109a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 109b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 109a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 109b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 109c | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 110 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 111 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 112 | incomplete, email chain is CB 2826-2827 |
| 113 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 114 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 115 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 116 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 117a | not relevant as claim dismissed, and proposed exhibit includes portions of several disparate documents |
| 117b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 117c | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 118a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 118b | CB 19 is ok, objection to other unidentified pages |
| 118c | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 121 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 122 | not relevant, several email chains that are not complete |
| 123 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 124 | not relevant |
| 125 | not relevant |
| 126 | incomplete, email chain is CB 2317-2327 |
| 127 | incomplete, email chain is CB 2317-2327 |
| 128 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 129 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 131 | not relevant |
| 133 | not relevant |
| 134 | not relevant |
| 135 | Not relevant |
| 136 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 137 | not relevant |
| 138 | not relevant |
| 139 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 140 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 141 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 142 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 143 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 144 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 145 | not relevant as claim dismissed |
| 146 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 147 | not relevant |
| 149 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 150 | not relevant |
| 151 | not relevant |
| 152a | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 152b | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 153 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 154 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 155 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 156 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 157 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 158 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 159 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 160 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 161 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 162 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 164 | inaccurate, email is CB 2367-2368 |
| 167 | incomplete, full email is CB 2186-2188 |
| 168 | incomplete, full email is CB 1624-1627 |
| 170 | hearsay; incomplete, full email is CB 2176-2179 |
| 171 | not relevant as claim dismissed |
| 173 | duplicate |
| 174 | incomplete, email chain is CB 2629-2633 |
| 176 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 177 | hearsay; incomplete, full email is CB 2172-2175 |
| 178 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 179 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 180 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 181 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 183 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 184 | incomplete, email chain is 1929-1937 |
| 185 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 186 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 187 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 188 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 189 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 190 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 191 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 192 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 193 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 194 | not relevant |
| 195 | incomplete and illegible, edges cut off |
| 196 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 197 | not relevant |
| 198 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 199 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 200 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 201 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 202 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 203 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 204 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 205 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 206 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 207 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 208 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 209 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 210 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 211 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 212 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 213 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 214 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 215 | not relevant |
| 216 | not relevant |
| 217 | redundant |
| 218 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 219 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 221 | incomplete,  full email is CB 768-770 |
| 223 | redundant |
| 224 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 225 | not relevant as claim dismissed |
| 226 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 227 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 228 | incomplete,  email chain is 2071-2075 |
| 229 | not relevant |
| 230 | redundant |
| 231 | incomplete, email chain is BD 61-62 |
| 234 | not relevant |
| 235 | redundant; not relevant |
| 236 | not relevant |
| 237 | not relevant; object to unidentified pages |
| 238 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 240 | not relevant; redundant |
| 241 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 242 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 243 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 244 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 245 | not relevant |
| 246 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 247 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 248 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 249 | not relevant |
| 250 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 251 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 252 | not relevant; incomplete, email chain is CB 2154-2156 |
| 253 | not relevant; incomplete, email chain is CB 2147-2151 |
| 254 | redundant; not relevant |
| 255 | redundant |
| 256 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 257 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 258 | not relevant |
| 259 | ok |
| 260 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 261 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 262 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 263 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 264 | incomplete document |
| 265 | not relevant |
| 266 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 267 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 269 | redundant |
| 270 | not relevant; redundant |
| 271 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 272 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 273 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 275 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 276 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 277 | incomplete; email chain is 2429-2430 |
| 278 | redundant, see above |
| 279 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 280 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 281 | not relevant |
| 282 | redundant |
| 283 | redundant |
| 284 | redundant |
| 285 | not relevant |
| 287 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 289 | not relevant |
| 290 | redundant |
| 291 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 292 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 293 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 294 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 295 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 296 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 297 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 298 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 299 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 300 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 301 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 303 | not relevant |
| 306 | incomplete, email chain is CB 2314-2316 |
| 307 | incomplete, email chain is CB 2334-2337 |
| 308 | redundant, see above |
| 310 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 311 | redundant |
| 312 | incomplete, email chain is CB 798-805 |
| 313 | redundant, see above |
| 314 | redundant, see above |
| 315 | not relevant |
| 316 | not relevant |

| | |
|---|---|
| 317 | not relevant |
| 318 | not relevant |
| 319 | not relevant |
| 320 | not relevant |
| 321 | not relevant |
| 322 | not relevant |
| 323 | not relevant |
| 324 | not relevant |
| 325 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 327 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 328 | not relevant |
| 329 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 330 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 331 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 332 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 333 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 334 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 335 | not relevant |
| 338 | not relevant as claim dismissed |
| 339 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 340 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 341 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 342 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 343 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 344 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 345 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 346 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 347 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 349 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 350 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 351 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 352 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 353 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 354 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 355 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 356 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 357 | not relevant |
| 358 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 359 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 360 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 361 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 362 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 363 | redundant |
| 364 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 366 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 367 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 368 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 369 | not relevant |
| 370 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 371 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 372 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| 373 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
|-----|-----|
| 374 | incomplete, email chain is 2143-2146 |
| 375 | not relevant; redundant |
| 376 | not relevant; redundant |
| 377 | incomplete, email chain is 2131-2134 |
| 378 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 379 | not relevant |
| 382 | incomplete, email chain is 2047-2049 |
| 383 | redundant |
| 384 | redundant |
| 385 | redundant |
| 386 | not relevant |
| 387 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 388 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 389 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 390 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 391 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 392 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 393 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 394 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 395 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| | |
|---|---|
| 396 | not relevant |
| 397 | not relevant |
| 398 | redundant |
| 400 | not relevant |
| 402 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 403 | not relevant; excerpt from a larger, unidentified document |
| 404 | redundant |
| 405 | incomplete, one page of many |
| 406 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 408 | redundant |
| 412 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 413 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 414 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 415 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 416 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 417 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 418 | redundant |
| 419 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 421 | redundant |
| 422 | redundant and not relevant |
| 423 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

| 424 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 425 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 426 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 427 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 428 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |
| 429 | Copy not provided; document not identified sufficiently for plaintiff to locate and review; may not have been produced in discovery or with Rule 26 disclosures |

[COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND (3) THREE BENCH BOOKS OF EXHIBITS ARE TO BE DELIVERED TO THE JUDGE IN ACCORDANCE WITH "JUDGE ESTHER SALAS'S GENERAL PRETRIAL AND TRIAL PROCEDURES."]

18. PLAINTIFF'S LEGAL ISSUES—[Any issue not listed shall be deemed waived.]

    a. Did Defendants breach of the Franchise Agreement by failure to pay royalty and/or BMF fees in a timely manner;

    b. Did Defendants breach the Franchise Agreement by transfer of ownership of Defendants' corporate entities;

    c. Did Defendants infringement on Coldwell Banker's trademark rights by failure to deidentify promptly and completely;

    d. Are Defendants liable to Coldwell Banker for statutory damages under 25 U.S.C. § 1117(c) of the Lanham Act for infringement (if not resolved on motion *in limine*);

    e. Are Defendants required to provide an accounting for their sales for purposes of confirming royalty and BMF fees due;

    f. Are Defendants required to provide an accounting of how the cash and account receivable Collateral was used;

g.  Did Defendants breach the Security Agreements by failure and/or refusal to assemble the Collateral and deliver it to Coldwell Banker;

h.  Did Defendants breach the Security Agreements by failure and/or refusal to abandoning the Collateral in their leaseholds;

i.  Did Defendants breach the Security Agreements by failure and/or refusal to deliver their cash and account receivables to Coldwell Banker;

j.  Did Neil Binder direct the failure to preserve and deliver the Collateral to Coldwell Banker;

k.  Did Defendants convert to themselves the proceeds of the Conversion Notes and the Collateral;

l.  Have Defendants been unjustly enriched;

m.  Did Neil Binder breach his guaranty of payment of the obligations of Defendants;

19. DEFENDANT'S LEGAL ISSUES—[Any issue not listed shall be deemed waived.]

A. Violation of § 687 of the General Business Law of New York

B. Breach of Covenant of Good Faith

C. Breach of the Franchise Agreement

20. MISCELLANEOUS—[The parties must indicate any other matters that require action by, or should be brought to the attention of, the Court.]

21. JURY TRIALS—[Litigants should send to Chambers two (2) courtesy copies of the following materials. Submissions should be tabbed and spiral bound (not Velo-bound). The materials should also be sent to the Court on a disc in Microsoft Word format. These materials are due no later than forty-five (45) days prior to trial (or as otherwise ordered by the Court). For clarification on the below, the parties are required to consult Part 11.1.1-4 of "Judge Esther Salas's General Pretrial and Trial Procedures."]

a.  Each side shall submit to the Court and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2, with citations to authorities and arguments in support of its position on all disputed issues of law.

b.  The parties are required to confer and submit a combined draft of the proposed jury instructions, including columns indicating disagreements.

c.  Any hypothetical questions to be put to an expert witness on direct examination shall be submitted to the Court and to opposing counsel.

    d.   Counsel shall jointly submit to the Court a single set of proposed *voir dire* questions as to which the parties are in agreement, not to exceed 30 questions. Parties must also identify any disputed questions in column format.

    e.   Counsel shall jointly submit to the Court a single proposed special verdict sheet.

    f.   The parties shall prepare a joint trial exhibit list containing a description of all exhibits. The list shall be divided into three columns: the first column will identify the exhibit; the second column will state the opponent's objection and contain a short statement citing the relevant rule and/or concept that supports the objection; the third column will contain the proponent's rationale for admissibility. The exhibits themselves are to be pre-marked and must include exhibit stickers. Additionally, the parties must prepare three copies of the bench book containing the exhibits that they expect to use.

    g.   The parties shall identify any equitable, legal, or other issues that they contend should be decided by the Court, through a bench trial or otherwise.

