# LeClairRyan

A Professional Limited Liability Company
One Riverfront Plaza
1037 Raymond Boulevard, Sixteenth Floor
Newark, New Jersey 07102
(973) 491-3600
David W. Phillips, Esq.
Attorneys for Plaintiff Coldwell Banker Real Estate, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| COLDWELL BANKER REAL ESTATE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE BELLMARC GROUP LLC; AC LAWRENCE REAL ESTATE LLC; BELLMARC BROKERAGE MIDTOWN, INC.; BELLMARC DOWNTOWN LLC.; BELLMARC EAST LLC; BELLMARC WEST LLC; BELLMARC SIMONE SONG INC.; BELLMARC GRAMERCY/CHELSEA INC.; NEIL BINDER, AN INDIVIDUAL; NICE IDEA LLC; AMD ALL ENTERPRISES, LLC, <br><br> Defendants. | Civil Action No. 14-cv-07926 MCA-MAH <br><br><br><br><br> **CERTIFICATION OF DAVID W. PHILLIPS, ESQ., IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*** |

I, David W. Phillips, Esq., of full age, certify as follows:

1.      I am an attorney at law of the State of New Jersey and admitted to

practice before the United States District Court for the District of New Jersey, and

a member of LeClairRyan, PLLC, counsel for plaintiff Coldwell Banker Real

Estate, Inc., in this matter.  I make this certification from my review of the files of

LeClairRyan.

2.	Attached hereto as Exhibit 1 is a true copy of a expert report of Linda

Alexander dated November 30, 2017, and her CV.

3.	Attached hereto as Exhibit 2 is a true copy of the documents provided

to Plaintiff's by defendants as being relied on and cited by Linda Alexander in her

expert report.

4.	Attached hereto as Exhibit 3 is a true copy of the affidavit of Neil

Binder, sworn to on October 16, 2016, in the matter *Capital One, N.A., v. Binder*,

New York Supreme Court, Suffolk County (Index No. 067110/2014)

5.	Attached hereto as Exhibit 4 is a true copy of the Complaint filed by

DeGrotta and Friedman in the matter *DeGrotta v. Binder*, New York Supreme

Court, New York County, Civil Division (Index No. 652633/2014) (the "New

York Supreme Litigation").

6.	Attached hereto as Exhibit 5 is a true copy of the Deposition of Linda

Alexander, taken in this action on March 28, 2018.

7.	Attached hereto as Exhibit 6 is a true copy of the seven page report of

Stephen Murray, dated April 19, 2017, and the documents produced in January

2018, as being the documents Mr. Murray relied on to draft his report .

8.      Attached hereto as Exhibit 7 is a true copy of the Deposition of Stephen Murray, taken in this action on March 7, 2018.

9.      Attached hereto as Exhibit 8 is a true copy of Defendants' exhibit list as submitted with the draft pre-trial order on October 11, 2018.

10.      Attached hereto as Exhibit 9 is a true copy of Defendants' Rule 26 disclosures.

11.      Attached hereto as Exhibit 10 is a true copy of Defendants' interrogatory answers as related to identification of people with knowledge.

12.      Attached hereto as Exhibit 11 is a true copy of Defendants' exhibit list as received by email for the first time on October 10, 2018, at approximately 6:30 p.m., less then 24 hours before the draft pre-trial order was due to be submitted.

13.      Attached hereto as Exhibit 12 is a true copy of relevant portions of the fact deposition of Neil Binder, taken in this action on October 24, 2016.

14.      Attached hereto as Exhibit 13 is a true copy of the 2013 version of Exhibit G to the Franchise Disclosure Document, listing each Coldwell Banker franchisee in the United States.

15.      Attached hereto as Exhibit 14 is a true copy of the signature pages bearing the signature of Mr. Binder for each of the entities, from the Franchise Disclosure Document.

16.     Attached hereto as Exhibit 15 is a true copy of a expert report of Neil Binder dated December 7, 2017.

17.     Attached hereto as Exhibit 16 is a true copy of the Addendum to the Binder Report, delivered on March 26, 2018, at the beginning of his expert deposition.

18.     Attached hereto as Exhibit 17 is a true copy of the expert deposition of Neil Binder, taken in this action on March 26, 2018, and April 3, 2018.

19.     Attached hereto as Exhibit 18 is a redacted copy of the Real Estate Franchise Agreement dated March 27, 2013, and the amendments/addendums thereto, being:

   a.     Addendum to Franchise Agreement dated March 27, 2013,

   b.     Amendment to Franchise Agreement dated May 13, 2013,

   c.     Amendment to the Addendum to Franchise Agreement dated May 22, 2013,

   d.     First Addendum to Amendment to Franchise Agreement dated October 24, 2013,

   e.     Master Brand Marketing Fund Addendum to Franchise Agreement dated November 8, 2013, and

   f.     Third Addendum to Amendment to Franchise Agreement dated December 10, 2013.

20.     Attached hereto as Exhibit 19 is a true copy of the index of Defendants' unidentified and likely unproduced documents they listed in the pre-trial order, as submitted to Judge Hammer on November 2, 2018, at ECF #150-1.

- 4 -

21.     On November 13, 2018, I conducted a search on Westlaw for any cases using the phrase "accretive loss" as used by Mr. Binder in his expert report. The phrase "accretive loss" does not appear in any state or federal case reported on Westlaw.

I certify that the foregoing statement made by me are true, under penalty of perjury.

DATED:     Newark, New Jersey
            November 13, 2018

                                    */s/ David W. Phillips*
                            _____
                            David W. Phillips, Esq.

a member of LeClairRyan, PLLC, counsel for plaintiff Coldwell Banker Real

Estate, Inc., in this matter.  I make this certification from my review of the files of

LeClairRyan.

2.      Attached hereto as Exhibit 1 is a true copy of a expert report of Linda

Alexander dated November 30, 2017, and her CV.

3.      Attached hereto as Exhibit 2 is a true copy of the documents provided

to Plaintiff's by defendants as being relied on and cited by Linda Alexander in her

expert report.

4.      Attached hereto as Exhibit 3 is a true copy of the affidavit of Neil

Binder, sworn to on October 16, 2016, in the matter *Capital One, N.A., v. Binder*,

New York Supreme Court, Suffolk County (Index No. 067110/2014)

5.      Attached hereto as Exhibit 4 is a true copy of the Complaint filed by

DeGrotta and Friedman in the matter *DeGrotta v. Binder*, New York Supreme

Court, New York County, Civil Division (Index No. 652633/2014) (the "New

York Supreme Litigation").

6.      Attached hereto as Exhibit 5 is a true copy of the Deposition of Linda

Alexander, taken in this action on March 28, 2018.

7.      Attached hereto as Exhibit 6 is a true copy of the seven page report of

Stephen Murray, dated April 19, 2017, and the documents produced in January

2018, as being the documents Mr. Murray relied on to draft his report .

8.     Attached hereto as Exhibit 7 is a true copy of the Deposition of Stephen Murray, taken in this action on March 7, 2018.

9.     Attached hereto as Exhibit 8 is a true copy of Defendants' exhibit list as submitted with the draft pre-trial order on October 11, 2018.

10.     Attached hereto as Exhibit 9 is a true copy of Defendants' Rule 26 disclosures.

11.     Attached hereto as Exhibit 10 is a true copy of Defendants' interrogatory answers as related to identification of people with knowledge.

12.     Attached hereto as Exhibit 11 is a true copy of Defendants' exhibit list as received by email for the first time on October 10, 2018, at approximately 6:30 p.m., less then 24 hours before the draft pre-trial order was due to be submitted.

13.     Attached hereto as Exhibit 12 is a true copy of relevant portions of the fact deposition of Neil Binder, taken in this action on October 24, 2016.

14.     Attached hereto as Exhibit 13 is a true copy of the 2013 version of Exhibit G to the Franchise Disclosure Document, listing each Coldwell Banker franchisee in the United States.

15.     Attached hereto as Exhibit 14 is a true copy of the signature pages bearing the signature of Mr. Binder for each of the entities, from the Franchise Disclosure Document.

16.     Attached hereto as Exhibit 15 is a true copy of a expert report of Neil Binder dated December 7, 2017.

17.     Attached hereto as Exhibit 16 is a true copy of the Addendum to the Binder Report, delivered on March 26, 2018, at the beginning of his expert deposition.

18.     Attached hereto as Exhibit 17 is a true copy of the expert deposition of Neil Binder, taken in this action on March 26, 2018, and April 3, 2018.

19.     Attached hereto as Exhibit 18 is a redacted copy of the Real Estate Franchise Agreement dated March 27, 2013, and the amendments/addendums thereto, being:

 a.     Addendum to Franchise Agreement dated March 27, 2013,

 b.     Amendment to Franchise Agreement dated May 13, 2013,

 c.     Amendment to the Addendum to Franchise Agreement dated May 22, 2013,

 d.     First Addendum to Amendment to Franchise Agreement dated October 24, 2013,

 e.     Master Brand Marketing Fund Addendum to Franchise Agreement dated November 8, 2013, and

 f.     Third Addendum to Amendment to Franchise Agreement dated December 10, 2013.

20.     Attached hereto as Exhibit 19 is a true copy of the index of Defendants' unidentified and likely unproduced documents they listed in the pre-trial order, as submitted to Judge Hammer on November 2, 2018, at ECF #150-1.

- 4 -

21.     On November 13, 2018, I conducted a search on Westlaw for any cases using the phrase "accretive loss" as used by Mr. Binder in his expert report. The phrase "accretive loss" does not appear in any state or federal case reported on Westlaw.

I certify that the foregoing statement made by me are true, under penalty of perjury.

DATED:     Newark, New Jersey
           November 13, 2018

                              */s/ David W. Phillips*
                              _____
                              David W. Phillips, Esq.

**Exhibit 1**





**Alexander Marketing Corp.**

Re: Value of Loss Due to Impairment of Reputation
Neil Binder;
The Bellmarc Group LLC;
Bellmarc Brokerage Midtown Inc.;
Bellmarc Downtown East LLC;
Bellmarc East LLC; Bellmarc West LLC;
Bellmarc Gramercy/Chelsea.

November 30, 2017

Mr. Laurence D. Pittinsksy
Rosenberg & Pittinsky LLP
232 Madison Avenue
New York, NY 10016

Dear Mr. Pittinsky:

I have been asked to provide an opinion of the loss incurred by Neil Binder and Bellmarc
Group as a result of negative media coverage of events spanning June 2013 through
December 31, 2014. As a communications consultant and principal of a New York-based
firm specializing in media relations, social media platforms and reputation management
for the real estate industry, it is my opinion that the damage to Mr. Binder's reputation is
extensive. In forming my opinion, please be advised of the following:

- The loss is based on the overall effect of the negative media coverage that impairs
  the reputation of all the operating entities bearing the Bellmarc name.
- The focus of the negative media coverage on Neil Binder, specifically,
  significantly damaged the reputation of an individual who had garnered positive
  coverage for more than four decades.

Bellmarc engaged Alexander Marketing Corp. to perform public relations services from
2002 to 2003. At the time, Bellmarc was recognized industry-wide for its comprehensive
training programs and skilled agents. That stellar reputation continued unimpeached for
another decade until the much-publicized collapse of the Coldwell Banker franchise in
December 2014.

It is my opinion, should Mr. Binder endeavor to revive the Bellmarc brand, he will be
facing tremendous media and industry pushback and bias as a direct result of the negative
coverage. A valuation of the loss due to reputation impairment is based on the following
principles:

Alexander Marketing, 1650 Broadway, Suite 1002, New York, NY 10019-6833
Tel: 212/247-7940 • Fax: 212/582-5105 • www.alexandermktg.com

1

- Reputation represents the familiarity of the person or entity to the general public or a defined population and serves an indication of the public's willingness to rely on that person or entity to provide a specific service or benefit.
- Reputation impairment may be caused by statements and actions made by third parties which become known to the general public or a defined public and diminish the publics' perception and confidence in that person or entity to provide an expected service or benefit.
- Reputation Management is the effort made by a public relations firm, advertising agency and/or other communications companies to improve the perception of the person or entity whose reputation has been impaired through the dissemination of negative coverage in conventional media and social media.

I have reviewed the majority of the news articles still appearing on the Internet relating to Neil Binder and Bellmarc for the year before and the one year after the conflicts between the former partners and the Coldwell Banker franchise in order to ascertain the extent of the damage to Mr. Binder and the Bellmarc brand. The attached evaluation outlines my conclusions as to the estimated cost of what will be required to return credibility to Mr. Binder's impaired reputation and that of the Bellmarc brand.

By way of disclosure, as previously stated, Alexander Marketing Corp. did provide public relations services to Bellmarc. We have in the past represented a Coldwell Banker Commercial franchise, but never a Coldwell Banker residential franchise. We have, however, been provided services to individual brokers/teams whose licenses were, at the time, held by Realogy-owned franchises. In those cases, our fees were provided directly by the broker/teams, and not by the company.

My opinion of loss value does not make any conclusions about the party or parties responsible for the loss.

Sincerely

*Linda S. Alexander*

Linda S. Alexander
President

ATT:

2

## Analysis of Loss – Reputation

In analyzing the value of lost reputation, an evaluation of the severity of the impairment of the reputation must be determined.

Reputation Guideline
The following reputational guidelines are utilized for ascertaining the relative standing and the severity of the effect of loss reputation on The Bellmarc Group and Neil Binder:

Reputation 10:  International Reputation highly regarded.
Reputation 9:  National Reputation highly regarded.
Reputation 8:  Local Reputation highly regarded.
Reputation 7:  Industry Specific reputation highly regarded.
Reputation 6:  Event specific reputation
Reputation 5:  Controversial. reputation is based on events that are construed in both a positive and negative form
Reputation 4:  Accusations. Reputation had been labeled as subject to investigation due to possible civil improprieties.
Reputation 3 – Accusation. Reputation is damaged due to accusations of a serious nature that include fraud, civil actions.
Reputation 2 – Accusations of Material Sexual Misconduct and/or Criminal Offenses.
Reputation 1 – Convictions of Serious Offenses particularly if there is imprisonment.

Relevant Facts about Neil Binder and The Bellmarc Group
Reputation Prior to Impairing Events:
Neil Binder was well known in the Manhattan Real Estate Industry. He was the owner of Bellmarc Realty with his partner Marc Broxmeyer from 1979 until 2008. Thereafter, he represented himself as the owner of the company until he formed The Bellmarc Group after the acquisition of AC Lawrence.

The new company, The Bellmarc Group, was presented with Mr. Binder as majority shareholder and operating partners Anthony DeGrotta and Larry Friedman, who were the former operators of AC Lawrence, as operators and minority partners. At the time of the merger, Bellmarc had for many years been designated as one of the top 10 residential real estate firms in Manhattan. Mr. Binder was recognized as the primary party involved in operating the residential brokerage component of the company.

In addition, Mr. Binder was a recognized author of four well-received books on real estate. One of the books, "The Ultimate Guide for Buying and Selling Coops and Condos in New York City" has had four printings and is available for purchase on Amazon. Considered an excellent resource guide, real estate industry trade publication The Real Deal named it one of the 10 best books on real estate in New York City.

Mr. Binder had been well known for his highly regarded training program. As a result, Bellmarc was able to attract a large number of agents due to the superior quality of the training the

1

company offered compared to its competitors. In addition, Bellmarc was also known for the early development of its technology. The company was one of the first firms to formulate proprietary computer programs to operate its business rather than subscribe to existing platforms available in the industry.

Bellmarc was a preeminent brokerage firm in New York City and Mr. Binder was highly regarded as an expert in the field, a strong business operator, and a mentor to thousands of agents with a Reputation ranking of 7.

Events affecting Bellmarc and Mr. Binder and the impact on reputation:
1. Bellmarc announces that it has engaged in discussions to be acquired by William Raveis.– impact neutral. (The Real Deal, May 20, 2011)
2. Bellmarc announces that it has acquired AC Lawrence -  impact very positive (The Real Deal, November 9, 2012)
3. Bellmarc is identified as the fifth largest residential firm in The Real Deas 2013 Rankings. Impact positive.
4. Bellmarc announces affiliation with Coldwell Banker – impact positive (The Real Deal, June 13, 2013)
5. Bellmarc announces the opening of a new office with 100 rental agents – impact positive (July 19, 2013)
6. "Coldwell Banker's Back: Why Bellmarc thinks it can succeed where other failed" – impact positive (The Real Deal, September 1, 2013)
7. The Real Deals' 10 Must Read Books on NYC lists Mr. Binder's "The Ultimate Guide for Buying and Selling Coops and Condos in New York City" (September 20, 2013)
8. Bellmarc announces that it is opening a new office with 100 rental agents – impact positive (The Real Deal, December 1, 2013)
9. Bellmarc settles with partners and they depart – impact neutral (The Real Deal, December 1; Real Estate Weekly, December 16)
9. Bellmarc partners accuse Binder of Embezzlement and Mismanagement – impact very negative (The Real Deal, August 26, 2014)
10. Drug-addled exec raided employee healthcare fund – impact extremely negative (New York Post, August 26, 2014)
11. Bellmarc agents flee the company – impact extremely negative (The Real Deal, October 15, 2014)
12. Bellmarc is not paying agents – Impact very negative (The Real Deal, February 17, 2016)
13. Will Bellmarc go into Receivership? – impact very negative (The Real Deal, March 28, 2016)
14. Bellmarc may be booted from its last Manhattan office – impact very negative (The Real Deal, April 12, 2016)

The impact of the identified publicly reported events is a decline in the reputation of Bellmarc and Binder to a grade of 3.

2

Goal – To increase the reputation of Binder and Bellmarc back to 7.
A three-year plan is envisioned to upgrade the reputation of Binder and Bellmarc:

Step 1 Crisis Management mode:
> Heavy intensive reporting on Company events and closely monitoring press and social media with a large infusion of positive publicity both in social media and press.
> a.  Public relations heavy support mode:
> b.  Writing articles, press releases about relevant newsworthy topic.
> c.  Establish meetings with press.
> d.  Develop campaign strategies oriented to positive reputation goals.
> e.  Develop and populate social media platforms to support public relations program

Cost $15,000 per month for 1 year = $180,000

Step 2:  Advertising: Additional company promotional efforts in various periodicals and social media campaigns to promote company image
Cost $25,000 per month for one year  = $300,000

Projected cost for Crisis Management/Marketing Program for one year: $480,000

**Conclusion**
It is my opinion that Bellmarc and Neil Binder suffered significant impairment in the reputations of both the firm and its co-founder due to two years of unremitting negative media coverage. The capacity to bring a once-respected brand back to the mainstream and restore its credibility may take longer than a year but is still feasible in a constantly evolving real estate marketplace. The most critical issue is Mr. Binder's personal reputation and his capacity to recapture even a portion of the stature he maintained for close to four decades as an important leader in New York City residential real estate.

3

**LINDA S. ALEXANDER**
1650 Broadway, Suite 1002 | New York, NY 10019
O 212-247-7940 x10 | M 917-881-5360 | E linda@alexandermktg.com

Background
Linda S. Alexander is a communications professional, writer and branding expert who founded Alexander Marketing in 1998 and incorporated the firm in 2000. Her professional background has included positions in media, marketing and real estate.

Skills
- Award-winning publicist with extensive experience working with clients from residential real estate, commercial real estate, asset management, project management, property management, property owners, real estate investment trusts, property development, architecture, interior design, engineering, construction, and other real estate related categories.
- Expertise in developing and implementing comprehensive marketing, advertising, and public relations campaigns.
- Expertise in developing branding and image campaigns.
- Expertise in writing for social media platforms.
- Expertise in crisis management one-off situations.
- Expertise in long-term reputation management strategies.
- Award-winning copy writer with extensive experience in residential and commercial real estate.

Professional Expertise
**PRESIDENT | OWNER**                                                      2000-Present
Alexander Marketing Corp., New York, NY
Full-service corporate communications firm providing public relations, corporate relations, media relations, social media, branding, crisis management and reputation management services.

**FREELANCE COPYWRITER AND PUBLICIST**                                      1996-2000
- Pitched article ideas to reporters and editors.
- Edited and co-wrote bylined articles for clients to appear in real estate trade publications
- Wrote direct marketing copy for brochures and forms of collateral for real estate and advertising clients.

**FREELANCE EDITOR AND WRITER**
- Grid Magazine, article for monthly architecture magazine                 1998
- West Side Spirit/Our Town, weekly real estate column                     1997-1998
- Residential Business New York, wrote features for monthly trade publication   1997-1998
- The Cooperator, monthly publication geared to co-op and condo board members 1996-1998

**MARKETING DIRECTOR**
Charles H. Greenthal Real Estate                                           1993-1996
Responsible for the advertising and direct marketing programs for residential brokerage, which at the time was the fourth largest in New York City. Responsible for providing advertising and marketing materials for the Company's commercial real estate and property management divisions.



Professional and Community Organizations
- Commercial Real Estate Women's Network                               2015-Present
- Association of Real Estate Women                                     2007-2015
- Community Board 7/Manhattan                                          2001-Present
- Friends of Roosevelt Park, Board of Directors                       2017-Present
- Broadway Mall Association, Advisory Board                           2012-2015


Select Awards
- 14 Women to Watch in Real Estate, Sokol Media                       2014
- Publicist of the Year, Commercial RE, Mann Foundation              2009
- Clarissa Award, St. Francis Food Pantries & Shelters               2004
- Top New York Area PR Firms, Development New York Magazine          March 2004
- Strathmore's Who's Who in Real Estate                              2002-2003
- Winner's Circle, AGC Graphic Arts for Copywriting 375 Park Avenue Brochure   2001

Education
- University of Chicago Laboratory Schools (High School)
- University of Florida
- New School
  - Bachelor's Degree, Psychology Concentration

**Exhibit 2**

Sections   **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS    NEW YORK CITY REAL ESTATE NEWS

## William Raveis to acquire Bellmarc: sources

April 08, 2011 02:43PM

f  🦋  in  ✉  ⌣

Bellmarc CEO Neil Binder and William Raveis' Westchester office

Bellmarc Realty is close to being acquired by Connecticut-based William Raveis Real Estate, sources tell Crain's. As *The Real Deal* previously reported in a profile of the firm in the April issue, William Raveis has sought to enter the Manhattan market ever since expanding to Westchester in July 2009. *The Real Deal* ranked William Raveis the 10th largest firm in Westchester on the strength of its 80 agents and 98 residential listings averaging more than $1 million in value.

Bellmarc had already sold its 50-building rental portfolio to Prudential Douglas Elliman last year. Crain's could not obtain details of the deal, and neither Bellmarc nor William Raveis would comment on the pending acquisition. [Crain's]

Tags: bellmarc, william raveis

Share          Tweet          Share



EXHIBIT

Alexander 3
3·28·18

Linda Alexander 000001

## Bellmarc acquires A.C. Lawrence
*Consolidated firm will have 400 agents*

By Guelda Voien | November 09, 2012 09:30AM



Bellmarc Companies, the parent company of Bellmarc Realty, one of Manhattan's largest residential brokerages, has absorbed residential and commercial real estate brokerage A.C. Lawrence Real Estate, *The Real Deal* has learned. The consolidated company, which will be known as the Bellmarc Group, will have about 400 agents, a spokesperson for the new firm said.

Bellmarc owner Neil Binder said he had been looking for opportunities to sell some of his former partner Marc Broxmeyer's interest in the firm since Broxmeyer's retirement a few years ago. "I tried to sell his interests but was not satisfied with the options, so I decided to find a company that would complement us," and then acquire it, with some interest in Bellmarc given "as consideration," Binder said.

A.C. Lawrence will suit Bellmarc, as it specializes in rentals, a helpful supplement to Binder's firm, which does mostly sales, Binder said. While the companies will have "two separate cultures," they will share training programs, Binder says.

Bellmarc has about 250 agents, representatives said, while A.C. Lawrence has some 150.

Last year, sources said that the New England–based William Raveis Real Estate was preparing to acquire Bellmarc, but Binder told *TRD* at the time that in fact he had been negotiating for the brokerage to purchase Broxmeyer's shares in Bellmarc.

Binder continued to shop a 33 percent stake in the firm, as the firm shuttered its Madison Avenue location in favor of A New Storefront On Lexington Avenue ⊕ last May. Before the merger, Bellmarc had five Manhattan offices; A.C. Lawrence had one. Staff will now use the Bellmarc spaces, the representative said.

The deal provides minority interest in Bellmarc to A.C. Lawrence co-founders Anthony DeGrotta and Larry Friedman, but allows Binder to retain majority interest. All three partners have equal managerial standing. The deal closed on October 5, according to Binder.

Tags: AC Lawrence, bellmarc, neil binder

Share          Tweet          Share

Sections | **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS

**THE REAL DEAL**
NEW YORK CITY REAL ESTATE NEWS

August 2013 Issue

## Manhattan's biggest managing agents
*Companies snap up other firms, cut prices to get ahead*

By C. J. Hughes | August 01, 2013 07:00AM

f  🐦  in  ✉  ⤴



*Click to enlarge*

They pencil out budgets. They organize repairs. They field complaints about noise in the middle of the night. And many of Manhattan's managing agents — the companies that handle the unglamorous, day-to-day aspects of the real estate business — seem particularly adept at weathering recessions.

Many of the city's major property management companies expanded during the recession and its aftermath, often by gobbling up smaller firms and poaching clients from their rivals, according to *The Real Deal*'s ranking of Manhattan's 20 largest residential managing agents.

For example, FirstService Residential New York, previously known as Cooper Square Realty, is ranked No. 1 by number of units on *The Real Deal*'s list, after an aggressive expansion. After joining forces with a large publicly traded company and snapping up several other firms, FirstService now has 45,000 units, a leap of nearly 30 percent from 35,000 in 2009, the last time *TRD* ranked managing agents. FirstService unseated 2009's top finisher, Douglas Elliman Property Management, which came in at No. 2 this year despite its recent acquisition of Bellmarc Property Management.

*TRD* compiled its rankings from surveys of property management companies, the Real Estate Board of New York and industry reports. The list includes only "third-party" agents, or property management companies that own less than half of their portfolio; it does not count developers like the Related Companies, which manage the buildings they own.

Other companies that have shown impressive growth include Halstead Management Company, which has soared 51 percent by number of units since 2009, putting it in the No. 7 spot. At No. 13, Century Management is a newcomer to the list, with 7,200 units in 70 buildings.

The company with the most buildings is Andrews Building Corp., which has 350 properties in its portfolio. But the majority of these buildings have less than 100 units, and some much less. Fairly typical is 25 Bond

Linda Alexander 000003

Street, a 30-unit boutique property, said Divya Rashad, Andrews' managing director.

Despite the growth of some companies, though, the industry as a whole has had a difficult time. Landlords are increasingly opting to manage their own high-rises; many firms have frozen their fees or have drastically cut their prices to keep their clients happy. Some firms have succeeded in grabbing market share by dramatically undercutting the competition's rates.

"We are adapting" to the new conditions, said David Kuperberg, founder of Cooper Square and now president of FirstService Residential New York. But he said other firms seem to be hurting, adding: "I'm not sure that others are investing in their business."

Less demand, coupled with consolidation, means the market-share pie is shrinking.

"The market is getting more diverse and consolidated at the same time," said Brian Peters, the chief operating officer of Rose Associates, which has a property management arm.



*Click to enlarge*

## Mergers and acquisitions

Kuperberg started Cooper Square Realty in 1987, managing a 23-unit co-op in Greenwich Village. In 2003, the company became a subsidiary of FirstService Residential, the largest manager of residential communities in North America. Cooper Square changed its name in June, along with several other FirstService subsidiaries.

FirstService has been aggressively expanding in New York City, in part by snapping up other firms. In 2010, it bought Goodstein Management, adding 40 buildings to its portfolio, including the San Remo, the legendary two-towered co-op at 145 Central Park West.

Today, FirstService has 285 Manhattan buildings, up from 200 in 2009, with another 215 buildings in the Bronx, Brooklyn, Queens and Staten Island. Other high-profile buildings it manages include New York by Gehry, a 900-unit rental at 8 Spruce Street in the Financial District.

Elliman is another firm swallowing up other companies. It purchased Bellmarc Property Management in 2010, adding 50 buildings to its roster, including CitySpire at 150 West 56th Street, where a penthouse is famously on the market now for $100 million.

Elliman manages 290 buildings in Manhattan, the firm said, up from 250 in 2009. But its total number of Manhattan units is 38,000, down 14 percent from 44,000 in 2009.

Linda Alexander 000004

Halstead, too, has made aggressive moves to expand its management portfolio. In 2009, Terra Holdings, the parent company of Halstead and Brown Harris Stevens, bought Penmark Realty and merged it with Halstead. That helped significantly boost Halstead's unit count: Today, it manages 11,670 units in 131 buildings, a 51 percent increase from 2009, when it had 7,700 units in 80 buildings.

Many of the buildings Halstead manages are new condos, such as One Jackson Square, a 30-unit development in Greenwich Village where sales were handled by the Corcoran Group, which is not in the management business; 110 Third Avenue, an East Village condo developed by Toll Brothers; and the Lucida condo at 151 East 85th Street.

Another big mover is Manhattan-based Century Management, founded in 1971, which did not make *TRD*'s list in 2009. Mitchell Barry, the firm's CEO, could not be reached for comment, but according to the firm's website, current Manhattan properties it manages include the Gramercy Park co-op 130 East 18th Street, and 190 East 72nd Street in Lenox Hill.

Large firms are merging with smaller ones in part to help recapture market share lost now that more building owners are self-managing their properties, industry insiders said. Among these are the many REITs now entering the New York City marketplace. The Colorado-based firm UDR, for example, is ramping up its purchases in New York and now owns and manages the Financial District apartment building 10 Hanover Square, among other buildings.

And current market conditions have prompted many buildings to look around for new managing agents. With material and labor costs going up, complying with city rules like Local Law 11 — which requires buildings to repair their façades — is now a pricier proposition than in the past. Higher prices, combined with difficult economic times, tend to make buildings dissatisfied with their management companies, so they're more likely to switch firms.

As a result, nearly every city management company has gained and lost buildings over the past few years. Rose Associates, for example, has nabbed some key buildings from its competitors, such as the 142-unit rental tower 2 Cooper Square, which Rose took over from Knickerbocker Management. Rose's Peters said a long-standing partnership with JPMorgan, an institutional owner, has helped the company add clients.

But Rose, which came in at No. 4 in the rankings, has also lost some buildings. AKAM Living Services took over at the Sheffield, a nearly 600-unit condo at 322 West 57th Street previously managed by Rose. Peters said a short-term stay was the plan the whole time; Rose, along with Fortress Investment Group, came in after Swig Equities lost the property to help convert it from rentals.

In total, Rose is managing more than 22,294 units in 100 buildings, up from 19,360 units and 77 buildings in 2009.

Rose, which started developing buildings in 1925, still controls some rentals that it built, such as the Chelsea Landmark on West 25th Street and Sixth Avenue. Still, less than 20 percent of its 22,294-unit management portfolio is Rose-owned, company officials said.

Linda Alexander 000005

"I think developing and managing go hand in hand," Peters said. "You learn things on one side or the other that you can apply to the benefit of everybody."

## Comparison shopping

But there's another key reason why buildings are ditching their managing agents: price. Sources said the market is currently very price-sensitive, which is one reason FirstService has dominated, while more expensive firms such as Brown Harris Stevens Residential Management have lost ground.

FirstService's size allows it to give customers deals on everything from yearly fees to electricity costs. Last fall, for example, buying electricity in bulk for all of its buildings allowed the company to offer clients a hefty 17 percent discount, Kuperberg said.

FirstService's fees are on the low end of the scale, starting at $10,000 a year, allowing for profit margins of 10 to 15 percent, he said.

Indeed, competitors gripe that FirstService and some other firms have grabbed market share by offering clients steep discounts.

For example, FirstService recently added the 244-unit condo 100 United Nations Plaza to its roster, taking over from Charles H. Greenthal Management, which had managed the building since 1988.

Greenthal is far more expensive that FirstService, with fees starting at $60,000 per year per building and going up to a "couple hundred thousand" for some large complexes, according to company president Jonathan West.

At 100 United Nations Plaza, West said, "yuppies from Wall Street and whatnot came onto the board there and discarded the accountant, attorney, and resident manager, as well as management." Five of seven board members were new, he said, and "they had a whole different philosophy about how money should be spent."

Greenthal, founded in 1959, came in at No. 3 on *TRD*'s ranking. Today, it manages nearly 23,000 units in Manhattan, down slightly from 2009's 24,000. Its building total, too, has fallen a bit from 185 in 2009 to 184 today.

West said the firm has been focused on expanding in Brooklyn and Queens rather than Manhattan.

For its part, Andrews charges a minimum of $12,000 a year. Fees go up by 2 percent annually, though the company decided not to raise its rate in recession-battered 2008, Rashad said. Metal Shutter Houses, an 11-story condo at 524 West 19th Street, has switched from Halstead to Andrews, which Rashad attributed to Andrews' performance cleaning up after Hurricane Sandy. "We have gotten several new buildings because of Sandy," Rashad said.

AKAM, which came in at No. 5, has also benefited from below-average fees, sources said. Founded in 1983 by Leslie Kaminoff, 103-employee AKAM manages 21,000 units in 125 buildings, up from 18,000 units in 95 buildings in 2009.

