<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **COLDWELL BANKER REAL ESTATE, LLC,** *Plaintiff,* v. **THE BELLMARC GROUP LLC, et al.,** *Defendants.* | Civil Action No. 14-7926 FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**I.   INTRODUCTION**

Plaintiff Coldwell Banker Real Estate LLC's ("Coldwell Banker" or "Plaintiff") brought this breach of contract action against Defendants The Bellmarc Group LLC, Bellmarc Downtown LLC, Bellmarc Brokerage Midtown Inc., Bellmarc East LLC, Bellmarc West LLC, Bellmarc Simone Song Inc., Bellmark Gramercy Chelsea Inc. (collectively the "Bellmarc Group"), AC Lawrence Real Estate LLC ("AC Lawrence" and with the Bellmarc Group, the "Franchisees") and Neil Binder ("Binder" and together with the Franchisees, "Defendants").

The Court conducted a two-day bench trial on May 19-20, 2021, in which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and evidence. For the reasons set forth below, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). The Court finds that Defendants breached the operative Franchise Agreements and accordingly judgment will be entered for Plaintiff.

1

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 175 Park Avenue, Madison, New Jersey. Final Pretrial Order, Stipulated Facts ¶ 1, ECF No. 186.

2. The Franchisees are limited liability companies organized and existing under the laws of New York, and all members are residents of the State of New York. Stipulated Facts ¶¶ 2-9.

3. Binder is an individual and citizen of the State of New York who has been employed in real estate in New York City since 1977. Stipulated Facts ¶¶ 12, 15.

### B. The Parties' Operations

4. Coldwell Banker was founded in 1906 and is the oldest national real estate brand in the United States, handling over 750,000 transactions annually and generating over $350 million in revenue. T1 14:7-25.[1]

5. Coldwell Banker has the exclusive right to use and sublicense certain trade names, trademarks, and service marks, including the name "Coldwell Banker"® (collectively referred to as the "Coldwell Banker Marks"). The Coldwell Banker Marks have been registered on the Principal Register of the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with government agencies of foreign countries. Stipulated Facts ¶ 18.

---

[1] The Court refers to the trial transcript from May 19, 2021, ECF No. 235, as "T1." The Court refers to the trial transcript from May 20, 2021, ECF No. 236, as "T2."

6. The Bellmarc Group, owned by Binder, and AC Lawrence, owned by Anthony DeGrotta ("DeGrotta") and Larry Friedman ("Friedman") combined operations in or about October 1, 2012 and began doing business as of January 1, 2013. Stipulated Facts ¶ 13.

**C. Terms of the Franchise Agreements**

7. Coldwell Banker and the Franchisees entered into a Real Estate Franchise Agreement dated March 27, 2013, as amended by the following addendums: Addendum to Franchise Agreement (dated March 27, 2013), Amendment to Franchise Agreement (dated May 13, 2013), Amendment to the Addendum to Franchise Agreement (dated May 22, 2013), First Addendum to Amendment to Franchise Agreement (dated October 24, 2013), Master Brand Marketing Fund Addendum to Franchise Agreement (dated November 8, 2013), and Third Addendum to Amendment to Franchise Agreement (dated December 10, 2013). Id. ¶ 19; Exs. P-1, P-2, P-4, P-5, P-6, P-7, P-8 (the "Franchise Agreements").

8. Initially, the term of the Franchise Agreements was 10 years, which was later amended to 20 years. Exs. P-1 § 1.5; P-2 § 25.6.

9. The Franchisee Agreements required the "Owners" to actively manage and supervise the business operations of the Franchisees. Stipulated Facts ¶ 23. The Owners of the Franchisees include (1) Defendant Nice Idea, LLC, wholly owned by Binder, and (2) Defendant All Enterprises, LLC, which was owned by DeGrotta, Friedman, Lenny Flausso, and Frank Sanchez at the time the Franchise Agreements were executed. Id. ¶¶ 24-26.

10. Binder, Nice Idea, LLC, and All Enterprises, LLC each executed and conveyed to Coldwell Banker a Guaranty of Payment and Performance of the obligations of the Franchisees under the Franchise Agreements. Id. ¶ 35.

11. The Franchise Agreements required the Franchisees to report transactions to Coldwell Banker. Failure to do so is an event of default under the Franchise Agreements. Id. ¶ 29.

12. The Franchise Agreements required the Franchisees to maintain accurate financial statements and records and provide the same periodically to Coldwell Banker. Id. ¶ 31.