22. NON-JURY TRIALS—[The following materials should be submitted to the Court in the same manner as materials for jury trials, listed above. The materials must be submitted no later than forty-five (45) days prior to trial or as otherwise ordered by the Court]:

    a.   Each side shall submit to the Court and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2 with citation to authorities and arguments in support of its position on all disputed issues of law.

    b.   Following a non-jury trial, proposed findings of fact and conclusions of law must be submitted to the Court within one week of the close of trial (or as otherwise ordered by the Court). Submitting litigants must include specific reference to testimonial or documentary evidence in support of the proposals.

    c.   If any hypothetical questions are to be put to an expert witness on direct examination, they shall be submitted to the Court and opposing counsel.

23. TRIAL COUNSEL—[Each party shall identify the names, law firms, addresses, telephone numbers, and email addresses for the attorneys who will try the case on behalf of that party.]

    <u>For Plaintiff</u>:

    David W. Phillips, Esq.
    LeClairRyan
    One Riverside Plaza
    1037 Raymond Boulevard, Sixteenth Floor
    Newark, New Jersey 07105
    Phone: 973.491.3530
    Fax: 973-491-3491
    David.phillips@leclairryan.com

Daniel M. Eliades, Esq.
K&L Gates
One Newark Center - 10th Floor
Newark, New Jersey 07102
Phone: 973 848 4018
Fax: 973 848 4001
Daniel.Eliades@klgates.com


For Defendants (excluding All Enterprises, Inc.):

Laurence D. Pittinsky, Esq.
Rosenberg & Pittinsky, LLP
232 Madison Avenue, Suite 906
New York, New York 10016
Tel. (212) 286-6100, Ext. 308
Fax. (212) 286-6818
larry@rpllplaw.com

24. BIFURCATION—[If any party intends to request phasing, bifurcation, or other procedure concerning the trial length or ordering of evidence, that party shall include any such request herein and explain the basis for the request.]

The parties do not believe bifurcation will result in any savings of trial time.

25. ESTIMATED LENGTH OF TRIAL—[Each party shall specify the number of hours that it contends is appropriate for each party for each of the following: (a) *voir dire;* (b) opening statements; (c) presentation of evidence for liability; (d) presentation of evidence for damages; (e) closing arguments.]

Plaintiff:

    (a) *voir dire*:  n/a

    (b) opening statements: 30 minutes

    (c) presentation of evidence for liability:

        Case in chief: 4 hours

        Defense of counterclaims: 12 hours

    (d) presentation of evidence for damages:

        Case in chief: 1 hour

        Defense of counterclaims: 4 hours

    (e) closing arguments: 1 hour

Defendants:

    (a) *voir dire*: n/a

    (b) opening statements: 1 hour

    (c) presentation of evidence for liability: Approx. 40 hours

    (d) presentation of evidence for damages: 6 hours

    (e) closing arguments: 2 hours.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT WERE THE AMENDMENT DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

DATED:      Newark, New Jersey
               October __, 2018

                                    _____
                                    David W. Phillips, Esq.
                                    Attorney for Plaintiff

                                    _____
                                    Daniel M. Eliades, Esq.
                                    Attorney for Plaintiff

                                    _____
                                    Laurence D. Pittinsky, Esq.
                                    Attorney for Defendants
                                    (Excluding All Enterprises, LLC)

                                    _____
                                    Michael A. Hammer, U.S.M.J.

## Exhibit A

**Plaintiff Coldwell Banker Real Estate, LLC, Exhibits**

P-1.    Real Estate Franchise Agreement dated March 27, 2013, Binder deposition exhibit NB-13;

P-2.    Addendum to Franchise Agreement dated March 27, 2013, Binder deposition exhibit NB-14;

P-3.    2013 Franchise Disclosure Document, bates numbered BD 687 to 817, Binder deposition exhibit NB-15;

P-4.    Amendment to Franchise Agreement dated May 13, 2013, Binder deposition exhibit NB-16;

P-5.    Amendment to the Addendum to Franchise Agreement dated May 22, 2013, Binder deposition exhibit NB-27;

P-6.    First Addendum to Amendment to Franchise Agreement dated October 24, 2013, Binder deposition exhibit NB-28;

P-7.    Master Brand Marketing Fund Addendum to Franchise Agreement dated November 8, 2013, Binder deposition exhibit NB-29;

P-8.    Third Addendum to Amendment to Franchise Agreement dated December 10, 2013, Binder deposition exhibit NB-30;

P-9.    Defendants' Responses to Requests for Admission, ¶¶s 5, 9 to 15, 17 to 21, 23 to 25, 26, 27, 28, 88, 89, 90, 91, and 92.

P-10.   2013 Franchise Disclosure Document, bates numbered CB 3797 to 4215;

P-11.   2014 Franchise Disclosure Document, bates numbered CB 4216 to 4643;

P-12.   Guaranty Agreement of Payment and Performance executed by Nice Idea, All Enterprises, and Neil Binder, Exhibit B to Franchise Agreement, bates numbered BD 633-634.

P-13.   Conversion Promissory Note dated May 15, 2013, in the original principal amount of $1,250,000, Binder deposition exhibit NB-17;

P-14.   Assignment of Conversion Promissory Note by ERA Franchise Systems LLC to Coldwell Banker;

P-15.   Conversion Promissory Note dated December 13, 2013 in the original principal amount of $187,500, Binder deposition exhibit NB-31;

P-16.   Security Agreement entered by The Bellmarc Group LLC, in favor of Plaintiff, Binder deposition exhibit NB-18;

P-17.   Security Agreement entered by AC Lawrence Real Estate LLC, in favor of Plaintiff, Binder deposition exhibit NB-25;

P-18.   Security Agreement entered by Bellmarc Brokerage Midtown Inc., in favor of Plaintiff, Binder deposition exhibit NB-21;

P-19.   Security Agreement entered by Bellmarc Downtown LLC, in favor of Plaintiff, Binder deposition exhibit NB-20;

P-20.   Security Agreement entered by Bellmarc East LLC, in favor of Plaintiff, Binder deposition exhibit NB-23;

P-21.   Security Agreement entered by Bellmarc West LLC, in favor of Plaintiff, Binder deposition exhibit NB-26;

P-22.   Security Agreement entered by Bellmarc Gramercy/Chelsea Inc., in favor of Plaintiff, Binder deposition exhibit NB-22;

P-23.   Security Agreement entered by ALL Enterprises, LLC, in favor of Plaintiff, Binder deposition exhibit NB-19;

P-24.   Security Agreement entered by Nice Idea, LLC, in favor of Plaintiff, Binder deposition exhibit NB-24;

P-25.   UCC-1 Financing Statements for the Security Agreements that are Exhibits 17 through 25;

P-26.   Letter dated July 29, 2014 to Defendants, with all attachments, Binder deposition exhibit NB-34;

P-27.   Letter of August 29, 2014, to Defendants, with all attachments, Binder deposition exhibit NB-35;

P-28.   Complaint, Anthony DeGrotta and Laurence Friedman v. Neil Binder, individually, and d/b/a "Nice Idea LLC" and "A Nice Idea Publishing LLC", Danuta Brodzinska, Steven Beispel, and Nice Idea Publishing Inc., New York Supreme Court, Civil Division (Index No. 652633/2014);

P-29.   A stipulated order was entered in the Supreme Court Action by Judge Friedman on September 8, 2014, Binder deposition exhibit NB-36;

P-30.   Letter dated September 22, 2014, to Defendants, with all attachments, Binder deposition exhibit NB-38;

P-31.   Letters to each of the Defendants dated September 22, 2014, demanding that they assemble and preserve Collateral, combined into one exhibit, with all attachments, Binder deposition exhibits NB-39 to 47;

P-32.   Letter dated October 1, 2014, to Defendants, with all attachments, Binder deposition exhibit NB-48;

P-33.   Letter dated October 10, 2014, with all attachments, Binder deposition exhibit NB-49;

P-34.   Extension/forbearance agreement dated October 25, 2014, and Letter dated October 31, 2014, terminating Extension/forbearance agreement dated October 25, 2014, Exhibit 36 to January 6, 2015 Certification of Budge Huskey, at ECF #4-38;

P-35.   Letter dated December 18, 2014, with all attachments, Binder deposition exhibit NB-50;