AKAM, which focuses on buildings with 100 or more units, in 2012 started managing the 275-unit condo 120 Riverside Boulevard, which it took over from the Trump Organization, according to President Michael Berenson.

He declined to discuss what the firm charges, though he said the company does increase fees 2 to 5 percent annually. "We have a niche, and we've been staying in that niche," said Berenson, who joined the company in 1987. "We are not everything to everybody."

Brown Harris saw its ranking by number of units drop to No. 12 this year, down from No. 8 in 2009. At Brown Harris, the residential arm of the major real estate brokerage, fees start at $60,000 per year, said Paul Herman, the management division's president. Brown Harris manages some of the city's most exclusive buildings, such as 730 Park Avenue.

Unlike other companies, however, Herman said Brown Harris isn't planning to try to increase business by buying up competitors. "We didn't buy companies, and we don't really advertise," said Herman. "We're interested in good business, not more business."

After all, being part of a major brokerage has its advantages. Brown Harris will be the property manager of the new 16-unit condo 18 Gramercy Park South when it is completed by Terra Holdings principals Arthur and William Zeckendorf.

"This is a very price-sensitive business, but on the other hand, clients are willing to pay for value and good service," Herman said.

Another firm that slipped in the rankings this year is Orsid Realty, which dropped to No. 8 from No. 7 in 2009. The firm grew, but not at the same rate as some other property management companies: Orsid manages 11,451 units in 141 buildings, up from 10,000 units in 120 buildings in 2009.

Founded in 1955 by Albert Etingin and now run by his son, Maks, Orsid manages buildings ranging in size from eight to 500 units. But its sweet spot is somewhere in the middle, and usually Uptown, such as 470 Park Avenue, a 60-unit prewar doorman building. The company's fees are in the middle of the pack, starting at around $45,000 a year, said Dennis DePaola, executive vice president at the 65-employee firm, but fees vary depending on the level of service.

"It really depends," he said, "on how much hand-holding the group is going to need."

Drastically discounting its rates, DePaola said, wouldn't allow Orsid to properly serve its clients. As it is, he said, Orsid usually loses money during the first two years it manages a building, because of the time it takes to get settled in.

"We will not [be able to] adequately service the building if we come in really low," he said.

Linda Alexander 000007

Sections   **THE REAL DEAL**   **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS   NEW YORK CITY REAL ESTATE NEWS

## Bellmarc Group to become Coldwell Banker franchise

By Hayley Kaplan | June 13, 2013 11:00AM



A major shift is in the works for one of Manhattan's largest residential brokerages. The Bellmarc Group will become a franchise of Coldwell Banker, the international firm that is part of the publicly traded Realogy real estate conglomerate, company officials told *The Real Deal.*

The franchise, known as Coldwell Banker The Bellmarc Group, will act as a holding company for two divisions, Coldwell Banker Bellmarc and Coldwell Banker AC Lawrence, though the day-to-day operations of the firm will remain unchanged, executives said.

The 600 agents of the 34-year-old firm, which acquired the rental-focused AC Lawrence Real Estate in November, will continue to operate out of its seven existing Manhattan offices. The firm will use a new company logo and branding materials beginning today.

From Bellmarc's perspective, the partnership represents a chance to court higher-end and international business — both increasingly lucrative segments of the industry, as the demand for luxury New York City homes has taken off — which neither Bellmarc nor AC Lawrence has heavily targeted in the past.

"We want to increase our penetration in the market and serve the higher-end segment more effectively than we are by having the power of Coldwell Banker behind us and their referral network that we are hopefully going to exploit to its extreme," said Neil Binder, the president of Bellmarc Group, who will become president of Coldwell Banker The Bellmarc Group. Larry Friedman and Anthony DeGrotta, the co-founders of AC Lawrence, will become president of Coldwell Banker Bellmarc and president of Coldwell Banker AC Lawrence, respectively.

Coldwell Banker has 82,000 agents located in 50 countries around the world, and falls under the corporate umbrella of Realogy, along with the Corcoran Group, Citi Habitats and Sotheby's International Realty.

"To take our brand and company to the next level we had to partner up with somebody who had global reach," Friedman said. "Although we had a strong Manhattan presence we're not very strong internationally."

Meanwhile, Coldwell Banker — like several other national franchises seeking to gain a foothold in Manhattan — has floundered in New York City. In 2009, its 214-agent franchise Coldwell Banker Hunt Kennedy shuttered with $12 million in debt, as *The Real Deal* reported.

Following the closure, the company took a "step back" from New York, said Budge Huskey, the president and CEO of Coldwell Banker. It was not until about 18 months ago that the firm began contemplating another go at Manhattan, attempting to "identify who would be the perfect business partner," he said.

Linda Alexander 000008

"It's painfully obvious that there was a lack of presence in the New York City market," he added. "It's extremely important to us as an international brand to reestablish a very strong footprint within the New York City market because it's such an important city to us and our international partners."

Huskey identified the Bellmarc Group as an ideal partner because of its quality and number of agents, as well as its prominence in both the rental and sales markets.

Only a few months old, the Bellmarc Group is the product of a tie-up between Bellmarc Realty and AC Lawrence, and now ranks as the fifth largest residential brokerage in Manhattan, according to *The Real Deal*'s May ranking. Binder had been looking to partner with another firm for some time, specifically after co-founder Marc Broxmeyer wanted to sell his stake in the firm due to a serious illness.

Talks with Coldwell Banker began last July, Friedman said.

"We were approached by Coldwell Banker, who always had an interest in talking to me, and this time we really felt it would be tremendously synergistic to have the two companies work together as a team to create the finest company in New York City — that's the goal," Binder said. "We don't want to be a company that just has Coldwell Banker. We want to be the finest company in New York City that has the name Coldwell Banker."

The company is actively looking to hire an unspecified number of new agents.

"[We're] aggressively looking for great people," Friedman said. "This arrangement will tremendously help us to attract and retain great agents."

---

Tags: AC Lawrence, bellmarc, coldwell banker, realogy

Share                      Tweet                        Share

  

Sections   **THE REAL DEAL**   **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS   NEW YORK CITY REAL ESTATE NEWS

# Bellmarc rental arm to open 100-agent office in Midtown

By Guelda Voien | July 19, 2013 09:00AM



Bellmarc Realty's rental arm, AC Lawrence Real Estate, is opening an office next month near the Midtown East neighborhood, firm head Neil Binder told *The Real Deal*.

The office should open in about three weeks at 155 East 56th Street, near Third Avenue; it will be large enough for 100 agents, Binder said.

Bellmarc chose the location because it is close to both the subway and Bellmarc's Midtown office at 681 Lexington Avenue, he said.

"We are trying to create sister environments with AC Lawrence," Binder said.

Bellmarc, one of Manhattan's largest residential sales brokerages, absorbed residential and commercial rental brokerage AC Lawrence Real Estate in November, although the companies maintained their identities and areas of specialties.

Only last month, the Bellmarc Group became a franchise of Coldwell Banker, the international firm that is part of Realogy, as *The Real Deal* reported at the time.

The franchise acts as a holding company for two divisions, Coldwell Banker Bellmarc and Coldwell Banker AC Lawrence; the day-to-day operations of the firm remain unchanged, executives said.

A manager has been tapped to head the new location, but Binder declined to disclose the person's identity because she has not given notice at her current job, he said.

Tags: AC Lawrence, bellmarc, coldwell banker, neil binder, realogy

Share          Tweet          Share



Linda Alexander 000010

Sections   **THE REAL DEAL**   **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS       NEW YORK CITY REAL ESTATE NEWS

## Coldwell Banker's back: Why Bellmarc thinks it can succeed where others failed

By Hayley Kaplan | September 10, 2013 10:30AM

*From the September issue:* After 34 years of private ownership, Manhattan residential brokerage the Bellmarc Group this summer announced that it would become a franchise of the massive Coldwell Banker. While the brand has locations across the U.S. and in 51 countries, Manhattan had been without a Coldwell Banker franchise since 2009, when Coldwell Banker Hunt Kennedy shuttered in the midst of the real estate downturn. [more]

Tags: bellmarc, coldwell banker

Share           Tweet           Share

## South Beach Luxury Condo

Discover The Most Beautiful Luxury Condo at Apogee South Beach. Corner Residence #2104
nelsongonzalez.com



Sections **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS   NEW YORK CITY REAL ESTATE NEWS

## 10 must-read books on NYC real estate

By Hayley Kaplan | September 20, 2013 02:07PM

 f 🐦 in ✉ ⤳

From how-to guides to memoirs, financial crisis exposés to histories of the Manhattan skyline, the world of real estate literature has a lot to offer. Some of the industry's biggest names — Barbara Corcoran, Donald Trump — have penned their own guides on success. Likewise, journalists have taken inspiration from Gotham's best-known buildings — 740 Park Avenue, Stuyvesant Town-Peter Cooper Village — to tell some of the most enthralling stories around. Read on for *The Real Deal*'s roundup of 10 must-read New York City real estate books.

### 1. Use What You've Got, and Other Business Lessons I Learned From My Mom
*by Barbara Corcoran*
After selling her eponymous brokerage the Corcoran Group, Barbara Corcoran penned a memoir about growing up in a blue-collar family in Edgewater, New Jersey, her early failures in the business world and how she formed what is now one of the largest brokerages in the city — famously with just a $1,000 loan. The 2003 book, her first of four, was an instant hit with the real estate industry and budding entrepreneurs alike.

### 2. The Subprime Solution: How Today's Global Financial Crisis Happened, and What To Do About It
*by Robert Shiller*
Published in August 2008 on the eve of Lehman Brothers' bankruptcy filing, "Subprime Solution" is bestselling Yale University professor and housing stats guru Robert Shiller's most popular book. It boldly outlines the origins of the subprime mortgage crisis and proposes a solution — bailouts in the short term and a revamp of lenders' financial priorities in the long term.

### 3. Other People's Money: Inside the Housing Crisis and the Demise of the Greatest Real Estate Deal Ever Made
*by Charles Bagli*
New York Times reporter Charles Bagli's book, published earlier this year, takes the reader inside the now-infamous Stuyvesant Town-Peter Cooper Village deal, and explains how powerhouse developer Tishman Speyer and asset manager Blackrock lost billions of dollars of other people's money on the deal. "That book

Linda Alexander 000012

made me mad," Jonathan Miller, president of appraisal firm Miller Samuel said, explaining that the major players lost nothing while the bondholders were the ones that got hurt in the end.

### 4. 740 Park Avenue
*by Michael Gross*
The Famed Park Avenue building has always attracted an exclusive crowd.

Among its former residents are Jacqueline Kennedy Onassis and John Rockefeller Jr., while its current residents include designer Vera Wang, Blackstone Group's Stephen Schwarzman and Oaktree Capital Management's Howard Marks. The 2005 book chronicles the building's history, from its construction (James T. Lee, Kennedy Onassis' grandfather, built the building) to the social climbers who still inhabit it today.

"It's written like a novel," even though it's not, said John Barbato, a broker at Stribling & Associates. "It's not only giving the history of a building but an older New York, Upper East Side, prewar one [and] the history of how it was sold."

### 5. The Sky's the Limit: Passion and Property in Manhattan
*by Steven Gaines*
This 2005 book provided the outside world an inside peek at the cloistered environs of Manhattan's luxury real estate, examining the most exclusive condos and co-ops in Manhattan and the brokers who were their gatekeepers. Some critics called the book gossipy because it reported on elusive co-op boards and landlords.

### 6. Skyscraper Dreams: The Great Real Estate Dynasties of New York
*by Tom Shachtman*
The story goes that the Dutch paid the Indians $24 for the island of Manhattan. Afterwards, the skyscraper race began. That's the story that journalist and author Tom Shachtman tells in this 2000 book. From moguls like the Rockefellers and Astors to the Tishmans and Rudins, the narrative charts the history of the skyscraper in Manhattan and how generations of builders have ignored the city's overall structure and health.

### 7. The Millionaire Real Estate Agent
*by Gary Keller*
The first book by the founder of Keller Williams outlines step-by-step how to succeed in the real estate industry. According to Keller, there are just three concepts that drive production — economics,

Linda Alexander 000013

organization and lead generation. Keller's follow-up books include "The Million Real Estate Investor" and the recession-era "Shift: How Top Real Estate Agents Tackle Tough Times."

## 8. Trump: The Art of the Deal
*by Donald Trump*

Among real estate mogul Donald Trump's long list of accomplishments are several books.

However, one of his earliest, "Trump: The Art of the Deal" is nearly synonymous with Trump's name. Published in 1987, it shows how the developer runs his day-to-day business and personal life. Along the way, the book outlines Trump's 11 steps to success while breaking long-held myths about the real estate biz.

## 9. The Ultimate Guide to Buying and Selling Co-ops and Condos in New York City
*by Neil Binder*

Newly updated this month, Neil Binder's guide provides an insider account of how to successfully buy and sell apartments in Manhattan, for consumers and brokers alike. Readers get a look at the sales process from house hunting to closing costs. Binder, the founder of Manhattan brokerage Bellmarc Realty (now a Coldwell Banker franchise) has taught courses at the brokerage since it was founded 34 years ago.

## 10. The Peebles Principles: Tales and Tactics From an Entrepreneur's Life of Winning Deals, Succeeding in Business and Creating a Fortune From Scratch
*by Don Peebles*

Developer Don Peebles' first book is an account of how he dove into the business world at age 19 with no past experience or contacts in the industry, becoming a multimillionaire just seven years later. Besides a memoir, the book offers tips on what it really means to be lucky and how to negotiate a deal while dealing with personal attacks.

---

Tags: 740 park avenue, Barbara Corcoran, don peebles, Donald Trump, neil binder, Robert Shiller

Share                    Tweet                    Share

Linda Alexander 000014

**Sections** **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS     NEW YORK CITY REAL ESTATE NEWS

## Bellmarc rental arm to open 100-agent office in Midtown

By Guelda Voien | July 19, 2013 09:00AM



Bellmarc Realty's rental arm, AC Lawrence Real Estate, is opening an office next month near the Midtown East neighborhood, firm head Neil Binder told *The Real Deal*.

The office should open in about three weeks at 155 East 56th Street, near Third Avenue; it will be large enough for 100 agents, Binder said.

Bellmarc chose the location because it is close to both the subway and Bellmarc's Midtown office at 681 Lexington Avenue, he said.

"We are trying to create sister environments with AC Lawrence," Binder said.

Bellmarc, one of Manhattan's largest residential sales brokerages, absorbed residential and commercial rental brokerage AC Lawrence Real Estate in November, although the companies maintained their identities and areas of specialties.

Only last month, the Bellmarc Group became a franchise of Coldwell Banker, the international firm that is part of Realogy, as *The Real Deal* reported at the time.

The franchise acts as a holding company for two divisions, Coldwell Banker Bellmarc and Coldwell Banker AC Lawrence; the day-to-day operations of the firm remain unchanged, executives said.

A manager has been tapped to head the new location, but Binder declined to disclose the person's identity because she has not given notice at her current job, he said.

Tags: AC Lawrence, bellmarc, coldwell banker, neil binder, realogy

Share                    Tweet                    Share

Ad closed by Google

Linda Alexander 000015

Sections   **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS     NEW YORK CITY REAL ESTATE NEWS

## Coldwell Banker Bellmarc Group settles lawsuits
*Principals Anthony DeGrotta and Larry Friedman to resign*

By Claire Moses | December 01, 2014 09:03AM

 f 🐦 in ✉ ⌁

Coldwell Banker Bellmarc Group's President Neil Binder has reached a settlement with two of its principals, dismissing all litigation, according to a statement from Binder. His business partners and fellow principals Anthony DeGrotta and Larry Friedman, who sued him for allegedly embezzling money from the brokerage, have resigned.

"I am pleased that the dispute between myself and Larry and Anthony is now behind us, and that we can move forward as a unified company," Binder said. Binder called DeGrotta's and Friedman's claims "false allegations." The accusations, Binder said, "will always haunt me as a personal blemish on my 35 years of pursuing the highest standards in the business."

Friedman and DeGrotta alleged that Binder used the firm's funds as "his personal piggy bank" and asked for $2 million in damages. Since the lawsuit was filed, 25 agents have left the brokerage to join other firms.

In August, Bellmarc, which is a franchisee of national brokerage Coldwell Banker, was evicted from its Lexington Avenue office, as reported by *The Real Deal*. Earlier this year, Coldwell Banker, which claims Bellmarc owes the company $270,000, asked a judge to appoint a temporary receiver to oversee the firm's finances pending the outcome of the litigation.

Friedman and DeGrotta also "transferred their ownership interest to a third party," Binder noted. He will remain as the sole operating manager of the firm.

DeGrotta and Friedman "have also made financial payment to the company," Binder said.

Binder co-founded Bellmarc in 1979 and bought A.C. Lawrence from Friedman and DeGrotta in 2012. Bellmarc became a Coldwell Banker franchise last summer. The company's current structure and branding will remain the same following the settlement.

Tags: coldwell banker, neil binder

Share        Tweet        Share

Sections   **THE REAL DEAL**   **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS        NEW YORK CITY REAL ESTATE NEWS

## Bellmarc founder Neil Binder allegedly misused company funds

*$2M suit could endanger Coldwell Banker franchise deal*

August 26, 2014 04:20PM



Neil Binder, co-founder of the Bellmarc Group, is being sued by his business partners for allegedly embezzling hundreds of thousands of dollars, according to court papers.

Larry Friedman and Anthony DeGrotta, Binder's business partners, filed papers on Tuesday in Manhattan Supreme Court, stating that Binder allegedly used the company's funds as "his personal piggy bank." The business partners are looking to receive $2 million in damages. Bellmarc could be in danger of losing its franchise deal with Coldwell Banker and the embezzlement the suit alleges could cause tax problems for the company.

The funds Binder allegedly took out of the company account — in one case an escrow account that was used for employees' health insurance premiums, according to the court papers — were used to support a "lavish lifestyle" and pay "personal debts," according to court papers cited by the New York Daily News.

Binder's debts include the mortgage on his luxury co-op in Westhampton and rent on his $11,950-per-month Apartment On East 90th Street.

The suit also alleges that Binder has "issues" with his female employees, according to the Daily News, and claims he used Bellmarc resources to improperly pay his wife, sister and daughter.

Binder did not immediately respond to the Daily News' calls or emails seeking comment. [NYDN] — *Claire Moses*

Tags: Bellmarc Group, coldwell banker, neil binder

Share          Tweet          Share

Linda Alexander 000017

METRO

# Drug-addled exec raided employee healthcare fund for Hamptons home: suit

By Julia Marsh                                                                    August 26, 2014 | 3:46pm



Neil Binder was the co-founder of the Bellmarch Group which is now a part of Coldwell Banker.

A drug-addled Manhattan real-estate executive raided his company's coffers — including the employees' health-care fund — to finance his Hamptons summer home and Upper East Side pad, a new lawsuit charges.

Bellmarc Group co-founder Neil Binder embezzled hundreds of thousands of dollars to pay for the $5 million waterfront Westhampton residence and $12,000-a-month East 90th Street pad — and even no-show jobs for relatives, according to the $2 million lawsuit.

The married, 62-year-old Binder's behavior is now threatening to sink the 35-year-old company, which has more than 600 employees, says the suit filed by his business partners, Anthony DeGrotta and Larry Friedman.

DeGrotta and Friedman say Binder has been popping so much Adderall and other pills that he is either "completely incoherent" or "incessantly screams and yells within in the office."

Linda Alexander 000018

Binder, also an author of real-estate books, has "utilized as his personal piggy bank a ... sacrosanct health-insurance escrow account," withdrawing around $88,000 to "finance his mounting personal debts and a lavish lifestyle," the suit says.

The Queens native owes $69,000 to the IRS and $1.8 million to Signature bank, according to court papers.

He also paid wife Nina Scerbo's design firm more than $9,000 without an invoice for any services allegedly rendered, gave his daughter a real-estate commission even though she's not a licensed broker and doles out a salary to his sister, who is "incapable of performing substantive work," the suit says.



**Neil Binder**
LinkedIn

Binder even swiped $276,000 set aside to pay Coldwell Banker franchise fees and wrote himself a $281,000 check for unspecified expenses, according to the Manhattan Supreme Court filing.

Saul Bruh, DeGrotta's and Friedman's lawyer, told The Post that the suit makes "a lot of allegations that are going to be supported by the evidence."

The exec's spokeswoman said, "Mr. Binder has been engaged in a business dispute with his partners that unfortunately has escalated into unfounded personal attacks. These allegations are entirely without merit and Mr. Binder intends to contest them vigorously."

FILED UNDER   **LAWSUITS**

Recommended by

Sections **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS      NEW YORK CITY REAL ESTATE NEWS

## Bellmarc agents flee firm as legal woes mount

*Exodus follows claim that co-founder Neil Binder used firm's funds as his "personal piggy bank"*

By E.B. Solomont | October 15, 2014 08:00AM



More than 25 agents from Coldwell Banker Bellmarc Group have decamped to other firms amid fallout from allegations that co-founder Neil Binder embezzled money from the brokerage.

The majority of the agents who migrated to other brokerages came from Bellmarc's office at 681 Lexington Avenue after Bellmarc was evicted in August for non-payment of rent, *The Real Deal* has learned.

In the past few weeks, 15 agents have joined Halstead Property's Park Avenue office, including top producer Geri Epstein and a team lead by Leslie Penny and Harriet Botwinick. Another 10 agents have moved to David Schlamm's City Connections Realty, including husband-and-wife team Hy and Myrna Rosen.

The shakeup comes just two months after Binder was sued by his business partners, Larry Friedman and Anthony DeGrotta, for allegedly embezzling hundreds of thousands of dollars from the brokerage. On August 26, the firm, which is a franchisee of national brokerage Coldwell Banker, was evicted from its Lexington Avenue office, according to court documents. Soon after, Coldwell Banker – which claims it is owed more than $270,000 – asked the judge in the case to appoint a temporary receiver to oversee Coldwell Banker The Bellmarc Group's operations pending the outcome of the litigation.

According to court documents, the dispute between Binder, Friedman and DeGrotta gained steam last winter as the brokerage faced financial constraints and was struggling to pay its franchise dues to Coldwell Banker. In their suit, Friedman and DeGrotta alleged Binder used the company as his "personal piggy bank."

Bellmarc, co-founded by Binder in 1979, acquired A.C. Lawrence from Friedman and DeGrotta in 2012. The combined Bellmarc Group became a Coldwell Banker franchise last summer, marking the second time the San Francisco-based brokerage tried to break into the New York City market. Coldwell Banker Hunt Kennedy shuttered in 2009, at the height of the downturn.

As of May, Coldwell Banker The Bellmarc Group had 519 agents, slightly higher than 511 in 2013, according to *The Real Deal*'s annual brokerage ranking. The firm had 81 listings this year, versus 115 last year, according to *TRD* research, based on data from the OLR listing portal.

In an affidavit, Binder said the brokerage had run into a "serious negative cash position." In fact, during a February 2014 meeting with the president of Coldwell Banker, Binder expressed his intention to sell the business.

Linda Alexander 000020

Binder did not immediately return a call seeking comment.

But in his affidavit, Binder characterized the suit by Friedman and DeGrotta as a "premeditated action and 'slap' style suit" designed to give his partners control of A.C. Lawrence. "This lawsuit is also an attempt to cover up their own malfeasance and improper actions," he said, including "suspicious or unauthorized" payments by Friedman and DeGrotta.

Meanwhile, on September 10, Coldwell Banker asked Judge Saliann Scarpulla to appoint a temporary receiver to oversee the New York City business "so as to preserve [its] value while this litigation is pending." In court documents, the company said that Coldwell Banker The Bellmarc Group owed more than $276,545 in franchise payments as of August 26.

"As Franchisees have not cured these material defaults, despite notice, Coldwell Banker is entitled to notice termination of the Franchise Agreements and to pursue its collection and enforcement remedies." A lawyer for Coldwell Banker didn't immediately return a call seeking comment.

William Hummell, an attorney for Friedman and DeGrotta, said as far as he knows, Coldwell Banker has not terminated the franchise agreement. "The parties are discussing possible settlement among themselves," he added.

The new City Connections group includes the Rosens, as well as Adolfo Brenes, Nicolas Bustamante, Janis Cooke, Susie Gomez, Richard Mulholland, Tama Robertson, Eva Posner and Vanessa Palka.

The Halstead group includes Epstein, Penny and Botwinick along with Marcia Gershon, Neil Gallo, Richard Topp, Leslie Bettison, Greta Elias, Seth Price, James Lake, Kim Cowal, Joe Irving and Arnie Roiutman.

John Wollberg, who heads up Halstead's Park Avenue office, said it was "highly unusual" to hire such a large group in "one fell swoop." But, he said, "This was a unique opportunity. We seized it."

"I'm still getting telephone calls each week from someone else who wants to sit and talk with me," he said.

---

Tags: Bellmarc Group, coldwell banker, neil binder

Share          Tweet          Share



Linda Alexander 000021

Sections   **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS   NEW YORK CITY REAL ESTATE NEWS

## Bellmarc screwed us out of commissions, and we're suing: ex-agents
*Neil Binder's firm downsized to a single location last month, after two years of turmoil*

By E.B. Solomont | February 17, 2016 02:00PM

f 🐦 in ✉ ⤴

Neil Binder and Bellmarc Realty — having weathered two tumultuous years of financial distress, including an eviction and a shrinking roster of agents — are now facing two lawsuits from former brokers who claim they are owed thousands in unpaid commissions.



In a suit filed Feb. 14, former agent Doreen Mangan said she is owed $30,853 related to three sales and one rental between January 2014 and September 2015. She's now an agent with Weichert Realtors in Washington Heights and Hudson Heights.

Agent Julia Congdon, who worked for Bellmarc between September 2014 and May 2015, filed suit on Feb. 4, saying she's owed $9,375 related to a single sale. Congdon is now an agent at Bond New York.

*Neil Binder*

Binder did not immediately respond to a request for comment.

In a letter sent to Binder in December 2015, an attorney for Mangan wrote: "There is no question that the commission are owed, and there is no question that they have not been paid."

The brokerage chief has weathered a firestorm in recent years after his former business partners, Anthony DeGrotta and Larry Friedman, sued him in 2014 alleging he embezzled from the firm. They later settled the suit and DeGrotta and Friedman, who are now at Keller Williams NYC, relinquished their stakes in Bellmarc.

TD Bank temporarily froze Bellmarc's bank accounts last year as a result of a $33,000 withdrawal Binder made from E*Trade. The bank subsequently removed the freeze, and in an email to his employees, Binder wrote, "The bank has accepted its error and has now released all accounts of the company."

Bellmarc shuttered four offices last month, downsizing into a single office at 939 Broadway in the Flatiron district, as *TRD* reported. At the time, Binder said he created a new search engine that would help to eliminate the need for multiple office locations.

Bellmarc now has just north of 200 agents, down from a high of 600 in 2013, when the firm signed a franchise agreement with Coldwell Banker. In 2015, Coldwell Banker terminated the relationship with Bellmarc, citing unpaid fees totaling hundreds of thousands of dollars.

Linda Alexander 000022

Sections | **THE REAL DEAL** THE REAL DEAL
NEW YORK REAL ESTATE NEWS   NEW YORK CITY REAL ESTATE NEWS

## Receivership would put Bellmarc out of business: Neil Binder

*Capital One asked a judge to appoint receiver so it can collect $580K+ from brokerage*

By E.B. Solomont | March 28, 2016 04:50PM                        f 🐦 in ✉ ⟨

In an attempt to stave off a court-appointed receiver, embattled brokerage head Neil Binder told a judge that such a move would put his firm, Bellmarc Realty, out of business by depriving him of income and forcing him to file for bankruptcy.

"Saddling me with a receiver will not only prevent the turnaround of Bellmarc, but will hasten its demise," he argued in court documents dated March 25.



*Neil Binder*

Earlier this month, Capital One bank asked a Suffolk County judge to appoint a receiver in its attempt to collect nearly $580,000 from the brokerage. Court documents indicate Binder defaulted on a $1.15 million promissory note in 2009, and was fined $557,697 plus interest in December 2014.

In opposing Capital One's motion, Binder said the bank's "best hope" for collecting its fee is to allow him to rebuild Bellmarc, which has dwindled to roughly 200 agents from more than 600 in 2013.

In court documents, Binder said the negative publicity surrounding receivership would prompt his sales agents to defect to other firms. "Who would want to be affiliated with or do business with the company if it becomes known that a receiver has been appointed to run my affairs and liquidate my holdings," he wrote.

Binder said he may have no other choice than to file for bankruptcy if a receiver were appointed. Binder did not respond to a request for comment.

In his motion, Binder also "vehemently" disputed Capital One's claims that he lives in an expensive apartment paid for by Bellmarc, drives a car owned by his brother-in-law's company and has refused to turn over relevant financial information. "The dire financial position I find myself in today is not the result of some devious asset protection scheme," he said, "but rather the consequence of a bitter and highly publicized battle with former partners."

In December 2014, Binder settled a lawsuit filed by former principals Anthony DeGrotta and Larry Friedman, as *The Real Deal* previously reported. At that time, DeGrotta and Friedman, who accused Binder of using Bellmarc as his personal piggybank, resigned from the firm and sold their stakes in the company.

Earlier this year, Bellmarc consolidated into a single office in the Flatiron district. Two former agents sued the firm in February, alleging they weren't paid commissions – a claim Binder denied.

Tags: Bellmarc Group, neil binder

Linda Alexander 000023

**Sections**  **THE REAL DEAL** **THE REAL DEAL**
NEW YORK REAL ESTATE NEWS    NEW YORK CITY REAL ESTATE NEWS

## Bellmarc may be booted from its last Manhattan office
*Landlord at 936 Broadway alleges Binder owes $202K in unpaid rent and fees*

By E.B. Solomont | April 12, 2016 08:00AM

f 🐦 in ✉ ⤴



*936 Broadway in the Flatiron District and Neil Binder" width="570" height="294" /> 936 Broadway in the Flatiron District and Neil Binder*

Neil Binder's Bellmarc Realty is at risk of losing its last remaining Manhattan office.

The residential brokerage, already rocked by mass agent defections, lawsuits and financial challenges, allegedly owes $202,357 in unpaid rent at 936 Broadway, according to a complaint filed by First Sterling Corp., which owns the building's commercial condominium.

The Great Neck-based First Sterling initially filed suit in December in an attempt to collect three months' rent, which it said amounted to $67,945. In a March 3 court filing, the landlord said the amount of unpaid rent plus fees had grown to $202,357.

The suit names Austin St. Associates Inc., which does business as Bellmarc Realty and signed a lease for retail space at 936 Broadway in 2004. Binder personally guaranteed the original lease, according to court documents.

In court documents, an attorney for Bellmarc portrayed the outcome of the dispute as "existentially critical" for the brokerage.

"In an effort to cut costs, in response to financial duress, [Bellmarc] has closed all of its offices except the one that is the subject of this proceeding." The possibility of eviction and "loss of its last remaining place of business would be more than devastating."

For his part, Binder claims Sterling failed to correct a "noxious condition" in the office, he told *The Real Deal* in an email. Specifically, he said, the building's heating system caused "excessive heat" in Bellmarc's office, and forced the firm to install and maintain an expensive air conditioning system. Bellmarc is claiming $641,741 in damages, according to court documents.

Linda Alexander 000024

The dispute comes amid ongoing financial woes for Binder and, by extension, Bellmarc.

In August 2014, the brokerage was evicted from its office at 681 Lexington Avenue, as *TRD* reported. In January, it shuttered four offices across Manhattan, leaving it with the single location at 936 Broadway.

In a separate lawsuit also filed in December, Bellmarc's former landlord at 1178 Lexington Avenue is also seeking money from the brokerage.

In its petition, the landlord – identified in court documents as 120 East 81st Street Corp. – claimed it is owed $72,587 in unpaid rent between September and December. Bellmarc's base rent was $23,842 a month, according to the suit.

In an affidavit, Binder contends the landlord was "unhappy" with Bellmarc because it repeatedly made late rental payments. In August 2015, as per Binder, the building's manager exclaimed, "I want you out!"

That comment served as Bellmarc's notice that it had to vacate the office, according to Binder. As a result, he said, "this proceeding was improperly brought as a non-payment proceeding because the lease had already been terminated by the landlord a few months earlier in August."

Last month, Binder sparred with Capital One Bank in court, after the bank asked a judge to appoint a receiver in an attempt to collect a $580,000 debt. Binder argued that a receiver could force him into bankruptcy and could lead to Bellmarc's demise.

---

Tags: bellmarc, neil binder

Share          Tweet          Share





Linda Alexander 000025

**Exhibit 3**

Case 2:14-cv-07926-MCA-MAH   Document 155-1   Filed 11/13/18   Page 45 of 149 PageID: 4505

Binder Capital One Receiver Binder Aff #2 (Final).aff.doc

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---

CAPITAL ONE, N.A.,

                          Plaintiff,

              -against-.

NEIL BINDER,

                         Defendant.