13. The Franchise Agreements required the Franchisees to pay Coldwell Banker franchise Royalty Fees, marketing fees, interest, and other amounts. Ex. P-1 §§ 7- 8, 11.

14. As for Royalty Fees, the Franchisees were to pay Coldwell Bank 6% royalty, calculated from the gross revenues of the Franchisees at the time of a closing. Id. § 7.1.1.

15. In one of the initial addendums before the franchise began operating, Coldwell Banker agreed to reduce the Royalty Fee to 2.25%, so long as the Franchisees were in compliance with the Franchise Agreements. Ex. P-2 § 25.3.

16. Royalty Fees were due immediately after the closing. Ex. P-1 § 7.1.1; T1 22:8-23:8.

17. As for marketing fees, the Franchisees were also required to pay into the "Brand Marketing Fund" ("BMF" or "NAF"), which was used for the promotion of the Coldwell Banker brand nationally. T1 23:19-24:8.

18. The BMF contribution rate was calculated as a percentage of gross revenues of the Franchisees. The Franchise Agreements detailed that the Franchisees' BMF contribution rates were 2.5% of the first $2 million in gross revenues reported during a calendar year,[2] and then 0.5% of revenues thereafter. Ex. P-1 § 8.1.

19. The Franchise Agreements specified: "To be eligible for the reduced BMF contribution rates . . . you must have reported and paid Royalty Fees and BMF contributions on all Gross

---

[2] Coldwell Banker also agreed to split the $2 million threshold for a reduced BMF fee between the Bellmarc Group and AC Lawrence, so that the Bellmarc Group had to report and pay royalties and BMF at 2.5% on $1.3 million in gross revenues in order to achieve the reduced rate of 0.5%. Ex. P-5 §§ 25.17, 25.18.

Revenue. . . . [A]ll Gross Revenue on which Royalty Fees and BMF contributions are not paid within 30 days of accrual will be subject to a 2.5 percent BMF contribution." Ex. P-5 §§ 25.17, 25.18. In other words, the lower BMF contribution range is operable only if the Franchisees pay their Royalty Fees when due immediately after a closing. T1 26:6-8.

20. Coldwell Banker agreed to use BMF contributions paid by the Franchisees to fund brand marketing in Manhattan, where the Franchisees were based. Ex. P-2 § 25.1.

21. Pursuant to the Franchise Agreements, the Franchisees agreed that the Royalty Fees and BMF contributions had to be paid regardless of whether any sums were due or might become due to the Franchisees from Coldwell Banker. Ex. P-1 §§ 7.3, 11.2.

22. If any payments under the Franchise Agreements, including Royalty Fees and BMF contributions, were more than 10 days late, they would bear interest thereafter at 18% per annum. Id. § 11.2.

23. The Franchise Agreements provided for "conversion funding," which Coldwell Banker offered to certain new franchisees to help offset costs associated with moving from an independent brokerage to a franchise-branded broker. Ex. P-2 §§ 25.8, 25.9; T1 31:19-32:3.

24. The "conversion funding" functioned as a loan that Coldwell Banker would forgive over time, but only so long as the Franchisees hit certain gross revenue thresholds and remained in compliance with the Franchise Agreements. T1 33:6-14. If the Franchisees were not in compliance, the agreement provided that the loans had to be paid back to Coldwell Banker.[3]

---

[3] According to the terms of the Conversion Promissory Notes, Coldwell Banker agreed to forgive one-eighteenth of the amount due over the course of 18 years, provided that beginning at the end of the first calendar year after the Notes were executed (December 31, 2014), Defendants were not in default of the Franchise Agreement and had met established annual royalty quotas. Exs. P-13, P-15. As explained infra, Defendants were in default as of December 31, 2014.

5

25. Specifically, under the terms of the Franchise Agreements, initial conversion funding of $1,250,000 (the "first conversion funding") was paid to the Franchisees on or before June 13, 2013, the date they officially became franchisees. T1 46:23-47:17, 21:5-16. When the Franchisees achieved $8.5 million in gross revenues, they were eligible for an additional $375,000 in conversion funds (the "second conversion funding"), as long as they remained current in reporting and payments due under the Franchise Agreements. Ex. P-2 §§ 25.8, 25.9.

26. When the Franchisees struggled to meet this $8.5 million threshold to receive additional conversion funding, Coldwell Banker adopted a new method of conversion fund payments, agreeing to release $187,500 once the Franchisees reached $4,250,000 in gross revenues, essentially splitting the second conversion funding in half. T1 45:1-25; Ex. P-8.