P-36.   Injunction dated February 9, 2015, ECF #17;

P-37.   Consent Order Resolving Contempt Motion, filed May 19, 2015, ECF #35;

P-38.   Calculation of Liquidated Damages by office, Exhibit 2 to Certification of Michael Fischer, filed in this action on September 22, 2017, at ECF #100-4, pages 12 to 21;

P-39.   Affidavit of Neil Binder in Support of Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated September 10, 2014, filed in *Friedman v. Binder*, New York Supreme Court, New York County, Index No. 652633/2014, Binder deposition exhibit NB-37;

P-40.   Affidavit of Neil Binder in Opposition to Plaintiff's Order to Show Cause for a Appointment of a Receiver, dated October 27, 2016, filed in *Capital One, N.A., v. Binder*, New York Supreme Court, Suffolk County, Index No. 67110/2014;

P-41.   Decision and Order dated August 24, 2016, by Justice Manuel Martinez of the New York County Supreme Court.  *In The Matter of the Application of Capital One, N.A., against Nievda Inc., and Nina Scerbo*, Supreme Court of New York, New York County, Index. No. 152583/2016;

P-42.   email dated 9/13/2012, bates numbered BD 320 to 320

P-43.   email dated 2/27/2013, bates numbered BD 316 to 318

P-44.   email dated 2/27/2013, bates numbered CB 1465 to 1465

P-45.   email dated 2/27/2013, bates numbered CB 1466 to 1466

P-46.   email dated 3/3/2013, bates numbered CB 1464 to 1464

P-47.   email dated 3/4/2013, bates numbered CB 1470 to 1472

P-48.   email dated 3/7/2013, bates numbered BD 305 to 306

P-49.   email dated 3/11/2013, bates numbered CB 2832 to 2832

P-50.   email dated 3/19/2013, bates numbered CB 1494 to 1494

P-51.   email dated 3/21/2013, bates numbered CB 1482 to 1483

P-52.   email dated 3/24/2013, bates numbered CB 1497 to 1497

P-53.   email dated 3/25/2013, bates numbered CB 1495 to 1496

P-54.   email dated 3/26/2013, bates numbered BD 600 to 646

P-55.   email dated 3/28/2013, bates numbered CB 1485 to 1485

P-56.   email dated 4/7/2013, bates numbered CB 3506 to 3509

P-57.   email dated 4/18/2013, bates numbered BD 54 to 60

P-58.   email dated 4/30/2013, bates numbered BD 358 to 369

P-59.   email dated 5/2/2013, bates numbered BD 280 to 280

P-60.   email dated 6/17/2013, bates numbered CB 1551 to 1553

P-61.   email dated 6/30/2013, bates numbered BD 384 to 406

P-62.   email dated 7/11/2013, bates numbered CB 2445 to 2445

P-63.   email dated 7/16/2013, bates numbered CB 3639 to 3640

P-64.   email dated 7/16/2013, bates numbered CB 3643 to 3644

P-65.   email dated 9/10/2013, bates numbered CB 3156 to 3160

P-66.   email dated 10/1/2013, bates numbered CB 2409 to

P-67.   email dated 10/15/2013, bates numbered BD 133 to 151

P-68.   email dated 10/15/2013, bates numbered BD 205 to 206

P-69.   email dated 10/15/2013, bates numbered CB 2426 to 2428

P-70.   email dated 10/15/2013, bates numbered CB 2426 to 2428

P-71.   email dated 10/16/2013, bates numbered CB 2429 to 2431

P-72.   email dated 10/30/2013, bates numbered CB 3121 to 3122

P-73.   email dated 11/2/2013, bates numbered BD 257 to 257

P-74.   email dated 12/11/2013, bates numbered BD 218 to 218

P-75.   email dated 1/14/2014, bates numbered BD 202 to 202

P-76.   email dated 1/18/2014, bates numbered BD 184 to 189

P-77.   email dated 1/21/2014, bates numbered BD 174 to 174

P-78.   email dated 1/24/2014, bates numbered BD 319 to 319

P-79.   email dated 1/28/2014, bates numbered BD 123 to 125

P-80.   email dated 1/28/2014, bates numbered BD 375 to 375

P-81.   email dated 1/30/2014, bates numbered CB 3015 to 3016

P-82.   email dated 2/7/2014, bates numbered CB 2197 to 2309

P-83.   email dated 2/20/2014, bates numbered CB 2157 to 2171

P-84.   email dated 2/21/2014, bates numbered CB 2147 to 2151

P-85.   email dated 2/21/2014, bates numbered CB 2152 to 2153

P-86.   email dated 2/26/2014, bates numbered BD 76 to 76

P-87.   email dated 2/26/2014, bates numbered BD 77 to 77

P-88.   email dated 3/3/2014, bates numbered BD 85 to 89

P-89.   email dated 9/23/2014, bates numbered CB 2035 to 2035

P-90.   NY Alliance memo, bates numbered BD 252 to 256

P-91.   Business Plan, bates numbered BD 376 to 383

P-92.   Bellmarc Metropolitan Alliance form of agreement with brokers, bates numbered BD 93 to 103

P-93.   email dated 12/13/2013, and attachment, bates numbered BD 00001 to 11

P-94.   email dated 12/12/2013, bates numbered BD 000013

P-95.   email dated 12/3/2014, bates numbered BD 00020 to 21

P-96.   email dated 9/3/2014, bates numbered BD 00039

P-97.   email dated 9/2/2014, bates numbered BD 00044

P-98.   email dated 8/29/2014, bates numbered BD 00045

P-99.   email dated 8/11/2014, bates numbered BD 00046

P-100. email dated 7/14/2013, and attachment, bates numbered BD 00053 to 60

P-101. email dated 7/10/2014, bates numbered BD 00061 to 62

P-102. email dated 6/11/2014, bates numbered BD 00067

P-103. email dated 2/26/2014, bates numbered BD 00076

P-104. email dated 2/26/2014, bates numbered BD 00077 to 78

P-105. email dated 3/4/2014, bates numbered BD 00085 to 88

P-106. email dated 5/30/2014, bates numbered BD 00108

P-107. email dated 6/13/2014, bates numbered BD 00118

P-108. email dated 1/28/2014, bates numbered BD 00123 to 125

P-109. letter, Neil Binder to Nelson Bennett, undated, bates numbered BD 00133 to 151

P-110. letter, Neil Binder to Budge Huskey, undated, bates numbered DB 00155 to 168