Index No.: *067110/2014*

Assigned to:

Hon. Jerry Garguilo
IAS Part 48

**AFFIDAVIT OF NEIL BINDER
IN OPPOSITION TO PLAINTIFF'S
ORDER TO SHOW CAUSE FOR
<u>APPOINTMENT OF A RECEIVER</u>**

---

STATE OF NEW YORK    )
                          ss.:
COUNTY OF NEW YORK  )

       Neil Binder, being duly sworn deposes and says:

1.      I am the defendant-judgment debtor in the above matter and submit this affidavit on personal knowledge in response to Capital One, N.A.'s ("Plaintiff") motion to appoint a receiver pursuant to CPLR §5228 over my assets and to have the receiver take control over various entities.

2.      The appointment of a receiver to control my personal business and financial affairs is not warranted and is drastic.  At the present time I am in financial dire straits with judgments against me and judgments against the entities which leased and operated the sales and rental brokerage business that I was associated with.

3.      Plaintiff's prior motion seeking to appoint a receiver, which was denied, was reported in the press and contributed to the downfall of the "Bellmarc" rental and sales business. At the present time, there is no existing or expected future business operations for the "Bellmarc" rental and sales business and there are no longer any offices.

4.      By way of example, "Bellmarc" was forced to vacate its main and last office at 936 Broadway due a landlord tenant non-payment eviction proceeding and a judgment was entered against the named tenant, Austin St. Associates, Inc., in the amount of $101,769.07. Copies of the judgment and "so ordered" stipulation dated June 16, 2016 from the landlord tenant proceeding are collectively attached hereto as Exhibit "A".

5.      Similarly, Bellmarc Realty, LLC had been forced to vacate its office at 1178 Lexington Avenue due to a landlord tenant non-payment eviction proceeding and eventually a judgment in the amount of $31,494.00 was entered against the company in order to conclude the eviction case.  A copy of the Stipulation of Settlement dated August 18, 2016 and the monetary judgment are collectively annexed hereto as Exhibit "B".

6.      Further, Coldwell Banker Real Estate LLC ("Coldwell Banker") has sued me and the entities from the rental and sales brokerage business in the action styled *Coldwell Banker Real Estate LLC v. The Bellmarc Group LLC, et al.*, United States District Court, District of New Jersey, Civil Action No.: 2:14-CV-07926-MCA-MAH.   A copy of the Complaint is annexed hereto as Exhibit "C".

7.      According to various security agreements, Coldwell Banker has claims against the assets of the entities that are parties to the security agreements.   Copies of the security agreements are collectively annexed hereto as Exhibit "D".

8.      Personally, I guarantied various leases of the sales and brokerage offices such as the lease at 729 Seventh Avenue, New York, New York, the lease at 2697 Broadway, New York, New York and the lease at 1178 Lexington Avenue, New York, New York.  Copies of the guaranties from the 729 Seventh and 2697 Broadway offices are collectively annexed hereto as

2

Exhibit "E".  At the present time, I cannot locate a signed copy of the guaranty for the 1178 Lexington lease.

9.     Rather than pursuing a completely counter-productive measure such as appointing a receiver, I have offered to assist Plaintiff by volunteering to submit to additional discovery, such as depositions and document production.  Plaintiff has rejected said offers.

10.     While it is true that I hold various interest in some closely held family businesses I vehemently disagree with Plaintiff's characterization of my intentions as erroneously claimed in its brief, "He has structured his life to give the appearance of being judgment proof.  Yet, he lives in a high rent apartment paid by Bellmarc Realty and drives a car which is supposedly owned by his brother-in-law's company.  Equally significant, he has refused to turn over financial information about his interests in these companies despite repeated requests to do so."

11.     The dire financial position I find myself in today is not the result of some devious asset protection scheme, but rather the consequence of a bitter and highly publicized battle with former partners that in fact destroyed a successful business that I spent thirty (30) years of my life building.  Any transfers of assets that I made to my wife and children over the years are/were for legitimate estate and tax planning purposes.  Moreover, I am more than willing to provide financial information to Plaintiff which will substantiate my predicament and prove that the appointment of a receiver will only exacerbate matters.

12.     To respond to the claim that I am living in a "high rent" apartment, my wife and I moved out of the apartment Plaintiff is referring to as a result of non-payment of rent and the landlord's eviction proceeding.  Copies of the landlord's non-payment Notice of Petition and Petition are attached hereto as Exhibit "F".

3

13.     In response to the unsupported allegations made in Plaintiff's brief, FAWBS, LLC is a New Jersey entity with one piece of property in New Jersey.  Although I own a fifty percent (50%) interest of the company with my brother-in-law Alan Scerbo and the company does receive approximately $25,000 a month in rent, it also has expenses including hefty mortgage interest.  I have not received any distributions from FAWBS in two years.

14.     The Bellmarc group companies are no longer operational, even though they may not have been dissolved or filed for bankruptcy.  Again, I am willing to provide substantiation of their insolvency to Plaintiff.

15.     Bellmarc Property Management Services, Inc. was an operating property management business that was sold to Douglas Elliman ten (10) years ago, under an installment contract that was paid off last year with the installments being paid to the lender.

16.     With respect to Bellmarc Property Management Services, Inc.; Nice Idea Publishing and Nice Idea Media, I am again willing to produce such financial records and information that Plaintiff may request.

17.     Appointing a receiver to try to sell the interests I hold in the companies mentioned above will not be fruitful.  No one would be willing to buy a minority interest in these closely held family businesses and in most cases, non-operational entities.  Plaintiff will yield little or no proceeds.

18.     Plaintiff's best hope for collecting on the judgment against me is to allow me to work with whatever I have left and restore my credit and solvency.

4

**WHEREFORE**, it is respectfully requested that Plaintiff's motion to appoint a receiver

pursuant to CPLR §5228 be denied.

Neil Binder

Sworn to before me
on October 27, 2016

Notary Public

BARBARA EVE BINDER
Notary Public, State of New York
No. 01BI6325724
Qualified in New York County
Commission Expires June 01, 20___

5

Index No.: 067110/2014
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK: IAS PART 48

===================================================

CAPITAL ONE, N.A.,

                    Plaintiff,

        -against-

NEIL BINDER,

                    Defendant.

===================================================

## AFFIDAVIT OF NEIL BINDER IN OPPOSITION TO PLAINTIFF'S ORDER TO SHOW CAUSE FOR APPOINTMENT OF A RECEIVER

===================================================

### ROSENBERG & PITTINSKY, LLP
#### COUNSELORS AT LAW

*Attorney for Defendant*
*Office and Post Office Address, Telephone*

### 232 MADISON AVENUE, SUITE 906
### NEW YORK, NEW YORK 10016
### (212) 286-6100

===================================================

| | |
|---|---|
| Service of a copy of the within _____ is hereby admitted and acknowledged. | Signature Pursuant to Section 130-1.1a of the Rules of the Chief Administrator. |
| Dated: | Dated: 10/27 /2016, New York , New York |
| _____ Attorney(s) for _____ | Laurence D. Pittinsky/~~Eric Rosenberg~~ |

===================================================

### AFFIRMATION OF SERVICE

_____, an attorney duly admitted to practice law in the State of New York, affirms the following to be true under the penalties of perjury; that I am a(n) _____ of Rosenberg & Pittinsky, LLP; that I am over eighteen years of age, am not a party to this action and reside in _____ County, New York; that on _____, I served a true copy of the within _____ by:

_____  personally delivering same as indicated below:

_____  first class mail by depositing same in a sealed envelope with postage prepaid thereon, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York addressed as indicated below:

_____         _____
(Attorney(s) for                Attorney(s) for

Dated: _____, _____, New York

                                        _____
                                        Laurence D. Pittinsky/~~Eric Rosenberg~~

**Exhibit 4**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x

ANTHONY DeGROTTA and LARRY FRIEDMAN,          Index No.
individually, and on behalf of THE BELLMARC          Date Purchased
GROUP LLC, and on behalf of AC LAWRENCE
REAL ESTATE LLC, and on behalf of BAL
ADMINISTRATION INC., and on behalf of
BELLMARC BROKERAGE MIDTOWN INC.,          ECF CASE
and on behalf of BELLMARC GRAMERCY/
CHELSEA INC., and on behalf of
AC LAWRENCE OPERATIONS INC., and
on behalf of BELLMARC EAST LLC, and          **SUMMONS**
on behalf of BELLMARC WEST LLC, and
on behalf of BELLMARC DOWNTOWN LLC,
and ALL ENTERPRISES LLC,
                                                         Plaintiff designates New York
                                                         County as the place of trial.
                                    Plaintiffs,

                                                         The basis for the venue is the
          - against -                                    residence of defendants.

NEIL BINDER, individually, and doing
business as "Nice Idea LLC", and doing
business as "A Nice Idea Publishing LLC,"
DANUTA BRODZINSKA,
STEVEN BEISPEL, and
NICE IDEA PUBLISHING INC.,

                                    Defendants.
-------------------------------------------------------------x


**YOU ARE HEREBY SUMMONED** to appear in the Supreme Court of the State of

New York, County of New York, at the Office of the said Clerk of the said Court at 60 Centre

Street, in the County, City and State of New York, to answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this Summons, to serve a

notice of appearance, on the Plaintiff's attorney(s) within twenty (20) days after the service of

this summons, exclusive of the day of service (or within (30) days after the service is complete if

this summons is not personally delivered to you within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in this complaint.

Dated: New York, New York
      August 25, 2014

                              KUCKER & BRUH, LLP
                              *Attorneys for Plaintiffs*

By:                     
                              William D. Hummell, Esq.
                              747 Third Avenue, 12th Floor
                              New York, New York 10017
                              Tel: (212) 869-5030

**Defendants' Addresses:**

NEIL BINDER, individually, and doing
business as "Nice Idea LLC" and
"A Nice Idea Publishing LLC"
The Metropolitan Condominium
181 East 90th Street, Unit 9C
New York, New York 10028

DANUTA BRODZINSKA
c/o Nice Idea Publishing Inc.
936 Broadway
New York, New York 10010

STEVEN BEISPEL
12 East 46th Street, Suite 6E
New York, New York 10017

NICE IDEA PUBLISHING INC.
c/o New York State Department of State

and

936 Broadway
New York, New York 10010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------x

ANTHONY DeGROTTA and LARRY FRIEDMAN,
individually, and on behalf of THE BELLMARC
GROUP LLC, and on behalf of AC LAWRENCE
REAL ESTATE LLC, and on behalf of BAL                          ECF CASE
ADMINISTRATION INC., and on behalf of
BELLMARC BROKERAGE MIDTOWN INC.,                               Index No.
and on behalf of BELLMARC GRAMERCY/
CHELSEA INC., and on behalf of
AC LAWRENCE OPERATIONS INC., and
on behalf of BELLMARC EAST LLC, and                           **COMPLAINT**
on behalf of BELLMARC WEST LLC, and
on behalf of BELLMARC DOWNTOWN LLC,
and ALL ENTERPRISES LLC,

Plaintiffs,

   - against -

NEIL BINDER, individually, and doing
business as "Nice Idea LLC", and doing
business as A Nice Idea Publishing LLC ,
DANUTA BRODZINSKA,
STEVEN BEISPEL, and
NICE IDEA PUBLISHING INC.,

Defendants.

-----------------------------------------------------------x

Plaintiff Anthony DeGrotta and plaintiff Larry Friedman, individually each on his own

behalf, and on behalf of The Bellmarc Group LLC, and on behalf of AC Lawrence Real Estate

LLC, and on behalf of BAL Administration Inc., and on behalf of AC Lawrence Operations Inc.,

and on behalf of Bellmarc Brokerage Midtown Inc., and on behalf of Bellmarc Gramercy/Chelsea

Inc., and on behalf of Bellmarc East LLC, and on behalf of Bellmarc West LLC, and on behalf of

Bellmarc Downtown LLC, and plaintiff All Enterprises LLC (collectively, the "Plaintiffs"), by

and through their attorneys, Kucker & Bruh, LLP, allege as follows as and for their Complaint in

this action (the "Complaint") against the named Defendants.

- 1 -

## PRELIMINARY STATEMENT

1.      Regarding The Bellmarc Group LLC and regarding AC Lawrence Real Estate LLC,

Defendant Neil Binder has engaged in numerous illicit acts and actions and grievously violated each

respective Operating Agreement.  Plaintiffs Anthony DeGrotta and Larry Friedman have ownership

interests in The Bellmarc Group LLC, and in AC Lawrence Real Estate LLC, by membership in All

Enterprises LLC.  In their individual names Anthony DeGrotta and Larry Friedman are two of the

three LLC Managers of each of these LLC's and two of the three members of the Board of Directors

of each of these LLC's.  Each of the respective Operating Agreements provides, *inter alia*, each of

the Three Managers/ Directors has an equal one vote among the total of three eligible votes, and all

major decisions require a unanimous vote.

2.      Regarding Bellmarc Brokerage Midtown Inc., BellmarcGramercy/Chelsea Inc.,

Bellmarc East LLC, Bellmarc West LLC, Bellmarc Downtown LLC and BAL Administration Inc.,

Neil Binder has engaged in numerous illicit acts and actions.  Anthony DeGrotta and Larry Friedman

have an ownership interest by way of their membership in All Enterprises LLC.  In their individual

names Anthony DeGrotta and Larry Friedman are the two Vice Presidents of Bellmarc Brokerage

Midtown Inc. and of Bellmarc Gramercy/Chelsea Inc.; Neil Binder is President; there are no other

officers.  In their individual names Anthony DeGrotta and Larry Friedman are two of the three

managers of Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC, and each of

them has an equal one vote among the total of three eligible votes; the third vote is by Neil Binder.

3.      As is set forth in subsequent paragraphs of this Complaint, the numerous illicit acts

and actions by Defendant Neil Binder include, the following examples:

        a.      Neil Binder utilized as his personal piggy bank an escrow account in which
        funds are placed exclusively for the subsequent payment of health insurance
        premiums which protect staff employees and brokers employed by The Bellmarc
        Group LLC insofar as health insurance for them and their families is concerned.

- 2 -

b.   Neil Binder has embezzled many hundreds of thousands of dollars from Plaintiffs to pay his personal debts, including the substantial mortgage on his luxury cooperative residence in Westhampton, New York, and the substantial rent for his lease on a luxury apartment in Manhattan, New York City which has a monthly rent of $11,950.00.

c.   As to the luxury apartment in Manhattan, Neil Binder fraudulently put the lease in the name of a fictional entity which does not actually exist ("The Bellmarc Realty LLC) and falsely submitted to the condominium board financial statements for Plaintiff The Bellmarc Group LLC and falsified his application documents, including by making inaccurate statements concerning his ownership and management positions and illegally forged the signature of Plaintiff Larry Friedman on a supporting document; among other things, these false and illegal acts have exposed Plaintiffs to a possible future legal claim by the condominium.

d.   Diverted funds from Plaintiffs to pay his personal debts which, among other things, has had the effect of obstructing The Bellmarc Group LLC from paying any of the $276,158.53 owed to Coldwell Banker Real Estate LLC under a franchise agreement, for the portion of the entire franchise debt attributable to the Bellmarc operational group (*i.e.*, Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC); during the same time period, Plaintiffs Anthony DeGrotta and Larry Friedman have made certain that the portion of the franchise debt owed by AC Lawrence Real Estate LLC has been paid.  The obstruction by Neil Binder as to payment to Coldwell Banker has put into jeopardy the entire franchise agreement on which all of the Plaintiffs depend.

e.   Engaged in acts and actions solely for his own personal benefit which exposed Plaintiffs to punitive action by the Internal Revenue Service.

f.   Caused Plaintiffs to pay rent "owed" by a limited liability company formed by Defendant in 1995 unrelated to Plaintiffs, named "Bellmarc Downtown L.L.C." to the putative landlord, M&N 12 St. Associates Inc., owned and controlled by Defendant, even though the alleged lease is terminable at will for lack of definite terms and Plaintiffs do not occupy or utilize the premises at 16 East 12th Street, New York, New York.

g.   While at the same time Defendant Neil Binder has made certain that "rent" is paid by Plaintiffs to M&N 12 St. Associates Inc., owned and controlled by him, he has obstructed payment of rent to the landlords for the premises occupied and utilized by the brokers employed by the Bellmarc operational group on which that business depends (*i.e.*, Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC).  Those landlords have served formal notices of nonpayment which is prefatory to their commencement of eviction actions in court.

### THE PARTIES

4.     **The Bellmarc Group LLC**, one of the Plaintiffs, is a limited liability company that was organized in the State of New York on or about August 27, 2012 (hereinafter, the term limited liability company sometimes is referred to simply as "LLC"). During relevant times, it has been authorized to do business in New York. Its principal offices are in New York County, State of New York, at 936 Broadway, New York, New York 10010. The primary role of The Bellmarc Group LLC has been as the franchisee concerning a franchise provided by Coldwell Banker® through its subsidiary Coldwell Banker Real Estate LLC.

5.     **AC Lawrence Real Estate LLC**, one of the Plaintiffs, is a limited liability company that was organized in the State of New York on or about August 27, 2012. During relevant times, it has been authorized to do business in New York. Its principal offices are in New York County, State of New York, located at 936 Broadway, New York, New York 10010. During its existence, the business conducted by AC Lawrence Real Estate LLC has included real estate brokerage transactions, including rental transactions, sales transactions and cooperative transactions.

6.     **Anthony DeGrotta** (hereinafter, sometimes simply referred to as: "DeGrotta"), one of the Plaintiffs, *inter alia*, is a Member and a Manager of The Bellmarc Group LLC, and a Member and a Manager of AC Lawrence Real Estate LLC (there are three Members and Managers of each of them). Anthony DeGrotta is a resident of the State of New York.

7.     **Larry Friedman** (hereinafter, sometimes simply referred to as: "Friedman"), one of the Plaintiffs, *inter alia*, is a Member and a Manager of The Bellmarc Group LLC, and  a Member and a Manager of AC Lawrence Real Estate LLC (there are three Members and Managers of each of them). Larry Friedman is a resident of the State of New York.

8.     **Neil Binder**, one of the named Defendants, *inter alia*, is a Member and a Manager of The Bellmarc Group LLC, and a Member and a Manager of AC Lawrence Real Estate LLC

(there are three Members and Managers of each of them).  Defendant Neil Binder is a resident of

the State of New York and the City of New York with a residence located at 240 East 47th Street, #

2CD, New York, New York 10017.  During the relevant times, Neil Binder engaged in illicit acts

and actions in New York County which, *inter alia*, adversely affected The Bellmarc Group LLC,

AC Lawrence Real Estate LLC, BAL Administration Inc., AC Lawrence Operations Inc., Bellmarc

Brokerage Midtown Inc., and Bellmarc Gramercy/Chelsea Inc., and adversely affected the interests

of Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman.

9.    **Danuta Brodzinska,** one of the named Defendants, is an individual person who

has been employed as a Controller of BAL Administration Inc. with responsibilities for financial

transactions as to the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc

Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC).

As is discussed *infra*, Danuta Brodzinska, *inter alia*, engaged in illicit acts and actions along with

Neil Binder which facilitated his illicit acts and actions and violation of his fiduciary obligations

which directly caused substantial adverse consequences suffered by Plaintiffs.

10.    **Steven Beispel**, one of the named Defendants, is an individual person who has been

employed by the Plaintiff entities as an attorney.  In addition, he is a certified public accountant.

Mr. Beispel's offices are located at 12 East 46 Street, Suite 6E, New York, New York 10017. As is

discussed *infra*, Defendant Steven Beispel, *inter alia*, engaged in illicit acts and actions along with

Defendant Neil Binder which facilitated Neil Binder's illicit acts and actions and violation of his

fiduciary obligations which directly caused substantial adverse consequences suffered by Plaintiffs.

11.    **Bellmarc Brokerage Midtown Inc.,** one of the Plaintiffs, is a corporation that was

organized in the State of New York on or about August 29, 2012.  During relevant times, it has

been authorized to do business in New York.  According to DOS records: Bellmarc Brokerage

Midtown Inc. has a designated address - "*(Address to which DOS  will mail process if accepted*

*on behalf of the entity),"* of 936 Broadway, New York, New York 10010.

12.    **Bellmarc Gramercy/Chelsea Inc.** , one of the Plaintiffs, is a corporation that was

organized in the State of New York on or about August 29, 2012.  During relevant times, it has

been authorized to do business in New York.  According to DOS records: Bellmarc Gramercy/

Chelsea Inc. has a designated address - *"(Address to which DOS will mail process if accepted on*

*behalf of the entity)"* of 936 Broadway, New York, New York 10010.

13.    **Bellmarc East LLC**, one of the Plaintiffs, despite the presence of the letters "LLC"

in its name as represented by Neil Binder to Anthony DeGrotta and Larry Friedman, is not an

actual limited liability company.  Plaintiffs DeGrotta and Friedman have learned there is no

limited liability company with that precise name.  The persons who have participated in the

general association loosely referred to as Bellmarc East LLC are three persons: Neil Binder,

Anthony DeGrotta and Larry Friedman. [1]

14.    **Bellmarc West LLC**, one of the Plaintiffs, despite the presence of the letters "LLC"

in its name as represented by Neil Binder to Anthony DeGrotta and Larry Friedman, is not an actual

limited liability company.  Plaintiffs DeGrotta and Friedman have learned there is no limited

liability company with that precise name.  The persons who have participated in the general

association loosely referred to as Bellmarc West LLC are three persons: Neil Binder, Anthony

DeGrotta and Larry Friedman. [2]

---

[1]    There is a limited liability company with a different name: **"Bellmarc East L.L.C."**  According to DOS records: Bellmarc East L.L.C. was organized on April 21, 1995, and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010.  Neil Binder caused the creation of Bellmarc East L.L.C. in 1995.

[2]    There is a limited liability company with a different name: **"Bellmarc West L.L.C."**  According to DOS records: Bellmarc West L.L.C. was organized on April 21, 1995, and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010.  Neil Binder caused the creation of Bellmarc West L.L.C. in 1995.

15.     **Bellmarc Downtown LLC**, one of the Plaintiffs, despite the presence of the letters "LLC" in its name as represented by Neil Binder to Anthony DeGrotta and Larry Friedman, is not an actual limited liability company.  Plaintiffs DeGrotta and Friedman have learned there is no limited liability company with that precise name.  The persons who have participated in the general association loosely referred to as Bellmarc Downtown LLC are three persons: Neil Binder, Anthony DeGrotta and Larry Friedman. [3]

16.     **BAL Administration Inc.**, one of the Plaintiffs, is a corporation that was organized in the State of New York on or about August 29, 2012.  During relevant times, it has been authorized to do business in New York.  Its principal offices are in New York County, State of New York, located at 936 Broadway, New York, New York 10010.

17.     **AC Lawrence Operations Inc.**, one of the Plaintiffs, is a limited liability company that was organized in the State of New York on or about September 25, 2012.  During relevant times, it has been authorized to do business in New York.  According to DOS records: AC Lawrence Operations Inc. has a designated address - *"(Address to which DOS will mail process if accepted on behalf of the entity)"* of 936 Broadway, New York, New York 10010.

18.     **All Enterprises LLC**, one of the Plaintiffs, is a limited liability company that was organized in the State of New York on or about February 9, 2011.  Its principal offices are in New York County, State of New York.  The persons who are Members and Managers of All Enterprises LLC include Plaintiffs Anthony DeGrotta and Larry Friedman, but do not include Neil Binder. [4]

---

[3]  There is a limited liability company with a different name: "**Bellmarc Downtown L.L.C.**" According to DOS records: Bellmarc Downtown L.L.C. was organized on April 21, 1995, and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010. Neil Binder caused the creation of Bellmarc Downtown L.L.C. in 1995.

[4]  There are two other Members of All Enterprises LLC: Leonard Franzblau and Francis Sanchez. However, each is an investor who has not been an active operator in the day-to-day business of All Enterprises LLC.

19. **A Nice Idea Publishing LLC**, despite the presence of the letters: "LLC" in its name, is not an actual legal entity, but instead is a mere doing business as name which Defendant Neil Binder has utilized solely for his own personal benefit.

20. **Nice Idea LLC**, despite the presence of the letters: "LLC" in its name, is not an actual legal entity, but instead is a mere doing business as name which Defendant Neil Binder has utilized solely for his own personal benefit.

21. **Nice Idea Publishing Inc.**, one of the named Defendants in this action, is a corporation organized in the State of New York. According to DOS records: Nice Idea Publishing Inc. was organized on November 17, 2000, and has a designated address - "*(Address to which DOS will mail process if accepted on behalf of the entity),*" of 936 Broadway, New York, New York 10010. On information and belief, Defendant Neil Binder is the principal and sole shareholder of Nice Idea Publishing Inc.

### *JURISDICTION AND VENUE*

22. Each of the Defendants, Neil Binder, Danuta Brodzinska, Steven Beispel and Nice Idea Publishing Inc., is subject to New York personal jurisdiction pursuant to the legal principles recognized in CPLR § 301 and CPLR § 302, and related case law.

23. Pursuant to CPLR § 503(a), the venue of this action is properly in New York County, which, *inter alia* (i) is the principal place of business for Plaintiffs The Bellmarc Group LLC, AC Lawrence Real Estate LLC, BAL Administration Inc., AC Lawrence Operations Inc., Bellmarc Brokerage Midtown Inc., and Bellmarc Gramercy/Chelsea Inc.; (ii) the residence of Defendant Neil Binder; (iii) the location from which monies, including remunerations, were paid to Defendants Neil Binder, Danuta Brodzinska, and Steven Beispel by Plaintiffs; and (iv) the county which has been designated for venue by Plaintiffs in this Complaint.

### *OTHER PERSONS*

24.     **Bellmarc Realty L.L.C.** is a limited liability company that was organized in the State of New York on or about April 21, 1995. According to DOS records: Bellmarc Realty L.L.C. is "Active" and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010.  During the relevant times Defendant Neil Binder has been the principal and sole Member and Manager of Bellmarc Realty L.L.C. Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman never have had any interest in the aforesaid Bellmarc Realty L.L.C.

25.     **Bellmarc Administrative Corporation** is a corporation that was organized in the State of New York on or about February 6, 1985.  According to DOS records: Bellmarc Administrative Corporation is "Active" and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010.  During the relevant times, Defendant Neil Binder has been the principal and sole shareholder of Bellmarc Administrative Corporation.  Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman never have had any interest in the aforesaid Bellmarc Administrative Corporation.

26.     **Bellmarc Insurance Agency, Inc.** is a corporation that was organized in the State of New York on or about March 9, 1998.  According to DOS records: Bellmarc Insurance Agency, Inc. is "Active" and has an *"(Address to which DOS will mail process if accepted on behalf of the entity),"* of 936 Broadway, New York, New York 10010.  According to DOS records: (Defendant) Neil Binder is (i) Chief Executive Officer of Bellmarc Insurance Agency, Inc.; and (ii) the contact at the Principal Executive Offices of Bellmarc Insurance Agency, Inc.  During the relevant times, Defendant Neil Binder has been the principal and sole shareholder of Bellmarc Insurance Agency.  Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman never have had any interest in the aforesaid Bellmarc Insurance Agency, Inc.

27.     **M&N 12 St. Associates Inc.** is a corporation that was organized in the State of New

York on or about January 20, 2000.  According to DOS records: (i) M&N 12 St. Associates Inc. is

"Active" and has an "*(Address to which DOS will mail process if accepted on behalf of the entity)*":

"c/o Broxmeyer, 352 Park Avenue South, 9ᵗʰ Floor, New York, New York 10010; and (ii) Marc

Broxmeyer is Chief Executive Officer of M&N 12 St. Associates Inc.  However, Marc Broxmeyer

is a business associate of Defendant Neil Binder who many years ago surrendered his stake in

Bellmarc Realty L.L.C. to Defendant.  During the relevant times, Defendant Neil Binder has been

the principal and sole shareholder of M&N 12 St. Associates Inc.  Plaintiff Anthony DeGrotta and

Plaintiff Larry Friedman never have had any interest in the aforesaid M&N 12 St. Associates Inc.

28.     **Bellmarc Construction Services , L.L.C.** is a limited liability company that was

organized in the State of New York on or about November 3, 1995.  According to DOS records:

Bellmarc Construction Services, L.L.C. is "Active" and has a designated address - "*(Address to

which DOS will mail process if accepted on behalf of the entity),*" of: "c/o John Janangelo, 352 Park

Avenue South, 9ᵗʰ Floor, New York, New York 10010.  This is the same address listed with DOS

for M&N 12 St. Associates Inc.  During the relevant times, Defendant Neil Binder has been the

principal and sole Member and Manager of Bellmarc Construction Services, L.L.C.  Plaintiff

Anthony DeGrotta and Plaintiff Larry Friedman never have had any interest in the aforesaid

Bellmarc Construction Services, L.L.C.

29.     On information and belief, John Janangelo is a former President of **Bellmarc**

**Property Management Services, Inc.,** which was subordinate to Bellmarc Realty L.L.C., and he

reported to, and took instructions, from Defendant Neil Binder.  According to DOS records:

Bellmarc Property Management Services, Inc. was formed on March 20, 1996, is "Active" and has

an "*(Address to which DOS will mail process if accepted on behalf of the entity),*" of 936 Broadway,

New York, New York 10010; and (ii) Neil Binder is Chief Executive Officer of Bellmarc Property

- 10 -

Management Services, Inc. with an address of 936 Broadway, New York, New York 10010.

30.    On or about February 2, 2010, Bellmarc Realty L.L.C. and Neil Binder conveyed to Douglas Elliman Property Management all of Bellmarc Realty L.L.C.'s interests in the subordinate company, Bellmarc Property Management Services, Inc., and John Janangelo became an employee of Douglas Elliman Property Management. However, in fact Bellmarc Property Management Services, Inc. continues to exist as perpetuated by Neil Binder, except that, on February 10, 2010, he caused the name to be changed to BPM Group Associates, Inc.

31.    **Austin St. Associates, Inc.** is a corporation that was organized in the State of New York on or about September 3, 2003. According to DOS records: Austin St. Associates Inc. is "Active" and has an "*(Address to which DOS will mail process if accepted on behalf of the entity),*" c/o Bellmarc, 352 Park Avenue South, 9th Floor, New York, New York 10010, and Neil Binder is Chief Executive Officer with an address at 352 Park Avenue South, 9th Floor, New York, New York 10010. This is the same address listed with DOS for M&N 12 St. Associates Inc. and for Bellmarc Construction Services, L.L.C. During the relevant times, Defendant Neil Binder has been the principal and sole shareholder of Austin St. Associates Inc.

32.    Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman never have had any interest in the aforesaid Austin St. Associates Inc.

**Bellmarc Downtown LLC**.

33.    Regarding the afore-described association named Bellmarc Downtown LLC, Defendant Neil Binder has utilized it for self-dealing by which he has received revenue from Plaintiffs based on a specious lease and rent obligation.

34.    Neil Binder represented to Plaintiffs Anthony DeGrotta and Larry Friedman that there is a lease for premises located at 16 East 12th Street, New York, New York 10003, for which

M&N 12 St. Associates Inc. is the Landlord, which must be paid by Plaintiffs, and that the term of

the lease is 20 years.

35.     However, Plaintiffs subsequently discovered that the alleged lease was created by

Neil Binder on October 1, 2010, and the alleged lease is not in the name of Bellmarc Downtown

LLC (in which Plaintiffs allegedly have an interest), but instead is in the name of "Bellmarc

Downtown L.L.C.", which Neil Binder formed long ago, in 1995, in which only he has an interest,

and in which Plaintiffs Anthony DeGrotta and Larry Friedman have no interest.

36.     In addition, as is discussed in greater detail in subsequent paragraphs of this

Complaint, Plaintiffs learned that the designated Landlord on the putative lease (*i.e.,* M&N 12 St.

Associates Inc.) in fact is owned by Neil Binder.

37.     Because of defects in the alleged lease, it is terminable at will, for example: it lacks

definiteness on material terms, including without limitation:

      a.     In Section 3 of the alleged lease, there is a complete absence of any actual designated monthly rent amount.

      b.     In Section 3 of the "lease", the document was physically altered subsequent to its original execution, but there is no formal amendment of the lease.

      c.     In Section 3 of the "lease", it is stated that the tenant on the first of each month will pay as additional rent to landlord (1) whatever amount is required to be paid by landlord (*i.e.,* M&N 12 St. Associates Inc.) to the holder of an existing mortgage, AND (2) whatever amount landlord will pay to any person who subsequently provides a new mortgage to the landlord.

      d.     The alleged lease is incomplete, not only because, as previously noted, there is no designated rent amount in Section 3, but also because the Rider annexed to the alleged lease as it was presented by Neil Binder to Plaintiffs DeGrotta and Larry Friedman, on page 2 of the Rider, is missing a substantial portion of Section 6, and is missing a substantial portion of Section 7, and it is not possible even to discern what either of those Sections purports to state.

38.     For at least the past four months, since at least March 2014, the afore-described

16 East 12th Street premises have not been occupied or in any other way utilized by any entity.

39.     On information and belief, the alleged named tenant, Bellmarc Downtown L.L.C., owned and controlled by Neil Binder, is a shell corporation with no assets.

40.     Plaintiffs have no privity with M&N 12 St. Associates Inc. and no legal obligation to pay rent to M&N 12 St. Associates Inc.

41.     Accordingly, it would have been reasonable in addition to prudent for Plaintiffs to refuse categorically to pay any rent to the alleged landlord, M&N 12 St. Associates Inc.