27. The details of the conversion funding were provided in Conversion Promissory Notes dated May 15, 2013 and December 13, 2013, which Binder executed. See Exs. P-13, P-15.

28. The Conversion Promissory Notes provided that Coldwell Banker may declare the notes in default and accelerate the amounts due if, among other things, any of the Defendants were in default of the Franchise Agreements, or upon termination or expiration of the Franchise Agreements. Id.

29. In the Conversion Promissory Note, Defendants agreed to pay Coldwell Banker's reasonable attorneys' fees, including in-house attorneys, court costs and all costs of collection in the event that Coldwell Banker had to take legal action to enforce the notes. Id.

30. In order to secure the amounts due under the Conversion Promissory Notes and the Franchise Agreements, each Franchisee executed and delivered Security Agreements to Coldwell Banker. Stipulated Facts ¶¶ 13, 17; see also Exs. P-16 to P-24.

31. The Security Agreements granted Coldwell Banker a lien and security interest in identified property owned by Defendants. See, e.g., P-16. According to the terms of the Security Agreements, default occurs upon failure to pay any amount when due under the terms and provisions of the notes or the Franchise Agreements and, upon default, Coldwell Banker has the right to demand possession of the collateral, among other remedies. See, e.g., id. §§ 2, 3.

32. The Security Agreements provided that the prevailing party is entitled to reasonable attorneys' fees and court costs in the event of litigation. See, e.g., id. § 6(g).

33. Binder executed the Security Agreements on behalf of the Franchisees. Exs. P-16 to P-24.

34. The Franchise Agreements granted the Franchisees a license to the use the Coldwell Banker Marks until termination of the Franchise Agreements. Ex. P-1 § 4.

35. The Franchise Agreements provided for curable and non-curable defaults.

36. Curable defaults included failure to timely pay Royalty Fees or BMF contributions. Under the Franchise Agreements, the Franchisees were given 30 days, after receiving written notice, to correct curable defaults. Ex. P-1 § 16.2.3. That said, a second instance of a curable default within 12 months of the first is a non-curable default. Id. § 16.2.4.5.

37. A non-curable default allowed Coldwell Banker to terminate the Franchise Agreements without advance notice or an opportunity to cure. Id. § 16.2.4.

38. Upon termination of the Franchise Agreements, the Franchisees were liable for monetary and non-monetary obligations.

39. In terms of monetary obligations, the Franchisees were required to pay (1) all sums due or accelerated, with interest accruing at 18%, Ex. P-1 §§ 11.2, 16.7; (2) liquidated damages "equal to the combined monthly average of Royalty Fees, BMF contributions, and any other fees . . . payable from the Opening Date through the date of early termination, multiplied by the less of (i) 36 or (ii) the number of full months remaining in the Term," calculated at an 8% discount rate, id. § 16.7.2;[4] and (3) costs incurred by Coldwell Banker in enforcing its rights under the Franchise Agreements, including reasonable attorneys' fees, court costs, expert fees, costs of investigation and other litigation expenses, id. § 22.11.

40. In terms of non-monetary obligations, the Franchisees were required to return all of Coldwell Banker's property being used by the Franchisees and cease using the Coldwell Banker Marks.[5] Id. §§ 16.4, 16.5.

41. The Franchise Agreements are fully integrated contracts. See ECF No. 223.[6]

42. Nothing in the Franchise Agreements obligates Coldwell Banker to reimburse Defendants for any advertising expenses. See ECF No. 134 at 4 n.5.[7]

---

[4] The parties agreed that liquidated damages were necessary because it was "impractical or extremely difficult to calculate the actual amount [the Franchisees] would have been obligated to pay as Royalty Fees, BMF Contributions and any other fees due under this Agreement through the Expiration Date." Ex. P-1 § 16.7.2.

[5] Pursuant to Section 16.6 of the Franchise Agreements, the Franchisees acknowledged that Coldwell Banker had no adequate remedy in the event that the Franchisees engaged in unauthorized post-termination use of the Coldwell Banker Marks and expressly agreed that Coldwell Banker may obtain an injunction and/or temporary restraining order to terminate such use.

[6] The Court previously found this fact in dismissing Defendants' counterclaim for fraudulent inducement. See ECF No. 209.

[7] In a prior order dismissing Defendants' counterclaim, the Court found there to be no material dispute regarding this fact. ECF No. 134 at 4 n.5.