P-111. email dated 1/23/2014, bates numbered BD 00172

P-112. email dated 1/21/2014, bates numbered BD 00174

P-113.  email dated 1/21/2014, and attachments, bates numbered BD 00175 to 183

P-114.  email dated 1/15/2014, bates numbered BD 00201

P-115.  email dated 1/2/2014, bates numbered BD 00207

P-116.  email dated 12/30/2013, bates numbered BD 00201

P-117.  email dated 12/11/2013, bates numbered BD 00218

P-118.  email dated 11/12/2013, bates numbered BD 00257

P-119.  email dated 11/6/2013, bates numbered BD 00258 to 260

P-120.  email dated 7/27/2013, bates numbered BD 00277

P-121.  email dated 3/3/2013, bates numbered BD 00312 to 314

P-122.  email dated 2/27/2013, bates numbered BD 00316 to 318

P-123.  letter dated 9/13/2012, bates numbered BD 00320

P-124.  letter dated 8/20/2012, bates numbered BD 00326 to 327

P-125.  Bellmarc Business Plan, bates numbered BD 00384 to 406

P-126.  Account summaries, BD 00496 to 523

P-127.  Franchise Disclosure Document, bates numbered BD 00687 to 817

P-128.  email dated 12/31/2013, bates numbered CB 163

P-129.  email dated 10/31/2013, bates numbered CB 164

P-130.  email dated 1/27/2014, bates numbered CB 164-165

P-131.  email dated 3/20/2014, bates numbered CB 167-168

P-132.  email dated 4/15/2014, bates numbered CB 169-170

P-133.  email dated 1/21/2014, bates numbered CB 174-175

P-134.  email dated 1/6/2014, bates numbered CB 176-180

P-135.  email dated 1/18/2014, bates numbered CB 198-203

P-136.  letter dated 3/26/2014, bates numbered CB 205-212

P-137.  email dated 5/07/2014, bates numbered CB 223

P-138.  email dated 6/04/2014, bates numbered CB 234-236

P-139.  email dated 7/29/2013, bates numbered CB 262

P-140.  email dated 12/26/2013, bates numbered CB 364

P-141.  email dated 6/16/2014, bates numbered CB 411- 416

P-142.  letter dated 12/31/13, bates numbered CB 434

P-143.  email dated 4/30/2014, bates numbered CB 476-477

P-144.  email dated 7/22/2013, bates numbered CB 478-479

P-145.  email dated 5/21/2014, bates numbered CB 541-542

P-146.  email dated 12/23/2013, bates numbered CB 768-770

P-147.  email dated 3/31/2014, bates numbered CB 1215-1223

P-148.  memo dated 3/7/13 bates numbered CB 1425-1426

P-149.  email dated 6/12/13 bates numbered CB 1428-1430

P-150.  email dated 3/21/13 bates numbered CB 1433

P-151.  email dated 3/23/13 bates numbered CB 1434

P-152.  email dated 3/21/13 bates numbered CB 1436-1437

P-153.  email dated 5/2/13 bates numbered CB 1455-1457

P-154.  email dated 3/5/13 bates numbered CB 1466

P-155.  email dated 3/3/13 bates numbered CB 1468-1469

P-156.  email dated 6/13/13 bates numbered CB 1511

P-157.  email dated 6/3/13 bates numbered CB 1512

P-158.  email dated 4/11/13 bates numbered CB 1518

P-159. email dated 6/7/13 bates numbered CB 1519-1521

P-160. email dated 6/7/13 bates numbered CB 1528

P-161. email dated 6/14/13 bates numbered CB 1537-1538

P-162. email dated 6/24/13 bates numbered CB 1541-1542

P-163. email dated 6/17/13 bates numbered CB 1551-1553

P-164. email dated 4/18/13 bates numbered CB 1583-1586

P-165. email dated 6/14/13 bates numbered CB 1592-1593

P-166. email dated 6/14/13 bates numbered CB 1594-1595

P-167. financial statements of Bellmarc, bates numbered CB 1607-1617

P-168. calendar entry and email dated 2/17/14 bates numbered CB 1624-1627

P-169. calendar entry dated 7/13/13 bates numbered CB 1631

P-170. calendar entry dated 12/9/13 bates numbered CB 1632

P-171. calendar entry dated 6/28/13 bates numbered CB 1633

P-172. calendar entry dated 7/31/13 bates numbered CB 1634

P-173. calendar entry dated 8/5/13 bates numbered CB 1635

P-174. calendar entry dated 2/7/14 bates numbered CB 1644

P-175. email dated 12/31/13 bates numbered CB 1647

P-176. email dated 10/31/13 bates numbered CB 1648

P-177. email dated 1/27/14 bates numbered CB 1649-1650

P-178. email dated 11/1/13 bates numbered CB 1652-1653

P-179. email dated 2/11/14 bates numbered CB 1654

P-180. email dated 12/6/13 bates numbered CB 1658

P-181. email dated 1/23/14 bates numbered CB 1668-1686

P-182. email dated 6/20/14 bates numbered CB 1691

P-183. email dated 8/19/14 bates numbered CB 1761-1762

P-184. email dated 1/31/14 bates numbered CB 1766

P-185. letter dated 7/29/14 bates numbered CB 1797-1799

P-186. email dated 2/11/14 bates numbered CB 1809

P-187. email dated 12/20/13 bates numbered CB 1820-1821

P-188. email dated 6/6/13 bates numbered CB 1882-1883

P-189. email dated 7/29/13 bates numbered CB 1924-1925

P-190. email dated 8/2/13 bates numbered CB 1926-1928

P-191. email dated 3/17/14 bates numbered CB 1954-1961

P-192. email dated 10/19/13 bates numbered CB 2005-2006

P-193. email dated 6/29/14 bates numbered CB 2013-2014

P-194. email dated 6/20/14 bates numbered CB 2016-2019

P-195. email dated 8/28/14 bates numbered CB 2046

P-196. email dated 8/13/14 bates numbered CB 2063

P-197. email dated 4/25/14 bates numbered CB 2137

P-198. email dated 3/25/14 bates numbered CB 2141-2142

P-199. email dated 2/21/14 bates numbered CB 2152-2153

P-200. email dated 2/19/14 bates numbered CB 2172-2175

P-201. email dated 2/19/14 bates numbered CB 2176-2179

P-202. email dated 2/15/14 bates numbered CB 2189-2191

P-203. email dated 2/8/14 bates numbered CB 2192-2196

P-204. email dated 2/7/14 bates numbered CB 2197-2309

P-205. email dated 2/1/14 bates numbered CB 2310-2312

P-206. email dated 1/16/14 bates numbered CB 2334-2337

P-207. email dated 1/14/14 bates numbered CB 2343

P-208. email dated 1/2/14 bates numbered CB 2344

P-209. email dated 1/2/14 bates numbered CB 2345-2348

P-210. email dated 11/21/13 bates numbered CB 2367-2368

P-211. email dated 8/20/14 bates numbered CB 2419-2420

P-212. email dated 6/17/13 bates numbered CB 2447

P-213. email dated 6/14/13 bates numbered CB 2453-2454

P-214. email dated 6/11/13 bates numbered CB 2458-2469

P-215. email dated 6/10/13 bates numbered CB 2481-2482

P-216. email dated 4/4/13 bates numbered CB 2658-2660

P-217. email dated 1/30/14 bates numbered CB 3017-3018

P-218. email dated 1/15/14 bates numbered CB 3026

P-219. email dated 1/3/14 bates numbered CB 3033

P-220. email dated 12/3/13 bates numbered CB 3061-3064

P-221. email dated 12/2/13 bates numbered CB 3097-3098

P-222. email dated 10/30/13 bates numbered CB 3121-3122

P-223. email dated 9/11/13 bates numbered CB 3153-3155

P-224. email dated 9/10/13 bates numbered CB 3161-3165

P-225. email dated 8/19/13 bates numbered CB 3207-3208

P-226. email dated 7/3/13 bates numbered CB 3230

P-227. email dated 7/2/13 bates numbered CB 3236-3237

P-228. email dated 6/27/13 bates numbered CB 3243

P-229. email dated 6/19/13 bates numbered CB 3250

P-230. email dated 6/7/13 bates numbered CB 3359-3361

P-231. email dated 6/3/13 bates numbered CB 3367-3368

P-232. email dated 3/27/13 bates numbered CB 3555

P-233. email dated 2/27/13 bates numbered CB 3585-3586

P-234. email dated 7/16/13 bates numbered CB 3643-3644

P-235. email dated 6/14/13 bates numbered CB 3660

P-236. email dated 6/14/13 bates numbered CB 3662

P-237. email dated 6/13/13 bates numbered CB 3668-3677

P-238. Franchise Disclosure Document dated 3/30/12 bates numbered CB 3797-4215

P-239. Franchise Disclosure Document dated 3/29/13 bates numbered CB 4216-4643

P-240. email dated 6/02/2014, bates numbered CB 2086 to 2087

P-241. Affidavit of Anthony DeGrotta dated September 4, 2014, filed in the Supreme Court action, with exhibits.

P-242. email dated 10/17/2013, bates numbered CB 2423 to 2428

P-243. email dated 10/16/2013, bates numbered CB 2429 to 2431

P-244. email dated 7/22/14, bates numbered CB 2994 to 2995

P-245. organizational structure, first page only, CB 2410

P-246. financial records produced by Defendants, B-RT-0004-6, 16-27 and 36-39

## Exhibit B

## The Bellmarc Defendants, Exhibits

| Exhibit | Description (Abbreviated) | Designation |
|---------|--------------------------|-------------|
| D1 | Budge Huskey profile | |
| D2 | Realogy news release on successor to Huskey | |
| D3 | Richard Smith profile | |
| D4 | Alex Periello profile | |
| D5 | Andrew Napurano profile | |
| D6 | Nelson Bennett profile | |
| D7 | Michael Fischer profile | |
| D8 | Sean Blankenship profile | |
| D9 | David Marine profile | |
| D10 | David Siroty profile | |
| D11 | Peter Turtzo profile | |
| D12 | Marc Seinfeld profile | |
| D13 | Richard DeNicola profile | |
| D14 | Rick Gregory profile | |
| D15 | Phil Hugh profile | |
| D16 | Dawn Covahey profile | |
| D17 | Neil Binder CV | |
| D18 | Coldwell Banker application form | |
| D19 | Seinfeld to Binder Email 07/13/2012 (Lunch Meeting) | |
| D20 | Seinfeld to Binder Email 08/10/2012 (Lunch Set-Up) | |
| D21 | Binder to Seinfeld Email 08/13/2012 (Training Memo) | |
| D22 | Binder to Seinfeld Email 08/13/2012 (Recruiting) | |
| D23 | Binder to Seinfeld Email 08/13/2012 (Disclosure Docs) | CB2826 |
| D24a | Binder to Seinfeld Email 8/16/2012 (Business Plan) | |
| D24b | Business Plan dated August 16, 2012 | |
| D25 | Seinfeld to Binder Email 08/16/2012 (VIP Meeting) | |
| D26a | Binder to Seinfeld Email 08/20/2012 (Proposed Terms) | BD0326-0327 |
| D26b | Binder to DeNicola Email 08/20/2012 (AC Lawrence Transaction) | |
| D27 | Seinfeld to Binder Email 08/17/12 (Info. Request) | |
| D28 | Binder to DeNicola Email 08/21/2012 (Info. to CB) | |
| D29a | DeNicola to Binder Email 08/21/2012 (Financial Questions) | |
| D29b | Binder to DeNicola Email 08/21/2012 (Financials) | |
| D30 | Binder to DeNicola Email 08/30/2012 (Company. Strategy) | BD0322-0323 |
| D31 | Seinfeld, Binder and DeNicola Email 09/03/2012 (Lunch A Voce) | |