42.     Despite the fact that the alleged lease for premises 16 East 12th Street is terminable at will, and the only "tenant" is Bellmarc Downtown L.L.C., a shell corporation with no assets, and the premises are not being occupied or otherwise utilized, and Plaintiffs have no privity with M&N 12 St. Associates Inc. and no legal obligation to pay rent, Defendant Neil Binder for numerous months has caused substantial funds to be delivered by Plaintiffs to M&N 12 St. Associates Inc. as alleged monthly rent payments.

43.     The motivation for Defendant to egregiously waste Plaintiffs' assets in this manner is that the "landlord" who is receiving the so-called rent payments on the alleged lease which is terminable at will in fact is Defendant Neil Binder through the vehicle of his ownership of M&N 12 St. Associates Inc.

44.     Defendant has knowingly, purposefully, and illicitly permitted a conflict of interest to cause him to waste Plaintiffs' assets.

45.     These acts and actions by Defendant Neil Binder, in addition to being a knowing, purposeful, and illicit waste Plaintiffs' assets, is a breach of his fiduciary obligations.

## *ALLEGATIONS COMMON*
## *TO ALL CAUSES OF ACTION*

46.     On October 5, 2012, a document titled: "MEMORANDUM OF UNDERSTANDING FOR THE FORMATION OF THE BELLMARC GROUP LLC AND AC LAWRENCE REAL ESTATE LLC

- 13 -

AND THE RELATED BUSINESS OPERATION", which previously was prepared on August 15, 2012, was signed by four persons:

    a.    Neil Binder (designated on the signature page as a Manager), and a second time, utilizing his doing business as name of Nice Idea LLC. [5]

    b.    Anthony DeGrotta (designated on the signature page as a Manager).

    c.    Larry Friedman (designated on the signature page as a Manager).

    d.    All Enterprises LLC, as signed by Anthony DeGrotta and Larry Friedman who were Members and Managers of All Enterprises LLC.

47.    A document titled: "SHARED ADMINISTRATIVE SERVICES AGREEMENT", dated as of October 1, 2012, was executed by The Bellmarc Group LLC, AC Lawrence Real Estate LLC, BAL Administrative Inc., Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc. and AC Lawrence Operations Inc.  BAL Administrative Inc. was intended to act as a vehicle to administer various business banking needs and to address other administrative needs for The Bellmarc Group LLC, for AC Lawrence Real Estate LLC, and for other entities.

48.    Subsequently, a written operating agreement for The Bellmarc Group LLC was prepared and thereafter finalized, and a written operating agreement for AC Lawrence Real Estate LLC was prepared and thereafter finalized.

**The Operating Agreement of
The Bellmarc Group LLC.**

49.    The Operating Agreement of The Bellmarc Group LLC as finalized was signed by the following persons as LLC Members on June 11, 2013, contemporaneous with discussions on June 4, 2013 and June 6, 2013, among Neil Binder, Anthony DeGrotta and Larry Friedman, and representatives of Coldwell Banker including Lude Kemock:

    a.    Neil Binder, utilizing the doing business as name of "A Nice Idea

---

[5]    As previously noted, there is no actual limited liability company with the name: "Nice Idea LLC."

Publishing LLC." [6]

    b.    All Enterprises LLC, as signed by Anthony DeGrotta and Larry Friedman.

50.    The Operating Agreement of The Bellmarc Group LLC which, as has been noted, was signed on June 11, 2013, contains, in Section 13.08 thereof, an integration clause which in full states the following:

> 13.08  <u>Entire Agreement</u>.  This Agreement sets forth all (and is intended by all parties hereto to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to the Company, the Company business and the Company assets, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, except as set forth herein.

51.    In Schedule A annexed to the Operating Agreement of The Bellmarc Group LLC it is stated that there are TWO (2) LLC "Members" of The Bellmarc Group LLC: (i) A Nice Idea Publishing LLC; and (ii) All Enterprises LLC.   However, A Nice Idea Publishing LLC does not actually exist. [7]

52.    In the Operating Agreement of The Bellmarc Group LLC, set forth in Section 6.01 thereof (quoted in relevant part below), it is stated, *inter alia*, that there are THREE (3) LLC "Managers" of The Bellmarc Group LLC: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman, who collectively are described not only as the LLC Managers but also as the Board of Directors for the limited liability company.

> The management of the Company shall be vested in the Board of Directors which shall be comprised of the three Managers, Neil Binder, Anthony DeGrotta and Lawrence Friedman.  The Board of Directors shall elect officers who shall manage the company. The President and Secretary may act for and on behalf of the LLC and shall have the power and authority to bind the LLC in all transactions and business dealings of any kind except otherwise provided in this Agreement.

---

[6]    There is no actual limited liability company with the name: "A Nice Idea Publishing LLC."
[7]    There is no actual limited liability company with the name: "A Nice Idea Publishing LLC."

53.     However, the Three (3) Managers of The Bellmarc Group LLC who collectively constitute the Board of Directors pursuant to Section 6.01, never have elected a President or a Secretary for The Bellmarc Group LLC.

54.     The Operating Agreement of The Bellmarc Group LLC, in Section 6.05 thereof, provides that each of the Three (3) designated Managers is entitled to one vote.

55.     Accordingly, if there had been an election in which a President or Secretary had been selected for The Bellmarc Group LLC (which never happened), in such an instance, as required by Section 6.05 of the Operating Agreement, Neil Binder, as one of the LLC Managers, would have possessed only one of the three eligible votes for such an election, and the other two LLC Managers (*i.e.,* Anthony DeGrotta and Larry Friedman) would have possessed the other two votes which provided them with a majority of the eligible votes.

56.     With only one vote, it never has been the case that Neil Binder has had authority solely on his own initiative to elect himself as President or as Secretary of The Bellmarc Group LLC.

57.     In addition, in the Operating Agreement of The Bellmarc Group LLC, set forth in Section 6.01 (quoted in relevant part below), it is stated that any Major Decision MUST be made by unanimous decision of the three Managers (Binder, DeGrotta AND Friedman):

> No decision shall be made with respect to any of the major decisions enumerated below "Major Decisions"), unless and until same has been approved in writing by a unanimous vote of the Board of Directors.
>
> (a)   The acquisition of any additional real estate brokerage companies or businesses;
>
> (b)   The decision to borrow money and issue evidence of indebtedness and security therefor, mortgage, pledge or otherwise encumber assets of the Company, refinance any borrowing, and name of the Company as guarantor or indemnitor for any loan or borrowing to the extent permissible under any other agreements (including mortgages) to which the Company is a party;
>
> (c)   The sale, exchange or other disposition of all, or any substantial portion (75% or more) of the assets of the Company;

    (d)  The admission of additional members.

    (e)  The decision to dissolve the Company.

58.    The Operating Agreement of The Bellmarc Group LLC, in Section 6.02 thereof

(quoted in full below), provides that the rights, powers and duties of each LLC Manager of The

Bellmarc Group LLC include acting in good faith and other fiduciary obligations.

> 6.02  <u>Rights, Powers and Duties of the Manager</u>. Subject to the provisions of Section 6.01 hereof, the Managers shall conduct the day-to-day operations of the Company and shall use good faith efforts to carry out the business of the Company as set forth herein. Without limiting the generality of the foregoing, the Managing Members shall have the right, power and authority, on behalf of the Company, to:
>
> (a)  Negotiate and execute, on behalf of the Company, any and all agreements, contracts, documents, certificates and instruments necessary or convenient in connection with the operation of the Company, including, but not limited to, lease agreements, sublease arrangements, and all matters pertaining to state or federal regulatory bodies or taxing authorities;
>
> (b)  Purchase or sell any asset in the ordinary course of business subject to the parameters established as a Major Decision;
>
> (c)  Maintain adequate records and accounts of all operations and expenditures and furnish the Members with statements of accounts with respect to the operations of the Company;
>
> (d)  Employ such agents, employees, managers, accountants, attorneys, consultants and other personnel as may be deemed necessary or desirable for the conduct of the Company's business, pay from Company assets such fees, expenses, salaries, wages and other compensation to such parties as they may determine, and delegate such authority and responsibility to such personnel as the Manager may determine to be necessary or appropriate;
>
> (e)  Purchase, at the expense of the Company, liability and  other insurance to protect the Company, the Members, the Manager and the Company's assets and business;
>
> (f)  Hold reasonable reserves for anticipated future expenses, and invest Company's assets in bank and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, bankers' acceptances, other short term interest bearing obligations and any other investments in the sole and absolute discretion of the Manager;
>
> (g)  Take such other actions in connection with the day-to-day management of the Company as is not reserved to the Members or designated as a Major Decision.

59.     The Operating Agreement of The Bellmarc Group LLC, in Section 7.07, provides

for the termination of a contract with a Managing Member.  However, The Bellmarc Group LLC

never has executed a contract by which it engaged a Managing Member.

**The Operating Agreement of
AC Lawrence Real Estate LLC**.

60.     The Operating Agreement of AC Lawrence Real Estate LLC as finalized was signed

by the following persons as LLC Members on June 11, 2013, contemporaneous with the afore-

described discussions on June 4, 2013 and June 6, 2013, among Neil Binder, Anthony DeGrotta and

Larry Friedman, and representatives of Coldwell Banker, including Lude Kemock:

  a.     Neil Binder, utilizing the doing business as name of "A Nice Idea
         Publishing LLC." [8]

  b.     All Enterprises LLC, signed by Anthony DeGrotta and Larry Friedman.

61.     The Operating Agreement of AC Lawrence Real Estate LLC, which, as previously

noted, was signed on June 11, 2013, contains, in Section 13.08 thereof, an integration clause

which in full states the following:

> 13.08  Entire Agreement.  This Agreement sets forth all (and is intended
> by all parties hereto to be an integration of all) of the promises,
> agreements, conditions, understandings, warranties and representations
> among the parties hereto with respect to the Company, the Company
> business and the Company assets, and there are no promises, agreements,
> conditions, understandings, warranties or representations, oral or written,
> express or implied, except as set forth herein.

62.     In Schedule A annexed to the Operating Agreement of AC Lawrence Real Estate

LLC it is stated there are TWO (2) LLC Members of AC Lawrence Real Estate LLC: (i) A Nice

Idea Publishing LLC; and (ii) All Enterprises LLC.   However, A Nice Idea does not exist. [9]

63.     In Section 6.01 of the Operating Agreement of AC Lawrence Real Estate LLC

---

[8]     There is no actual limited liability company with the name: "A Nice Idea Publishing LLC."

[9]     There is no actual limited liability company with the name: "A Nice Idea Publishing LLC."

(quoted in relevant part below), *inter alia*, it is confirmed that there are THREE (3) LLC Members of AC Lawrence Real Estate LLC: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman, who collectively are described not only as the LLC Managers but also as the Board of Directors for the limited liability company.

> The management of the Company shall be vested in the Board of Directors which shall be comprised of the three Managers, Neil Binder, Anthony DeGrotta and Lawrence Friedman. The Board of Directors shall elect officers who shall manage the company. The President and Secretary may act for and on behalf of the LLC and shall have the power and authority to bind the LLC in all transactions and business dealings of any kind except otherwise provided in this Agreement.

64.     However, the Three (3) Managers of AC Lawrence Real Estate LLC who collectively constitute the Board of Directors pursuant to Section 6.01, never have elected a President or a Secretary for the limited liability company.

65.     The Operating Agreement of AC Lawrence Real Estate LLC, in Section 6.05 thereof, provides that each of the Three (3) Managers is entitled to one vote.

66.     Accordingly, if there had been an election in which a President or Secretary had been selected for AC Lawrence Real Estate LLC (which never happened), in such an instance, as required by Section 6.05 of the Operating Agreement, Neil Binder, as one of the LLC Managers, would have possessed only one of the three eligible votes for such an election, and the other two LLC Managers (*i.e.,* Anthony DeGrotta and Larry Friedman) would have possessed the other two votes, which provided them with a majority of the eligible votes.

67.     As such, with only one vote, it never has been the case that Neil Binder has had any authority solely on his own initiative to elect himself as President or as Secretary of AC Lawrence Real Estate LLC.

68.     In addition, in the Operating Agreement of AC Lawrence Real Estate LLC, set forth in Section 6.01 (quoted in relevant part below), it is stated that any Major Decision MUST be made

by unanimous decision of the three Managers (Binder, DeGrotta AND Friedman):

> No decision shall be made with respect to any of the major decisions enumerated below "Major Decisions"), unless and until same has been approved in writing by a unanimous vote of the Board of Directors.
>
> (a) The acquisition of any additional real estate brokerage companies or businesses;
>
> (b) The decision to borrow money and issue evidence of indebtedness and security therefor, mortgage, pledge or otherwise encumber assets of the Company, refinance any borrowing, and name of the Company as guarantor or indemnitor for any loan or borrowing to the extent permissible under any other agreements (including mortgages) to which the Company is a party;
>
> (c) The sale, exchange or other disposition of all, or any substantial portion (75% or more) of the assets of the Company;
>
> (d) The admission of additional members.
>
> (e) The decision to dissolve the Company.

69.     The Operating Agreement of AC Lawrence Real Estate LLC, in Section 6.02 thereof (quoted in full below), provides that the rights, powers and duties of each LLC Manager of AC Lawrence Real Estate LLC include acting in good faith and other fiduciary obligations.

> 6.02   Rights, Powers and Duties of the Manager. Subject to the provisions of Section 6.01 hereof, the Managers shall conduct the day-to-day operations of the Company and shall use good faith efforts to carry out the business of the Company as set forth herein. Without limiting the generality of the foregoing, the Managing Members shall have the right, power and authority, on behalf of the Company, to:
>
> (a) Negotiate and execute, on behalf of the Company, any and all agreements, contracts, documents, certificates and instruments necessary or convenient in connection with the operation of the Company, including, but not limited to, lease agreements, sublease arrangements, and all matters pertaining to state or federal regulatory bodies or taxing authorities;
>
> (b) Purchase or sell any asset in the ordinary course of business subject to the parameters established as a Major Decision;
>
> (c) Maintain adequate records and accounts of all operations and expenditures and furnish the Members with statements of accounts with respect to the operations of the Company;
>
> (d) Employ such agents, employees, managers, accountants, attorneys, consultants and other personnel as many be deemed necessary or desirable for the conduct of the Company's business, pay from Company assets such fees, expenses, salaries, wages and other compensation to such parties as they may determine, and delegate

such authority and responsibility to such personnel as the Manager may determine to be necessary or appropriate;

(e) Purchase, at the expense of the Company, liability and other insurance to protect the Company, the Members, the Manager and the Company's assets and business;

(f) Hold reasonable reserves for anticipated future expenses, and invest Company's assets in bank and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, bankers' acceptances, other short term interest bearing obligations and any other investments in the sole and absolute discretion of the Manager;

(g) Take such other actions in connection with the day-to-day management of the Company as is not reserved to the Members or designated as a Major Decision.

70.     The Operating Agreement of AC Lawrence Real Estate LLC, in Section 7.07, provides for the termination of a contract with a Managing Member.  However, AC Lawrence Real Estate LLC never has executed a contract by which it engaged a Managing Member.

**The Shareholder Agreement of**
**Bellmarc Brokerage Midtown Inc**.

71.     A Shareholder Agreement dated as of January 1, 2013 was executed for the corporation Bellmarc Brokerage Management Inc.

72.     The Shareholder Agreement provides there are two shareholders: (1) All Enterprises LLC, which the agreement indicates has 35 shares; and (2) A Nice Idea Publishing LLC, which the agreement indicates has 65 shares. [10]

73.     The Shareholder Agreement provides there is a Board of Directors and that the management and control of the corporation shall be by the Board of Directors, but inexplicably states that each shareholder is a member of the Board of Directors.

74.     New York Business Corporation Law (the "BCL") requires that each member of a corporation board of directors must be an individual person, and cannot be an entity, and in fact BCL Section 701 mandates that each individual director must be at least 18 years of age.  Thus,

---

[10]     However, there is no actual limited liability company named: "A Nice Idea Publishing LLC."

the Shareholder Agreement for Bellmarc Brokerage Midtown Inc. violates the BCL by providing for two entities to be the only members of the Board of Directors.

75.     In Section 2.b. of the Shareholder Agreement, Bellmarc Brokerage Midtown Inc. provides that there are three (3) corporate officers: (i) Neil Binder, as President; (ii) Anthony DeGrotta as Vice President; and (iii) Larry Friedman, as Vice President.  It is indicated in this Section of the Shareholder Agreement that these three officers shall manage, control and operate the business and affairs of the corporation, Bellmarc Brokerage Midtown Inc.

76.     The Shareholder Agreement, in Section 2.g. provides for termination of any Shareholder as a corporate officer, director or employee of the corporation for cause, including for having performed any of the following:

a.     Failed to fulfill their responsibilities or duties as an Officer.

b.     Engaged in misconduct or a wilful breach of this Agreement.

c.     Ceases to hold shares in the Corporation.

d.     Convicted by any court of any offense punishable as a felony.

e.     Makes an assignment or agreement for the benefit of the Corporation's creditors.

77.     The plain meaning of the language in Section 2.g. of the Shareholder Agreement is that individual persons are the officers, directors and employees of the corporation.

78.     Accordingly, the Court should deem the members of the Board of Directors of Bellmarc Brokerage Midtown Inc. to be three individual persons: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman.

**The Shareholder Agreement of
Bellmarc Gramercy/Chelsea Inc**.

79.     A Shareholder Agreement dated as of January 1, 2013 was executed for the corporation Bellmarc Gramercy/Chelsea Inc.

80.     The Shareholder Agreement provides there are two shareholders: (1) All Enterprises LLC, which the agreement indicates has 35 shares; and (2) A Nice Idea Publishing LLC, which the agreement indicates has 65 shares. [11]

81.     The Shareholder Agreement provides there is a Board of Directors and that the management and control of the corporation shall be by the Board of Directors, but inexplicably states that each shareholder is a member of the Board of Directors.

82.     New York Business Corporation Law (the "BCL") requires that each member of a corporation board of directors must be an individual person, and cannot be an entity, and in fact BCL Section 701 mandates that each individual director must be at least 18 years of age.  Thus, the Shareholder Agreement for Bellmarc Gramercy/Chelsea Inc. violates the BCL by providing for two entities to be the only members of the Board of Directors.

83.     In Section 2.b. of the Shareholder Agreement, Bellmarc Gramercy/Chelsea Inc. provides that there are three (3) corporate officers: (i) Neil Binder, as President; (ii) Anthony DeGrotta as Vice President; and (iii) Larry Friedman, as Vice President.  It is indicated in this Section of the Shareholder Agreement that these three officers shall manage, control and operate the business and affairs of the corporation, Bellmarc Gramercy/Chelsea Inc.

84.     The Shareholder Agreement, in Section 2.g. provides for termination of any Shareholder as a corporate officer, director or employee of the corporation for cause, including for having performed any of the following:

a.     Failed to fulfill their responsibilities or duties as an Officer.

b.     Engaged in misconduct or a wilful breach of this Agreement.

c.     Ceases to hold shares in the Corporation.

d.     Convicted by any court of any offense punishable as a felony.

---

[11]     However, there is no actual limited liability company named: "A Nice Idea Publishing LLC."

e.      Makes an assignment or agreement for the benefit of the Corporation's creditors.

85.      The plain meaning of the language in Section 2.g. of the Shareholder Agreement is that individual persons are the officers, directors and employees of the corporation.

86.      Accordingly, the Court should deem the members of the Board of Directors of Bellmarc Gramercy/Chelsea Inc. to be three individual persons: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman.

**The Operating Agreement of
Bellmarc East LLC.**

87.      As previously noted in this Complaint, despite the presence of the letters "LLC" in its name, Bellmarc East LLC is actually a general association, [12] comprised of (i) Neil Binder, utilizing the fictional name of A Nice Idea Publishing LLC; and (ii) All Enterprises LLC, including its own Members Anthony DeGrotta and Larry Friedman.

88.      The Operating Agreement of the general association named Bellmarc East LLC, in Section 6.01, provides, *inter alia*, that there are THREE (3) "Managers" of the company: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman, who collectively are described not only as the Managers but also as the Board of Directors for the company who are vested with the management of the company, including binding it in all transactions and business dealings.

89.      The Three Managers who collectively constitute the Board of Directors never have elected a President or a Secretary for the general association named Bellmarc East LLC.

90.      The Operating Agreement, in Section 6.05 thereof, provides that each of the Three (3) designated Managers is entitled to one vote.

---

[12]      No limited liability company with the precise name of Bellmarc East LLC is registered with the New York Department of State, Division of Corporations.

91.     Accordingly, if there had been an election in which a President or Secretary had been selected for the general association named Bellmarc East LLC (which never happened), then, as required by Section 6.05 of the Operating Agreement, Neil Binder, as one of the Managers/ Directors, would have possessed only one of the three eligible votes for such an election, and the other two Managers/Directors (*i.e.,* Anthony DeGrotta and Larry Friedman) would have possessed the other two votes which provided them with a majority of the eligible votes.

92.     With only one vote, it never has been the case that Neil Binder has had authority solely on his own initiative to elect himself as President or as Secretary of the general association named Bellmarc East LLC.

93.     The Operating Agreement, in Section 6.01, provides that any Major Decision MUST be made by unanimous decision of the three Managers/Directors (Neil Binder, Anthony DeGrotta AND Larry Friedman):

94.     The Operating Agreement, in Section 6.02, provides that the rights, powers and duties of each Manager include acting in good faith and other fiduciary obligations.

95.     The Operating Agreement, in Section 7.07, provides for the termination of a contract with a Managing Member.  However, the general association named Bellmarc East LLC never has executed a contract by which it engaged a Managing Member.

**The Operating Agreement of**
**Bellmarc West LLC**.

96.     As previously noted in this Complaint, despite the presence of the letters "LLC" in its name, Bellmarc West LLC is actually a general association, [13] comprised of (i) Neil Binder, utilizing the fictional name of A Nice Idea Publishing LLC; and (ii) All Enterprises LLC, including its own Members Anthony DeGrotta and Larry Friedman.

---

[13]     No limited liability company with the precise name of Bellmarc West LLC is registered with the New York Department of State, Division of Corporations.

97.    The Operating Agreement of the general association named Bellmarc West LLC, in Section 6.01, it provides, *inter alia*, that there are THREE (3) "Managers" of the company: (i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman, who collectively are described not only as the Managers but also as the Board of Directors for the company who are vested with the management of the company, including binding it in all transactions and business dealings.

98.    The Three Managers who collectively constitute the Board of Directors never have elected a President or a Secretary for the general association named Bellmarc West LLC.

99.    The Operating Agreement, in Section 6.05 thereof, provides that each of the Three (3) designated Managers is entitled to one vote.

100.    Accordingly, if there had been an election in which a President or Secretary had been selected for the general association named Bellmarc West LLC (which never happened), then, as required by Section 6.05 of the Operating Agreement, Neil Binder, as one of the Managers/ Directors, would have possessed only one of the three eligible votes for such an election, and the other two Managers/Directors (*i.e.,* Anthony DeGrotta and Larry Friedman) would have possessed the other two votes which provided them with a majority of the eligible votes.

101.    With only one vote, it never has been the case that Neil Binder has had authority solely on his own initiative to elect himself as President or as Secretary of the general association named Bellmarc West LLC.

102.    The Operating Agreement, in Section 6.01, provides that any Major Decision MUST be made by unanimous decision of the three Managers/Directors (Neil Binder, Anthony DeGrotta AND Larry Friedman):

103.    The Operating Agreement, in Section 6.02, provides that the rights, powers and duties of each Manager include acting in good faith and other fiduciary obligations.

104.    The Operating Agreement, in Section 7.07, provides for the termination of a

contract with a Managing Member. However, the general association named Bellmarc West LLC

never has executed a contract by which it engaged a Managing Member.

**The Operating Agreement of**
**Bellmarc Downtown LLC**.

105.   As previously noted in this Complaint, despite the presence of the letters "LLC" in

its name, Bellmarc Downtown LLC, [14] is actually a general association comprised of (i) Neil

Binder, utilizing the fictional name of A Nice Idea Publishing LLC; and (ii) All Enterprises LLC,

including its own Members Anthony DeGrotta and Larry Friedman.

106.   The Operating Agreement of the general association named Bellmarc Downtown

LLC, in Section 6.01, provides, *inter alia*, that there are THREE (3) "Managers" of the company:

(i) Neil Binder; (ii) Anthony DeGrotta; and (iii) Larry Friedman, who collectively are described

not only as the Managers but also as the Board of Directors for the company who are vested with

the management of the company, including binding it in all transactions and business dealings.

107.   The Three Managers who collectively constitute the Board of Directors never have

elected a President or a Secretary for the general association named Bellmarc Downtown LLC.

108.   The Operating Agreement, in Section 6.05 thereof, provides that each of the Three

(3) designated Managers is entitled to one vote.

109.   Accordingly, if there had been an election in which a President or Secretary had

been selected for the general association named Bellmarc Downtown LLC (which never happened),

then, as required by Section 6.05 of the Operating Agreement, Neil Binder, as one of the Managers/

Directors, would have possessed only one of the three eligible votes for such an election, and the

other two Managers/Directors (*i.e.*, Anthony DeGrotta and Larry Friedman) would have possessed

the other two votes which provided them with a majority of the eligible votes.

---

[14]   No limited liability company with the precise name of Bellmarc Downtown LLC is registered with the
New York Department of State, Division of Corporations.

110.    With only one vote, it never has been the case that Neil Binder has had authority

solely on his own initiative to elect himself as President or as Secretary of the general association

named Bellmarc Downtown LLC.

111.    The Operating Agreement, in Section 6.01, provides that any Major Decision

MUST be made by unanimous decision of the three Managers/Directors (Neil Binder, Anthony

DeGrotta AND Larry Friedman):

112.    The Operating Agreement, in Section 6.02, provides that the rights, powers and

duties of each Manager include acting in good faith and other fiduciary obligations.

113.    The Operating Agreement, in Section 7.07, provides for the termination of a

contract with a Managing Member.  However, the general association named Bellmarc Downtown

LLC never has executed a contract by which it engaged a Managing Member.

**The Shared Services Agreement**
**and BAL Administration Inc.**

114.    As previously noted, a document titled: "SHARED ADMINISTRATIVE SERVICES

AGREEMENT", dated as of October 1, 2012, was executed by The Bellmarc Group LLC, AC

Lawrence Real Estate LLC, BAL Administrative Inc., Bellmarc Brokerage Midtown Inc.,

Bellmarc Gramercy/Chelsea Inc., and AC Lawrence Operations Inc.

115.    BAL Administrative Inc. was intended to act as a vehicle to administer various

business banking needs and to address other administrative needs for the entities which executed

the agreement, including by providing office space, administration services, financial services,

clerical services, mailroom services, telecommunications services, computer services and

equipment, and copy equipment.

116.    In the shared services agreement, in Section 3 thereof (quoted in full below), it is

stated that:

3.  Obligations and Relationship

The relationship established hereunder between the parties shall not be
construed as a partnership, joint venture or other form of joint enterprise.
Except as specifically authorized by a party hereto, no party shall be
authorized to make any representations or to create or assume any
obligations or liability in respect or on behalf of the other party, and this
Agreement shall not be construed as constituting either party as the agent
of the other party.

117.    The shared services agreement, in Section 4.1, recognizes that BAL Administrative

Inc. may be liable for fraud, bad faith or gross negligence, and that individual employees of BAL

Administration Inc. may be liable for their own personal misconduct which causes damages to be

suffered by The Bellmarc Group LLC or AC Lawrence Real Estate LLC, or any other entity who

signed the agreement.

118.    Defendant Danuta Brodzinska has been an employee of BAL Administration Inc.

whose position was as a Controller.

**The Coldwell Banker Franchise**.

119.    Coldwell Banker®, on information and belief, is the trademarked name for a group

of companies that claim to be the oldest and most established residential real estate franchise

system in North America, and Coldwell Banker Real Estate LLC is a subsidiary of Coldwell

Banker®.

120.    Plaintiff Anthony DeGrotta, Plaintiff Larry Friedman and Defendant Neil Binder

negotiated a franchise agreement which includes Coldwell Banker Real Estate LLC and The

Bellmarc Group LLC, with the latter as the designated franchisee.  The franchise agreement, which

has a term of 10 years, was signed for Plaintiffs on March 26, 2013, and for Coldwell Banker Real

Estate LLC on March 27, 2013.  The designated Opening Date was May 15, 2013.

121.    Pursuant to the franchise agreement, *inter alia*, Plaintiffs have been permitted to

utilize the following three doing business as names:  "Coldwell Banker Bellmarc", "Coldwell

- 29 -

Banker Bellmarc Group", and "Coldwell Banker AC Lawrence".

122.    The franchise agreement, including the utilization of the doing business as names and utilization of the substantial funds provided by Coldwell Banker to Plaintiffs, have been integral to Plaintiffs' business.

123.    Pursuant to the franchise agreement: (i) based on the portion of total funds received from Coldwell Banker Real Estate LLC which are utilized by the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC) and the transactions performed by those entities, certain resulting franchise fees must be paid timely for those companies to Coldwell Banker Real Estate LLC; and (ii) based on the portion of the total funds received from Coldwell Banker which are utilized by the AC Lawrence operational group (*i.e.,* AC Lawrence Real Estate LLC) and the transactions performed by this group, certain resulting franchise fees must be paid timely for AC Lawrence Real Estate LLC to Coldwell Banker Real Estate LLC.

**Defendant Neil Binder Has Jeopardized
the Entire Coldwell Banker Franchise**.

124.    Defendant Neil Binder because of his illicit acts and actions which he has performed solely for his own personal benefit, he has jeopardized the entire franchise.

125.    Pursuant to the shared services agreement, BAL Administration Inc. has regularly issued periodic checks made payable to Coldwell Banker Real Estate LLC for the portion of the total franchise fees attributable to the transactions conducted by the brokers who represent the AC Lawrence group (*i.e.,* AC Lawrence Real Estate LLC).

126.    On the initiative of Plaintiffs Anthony DeGrotta and Larry Friedman, BAL Administration has properly utilized the revenues created by transactions conducted by the brokers who represent AC Lawrence Real Estate LLC to pay timely the portion of the Coldwell Banker

- 30 -

Real Estate LLC franchise fees attributable to the transactions conducted by the brokers who represent AC Lawrence Real Estate LLC.

127.    Pursuant to the shared services agreement, BAL Administration Inc. has regularly issued periodic checks made payable to Coldwell Banker Real Estate LLC for the portion of the total franchise fees attributable to the transactions conducted by the brokers who represent the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC).

128.    However, Neil Binder has prevented any of those checks from being delivered to Coldwell Banker Real Estate LLC.

129.    The portion of the Coldwell Banker Real Estate LLC franchise fees attributable to Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC which are in arrears and have not been delivered to Coldwell Banker Real Estate LLC as of the date of this Complaint is Two Hundred Seventy Six Thousand One Hundred Fifty Eight Dollars and Fifty-Three Cents ($276,158.53).

130.    It appears the motivation of Defendant Neil Binder in causing the withholding of the checks and nonpayment to Coldwell Banker Real Estate LLC is that he has diverted substantial funds from Plaintiffs' accounts to pay his own substantial personal debts, and that his diversions of substantial funds out of Plaitniffs' accounts left no available money in possession of Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC sufficient to pay timely the franchise fees attributable to the transactions conducted by the brokers who represent Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC.

131.    By engaging in the illicit acts and actions, Defendant Neil Binder caused Plaintiffs to be delinquent on the obligations of the franchise agreement with Coldwell Banker Real Estate

LLC upon which the continued existence of all of the Plaintiffs depend.

132. Defendant Danuta Brodzinska knowingly facilitated the illicit acts and actions by Defendant Neil Binder regarding the failure of Plaintiffs to make timely payment to Coldwell Banker Real Estate LLC of the franchise fees attributable to the transactions conducted by the brokers who represent Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC.

133. Very recently, the chief executive officer of Coldwell Banker Real Estate LLC telephoned Plaintiffs Anthony DeGrotta and Larry Friedman and informed them that the shortfall in the franchise fees money owed by Plaintiffs - attributable to nonpayment by the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC) must be paid.

134. A loss of the Coldwell Banker franchise would cause irreparable harm to Plaintiffs.

135. Plaintiffs Anthony DeGrotta and Larry Friedman have pleaded with Defendant Neil Binder to cause the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC) to pay to Coldwell Banker Real Estate LLC the portion of the franchise fees attributable to transactions by the Bellmarc operational group companies, and to cure the entire deficiency in franchise fees which he alone caused to exist.

136. Instead of constructively responding, Neil Binder has increased his self-dealing and his waste of Plaintiffs' assets by diverting them to pay his personal debts to the detriment of the companies for which he is a fiduciary, as was described in earlier paragraphs of this Complaint and is discussed in subsequent paragraphs of this Complaint.

**Defendant Neil Binder Solely On His Own Initiative
Unilaterally Without Any Proper Authority
Has Raided Special Accounts**

- 32 -

137.    The Plaintiff entities maintain a health insurance escrow account at Signature Bank

called Bellmarc Insurance Escrow, Account # 1500235338.  Plaintiff BAL Administration Inc.

(sometimes hereinafter referred to as "BALADMIN" or "BAL") is the administrator for the funds

in the afore-described health insurance escrow account at Signature Bank.