43. The Franchise Agreements and Franchise Disclosure Documents provide that referrals between the Franchisees and other Coldwell Banker offices and agents could not be expected or guaranteed. See Ex. P-3 § 12.

44. Nothing in the Franchise Agreements required Plaintiff to adjust its rental system in order to accommodate Defendants' needs. The Franchise Agreements explicitly state that systems developed by Coldwell Banker "are licensed and distributed on an 'as is' basis," and that Coldwell Banker would "use [its] best efforts to provide support, limited solely to our issued applications." See Ex. P-1 § 9.4.

**D. Parties' Relationship Under the Franchise Agreements & Termination**

45. On June 13, 2013 (the "impact date"), the Franchisees became branded as a Coldwell Banker franchise. Stipulated Facts ¶¶ 129-30.

46. By June 29, 2013, the Franchisees were late remitting payments to Coldwell Banker, T1 56:1-22; Ex. P-189, and as of November 1, 2013, the Franchisees remained late in payments and were over 30 days late in payments. T1 58:17-59:7; Ex. P-178.[8]

47. During this time, Binder admitted that the Franchisees were under serious financial strain. Stipulated Facts ¶¶ 112-15.

48. By January 2, 2014, however, Coldwell Banker verified that the Franchisees were current on their obligations and on January 6, 2014, Coldwell Banker released the first half of the second conversion funding to the Franchisees. T1 70:3-17; Ex. P-105.

49. On January 8, 2014, after receiving the first half of the second conversion funding, Defendants stopped paying Royalty Fees and BMF contribution. T2 74:25-75:7.

---

[8] Additionally, an audit of Defendants' books and records in the fall of 2013 revealed that $11,074.56 in Royalty Fees due to Coldwell Banker had not been reported by Defendants. Stipulated Facts ¶ 128.

50. According to Binder, he withheld these contributions in the hopes that Coldwell Banker would offset reimbursements for advertising costs that he thought Defendants were owed. 10/24/16 Binder Dep. 182:1-19. Coldwell Banker denied Defendants' request for an offset. T1 87:24-88:23; T2 86:15-16.

51. As a result of Defendants' failure to pay contributions, Coldwell Banker declared Defendants delinquent in January 2014. Stipulated Facts ¶ 134. Defendants were delinquent until the Franchise Agreements were terminated in December 2014. T1 72:1-77:19; see generally Ex. P-35.[9]

52. Throughout the delinquency period, Coldwell Banker repeatedly communicated with Defendants about their outstanding balance. For example, in a meeting held in February 2014, Coldwell Banker informed Defendants that they had to pay all past due fees prior to any distributions from Coldwell Banker. Stipulated Facts ¶ 116.[10] Coldwell Banker also sent letters and emails dated March 26, 2014, April 15, 2014, April 29, 2014, and July 10, 2014, reminding Defendants that they owed fees that were past due. T1 88:24-91:13; Exs. P-101, P-132, P-136, P-143.

53. In the spring of 2014, Binder informed Coldwell Banker that he had arranged a loan, secured by real estate he owned in New Jersey, that he would use to bring the Franchisees' contribution payments current. Stipulated Facts ¶ 117; 10/24/16 Binder Dep. 208:7-209:3. Then, by email dated June 11, 2014, Binder advised Coldwell Banker that Defendants

---

[9] During this time, the Bellmarc Group stopped making payments. AC Lawrence remained current on payments until October 2014. T1 76:25-77:19; Ex. P-35, at BD 00519.

[10] Although this fact is stipulated to, Defendants assert that prior to March 26, 2014, they "did not receive a single notice or other indicia that Plaintiff considered them to be making payments in an untimely manner." Defendants' Rebuttal to Plaintiff's Summation and proposed Findings of Fact and Conclusions of Law ("Def. Reply") ¶ 1, ECF No. 234. Because factual stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact," it "is conclusive in the case." Christian Legal Soc'y Chapter of the Univ. of Cal., 561 U.S. 661, 677-78 (2010) (quotation marks and citations omitted).

would "fully" pay the outstanding contribution payments by the end of the week. T1 91:14-92:1; Ex. P-102.

54. After not receiving the delinquent contributions, Coldwell Banker issued a Notice of Non-Compliance by letter on July 29, 2014. Stipulated Facts ¶ 60; Ex. P-26. The Notice of Non-Compliance asserted that the Franchisees had committed monetary and non-monetary defaults under the Franchise Agreements and demanded that the Franchisees pay all past due fees and comply with certain non-monetary obligations under the Franchise Agreement by August 28, 2014. See id. The Notice stated that the dues owed totaled $291,880.90. Stipulated Facts ¶ 62; Ex. P-26. The Bellmarc Group received the Notice of Non-Compliance, and Binder received the Notice and did not respond. Stipulated Facts ¶ 61; 1/9/2019 Binder Dep. 506:16-507:11. Defendants did not pay Coldwell Banker the dues demanded by the Notice of Non-Compliance. Stipulated Facts ¶ 64.