| | | |
|---|---|---|
| D32 | CB Memorandum 08/14/2012 (Bellmarc Deal Initial Terms) | CB3793 |
| D33 | Binder to DeNicola Email 09/13/2012 (Proposal Response) | BD0320 |
| D34 | DeNicola to Binder Email 10/09/2012 (Legacy Debt Financing) | |
| D35 | Legacy Debt Schedule (09/13/2012) | |
| D36 | Hugh/Binder Negotiating Documents 02/27/2013 | CB1466-1467 |
| D37 | Gregory to Binder Email 03/25/2013 (Board Signoff/Apollo) | |
| D38a | Fischer to Gregory Email 03/11/2013 (NYTimes CB One-Third Payment) | |
| D38b | Fischer to Gregory Email 03/11/2013 (Previews) | |
| D39 | Marine to Fischer Email 04/11/2013 (Lower Third Design-Bellmarc) | CB2642 |
| D40 | Franchise Agreement Addendum Redlined 03/27/2013 | |
| D41 | Siroty to Huskey Email 02/27/2013 (Social Media Audit) | CB3762 |
| D42 | Execution Memo 03/27/2013 (Marc Seinfeld) | CB0319-0327 |
| D 43a | Sklareski to Kemlock Email 06/04/2013 (Brochure Comments) | CB3690 |
| D43b | Brochure CB Edits 06/06/2013 | |
| D43c | Sklareski to Scerbo Email 06/06/2013 (Brochure approval) | |
| D43d | Sklareski to Scerbo Email 06/04/2013 (Disclaimer) | |
| D44a | CB Announcement Brochure (Outside) 06/13/2013 | |
| D44b | CB Announcement Brochure (Inside) 06/13/2013 | |
| D45 | Budge Huskey Welcome Letter 06/13/2013 | |
| D46 | Bellmarc Affiliation Announcement Agenda 06/11/2013 | CB3343 |
| D47 | Periello to Huskey Email 06/13/2013 (Compliment – NY Press) | CB1512 |
| D48 | Franchise Agreement, amendments and related documents | BD600-669 |
| D49 | CB Disclosure Document 12/06/2012 | |
| D50 | Promissory Notes dated 06/12/2013 | BD0674-0678 |
| D51 | Coldwell Banker Policy and Procedures Manual | |
| D52 | NAR Code of Ethics | |
| D53 | Realogy Code of Ethics | |
| D54a | Broderick to Binder Email 11/22/2013 (Second Amendment) | BD0249 |
| D54b | Second Amendment 11/22/2013 | |
| D55 | Binder to Broderick Email 12/11/2013 (Sec. Amendment Objections) | BD0217 |
| D56a | Hughes to Hull et al Email 03/21/2013 (Friedman/DeGrotta Guaranty) | CB1433 |
| D56b | Guarantees – Companies/Neil Binder 06/13/2013 | BD633-634 |
| D57 | Binder Email 12/10/2013 (Signed Third Addendum) | |
| D58 | Hunt Kennedy Franchise Agreement 02/14/1996 | CBHK0002-0069 |
| D59a | CB Hunt Kennedy Dispute (Arbitration Decision 06/29/2005 | |
| D59b | Petition US District Court Arbitration Award Hunt Kennedy 07/11/2005 | |
| D60 | FTC Franchise Rule Compliance Guide | |
| D61 | Realogy Chairman Richard Smith Ltr. (Ethics) | |

| | | |
|---|---|---|
| D62 | Merriam Webster Definition of "network" | |
| D63 | CB Course Conduct (30 day payment rule) 01/21/2014 | CB1311-1313 |
| D64 | Analysis-Franchise outlets by state | |
| D65 | Analysis- Agent counts for Corcoran, Citi Habitats, Bellmarc | |
| D66 | Two franchise Codes for Bellmarc and AC Lawrence 05/17/2013 | CB2558 |
| D67 | Bellmarc Offices-Photographs | |
| D68 | Binder to Gregory Email 04/15/2013 (Bellmarc Structure) | CB1584-1585 |
| D69 | CB Employees Compensation - Bellmarc Deal 06/13/2013 | CB3796 |
| D70 | Realogy Ethics Announcement 03/7/2016 | |
| D71 | Merriam Webster Definition of "extent" | |
| D72 | Fischer to Gregory Email 03/11/2013 (Previews-Franchise Agmnt) | |
| D73 | AC Lawrence Financial Statement for 2012 | |
| D74 | Bellmarc Financial Statement for 2012 | |
| D75 | Neil Binder Personal Financial Statement 2012 | |
| D76 | Inception Statement for The Bellmarc Group 01/01/13 | |
| D77 | Bellmarc Group Financial Statement for 9 months ending 09/30/2013 | |
| D78 | Neil Binder Personal Financial Statement September 2013 | |
| D79 | Bellmarc Group Interim Financial Statement as of June 30, 2014 | |
| D80 | Bellmarc Financial Statement for 2013 | CB2108-2119 |
| D81 | Bellmarc Financial Statement for 2014 | |
| D82 | Neil Binder Personal Financial Statement for Y/E December 2017 | |
| D83 | Binder to Hugh Email 03/05/2013 (Empathize Position) | BD0307 |
| D84 | Binder to DeNicola Email 02/08/2013 (Financial Information) | |
| D85 | Bennett to Huskey Email 10/29/2013 (NB Financial Docs.) | CB2394 |
| D86 | Binder to Bennett Email 10/30/2013 (Bellmarc Cash Flow) | |
| D87 | Bennett to Huskey et al Email 11/04/2013 (Finances) | CB2373 |
| D88 | Binder to Bennett Email 04/29/2014 ($250,000.00) | CB2132 |
| D89 | Binder to Bennett Email 06/20/2014 ($450,000.00) | CB2076-2079 |
| D90 | Bennett to Huskey Email 06/21/2014 (Binder's Numbers) | CB2076-2078 |
| D91 | Huskey to Bennett Email 06/21/2014 (Discrepancy Call) | CB2076-2080 |
| D92 | Bennett Email (Acknowledgment Funds due Bellmarc) | |
| D93 | Bellmarc Policy Manual 01/01/2014 | |
| D94 | Bellmarc Group Operating Agreement 10/24/2012 | |
| D95 | Bellmarc Group Business Plan 07/05/2013 | |
| D96 | Bellmarc Group Business Plan October 2013 | CB2409-2416 |
| D97 | Gregory to Binder Email 11/05/2013 (Status Meeting) | |
| D98 | Binder to Bennett Email 11/12/2013 (Expenses Memorandum) | CB2372 |
| D99 | Binder to Bennett Memo. 11/09/2013 (What Happened/Plan Expenses) | BD0133-0151 |
| D100 | Bennett to Huskey Email 11/15/2013 (November Plan Comments) | CB2371 |

| | | |
|---|---|---|
| D101 | Plan for Premier Properties 07/07/2013 | BD0364-0369 |
| D102 | Binder to Huskey Memo Premier Properties 10/17/2013 | |
| D103 | Huskey to Bennett Email 11/15/2013 (Rental Problems) | CB2371 |
| D104 | Referral and Relocation Plan 12/10/213 | BD0345-0356 |
| D105 | CB Refusal to permit Previews advertising 01/14/2014 | |
| D106 | Confirmation of Premier Properties commission program | |
| D107a | Previews promotional material and website | |
| D107b | Previews promotional material and website | |
| D107c | Previews promotional material and website | |
| D107d | Previews promotional material and website | |
| D108 | Referral and relocation point of sale material | |
| D109a | Manhattan Apartments Lease Emails 03/25/2013 | |
| D109b | Manhattan Apartments Arrangement 03/21/2013 | |
| D109a | New York Living Solutions agreement 11/05/2013 | |
| D109b | New York Living Solutions Contract | |
| D109c | New York Living Solutions Correspondence 11/21/2013 | |
| D110 | Simone Song Purchase Agreement 10/24/2013 | |
| D111 | Blankenship to Binder Email 12/11/2013 (Promotion Previews) | |
| D112 | DeNicola to Binder Email 03/22/2013 (CB Book Sponsor) | CB2826 |
| D113 | Real Deal William Raveis Bellmarc Acquisition (04/08/2011) | |
| D114 | Real Deal William Raveis Deal Scuttled 05/10/2011 | |
| D115 | Bellmarc 2013 Projection | |
| D116 | Bellmarc Budget for 2014–2015 | |
| D117a | Invoices, NYTimes, Real Deal Ads/Entire Franchise Term | CB2376-2396 CB0499-0505 |
| D117b | NYTimes Ads | |
| D117c | Real Deal Ads | |
| D118a | CB Account Statement List | |
| D118b | CB Account Statements | CB0019 + various |
| D118c | CB Account Statement December 2014 | |
| D119 | FAQs on Bellmarc for PR 04/16/2013 | CB3492-3494 |
| D120 | Bennett to Fischer Email 09/11/2013 (Binder's Book) | CB2442-2443 |
| D121 | Binder to Fischer Email 6/4/13 (Manhattan Initiative) | |
| D122 | CB Signage Internal Docs March 24 – April 19, 2013 | |
| D123 | Gen Blue Flyer 09/16/2013 | |
| D124 | Bennett to Binder Email 08/01/2013 (Binder Book) | CB2442-2443 |
| D125 | Santone to Huskey et al. Email 09/12/2013 (Binder Book) | CB2439 |
| D126 | Binder to Blankenship et al Memo 01/18/2014 (Advertising) | CB2323 |
| D127 | Blankenship to Binder Email 01/21/2014 (NYTimes Ads) | CB2317 |