138.    The purpose of the health insurance escrow account is to collect premiums for

health insurance coverage as they are paid by participants in the plan, including staff employees

and brokers for the Plaintiff entities, and keep them in a secure account which then is to be

remitted, along with the contribution of the Plaintiff entities, to the health care providers for the

benefit of the staff employees and brokers.  This account is not related to any day to day business

operations and must not be touched for any purpose other than collecting the contributions to

health insurance premiums and promptly remitting them to the insurance carrier.

139.    The Plaintiff entities and each LLC Manager/Director (*i.e.,* Neil Binder, Anthony

DeGrotta and Larry Friedman) has a fiduciary responsibility to safeguard the health insurance

escrow account and the funds deposited therein by Plaintiffs' staff employees and brokers.

140.    Anthony DeGrotta and Larry Friedman have learned that Defendant Neil Binder

solely on his own initiative unilaterally without any proper authority on numerous occasions has

raided this sacrosanct health insurance escrow account and embezzled funds which the staff

employees and brokers had deposited into that escrow account.  For example, Neil Binder raided

the health insurance escrow account and embezzled funds on each of the following dates (the

information set forth below includes reference to bank statements and cancelled checks written to

and from the Bellmarc Insurance Escrow Account):

      a.    2/24/14 chk # 23393 to BALADMIN for $32,000 – coded in the general
             ledger and in the memo of the check itself as (an alleged) short term loan to
             BAL.

*(As previously noted in this Complaint, BAL is the administrative company that handles certain day-to-day operations for The Bellmarc Group LLC and for AC Lawrence Real Estate LLC. This commingling of funds by Defendant Neil Binder was illicit and irresponsible.)*

b.   3/11/14 chk # 1435 payable from BALADMIN to Bellmarc Insurance Escrow for $32,000 – coded in the general ledger as (an alleged) repayment of short term loan.

c.   3/20/14 wire transfer to BALADMIN for $6,000 – coded in the general ledger as (an alleged) short term loan to BAL.

d.   4/3/2014 chk # 14764 payable from BALADMIN to Bellmarc Insurance Escrow for $6,000 – coded in the general ledger as (an alleged) repayment of short term loan.

e.   6/20/14 chk # 23426 to Peter Guttman for $6,875 – coded in the general ledger and in the memo of the check itself as (an alleged) short term loan/Labor.

   *(Peter Guttman is the facilities manager for The Bellmarc Group LLC.)*

f.   6/25/14 chk # 15606 payable from BALADMIN to Bellmarc Insurance Escrow for $6,875 – coded in the general ledger and in the memo of the check itself as (an alleged) repayment of short term loan.

141.   Anthony DeGrotta and Larry Friedman discovered that Defendant Neil Binder's apparent motivation for embezzling funds from the health insurance escrow was to finance his mounting personal debts and a lavish life style.

142.   Each of the instances in which Defendant Neil Binder solely on his own initiative unilaterally without any proper authority raided the health insurance escrow and embezzled funds deposited by individual staff employees and brokers, *inter alia*, was an egregious breach of his fiduciary obligations owed to each staff employee and broker who deposited the funds in order to participate in the health plan, in addition to a violation by Defendant Neil Binder of the operating agreements and the shared services agreement concerning BAL Administration LLC, and a violation of his fiduciary duties owed to his fellow LLC Managers/Directors – Anthony DeGrotta and Larry Friedman.

143.    The misconduct of Defendant Neil Binder also has risked the highly regarded reputation of Anthony DeGrotta and Larry Friedman in the industry generally and their business.

144.    Unless Defendant Neil Binder is prevented from continuing these egregious acts and actions, Plaintiffs will suffer irreparable harm.

145.    Anthony DeGrotta and Larry Friedman have discovered that Defendant Neil Binder solely on his own initiative unilaterally without any proper authority utilized a bank account at Valley National Bank (hereinafter, referred to as "VNB") in the name of Bellmarc Insurance Agency, Inc., which as previously noted is owned by Neil Binder, to divert funds from the Plaintiff entities to pay his personal debts.  The VNB account in the name of Bellmarc Insurance Agency, Inc. is account # 41734610.

146.    Defendant solely on his own initiative unilaterally without any proper authority diverted money out of the BALADMIN account and funneled the pilfered funds into his private Bellmarc Insurance Agency, Inc. account with VNB.  Two examples of this misconduct are set forth below::

      a.      7/2/14 Deposit for $12,500 – chk # 15713 PAYEE as INSAGENCY.

      b.      7/14/14 Deposit for $13,780.24 – chk # 15793 PAYEE as INSAGENCY

147.    Anthony DeGrotta and Larry Friedman have discovered that the money pilfered by Neil Binder via his private VNB account solely on his initiative unilaterally without any proper authority, including, but not limited to, was utilized by him to pay his personal expenses on the following dates (the information is, in sequence: calendar date, check #, check amount and payee:

      a.      07/09/2014 chk 1325 **$7,375.50**  Westhampton House *(Neil Binder's cooperative residence which is his private home in the Hamptons).*

      b.      07/02/2014 chk 1326 **$11,559.53**  Salmon Shoab *(Neil Binder's private home in Manhattan, New York City).*

      c.      07/02/2014 chk 1327 **$ 60.00**  Barbara Binder *(Neil Binder's sister).*

    d.    07/08/2014  chk 1328  **$1,626.70**  Signature Bank *(Neil Binder's personal indebtedness).*

    e.    07/08/2014  chk 1329  **$6,164.32**  Signature Bank *(Neil Binder's personal indebtedness).*

    f.    07/08/2014  chk 1330  **$ 500.00**  Cash *(Neil Binder's own purposes).*

    g.    07/08/2014  chk 1331  **$6,378.56**  Capital One Bank *(Neil Binder's personal indebtedness).*

    h.    07/08/2014  chk 1332  **$7,401.68**  Capital One Bank *(Neil Binder's personal indebtedness).*

    i.    07/08/2014  chk 1333  **$ 500.00**  Neil Binder *(himself).*

148.    To reiterate: the afore-described transactions concern Defendant Neil Binder's utilizing his VNB account in the name of Bellmarc Insurance Agency, Inc., in order indirectly to divert substantial money from the Plaintiff entities to pay his personal debts.

149.    In addition to the aforesaid indirect diversions, Neil Binder has directly raided company accounts and extracted money to pay his personal debts.  For example, in July 2014 alone, Neil Binder illicitly drained more than $56,000.00 out of the company accounts in the following transactions:

    a.    07/01/2014  ck # 15633  M&T Bank  **$4,818.28**  *(to pay his M&T bank loan on the real property he owns at 16 East 12th Street, New York, New York).*

    b.    07/01/2014  ck # 15634  M&T Bank  **$3,732.63**  *(to pay his M&T bank loan on the real property he owns at 16 East 12th Street, New York, New York).*

    c.    07/05/2014  ck # 15713  Insurance Agency  **$12,500.00**  *(illicit payment to an account he controls and makes personal disbursement).*

    d.    07/07/2014  ck # 15738  M&T Bank  **$5,938.72**  *(to pay his M&T loan on the real property he owns at 16 East 12th Street, New York, New York).*

    e.    07/08/2014  ck # 15739  TD Bank  **$9,962.50**  *(to pay his personal TD Bank loan).*

    f.    07/11/2014  ck # 15793  Insurance Agency  **$13,780.24**  *(illicit payment to an account he controls and makes personal disbursement).*

g.    07/31/2014  ck # 15981  Lakeland  **$5,000.00**  *(to pay for a survey on his privately owned real property in New Jersey).*

**Defendant Neil Binder Procured A Lease**
**for His Family Apartment In The Name of**
**Bellmarc and Utilized Fabricated Documents**
**and Forged Signatures**.

150.    Recently, Defendant Neil Binder submitted an application and alleged supporting documents to The Metropolitan Condominium, requesting a lease for a luxury residential apartment in Manhattan, located at 181 East 90th Street, Unit 9C, New York, New York 10028, to be occupied by him, and his wife (Nina Scerbo Binder) and their children.

151.    The person who is listed as the landlord on the lease is Hani Abuali ("Landlord"), and the monthly rent is Eleven Thousand Nine Hundred Fifty Dollars ($11,950.00).

152.    The application which Defendant Neil Binder submitted to the Metropolitan Condominium for the luxury residential apartment is dated and signed August 11, 2014.

153.    However, Neil Binder, by the application and supporting documents he submitted induced Metropolitan Condominium and the Landlord to issue the lease for this luxury residential apartment which has very high monthly rent in the name of "The Bellmarc Realty LLC." Despite the presence of the letters "LLC" in the name: The Bellmarc Realty LLC utilized by Neil Binder, there is no actual legal entity with that name; no such limited liability company is registered with the New York Department of State, division of Corporations.

154.    In addition to these false statements, Neil Binder knowingly misled the Landlord and Metropolitan Condominium by submitting false, fabricated and forged documents in support of his application for the lease.

155.    In submitting false, fabricated and forged documents, Defendant Neil Binder exposed The Bellmarc Group LLC to potential future legal claims and he jeopardized its Real Estate Brokerage License, upon which five hundred seventy one (571) licensed real estate salespeople

- 37 -

depend for their livelihood.

156.    One on the prevarications by Neil Binder was his fraudulent representation that he is the principal owner and President of Coldwell Banker Bellmarc.  In truth, Coldwell Banker Bellmarc is not a legal entity, but instead is merely a doing business as name, and there is no President for Coldwell Banker Bellmarc.

157.    As previously noted in this Complaint, Bellmarc Realty L.L.C. is a limited liability company that was formed in 1995, in which Neil Binder had an interest, but none of the Plaintiffs ever have had an interest in Bellmarc Realty L.L.C.

158.    In addition, Neil Binder submitted along with his application, in alleged support of his request for the lease, financial statements, except that those financial statements concern The Bellmarc Group LLC.  Although The Bellmarc Group LLC is a legal entity registered with the DOS, it is not the name of the alleged entity (The Bellmarc Realty LLC) which Neil Binder placed on the application for the lease.

159.    On information and belief, Neil Binder placed the word "The" in front of the words: "Bellmarc Realty LLC" on the application in order to confuse the facts and make the board of directors for the landlord (Metropolitan Condominium) believe the tenant will be The Bellmarc Group LLC.  Defendant's utilization of the word "The" along with "Bellmarc Realty LLC" strengthens the apparent similarity between the name "Bellmarc Realty LLC" (an entity which does not exist) and The Bellmarc Group LLC.

160.    Additional times in the application and supporting documents Neil Binder indicates in error that the applicant is "The Bellmarc Realty LLC", again a company that does not actually exist.

161.    In his alleged supporting documents for the application for lease, Defendant Neil Binder identifies bank account numbers which are incorrect, or inconsistent with the alleged

- 38 -

names of the entities he describes.  For example, Neil Binder identifies an account number

15019383 which is similar to a bank account of The Bellmarc Group LLC, except that the last two

digits ("66") of the bank account are missing.  It appears Defendant intended to cite the bank

operating account utilized by various entities in the Bellmarc operational group through the BAL

Administration Inc. account.

162.    In addition, despite Neil Binder's representations to the contrary, there is no

account number 497-4936358 under BAL Administration Inc. at Signature Bank.  However, there

is a bank account with that number at Citi Bank.  That Citi Bank account number is for the Special

account utilized for business performed by Plaintiff AC Lawrence Real Estate LLC.

163.    It appears that Neil Binder's motivation in utilizing these account numbers,

although he failed to accurately describe them and he has no authority to identify the account

numbers in alleged support for a residential lease, was to impress the Metropolitan Condominium

board of directors by calling attention to an account that is infused with monies, of which the

majority, is dedicated to other purposes, including payment of security by Plaintiffs' customers

and earned commissions required to be paid to Plaintiffs' brokers/agents.

164.    In the application and supporting documents, Neil Binder inaccurately represents

himself to be, and falsely signs documents as, the alleged president of two companies that do not

even exist.

165.    Multiple times, Neil Binder refers to the applicant for the residential lease as The

Bellmarc Realty LLC (again, this company does not actually exist).

166.    In response to the request of the Metropolitan Condominium board of directors for

his monthly salary, Neil Binder references a financial statement of The Bellmarc Group LLC.

167.    Defendant Neil Binder signs documents in support of the application for a

residential lease as the purported President on behalf "Bellmarc Realty LLC" and/or "The

Bellmarc Realty LLC" (both fictitious companies) acknowledging: The foregoing application has been carefully prepared, and the undersigned hereby solemnly declare(s) and certify(s) that all information contained herein is true and correct. The information is submitted as being a true and accurate statement of the financial condition of the undersigned on the 11th day of August, 2014. Those statements by Defendant are false.

168.    In support of Neil Binder's application for a residential lease in the name of The Bellmarc Realty LLC, Jeff Schapira, who is not a party in this action, identified himself as a certified public accountant, and purportedly verified to the Metropolitan Condominium board of directors that he is fully acquainted with Neil Binder's financial affairs and acts as his tax accountant and financial advisor. Mr. Schapira purportedly verified that he acts as the independent accountant to "Bellmarc", and that he is fully acquainted with its financial condition. In truth, there is no legal entity with the simple name of "Bellmarc".

169.    Jeff Schapira inaccurately represented to the Metropolitan Condominium board of directors that Neil Binder is Principal Owner of "Bellmarc" (a company that does not exist) and receives a base draw. The truth is that, as an operator for Plaintiffs, since the inception of the Plaintiff entities Neil Binder has received remunerations paid to various entities on his behalf. However, the nature of how Neil Binder has arranged these payments are acts of deception that evidence a tie between Bellmarc, Bellmarc Realty LLC, and The Bellmarc Realty LLC.

170.    Jeff Schapira states a false history for Neil Binder, including the inaccurate statement that Neil Binder engaged in a corporate reorganization to transfer 35% of the stock of The Bellmarc Group LLC to new partners as alleged payment for an "acquisition" of AC Lawrence Real Estate Inc. This statement is wildly inaccurate.

171.    Defendant Steven Beispel, an attorney and certified public accountant, conspires and aids Neil Binder in his charade to acquire the lease for the Manhattan luxury apartment. Mr.

Beispel represents to the Metropolitan Condominium board of directors that he is counsel to Bellmarc Realty and the related companies associated with Neil Binder. However, in truth, there is no actual entity named: Bellmarc Realty, and therefore no related companies.

172.    It appears from the representations made by Defendants Neil Binder and Steven Beispel and their utilization of financial statements for The Bellmarc Group LLC in support of Neil Binder's spurious application for the lease, that that the Metropolitan Condominium board of directors might contend that sole liability for payment of the lease obligation rests with The Bellmarc Group LLC.

173.    In the documents in alleged support of Defendant's application for a residential lease, Steven Beispel references Bellmarc Property Management Services Inc. by utilizing "Bellmarc" in place of it.

174.    In addition, Steven Biespel knowingly confuses the companies insofar as is concerned the Metropolitan Condominium board of directors by referencing "Bellmarc" and Bellmarc Property Management Services Inc., and by indicating in grievous error that Bellmarc Property Management Services Inc. is an (alleged) active business that is moving toward strong profitability. In truth, as previously noted in this Complaint, Bellmarc Property Management Services Inc. was sold to Douglas Elliman Property Management in 2010. Thus, it is impossible for Bellmarc Property Management Services Inc., which is dormant, to be moving toward strong profitability.

175.    It is indicated by Defendants that the financial statements and other documents which Neil Binder submitted are for the applicant (The Bellmarc Realty LLC) while the documents in truth concern The Bellmarc Group LLC, and in making these indications Defendant knowingly confuse the Metropolitan Condominium board of directors concerning The Bellmarc Group LLC.

176.    In the application and supporting documents for the residential lease, Defendants made false statements concerning Tax ID Number is 13-394-7990. That ID number is for Bellmarc Realty, L.L.C., the corporation owned and controlled solely by Neil Binder which is not the listed applicant.

177.    Defendants cause the lease to identify the Tenant of Record as Bellmarc Realty LLC, with an address of 936 Broadway, New York, New York. However, that alleged entity does not actually exist. In truth that address belongs to Plaintiff The Bellmarc Group LLC and other Plaintiff entities.

178.    The residential lease has a term of Two years and One-Half month. The total rent obligation described in the lease, allegedly due to be paid by Bellmarc Realty LLC (which does not actually exist) is Two Hundred Ninety-Two Thousand Seven Hundred Seventy-Five Dollars ($292,775.00).

179.    The application and supporting documents submitted by Defendant Neil Binder include an alleged Board of Directors Resolution for Bellmarc Realty LLC (a company that does not actually exist), purportedly made on July 31, 2014. According to the Resolution, the tenant corporation is authorized to sign a lease on behalf of Neil Binder. However, the Resolution is in the alleged name of a limited liability company, and not an alleged corporation.

180.    Defendants represented that two signatures were provided in connection with the "corporation Resolution." The first signature is by Defendant Neil Binder. The second signature is in the typed name of (Plaintiff) Larry Friedman. However, in truth Larry Friedman did not sign that document (the alleged Resolution), nor did he ever provide anyone with permission to sign his name on any such document. The truth is that the signature is a complete forgery, and the utilization of the forged signature by Defendant Neil Binder, *inter alia*, constituted a material breach of each shareholder agreement and operating agreement which has been described in this

- 42 -

Complaint.  In addition, by utilizing a forged signature Neil Binder committed a crime under the

penal laws of the State of New York.

181.    In the application including supporting documents, Defendant Danuta Brodzinska

represents herself to be the controller for Bellmarc Realty, LLC - a company that does not exist.

In truth she is a controller for various entities in the Bellmarc operational group (*i.e.,* Bellmarc

Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West

LLC and Bellmarc Downtown LLC).  Ms. Brodzinska affirms in grievous error that, since the year

1979, Neil Binder is the President of The Bellmarc Realty LLC (which does not exist) as well as

its (alleged) affiliated companies (which also do not exist).  In her statement which she knowingly

provided to assist Neil Binder in his spurious efforts to acquire the lease for the luxury residential

apartment, Ms. Brodzinska blurs the facts.  None of the Plaintiff entities, in which Plaintiffs have

an interest, existed prior to the year 2012.  The entities with Bellmarc in their name which existed

prior to 2012, including in 1979, were owned and controlled by Defendant Neil Binder.

182.    Defendant Danuta Brodzinska also affirms in error that compensation is provided

to Neil Binder as distributions from Bellmarc Realty (which does not exist).

183.    The application including supporting documents includes a recommendation letter

by Janice Silver.  That letter of recommendation inaccurately suggests that there is a legal entity

named The Bellmarc Realty LLC. By identifying herself as the purported manager for Bellmarc's

East Side office, Janice Silver made a false representation to the Metropolitan Condominium

board of directors.  This confusion created by her is another effort by Neil Binder to attempt to tie

the fictional Bellmarc Realty to Plaintiff The Bellmarc Group LLC and other Plaintiff entities with

similar names.

184.    The application including supporting documents includes two certified checks issued

by Valley National Bank.  One check, in the amount of $1,500.00 payable to The Metropolitan

Condominium, is for the Move-in Fee. The other check, in the amount of $962.50 payable to First

Service Residential New York, is for the Application processing fee, and a Consumer report fee for

two parties and a Document production fee. These certified checks were exchange checks issued

originally from an account of Neil Binder's private entity, Bellmarc Insurance agency.

## Tax Lien Imposed on Neil Binder
## by the Internal Revenue Service.

185.    February 11, 2014, Defendant Neil Binder and his wife, Nina Scerbo, were levied

with an IRS tax lien for $69,329.64.

186.    The tax obligations concerns the acts and activities of Neil Binder and Nina Scerbo,

and did not in any way arise from anything done by any person named as a Plaintiff in this action.

187.    By failing to pay his tax obligations owed to the Internal Revenue Service and

causing the tax authorities to levy this tax lien on him while he is a Member and Manager of the

Plaintiff entities, Defendant Neil Binder has harmed the reputation in the trade of the Plaintiff

entities and Anthony DeGrotta and Larry Friedman.

188.    By failing to pay his personal tax obligations owed to the Internal Revenue Service

and by causing the tax authorities to levy the tax lien on him while he is a Member and Manager

of the Plaintiff entities, Neil Binder substantially adversely affected the credit worthiness of the

Plaintiff entities.

## Signature Bank Judgment Against
## Defendant Neil Binder, Individually.

189.    On June 2, 2014, Signature Bank entered into the public records maintained by the

county clerk a personal judgment against Mr. Binder in the amount of One Million Eight Hundred

Thousand Thirty Nine Thousand and Ninety Eight Dollars and 16 Cents (**$1,839,098.16**), Supreme

Court of the State of New York, County of New York Index Number 155353/2014.

190.    The entered Judgment against Neil Binder individually did not in any way arise from anything done by any person who is a Plaintiff in this action.

191.    By failing to pay his individual debts owed to Signature Bank and by causing the bank to enter the substantial money Judgment against him while he is a Member and Manager of the Plaintiff entities, Neil Binder harmed the reputation in the trade of the Plaintiff entities.

192.    By failing to pay his individual debts owed to Signature Bank and by causing the bank to enter the substantial money Judgment against him while he is a Member and Manager of the Plaintiff entities, Defendant Neil Binder has made one of the operators of each of the Plaintiff entities not credit worthy.

**Commingling Funds And Other
Illegal Activities by Defendant**.

193.    On information and belief, the tax lien and the judgment have put a tremendous amount of pressure on Defendant Neil Binder.  On information and belief, either his personal accounts are frozen or he has chosen to divert funds to evade his creditors.

194.    On information and belief, Defendant Neil Binder, solely on his own initiative unilaterally and without any proper authority, is commingling funds and utilizing the Bellmarc Insurance Agency Account to shield money from the Internal Revenue Service and his judgment creditor as his personal accounts have been levied.  Neil Binder, solely on his own initiative unilaterally and without any proper authority, is utilizing the Plaintiff entities to commit these nefarious acts and actions.

195.    On information and belief, Neil Binder's grievous misconduct may constitute one or more federal or state crimes, including money laundering and criminal conversion.

**Defendant's Extensive Personal
Litigation**.

196.    Plaintiffs DeGrotta and Friedman have learned that Defendant Neil Binder has

- 45 -

several open lawsuits naming him and companies owned or controlled by him, or in which he has

an interest.  On information and belief, the sheer volume of lawsuits against Neil Binder and the

companies controlled by him are injuring the valuable reputation of the Plaintiff entities.

197.    Recently, the real estate press ("The Real Deal") contacted the operators for

Plaintiffs and asked us for comment on the Signature Bank litigation in which the bank recently

obtained a multimillion dollar Judgment against Neil Binder.

198.    Any negative publicity would reflect poorly on the integrity and reputation in the

entire brokerage community for the Plaintiff entities, and hinder the ability of the Plaintiff entities

to attract and retain agents and clients.

**Self-Dealing by Defendant Neil Binder**
**As To His Wife, Nina Scerbo**.

199.    Defendant Neil Binder has caused money to be taken out out of the Plaintiff entities

to deliver in effect cash to a company controlled by his wife, Nina Scerbo, called "Scerbo Designs."

To date, the Plaintiff entities have never obtained an engagement letter from Scerbo Designs, or

even a proposal for services, or an invoice for any services allegedly rendered.

200.    Despite these facts, Neil Binder caused the Plaintiff entities to deliver money to

Scerbo Designs, and thus to his wife, Nina Scerbo.  These deliveries of money (examples of which

are listed below) appear not to be based on any actual services performed (as there have been

none), and are merely another illicit method by which Defendant Neil Binder diverted money out

of the Plaintiff entities and wasted Plaintiffs' assets.

    a.    03/14/2014  chk # 14596  Payee Scerbo Designs  $ 5,000.00.

    b.    05/20/2014  chk # 15213  Payee Scerbo Designs  $ 3,765.00.

    c.    06/18/2014  chk # 15562  Payee Scerbo Designs  $ 500.00.

**Self-Dealing by Defendant Neil Binder**
**As To His Daughter Darci Binder**

201.    Darci Binder, who is the daughter of Defendant Neil Binder, performed a real

estate transaction, and solely on the initiative of Neil Binder subsequently was paid a commission

by the Plaintiff entities.

202.    On information and belief:

      a.     Darci Binder is not a licensed broker or a licensed real estate agent, and
did not have any legal right to be paid a commission.

      b.     Despite the legal prohibitions, Defendant Neil Binder solely on his own
initiative unilaterally without any proper authority caused the Plaintiff
entities to pay a commission to his daughter, Darci Binder.

      c.     This financial transaction for the benefit of his family which was
unilaterally engineered by Defendant Neil Binder jeopardizes Plaintiffs'
licenses with the New York Department of State.  Plaintiffs cannot perform
business without a license.

      d.     It was a gross violation of his fiduciary obligations for Neil Binder to put
Plaintiffs' licenses at risk by illicitly delivering money to his daughter.

**Self-Dealing by Defendant Neil Binder**
**As To His Sister, Barbara Binder**.

203.    Neil Binder has a sister, Barbara Binder, who solely on the initiative of Neil Binder

is on the payroll of the Plaintiff entities.  Barbara Binder is completely incapable of performing

substantive work for any of the Plaintiff entities.

204.    Anthony DeGrotta and Larry Friedman objected to the fact that Barbara Binder is

paid a salary despite being incapable of performing substantive work.  Mr. DeGrotta and Mr.

Friedman understand that Neil Binder has an emotional desire that his sister will receive wages

even if she cannot perform substantive work for any of the Plaintiff entities.  However, Neil

Binder has a conflict of interest.  He is a fiduciary and it is a waste of Plaintiffs' assets for the

companies to pay wages to any person who cannot perform substantive work.

- 47 -

205.    Neil Binder has been motivated by his emotional desires and has refused to cease having the Plaintiff entities pay wages to his sister, Barbara Binder.

206.    It is a violation of his fiduciary obligations for Defendant Neil Binder to ignore his inherent conflict of interest insofar as his sister is concerned and waste Plaintiffs' assets.

**Self-Dealing by Defendant Neil Binder**
**As To Plaintiffs' Bank Accounts**.

207.    Neil Binder has been unreasonable, imprudent and reckless in treating the bank accounts of The Bellmarc Group LLC and AC Lawrence LLC as if they were his own personal piggy banks.

208.    On information and belief, Neil Binder is deeply in debt personally and has acted in a completely irresponsible manner financially morally and ethically.

209.    On information and belief, Neil Binder is consuming a multitude of medications which severely alter his ability to act in a civilized, professional, prudent and reasonable manner, and the medications sometimes make him completely incoherent.

**Payments Unilaterally Taken by Defendant**
**Neil Binder for Labor/Cash**

210.    From January 1, 2013 to August 18, 2013, Defendant Neil Binder caused payments to be made from Plaintiffs to him in the amount of Two Hundred Eighty-One Thousand One Hundred Ninety-Nine Dollars ($281,199.00).  These payments were classified by Defendant as labor/cash in the check memo.

211.    Subsequently, Plaintiffs Anthony DeGrotta and Larry Friedman asked Defendant Neil Binder about these expenditures.  Defendant replied that the expenditures concern "expenses" in which he paid people cash.  Defendant stated there is documentation for each of these "expenses;" however, he has not provided any actual documentation.  This amount ($281,199.00) is above and beyond the agreed upon compensation for Neil Binder.

212.    As Neil Binder knows, even if there is back up for each and every expense (which Plaintiffs have not received), this is certainly not proper accounting and invites the conclusion that Defendant is siphoning off cash from Plaintiffs to himself.

**Defendant Binder Has Locked Out**
**Plaintiffs DeGrotta and Friedman From**
**Financial Records and Transactions**.

213.    On August 20, 2014, Plaintiffs Anthony DeGrotta and Larry Friedman entered Plaintiffs' office at 936 Broadway, New York, New York, and attempted to log into the computer system for the Plaintiff entities.  A message appeared that said "user account disabled – contact system administrator".

214.    Plaintiffs' telephoned the system administrator and the administrator verbally stated that he had observed Neil Binder instruct an IT consultant to disable access for Plaintiffs Anthony DeGrotta and Larry Friedman to the computer system for the Plaintiff entities.

215.    At this very moment, Plaintiffs Anthony DeGrotta and Larry Friedman do not have access to the accounting records, transaction records, check registers, files, listing system for the Plaintiff entities.  Plaintiffs Anthony DeGrotta and Larry Friedman cannot work.  Plaintiffs Anthony DeGrotta and Larry Friedman contacted Neil Binder via email and telephone and left messages asking him to rectify the issue.

216.    Plaintiffs Anthony DeGrotta and Larry Friedman also contacted Defendant Steven Beispel to request assistance.  He expressed distress, but he did not provide any guidance.

**Defendant Neil Binder Without Authority**
**Took Monies Out of AC Lawrence**

217.    On August 20, 2014, Neil Binder solely on his own initiative without proper authority wrote checks from the AC Lawrence Real Estate LLC operating account to Bellmarc for a total of One Hundred Thirty Thousand One Hundred Seventeen Dollars and Seventy-Two Cents.

This entailed two checks, one for Fifty-Five Thousand One Hundred Seventeen Dollars and Seventy-Two Cents ($55,117.72) and the other for Seventy-Five Thousand Dollars ($75,000.00).

218.    Plaintiffs Anthony DeGrotta and Larry Friedman almost immediately transmitted email letters to Defendant Neil Binder protesting that both of these checks were unauthorized withdrawals and he must immediately return the funds.  Plaintiffs also informed Defendant that AC Lawrence Real Estate LLC did not have sufficient funds in its account to cover his unauthorized checks and that Defendant was putting the Plaintiff entities in grave danger.

**Defendant Neil Binder Took Funds**
**To Pay His Own Personal Life insurance.**

219.    Defendant solely on his own initiative without proper authority took funds out of the accounts of the Plaintiff entities to pay premiums for his own personal life insurance.  The amount paid from January 1, 2013 to August 18, 2014 was $7,849, paid to William Penn.

220.    It is not the responsibility of any of the Plaintiff entities to pay premiums for Neil Binder's personal life insurance.  The insurance is not key man insurance.

221.    The Plaintiff entities do not pay any premiums for any life insurance for either of the other LLC Managers and members of the Board of Directors for the Plaintiff entities (*i.e.,* Plaintiff Anthony DeGrotta and Plaintiff Larry Friedman).

**Sexual Harassment by Defendant**
**Neil Binder**

222.    Multiple informal complaints and one formal documented complaint have been lodged by staff employees and female brokers against Neil Binder for sexual harassment of the complainant.  As part of the practices and procedures of the Plaintiff entities, Plaintiffs thoroughly investigated the complaints.

223.    As part of their investigation of the formal complaint by one female concerning alleged sexual harassment by Defendant Neil Binder, Anthony DeGrotta and Larry Friedman

requested Neil Binder to provide a statement in which he summarizes the relevant events. Neil Binder provided a statement. However, he subsequently attempted to rescind his statement and attempted to cancel the request for a statement furnished by him, both of which, on information and belief, were done by Neil Binder based on advice he received from his own personal counsel.

224.    The preliminary findings which resulted from the investigation of the formal complaint of sexual harassment against Neil Binder determined that the complaint had merit in complaining the Neil Binder had engaged in sexual harassment against the complaining female.

225.    Subsequently, Neil Binder solely on his own initiative unilaterally without any proper authority fired the female who had lodged the complaint of sexual harassment against him. Anthony DeGrotta and Larry Friedman strenuously objected to Neil Binder's termination of the complainant. Neil Binder refused to alter his position and permit her to return to work.

226.    Subsequent to receipt of the complaint of sexual harassment against Neil Binder, Anthony DeGrotta and Larry Friedman made arrangements for sexual harassment training to be provided in the work place to staff employees, brokers and senior management of the Plaintiff entities. Anthony DeGrotta and Larry Friedman arranged for this training to occur in all of the offices. They pleaded to Neil Binder that he will attend the sexual harassment training sessions. However, Neil Binder declined to attend any sexual harassment training session. Anthony DeGrotta, Larry Friedman, and all senior management attended the sexual harassment training sessions, except for Neil Binder who refused to do so.

227.    Thus, Defendant Neil Binder, who was the only person that had been accused of sexual harassment, and for which there had been an investigation that resulted in a determination that the accusations of harassment levied against Neil Binder had merit, is the only person who refused to participate in sexual harassment training session.

228.    Defendant's refusal, in addition to being insensitive, was unreasonable, imprudent and unprofessional, and it gratuitously exposed Plaintiffs to substantial future legal risk for a subsequent claim against Neil Binder.

229.    It was an egregious breach of his fiduciary obligations for Defendant Neil Binder to refuse to participate in the sexual harassment training sessions which he was requested to attend and in which he should have participated.

230.    Anthony DeGrotta and Larry Friedman requested Neil Binder to seek outside professional assistance to attempt to remediate his future conduct.  On information and belief, Neil Binder has not sought or obtained any outside professional assistance, and he has refused all of Plaintiffs' requests that he will do so.

**Hostile Environment Created
By Defendant Neil Binder.**

231.    Separate and distinct from the sexual harassment complaints which have been lodged by female staff employees and brokers of the Plaintiff entities against Neil Binder, there have been many complaints about his creating a hostile work environment.

232.    Many of these complaints have centered on Neil Binder's abusive and disrespectful behavior towards staff employees.