55. By letter dated August 29, 2014, Coldwell Banker issued a Notice of Continuing Default, asserting that Franchisees failed to cure the defaults detailed in the Notice of Non-Compliance and that past dues under the Franchise Agreement had increased to $276,545 as of August 26, 2014. Id. ¶ 65; Ex. P-27. Although the Notice of Continuing Default was actually a notice of a second curable default and thus could have been treated as a non-curable default, Coldwell Banker schedule a meeting with a representative of the Franchisees to discuss potential cure of the Franchisees' outstanding defaults under the Franchise Agreements. Stipulated Facts ¶ 67. Although the Bellmarc Group and Binder confirmed receipt of the Notice of Continuing Default, Binder did not attend this meeting. Id. ¶ 66; T1 96:25-97:5; T2 150:2-20.

56. Finally, by letter dated September 22, 2014, Coldwell Banker issued a Notice of Default and Intent to Terminate Franchise Agreements ("Default/Termination Notice"), alleging that the Franchisees had committed monetary defaults under the Franchise Agreements and demanding the Franchisees pay all amounts due—$372,807.10 as of September 18, 2014— by October 23, 2014 (the "Cure Date"). Stipulated Facts ¶¶ 74-76; Ex. P-30. The Default/Termination Notice provided that if the Franchisees failed to pay the amount due by or before the Cure Date, the Franchise Agreements would be terminated effective October 24, 2014 without additional notice from Coldwell Banker. Stipulated Facts ¶ 78; Ex. P-30.

57. By separate correspondence dated September 22, 2014, Coldwell Banker alleged that the Franchisees were in default under the respective Security Agreements. Id. ¶ 81; Ex. P-31 (the "Demands to Assemble and Preserve Collateral"). The Demands to Assemble and Preserve Collateral required each Franchisee to assemble and make available the collateral for Coldwell Banker's inspection and possession. Id. They also advised that Coldwell Banker objected to the use of the collateral or the proceeds of collateral for any purpose other than payment to Coldwell Banker for the amount due. Id.

58. By letter dated October 1, 2014, Coldwell Banker notified the Franchisees that they were in default under the Promissory Notes and advised them that they were not eligible for loan forgiveness, additional funding, or other benefits provided for by the terms of the Franchise Agreements. Stipulated Facts ¶ 83; Ex. P-32 (the "Notice of Default Under Note").[11]

---

[11] While this was ongoing, there was clear internal dysfunction between Binder, DeGrotta, and Friedman. On August 25, 2014, DeGrotta and Friedman, individually and on behalf of the Franchisees and All Enterprises, filed a complaint against Binder and Nice Idea in the New York Supreme Court (the "Supreme Court Action"). Stipulated Facts ¶ 68. DeGrotta and Friedman alleged that the defendants engaged in illicit and wrongful acts in violation of the Franchisees' operating agreements and to the legal and financial detriment of the plaintiffs. Id. ¶ 69. Among other things, the plaintiffs in the Supreme Court Action sought the appointment of a receiver for the Franchisees. Id. ¶ 70. Coldwell

59. Ultimately, the Franchise Agreements were terminated by Coldwell Banker effective December 18, 2014 due to the Franchisees' failure to cure the defaults. Stipulated Facts ¶ 48; Ex. P-35 (the "Termination Notice").

60. Coldwell Banker also demanded that the Franchisees satisfy their post termination obligations provided for in the Franchise Agreements, including immediate payment of $2,146,001.67 known to be due under the Franchise Agreements, comprised of: (1) $422,151.39 in Royalty Fees and BMF contributions as of December 15, 2014;[12] (2) $1,640,769.33 in liquidated damages; and (3) $83,080.95 in attorneys' fees, costs of investigation, court costs, and other litigation expenses incurred as of November 30, 2014. Stipulated Facts ¶ 97; Ex. P-35.

---

Banker was largely uninvolved in the Supreme Court Action, intervening only with respect to the request for the appointment of a receiver for the Franchisees. Id. ¶ 71.