| | | |
|---|---|---|
| D128 | DeNicola to Fischer Email 03/11/2013 CB Ad NYTimes) | |
| D129 | Fischer to Gregory Email 03/11/2013 (Previews Reference) | |
| D130 | Marine to Corporate "Monumental Occasion" 06/14/2013 | CB3256 |
| D131 | NYTimes Ads. Announcing Bellmarc Franchise 06/14/2013 | |
| D132 | Blankenship Email 07/16/2013 ("Gateway to NYC" | CB3639-3640 |
| D133 | Panus to Siroty Email 03/27/2013 (Earnings Launch Date) | CB3562 |
| D134 | Real Deal Article 06/13/2013 (Bellmarc CB Franchise) | BD0336 |
| D135 | Real Deal Article Bellmarc 09/01/2013 | |
| D136 | DeNicola to Binder Email 03/27/2013 (Franchise Agreements) | |
| D137 | Project Double-Take Emails Realogy Executives 03/24/2013 | CB1434, CB1495 CB1579, CB1581 |
| D138 | Project Double-Take Emails CB executives | CB1495, CB1581, CB1579 |
| D139 | Gregory to Binder Email 03/25/2013 (Apollo) | |
| D140 | Binder to Bennett Email 10/22/2013 (Lisa Kulka) | |
| D141 | Selection Portfolio handouts | |
| D142 | HomePik brochure | |
| D143 | SPValuation 258 Saint Nicholas Avenue 3B | |
| D144 | Periello to Hugh Email 03/24/2013 (Approval) | |
| D145 | Marine to Fischer Email 04/17/2013 (NYTimes Ads Plans) | |
| D146 | Bellmarc Recruiting Brochure | |
| D147 | Bennett to Fischer Email 04/19/2013 (Brand) | CB2610 |
| D148 | Fischer to Kenock Email 04/09/2013 (Rental) | CB2641 |
| D149 | Bellmarc Pitch Packet | |
| D150 | Gregory Initial Due Diligence 02/07/2013 | CB2863 |
| D151 | Real Deal Advertorial 01/01/2014 (Training) | CB2845 |
| D152a | Real Deal Article 03/11/2016 (Receivership) | |
| D152b | Real Deal Article 03/28/2016 (Receivership) | |
| D153 | Real Deal Article 01/12/2016 | |
| D154 | Real Deal Ad for The Ultimate Guide | |
| D155 | Perspectives in Property Management | |
| D156 | Process of Persuasion | |
| D157 | How to Become a Great Rental Agent | |
| D158 | Bellmarc Training Program Schedule | |
| D159 | Bellmarc Sales Agent Test and Answers | |
| D160 | Computer listing system manual | |
| D161 | Bellmarc Sales Training Videos | |
| D162 | Patents invented by Binder | |
| D163 | Rental Meeting June 27, 2013 | CB1639 |

| | | |
|---|---|---|
| D164 | Rental Meeting CB Notes August 26, 2013 | CB2368-2369 |
| D165 | Rental Meeting CB Notes November 25, 2013 | CB2363 |
| D166 | Rental Meeting CB Notes December 20, 2013 | CB2363 |
| D167 | Rental Meeting CB Notes February 14, 2014 Previews | CB2186 |
| D168 | Rental Meeting CB Notes February 19, 2014 | CB1624-1625 |
| D169 | Fischer to Rubenstein Email 12/20/2013 (NRT Rentals) | CB2362 |
| D170 | Covahey to Huskey et al Email 02/14/2013 (CB Rentals) | CB2178 |
| D171 | Marine to Fischer et al Email 06/17/2013 (Marketing Funds | CB2447-2449, CB2663 |
| D172 | Blankenship to Burke Email 06/19/2013 (Marketing Material) | CB3250 |
| D173 | Burke to Bennett Email 06/19/2013 (DeGrotta and Scerbo) | CB3250 |
| D174 | Galasso to Fischer Email 04/16/2013 (Rentals Launch) | CB2629 |
| D175 | Periello Email 04/17/2013 (Cash Flow Concern) | CB1492 |
| D176 | Real Deal Article 09/25/2013 (NYC Real Estate Books) | |
| D177 | DeGrotta to Covahey Email 02/10/2014 (Rental Market) | CB2174 |
| D178 | Real Deal Article 12/01/2015 (Manhattan's Rental Elite) | |
| D179 | Corcoran, Citi Habitat Rental Reports 4th Qtr 2015 | |
| D180 | Articles Manhattan Rental Market 06/10/2015 | |
| D181 | Binder to Seinfeld and Gregory Email 01/24/2014 (Problems) | |
| D182 | Binder to Huskey Letter Complaint 02/20/2014 | CB2157-2171 |
| D183 | Friedman to Bennett Email 02/18/2014 (Finders Fees) | |
| D184 | Bennett to Ferrazzano Email 02/25/2014 (Finders Fees) | CB1935 |
| D185 | Real Deal Realogy IPO 08/1/2012 | |
| D186 | NYTimes Article Apollo Wizardry 10/09/2012 | |
| D187 | Forbes Article 10/11/2012 Realogy Rises from the Ashes | |
| D188 | Bloomberg Article 04/11/2012 Realogy Falls on Sales Estimate | |
| D189 | Motley Fool Article 07/16/2013 Realogy Stock Sold Secondary Offering | |
| D190 | Law360 Article 07/17/2013 Apollo Exit Realogy Secondary Share Sale | |
| D191 | Motley Fool Article 05/05/2014 Why Realogy Holdings Corp Shares Sank | |
| D192 | Realogy news release 04/16/2013 Closing of Secondary Offering | |
| D193 | Realogy news release 07/16/2013 Sale of Remaining Stock | |
| D194 | Bennett to Binder Email 03/06/2014 (Meeting) | BD0115 |
| D195 | Bennett to Binder Huskey 08/08/2014 (Balances, Terminations) | BD0049 |
| D196 | Real Deal List of Articles - Binder and Bellmarc | |
| D197 | Inman News 06/13/2013 CB Awards Franchise Bellmarc Group | CB3253 |
| D198 | Real Deal Bellmarc Article 08/26/2014 (Founder Misused Funds) | |
| D199 | Real Deal Article 03/21/2016 Binder Bellmarc and Bankruptcy | |
| D200 | Real Deal Article 06/28/2016 Facing Eviction Bellmarc issues IOUs | |
| D201 | Real Deal Article 08/10/2016 Binder Faces Eviction from UES Apartment | |

| | | |
|---|---|---|
| D202 | Real Deal Article 04/19/2016 Binder owes 189K rent on UWS | |
| D203 | NY Post Article 08/26/2014 Drug-added Exec | |
| D204 | Daily News Article 08/26/2014 RE Exec Uses Company Money | |
| D205 | NYHabitat Article 08/27/2014 Partners Sue Co-Founder for embezzlement | |
| D206 | Law and More Article 08/26/2014 Binder Allegedly Embezzled | |
| D207 | Real Deal Article 12/16/2014 Real Estate's juiciest lawsuits | |
| D208 | Real Deal Article 12/01/2014 CB Bellmarc Group settles lawsuit | |
| D209 | Real Deal Article 12/19/2014 Coldwell Banker Dumps Bellmarc | |
| D210 | Real Deal Article 03/13/2015 Binder's Bind | |
| D211 | Real Deal Article 04/20/2015 Bellmarc Realty unable to pay bills | |
| D212 | Real Deal Article 04/20/2015 Cold currency TD Bank unfreezes Bellmarc | |
| D213 | Real Deal Article 02/17/2016 Bellmarc screwed us out of commissions | |
| D214 | Real Deal Article 04/12/2016 Bellmarc booted last Manhattan office | |
| D215 | Napurano to Hugh Email 06/07/2014 (Funding Conversion Funds) | CB1520 |
| D216 | Gregory to Binder Email 06/14/2013 (Conversion fund transfer) | CB1622 |
| D217 | Bennett to Husky Email 10/29/2013 (Conversion funding proposal) | CB2394 |
| D218 | Manhattan Initiative and Statement Analysis | |
| D219 | Bennett to Binder et al Email 12/06/2013 (Advanced Funding) | |
| D220 | Bennett to Binder et al Email 12/26/2013 (Funding procedures) | BD0211 |
| D221 | Schnell 12/23/2013 Release of Conversion Funds | CB0768 |
| D222 | Binder to Bennett Email 12/23/2013 (Charges Paid-BMF Funds) | CB2352 |
| D223 | Bennett to Binder Email 12/26/2013 (Funding Requirements) | BD0212 |
| D224 | Bennett to Binder Email 01/06/2014 (Funds Transfer) | |
| D225 | Covahey to Ferrazzano Email 12/09/2013 (BMF Funds) | CB0382 |
| D226 | Binder to Covahey Email 01/08/2014 (BMF Funds) | |
| D227 | Bennett to Binder Email 05/30/2014 (AGC as of May 27 2014) | |
| D228 | Binder to Bennett Email 06/28/2014 (Mortgage) | CB2072 |
| D229 | Binder Email 05/29/2014 (Balances Reconciliation) | CB0471, CB1660 |
| D230 | Bennett to Huskey Email 11/04/2013 (Binder's Predicament) | CB2373 |
| D231 | Bennett to Binder Email 07/10/2014 (Fees Offset) | BD0061 |
| D232 | Bennett to Huskey Email 02/15/2014 (Principals) | CB2189 |
| D233 | Bennet to Huskey Email 05/16/2014 (Expenses) | CB2129 |
| D234 | The Bellmarc Group Lease Information | CB2104 |
| D235 | December 23, 2013 Reconciliation | |
| D236 | Bennett to Bellmarc Principals Email 04/08/2013 (Meeting) | CB3510 |
| D237 | Colletti to Molnar Email 07/29/2013 (Pending transactions) | CB1011 + various |
| D238 | Analysis of NRT concentration in Metropolitan area | |
| D239 | CB referrals to Manhattan 6/1/2013-12/31/201 | CB3789 |
| D240 | List of CB offices within 100 miles of Manhattan | CB3774-3778 |