233.    Persons who have complained have claimed that Neil Binder incessantly screams and yells within the office.  These employees have stated they cannot work in the environment in which Neil Binder incessantly yells and verbally abuses persons.

234.    Many staff employees and agents have been intimidated by Defendant and are reluctant to formally complain for fear of reprisal by him.  The staff employees and brokers are aware of what happened regarding the female employee who documented her sexual harassment complaint against Neil Binder, and he fired her.

**Moral Turpitude**.

235.    Defendant Neil Binder is consuming a multitude of prescription medications.

236.    During one evening, he coerced Tahsina Sultana, the controller for BAL Administration Inc. who has responsibility as to AC Lawrence Real Estate LLC, to take one of his prescription medications – an Adderall.  Tahsina took the medication because Neil Binder insisted that it would help her concentrate on her work.

237.    Subsequently, Tahsina Sultana reported this incident to Anthony DeGrotta and Larry Friedman, and they immediately told Neil Binder never again to coerce anyone to take any of his medications, and also to apologize to Mrs. Sultana.

238.    On information and belief, in the past 7-10 days, Neil Binder employed a man to work for him under the condition that the man shall commence taking Adderall.  Neil Binder coached the man on what he would say to a doctor in order to obtain a prescription for this medication.

**Recent Events**.

239.    On Friday, August 8, 2014, Plaintiff Larry Friedman received an email from Defendant Danuta Brodzinska, the Controller at BAL Administration Inc. responsible for financial transactions concerning the Bellmarc operational group (*i.e.,* Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and Bellmarc Downtown LLC), in which she expressed grave concern that, if those entities did not acquire $50,000.00 from some source prior to 11:00 am that day, then, checks that she had written for Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC and/or Bellmarc Downtown LLC on the initiative of Neil Binder would be dishonored by the issuing bank.

- 53 -

240.   Very soon thereafter, Larry Friedman received a telephone call from Tahsina Sultana, the Controller at BAL Administration Inc. responsible for financial transactions concerning AC Lawrence Real Estate LLC, expressing her fear that Neil Binder would attempt to raid AC Lawrence Real Estate LLC's client special account.

241.   AC Lawrence Real Estate LLC's client special account contains funds which are dedicated for future payment to clients and vendors.

242.   It is absolutely inappropriate for anyone, including Defendants Neil Binder and Danuta Brodzinska, to take money out of AC Lawrence Real Estate LLC's client special account in order to attempt to fill a hole in any account of Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC or Bellmarc Downtown LLC, and even more so if the hole in those accounts was created by Neil Binder's having raided those accounts in order to pay his personal debts and expenses (which in fact was what has happened).

243.   The fear expressed by Ms. Sultana concerning the AC Lawrence Real Estate LLC client special account arose in part because she had very recently received a telephone call from Danuta Brodzinska in which Ms. Brodzinska (on behalf of Neil Binder) requested Ms. Sultana to disclose to Ms. Brodzinska the account number for the AC Lawrence Real Estate LLC client special account.  As a result of learning all of this information from Ms. Sultana, Plaintiff Larry Friedman also became fearful that Neil Binder was attempting to raid the AC Lawrence Real Estate LLC client special account.

244.   Larry Friedman immediately telephoned Steven Beispel, who was general counsel for the Plaintiff entities, to express Larry's concerns, and pleaded with Mr. Beispel to prepare and transmit a letter reiterating to each of the three LLC Managers/Directors for the Plaintiff entities (*i.e., Neil Binder, Anthony DeGrotta and Larry Friedman)* that the AC Lawrence Real Estate LLC client special account is off limits and cannot be utilized by Neil Binder for any other purpose.

245.     During the telephone call which Larry Friedman initiated with Steven Beispel, Mr. Beispel agreed with Mr. Friedman that the AC Lawrence Real Estate LLC client special account was off limits and could not be utilized by Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/ Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC or Bellmarc Downtown LLC, and Steven Beispel then personally telephoned Neil Binder and warned him not to raid the AC Lawrence Real Estate LLC client special account.

246.     Thankfully, on this particular occasion, Defendant Neil Binder relented and did not touch the AC Lawrence Real Estate LLC client special account.

247.     A few hours after Steven Beispel warned Neil Binder not to touch the AC Lawrence Real Estate LLC client special account, Neil Binder sent Larry Friedman an email in which he claimed that Larry Friedman was violating the operating agreement.

AS AND FOR A
FIRST CAUSE OF ACTION
*(Breach of Fiduciary Duties)*

248.     Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 247, *supra*, as though they were fully set forth herein.

249.     As previously noted, while Defendant Neil Binder was a principal of Plaintiff The Bellmarc Group LLC receiving salary and other remunerations from said company, he knowingly engaged in numerous unauthorized and/or illicit acts and actions which exposed The Bellmarc Group LLC to substantial economic harm, and jeopardized its future viability.

250.     As previously noted, while Defendant Neil Binder was a principal of Plaintiff AC Lawrence Real Estate LLC receiving salary and other remunerations from said company, he knowingly engaged in numerous unauthorized and/or illicit acts and actions which exposed AC Lawrence Real Estate LLC, to substantial economic harm and jeopardized its future viability.

- 55 -

251.   Defendant Neil Binder concealed many of his unauthorized and illicit acts and actions from Plaintiff DeGrotta and Plaintiff Friedman who were fellow Members and Managers of The Bellmarc Group LLC and AC Lawrence Real Estate LLC.

252.   Neil Binder was well aware of the true facts which he concealed from Plaintiffs.

253.   It was a requirement of his position as a Manager and Member of The Bellmarc Group LLC, and/or an employee, that Defendant Neil Binder must prudently engage only in acts and actions which are in the best interests of The Bellmarc Group LLC.

254.   It was a requirement of his position as a Manager and Member of AC Lawrence Real Estate LLC, and/or an employee, that Defendant Neil Binder must prudently engage only in acts and actions which are in the best interests of AC Lawrence Real Estate LLC.

255.   It was a requirement of his positions and relationship with The Bellmarc Group LLC that Defendant Neil Binder must prepare accurate paperwork for each transaction in which he participates concerning The Bellmarc Group LLC, including, but not limited to, any transaction concerning BAL Administration Inc., and accurately record each transaction.

256.   It was a requirement of his positions and relationship with AC Lawrence Real Estate LLC that Defendant Neil Binder must prepare accurate paperwork for each transaction in which he participates concerning AC Lawrence Real Estate LLC, including, but not limited to, any transaction concerning BAL Administration Inc., and accurately record each transaction.

257.   Each of these requirements was well known by Defendant Neil Binder.

258.   As discussed in previous paragraphs of this Complaint, Defendant Neil Binder knowingly engaged in numerous acts and actions which were not prudent and adversely affected the interests of The Bellmarc Group LLC, including, but not limited to, transactions concerning BAL Administration Inc., and adversely affected the legal and economic interests of Plaintiff DeGrotta and Plaintiff Friedman as to The Bellmarc Group LLC and BAL Administration Inc.

259.     As discussed in previous paragraphs of this Complaint, Defendant Neil Binder knowingly engaged in numerous acts and actions that were not prudent and in fact adversely affected the interests of AC Lawrence Real Estate LLC, and adversely affected the legal and economic interests of Plaintiff DeGrotta and Plaintiff Friedman as to AC Lawrence Real Estate LLC and BAL Administration Inc.

260.     In New York, each person who is an employee owes a duty to act in good faith and in the employer's best interests during the period of the employment.

261.     Similarly, in New York, each person who is a corporation officer or a limited liability company manager owes a duty to act in good faith and in the best interests of the corporation or the limited liability company, as the case may be, during the time period he or she is in the position of a corporation officer or a limited liability company manager.

262.     The period of the employment includes the time in which the employee receives wages from his or her employer.

263.     A person who is an employee, corporation officer, or limited liability company manager is a fiduciary who owes his or her employer, the corporation or limited liability company undivided and unqualified loyalty and may not act in any manner contrary to the interests of the employer, the corporation or limited liability company.

264.     A person acting in a fiduciary capacity, such as an employee, corporation officer or limited liability company manager, is required to make truthful and complete disclosures to those to whom a fiduciary duty is owed, such as the employer, the corporation or fellow limited liability company managers, and the fiduciary is forbidden to obtain an improper advantage at the expense of the person to whom a fiduciary duty is owed.

265.     An employee, corporation officer, or limited liability company manager may not participate in any act or activity which is adverse to the economic interests, or any other interests,

of his or her employer, the corporation or the limited liability company.

266.    During the period of time in which Defendant Neil Binder was a Manager and received salary and other remunerations from Plaintiff The Bellmarc Group LLC and Plaintiff AC Lawrence Real Estate LLC, Neil Binder knowingly and intentionally:

      a.      failed to act in good faith and in the best interests of Plaintiffs;

      b.      acted in a manner contrary to the interests of Plaintiffs;

      c.      failed to make truthful and complete disclosures to Plaintiffs; and

      d.      engaged in acts and actions adverse to the business of Plaintiffs and their legal and economic interests.

267.    As a direct and proximate result of the acts and actions by Defendant Neil Binder, Plaintiffs suffered substantial damages, in an amount to be determined but not less than Two Million Dollars ($2,000,000.00).

268.    None of the damages were caused by Plaintiffs.

269.    Plaintiffs request an award of all additional and further relief in their favor and against Defendants which the Court deems to be appropriate under the circumstances.

AS AND FOR A
SECOND CAUSE OF ACTION
*(Declaratory Relief)*

270.    Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 269, *supra*, as though they were fully set forth herein.

271.    Pursuant to CPLR § 3001, the Supreme Court may render a declaratory judgment having the effect of a final judgment concerning the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed.

272.    As is discussed in the previous paragraphs of this Complaint, there are justiciable controversies between the parties.

- 58 -

273.    Plaintiffs request this Court will determine the rights and obligations of the parties.

274.    Plaintiffs request the declaratory relief to be provided by this Court will include

without limitation the following relief:

        a.      Plaintiffs Anthony DeGrotta and Larry Friedman have legal standing to bring legal claims and equitable claims in this honorable Court on behalf of themselves and on behalf of each of the Plaintiff entities.

        b.      Plaintiffs Anthony DeGrotta and Larry Friedman are two of the three LLC Managers and two of the three members of the Board of Directors for each Plaintiff entity which is a limited liability company, and Defendant Neil Binder is the third Manager and member of the board of directors, and the Operating Agreement for each Plaintiff entity which is a limited liability company provides that each LLC Manager and member of the Board of Directors is entitled to an equal one vote, and there is a total of three eligible votes.

        c.      None of the Plaintiff entities which is a limited liability company have selected a President, Secretary or any other officer, and Defendant Neil Binder never had any valid authority to attempt to elect himself as a corporate officer solely on his own unilateral initiative because Plaintiffs Anthony DeGrotta and Larry Friedman possess the majority of two of the three eligible votes for such an election.

        d.      Plaintiffs Anthony DeGrotta and Larry Friedman are two of the three members of the Board of Directors for the two Plaintiff entities which are corporations (Bellmarc Brokerage Midtown Inc. and Bellmarc Gramercy/Chelsea Inc.) and they are two of the three corporate officers of each of those two corporations, in the position of Vice President.

        e.      The Operating Agreement for each Plaintiff entity which is a limited liability company requires each person who is a LLC Manager and member of the Board of Directors to fulfill fiduciary obligations owed to the LLC, including not wasting assets or otherwise harming the company.

        f.      The Operating Agreement for each Plaintiff entity which is a limited liability company authorizes a majority of the persons who are LLC Managers and members of the Board of Directors to terminate the participation in management and administration of the LLC by any LLC Manager and member of the Board of Directors who fails to fulfill his or her fiduciary obligations owed to the LLC, including by wasting assets or otherwise harming the company.

        g.      Defendant Neil Binder has failed to fulfill his fiduciary obligations owed to each Plaintiff entity which is a limited liability company including by having wasted assets and otherwise grievously harming the company.

h.      The Shareholder Agreement for each Plaintiff entity which is a corporation requires each person who is a member of the Board of Directors to fulfill fiduciary obligations owed to the company, including by not wasting assets or otherwise harming the company.

i.      The Shareholder Agreement for each Plaintiff entity which is a corporation authorizes a majority of the persons who are members of the Board of Directors to terminate the participation in management and administration of the company by any person who is a member of the Board of Directors who fails to fulfill his or her fiduciary obligations owed to the company, including by wasting assets or otherwise harming the company.

j.      Defendant Neil Binder has failed to fulfill his fiduciary owed to each Plaintiff entity which is a corporation including by having wasted assets and otherwise grievously harming the company.

275.    As is provided for in CPLR § 3017(b), Plaintiffs hereby state that no other consequential relief is claimed regarding this Second Cause of Action.

276.    However, the fact that this Cause of Action is limited to a request for a declaratory relief, is not intended by Plaintiffs, and shall not be deemed to be, any limitation on the separate and distinct Causes of Action in which Plaintiffs request an award of the monetary relief to which they are entitled under New York law.

277.    Plaintiffs request an award of all additional and further relief in their favor and against Defendants which the Court deems to be appropriate under the circumstances.

AS AND FOR A<br>THIRD CAUSE OF ACTION

*(Wilful Misconduct)*

278.    Plaintiffs repeat and reallege the allegations which are set forth in ¶¶ 1 through 277, *supra*, as though they were fully set forth herein.

279.    Defendants acted in so reckless a manner, or failed to act in circumstances where an act was clearly required, so as to indicate disregard of the consequences of their conduct.

280.    Each Defendant is jointly and severally liable for all of Plaintiffs' damages, in an

amount to be determined.

281.   Plaintiffs request an award of all additional and further relief in their favor and against Defendant Neil Binder which the Court deems to be appropriate under the circumstances.

AS AND FOR A
FOURTH CAUSE OF ACTION
*(Injunctive Relief)*

282.   Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 281, *supra*, as though they were fully set forth herein.

283.   Pursuant to CPLR § 6001, the Supreme Court may render provisional remedies including injunctive relief as is appropriate for the circumstances.

284.   Pursuant to CPLR § 6301, the Court, as is appropriate under the circumstances, may grant a preliminary injunction and a temporary restraining order where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff.

285.   As has been set forth at length above and as will be emphasized in the immediately following paragraphs, Neil Binder with the assistance and cooperation of the other individual Defendants is tearing apart the Plaintiff's business by diverting the available cash to his own current personal use and repaying his own personal prior indebtedness.  As provided above, Neil Binder and the other individual Defendants conduct themselves in such a manner as to intimidate and harass the other staff and agents. Neil Binder's behavior is not only contrary to a successful business, he is so involved with diverting all sources of available cash he fails to pay the

- 61 -

obligations of the Plaintiff companies and is currently in serious danger of losing the Coldwell Banker franchise . Neil Binder has failed to pay the franchise fees and currently owes over a quarter million dollars in unpaid fees and recently three brokerage offices received preliminary notices for non-payment of rent cases.

286.    For the foregoing reasons and the reasons set forth concisely below Neil Binder and the other individual Defendants must be permanently enjoined from engaging in any management, administrative or financial decision making functions. As it is impossible for Neil Binder and the other individual Defendants to be present and not impose themselves in these functions, Neil Binder and the other individual Defendants must be barred and prevented from attending any of Plaintiffs' business offices.

287.    Neil Binder has been unreasonable, imprudent and reckless in treating the bank accounts of The Bellmarc Group LLC and AC Lawrence Real Estate LLC as if they were his own personal piggy banks.

288.    On information and belief, Neil Binder is deeply in debt personally and has acted in a completely irresponsible manner financially morally and ethically.

289.    On information and belief, Neil Binder is consuming a multitude of medications which severely alter his ability to act in a civilized, professional, prudent and reasonable manner, and the medications sometimes make him completely incoherent.

290.    On information and belief, Neil Binder has systematically raided special accounts and has no regard for them, as has been explained in previous paragraphs of this Complaint.

291.    On information and belief, Neil Binder has written checks from the operating, special and escrow accounts of the Bellmarc entities for his own current personal obligations and to pay for the money judgments that have been lodged against him by various creditors.

292.   On information and belief, Neil Binder has written these checks to pay for these personal obligations despite the fact that he is drawing from monies that are being held for the escrow of staff member's health insurance accounts and Neil Binder has written these checks to pay for personal obligations despite the fact that the monies are being held in special escrow accounts on behalf clients who are awaiting their transactions to close.  These type of actions place the license of the brokerage entities in jeopardy and could result in the total loss of the business.

293.   On information and belief, despite the fact that Neil Binder is systematically depleting the operating and escrow accounts of funds for his personal benefit and to pay his non-business related personal obligations he is failing to pay the Coldwell Banker franchise fees. Currently, the Bellmarc entities are indebted to Coldwell Banker in a sum of over $250,000.00. Coldwell Banker has made it abundantly clear that the failure to pay these fees will lead to the termination of the franchise which is extremely important to the business and the ability of the various entities to attract clients.

294.   On information and belief, Neil Binder has consciously failed and refused to pay the Franchise Fees that are owed for the Bellmarc entities. Despite prior systems devised by the operators of the Bellmarc entities causing the checks to be drafted and ready for execution and transmittal to Coldwell Banker, Neil Binder has refused to send the checks that have automatically been generated for transmittal. While the Coldwell Banker relationship is in danger of being lost, the AC Lawrence entities have been paying their franchise fees in accordance with the franchise agreement.  Were it not for the fact that Neil Binder has refused to pay his fees the company's relationship with this most important franchisor would not be in jeopardy.

295.   On information and belief, despite his refusal to pay the franchise fees Neil Binder has diverted the funds necessary to pay the fees to his own personal obligations and prior indebtedness.

- 63 -

296.     On information and belief, the business offices for three of the five companies in the Bellmarc operational group have recently received non-payment of rent notices.  Again, the money necessary to pay the rents has been diverted to Neil Binder's personal obligations. Were it not for the fact that Neil Binder has systematically diverted operating, special and escrow funds to his personal debts and obligations the rents for the business would have been paid.

297.     On information and belief, the failure to make the payments described above and the diversion of special, escrow and operating funds to Neil Binder's personal debts is causing the Plaintiffs to be in jeopardy of losing a business that would be thriving were it not for Neil Binder's inappropriate conduct. The unethical conduct of dipping into the escrow account and the account specially held for the staff health insurance premiums is sociopathic in nature and jeopardizes the licensing of the Plaintiffs.

298.     Not only will the principle members of Plaintiffs lose their livelihood, Five Hundred Seventy-One (571) brokers in addition to staff employees will lose their occupations and financial support for their families unless changes are immediately implemented to cease Defendants' misconduct.

299.     Plaintiffs' civil Complaint sets forth the facts necessary to establish the predicate elements for a permanent injunction.

300.     Clearly, the foregoing facts establish the predicate of the foreboding likelihood of irreparable harm.  If Neil Binder with the cooperation and assistance of the other individual Defendants aren't prevented from operating in the Plaintiff's business and Neil Binder isn't removed as a signer on Plaintiffs' bank accounts, the business will simply expire as the franchise with Coldwell Banker will be cancelled and terminated and the business offices will close for lack of rent; the company will be sued by the various client Landlords and Tenants for the loss of the funds that are being systematically pilfered and diverted to Neil Binder's personal indebtedness;

the brokerage licenses are in jeopardy because the conduct described above is simply incompatible with the ethics of the profession.

301.    Defendants' conduct is so egregious that there is no doubt the Court ultimately will find that Plaintiffs have a high likelihood of success on the merits.

302.    The conduct is so egregious there is little doubt that, on balance, the equities must favor Plaintiffs over Defendants.

303.    Based on the conduct of Defendants, Plaintiffs pray the Court enjoins and restrains Defendants from having a governance and administrative role in operating Plaintiff's business. Instead, Plaintiffs must be permitted to operate the business in an ethical and lawful manner pursuant to the various Operating and Shareholder Agreements and governing documents.

304.    As the conduct of the other individual Defendants are in concert with that of Neil Binder as demonstrated by the supporting recitation of the history of the bad acts set forth in this civil Complaint, it is necessary to enjoin and restrain all of the individual Defendants from taking any actions to attempt to govern and administer Plaintiffs' businesses in any manner. This must require that all of the individual Defendants absent themselves from Plaintiffs' business offices as, on information and belief, not only is Neil Binder raiding the accounts resulting in the loss of operating capital, the other individual Defendants are cooperating with Neil Binder to impose a hostile work environment where staff members feel they have no choice but to assist in causing harm to the business.

305.    As such, Plaintiffs also request that all of the named individual Defendants be prevented from entering any of Plaintiffs' business offices permanently.

306.    Plaintiffs further request an award of all additional and further relief in their favor and against Defendants which the Court deems to be appropriate under the circumstances.

- 65 -

AS AND FOR A
FIFTH CAUSE OF ACTION
*(Conversion)*

307.    Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 306, *supra*, as though they were fully set forth.

308.    Defendants, including Neil Binder, appropriated to themselves, without authority, property owned by the Plaintiffs, including without limitation assets of the Plaintiff entities which have been described in this Complaint, including, but not limited to, funds which should have inured to the benefit of the Plaintiff entities and the individual Plaintiffs.

309.    Defendants intermeddled with Plaintiffs' property beyond the extent of any authority conferred upon them.

310.    It is not necessary for Plaintiffs to demand that Defendants cease their unauthorized conduct.  However, here there have been many demands by Plaintiffs Anthony DeGrotta and Larry Friedman.  Defendants have disregarded those demands.

311.    Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.

312.    Here, the named Plaintiffs had a possessory right and interest in the property owned by the Plaintiff entities, including, but not limited to, the funds which should have inured to the benefit of the Plaintiff entities and the individual Plaintiffs, and other assets.

313.    Defendants, in derogation of Plaintiffs' rights, asserted dominion over, and interfered with, the property and assets of the Plaintiff entities, and the individual Plaintiffs.

314.    Defendants jointly and severally are liable for the damages and harm which was suffered by Plaintiffs.

- 66 -

315.    Plaintiffs request an award of all additional and further relief in their favor and against Defendants which the Court deems to be appropriate under the circumstances.

AS AND FOR A
SIXTH CAUSE OF ACTION
*(Accounting)*

316.    Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 315, *supra*, as though they were fully set forth.

317.    On information and belief, the individual Defendants engaged in numerous acts that constituted mismanagement, misappropriation, and waste of the Plaintiffs' assets.

318.    On information and belief, the full scope of the wrongdoing and the exact amount of misappropriation, mismanagement and waste can only be ascertained by a complete audit and accounting of the books and records of the Plaintiffs' businesses.

319.    On information and belief, an accounting is necessary in order for this Court to determine the full scope of the assets that the individual Defendants diverted, wasted and misappropriated from the capital and assets rightfully belonging to the Plaintiffs.

320.    Wherefore, Plaintiffs respectfully request that the Court issue an order compelling: (i) Defendants to provide a full and complete audit and accounting of Plaintiffs' businesses to date, which commenced in or about January 1, 2013; and (ii) all Defendants to provide a full accounting of the payments they each received either directly or through payments to third parties from the Plaintiffs' businesses for the entire period covered by this action.

AS AND FOR A
SEVENTH CAUSE OF ACTION
*(Faithless Servant Doctrine)*

321.    Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 320, *supra*, as though they were fully set forth herein.

322.     An employee who acts adversely to the interests of his employer, or omits to disclose any interest which would naturally influence the employee's conduct in dealing with the subject of the employment, commits a fraud against the employer and forfeits any right to compensation for his or her services during the entire period of time he or she is a faithless servant.

323.     As previously noted, Neil Binder performed acts and actions which were directly adverse to the interests of Plaintiffs, beginning from October 5, 2012, through the present date, and he concealed these acts from Plaintiffs.

324.     The acts and actions performed by Defendant Neil Binder directly adverse to the interests of Plaintiffs were intentional in having been done deliberately by Defendant Binder.

325.     Defendant Neil Binder violated New York law which prohibits an employee from being a faithless servant to his employer, and, by his illicit acts and actions contrary to the interests of his employer, he forfeited any right to have received salary or other remunerations during the period of time in which he was a faithless servant.

326.     Accordingly, Plaintiffs are entitled to a judgment which orders Defendant Neil Binder to disgorge and return to Plaintiffs all of the salary and other remunerations which he received from Plaintiffs during the entire period of time beginning on October 5, 2012, and continuing through the present date.

327.     Plaintiffs request an award of all additional and further relief in their favor and against Defendants which the Court deems to be appropriate under the circumstances.

AS AND FOR A
EIGHTH CAUSE OF ACTION
*(Unjust Enrichment)*

328.     Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through 327, *supra*, as though they were fully set forth.

329.     Defendant Neil Binder expropriated to himself, directly or indirectly, substantial

- 68 -

money and other assets owned by Plaintiffs The Bellmarc Group LLC, AC Lawrence Real Estate

LLC, BAL Administration Inc., Anthony DeGrotta and Larry Friedman.

330.    In expropriating to himself, directly or indirectly, substantial money and other

assets owned by Plaintiffs, Defendant Neil Binder unjustly enriched himself, in an amount to be

determined, but in any event not less than two million dollars ($2,000,000.00).

331.    Defendant Neil Binder is liable to Plaintiffs for the value of all of the assets he

expropriated to himself, directly or indirectly, from The Bellmarc Group LLC, AC Lawrence Real

Estate LLC, BAL Administration Inc., Anthony DeGrotta and Larry Friedman.

332.    Plaintiffs request an award of all additional and further relief in their favor and

against Defendants which the Court deems to be appropriate under the circumstances.

AS AND FOR A
NINTH CAUSE OF ACTION
*(Appointment of Receiver)*

333.    Plaintiff repeats and realleges the allegations which are set forth in ¶¶ 1 through

332, *supra,* as though they were fully set forth herein.

334.    The conduct described above clearly shows that the circumstances dictate that there

must be a drastic and immediate change to the governance of the Plaintiffs' businesses. In the

event the court does not act to permanently enjoin governance by the individual Defendants and

order that the individual Plaintiffs may take over the complete governing duties that the individual

Defendants vacate there will either be a vacuum or the Plaintiffs business will be forced to go out

of business. Hence, in the event the individual Plaintiffs are not permitted to run the business

they are so familiar with and which the facts will demonstrate they are more than capable of

governing, then, the intolerable conduct of the individual Defendants requires that the court

appoint a receiver to attempt to preserve the status quo.

- 69 -

335.    On this record, it appears that the Individual Defendants are operating, governing and administering the Plaintiffs in such a manner that the business will lose their licensure and their franchise affiliation with Coldwell Banker. There is a sufficient demonstration of waste and mismanagement of the Plaintiffs business that they are in mortally threatened.  Any loss of the Coldwell Banker Franchise and or loss of the use of the three business offices for companies in the Bellmarc operational group that have received notices of non-payment is only surpassed by the repeated invasions of the operating, special and escrow accounts for the unlawful purpose of paying down Neil Binder's personal indebtedness and incredibly paying Neil Binder's almost $12,000 per month residential rent.

336.    Two hundred and fifty thousand dollars in franchise fees haven't been paid, the rent for the three offices where Plaintiffs' agents work from hasn't been paid yet the individual Defendants are daily hunting down  and siphoning the income of the Plaintiffs' business to pay off debts and judgments that Neil Binder accumulated years before the Plaintiffs' entities were formed.

337.    Plaintiffs have shown that the assets and indeed the business itself is in serious and immediate danger of dissipation, and in view of the irreversible nature of such dissipation the necessity of receivership is evident.  The installation of a receiver would permit Plaintiffs to continue the operation of the businesses, so that at the end of the day there will be something left to fight about.  It is well recognized that courts of equity exercise extreme caution in appointing receivers pendent lite yet where circumstances dictate such appointment will be made so that the status quo can be preserved.

338.    The appointment of a receiver of a going concern is a drastic remedy, and can properly be invoked where there is a clear evidentiary showing of the necessity for the conservation of property and the protection of the interests of the litigants. Plaintiff's complaint

amply demonstrate the clear and present danger of the dissipation of the assets of this personal service business, and in view of the nature of the business, and the hundreds of employees and agents that rely on the continuity of the business, a receiver is necessary and would be able to continue the operation of the business so as to preserve plaintiffs' interest and indeed prevent the total destruction of the business.

### PRAYER FOR RELIEF

WHEREFORE, it is respectfully demanded that Plaintiffs shall be awarded judgment against Defendant Neil Binder as follows:

a.      **Cause of Action # 1 -- *Breach of Fiduciary Duty*.** On this cause of action, a judgment which awards compensatory damages to be paid by Defendant Neil Binder to Plaintiffs in amounts to be determined, but in any event not less than two million dollars ($2,000,000.00).

b.      **Cause of Action # 2 – *Willful Misconduct*.** On this cause of action, a judgment which awards compensatory damages to be paid by each of the Defendants, jointly and severally to Plaintiffs in amounts to be determined which compensate Plaintiff for all of their damages.

c.      **Cause of Action # 3 – *Declaratory Relief*.** On this cause of action, a judgment which determines the rights and interests of the parties, and awards the relief identified in the Third Cause of Action, *supra*.

d.      **Cause of Action # 4 – *Injunctive Relief*.** On this cause of action, a judgment in the form of a preliminary and permanent injunction which bars Defendant Neil Binder from any future role in the management or administration of any of the following named Plaintiffs: The Bellmarc Group LLC, AC Lawrence Real Estate LLC, BAL Administration Inc., AC Lawrence Operations Inc., Bellmarc Brokerage Midtown Inc., Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC, and Bellmarc Downtown LLC.

339.   **Cause of Action # 5** – *Conversion.*  On this cause of action, a judgment against each Defendant, jointly and severally, which awards in favor of Plaintiffs and against Defendants all of the damages suffered by Plaintiffs.

e.     **Cause of Action # 6** – *Accounting.*  On this cause of action, a judgment which includes an order compelling: (i) Defendants to provide a full and complete audit and accounting of Plaintiffs' businesses to date, which commenced in or about January 1, 2013; and (ii) all Defendants to provide a full accounting of the payments they each received either directly or through payments to third parties from the Plaintiffs' businesses for the entire period covered by this action.

f.     **Cause of Action # 7** -- *Faithless Servant Doctrine.*  On this cause of action, a judgment which awards the following relief: orders Defendant Neil Binder to return respectively to Plaintiff The Bellmarc Group LLC and Plaintiff AC Lawrence Real Estate LLC all of the salary and other remunerations which he received from them during the period of time beginning on October 5, 2012, and continuing through the present date.

g.     **Cause of Action # 8** -- *Unjust Enrichment.*  On this cause of action, a judgment which orders Defendant Neil Binder to disgorge to Plaintiffs The Bellmarc Group LLC, AC Lawrence Real Estate LLC, BAL Administration Inc., Anthony DeGrotta and Larry Friedman the assets that he expropriated to himself, directly or indirectly, which constituted unjust enrichment, in an amount to be determined, but in any event not less than two million dollars ($2,000,000.00).

h.     **Cause of Action # 9** – *Appointment of Receiver.*  On this seventh cause of action (in the alternative), a judgment which appoints a Receiver for The Bellmarc Group LLC, and for AC Lawrence Real Estate LLC, and for BAL Administration Inc.

i.     In addition, Plaintiffs Anthony DeGrotta and Larry Friedman, individually and on behalf of the other named Plaintiffs (*i.e.,* The Bellmarc Group LLC, AC Lawrence Real Estate

LLC, BAL Administration Inc., AC Lawrence Operations Inc., Bellmarc Brokerage Midtown Inc.,

Bellmarc Gramercy/Chelsea Inc., Bellmarc East LLC, Bellmarc West LLC, Bellmarc Downtown

LLC), request an award of all additional and further relief in favor of Plaintiffs and against

Defendant Neil Binder which the Court deems to be appropriate under the circumstances.

Dated:  New York, New York
        August 25, 2014

**KUCKER & BRUH, LLP**
*(Attorneys for Plaintiffs)*
747 Third Avenue, 12th Floor
New York, New York 10017
(212) 869-5030

By: _____
      William D. Hummell, Esq.
      A Member of the Firm

**Exhibit 5**

Page 1

1

UNITED STATES DISTRICT COURT
2     DISTRICT OF NEW JERSEY
      Civil Action No. 14-cv-07926MCA-MAH
3     - - - - - - - - - - - - - - - - - -x
4     COLDWELL BANKER REAL ESTATE LLC,
5                     Plaintiff,
6     v.
7     THE BELLMARC GROUP LLC, AC
      LAWRENCE REAL ESTATE LLC;
8     BELLMARC BROKERAGE MIDTOWN,
      INC.; BELLMARC DOWNTOWN LLC;
9     BELLMARC EAST LLC; BELLMARC
      WEST LLC; BELLMARC SIMONE SONG
10    INC.; BELLMARC GRAMERCY/CHELSEA
      INC.; NEIL BINDER, AN INDIVIDUAL;
11    NICE IDEA LLC; AMD ALL ENTERPRISES,
      LLC,
12
                      Defendants.
13
      - - - - - - - - - - - - - - - - - -x
14
15                    March 28, 2018
                      11:15 a.m.
16
   Job No. NJ2853550
17
18          Deposition of LINDA ALEXANDER, an
19    Expert Witness on Behalf of Bellmarc,
20    taken by Plaintiff, pursuant to
21    Subpoena, held at the offices of
22    LeClairRyan, 885 Third Avenue,
23    New York, New York, before Kathleen
24    Piazza Luongo, a Notary Public of the
25    State of New York.