On September 8, 2014, a stipulated order was entered in the Supreme Court Action, which provided that the Franchisees "shall report and pay all fees to [Coldwell Banker] pursuant to the terms of the Franchise Agreement[s]." Id. ¶ 72. On September 11, 2014, a judge again ordered that the Franchisees report and pay transactions to Coldwell Banker pursuant to the Franchise Agreements subsequent to September 8, 2014. Id. ¶ 73. By letter dated October 10, 2014, Coldwell Banker notified counsel for Defendants that the Franchisees were in default of the orders of September 8 and 11, 2014 in the Supreme Court Action because the Franchisees had failed to report any transactions or make any payments to Coldwell Banker. Id. ¶ 84.

On or around December 2, 2014, the Supreme Court Action was resolved by a settlement among the plaintiffs and defendants in that action. Id. ¶ 89. As part of the settlement agreement, DeGrotta and Friedman agreed to relinquish their ownership interest, resign from the company, and pay $25,000 in damages to plaintiff. Id. ¶ 149. Soon after, Binder advised Coldwell Banker of the settlement. Id.

[12] Coldwell Banker was entitled to a 6% default rate for royalties, but in calculating the royalty rates, it continued a 2.25% non-default rate. T1 169:25-172:17.

Additionally, the account statements attached to the Termination Notice list closings for which Defendants had not paid fees to Coldwell Banker but for which Defendants had reported to Coldwell Banker. T1 72:1-74:3; Ex. P-35. Although Defendants had been ordered to report all future transactions to Coldwell Banker in the Supreme Court Action, they did not report transactions after September 8, 2014. Stipulated Facts ¶ 86; Exs. P-33 & P-34. Thus, closings conducted by Defendants subsequent to September 8, 2014, as well as any other unreported transactions are not reflected anywhere in the Termination Notice. For this reason, Plaintiff here seeks an accounting from Defendants. See Section III. B. As set forth infra, the Court will grant that relief.

61. The Termination Notice also accelerated the unpaid principal sum of $1,437,500 and all interest accrued under each of the Promissory Notes and demanded immediate payment thereof. Stipulated Facts ¶ 98; Ex. P-35.

62. None of the money demanded was ever paid by Defendants. T1 103:11-12, 178:13-17.

63. The Termination Notice reiterated Coldwell Banker's demands regarding collateral. Stipulated Facts ¶¶ 99-100; Ex. P-35. None of the collateral was ever given to Coldwell Banker. T1 104:2-4. According to Binder's own accounting of Bellmarc Group's finances, the Bellmarc defendants had $7,165,260 in assets as of December 31, 2014. Ex. D-81.

64. In the Termination Notice and afterwards, Coldwell Banker repeatedly demanded that the Franchisees cease using the Coldwell Banker Marks and discontinue identifying the Offices to the public as "Coldwell Banker®" affiliated establishments. Stipulated Facts ¶ 103; P-35. Defendants ultimately ceased using the Coldwell Banker Marks as of May 19, 2015 via a consent order. See ECF No. 35.[13]

### III. CONCLUSIONS OF LAW

#### A. Breach of Contract

65. A breach of contract claim requires proof of four elements by a preponderance of the evidence: "(1) a valid contract existed between plaintiff and defendant; (2) plaintiff performed its obligations under the contract; (3) defendant breached the contract; and (4) plaintiff was damaged as a result of the breach." Bonnieview Homeowners Ass'n v.

---

[13] Prior to the issuance of the consent order, the Court entered an injunction ordering Defendants to cease using the Coldwell Banker Mark and de-identify as an affiliate. ECF No. 17. Thereafter, Plaintiff believed that Defendants did not comply with the injunction and moved for contempt. ECF No. 21. In order to resolve the contempt motion, Defendants agreed to the consent order, requiring them to immediately comply with the Court's injunction and to complete de-identification immediately. See Stipulated Facts ¶ 105.

Woodmont Builders, LLC, 655 F. Supp. 2d 473, 509 (D.N.J. 2009) (quotation marks and citation omitted).[14]

66. Following a material breach, "the non-breaching party may treat the contract as terminated and refuse to render continued performance." Goldman S. Brunswick Partners v. Stern, 265 N.J. Super. 489, 494 (App. Div. 1993).