| | | |
|---|---|---|
| D241 | Analysis of Corcoran referrals | |
| D242 | CB website "all offices independently owned and operated" | |
| D243 | CB Website recruiting video (Offices Ownership/Operation) | |
| D244 | Corcoran website Pam Liebman letter | |
| D245 | CB/Realogy letters with Ethisphere branding | CB0815 |
| D246 | Los Angeles Times Article 10/27/2014 Ethisphere paid | |
| D247 | News Release 03/9/2015 Realogy Wins Ethical from Ethisphere | |
| D248 | NRT website describing company | |
| D249 | Yauch to Siroty Huskey Email 06/27/2013 Franchise Contacts | CB3243-3244 |
| D250 | Metropolitan Alliance proposal 12/11/2013 | |
| D251 | Metropolitan Alliance Forms | |
| D252 | NRT 1 Metropolitan Alliance Email 02/21/2014 (CB-owned offices) | CB2155 |
| D253 | NRT 2 Clark to Delayne Email 02/21/2014 | CB2148 |
| D254 | NRT 3 2/21/14 Email (Have you seen this?) | CB2154 |
| D255 | NRT 4 Clark to Blankenship 02/21/2014 Email ("Ugh") | CB2147 |
| D256 | NRT Relocation and referral service website | |
| D257 | Cooper to Binder 10/22/2012 (CB referral from Italy) | |
| D258 | Bennet to Fischer Email 04/07/2013 (Previews) | CB3506-3509 |
| D259 | Clifford to Binder et al Email 07/11/2013 (Previews) | CB2445 |
| D260 | Burke to Delayne (Alpizar) Review 11/12/2013 (Previews) | |
| D261 | Binder Email 01/14/2014 (Previews & Blankenship rejection) | |
| D262 | Blankenship Email 01/21/2014 (Metropolitan Alliance/Manhattan Initiative) | |
| D263 | Delayne to Fischer et al Email 01/21/2014 (Previews) | |
| D264 | Covahey to Friedman, Binder, DeGrotta Email 01/28/2014 (Previews) | BD0375 |
| D265 | Binder to Gregory et al Email 07/14/2013 Dolly Lenz letter) | BD0053 |
| D266 | Premier Properties submission outline for Dolly Lenz 07/14/2013 | |
| D267 | Binder to Huskey Email 07/17/2013 | |
| D268 | Gregory to Huskey et al Email 07/16/2013 (Dolly Lenz) | CB3643 |
| D269 | Gregory to Huskey Email 07/16/2013 (Dolly Lenz Agenda) | CB3639 |
| D270 | Siroty to Topalanchik Lenz Email 07/15/2013 (Uber) | CB3645 |
| D271 | Gregory to Friedman Email 07/20/2013 (Dolly Lenz) | |
| D272 | Binder to Seinfeld Email 08/05/2013 (RE Brokers Meetings) | |
| D273 | Binder to Blankenship Email 01/07/2014 (Previews) | |
| D274 | Siroty to Topalanchik et al Email 01/30/2014 (Previews) | CB3017 |
| D275 | Proposal for Mercedes/Berk 10/11/2013 | |
| D276 | Binder to Royce Pinkwater 10/15/2013 (Memo) | |
| D277 | Turtzo to Seinfeld Email 10/16/2013 (Pinkwater) | CB2430 |
| D278 | Bennett to Huskey Email 10/16/2013 (Previews) | CB2429 |
| D279 | Huskey to Bennett Email 10/17/2013 | CB2423 |

| | | |
|---|---|---|
| D280 | Turtzo to Bennett Email 10/17/2013 (Plan) | |
| D281 | Hogan to Wright Email 09/29/2014 (Bellmarc Agents) | CB2035 |
| D282 | Gregory to Fischer Email 07/16/2013 (Dolly Lenz) | CB3639-3640 |
| D283 | Bennett to Fischer Email 09/11/2013 (Binder's Book) | CB2442 |
| D284 | Invoice 09/23/2013 for Ultimate Guide Book | CB2437 |
| D285 | Bennett to Ferrazzano Email 01/07/2014 (DAN Funding) | CB1334 |
| D286 | Ferrazzano to Bennett Email 07/07/2014 (AGC for 2013) | CB1331 |
| D287 | Binder to Bennett Email 01/22/2014 (Accounting Memo) | |
| D288 | Ferraro to Bennett Email 01/27/2014 (31+ day Balance) | CB0165 |
| D289 | Binder to Covahey Email 01/28/2014 (Top Payment | BD0170-0171 |
| D290 | Michael Fisher Email 02/14/2014 (NRT Emails) | CB2363 |
| D291 | Real Deal Article 02/02/2010 Sale of Bellmarc Property Management | |
| D292 | Real Deal Article 12/12/2012 Manhattan Apartments | |
| D293 | Real Deal Article 11/9/2012 Bellmarc Acquires AC Lawrence | |
| D294 | Real Deal Article 07/01/2014 Broker Splits | |
| D295 | Real Deal Article 10/22/2013 Bellmarc Acquires Firm Upper Manhattan | |
| D296 | Real Deal Article 06/01/2012 Real Estate Broker ranking 2012 | |
| D297 | Real Deal Article 05/01/2013 Real Estate Broker ranking 2013 | |
| D298 | Real Deal Article 05/01/2015 Real Estate broker ranking 2014 | |
| D299 | Real Deal Article 07/19/2013 Bellmarc Open 100-agent office | |
| D300 | Real Deal Article 05/01/2015 Corcoran sold most apartments | |
| D301 | Real Deal Article 05/01/2015 Done deals don't lie | |
| D302 | CB audit summary 12/09/2013 | BD0232-0237 |
| D303 | Binder to Kleezer Email 12/31/2013 (Object Audit Conclusions) | BD0231 |
| D304 | Hager to Binder letter 12/31/2013 (CB conclusions audit) | CB1308 |
| D305 | Bennett to Binder Email 01/15/2014 (Audit issues) | CB3026 |
| D306 | Binder to Bennet Email 01/15/2014 (Audit objections) | CB2315 |
| D307 | Bennett to Binder Email 01/16/2014 (audit objections) | CB2334 |
| D308 | Binder to Bennett Email/Letter 01/15/2014 (Audit objections) | CB2335 |
| D309 | Binder to Kleezer Email 01/23/2014 (Audit reconciliation) | BD0175 |
| D310 | Binder to Bennett Email 01/23/2014 (Audit meeting) | |
| D311 | Bennett to Binder Email 01/15/2014 (Conversion funds-audit | CB2336 |
| D312 | Bennett to Ferrazzano Email 06/04/2014 (Bellmarc credit) | CB0803 |
| D313 | Ferrazzano to Paladino Email 06/16/2014 (Audit position) | CB0815, CB0808, CB0814 |
| D314 | Ferrazzano to Hager Email 06/18/2014 (Audit Waiver) | CB0814 |
| D315 | Binder press release 03/27/2013 | CB3752-3754 |
| D316 | Internal CB emails 03/27/2013 (Binder's press release) | CB3578, CB3544-3545 |