Page 2

1
2   A P P E A R A N C E S :
3
4   LECLAIR RYAN
5   885 Third Avenue
6   Sixteenth Floor
7   New York, New York  10022
8       Attorneys for Plaintiff
9   BY:  DAVID W. PHILLIPS, ESQ.
10
11  ROSENBERG & PITTINSKY LLP
12  232 Madison Avenue
13  Suite 906
14  New York, New York  10016
15      Attorneys for Defendants
16  BY:  LAURENCE D. PITTINSKY  ESQ.
17      larry@rpllplaw.com
18
19
20  ALSO PRESENT:
21
22      Neil Binder
23      Nina Scerbo
24      James Mathews
25

Page 3

1           Linda Alexander
2
3   L I N D A   A L E X A N D E R, called as
4   an expert witness, having first been duly
5   sworn, was examined and testified as
6   follows:
7   EXAMINATION BY MR. PHILLIPS:
8       Q.   Please state your name for the
9   record.
10      A.   Linda Alexander.
11      Q.   What is your business address?
12      A.   1650 Broadway, Suite 1002,
13  New York, New York  10019.
14          MR. PITTINSKY:  I have a Rule
15      30 demand so the witness can receive
16      the transcript and make corrections.
17          MR. PHILLIPS:  Sure.
18      Q.   Good morning, Ms. Alexander,
19  how are you?
20      A.   I'm fine.
21      Q.   Have you ever been deposed
22  before?
23      A.   No.
24      Q.   Do you have a sense of what is
25  going on here today?

Page 4

1           Linda Alexander
2   A.   I think so, yes.
3       MR. PHILLIPS:  I'm asking you
4   questions, you have to respond to
5   them truthfully.
6       If my question is unclear tell
7   me that and I'll try to clarify it.
8       The court reporter is taking
9   down everything you say and we can
10  use this later in trial if this goes
11  to trial.
12      If Mr. Pittinsky objects, wait
13  to hear the objection and then we
14  will deal with that objection and
15  then probably tell you what to do at
16  that point in time.
17      If you need a break just let me
18  know, we can take as many breaks as
19  you want.  Hopefully this won't be
20  too long, I know you have somewhere
21  to go, so we will finish up and get
22  out of here.  Okay?
23      Please mark this a Alexander
24  Exhibit 1 for identification.
25      (Whereupon, the above-mentioned

Page 5

1           Linda Alexander
2   two-page Curriculum Vitae of Linda S.
3   Alexander was marked Alexander Exhibit
4   1 for identification.)
5   CONTINUED EXAMINATION BY MR. PHILLIPS:
6       Q.   In front of you you have been
7   given Alexander Exhibit 1.  Can you tell
8   me what that is.
9       A.   It's a CV, it's a basic
10  description of my background.
11      Q.   It's your CV?
12      A.   Yes.
13      Q.   When did you prepare this?
14      A.   Oh, gosh, it's been a while.  I
15  would say before the end of 2017.
16      Q.   Okay.
17      A.   Yes.
18      Q.   Relying on your CV, can you
19  tell me your educational background.  Or
20  not relying, whatever, can you tell me
21  your educational background?
22      A.   Yes, I have a bachelor's degree
23  in psychology from a thousand years ago
24  from The New School, it was social, from
25  The New School.

2 (Pages 2 - 5)

Linda Alexander

1
2   Q.   Do you recall the year?
3   A.   Yeah, 1975.
4   Q.   Any formal education after
5 that?
6   A.   No.
7   Q.   And subsequent to 1975 what was
8 your employment history?
9   A.   Oh, subsequent?
10   Q.   Yes.
11   A.   Oh, many things.
12      My first job out of college was
13 as a music therapist at Kirby Hospital,
14 Manhattan State Psychiatric Center, I
15 worked there until '78, '79; and then
16 after that I got positions in advertising
17 as copywriter.  I was a professional
18 singer --
19   Q.   You can refer to your resume if
20 you want, your CV.
21   A.   Oh, great, it's been a long
22 time.
23      I was a professional song
24 writer.  I was -- did we go back that
25 far?  No, we didn't.

Linda Alexander

1
2   Q.   The CV starts in 1993, do you
3 recall?
4   A.   Yes, that makes a lot more
5 sense, doesn't it?
6      So anyway, yes, what I did
7 initially was I was a music therapist in
8 a psychiatric hospital, that was my first
9 job out of college.
10   Q.   Okay, and that was in 1978,
11 '79?
12   A.   Yes.
13   Q.   And after that what did you do?
14   A.   Oh, um, starting in 1993 I was
15 a marketing direct for Greenthal.
16   Q.   Were you unemployed from 1979
17 to 1993?
18   A.   Oh, no, no, no, no, no.  I was
19 always, I was working as a copywriter,
20 primarily ad agencies.
21   Q.   Okay.
22   A.   I'm an associate, HCM direct,
23 so I had a whole history of working as a
24 writer, a copywriter initially.
25   Q.   Tell me what a copywriter does.

Linda Alexander

1
2   A.   We write advertising copy.  So
3 some of my clients included Roman Polanc,
4 Dannon, Kraft Dairy Group.  It's been a
5 long time.
6   Q.   You worked for companies that
7 worked for --
8   A.   I worked for advertising
9 agencies.
10   Q.   Okay.
11      Tell me what you started doing
12 in 1993.
13   A.   That's when I got a job as a
14 marketing director for Charles H.
15 Greenthal.
16   Q.   Who is Charles --
17   A.   It was -- oh, my goodness,
18 okay -- it was a real estate company.
19 They had five divisions.  They had --
20 they were at that time one of the largest
21 residential brokerage firms.  By today's
22 standards small.
23   Q.   I assume that's here in
24 Manhattan?
25   A.   It was in Manhattan as well.

Linda Alexander

1
2      They also had a property
3 management division, which they still
4 have, and they had a commercial real
5 estate division.
6   Q.   What did you do as a marketing
7 director?
8   A.   I was in charge of all of the
9 advertising.  I had all the
10 communications people.
11   Q.   When you say "in charge," were
12 you writing the advertising or were you
13 directing outside agencies in the
14 advertising?
15   A.   Both.  We worked with some
16 agencies and I wrote a lot of it, too.
17   Q.   What do you mean by directed
18 the communications?
19   A.   We were also overseeing the
20 public relations at that time.  We hired
21 the public relations firm and we were
22 overseeing that as well, I was, my
23 office.
24   Q.   Tell me what you mean by
25 "public relations."

3 (Pages 6 - 9)

Linda Alexander

1
2      Let me say sometimes the
3  questions may seem dumb, but we need to
4  be clear for the record.
5      A.   No, no, I know you're asking me
6  for the record.
7          Public relations then as
8  opposed to now?  So very specifically we
9  were --
10     Q.   Okay, let's do "then."
11     A.   Then was acquiring editorial --
12  editorial content.  So it was placing
13  stories about our company in newspapers
14  and in magazines.  It was an all-print
15  world in those -- in those days.
16     Q.   And how would you define public
17  relations today?
18     A.   It's part of a greater
19  communications picture.
20     Q.   More ways of communications you
21  mean?
22     A.   Yes.
23     Q.   And social media?
24     A.   Exactly.
25          Not all of the media is print

Linda Alexander

1
2  either, it's digital, and there's the
3  social media component on many, many
4  different platforms.
5      Q.   And more television, guest
6  shows?
7      A.   We still have the same amount
8  of broadcasting but there are more
9  opportunities for our clients on
10  different broadcasts, and there is also
11  Podcasts, there is also Webcasts, there
12  is also digital broadcasts, so that's
13  really kind of the world's expanded.
14     Q.   After Charles Greenthal what
15  did you do?
16     A.   Well, I became a freelance
17  writer.
18     Q.   Why did you leave Charles
19  Greenthal?
20     A.   I was recruited by an
21  advertising agency that within three
22  months went Chapter 11 and I found myself
23  in a position to be a freelancer.
24     Q.   Not exactly Mad Men?
25     A.   No.

Linda Alexander

1
2      Q.   You listed a couple of
3  different things on your CV, freelance
4  editor and writer, can you walk me
5  through those and tell me what those
6  mean, like "The Cooperator, Residential
7  Business New York"?
8      A.   Oh, I wrote stories about real
9  estate.  I was always a real estate
10  writer.  For West Side Spirit I had a
11  weekly real estate column, but I wasn't
12  on staff, I was what they called in those
13  days they called it a stringer.
14          The Cooperator, same thing.
15  Residential Business New York, I was
16  initially the editor but then I became --
17  I became one of the writers.  They --
18  they took care of that stuff in-house.
19          Grid Magazine was the article
20  -- I had done articles for a monthly
21  publication.
22     Q.   Had you taken any courses on
23  real estate?
24     A.   Yes, yes.
25     Q.   And what did you do?

Linda Alexander

1
2      A.   When I was working for Charles
3  Greenthal I actually got my real estate
4  license, so I had a familiarity with the
5  language.
6      Q.   You had a real estate agent's
7  license?
8      A.   Yes, salesperson's license.
9      Q.   Do you maintain it today?
10     A.   No, I let it go when I started
11  writing publications.  It was a conflict.
12     Q.   What do you mean "conflict"?
13     A.   Because later on I felt it was
14  a conflict to be writing about people
15  while still making money selling.
16     Q.   So that would have been about
17  1996 you let the license go?
18     A.   Yes, '97, 1997.
19     Q.   Since that point in time have
20  you taken any courses in real estate?
21     A.   No.
22          No, that's not true.  I took a
23  land use course for a Community Board in
24  the City.  I'm on Community Board Seven
25  and I took a land use course, so that is

Linda Alexander

1 stipulated.
2
3     Q.    And where is that land use
4 course?
5     A.    It was in Harlem at the
6 municipal offices there -- it's been
7 quite a while, so I want to say 225 -- it
8 was on 125th Street.  I don't remember
9 the exact address.
10    Q.    Do you recall the year?
11    A.    Um, yeah, it would have had to
12 have been 2002 or 2003.
13    Q.    Was that something that was
14 taught by the City of New York?
15    A.    Yes, it was the Borough
16 President's office that was taking care
17 of -- that was teaching the course.
18    Q.    Okay.
19          Other than that course have you
20 taken any real estate courses since 1996?
21    A.    Nope.
22    Q.    Have you taught any courses
23 since 1996?
24    A.    I have -- I have taught, I've
25 given seminars.

Linda Alexander

1
2     Q.    On what?
3     A.    On branding and PR related to
4 real estate, um, crew network, and I've
5 been invited to the Learning Annex many
6 years ago, I taught a couple of sessions
7 there but it was not an ongoing
8 experience, just people invited me to
9 speak.
10    Q.    When was the last seminar you
11 taught?
12    A.    Oh, probably 2006.  I would
13 have to check, but around that.
14    Q.    Approximately?
15    A.    Approximately.
16    Q.    Okay.
17          Over the twenty or thirty years
18 how many seminars do you think you
19 taught?
20    A.    Four to five.
21    Q.    Have you taken seminars?
22    A.    No.
23    Q.    On your CV you cite that in the
24 year 2000 you started Alexander Marketing
25 Corp.; is that correct?

Linda Alexander

1
2     A.    Yes.
3     Q.    Tell me why you started
4 Alexander Marketing.
5     A.    I was a freelance writer and I
6 was getting a lot of work that was more
7 public relations oriented than
8 journalistically oriented, they were kind
9 of combined in those days, there was a
10 lot of -- they were very related in those
11 days, and I was -- my revenue stream
12 required me to incorporate.  My
13 accountant said you have to incorporate
14 and Alexander Marketing was born.
15    Q.    Now, when it started how many
16 employees did you have?
17    A.    One.
18    Q.    How many employees do you have
19 today?
20    A.    Four.
21    Q.    That's including yourself?
22    A.    Yes.
23    Q.    What do the other three do?
24    A.    Social media, account
25 management and graphic design.

Linda Alexander

1
2     Q.    All located at --
3     A.    1650 Broadway, Suite 1002.
4     Q.    Does Alexander Marketing
5 operate in any particular industry?
6     A.    Real estate.
7     Q.    Is it all real estate?
8     A.    All real estate.
9     Q.    Why is it limited to real
10 estate?
11    A.    I was a real estate reporter.
12 It's a broad spectrum.  It's fascinating.
13 We represent developers, we represent
14 brokers, we represent project management
15 firms, construction management.  The
16 spectrum is broad.
17    Q.    Tell me what kind of public
18 relation needs real estate companies
19 have, what do you fulfill, without being
20 specific of course.
21    A.    Branding.
22    Q.    Meaning what?
23    A.    Letting -- letting the general
24 public know their names and what they do.
25 Presenting certain principals of the

Page 18

Linda Alexander

1  Linda Alexander
2  firms as thought leaders, identifying
3  developments and helping to market them,
4  but from an editorial capacity, and these
5  days in a social media capacity.
6      That's it.  And -- and -- and
7  reputation management.
8      Q.   In general terms what is your
9  annual revenue at the company?
10     A.   For the entire company?
11     Q.   Yes.
12     A.   Under half a million dollars a
13  year, around there.
14     Q.   Has that revenue been
15  approximately the same for, say, the last
16  ten years?
17     A.   Sometimes a little more,
18  sometimes -- yeah, right now, maybe a
19  little over a half a million.
20     Q.   Under "Skills" you indicate you
21  have "Expertise in long-term reputation
22  management strategies," or the company
23  does.
24      MR. PHILLIPS:  Strike that.
25     Q.   You indicate, this is your CV,

Page 19

1  Linda Alexander
2  correct, this isn't just the company CV?
3     A.   Yes, this is mine.
4     Q.   So when it indicates "Expertise
5  in long-term reputation management
6  strategies" that's your expertise; is
7  that correct?
8     A.   It is among my expertise, yes.
9     Q.   Good point.
10      Tell me what "expertise in
11  long-term reputation management
12  strategies" means.
13     A.   Protecting our client's
14  reputation, making sure that the -- if
15  there are controversial issues that we
16  respond quickly and we have ways to
17  mitigate the negative effects.
18     Q.   What are some of those ways?
19     A.   Through -- well, through
20  editorial.
21     Q.   Meaning placement of articles?
22     A.   Placement of articles.
23     Q.   Okay.
24     A.   Through introductions to
25  journalists so that they can tell their

Page 20

Linda Alexander

1  Linda Alexander
2  story directly, and through social media
3  these days.
4      In the last -- over the last
5  three years we've had social media
6  directors that that's their entire --
7  that's, you know, that's one of their
8  main objectives is to protect our
9  clients.
10     Q.   On the second page you list
11  select awards.  Can you tell me what each
12  of those are.
13     A.   Oh, "14 Women to Watch in Real
14  Estate" in 2014, Sokol Media.
15     Q.   What is Sokol Media?
16     A.   It's a publication.  It's they
17  -- they now do -- we had several real
18  estate titles and now she has -- well,
19  it's still around but they don't have the
20  real estate titles but at the time they
21  did.
22     Q.   Okay.
23      Is it a well known publication?
24     A.   Now it's entirely digital and
25  it's E Women News, so it has a different

Page 21

1  Linda Alexander
2  audience.  At the time it was a well
3  known publication.
4     Q.   Is that something that
5  publishes to people in the industry?
6     A.   Yes.
7     Q.   Okay.
8     A.   It was a trade publication.
9     Q.   Just for the record, can you
10  define a trade publication?
11     A.   Trade publications speak to
12  certain industries, specific industries.
13  In this case it would be real estate
14  trade publication as opposed to New York
15  Law Journal which is specifically a trade
16  publication for lawyers.
17     Q.   Right.
18      MR. PITTINSKY:  She made it so
19  we can all understand it.
20      MR. PHILLIPS:  I know, she
21  dumbed it down for us.
22     Q.   Can you tell me what the Mann
23  Foundation is?
24     A.   Mann Foundation is a charitable
25  organization that -- it was started by a

Page 22

Linda Alexander

1       publisher of Mann publications and the
2       publisher, Jeffrey Mann, started a
3       foundation that directs funds to the
4       research for Alzheimer's.
5          Q.   And you did publicity work for
6       them?
7          A.   I did do, yes, I did do some
8       publicity work for the Foundation
9       initially, but then I was later on I was
10      the publicist of the year had to do with
11      the fact that he honored different
12      publicists within the industry, that was
13      one of every year a new publicist -- a
14      different publicist was being honored.
15      That year I was honored.
16         Q.   What is the Clarissa Award?
17         A.   St. Francis Shelters is an
18      organization, it's obvious, and I
19      received a Woman of Valor Clarissa Award
20      because I participated and helped out
21      with work for them.
22         Q.   Okay.
23         A.   Pro bono work.
24         Q.   Development New York Magazine,

Page 23

Linda Alexander

1       what is that?
2          A.   It was, it's no longer -- it's
3       no longer a magazine -- but it was a
4       magazine and they named me one of the --
5       they named Alexander Marketing one of the
6       top PR firms in real estate.
7          Q.   So that award was limited to
8       real estate PR firms?
9          A.   Yeah, yup.
10         Q.   Okay.
11            AJC Graphic Arts for
12      Copywriting, what is that?
13         A.   That's a big deal. That was
14      the American Graphic consultancy, and
15      they -- I won an award for copyrighting
16      that I did for a brochure for the Seton
17      Building.
18         Q.   Okay.
19         A.   That was instrumental in
20      marketing the building.
21         Q.   Do you know Neil Binder?
22         A.   I do.
23         Q.   How do you know Mr. Binder?
24         A.   I worked for Mr. Binder and he

Page 24

Linda Alexander

1       hired me, I said 2002 but actually I'm
2       looking back it's more like 2001 to 2003,
3       Alexander Marketing was his public
4       relations consultant.
5          Q.   Did you know him before that?
6          A.   No.
7          Q.   Since 2003, have you maintained
8       a relationship with Mr. Binder?
9          A.   We see each other at events so
10      in that respect yes.
11         Q.   Would you characterize it as a
12      professional relationship or a social
13      relationship?
14         A.   Professional.
15         Q.   How often would you see
16      Mr. Binder on an annual basis?
17         A.   Once or twice a year I would
18      estimate.
19         Q.   And do you know the company
20      Bellmarc?
21         A.   I do.
22         Q.   When did you first learn of
23      Bellmarc?
24         A.   I wrote about Bellmarc back in

Page 25

Linda Alexander

1       the 1990s as a writer.
2          Q.   What did you write about
3       Bellmarc back in the 1990s?
4          A.   Probably some of the deals they
5       had done, probably incorporated them into
6       different stories, I can't be specific
7       because it's been a long, long time; but
8       of course Bellmarc was a major player in
9       our industry and that's what I wrote
10      about.
11         Q.   When you had occasion to write
12      about Bellmarc would you interview people
13      at Bellmarc?
14         A.   Yes.
15         Q.   Who would you interview; do you
16      recall anyone?
17         A.   Brokers, Mr. Binder, his former
18      partner, Mr. Broxmeyer.
19            MR. PHILLIPS:  Let's mark your
20      report as Alexander Exhibit 2.
21            (Whereupon, the above-mentioned
22      letter dated November 30, 2017, from
23      Alexander Marketing Corp. to Laurence
24      D. Pittinsky, with attached report

7 (Pages 22 - 25)

1        Linda Alexander
2    was marked Alexander Exhibit 2 for
3    identification.)
4    CONTINUED EXAMINATION BY MR. PHILLIPS:
5        Q.   Ms. Alexander, I've given you
6    what's been marked as Alexander 2 for
7    identification.
8        Do you recognize this document?
9        A.   I do.
10       Q.   Can you tell me what it is?
11       A.   It was a letter that I wrote to
12   Mr. Pittinsky describing my opinion about
13   what had transpired with Mr. Binder and
14   the damage that had been done to his
15   reputation.
16       Q.   At the time you wrote this
17   letter did you understand this was to be
18   an expert's report on damages for
19   litigation?
20       A.   Yes.
21       Q.   Prior to writing this letter
22   had you ever rendered an expert's report
23   on damages?
24       A.   No.
25       Q.   This was the very first

1        Linda Alexander
2    expert's report you ever wrote?
3        A.   Yes.
4        Q.   When you sat down to write your
5    report how did you know what procedures
6    to go through to render an opinion for
7    this litigation?
8        MR. PITTINSKY:  I'm just going
9    to object to the extent that there
10   may be communications with counsel in
11   that response.
12       Anything that we discussed
13   between you and I is not to be
14   disclosed.
15       Other than that, please answer.
16       A.   I have done in the past for
17   other clients I had done presentations
18   for media relations.  We had incorporated
19   social media.  We had incorporated
20   protecting reputations.  I had worked on
21   several projects prior to that with
22   clients where we actually did reputation
23   management work for them.  So I had
24   experience doing it.
25       And so I wrote what I thought

1        Linda Alexander
2    was a good analysis of what had
3    transpired and what I would do to -- what
4    I would recommend for remediation.
5        Q.   The procedures and methodology
6    you used, did you rely upon any other
7    written instructions, like a textbook or
8    treatise or anything of that sort?
9        A.   I -- I -- I did absolutely look
10   through the -- I did research on the
11   internet and, again, I worked with our
12   social media director and, you know,
13   consulted with my office, yeah, and --
14   and then I've been doing this a long time
15   so it was pretty pro forma.
16       Q.   When you say "research on the
17   internet" do you mean you researched the
18   manner in which to complete the analysis
19   or you researched reputational stuff with
20   respect to Mr. Binder and Bellmarc?
21       A.   I researched all of the above.
22       Q.   Okay.
23       What did you find on the
24   internet about how to do the analysis?
25       A.   Different -- different guides

1        Linda Alexander
2    on the internet.  But, again, let me
3    stress this, we had already -- my office
4    had already prepared presentations.  We
5    do, you know, for clients, we prepare
6    media presentations on how to speak to
7    journalists, so we've also done this in
8    the last -- in the last several years
9    about what not to say and if you do say
10   things, and so this was kind of part of
11   that, that was integral to those
12   presentations, so I had a background.
13       Q.   Do I understand correctly then
14   that this was mostly based upon how you
15   prepare presentations to a potential
16   client?
17       A.   There are elements in there,
18   elements, that I incorporated to put into
19   this.
20       The other thing that I did was
21   to Google the -- the articles from the
22   last few years.
23       Q.   Okay, we will get to those.
24       I'm trying right now to
25   understand how you came about to

Linda Alexander

1
2 formulate the report and methodology.
3     A.    But you have to understand they
4 were -- they were related.
5     Q.    Why is that?
6     A.    Because when I Googled the
7 information that's when I could surmise
8 what was going on, so...
9     Q.    You said that are elements in
10 the report that flow from proposals you
11 have done for potential clients. Can you
12 tell me what those --
13     A.    I didn't say proposals I said
14 presentations.
15     Q.    Presentations to potential
16 clients.
17     A.    Um hum.
18     Q.    Can you tell me what those
19 elements are?
20     A.    Let me see specifically. Let
21 me look in here and tell you.
22          Reputation, talk about what
23 defines reputation, the familiarity of
24 someone in the media, that's one; and
25 managing the narrative --

Linda Alexander

1
2     Q.    By "narrative" you mean the
3 public narrative?
4     A.    The public narrative, so that
5 the work we put out or the information we
6 distribute to the media presents a
7 certain story, there's a certain
8 narrative that pertains -- that presents
9 our clients in the best light.
10     Q.    Anything else?
11     A.    No.
12     Q.    I gather then that there are
13 some portions that come from your
14 research on the internet?
15     A.    Yes.
16     Q.    Some elements?
17     A.    Yes.
18     Q.    Okay.
19          Can you tell me what those are.
20     A.    Specifically?
21     Q.    I'm still speaking about the
22 methodology, how you went about the
23 method.
24     A.    Okay, so we're just talking
25 about the methodology --

Linda Alexander

1
2     Q.    Yes.
3     A.    -- even prior to that.
4          The methodology for all of this
5 is based on a lot of the work we've
6 already done. So a lot of it is
7 researching current coverage, media
8 coverage, and then determining how to
9 expand on the good coverage and how to
10 alleviate any negative coverage.
11     Q.    Your report has -- you have a
12 two-page report and then there are two
13 pages entitled "Analysis of Loss -
14 Reputation"; correct?
15     A.    Yes.
16     Q.    On the first page of Analysis
17 of Loss - Reputation you have a chart
18 called "Reputation Guideline"; can you
19 tell me where this comes from?
20     A.    That -- that was pulled
21 together from different elements. I had
22 a social media director who helped me
23 with it for a presentation and research
24 on the internet for more language, and it
25 was just put together in a way that would

Linda Alexander

1
2 seem effective, and a lot of it picked up
3 from presentations that we've done.
4     Q.    Did you rely upon any textbooks
5 or treatises for the preparation of the
6 Reputation Guideline?
7     A.    Internet sites, not textbooks.
8     Q.    Can you tell me what internet
9 sites?
10     A.    No.
11          In fact, it's funny because I
12 was looking for them today, because I had
13 a feeling this question would be asked,
14 and I couldn't find the specific links.
15     Q.    Is there any manner in which
16 you could go back and reconstruct what
17 sites you looked at?
18     A.    I don't know. Probably.
19          MR. PITTINSKY: Don't guess.
20 If you know.
21          THE WITNESS: I don't know. I
22 do not know.
23     Q.    Looking at the Reputation
24 Guideline and the ten divisions of it,
25 can you -- and take your time to read

9 (Pages 30 - 33)

Page 34

Linda Alexander

1 through it -- can you tell me what
2 portions might have come from or been
3 influenced by what you read on the
4 internet?
5    A.   I cannot discern the difference
6 between some of our presentations,
7 international reputation.  No, this is so
8 very, very basic that a lot of this is
9 simply common sense, a lot of this is
10 language and a lot of this is based on
11 different resources on the internet as
12 well as our own social media advisors.
13    Q.   You said before that you've
14 never written an expert's report on
15 reputation before; have you ever read an
16 expert's report on reputation before?
17    A.   No.
18    Q.   You were hired with respect to
19 the litigation; correct?
20    A.   I believe so, yes.
21    Q.   Do you have any understanding
22 of that litigation?
23    A.   Yes.
24    Q.   Tell me what your understanding

*(lines renumbered)*

1 through it -- can you tell me what
2 portions might have come from or been
3 influenced by what you read on the
4 internet?
5    A.   I cannot discern the difference
6 between some of our presentations,
7 international reputation.  No, this is so
8 very, very basic that a lot of this is
9 simply common sense, a lot of this is
10 language and a lot of this is based on
11 different resources on the internet as
12 well as our own social media advisors.
13    Q.   You said before that you've
14 never written an expert's report on
15 reputation before; have you ever read an
16 expert's report on reputation before?
17    A.   No.
18    Q.   You were hired with respect to
19 the litigation; correct?
20    A.   I believe so, yes.
21    Q.   Do you have any understanding
22 of that litigation?
23    A.   Yes.
24    Q.   Tell me what your understanding

Page 35

Linda Alexander

1 is.
2    A.   That -- that Bellmarc is suing
3 its former partners.
4    Q.   Did you read the Complaint?
5    A.   I did, yes.
6    Q.   That's the Complaint by
7 Coldwell Banker against Bellmarc?
8    A.   Yes.
9    Q.   And then you read the Answer
10 and Counterclaim by Bellmarc against
11 Coldwell Banker?
12    A.   Yes.
13    Q.   When did you first read it?
14    A.   Back in November.
15    Q.   Did you read any deposition
16 transcripts?
17    A.   No.
18    Q.   Did you ask for any further
19 materials with respect to the litigation?
20    A.   No.
21    Q.   Did you read any of the
22 materials, whether they be pleadings or
23 affidavits or deposition transcripts, in
24 the litigation between Mr. Binder and his

Page 36

Linda Alexander

1 partners in 2014?
2    A.   No.
3    Q.   Were you aware of that
4 litigation?
5    A.   Yes.
6    Q.   Okay.
7         So you didn't read the
8 Complaint in that litigation?
9    A.   I -- no.
10    Q.   Do you know if any depositions
11 were taken in that litigation?
12    A.   I do not know.
13    Q.   Have you read any documents
14 from any of the other litigations
15 involving  Mr. Binder since 2014?
16    A.   No.
17    Q.   With respect to your assignment
18 that produced this report, were you asked
19 to calculate whether -- or, I'm sorry,
20 were you asked to determine whether any
21 damages were caused by Coldwell Banker?
22         MR. PITTINSKY:  I'm going to
23 object to the extent it was a
24 communication between counsel and

Page 37

Linda Alexander

1 Ms. Alexander.
2         So if the answer has to do with
3 a discussion between us do not
4 answer; but identify if that's the
5 case.
6    A.   No.
7         THE WITNESS:  Can you rephrase
8 or actually ask me the question
9 again, please.
10         MR. PHILLIPS:  Can you read it
11 back, please.
12         (The requested portion of the
13 record was read.)
14    A.   No.
15    Q.   Have you reached the conclusion
16 as to whether any damages were caused by
17 Coldwell Banker?
18    A.   No, I cannot surmise that.  I
19 can surmise there are damages.
20    Q.   Can you determine -- can you
21 reach the conclusion that damages were not
22 caused by Coldwell Banker?
23    A.   No.
24    Q.   Did you reach any conclusion

10 (Pages 34 - 37)

Linda Alexander

1
2  that damages, reputational damages, were
3  caused by the lawsuit between Mr. Binder
4  and his partners?
5      A.  Yes.
6      Q.  And what was that conclusion?
7      A.  That the -- once the lawsuits
8  became public there were tremendous
9  damages that were caused by the ensuing
10 media coverage, and that is my expertise.
11     Q.  Do you recall what in
12 particular about the allegations of that
13 lawsuit were so damaging?
14     A.  Can you ask me that again?
15     Q.  I can try.
16     A.  It seems like such a --
17     Q.  Can you tell me in particular
18 what about the allegations of that
19 lawsuit were so damaging?
20     A.  They -- everything.
21     Q.  Prior to that Bellmarc had had
22 some business issues --
23         MR. PHILLIPS:  Strike that.
24     Q.  Prior to that Bellmarc had had
25 situations where it closed or, I'm sorry,

Linda Alexander

1
2  was evicted from an office, I believe it
3  was on the Upper West Side; do you recall
4  that?
5      A.  Yes, but your timeframe is
6  wrong, that's what.
7      Q.  Why is my timeframe wrong?
8      A.  Because everything seemed to --
9  with the coverage, it -- it started to --
10 to snowball, and by the time that they
11 got to the eviction the damage had
12 already been done.
13     Q.  So you don't recall if the
14 eviction was before the lawsuit with the
15 partners?
16     A.  I cannot say for sure.
17     Q.  Okay.
18     A.  I'd have to review -- I'd have
19 to review because I did study the
20 coverage.
21     Q.  Actually the point where I was
22 going to was that the economic problems
23 of a business are different from the kind
24 of stuff that was alleged in the suit
25 between partners, are they not, in terms

Linda Alexander

1
2  of reputation?
3      A.  Not in this case.
4      Q.  Have you found in your
5  expertise that it's easier to overcome
6  bad economic news than it is to overcome
7  other types of allegations against a
8  business?
9      A.  Sometimes.
10     Q.  In what times would it be and
11 what times would it not be?
12     A.  Sometimes -- hypothetically.
13     Q.  Sure.
14     A.  Sometimes a company is not
15 doing well and they may get, well, they
16 had to close this office, but then they
17 come back with they've opened this
18 office, they've done this, they've
19 expanded, they're concentrating; so
20 that's actually a current message, this
21 office is concentrating.
22         So that in and of itself is not
23 enough to destroy a reputation of a -- of
24 a company.
25     Q.  Okay.