67. The Franchise Agreements together formed a valid, fully integrated contract between the parties.

68. Plaintiff proved that the Franchisees breached the Franchise Agreements by (1) failing to remit BMF contributions and Royalty Fee payments between January 8, 2014 and December 18, 2014; (2) failing to repay the Conversion Promissory Notes; and (3) failing to comply with the Security Agreements by refusing to convey the collateral to Coldwell Banker.

   a. The Franchise Agreements required the Franchisees to pay Coldwell Banker Royalty Fees of 2.5%, calculated from gross revenues at the time of closing and due immediately after closing. Ex. P-2 § 25.3.

   b. The Franchise Agreements required the Franchisees to pay a percentage of revenues into the BMF, due immediately after closing. Id. § 25.1.

   c. The Conversion Promissory Notes required repayment of the loan if the Franchisees were not in compliance with the Franchise Agreements. Exs. P-13, P-15.

   d. The Security Agreements provided Coldwell Banker with a lien on property owned by the Franchisees to be conveyed to Coldwell Banker in the event of a default of the Agreements by the Franchisees. Exs. P-16 to P-24.

---

[14] New Jersey law applies to the Franchise Agreements. See Ex. P-1 § 22.6.

    e.  Starting on January 8, 2014, the Franchisees stopped paying Royalty Fees and BMF contributions, which constituted a breach of the Franchise Agreement. T2 74:25-75:7.

    f.  The Franchisees also failed to repay the Conversion Promissory Notes after they stopped paying Royalty Fees and BMF contributions, which was in breach of the Franchise Agreements.

    g.  The Franchisees failed to convey property owned by Coldwell Banker and secured by the Security Agreement after the Franchise Agreements were terminated, which was a breach of the Franchise Agreements.

69. Because Binder executed and conveyed to Coldwell Banker a Guaranty of Payment and Performance of the obligations of the Franchisees under the Franchise Agreements, he is liable for this breach. Stipulated Facts ¶ 35.

70. Plaintiff proved that it performed its obligations under the Franchise Agreements.

    a.  When the Franchisees' defaulted on the Franchise Agreements by failing to remit Royalty Fees and BMF contributions, Coldwell Banker gave the Franchisees multiple opportunities to cure the default.

    b.  Coldwell Banker terminated the Franchise Agreements in accordance with the terms of the agreement.

    c.  The Franchisees were not entitled to any additional release of conversion payments after January 8, 2014, because they were in default of the Franchise Agreements.

71. Coldwell Banker did not otherwise breach any provision of the Franchise Agreements.

    a.  The Franchise Agreements did not require Coldwell Banker to adjust its rental system in order to accommodate Defendants.

    b. The Franchise Agreements did not require Coldwell Banker to reimburse the Franchisees for advertisement costs.

    c. The Franchise Agreements explicitly stated that Coldwell Banker could not make any guarantees regarding referrals that the Franchisees may receive.

72. Coldwell Banker proved that it suffered damages as a result of the Franchisees' breach.

    a. Defendants withheld at least $422,151.39 in Royalty Fees and BMF contributions due under the Franchise Agreements.

    b. Defendants never repaid the $1,437,000 loaned by Coldwell Bank as conversion funding.

    c. Defendants withheld collateral owed to Coldwell Bank upon default of the Franchise Agreement.

73. In accordance with the terms of the Franchise Agreement, Coldwell Banker is also entitled to liquidated damages of $1,640,769.33 as a result of a breach of the Franchise Agreements.

74. Furthermore, Plaintiff is entitled to reasonable attorneys' fees.

    a. The parties stipulated that Section 22.11 of the Franchise Agreements allowed Coldwell Banker to collect reasonable attorneys' fees and that this right to collect fees survived termination of the Franchise Agreements. Stipulated Facts ¶ 59; Ex. P-1 § 22.11.

    b. Moreover, the Conversion Promissory Notes and the Security Agreements provide that Plaintiff was entitled to attorneys' fees incurred to enforce the terms of those agreements. See Ex. P-13; Ex. P-16 § 6(g).

75. Plaintiff is also entitled to interest, calculated at 18% as set forth in the Franchise Agreements, from December 18, 2014, the date of the Termination Notice. Interest as of

the date of the trial is as follows: (a) $487,567.51 on royalties and BMF; (b) $1,895,021.15 on liquidated damages;[15] and (c) $1,660,253.42 on the conversion notes.[16]

76. In total, Plaintiff is entitled to $7,543,262.80 in damages as a result of the breach of contract.

77. Plaintiff is not entitled to an additional $7,165,260 (the value of the collateral under the Security Agreements), as such payment would be duplicative of other damages.[17]

**B. Accounting as to Defendants**

78. The exercise of the equitable jurisdiction to compel an account rests upon three grounds: (1) the existence of a fiduciary or trust relation; (2) the complicated nature or character of the account; and (3) the need for discovery. The existence of any of these three grounds is sufficient to compel an accounting. See Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 181 & n.4 (1981).

79. In 2014, the Franchisees began underreporting their sales to Coldwell Banker. As a result, the New York Supreme Court ordered that Defendants were to correctly report all transactions to Coldwell Banker. They failed to do so and have continued to fail to do so.

80. Information regarding sales made by the Franchisees is solely within the possession of Defendants and has not been disclosed during discovery.

81. Accordingly, Coldwell Banker is entitled to an accounting of all transactions.

---

[15] Defendants argue that "the Franchise Agreement does not specifically provide for interest to be calculated on liquidated damages." Def. Reply ¶ 39. But under Section 16.7.2 of the Franchise Agreement, liquidated damages were due at the termination of the Franchise Agreements, and under Section 11.2, interest runs at 18% for any payments more than ten days past due. Ex. P-1.

[16] Defendants contend that the maximum interest rate permitted under New Jersey Law is 16% per annum. Def. Reply ¶ 48. This limitation, provided by N.J.S.A. § 31:1-1(a), does not apply to debts between corporations. See N.J.S.A. § 31:1-1(e); N.J.S.A. § 31:1-6; see also Westdale Constr. Ltd. v. Liberty State Fin. Holdings Corp., 2010 U.S. Dist. LEXIS 32615 (D.N.J., April 1, 2010).

[17] For similar reasons, Plaintiff is not entitled to damages under its claim of conversion or unjust enrichment, as these damages would be duplicative of the damages received for breach of contract.

82. To the extent Plaintiff seeks additional fees as a result of this accounting, they may file a new and separate action and identify it as a related case.

**C. Lanham Act Violation as to Defendants**

83. To establish infringement under the Lanham Act, a plaintiff must show "that (1) the mark is valid and legally protectable, (2) it owns the mark, and (3) the defendant's use of the mark is likely to create confusing concerning the origin of goods or services." E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 191 (3d Cir. 2008).

84. The first two elements are established if the mark at issue is federally registered and has become incontestable. Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000).

85. When a franchisor terminates a franchisee's license to use the franchisor's mark, continued use by the franchise is a form of counterfeiting, and the franchisee is liable under 25 U.S.C. § 1117(c) for counterfeiting damages. Motel 6 Operating LP v. Hi Hotel Grp. LLC, 670 F. App'x 759 (3d Cir. 2016).

86. Pursuant to 15 U.S.C. § 1117(b), damages are mandatory for counterfeiting defendants. Under 15 U.S.C. § 1117(c)(1) and (2), where the use of the counterfeit mark is willful, a court can award up to $2,000,000 per counterfeit mark per type of good or services sold.

87. The amount of statutory damages to award is in the sound, and wide, discretion of the Court. Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d 532, 537 (D.N.J., 2008).

88. The Coldwell Banker Marks are registered on the principal register of the U.S. Patent and Trademark Office and are owned by Coldwell Banker, satisfying the first two elements of a trademark infringement claim.

89. Defendants continued to use the Coldwell Banker Marks between December 18, 2014 and May 19, 2015, when it entered a consent order.

90. As a result of Defendants' violation of the Lanham Act, an award in the amount of $50,000 is warranted.[18]

91. The Court declines to grant Plaintiff $1,640,769.33—an award equal to the amount of liquidated damages—as requested by Plaintiff, because the Court awards all other damages Plaintiff seeks, plus 18% interest and attorneys' fees. Based on the totality of circumstances, the Court is satisfied that $50,000 is therefore sufficient to address the harm Plaintiff suffered. Moreover, by Plaintiff's own admission, Defendants have ceased use of the Coldwell Banker Marks, and thus a higher figure is not necessary to deter Defendants from engaging in infringing conduct in the future. Cf. Chanel, Inc., 558 F. Supp. 2d at 538 (granting Lanham Act damages equal to amount of actual damages sought when Court declined to award actual damages and when defendant continued to engage in infringing conduct).

## IV. CONCLUSION

For the reasons stated above, judgment will be entered against Defendants in the amount of $7,593,262.80, plus reasonable attorneys' fees and costs. An appropriate Order will follow.

**Date: September 9, 2021**　　　　　　　　　　　　　　　　　*/s Madeline Cox Arleo*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**MADELINE COX ARLEO**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

---

[18] The continued use of the marks would also constitute a breach of the Franchise Agreements. However, since Plaintiff seeks damages only under the Lanham Act, the Court does not address these possible damages.