| D317 | CB Press Release 06/13/2013 (Bellmarc franchise) | CB3383 |
| D318 | Cooper Katz Email 04/12/2013 (Media strategy) | CB3499-3501 |
| D319 | Siroty to Kullen et al Email 06/05/2013 (PR Media Tour) | CB2492 |
| D320 | Siroty to Huskey Email 04/26/2013 (Hunt Kennedy) | CB2598 |
| D321 | Topalanchik to Siroty Email 06/13/2013 (PR Meetings | CB3268 |
| D322 | Siroty to Roberts Email 09/11/2013 (Bellmarc Job) | CB3148 |
| D323 | Siroty to Delayne Email 02/10/2014 (NAR and MANAR) | CB2983, CB2986 |
| D324 | Siroty to Hendricks 04/08/2014 (Inman conference) | CB3007 |
| D325 | Correspondence 05/30/2014 (Valuation) | |
| D326 | Bennett to Huskey Email 05/09/2014 (Sale) | CB2130, CB2131 |
| D327 | Info on sale of Bellmarc sent to Bennett | |
| D328 | Bennett to Binder Email 06/09/2014 (Murray info.) | BD0071 |
| D329 | Real Deal Article 07/21/2016 | |
| D330 | Correspondence BHG Rand Assoc. Aug 8 thru Nov 2, 2014 | |
| D331 | Bellmarc Financial Forecast 2014-2015 | |
| D332 | Corcoran Report for 4th qtr 2013 | |
| D333 | Corcoran Report for 4th qtr 2014 | |
| D334 | ReferralExchange Survey 2017 | |
| D335 | Bennett to Huskey 07/07/2014 (Valuation Report) | CB2064 |
| D336 | Bennett to Huskey Email 05/30/2014 (Financials-Sale) | CB2106 |
| D337 | Fischer to Huskey Email 12/19/2014 (Bellmarc) | CB1998 |
| D338 | Huskey to Fischer Email 12/20/2014 (Bellmarc) | CB2028-2029 |
| D339 | 2013 Bellmarc Group Workpapers | |
| D340 | Binder to Friedman Email 08/16/2014 (Workpapers) | |
| D341 | Binder to Friedman Email 08/19/14 (Workpapers | |
| D342 | Comparison NRT performance SEC 10K 2012 thru 2015 | |
| D343 | Analysis of Realogy production SEC 10K 2014 | |
| D344 | Realogy Holdings Corp SEC 10K 2012 | |
| D345 | Realogy Holdings Corp SEC 10K 2013 | |
| D346 | Realogy Holdings Corp SEC 10K 2014 | |
| D347 | Realogy stock price activity | |
| D348 | CB to Bellmarc 03/26/2014 Letter | CB0214 |
| D349 | CB Notice to Bellmarc 07/29/2014 | |
| D350 | CB Notice to Bellmarc 08/29/2014 | |
| D351 | Belmarc/Binder Termination notices DeGrotta and Friedman 08/07/2014 | |
| D352 | CB Notice to Bellmarc 09/22/2014 | |
| D353 | CB Notice to Bellmarc 10/01/2014 | |
| D354 | Stipulation and Order by Justice Friedman 10/10/2014 | |
| D355 | CB letter to Bellmarc 10/31/2014 | |

| | | |
|---|---|---|
| D356 | Binder to Friedman Email 11/02/2014 (Access per Court Order) | |
| D357 | Fischer to Li Email 08/27/2014 (Agent Losses) | CB2052 |
| D358 | CB website "World of networking opportunities" | |
| D359 | NRT website 2018 | |
| D360 | Termination of franchise by CB 12/18/2014 | |
| D361 | Lakeland Promissory Note 62242 FAWBS Inc. 03/31/2014 | |
| D362 | FAWBS Board of Directors resolution 03/06/2014 | |
| D363 | Bennett to Ferrazzano Email 06/04/2014 ($200,000.00) | CB0803 |
| D364 | Kazdan mortgage for $250,000.00 08/21/2014 | |
| D365 | Bennett to Binder Email 04/29/2014 (Account) | CB2133 |
| D366 | Binder to Delayne Email 02/06/2014 (Meeting request with Delayne) | |
| D367 | Binder to Delayne Email 02/27/2014 (Apology) | |
| D368 | Delayne to Binder Email 02/27/2014 (Apology) | |
| D369 | Covahey to Friedman Email 03/06/2014 (Sexual Harassment) | CB2144 |
| D370 | Delayne Email 03/07/2014 (Sexual Harassment) | |
| D371 | Binder Email 03/07/2014 (Sexual Harassment) | |
| D372 | Covehay Email to DeGrotta 04/09/2014 (Hostile Work Environment) | |
| D373 | Meeting Minutes of DeGrotta/Friedman 02/20/2014 | |
| D374 | Bennett to Huskey Email 03/07/2014 (Friedman & DeGrotta) | CB2143 |
| D375 | Covahey to Ferraro Email 03/26/2014 (Binder & Nelson Meeting) | CB1962 |
| D376 | Huskey to Realogy Execs Email 03/25/2014 (Bellmarc) | CB2141 |
| D377 | Huskey to Bennett Email 04/29/2014 (Swap Position) | CB2132 |
| D378 | Binder to Siroty Email 07/24/2014 (New PR person) | |
| D379 | Siroty to Topanachek 07/17/2014 | CB2997 |
| D380 | Bennett to Huskey Friedman Email 08/13/2014 (Binder Behavior) | CB2063 |
| D381 | Bennett to Huskey Email 08/28/2014 (Binder) | CB2046 |
| D382 | Covahey to Bennett Email 08/28/2014 (Friedman & DeGrotta) | CB2048 |
| D383 | Covahey to Fischer Email 08/28/2014 (DeGrotta & Friedman) | CB2047 |
| D384 | Fischer to Covahey Email 08/28/2014 | CB2047 |
| D385 | Covahey to Fischer 08/28/2014 (Friedman & DeGrotta) | CB2047 |
| D386 | Siroty to Henricks Email 07/22/2014 (Friedman & DeGrotta) | CB2994 |
| D387 | Binder to Eliades Email 09/04/2014 (DeGrotta & Friedman) | |
| D388 | Huskey to Binder Email 12/03/2014 (Organizational changes) | |
| D389 | Binder to Huskey Email (Bellmarc Status) | |
| D390 | Binder to Huskey Email 12/13/2014 (Meet) | |
| D391 | Binder to Huskey 12/13/2014 (Revised Budget) | |
| D392 | Binder to Huskey 12/13/2014 (Capital Account) | |
| D393 | Jeffrey Shapira CPA statement 12/13/2014 | |
| D394 | Proposed resolution and reconciliation of funds owed CB 12/17/2014 | |

| | | |
|---|---|---|
| D395 | Real Deal Article 09/01/2013 (Foreign Buyers) | |
| D396 | Gregory to Hugh Email 03/21/2013 (Binder Attorney Issue) | CB1440 |
| D397 | Binder to Hugh Email 03/05/2013 | BD0307 |
| D398 | Hugh to Binder Email 03/05/2013 (Committee) | BD0307 |
| D399 | Bennett to Binder et al Email 03/06/2013 (Meeting) | BD0115 |
| D400 | Siroty to Fischer Email 04/29/2014 (Termination) | CB2950 |
| D401 | Binder to Huskey Email 04/30/2014 (Settlement Dispute) | BD0022 |
| D402 | Binder to Huskey Email 12/03/2014 (Bellmarc Payments) | |
| D403 | NY Observer Article 06/13/2013 (CB Franchise international) | CB3264-3265 |
| D404 | Binder to Bennett Email 12/23/2013 (BMF funds) | BD0213 |
| D405 | CB account summary March 26 2014 | CB0206 |
| D406 | CB account summary September 18 2014 | |
| D407 | Production report January 27 2013 | CB1296 |
| D408 | Production report January 07 2014 | CB1331 |
| D409 | Production report March 18 2014 | CB0450 |
| D410 | Production report May 22 2014 | CB0230 |
| D411 | Production report YTD July 31, 2014 | CB0446 |
| D412 | REBNY market report 4th quarter 2013 | |
| D413 | Inman Article 05/25/2014 (Commissions) | |
| D414 | Federal Reserve Interest Rates 2008-2017 | |
| D415 | Real Deal Article 11/21/2012 Average rents | |
| D416 | Real Deal broker ratios for Corcoran Citihabitat and Bellmarc | |
| D417 | New York City Housing Survey 2014 data | |
| D418 | Bennett to Huskey Email 04/30/2014 (Swaps) | CB2131 |
| D419 | Street Easy Article 10/02/2016 - NYC Commissions – How are handled | |
| D420 | Huskey to Fischer Email 10/29/2014 (Bellmarc) | CB2902 |
| D421 | Binder efforts to obtain mortgage 06/29/2014 | CB2013-2019 |
| D422 | Binder to Bennet Email 03/18/2013 (CB accounting problems) | |
| D423 | Real Deal Article 11/01/2015 Citi Habitats Sale | |
| D424 | Real Deal Article 05/01/2004 Brokerage Rankings | |
| D425 | Binder to Marine Email 09/12/2013 (BMF agreement) | |
| D426 | Binder Certification dated November 9, 2017 with exhibits | |
| D427 | REAL Trends Inc. report with exhibits dated April 19, 2017 | |
| D428 | Alexander Marketing Corp. report dated November 30, 2017 | |
| D429 | Binder Valuation reports with addenda and exhibits dated December 7, 2017 and Addendum dated March 25, 2018 | |