Linda Alexander

1
2          But then you added in
3  allegations of abuse, stealing money and
4  I think embezzlement was the word?
5      A.  Um hum.
6      Q.  Everything else that was in
7  that lawsuit between the parties, does
8  that take it to a different level?  Does
9  that change the analysis?
10     A.  Yes.
11     Q.  Why?
12     A.  Because then you're talking
13 about personal, personal malfeasance, is
14 that the right word?  Personal -- it
15 becomes a personalized account rather
16 than a company concentrating its
17 resources.
18     Q.  And if you take it to another
19 step where social media has said bad
20 reviews of a company, does that factor
21 into the reputation?
22     A.  Um hum, yes, it does.
23     Q.  How does it factor in?
24     A.  Because of individuals'
25 opinions, because there's no way to

11 (Pages 38 - 41)

Linda Alexander
1
2  determine whether this is a personal
3  vendetta, so that it has nothing to do
4  with news, per se, it has nothing to do
5  with editorial and it biases everything.
6          Not only that, with the digital
7  publications it's in there in perpetuity.
8      Q.   Because you can always find the
9  archive; right?
10     A.   You betcha.
11     Q.   Right.
12          In the first paragraph of
13  Alexander Exhibit 2 you write:  "It is my
14  opinion that the damage to Mr. Binder's
15  reputation is extensive."
16     A.   Where did I write that?
17     Q.   In the first paragraph.
18     A.   Oh, great.  I've got a memory
19  like a sieve today.  Yes, it is
20  extensive.
21     Q.   Was it also your opinion that
22  the damage to Bellmarc's reputation was
23  extensive?
24     A.   They're tied in, yes.  I think
25  -- I think when you think of Mr. Binder

Linda Alexander
1
2  you think of Bellmarc.
3      Q.   I just wanted to clarify that
4  that would have been both there?
5      A.   Yes.
6      Q.   Okay.
7          You state that the timeframe of
8  the negative coverage that you analyzed
9  is June 2013 through December 31, 2014;
10  why did you select that timeframe?
11     A.   Because that's where the
12  coverage, in my recollection -- again, I
13  don't have it in front of me -- my
14  recollection, that's when the coverage
15  turned from the dissolution of a
16  partnership into negative personalized
17  attacks.
18     Q.   And by that you meant
19  allegations in the lawsuit?
20     A.   I don't know if they were the
21  allegations in the lawsuit.  It was how
22  it was reported.
23          So the allegations in the
24  lawsuit presumably are what was reported,
25  but there was a lot of extra information

Linda Alexander
1
2  added to the coverage, and you could see
3  that in the tone of the coverage.
4      Q.   Do you recall what you mean?
5      A.   Specifically, some of the
6  headlines.
7      Q.   We will look at those documents
8  in a few minutes.  We will get to that.
9      A.   Yeah.
10     Q.   Would bad publicity after
11  December 31, 2014 be relevant to your
12  opinion?
13     A.   Yes, it's ongoing, but I think
14  the bulk of it -- the turn was during
15  that period.
16          MR. PHILLIPS:  Please mark this
17  as the next exhibit.
18          (Whereupon, the above-mentioned
19          documents bearing Bates numbers Linda
20          Alexander 000001 - 25 was marked
21          Alexander Exhibit 3 for
22          identification.)
23  CONTINUED EXAMINATION BY MR. PHILLIPS:
24     Q.   Ms. Alexander, I'm showing you
25  what's been marked as Alexander 3 for

Linda Alexander
1
2  identification.
3      A.   Okie-dokie.
4      Q.   Do you recognize these
5  documents?
6      A.   Sure, I printed them out.
7      Q.   I would note that I added a
8  footer at the bottom of the page that
9  provides a number to them.
10     A.   Okay.
11     Q.   Do you recall that you provided
12  25 pages to counsel who then provided
13  them to me?
14     A.   Yes.
15     Q.   And are these the 25 pages you
16  provided?
17     A.   Oh, I don't know.
18     Q.   Okay, fair enough.
19          MR. PHILLIPS:  I will represent
20  that I printed these out from what
21  Mr. Pittinsky provided to me after
22  putting the number at the bottom.
23  CONTINUED EXAMINATION BY MR. PHILLIPS:
24     Q.   Other than these 25 pages, did
25  you review any other information on the

12 (Pages 42 - 45)

Page 46

Linda Alexander

1
2  reputation of Mr. Binder or of Bellmarc?
3     A.   I had, yes.
4     Q.   What else did you review?
5     A.   I looked through history, media
6  history where it could be found.
7     Q.   What do you mean by that, you
8  looked through the internet?
9     A.   I looked through the internet,
10  yeah, and also I had some of, not many,
11  of my own records between 2002 and 2003
12  which I found an article of Quest, which
13  was a prominent publication in 2002.
14  They were great stories.
15     Q.   Is there any reason why you
16  didn't include those in the package
17  provided to counsel?
18     A.   Because we were dealing
19  specifically with this issue and those
20  predated this issue by a decade.
21     Q.   Did you use those other
22  articles to formulate your opinion on the
23  reputation of Mr. Binder or to assist you
24  in forming your opinion of Mr. Binder and
25  Bellmarc prior to the events presented

Page 47

Linda Alexander

1
2  here?
3     A.   Yes.
4     Q.   In formulating your report did
5  you have any discussions with Mr. Binder?
6     A.   No.
7     Q.   Did you have any discussions
8  with anyone else in the real estate
9  industry?
10     A.   No.
11     Q.   Did you have any discussions
12  with anyone else in the public relations
13  industry?
14     A.   No.
15        Caveat, outside of my team
16  discussed.
17     Q.   Understood.
18     A.   Yeah.
19     Q.   Going back to Alexander Exhibit
20  2, your report, on I guess it's the
21  second full paragraph on the first page,
22  you indicate that Bellmarc had a "stellar
23  reputation"; and you indicate the period
24  was approximately 2002 through about
25  2014; do you see that?

Page 48

Linda Alexander

1
2     A.   Yes.
3     Q.   What is your basis for saying
4  that Bellmarc had a "stellar reputation"?
5        MR. PITTINSKY:  I would just
6     object but you can answer.
7     A.   That was an industrywide
8  perception.
9     Q.   Are you saying that's your
10  personal knowledge?
11     A.   It was my personal perception.
12     Q.   Can you tell me what that was
13  formed from?
14     A.   I live in the small community
15  of real estate and Bellmarc was a highly
16  regarded -- highly regarded brokerage
17  firm and management firm.  It was simply
18  a highly regarded firm in our industry,
19  among others.
20     Q.   In that same sentence you say
21  the "reputation continued unimpeached for
22  another decade"; would that be the same
23  basis of your knowledge?
24     A.   Where are you reading from?
25     Q.   Second full paragraph.

Page 49

Linda Alexander

1
2        It says "That stellar
3  reputation continued unimpeached..."
4     A.   In 2002, absolutely.
5     Q.   Okay.
6        And the sentence before that
7  you speak of the Bellmarc comprehensive
8  training programs and skilled agents and
9  its recognition industrywide.  What was
10  your basis for that?
11     A.   Oh, beyond my personal
12  experience?
13     Q.   If it's your personal
14  experience then --
15     A.   It was my personal experience,
16  I had seen it and just, you know, this is
17  -- this is, again, this was the general
18  perception of Bellmarc, that it had the
19  best training program.
20        Many companies would seek out
21  Bellmarc-trained agents because they were
22  -- they were known to be the most -- they
23  had the most comprehensive background in
24  terms of the understanding of how to do
25  this kind of work.

13 (Pages 46 - 49)

Page 50

Linda Alexander

1
2    Q.   In that paragraph -- and I
3    think it mentions before -- that
4    Alexander Marketing was retained by
5    Bellmarc from 2002 to 2003.
6         What did you do for them during
7    that time?
8         A.   First of all I want to correct
9    that it was 2001.
10    Q.   Okay.
11    A.   I did not -- when I was writing
12    this I did not find earlier work that I
13    had done, so I want to clarify that.
14         So from 2001 to 2003 we were
15    their public -- Alexander Marketing was
16    their public relations representative.
17    Q.   Why did they have a PR
18    representative at that time?
19    A.   Most firms had a PR because you
20    were competing, it was a competitive
21    marketing tool.  It was a way to bring
22    your voice out and explain your -- ethos
23    of your firm and the benefits of your
24    firm.  It was a marketing tool.
25    Q.   Do you still retain any of the

Page 51

Linda Alexander

1
2    work you did for them back in that period
3    of time?
4         A.   No, that was the problem,
5    that's why -- I found something, that's
6    why I know.  I found one piece.
7    Everything in those days was done on
8    paper and print and kind of those files
9    are --
10    Q.   Gone?
11    A.   Yeah.
12    Q.   Okay.
13         On page 2 you have three bullet
14    points.
15    A.   Um hum.
16    Q.   Can you tell me where these
17    come from, what the source of these is?
18    A.   Yes, this is my perception on
19    this.  Again, we -- we have given
20    presentations to this effect, so this is
21    basically my language.
22    Q.   Okay.
23         And in the next paragraph on
24    page 2, the first full paragraph, you
25    indicate that you've attached an

Page 52

Linda Alexander

1
2    evaluation of "the estimated cost of what
3    will be required to return credibility to
4    Mr. Binder's impaired reputation and that
5    of the Bellmarc brand."
6         A.   Yup.
7         Q.   Is it your testimony or your
8    opinion that the estimated cost is the
9    same as the damages?
10    A.   No, I -- one, one is different
11    than the other.
12    Q.   How are they different?
13    A.   I can't surmise what the
14    damages were, per se, I don't know what
15    Mr. Binder and Bellmarc's revenue sources
16    were.  I can tell you how much it will
17    cost to work on renewing his estimated
18    cost and how much it will cost to renew
19    his reputation.
20    Q.   Okay.  Okay.
21         In your Analysis of Loss -
22    Reputation, the third and fourth pages of
23    your report?
24    A.   Third page?
25    Q.   Third page.

Page 53

Linda Alexander

1
2         MR. PITTINSKY:  I think he's
3    talking about this [indicating].
4         MR. PHILLIPS:  The Analysis of
5    Loss - Reputation.
6         THE WITNESS:  Analysis of Loss,
7    okay, so we're on the third page of
8    that, okay.
9         MR. PHILLIPS:  Right.
10   CONTINUED EXAMINATION BY MR. PHILLIPS:
11    Q.   About halfway down you have a
12    heading "Relevant Facts about Neil Binder
13    and The Bellmarc Group," and then you go
14    through about two-thirds of a page of
15    facts.
16         Can you tell me what the source
17    of these facts was.
18    A.   Oh, this was -- this was the --
19    this was based upon my research on his --
20    on his ink, his most recent coverage.
21    Q.   Meaning your research of most
22    recent media coverage of Bellmarc and
23    Mr. Binder?
24    A.   Pertaining to, yes.
25    Q.   Was this coverage before 2013?

14 (Pages 50 - 53)

Linda Alexander

1
2    A.   Some of it is, yes.
3    Q.   Did you print any of that out?
4    A.   Yes.
5    Q.   And is that part of what we
6  have marked as Alexander Exhibit 3?
7    A.   Yes, I hope so.  It was
8  initially printed out.
9    Q.   All right.
10        Let's go to Alexander Exhibit
11  3.  Alexander Exhibit 3 is 25 pages of
12  articles.
13        First of all most of these seem
14  to come from The Real Deal; correct?
15    A.   Yes.
16    Q.   Can you tell me what The Real
17  Deal is?
18    A.   The Real Deal is an industry
19  trade publication.
20    Q.   Who are the primary readers of
21  The Real Deal?
22    A.   The real estate community.
23    Q.   By that would you mean brokers?
24  Developers?
25    A.   Owners, investors, consultants,

Linda Alexander

1
2  lawyers, accountants.  Everyone who --
3  who -- everyone who has anything to do
4  with real estate tends to read The Real
5  Deal.
6    Q.   Okay.
7        The first one is an April 8,
8  2011 e-mail.  Can you tell me why you
9  included this one?
10    A.   Because I wanted to illustrate
11  the positive coverage he had been getting
12  up until then, and I couldn't find
13  anything before that because they weren't
14  publishing it, even though it was always
15  a digital publication for some reason I
16  couldn't find it.
17        So this -- I wanted to
18  illustrate the turning point and how
19  everything started to -- to present a
20  negative picture, whereas, prior to that
21  you had very positive -- positive
22  coverage.
23    Q.   Well, do you think this
24  particular e-mail or this particular
25  article is positive or neutral or how

Linda Alexander

1
2  would you describe it?
3    A.   This is positive/neutral.
4    Q.   The next one also is one page,
5  November 9, 2012.
6    A.   Yup.
7    Q.   Why was this one included?
8    A.   Because, again, this was it's
9  talk about mergers, they are going to
10  have 400 agents.  It's a very positive
11  message.  It's getting bigger and bigger;
12  correct.
13    Q.   This also is The Real Deal;
14  correct?
15    A.   Um hum.
16        MR. PITTINSKY:  You need answer
17  to yes or no.
18        THE WITNESS:  Okay, sorry.
19    A.   Yes.
20    Q.   The next one is August 2013,
21  and that looks like it's five pages;
22  correct?
23    A.   Yes.
24    Q.   Why was this one included?
25    A.   Because it illustrates that

Linda Alexander

1
2  Bellmarc was one of the top ten
3  companies, top 12 companies.
4    Q.   Can you point out for me where
5  Bellmarc is mentioned in here.
6    A.   It's actually in the chart and
7  you can't read the chart.  Anyway, I
8  think it was number five.
9    Q.   The chart on the first page?
10    A.   Yes, and there was another
11  chart too, hmmm.  Anyway.  Oh, here it
12  is.  Okay, there is a chart here,
13  Bellmarc.
14    Q.   On the second page of the
15  article?
16    A.   Yeah, yeah.
17    Q.   Which is page number 4?
18    A.   There is a chart here that
19  illustrates Bellmarc -- you can't see it.
20  Anyway, the charts -- one of the charts
21  indicated that Bellmarc was one of the
22  top five.
23    Q.   Okay.
24    A.   And that's why it was included.
25    Q.   But we can't read the chart on

15 (Pages 54 - 57)

Page 58

Linda Alexander

1          Linda Alexander
2  this copy; correct?
3     A.  No, sorry.
4     Q.  Let's skip to the next article,
5  it's on Bates number 8, that's the number
6  I put at the bottom of the page, June 13,
7  2013 article.
8     A.  Um hum.
9     Q.  Can you tell me why this
10 article was included?
11    A.  Yes, it talked about expansion
12 and growth.
13    Q.  And this is -- the headline is
14 "Bellmarc Group to become Coldwell Banker
15 franchise."  Why was that -- was it
16 neutral?  Good?  Bad?
17    A.  It was neutral, at this time at
18 this point a lot of the franchisees, a
19 lot of national brands were coming into
20 New York, so good.
21    Q.  Next article, July 19, 2013, it
22 looks like one page, headlines "Bellmarc
23 rental arm to open 100-agent office in
24 Midtown"; why was this one included?
25    A.  Because it was a positive

Page 59

Linda Alexander

1          Linda Alexander
2  message.
3     Q.  So opening an off of a hundred
4  agents was a positive message?
5     A.  Yes.
6     Q.  The next one, September 10,
7  2013, headlines "Coldwell Banker's back:
8  Why Bellmarc thinks it can succeed where
9  others failed"; why was this one
10 included?
11    A.  Because, again, it was a
12 positive article about their expertise
13 and why they were going to do well.
14    Q.  The next one, September 20,
15 2013, "10 must-read books on NYC real
16 estate"; why was this one included?
17    A.  Because Mr. Binder's book was
18 included as one of the top ten books to
19 read in the real estate industry, which
20 again established him, as has always
21 been, as an expert.
22    Q.  That's good?  Neutral?  Bad?
23    A.  It's positive.
24    Q.  The next one, July 19, 2013,
25 "Bellmarc rental arm to open 100-agent

Page 60

Linda Alexander

1          Linda Alexander
2  office in Midtown."
3     A.  Positive.
4     Q.  Is that the same as the other
5  one we just saw?
6     A.  I think so, yes.
7     Q.  It's the same office?
8     A.  Yes.
9     Q.  Yes, it's the same. .
10    A.  Yes, it is.
11    Q.  Oh, it's exactly the same.  All
12 right.
13        The next one, December 1, 2014,
14 it might be chronologically out of order,
15 but "Coldwell Banker Bellmarc Group
16 settles lawsuits"; why did you include
17 this one?
18    A.  It's neutral, it's not negative,
19 it's not positive, because it's just part
20 of the narrative.
21    Q.  It indicates that two of the
22 partners of the group are leaving; is
23 that neutral as well?
24    A.  If you read the quote, yes,
25 neutral.

Page 61

Linda Alexander

1          Linda Alexander
2     Q.  Next one, August 26, 2014,
3  headline "Bellmarc founder Neil Binder
4  allegedly misused company funds"; is that
5  article --
6        MR. PHILLIPS:  Strike that.
7     Q.  Why did you include this
8  article?
9     A.  Because that's the turning
10 point.  That illustrates the turning
11 point.
12    Q.  August 26, 2014?
13    A.  Um hum.
14        MR. PITTINSKY:  Yes or no.
15    A.  Yes.
16    Q.  I assume that this would be
17 negative?
18    A.  Yes.
19    Q.  And this is negative because of
20 all of the allegations about personal
21 stuff; is that correct?
22    A.  Yes.
23    Q.  Next page, August 26, 2014, and
24 it's a two-page article and the headline
25 is "Drug-addled exec raided employee

16 (Pages 58 - 61)

Page 62

Linda Alexander

1 Linda Alexander
2 healthcare fund for Hamptons home: suit."
3 Why did you include this one?
4    A.   To reinforce the turning point.
5    Q.   There is no actual indication
6 of what publication this was.  Is that
7 The Real Deal; do you recall?
8    A.   I'm sorry, it was The New York
9 Post, for some reason the masthead didn't
10 get printed, The New York Post.
11    Q.   Next one, October 15, 2014,
12 "Bellmarc agents flee firm as legal woes
13 mount"; why did you include this one?
14    A.   To illustrate the damage.
15    Q.   So this would be negative?
16    A.   Negative.
17    Q.   The next one, February 17,
18 2016, "Bellmarc screwed us out of the
19 commissions, we're suing: ex-agents"; why
20 did you include this one?
21    A.   Negative.
22    Q.   The next one is March 28, 2016,
23 "Receivership would put Bellmarc out of
24 business: Neil Binder"; why did you
25 include this one?

Page 63

1 Linda Alexander
2    A.   Negative.
3    Q.   Next one is April 20, 2016,
4 "Bellmarc may be booted from its last
5 Manhattan office"; why did you include
6 this one?
7    A.   Negative.
8    Q.   And that was the last one.
9    A.   Okay.
10    Q.   Now, you went back and looked
11 at --
12        MR. PHILLIPS:  Strike that.
13    Q.   When did you go back and pull
14 these articles?
15    A.   Around the same time -- I
16 believe it was around the same time that
17 I was putting everything together.
18    Q.   And you mean in the fall of
19 2017?
20    A.   Yes.
21    Q.   Would that have, in your
22 experience, limited the amount of
23 publicity you could have found from
24 2013/2014?
25    A.   I'm not sure what you're

Page 64

1 Linda Alexander
2 asking.
3    Q.   Would older articles have been
4 taken off the internet?
5    A.   Some would not -- older older
6 articles would not have made it to the
7 internet, so that's part of it.
8    Q.   Yes, but from 2013/2014 most of
9 them would have probably made it out?
10    A.   Yes, they would have still been
11 there.
12    Q.   Would they still be there in
13 2017?
14    A.   Most likely.
15    Q.   Would they still be there
16 today?
17    A.   Most likely.
18        MR. PITTINSKY:  You're showing
19 your age, David.
20        MR. PHILLIPS:  Please.
21    What time is it?
22    Time flies when you're having
23 fun.
24        THE WITNESS:  I was just going
25 to say that.  I'm glad you said it

Page 65

1 Linda Alexander
2 rather than I.
3 CONTINUED EXAMINATION BY MR. PHILLIPS:
4    Q.   All right.  Let's jump to the
5 last page of your report.
6    A.   Okay.
7    Q.   On this page you calculate the
8 cost to conduct a positive reputational
9 campaign for Mr. Binder and Bellmarc;
10 correct?
11    A.   Um hum.
12        MR. PITTINSKY:  You have to
13 answer yes or no, please.
14        THE WITNESS:  Yes.
15        MR. PITTINSKY:  Thanks.
16    Q.   Are there any prerequisites you
17 would need to see before this was
18 undertaken?  Would Bellmarc need to be in
19 business?
20    A.   No.
21    Q.   Would it need to be done with
22 all its litigations?
23    A.   No.
24    Q.   Would Mr. Binder need to be
25 done with all of his litigations?

17 (Pages 62 - 65)

Linda Alexander

1
2   A.   No.
3   Q.   In Step 2 you speak of
4 advertising.  Where in particular would
5 you advertise to resurrect Mr. Binder or
6 Mr. Bellmarc's representation?
7   A.   Social media.
8   Q.   Meaning Facebook?
9   A.   Google ads.
10   Q.   Google ads, okay.
11   A.   And -- and publications that
12 pertain to our industry.
13   Q.   Like The Real Deal?
14   A.   The Real Deal as well as
15 Crain's.
16   Q.   Okay.
17   A.   I have not put together a
18 whole -- but that -- that would be the
19 direction so that would be the estimate.
20   Q.   That's my next question, how
21 did you calculate that estimate?
22   A.   Based on the ad rates
23 primarily.
24   Q.   I'm sorry?
25   A.   Based upon advertising rates

Linda Alexander

1
2 and it's an estimate.
3   Q.   Well, what went into that?  Did
4 you figure X amount of ads per month?
5   A.   Yes.
6   Q.   All right.  How many ads per
7 month?
8   A.   Um, with -- with the social
9 media we would allocate 10 to $15,000 a
10 month in different social platforms,
11 social media platforms.
12   Q.   When you say "social media" are
13 you including the ads that run alongside
14 web pages?
15   A.   Some of them banners, we have
16 talked about banners as well as specific
17 ads.
18   Q.   When you go to like Yahoo News
19 or Google there's a --
20   A.   There's a banner.
21   Q.   Pops up on the side whether you
22 want it or not, and you're talking about
23 buying that; correct?
24   A.   Yes.
25   Q.   Okay.

Linda Alexander

1
2      Are you talking about -- are
3 you also talking about Facebook campaigns
4 or, what else, Instagram or whatever
5 there are?
6   A.   All of the above.
7   Q.   All of the above?
8   A.   Yes.
9   Q.   By periodicals you mean The
10 Real Deal and Crain's?
11   A.   Among, yes.  Not exclusively,
12 but yes.
13   Q.   You said 10 or $15,000 a month
14 for social media?
15   A.   Yes.
16   Q.   And is the other five or 10,000
17 for print publications?
18   A.   Print and digital.
19   Q.   And the first step, "Crisis
20 Management mode," how did you calculate
21 those costs?
22   A.   Based upon the hours that I
23 estimated, I calculated based upon my fee
24 structure.
25   Q.   Can you explain to me how you

Linda Alexander

1
2 did that, what the hours were and what
3 the fee structure is?
4   A.   No.
5      MR. PHILLIPS:  Please mark this
6 as the next exhibit.
7      (Whereupon, the above-mentioned
8 two-page article from the New York
9 Daily News, dated August 26, 2014 was
10 marked Alexander Exhibit 4 for
11 identification.)
12 CONTINUED EXAMINATION BY MR. PHILLIPS:
13   Q.   Ms. Alexander, I show you
14 what's been marked as Alexander Exhibit
15 4.
16   A.   Okay.
17   Q.   Have you seen that --
18   A.   No.
19   Q.   -- before?
20   A.   No.
21   Q.   That didn't come up in your
22 research?
23   A.   No.
24   Q.   Please take a moment to look
25 through it.

18 (Pages 66 - 69)

Linda Alexander
1
2     MR. PHILLIPS:  For the record
3  it's an article from the New York
4  Daily News, August 26, 2014.
5      (Witness peruses Alexander
6  Exhibit 4.)
7     MR. PITTINSKY:  Just for the
8  record I note part of it is
9  illegible.
10  CONTINUED EXAMINATION BY MR. PHILLIPS:
11  Q.   Have you read that article?
12  A.   I perused it.
13  Q.   Would you agree that this --
14     MR. PHILLIPS:  Strike that.
15  Q.   Would this article have
16  impacted on the reputation of Mr. Binder
17  or Bellmarc?
18  A.   Yes.
19  Q.   How would it impact?
20  A.   Negatively.
21  Q.   Would the fact that it was the
22  New York Daily News give it greater
23  weight than the other articles that we
24  looked at?
25  A.   No.

Linda Alexander
1
2  Q.   Doesn't it have a wider
3  distribution than The Real Deal?
4  A.   No.
5  Q.   Does the New York Daily News
6  reach a different audience than The Real
7  Deal?
8  A.   Yes.
9  Q.   What is the difference in the
10  audience?
11  A.   It -- it is not a Manhattan-
12  based audience, whereas, Bellmarc is a
13  Manhattan-based company.
14     Also, this is the old Daily
15  News where it's under new ownership, so
16  it's different reporting.
17     But, um, the impact would be at
18  a different -- different -- a different
19  readership.  It was primarily a
20  readership comprised of people in the
21  outer boroughs.
22  Q.   Would you also distinguish them
23  as being consumers versus the trade
24  organization?
25  A.   Yes.

Linda Alexander
1
2     But, now here's the thing, we
3  don't know if this is in the Business
4  section.  You don't know if this is --
5  you don't know where it appeared.  Was it
6  in the Metro section?  So I can't give
7  you my opinion on that.
8  Q.   If I asked you to assume there
9  was a link on the front page of the Daily
10  News would that matter?
11  A.   That would matter.
12  Q.   How would it matter?
13  A.   It would be more damage.
14  Q.   Why do you say that The Daily
15  News only reaches the outer boroughs?
16  A.   That was the primary audience
17  at that time in 2014.  They have since
18  tried to reposition themselves in 2017,
19  and that's it.
20  Q.   What daily newspapers or more
21  consumer-oriented media reached Manhattan
22  at that time?
23  A.   In my opinion The New York Post
24  article.
25  Q.   So the one that you showed us

Linda Alexander
1
2  before?
3  A.   Yes.
4  Q.   So that would have reached the
5  consumer in here?
6  A.   And the headline was more
7  sensational.
8  Q.   This one [indicating]?
9  A.   "Drug-addled."
10  Q.   The New York Post article?
11  A.   Yes.
12  Q.   Okay.
13     MR. PHILLIPS:  Please mark this
14  as the next exhibit.
15     (Whereupon, the above-mentioned
16  two-page Habitat Magazine article
17  entitled Habitat Legal/Financial
18  Bellmarc Group Partners Sue
19  Co-Founder, Claiming Embezzlement
20  was marked Alexander Exhibit 5 for
21  identification.)
22     THE WITNESS:  Do we get a break
23  for lunch.
24     MR. PHILLIPS:  We can probably
25  take a break if you want.  I think I

Page 74

Linda Alexander

1
2  only have about a half hour left.
3      THE WITNESS:  My stomach is
4  grumbling but I'm okay.
5  CONTINUED EXAMINATION BY MR. PHILLIPS:
6      Q.   Let me show you what has been
7  marked as Alexander Exhibit 5.
8      MR. PITTINSKY:  That's a
9  lawyer's half hour.
10     THE WITNESS:  That's okay.
11     Q.   Let me show you what has been
12  marked as Alexander 5.  Have you ever
13  seen that one before?
14     A.   No.  That would not be highly
15  optimized, it's Habitat.
16     MR. PITTINSKY:  Let him ask the
17  question, please.
18     Q.   Why did you say that?
19     A.   Because of the publication.
20     Q.   Tell me what you mean by that.
21     A.   Let's see, what year is this,
22  2014?  It was still an in-print
23  publication and it had a circulation of
24  about 12 to 15,000, I'm estimating, but a
25  relatively limited circulation.

Page 75

Linda Alexander

1
2      Q.   And what was the nature of the
3  circulation?  What kind of consumers?
4  What kind of readership did it have?
5      A.   Primarily co-op shareholders
6  and condominium owners.
7      Q.   In Manhattan or what?
8      A.   Yes.
9      Q.   If you notice they do quote The
10 Daily News article.
11     A.   I'm sure they did.  They
12 attributed it to the --
13     MR. PITTINSKY:  You have to
14 finish the sentence.
15     THE WITNESS:  They attributed
16 it as they should have to The Daily
17 News since they were --
18     Q.   I notice that your research
19 doesn't seem to include any social media;
20 correct?
21     A.   No, at the time it did not.  It
22 didn't need to.
23     Q.   Why not?
24     A.   Because -- because I can
25 surmise what was happening on social

Page 76

Linda Alexander

1
2  media would be exacerbated by the
3  negative coverage.
4      Q.   Tell me what you surmised.
5      A.   That it would be terrible.
6      MR. PHILLIPS:  Please mark this
7  as the next exhibit.
8      (Whereupon, the above-mentioned
9  two-page document from review page of
10 the Bellmarc Realty LLC Facebook page
11 was marked Alexander Exhibit 6 for
12 identification.)
13     MR. PITTINSKY:  Thank you.
14 CONTINUED EXAMINATION BY MR. PHILLIPS:
15     Q.   Ms. Alexander, I show you what
16 has been marked for identification as
17 Alexander 6.
18     A.   Yes.
19     Q.   Have you seen this before?
20     A.   No.
21     Q.   I will represent to you that
22 this was printed from the review page of
23 the Bellmarc Realty LLC Facebook page.
24     A.   Um hum.
25     Q.   Can you please take a moment to

Page 77

Linda Alexander

1
2  read through that, and I'll also explain
3  that the first page is a screen shot of
4  the review page and the second page is a
5  screen shot of the expansion of the first
6  review.
7      MR. PITTINSKY:  And you're
8  stating you printed this?
9      MR. PHILLIPS:  I printed this,
10 yes.
11     MR. PITTINSKY:  Okay.
12     (Witness peruses Alexander
13 Exhibit 6.)
14     MR. PITTINSKY:  Off the record.
15     (Discussion held off the
16 record.)
17 CONTINUED EXAMINATION BY MR. PHILLIPS:
18     Q.   Have you read through that?
19     A.   Yes.
20     Q.   How would this impact on the
21 reputation of Bellmarc?
22     A.   Negatively.
23     Q.   And would this be a different
24 impact to the reputation than what we
25 have seen so far here today?

20 (Pages 74 - 77)

Linda Alexander

1
2  A.  Yes.
3  Q.  And why is that?
4  A.  It would exacerbate what's
5  already been said because it's social
6  media.
7  Q.  And it's also on a consumer
8  base isn't it?
9  A.  A consumer base.
10  Q.  So you said before that would
11  stay around for a long period of time;
12  correct?
13  A.  They all will.
14  Q.  I will also ask you to assume
15  that there are a total of 13 reviews on
16  the Bellmarc page.  There were these five
17  that I have before you and then there
18  were eight positive reviews, that each
19  gave Bellmarc a five with no comment, one
20  comment said something like yeah, of
21  those eight reviews any idiot like me
22  could see that six of them were done by
23  Bellmarc employees, either brokers or the
24  accounting managers, and two of the
25  people, the other two didn't live in

Linda Alexander

1
2  New York, so when you looked at that what
3  would you surmise about the review page?
4  MR. PITTINSKY:  Assuming that
5  what you just stated is factually
6  correct?
7  MR. PHILLIPS:  Exactly.
8  A.  You know, there is no way to
9  know, there is no way to know which is,
10  and I hate to say it, which is real and
11  which isn't, so...
12  Q.  Would that as a consumer make
13  you question the positive reviews?
14  A.  I don't know.
15  MR. PHILLIPS:  She answered the
16  question, that's fine.
17  MR. PITTINSKY:  Just answer the
18  question.
19  Q.  On the basis of what we looked
20  at here today, including the Facebook
21  page I just provided you, isn't it true
22  that the only logical conclusion is that
23  the reputational damage to Bellmarc and
24  Mr. Binder were caused by either the
25  dispute with his partners or by poor

Linda Alexander

1
2  service as represented in the Facebook
3  page?
4  A.  There's no simple answer to
5  this.  No, I can't answer that.
6  MR. PHILLIPS:  I have no
7  further questions.
8  Actually, you know what, let me
9  just pause for a minute and speak to
10  my associate.
11  (Whereupon, a brief recess was
12  taken.)
13  MR. PHILLIPS:  I have no
14  further questions.
15  THE WITNESS:  Thank you.
16  [TIME NOTED:  12:40 p.m.]
17
18  _____
LINDA ALEXANDER
19
20
_____
21  Subscribed and sworn to
before me this _____
22  day of _____,
2018
23
24
_____
25  Notary Public

1
2  C E R T I F I C A T I O N
3
4
5  I, KATHLEEN PIAZZA LUONGO, a
6  Notary Public for and within the State of
7  New York, do hereby certify that the
8  foregoing witness, LINDA ALEXANDER was duly
9  sworn on the date indicated, and that the
10  foregoing is a true and accurate
11  transcription of my stenographic notes.
12  I further certify that I am not
13  employed by nor related to any party to
14  this action.
15
16  *Kathleen Piazza Luongo*
_____
17  KATHLEEN PIAZZA LUONGO
18
19
20
21
22
23
24
25

21 (Pages 78 - 81)

Page 82

```
 1            I N D E X
 2
 3
     WITNESS
 4
 5     Linda Alexander
 6
     EXAMINATION BY              PAGE
 7
 8     Mr. Phillips         4-80
 9
           E X H I B I T S
10
11
12   ALEXANDER      DESCRIPTION      PAGE
13
     Exhibit 1     two-page Curriculum  4
14             Vitae of Linda S.
               Alexander
15
16   Exhibit 2     letter dated       25
               November 30, 2017,
17             from Alexander
               Marketing Corp.
18             to Laurence D.
               Pittinsky, with
19             attached report
20
     Exhibit 3     documents bearing   44
21             Bates numbers Linda
               Alexander 000001 - 25
22
23   Exhibit 4     two-page article    69
               from the New York
24             Daily News, dated
               August 26, 2014
25
```

Page 83

```
 1   [Cont'd.]
 2
     ALEXANDER      DESCRIPTION      PAGE
 3
 4   Exhibit 5     two-page Habitat   73
               Magazine article
 5             entitled Habitat
               Legal/Financial
 6             Bellmarc Group
               Partners Sue
 7             Co-Founder, Claiming
               Embezzlement
 8
 9   Exhibit 6     two-page document   75
               from review page
10             of the Bellmarc
               Realty LLC Facebook
11             page
12
13   EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions